## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| NORTHWESTERN CORPORATION, | ) | C.A. No. 03-12872 (KJC) |
|  | ) |  |
| Reorganized Debtor. | ) | Re: D.I. 3575 |
|  | ) |  |

|  |  |  |
|---|---|---|
| MAGTEN ASSET MANAGEMENT CORP. and LAW DEBENTURE TRUST COMPANY OF NEW YORK, | ) ) ) ) |  |
|  | ) |  |
| Appellants/Movants, | ) |  |
|  | ) |  |
| v. | ) | Appeal No. 07-_____ |
|  | ) |  |
| NORTHWESTERN CORPORATION, | ) |  |
|  | ) |  |
| Appellee/Respondent. | ) |  |
|  | ) |  |

### BRIEF IN SUPPORT OF EMERGENCY MOTION OF MAGTEN ASSET MANAGEMENT CORPORATION AND LAW DEBENTURE TRUST COMPANY OF NEW YORK FOR (I) A STAY PENDING APPEAL OF ORDER IN AID OF EXECUTION OF PLAN OF REORGANIZATION AND (II) EXPEDITED APPEAL

Bonnie Steingart
Gary L. Kaplan
John W. Brewer
**FRIED, FRANK, HARRIS,**
**SHRIVER & JACOBSON LLP**
One New York Plaza
New York, NY 10004
Telephone: (212) 859-8000
Facsimile: (212) 859-4000

Dale R. Dubé (DE No. 2863)
Bonnie G. Fatell (DE No. 3809)
David W. Carickhoff, Jr. (DE No. 3715)
**BLANK ROME LLP**
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 425-6400
Facsimile: (302) 425-6464

*Counsel for Magten Asset Management*
*Corporation*

- and -

120087.01600/40167389v.1

John V. Snellings
Amanda Darwin
**NIXON PEABODY LLP**
100 Summer Street
Boston, MA  02110
Telephone: (617) 345-1000
Facsimile:  (617) 345-1300

Kathleen M. Miller (DE No. 2898)
**SMITH, KATZENSTEIN & FURLOW, LLP**
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE  19899
Telephone: (302) 652-8400
Facsimile:  (302) 652-8405

*Counsel for Law Debenture Trust Company of New York*

Dated:  February 23, 2007

(ii)

# TABLE OF CONTENTS

Page

SUMMARY OF ARGUMENT ................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND ........................................3

JURISDICTION AND VENUE ..........................................................................9

RELIEF REQUESTED ......................................................................................10

ARGUMENT ......................................................................................................11

1.   Claimants Will Likely Succeed on the Merits of their Appeal from the
     Order ........................................................................................................11

     A.   NorthWestern Cannot Substitute Cash in the Disputed Claims Reserve ............13

     B.   The Terms of the Plan Control and Trump Delaware Corporate Law, and the
          Bankruptcy Court's General Equitable Powers..................................................17

     C.   The Potential for a Merger was Squarely Presented Pre-Confirmation and
          NorthWestern Chose Not to Provide for it in the Plan ..........................................22

     D.   Judicial Estoppel Prevents NorthWestern from Exchanging the Shares in the
          Disputed Claims Reserve for Cash ........................................................................23

2.   Claimants Will Suffer Irreparable Harm if a Stay is Not Granted ...................................25

3.   Granting a Stay Will Not Substantially Injure Other Parties............................................28

4.   A Stay Pending Appeal Would Serve the Public Interest ................................................29

NO BOND IS NECESSARY .................................................................................30

EXPEDITED APPEAL .........................................................................................32

CONCLUSION .....................................................................................................33

i

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

In re Abbotts Dairies of Pa., Inc.,
    788 F.2d 143 (3d Cir. 1986) ....................................................................... 26

Almeroth v. Innovative Clinical Solutions Ltd. (In re Innovative Clinical
    Solutions, Ltd.),
    302 B.R. 136 (Bankr. D. Del. 2003) ............................................................ 14

In re Bankr. Appeal of Allegheny Health, Educ. & Research Found.,
    252 B.R. 309 (W.D. Pa. 1999) .................................................................... 10

BFP v. Resolution Trust Corp.,
    511 U.S. 531 (1994) .................................................................................... 18

Branchburg Plaza Assocs. v. Fesq (In re Fesq),
    153 F.3d 113 (3d Cir. 1998) ........................................................................ 20

In re Byrd,
    172 B.R. 970  (Bankr. W.D. Wash. 1994) ................................................... 30

In re Charterhouse, Inc.,
    84 B.R. 147 (Bankr. D. Minn. 1988) ............................................... 14, 15, 29

Citizens Nat'l Bank of Hammond (In re Turner),
    207 B.R. 373 (B.A.P. 2d Cir. 1997) ............................................................ 12

Consumers Realty & Dev. Co. v. Goetze (In re Consumers Realty & Dev.
    Co.),
    238 B.R. 418 (B.A.P. 8th Cir. 1999) ........................................................... 18

In re Cont'l Airlines, Inc.,
    91 F.3d 553 (3d Cir. 1996) .................................................................... 15, 29

Country Squire Assocs. of Carle Place, L.P. v. Rochester Cmty. Sav. Bank
    (In re Country Squire Assocs. of Carle Place, L.P.),
    203 B.R. 182 (B.A.P. 2d Cir. 1996) ...................................................... 26, 27

In re Del. & Hudson Ry. Co.,
    90 B.R. 90 (Bankr. D. Del. 1988) ............................................................... 10

In re Eddington Thread Mfg. Co.,
    189 B.R. 898 (E.D. Pa. 1995) .................................................................... 14

In re Edwards,
  228 B.R. 573 (Bankr. E.D. Pa. 1999) ................................................................. 10, 27

Evans v. Buchanan,
  435 F. Supp. 832 (D. Del. 1977) ...................................................................... 10, 12

Evans v. Buchanan,
  455 F. Supp. 705 (D. Del. 1978) ............................................................................ 10

In re Farrell Lines, Inc.,
  761 F.2d 796 (D.C. Cir. 1985) ............................................................................... 30

First Union Nat'l Bank v. Gibbons (In re Princeton-New York Investors,
    Inc.),
  219 B.R. 55 (D.N.J. 1998) ..................................................................................... 19

GECC v. Dial Bus. Forms, Inc. (In re Dial Bus. Forms, Inc.),
  341 F.3d 738 (8th Cir. 2003) .............................................................................. 27, 29

Goldstein v. Miller,
  488 F. Supp. 156 (D. Md. 1980), aff'd, 649 F.2d 863, aff'd sub nom.
  Overbook Egg Nog Corp. v. Miller, 649 F.2d 864 (4th Cir. 1981) ...................... 12

In re Granada Wines, Inc.,
  26 B.R. 131 (Bankr. D. Mass. 1983) ...................................................................... 17

In re Great Barrington Fair & Amusement, Inc.
  53 B.R. 237 (Bankr. D. Mass. 1985) ...................................................................... 27

Hawley Fuel Coalmart, Inc. v. Hawley Fuel Coal, Inc. (In re AOV Indus., Inc.,
  792 F.2d 1140 (D.C. Cir. 1986)) ........................................................................ 16, 17

Henthorn v. GMAC Mortgage Corp. (In re Henthorn),
  299 B.R. 351 (E.D. Pa. 2003), aff'd 127 Fed. App'x. 15 (3d Cir. 1985) ............... 22

In re Highway Truck Drivers & Helpers Local Union #107,
  888 F.2d 293 (3d Cir. 1989) ................................................................................... 10

Hillis Motors, Inc. v. Haw. Auto. Dealers' Ass'n,
  997 F.2d 581 (9th Cir. 1993) .............................................................................. 27, 29

Hirschfeld v. Bd. of Elections in the City of New York,
  984 F.2d 35 (2d Cir. 1993) ..................................................................................... 12

In re H&L Developers Inc.
  178 B.R. 77  (Bankr. E.D. Pa. 1994) ...................................................................... 14

120087.01600/40167389v.1

John Doe Agency v. John Doe Corp.,
    488 U.S. 1306 (1989) ......................................................................................... 26

Jones v. Keene Corp.,
    933 F.2d 209 (3d. Cir. 1991) ............................................................................ 18

Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.,
    337 F.3d 314 (3d. Cir. 2003), *cert. denied*, 541 U.S. 1043 (2004) ................................ 23

Licensing by Paolo, Inc. v. Sinatra (In re Gucci),
    105 F.3d 837 (2d Cir. 1997) ............................................................................ 11

MFS Telecom, Inc. v. Motorola, Inc. (In re Conxus Commc'ns), Inc.),
    262 B.R. 893 (D. Del. 2001) ........................................................................... 21

Montrose Med. Group Participating Sav. Plan v. Bulger,
    243 F.3d 773 (3d Cir. 2001) ............................................................................ 23

Morgan v. Polaroid Corp. (In re Polaroid Corp.),
    Civil Action No. 02-1353, 2004 U.S. Dist. LEXIS 1917
    (D. Del. Feb. 9, 2004) ...................................................................................... 11

In re Morristown & Erie R.R. Co.,
    885 F.2d 98 (3d Cir. 1989) .............................................................................. 21

In re Northampton Corp.,
    39 B.R. 955 (Bankr. E.D. Pa. 1984), *aff'd* 59 B.R. 963 (E.D. Pa. 1984) ...................... 15

O'Bryan v. Estelle,
    691 F.2d 706  (5th Cir. 1982) ......................................................................... 12

Ocasek v. Manville Corp. Asbestos Disease Comp. Fund,
    956 F.2d 152  (7th Cir. 1992) .......................................................................... 18

Official Comm. of Unsecured Creditors v. Aust (In re Network Access Solutions
    Corp.),
    330 B.R. 67 (Bankr. D. Del. 2005) .................................................................. 23

Official Comm. of Unsecured Creditors of Columbia Gas Transmission
    Corp. v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys.),
    Civil Action No. 92-127, 1992 U.S. Dist. LEXIS 3253
    (D. Del. Mar. 10, 1992) ................................................................................... 11

Official Comm. Of Unsecured Creditors v. DVI Bus. Credit (In re DVI, Inc.),
    326 B.R. 301 (Bankr. D. Del. 2005) ........................................................... 23, 24

(iv)

Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of Del., Inc v. Fleet
    Retail Fin. Group (In re Hechinger Inv. Co. of Del.)
    274 B.R. 71 (D. Del. 2002).................................................................................18

In re Penn. Cent. Trans. Co.,
    42 B.R. 657 (E.D. Pa. 1984), aff'd 771 F.2d (3d Cir. 1985)) .............................29

Pension Benefit Guar. Corp. v. Sharon Steel Corp. (In re Sharon Steel Corp.),
    159 B.R. 730 (Bankr. W.D. Pa. 1993)................................................................10

Pickett v. Integrated Health Servs., Inc. (In re Integrated Health Servs., Inc.),
    304 B.R. 101 (Bankr. D. Del. 2004)...................................................................25

Providence Journal Co. v. FBI,
    595 F.2d 889 (1st Cir. 1979)..............................................................................26

In re Public Serv. Co. of N.H.,
    116 B.R. 347 (Bankr. D.N.H. 1990)..............................................................11, 27

Republic of the Phil. v. Westinghouse Elec. Corp.,
    949 F.2d 653 (3d Cir. 1991) ...............................................................................10

In re Roach,
    824 F.2d 1370 (3d. Cir. 1987) .......................................................................18, 19

Ryan Operations G.P. v. Santiam-Midwest Lumber Co.,
    81 F.3d 355 (3d. Cir. 1996) ...........................................................................23, 24

Silverman v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA (In re Suprema
    Specialties, Inc.),
    330 B.R. 93 (S.D.N.Y. 2005) .............................................................................31

Southern Ry. Co. v. Johnson Bronze Co.,
    758 F.2d 137 (3d Cir. 1985) ...........................................................................21, 22

In re Sphere Holding Corp.,
    162 B.R. 639 (E.D.N.Y. 1994) ...........................................................................30

T. Copeland and Sons v. SML Int'l, Inc (In re SLM Int'l, Inc.),
    248 B.R. 240 (D. Del. 2000)...............................................................................24

Term Loan Holder Comm. v. Ozer Group, LLC (In re Caldor Corp.),
    303 F.3d 161  (2d Cir. 2002) ..........................................................................20, 21

In re Tillotson,
    266 B.R. 565 (Bankr. W.D.N.Y. 2001) ...............................................................15

(v)

In re United Merchants & Mfrs., Inc.,
    138 B.R. 426  (D. Del. 1992)................................................................................30

United States v. Lincoln Sav. Bank (In re Commercial Millwright Serv.
    Corp.),
    245 B.R. 603 (N.D. Iowa 2000) ......................................................................29

U.S. Brass Corp. v. Travelers Ins. Group, Inc. (In re U.S. Brass Corp.),
    301 F.3d 296 (5th Cir. 2002) ....................................................................14, 15

120087.01600/40167389v.1

## Federal Statutes

11 U.S.C. § 105(a) ........................................................................................... *passim*

11 U.S.C. § 1123(a)(4) .................................................................................... *passim*

11 U.S.C. § 1127(b) ......................................................................................... *passim*

11 U.S.C. §1142(b) .......................................................................................... *passim*

28 U.S.C. § 158 ....................................................................................................... 9

28 U.S.C. § 1334 .................................................................................................... 9

28 U.S.C. § 1408 .................................................................................................... 9

28 U.S.C. § 1409 .................................................................................................... 9

28 U.S.C. § 2075 .............................................................................................. 20, 21

## Federal Rules

Fed. R. Bankr. P. 3020(d) ........................................................................... 13, 19, 20

Fed. R. Bankr. P. 8005 .................................................................................. *passim*

## Miscellaneous

Collier on Bankruptcy,
    P 1127.04 (15th Ed. Rev. 2006) ...................................................................... 15

Pursuant to Rule 8005 of the Federal Rules of Bankruptcy Procedure and Rule 62 of the Federal Rules of Civil Procedure, Magten Asset Management Corporation ("Magten"), and Law Debenture Trust Company of New York ("Law Debenture") in its capacity as Indenture Trustee for the QUIPS (and, together with Magten, the "Claimants"), hereby submit this Brief in Support of their Emergency Motion (the "Motion") seeking (i) Stay of the Order In Aid of Execution of Confirmed Plan of Reorganization (the "Cash-Out Order")[1] pending their appeal from that order and (ii) an expedited appeal.

## SUMMARY OF ARGUMENT

1.      By its Cash-Out Order, the Bankruptcy Court has materially altered a substantially consummated chapter 11 plan and has deprived Claimants of the common stock to which they are entitled.  The Cash-Out Order directs La Salle Bank, the transfer agent (the "Transfer Agent") holding issued and outstanding shares of Reorganized NorthWestern[2], allocated to the Disputed Claims Reserve, to invest the cash to be received upon tender of the shares in the Disputed Claims Reserve upon consummation of an impending merger between NorthWestern and Babcock & Brown Infrastructure, Ltd. ("BBI") (the "BBI Transaction"), in accordance with section 345 of the Bankruptcy Code.  See Dubé Decl. Ex. A, p. 1.

2.      While at first glance, the Cash-Out Order appears to resolve an administrative issue, actually entry of the Order impermissibly amends NorthWestern's substantially consummated chapter 11 Plan, which does not provide or allow for cash to be substituted for shares in the Disputed Claims Reserve.  It is black letter law that once a chapter 11 plan is

---

[1]      See Declaration of Dale R. Dubé dated February 22, 2007 filed contemporaneously herewith (the "Dubé Decl."), Ex. A.

[2]      All capitalized terms not expressly defined herein have the meanings ascribed to them in Reorganized NorthWestern Corporation's ("NorthWestern") Second Amended and Restated Plan of Reorganization (the "Plan") Under Chapter 11 of the Bankruptcy Code.

120087.01600/40167389v.1

substantially consummated, it cannot be modified. And, it is the law of the case that NorthWestern's Plan has been substantially consummated: both the Bankruptcy Court and this Court have held that the Plan has been substantially consummated. Moreover, NorthWestern's current position that the Plan may be altered in this manner is 180 degrees inconsistent with the position it took before this Court on previous appeals – arguing then that because the Plan was substantially consummated, Magten and the Non-Accepting QUIPS Holders (whose interests are represented by Law Debenture) could not receive any consideration other than stock in satisfaction of their claims. The Bankruptcy Court erred by not judicially estopping NorthWestern from arguing (because now it suits them) that the shares in the Disputed Claims Reserve can be cashed-out. A stay of the Cash-Out Order is necessary to afford this Court the opportunity to review the Bankruptcy Court's reversible errors.

3.    The terms of the Plan that relate to this Motion are simple and are not in dispute. Once their claims are Allowed, Claimants, as the holders of certain securities called QUIPS (Qualified Income Preferred Securities), are entitled to their pro rata share of New Common Stock of NorthWestern. There is no provision in the Plan allowing for substitution of cash in lieu of stock in the Disputed Claims Reserve. The Cash-Out Order, however, modifies the Plan so that once their claims are Allowed, the Claimants will receive cash not stock.

4.    The potential irreparable harm to Claimants is real and certain if a stay pending appeal is not granted. NorthWestern is actively seeking regulatory approval[3] to consummate the BBI Transaction, whereby the stock in the Disputed Claims Reserve will be cashed-out. It

---

[3]    In seeking a stay of the Cash-Out Order pending appeal, Claimants are not requesting that the Court prevent NorthWestern from continuing to go forward with the regulatory approval process. Claimants seek only a modest stay of the Order pending appeal so that once NorthWestern obtains necessary regulatory approval, it will be delayed from consummating the Merger Agreement, which would require the cashing-out of NorthWestern common stock in the Disputed Claims Reserve, until the merits of the appeal are decided.

2

appears that NorthWestern might be in a position to consummate the transaction as early as the middle of March. Claimants seek an expedited briefing schedule that would allow the appeal to be fully briefed, argued, and ready for decision in March 2007, around the time that the last remaining regulatory agency to approve the Merger Agreement is beginning its approval hearings[1]. The stay will only potentially delay NorthWestern to the extent this Court needs additional time to consider the issues before ruling on the merits. Unless a stay of the Cash-Out Order is granted, Claimants face a substantial risk that once the BBI Transaction is approved, and the shares in the Disputed Claims Reserve are surrendered and converted to cash, they will be without any recourse, as any subsequent appeal of the Cash-Out Order will be rendered moot. A stay of the Cash-Out Order, therefore, is necessary to preserve the status quo pending appeal.

5.      Magten and Law Debenture as indenture trustee for the QUIPS are the only parties with disputed claims having an entitlement to the shares in the Disputed Claims Reserve. If the merger is consummated during the pendency of their appeal, Magten and Law Debenture will also be irreparably deprived of their right as creditors under the Bankruptcy Code to receive the same treatment as other similarly situated creditors. Claimants with Allowed claims in the same class as Magten and Law Debenture already received their pro rata shares of New Common Stock. However, if the stay is not ordered and the merger is consummated, Magten and Law Debenture will be forced to receive a different remedy without any appellate review. Thus, a stay pending appeal is necessary to preserve the status quo to provide for meaningful appellate review of what are clear errors made by the Bankruptcy Court in entering the Cash-Out Order.

## FACTUAL AND PROCEDURAL BACKGROUND

6.      NorthWestern is a publicly traded corporation that was incorporated in 1923. NorthWestern, together with its subsidiaries, comprise one of the largest providers of electricity

---

[1]      See Dubé Decl. Ex. B, p. 3; See also Dubé Decl. Ex. C, p. 11 (lines 14-17)

120087.01600/40167389v.1

and natural gas in the upper Midwest and Northwest regions of the United States, serving approximately 608,000 customers throughout Montana, South Dakota and Nebraska.

7.    Magten holds approximately 40% of the QUIPS issued by Montana Capital I (the "Trust"). Law Debenture is the Indenture Trustee for the QUIPS. The Trust is a business trust established pursuant to the Delaware Business Trust Act. The Trust was established by the Montana Power Company ("Montana Power"), predecessor in interest to Clark Fork & Blackfoot LLC ("Clark Fork") (f/k/a NorthWestern Energy, LLC), as a financing vehicle. The only assets of the Trust are the 8.4% Junior Subordinated Debentures due 2036 issued by Montana Power.

8.    On September 29, 2000, Montana Power entered into a unit purchase agreement with NorthWestern, pursuant to which NorthWestern agreed to purchase the Montana Utility Assets. In order to facilitate the assets sale to NorthWestern, Montana Power created a subsidiary, Montana Power Company LLC.

9.    On November 15, 2002, NorthWestern orchestrated the transfer of substantially all of the utility assets of its directly owned subsidiary, Clark Fork, to NorthWestern for inadequate consideration (the "Transfer"). Though the Clark Fork assets had a value in excess of $1.4 billion, the total consideration received for the Transfer was the assumption of approximately $700 million of liabilities by NorthWestern. (This discrepancy in value has not been disputed in any filings by NorthWestern). As a result of this Transfer, Clark Fork was rendered insolvent.

10.    On September 14, 2003, NorthWestern filed a voluntary petition for relief under chapter 11 of title 11 of the Bankruptcy Code.

11.    On April 16, 2004, Claimants commenced an adversary proceeding in the Bankruptcy Court based on NorthWestern's fraudulent transfer of substantially all of the utility

4

assets of Clark Fork.  See Dubé Decl. Ex. D.

12.    On August 19, 2004, NorthWestern filed its Plan and the Second Amended and Restated Disclosure Statement (the "Disclosure Statement").  See Dubé Decl. Ex. E.  On August 31, 2004, NorthWestern filed its revised Plan and Disclosure Statement, see Dubé Decl. Ex. F and G, and on September 2, 2004, the Bankruptcy Court entered an order approving the Disclosure Statement.  See Dubé Decl. Ex. H.

13.    Pursuant to the Plan, Magten and the Non-Accepting QUIPS Holders (whose interests are represented by Law Debenture), if successful, would receive an Allowed Class 9 Claim of New Common Stock to be satisfied from the Disputed Claims Reserve.  See Dubé Decl. Ex. F, pp. 36-37, § 4.8(b)(ii).  Specifically, the Plan provides, in relevant part, that Class 9 creditors "shall receive in full satisfaction, settlement, release, extinguishment and discharge … its Pro Rata Share of:  (a) 32,660,000 shares of New Common Stock … plus (b) the 505,591 shares of New Common Stock allocated to Class 8(b) if Class 8(b), as a class, votes to reject the Plan."  See Dubé Decl. Ex. F, pp. 40, § 4.9(c)(i).

14.    On October 19, 2004, the Bankruptcy Court entered an order confirming the Plan (the "Confirmation Order").  See Dubé Decl. Ex. I.  The Confirmation Order required NorthWestern to "establish an initial reserve of 13.5% of New Common Stock allocated to Class 7 and Class 9 for the Disputed Claims Reserve . . . pursuant to Section 7.5 of the Plan."[5]  See Dubé Decl. Ex. I, p. 80-81.

15.    On November 1, 2004, pursuant to section 7.5 of the Plan providing that "[i]n lieu of estimating, fixing or liquidating the amount of any Disputed Claim . . . such amount may be

---

[5]    The 13.5% reserve proposed by NorthWestern was predicated on representation that 13.5% of the stock was an amount equal to the relevant percentage of Distributions to which the holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims in the amount of such Disputed Claim or such lesser amount as required by Final Order, as required by Section 7.5 of the Plan.

120087.01600/40167389v.1

fixed *by an agreement in writing by and between the Debtor and the holder of a Disputed Claim*". (see Dubé Decl. Ex. F, p. 59 (emphasis added)), NorthWestern and the Indenture Trustee filed the QUIPS Stipulation (the "QUIPS Stipulation") with the Bankruptcy Court. See Dubé Decl. Ex. J. Pursuant to the QUIPS Stipulation, NorthWestern agreed to set aside a portion of the Disputed Claims Reserve "solely to satisfy in full a $25 million Class 9 claim of the QUIPS Litigation Claims holders" (the "QUIPS Claims Reserve") and set forth the rights of the QUIPS holders with respect to their litigation claims (the "QUIPS Litigation Claims") to recover on account of an Allowed Claim in excess of that amount. See Dubé Decl. Ex. J, pp. 2-3.

16.    NorthWestern emerged from bankruptcy on November 1, 2004, and the Plan became effective (the "Effective Date"). See Dubé Decl. Ex. K. A notice of substantial consummation of the Plan was filed on December 29, 2004. See Dubé Decl. Ex. L. It is law of the case that NorthWestern's Plan has become effective and has been substantially completed.

17.    Pursuant to a settlement agreement (the "Settlement Agreement"), dated as of January 27, 2005, Magten, Law Debenture, on behalf of the QUIPS holders, and NorthWestern agreed to a compromise and settle at a Plan value of approximately $25.5 million, or approximately a 51% recovery based on the face amount of the QUIPS' $50 million Class 9 Claim (not including accrued interest, fees and expenses), rather than the approximately 63% they are entitled to under the Plan in exchange for the cessation of litigation between the Parties. See Dubé Decl. Ex. M, ¶ 21.

18.    After the Settlement Agreement was negotiated and executed, presented to the Bankruptcy Court and made public through NorthWestern's press release, on February 16, 2005, NorthWestern advised Magten and Law Debenture by letter that it would not honor the terms of the Settlement Agreement. See Dubé Decl. Ex. N, p. 1.

6

19.    At the direction of the Bankruptcy Court, Claimants filed a Rule 9019 motion (the "9019 Motion") seeking approval of the Settlement Agreement.  See Dubé Decl. Ex. M. Subsequently, NorthWestern, the Plan Committee and the ad hoc committee of class 7 debtholders filed objections to the 9019 Motion.  The primary basis of the objections was that the Settlement violated the Plan insofar as it provided to the holders of the QUIPS a recovery under both Option 1 and Option 2, when the Plan required holders of the QUIPS to choose between such options.  Moreover, NorthWestern, in its objection (the "9019 Objection"), stated that "in negotiations with respect to the proposed settlement it was made very clear to both Magten and Law Debenture that NorthWestern *could not utilize cash to resolve Magten's and Law Debenture's claims.*"  See Dubé Decl. Ex. O, ¶ 65 (emphasis added).

20.    On March 10, the Bankruptcy Court entered an order (the "9019 Order"), denying the 9019 Motion, finding that "a plan amendment is not legally available because the Plan has been substantially consummated [since] [a] confirmed plan may be modified or amended after confirmation, but only before substantial consummation has taken place."  See Dubé Decl. Ex. N. p. 5.

21.    Following the Bankruptcy Court's denial of the 9019 Motion, Claimants timely filed an appeal (the "9019 Appeal").  See Dubé Decl. Ex. P.  On appeal, this Court affirmed the Bankruptcy Court's ruling, holding that an amendment to the Plan would be necessary to implement the settlement, but that such an amendment was not feasible, as the Plan had been substantially consummated.  See Dubé Decl. Ex. Q, p. 7.

22.    On September 29, 2005, the Plan Committee filed a Motion In Aid of Consummation and Implementation of the Plan for an Order Authorizing and Directing NorthWestern to Distribute Surplus Distributions (the "Surplus Distribution Motion").  See Dubé

Decl. Ex. R. Pursuant to the Surplus Distribution Motion, the Plan Committee sought an order authorizing and directing NorthWestern to designate certain shares in the Disputed Claims Reserve as surplus distributions and to distribute such shares to holders of Allowed Claims under Section 7.7 of the Plan. See Dubé Decl. Ex. R, pp. 5-6.

23.    On February 2, 2006, the Bankruptcy Court denied the Surplus Distribution Motion (the "Order Denying the Surplus Distribution Motion") on the grounds that Section 7.7 of the Plan and the QUIPS Claims Reserve Stipulation precluded any distribution from the Disputed Claims Reserve until the disputed claims of Magten and Law Debenture with respect to the QUIPS litigation were resolved. See Dubé Decl. Ex. S, p. 3. In rendering its decision, the Bankruptcy Court correctly concluded that "[t]he [Surplus Distribution] Motion was premature in view of the litigation surrounding the unresolved and disputed claims of Magten . . . and Law Debenture . . . ." Id. On March 9, 2006, the Plan Committee filed a Notice of Appeal of the Order Denying the Surplus Distribution Motion in the District Court. See Dubé Decl. Ex. T. Briefing of the Plan Committee Appeal has been completed, however, a decision has not yet issued from the Court.

24.    In a Form 8-K issued by NorthWestern on April 26, 2006, NorthWestern announced that it had signed a definitive agreement (the "Merger Agreement") to be acquired by BBI for $37 per share of common stock in an all cash transaction that values NorthWestern at approximately $2.2 billion. See Dubé Decl. Ex. U. Pursuant to section 2.01(i) of the Merger Agreement, each share of common stock in the Disputed Claims Reserve will be converted into $37 in cash – the value of the merger consideration. See Dubé Decl. Ex. V, ¶ 10. NorthWestern's Plan, however, does not provide for a cash-out of the shares in the Disputed Claims Reserve.

8

25.     On December 6, 2006, NorthWestern filed its Cash-Out Motion pursuant to 11 U.S.C. §§ 105(a) and 1142(b) before the Bankruptcy Court, seeking entry of an "Order In Aid of Execution of Confirmed Plan Of Reorganization, ... directing the Transfer Agent holding issued and outstanding shares of the Reorganized NorthWestern allocated to the Disputed Claims Reserve, upon tender of such shares in exchange for cash in accordance with the terms of an approved Merger Agreement, to invest any cash received in such exchange in accordance with Section 345 of the Bankruptcy Code." See Dubé Decl. Ex. V, p. 1.

26.     On January 15, 2007, Claimants filed an objection to NorthWestern's Cash-Out Motion. See Dubé Decl. Ex. W. On February 1, 2007, the Bankruptcy Court held a hearing on the Cash-Out Motion, and granted the motion. See Dubé Decl. Ex. C.

27.     On February 2, 2007, the Bankruptcy Court entered the Cash-Out Order that is the subject of this Motion. See Dubé Decl. Ex. A.

28.     On February 9, 2007, Claimants filed with the Bankruptcy Court an Emergency Motion (the "Emergency Motion") for a Stay Pending Appeal of the Cash-Out Order. See Dubé Decl. Ex. X. On February 20, 2007, the Bankruptcy Court held a hearing on the Emergency Motion and denied Claimants' Emergency Motion. See Dubé Decl. Ex. Y.

29.     On February 12, 2007, Claimants filed a notice of appeal of the Cash-Out Order in the Bankruptcy Court. See Dubé Decl. Ex. Z.

## JURISDICTION AND VENUE

30.     The Court has jurisdiction over this matter as a core proceeding under 28 U.S.C. §§1334 and 158. The relief requested herein is predicated on Rule 8005 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). Venue in this district is proper pursuant to 28 U.S.C. §§1408 and 1409.

9

**RELIEF REQUESTED**

31.    Bankruptcy Rule 8005 empowers the Court to stay any judgment or order pending appeal. "[A] stay may be appropriate in a case where the threat of irreparable injury to the applicant is immediate and substantial, the appeal raises serious and difficult questions of law in an area where the law is somewhat unclear and the interests of the other parties and the public are not harmed substantially." Evans v. Buchanan, 435 F. Supp. 832, 844 (D. Del. 1977).

32.    The Third Circuit has recognized that "a myriad of circumstances can occur that would necessitate the grant of a stay pending appeal in order to preserve a party's position." In re Highway Truck Drivers & Helpers Local Union #107, 888 F.2d 293, 298 (3d Cir. 1989).

33.    To obtain a stay pending appeal, the Court must consider the following well known four factors: (i) whether the moving party has a strong likelihood of success on the merits of the appeal; (ii) whether the movant will be irreparably harmed absent a stay; (iii) whether the issuance of the stay will substantially injure the other parties interested in the proceeding; and (iv) where the public interest lies. Republic of the Phil. v. Westinghouse Elec. Corp., 949 F.2d 653, 658 (3d Cir. 1991); see also In re Del. & Hudson Ry. Co., 90 B.R. 90, 91 (Bankr. D. Del. 1988). The analysis contemplates "individualized judgments in each case," id., such that no single factor is outcome determinative. In re Bankr. Appeal of Allegheny Health, Educ. & Research Found., 252 B.R. 309, 321 (W.D. Pa. 1999); see also Evans v. Buchanan, 455 F. Supp. 705, 708 (D. Del. 1978); In re Edwards, 228 B.R. 573 (Bankr. E.D. Pa. 1999) (balancing all factors in making the determination whether to grant a stay); Pension Benefit Guar. Corp. v. Sharon Steel Corp. (In re Sharon Steel Corp.), 159 B.R. 730, 733 (Bankr. W.D. Pa. 1993) (finding that the court can balance the factors "in light of the overall circumstances of the case").

34.    There is strong support for the proposition that courts should give serious consideration to motions seeking a preservation of the status quo pending appeal in the bankruptcy context.  See, e.g., Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 105 F.3d 837 (2d Cir. 1997), where the Second Circuit expressed concern that the district court's denial of a stay request effectively denied meaningful review on appeal and cautioned:

> On this motion to dismiss an appeal involving a bankruptcy sale, we write to alert district judges to a major and perhaps unappreciated significance of their action, after denying a stay pending appeal, in denying even a one-day stay to permit a party to seek a stay pending appeal from the Court of Appeals.

The Second Circuit added that

> where an appellant timely moves to stay a judicially authorized sale, a district court's denial of that motion will similarly limit the issues on appeal. Although an appellant's challenge to a sale authorization might raise meritorious arguments, a district court's denial of a requested stay has the effect of precluding this court from reviewing those issues, other than the good faith of the purchaser, if the sale has closed in the interim. *It becomes important for district judges to appreciate the special consequences of denying a stay of a bankruptcy sale, even a very brief stay to permit this Court time to consider whether a stay pending appeal is warranted.*

Id. at 840 (emphasis added).

## ARGUMENT

### 1.    Claimants Will Likely Succeed on the Merits of their Appeal from the Order

35.    The first prong of the standard – a likelihood of success on the merits – requires the movant to have a "'substantial case,' or a strong case on appeal." Official Comm. of Unsecured Creditors of Columbia Gas Transmission Corp. v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys.), Civil Action No. 92-127, 1992 U.S. Dist. LEXIS 3253 at *4 (D. Del. Mar. 10, 1992) (citation omitted) (quoting In re Public Serv. Co. of N.H., 116 Bankr. 347, 349 (Bankr. D.N.H. 1990)); Morgan v. Polaroid Corp. (In re Polaroid Corp.), Civil Action No. 02-1353, 2004 U.S. Dist. LEXIS 1917 at *4 (D. Del. Feb. 9, 2004). The "likelihood-of-success" standard,

11

however, does not require that the court have "serious doubts concerning the correctness of [the] decision in order to grant a stay pending appeal." Goldstein v. Miller, 488 F. Supp. 156, 172 (D. Md. 1980), aff'd, 649 F.2d 863, aff'd sub. nom., Overbrook Egg Nog Corp. v. Miller, 649 F.2d 864 (4th Cir. 1981). See also O'Bryan v. Estelle, 691 F.2d 706, 708 (5th Cir. 1982) (movant need not always show probability of success; substantial case on merits and serious legal question, coupled with balance of equities, weighs heavily in favor of granting stay). This prong merely reflects a court's "intent to restrict appellate review to those parties with colorable claims while at the same time conserving judicial resources by eliminating frivolous appeals." See Citizens Nat'l Bank of Hammond (In re Turner), 207 B.R. 373, 376-77 (B.A.P. 2d Cir. 1997) (citing Hirschfeld v. Bd. of Elections in the City of New York, 984 F.2d 35 (2d Cir. 1993)). Regarding the likelihood of success prong, the District Court in Evans v. Buchanan explained that

> [i]n a case where the movant will suffer irreparable injury in the absence of a stay, consideration of the merits of the movant's appeal permits an evaluation of whether that injury is likely to occur in any event. It seems illogical, however, to require that the court in effect conclude that its original decision in the matter was wrong before a stay can be issued.

435 F. Supp. 832, 844 (D. Del. 1977).

36.    Claimants will likely succeed on the merits of their appeal because:

(i)    the proposed cash-out of the Disputed Claims Reserve (which the Bankruptcy Court endorsed by entering an order directing the Transfer Agent to invest in said cash upon tendering the stock in the Disputed Claims Reserve) violates the Bankruptcy Code. Specially, the proposed cash-out violates sections 1127(b) and 1123(a)(4) of the Bankruptcy Code.

(ii)    the terms of the plan that was substantially consummated control as federal statutory law and trump Delaware Corporate Law and the Bankruptcy Court's general equitable powers. There is also no authority or discretion for the Court to authorize the cash-out of shares under

12

sections 105(a) and 1142(b) of the Bankruptcy Code and Rule 3020 of the Federal Rules of Bankruptcy Procedure.

(iii)    the potential for a merger was squarely presented pre-confirmation and NorthWestern determined not to provide for it in the Plan; and

(iv)    judicial estoppel precludes NorthWestern from arguing that it can exchange the shares in the Disputed Claims Reserve for cash.

**A.    NorthWestern Cannot Substitute Cash in the Disputed Claims Reserve**

1.    The Plan May Not Be Modified Because It Has Been Substantially Consummated

37.    Section 4.9(c) of the Plan provides the following treatment for holders of unsecured claims, including Claimants:

> On the Effective Date, or as soon thereafter as practicable, each holder of an Allowed General Unsecured Claims . . . shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim its Pro Rata Share of: (i) 32,660,000 shares of New Common Stock (such 32,660,000 shares representing 92% of the New Common Stock issued and outstanding on the Effective Date prior to any dilution resulting from shares of New Common Stock issued pursuant to the New Incentive Plan and exercise of the Warrants), plus (ii) the 505,591 shares of New Common Stock allocated to Class 8(b) if Class 8(b) as a class, votes to reject the Plan.

38.    In addition, Section 7.6 of the Plan also provides that, when a Disputed Claim becomes an Allowed Claim, such Distributions shall be made in accordance with the Plan based upon the Distributions that would have been made to such holder under this Plan if the Disputed Claim had been an Allowed Claim on or prior to the Effective Date.

39.    By permitting the substitution of cash in the Disputed Claims Reserve for the stock, NorthWestern is modifying section 4.9 of the Plan and section 7.6 of the Plan to provide that while all other holders of Class 9 Claims will have received their pro rata share of New

13

Common Stock, Claimants will receive cash. This directly contravenes section 4.9(a) of the Plan and section 7.6 of the Plan and is a material modification of a Plan that has been substantially consummated.

40.    Section 1127(b) of the Bankruptcy Code provides, in relevant part, that:

> The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan....[6]

11 U.S.C. § 1127(b).

41.    Courts have uniformly interpreted section 1127(b) as imposing a bar to modification of a chapter 11 plan once substantial consummation of the plan has occurred. See U.S. Brass Corp. v. Travelers Ins. Group, Inc. (In re U.S. Brass Corp.), 301 F.3d 296, 307 (5th Cir. 2002) (holding that a modification of a plan is prohibited once substantial consummation has occurred); In re H&L Developers Inc. 178 B.R. 77, 82 (Bankr. E.D. Pa. 1994) (concluding that since the confirmed plan was substantially consummated pursuant to section 1101(2), a modification would not be permitted under section 1127(b)); Almeroth v. Innovative Clinical Solutions Ltd. (In re Innovative Clinical Solutions, Ltd.), 302 B.R. 136, 144 (Bankr. D. Del. 2003) (finding that 1127(b) is the sole means for modifying a confirmed plan and that the plan could not be modified because it had been substantially consummated); In re Eddington Thread Mfg. Co., 189 B.R. 898, 904 (E.D. Pa. 1995) (stating a plan may be modified after its confirmation only if substantial consummation has not yet occurred); In re Charterhouse, Inc., 84 B.R. 147, 151 (Bankr. D. Minn. 1988) (noting that section 1127(b) operates to prohibit

---

[6]    Substantial consummation, as defined in section 1101(2) means: (A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of the distribution under the plan. 11 U.S.C. §1101(2).

14

modification once substantial consummation has occurred); 7 <u>Collier on Bankruptcy</u>, P 1127.04 (15th Ed. Rev. 2006) (explaining that a chapter 11 plan may not be modified after substantial consummation). Specifically, the Third Circuit has stated that section 1127(b) "dramatically curtails the power of a bankruptcy court to modify a plan of reorganization after its confirmation and 'substantial consummation.'" <u>In re Cont'l Airlines, Inc.</u>, 91 F.3d 553, 570 (3d Cir. 1996). It is irrelevant whether the plan modification sought is an explicit, direct modification of the plan, or whether it is to be effectuated through a purported post-confirmation transaction. <u>See</u> <u>In re U.S. Brass Corp.</u>, 301 F.3d at 307-08 (concluding that a proposed settlement agreement would impermissibly modify a plan in contravention of the Bankruptcy Code). Accordingly, any relief sought that in fact modifies a confirmed plan or produces a result at odds with specific provisions of a plan is subject to the bar imposed by Section 1127(b). <u>See</u> <u>In re Tillotson</u>, 266 B.R. 565, 571-72 (Bankr. W.D.N.Y. 2001); <u>In re Northampton Corp.</u>, 39 B.R. 955, 956 (Bankr. E.D. Pa. 1984), <em>aff'd</em> 59 B.R. 963 (E.D. Pa. 1984). <u>See also</u> Dubé Decl. Ex. Q, p. 7 (wherein this Court, affirming the Bankruptcy Court's ruling on the 9019 Motion, held that "an amendment to the Plan would be necessary to implement the settlement" but that "such an amendment was not feasible as the Plan has been substantially consummated.")

42. It is law of the case that the Plan has been substantially consummated: both the Bankruptcy Court and this Court have issued orders finding that the Plan has been substantially consummated.[7] Specifically, in connection with the 9019 Motion, the Bankruptcy Court held that the Plan could not be amended because the Plan had been substantially consummated, noting that the Notice of Substantial Consummation had been filed and it had received widespread publication. <u>See</u> Dubé Decl. Ex. N, p. 5. This Court echoed this finding when it affirmed the

---

[7]    See Dubé Decl. Ex. L (Notice of Substantial Consummation filed on December 29, 2004); Dubé Decl. Ex. N, p. 5 (March 10, 2005 Opinion of Bankruptcy Court); Dubé Decl. Ex. Q, p. 7 (September 29, 2006 Opinion of the District Court).

Bankruptcy Court's decision by finding that modification of the Plan was impermissible because the Plan had been substantially consummated.  See Dubé Decl. Ex. Q, p. 7.  Because the Plan has been substantially consummated, it cannot be amended, modified, or contradicted.

      2.      Substituting Cash for Stock in the Disputed Claims Reserve Would Violate Section 1123(a)(4) of the Bankruptcy Code

43.      While holders of Class 9 Claims whose claims have become Allowed will have received shares, by exchanging the shares in the Disputed Claims Reserve for cash, holders of Disputed Claims, by virtue of when their Claims become Allowed, will receive a wholly different treatment under the Plan.  Affording the Non-Accepting QUIPS Holders treatment that differs from that provided for Class 9 Claimants in the Plan and that was afforded to holders of Allowed Class 9 Claims violates the clear statutory requirement of Section 1123(a)(4) of the Bankruptcy Code that a plan shall:

> provide the same treatment for each claims or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest . . .

11 U.S.C. §1123(a)(4).

44.      Because Magten and the Non-Accepting QUIPS Holders are being forced to receive cash in lieu of shares of New Common Stock, claimants within the same class – Class 9 -- will be receiving non-consensual disparate treatment.  By cashing out the shares in the Disputed Claims Reserve, claimants in Class 9 are being treated differently depending upon when their claim became allowed.  Although 1123(a)(4) permits discriminatory treatment if claimants within a class opt to be treated differently, Magten and the Non-Accepting QUIPS Holders have never consented to be treated differently nor have they consented to receive less favorable treatment than other QUIPS holders.  See Hawley Fuel Coalmart, Inc. v. Hawley Fuel Coal, Inc. (In re AOV Indus., Inc.), 792 F.2d 1140, 1151-52 (D.C. Cir. 1986)) (finding that equal

16

treatment of class members is a basic premise of bankruptcy law); In re Granada Wines, Inc., 26 B.R. 131, 134 (Bankr. D. Mass. 1983), aff'd 748 F.2d 42 (1st Cir. 1984) (stating that the debtor is not permitted to unfairly discriminate against a member of a class). Without the consent of Claimants, the Plan cannot provide one treatment to some holders and a different treatment to others in the same class. In fact, the Plan could never have been confirmed if the Non-Accepting QUIPS Holders received cash while the remaining Class 9 Claimants received New Common Stock. Now, more than two years later, to substitute cash for shares post-confirmation would alter the bargain that Claimants received under the Plan, and would provide varying treatment of claimants within Class 9. Claimants believe they will be able to successfully argue that the Cash-Out Order violates Section 1123(a)(4) of the Bankruptcy Code in their appeal.

**B.     The Terms of the Plan Control and Trump Delaware Corporate Law, and the Bankruptcy Court's General Equitable Powers**

45.     In seeking to obtain the relief requested in the Cash-Out Order, NorthWestern argued that tendering the shares of New Common Stock in exchange for cash is not a modification of the Plan but is permitted by operation of Delaware corporate law. The Cash-Out Motion states that "NorthWestern is not seeking permission to effect the merger with Babcock & Brown – the merger will become effective pursuant to controlling Delaware law following applicable approvals." See Dubé Decl. Ex. V, ¶ 2. In granting the relief requested by NorthWestern, the Bankruptcy Court failed to realize that the issue before it was not whether the Court needs to approve the merger. Rather, the question is whether the purported effect of the merger, i.e., the conversion of the New Common Stock in the Disputed Claims Reserve into cash upon consummation of the merger in compliance with the procedural rules of Delaware corporate law, can be effected without an amendment to the Plan. The answer to that is clearly "no."

46.    The Third Circuit has noted that "if a provision of the [p]lan, a creature of federal law, conflicts with the law of a state and the state law 'frustrates the full effectiveness of federal law, [the state law], is rendered invalid by the Supremacy Clause.'" Jones v. Keene Corp., 933 F.2d 209, 214 (3d. Cir. 1991) (internal quotations omitted).  See also Consumers Realty & Dev. Co. v. Goetze (In re Consumers Realty & Dev. Co.), 238 B.R. 418, 426 (B.A.P. 8th Cir. 1999) (finding that the provisions of a confirmed plan will govern if contrary to state law); Ocasek v. Manville Corp. Asbestos Disease Comp. Fund, 956 F.2d 152, 154 (7th Cir. 1992) (holding that because the provisions of a plan bind all parties, the terms of the plan will govern and appellant cannot rest on contradictory Illinois state law for an award of interest).

47.    Similarly here, the treatment of creditors under NorthWestern's Plan, confirmed by the Bankruptcy Court and substantially consummated, cannot be altered by virtue of a state corporate law that provides for different treatment to holders of those claims.  See In re Roach, 824 F.2d 1370, 1373-1374 (3d. Cir. 1987) ("any state legislation that frustrates the full effectiveness of federal law is rendered invalid by the Supremacy Clause ..."); Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of Del., Inc. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co. of Del.), 274 B.R. 71, 95-97 (D. Del. 2002) (stating that state law may be preempted when it conflicts or stands as an obstacle to the implementation of specific provisions of the Bankruptcy Code).  In BFP v. Resolution Trust Corp., 511 U.S. 531 (1994), the Supreme Court noted that "when the meaning of the Bankruptcy Code's text is itself clear . . . its operation is unimpeded by contrary state law or prior practice" and that "the Bankruptcy Code can of course override by implication when the implication is unambiguous."  Id. at 546.  See also In re Roach, 824 F.2d at 1373 ("Under Article I, § 8 of the Constitution, Congress has the power to establish uniform bankruptcy laws in the United States and "where Congress has chosen to

18

exercise its authority, contrary provisions of state law must accordingly give way"); First Union Nat'l Bank v. Gibbons (In re Princeton-New York Investors, Inc.), 219 B.R. 55, 59 (D.N.J. 1998) (noting that where Congress chose to exercise its authority, contrary provisions of state law must give way). With respect to the BBI Transaction, enforcing a provision of Delaware corporate law that permits a cash-out of the shares in the Disputed Claims Reserve frustrates the Bankruptcy Code's very purpose and intent in prohibiting a modification of a substantially consummated plan. Allowing Delaware corporate law to override the express terms of the Plan and the provisions of the Bankruptcy Code obstructs the operation of federal law thereby violating the Supremacy Clause.

48.     Northwestern has created its own quandary. NorthWestern's need to cash-out shares in the Disputed Claims Reserve is the result of a voluntary transaction entered into by NorthWestern and BBI. NorthWestern negotiated the terms of the BBI Transaction and could have avoided this precise predicament when determining how to deal with the remaining Disputed Claims and the shares in the Disputed Claims Reserve. Since the transaction was first announced, Claimants have repeatedly informed NorthWestern that the stock cannot be cashed-out under the Plan. See Dubé Decl. Ex. AA and BB. Any apparent conflict between Delaware law and the Bankruptcy Code and Plan is self-created.

49.     By its motion, NorthWestern also contends that sections 105(a) and 1142(b) of the Bankruptcy Code and Rule 3020(d) of the Federal Rules of Bankruptcy Procedure provide the Bankruptcy Court with the authority to grant the relief requested in the Cash-Out Motion. See Dubé Decl. Ex. V, ¶ 12. Notably, the Bankruptcy Court during the hearing on the Cash-Out Motion, recognized that section 1142 of the Bankruptcy Code, which provides that the bankruptcy court may direct any necessary party to perform any act necessary for the

consummation of a plan of reorganization (11 U.S.C. § 1142 (b)) was not applicable, acknowledging that it was "too broad of a reading" of the statute. See Dubé Decl. Ex. C, p. 43, (line 20). The Bankruptcy Court relied on Rule 3020 of the Federal Rules of Bankruptcy Procedure in granting the relief sought by NorthWestern. See Dubé Decl. Ex. C, p. 43, (lines 18-21). Any reliance on Rule 3020, or section 105 of the Code (argued by NorthWestern but not specifically addressed by the Bankruptcy Court), however, ignores well-settled and necessary limitations that are placed on the bankruptcy courts' broad equitable powers granted under those provisions.

50.    Rule 3020 provides that "[n]othwithstanding the entry of the order of confirmation, the court may issue any other order necessary to administer the estate." Fed. R. Bankr. P. 3020(d). The Bankruptcy Court's reliance on this provision to provide it with the authority to enter the Cash-Out Order is misplaced. It is well-settled that the Bankruptcy Court's broad equitable power under the Federal Rules is superseded by substantive rights under the Bankruptcy Code, a creature of federal statutory law. See Branchburg Plaza Assocs. v. Fesq (In re Fesq), 153 F.3d 113, 116 (3d Cir. 1998) (finding that "when Congress accorded the Supreme Court authority to promulgate the Bankruptcy Rules, it stated 'such rules shall not abridge, enlarge, or modify any substantive right.'") (quoting 28 U.S.C. § 2075). The Third Circuit explained in In re Fesq, 153 F.3d at 116, that "as a general matter, the Code defines the creation, alteration or elimination of substantive rights but the Bankruptcy Rules define the process by which these privileges may be effected." (internal quotations omitted). Id. The Third Circuit held that the Bankruptcy Rules could not validly provide the creditor in that case with a substantive remedy that would be foreclosed by a provision of the Bankruptcy Code. See id. See also Term Loan Holder Comm. v. Ozer Group, LLC (In re Caldor Corp.), 303 F.3d 161, 171

20

(2d Cir. 2002) (recognizing that the Rules Enabling Act places "the rules in a subsidiary position to the Code."). The Bankruptcy Court erred by relying on Rule 3020 to enter the Cash-Out Order because it is inconsistent with and therefore superseded by an explicit substantive provision of the Code.

51.     Section 1142(b) of the Bankruptcy Code is explicit that there can be no modification of a chapter 11 plan after substantial consummation. As discussed above, NorthWestern's chapter 11 Plan does not provide for the cashing-out of shares in the Disputed Claims Reserve. By its Cash-Out Order, directing the Transfer Agent on how to proceed upon a cash-out when a cash-out itself is not permitted, the Bankruptcy Court has in effect relied on a Bankruptcy Rule to abridge an explicit substantive right of the Code, in direct contradiction to 28 U.S.C. § 2075.

52.     Furthermore, to the extent that NorthWestern or the Bankruptcy Court rely on section 105 of the Bankruptcy Code, which provides that the bankruptcy court may "issue any order . . . that is necessary to or appropriate to carry out the provisions" of Title 11, 11 U.S.C. § 105(a), such reliance is similarly misplaced. Section 105(a), although giving bankruptcy courts general equitable powers to issue orders necessary and appropriate to carry out the provisions of the Code, must be exercised in a manner consistent with the Code and does not give bankruptcy courts power to create rights that would otherwise be unavailable under the Code. See MFS Telecom, Inc. v. Motorola, Inc. (In re Conxus Comme'ns), Inc.), 262 B.R. 893, 899 (D. Del. 2001) (holding that "[w]hile Section 105(a) gives a bankruptcy court general equitable powers, those powers are limited by the provisions of the Bankruptcy Code.") (citing In re Morristown & Erie R.R.Co., 885 F.2d 98, 100 (3d Cir. 1989) (recognizing that Section 105(a) must be "applied in a manner consistent with the Code."). See also Southern Ry. Co. v. Johnson Bronze Co., 758

F.2d 137, 141 (3d Cir. 1985) (holding that Section 105(a) does not give a bankruptcy court "the power to create substantive rights that would otherwise be unavailable under the Code."); Henthorn v. GMAC Mortgage Corp. (In re Henthorn), 299 B.R. 351, 355 (E.D. Pa. 2003), *aff'd* 127 Fed. App'x. 15 (3d Cir. 2005) ("Although Section 105(a) of the Bankruptcy Code supplements courts' specifically enumerated bankruptcy powers by authorizing orders necessary or appropriate to carry out provisions of the Bankruptcy Code, it has a limited scope) (citations omitted).

53.    Now that the Plan has been deemed substantially consummated, section 1127(b), a substantive provision of the Bankruptcy Code prohibits any subsequent modification of the Plan. By permitting NorthWestern to effectuate a cash-out of the stock in the Disputed Claims Reserve, the Bankruptcy Court has created a substantive right for NorthWestern to which it would not otherwise be entitled. Such use of the Court's equitable powers is simply not permitted and likely will be admonished by this Court on appeal.

### C.    The Potential for a Merger was Squarely Presented Pre-Confirmation and NorthWestern Chose Not to Provide for it in the Plan

54.    NorthWestern suggested in its Cash-Out Motion that there is no conflict between the Plan and their proposed intention to cash-out is merely an "omission in the Plan or in the Confirmation Order as may be necessary to carry out its plan and intent." See Dubé Decl. Ex. V, ¶ 13. It was undisputed at the bankruptcy hearing regarding the Cash-Out Motion that NorthWestern was actively involved in discussions concerning the sale or merger of the company before, during and immediately following the Plan confirmation process[8] and, thus,

---

[8]    See also Dubé Decl. Ex. CC (news article announcing interest of MDU Resources Group and three major organizations in buying a large piece of NorthWestern's utility assets); Dubé Decl. Ex. DD (news article discussing Minnesota-based I Otter Tail Power's interest in purchasing NorthWestern's South Dakota utility operations); Dubé Decl. Ex. EE (news article announcing intent of Montana's major cities to make an offer to buy NorthWestern's Montana utility operations); Dubé Decl. Ex. FF (news article discussing the

120087.01600/40167389v.1

knew that this issue would arise. Therefore, to the extent that it is an omission in the Plan, it is an intentional omission that the Bankruptcy Court should not have on legal or equitable grounds corrected by granting the relief requested by NorthWestern.

**D.    Judicial Estoppel Prevents NorthWestern from Exchanging the Shares in the Disputed Claims Reserve for Cash**

55.    Under the doctrine of judicial estoppel, a party is precluded from assuming a position in a legal proceeding that is inconsistent with one previously asserted. See Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 358 (3d. Cir. 1996) ("[t]he basic principal of judicial estoppel … is that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory"); Official Comm. of Unsecured Creditors v. Aust (In re Network Access Solutions Corp.), 330 B.R. 67, 77 (Bankr. D. Del. 2005) (noting that judicial estoppel prevents a party from obtaining relief under one theory from later taking a contrary position).

56.    For the doctrine of judicial estoppel to apply, a three-part inquiry must be undertaken:  (1) has the party to be estopped taken two positions that are irreconcilably inconsistent; (2) has that party changed his or her position in bad faith, (i.e. with intent to play fast and loose with the court); and (3) is there no lesser sanction available under either statute or the applicable federal rules of procedure that would adequately remedy the damage done by the litigant's misconduct. See Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp., 337 F.3d 314, 319 (3d. Cir. 2003), cert. denied, 541 U.S. 1043 (2004); Montrose Med. Group Participating Sav. Plan v. Bulger, 243 F.3d 773, 779-80 (3d Cir. 2001); Official Comm.

---

Montana Public Power Authority's preliminary $1.26 billion bid to buy NorthWestern's Montana electric and natural gas systems); and Dubé Decl. Ex. GG (news article announcing the formation of the South Dakota Public Power Authority, organized to study the possibility of a bid for NorthWestern's assets.).

23

Of Unsecured Creditors v. DVI Bus. Credit (In re DVI, Inc.), 326 B.R. 301, 308 (Bankr. D. Del. 2005).[9] All three prongs of this test are met here.

57.      First, as previously noted, in connection with the failed Settlement Agreement, NorthWestern ardently took the position that Magten and the Non-Accepting QUIPS Holders could not receive any consideration other than stock in satisfaction of their claims without first amending the Plan, which was substantially consummated. See Dubé Decl. Ex. O, ¶ 65. In direct opposition to this previous position, which both the Bankruptcy Court and this Court accepted and relied upon, NorthWestern now seeks to provide Magten and the Non-Accepting QUIPS Holders with cash in lieu of the shares they are entitled to under the terms of the Plan. NorthWestern's positions regarding this issue are clearly inconsistent – either the Plan provides for an exchange of the Disputed Claims Reserve for cash or it does not.

58.      Second, there can be no question that NorthWestern changed its position in bad faith with the intent to further its own agenda.  By asserting the position that Magten and Law Debenture's claims could not be satisfied by a cash payout, NorthWestern clearly sought to gain an advantage in the prior litigation, in which they were successful.  Notwithstanding its previous position with the Bankruptcy Court[10], NorthWestern still managed to persuade the Court to adopt a theory that directly contradicts the theory previously espoused in order to facilitate the contemplated merger transaction.  NorthWestern should not be permitted to gain an advantage by

---

[9]      Notably, "the application of judicial estoppel does not turn on whether the estopped party actually benefited from its attempt to play fast and loose with the court." In re DVI, Inc., 326 B.R. at 324; see also T. Copeland and Sons v. SML Int'l, Inc (In re SLM Int'l, Inc.), 248 B.R. 240, 248 (D. Del. 2000).  Instead, any such benefit is only a factor in determining whether the evidence would support a conclusion of bad faith under the second prong of the inquiry. Id. (quoting Ryan, 81 F.3d at 361).

[10]     It's worth noting that the Bankruptcy Court also took the same previous inconsistent position as NorthWestern prior to granting the relief requested in the Cash-Out Motion.  At the hearing to consider Claimants' 9019 Motion, the Bankruptcy Court noted that "there is not going to be any cash paid.  That's not even contemplated by the agreement." See Dubé Decl. Ex. HH, p. 41 lines 12-13.  Inexplicably, however, by entering the Cash-Out Order the Bankruptcy Court is now allowing for cash to be paid out that is not contemplated by the Plan agreement.

24

asserting one theory in the earlier litigation and prevail to then turn around and assert a completely contrary theory to advance their self-serving interests.

59.    Finally, there is no lesser sanction available under either statute or the applicable federal rules of procedure that would adequately remedy the damage done by NorthWestern's conduct. Judicial estoppel is an equitable remedy, which will apply when there is a "sense of fundamental unfairness." Pickett v. Integrated Health Servs., Inc. (In re Integrated Health Servs., Inc.), 304 B.R. 101, 110 (Bankr. D. Del. 2004). It is clear in this instance that the doctrine of judicial estoppel is tailored to address the harm suffered by Claimants as a result of NorthWestern asserting contrary positions in these litigations. Specifically, Magten and Law Debenture are incurring additional fees and expenses in litigating their motions before the Bankruptcy Court and this Court that is predicated on the precise opposite position taken by NorthWestern in the 9019 Motion. There is no lesser sanction available to alleviate this harm other than to prevent NorthWestern from asserting this contrary position.

60.    Accordingly, the Bankruptcy Court erred by not applying the doctrine of judicial estoppel to protect the integrity of the judicial process by prohibiting NorthWestern from changing positions to suit their purposes.

**2.    Claimants Will Suffer Irreparable Harm if a Stay is Not Granted**

61.    If a stay is not granted, Claimants will suffer irreparable harm. In addition to the Merger Agreement being conditional upon approval by NorthWestern shareholders, the Merger Agreement must also be approved by certain regulatory authorities. See Dubé Decl. Ex. V, ¶ 9. To that end, NorthWestern is actively seeking regulatory approval to consummate the BBI Transaction. See id. It appears that the last remaining regulatory hurdle to consummation of the transaction is the approval by the Montana Public Service Commission (the "MPSC"). The approval hearings by MPSC are scheduled to commence on March 14, 2007. See Dubé Decl.

25

Ex. B. Even if expedited, there is no guarantee that an appeal from the Cash-Out Order will be resolved by the time NorthWestern has obtained the necessary regulatory approvals and can therefore consummate the transaction. If the merger is consummated before Claimants' appeal can be decided, NorthWestern will likely assert that the appeal will be rendered moot by virtue of the fact that upon consummation of the Merger Agreement, the existing shares of New Common Stock in the Disputed Claims Reserve (to which Claimants are explicitly entitled under the Plan once their claims are Allowed) will be forever gone. Thus, in the absence of a stay pending appeal, Claimants may be denied the ability to exercise meaningfully (or at all) their appeal rights. See In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 150 n.6 (3d Cir. 1986) ("[A]ppeal must be dismissed as moot when an event occurs that prevents the appellate court from granting any effective relief" (citations omitted)).

62.    Such loss of appellate review has been recognized as the consummate form of irreparable injury. See, e.g., John Doe Agency v. John Doe Corp., 488 U.S. 1306, 1309 (1989) (finding irreparable injury where the issue on an appeal would be moot absent the stay) ("[t]he fact that disclosure would moot that part of the Court of Appeal's decision requiring disclosure of the Vaughn index would also create an irreparable injury") (citations omitted); Providence Journal Co. v. FBI, 595 F.2d 889, 890 (1st Cir. 1979) (stating that "[w]hile we give weight to the views of the district court, the Constitution and laws entitle litigants to have their cases independently reviewed by an appellate tribunal."). In determining whether to stay the district court's order to disclose certain documents, the Court of Appeals in Providence, recognized that "[m]eaningful review entails having the reviewing court take a fresh look at the decision of the trial court before it becomes irrevocable." Id. See also Country Squire Assocs. of Carle Place, L.P. v. Rochester Cmty. Sav. Bank (In re Country Squire Assocs. of Carle Place L.P.) 203 B.R.

26

182, 183 (B.A.P. 2d Cir. 1996) (finding result that absent a stay pending appeal the foreclosure sale will proceed rendering the appeal moot as the quintessential form of prejudice) (internal quotations omitted).  But see In re Edwards, 228 B.R. at 580 ("I agree something more than preservation of the status quo is necessary to show irreparable harm"); In re Public Serv. Co. of N.H., 116 B.R. at 350 (noting that mootness was insufficient to show irreparable injury); In re Great Barrington Fair & Amusement, Inc., 53 B.R. 237, 240 (Bankr. D. Mass. 1985) (indicating that something more than possible mootness is needed to show irreparable harm).  The only way to prevent irreparable injury on these facts where following the consummation of the Merger Agreement, the stock in the Disputed Claims Reserve will be gone is by staying the Cash-Out Order until Claimants' appeal is addressed.

63.     Moreover, absent a stay of the Cash-Out Order, Claimants will also suffer irreparable injury by being deprived of their contractual right to receive the form of relief explicitly provided for in the Plan.  Once NorthWestern's Plan was confirmed, it is treated as a contract that binds the parties that participate in the plan.  See GECC v. Dial Bus. Forms, Inc. (In re Dial Bus. Forms., Inc.), 341 F.3d 738, 743 (8th Cir. 2003) (stating that a confirmed chapter 11 plan "acts like a contract that binds the parties in the plan") (internal quotations omitted); see also Hillis Motors, Inc. v. Haw. Auto. Dealers' Ass'n, 997 F.2d 581, 588 (9th Cir. 1993) (a reorganization plan should be construed as a contract).  Pursuant to the Plan contract, Claimants were entitled to relief in the form of stock in the Disputed Claims Reserve and only stock.  The Cash-Out Order, however, irreparably deprives Claimants of the stock in the Disputed Claims Reserve and the attendant rights and benefits associated with being a holder of the stock (i.e., the value of the upside of the shares, voting rights, etc).  Like a contract that cannot be changed once it has been definitely executed, NorthWestern cannot change the terms of the Plan post-

27

substantial consummation to suit its own interest.

**3.    Granting a Stay Will Not Substantially Injure Other Parties**

64.    As previously stated, Magten and the Non-Accepting QUIPS Holders are the only Claimants remaining that are entitled to the shares of stock in the Disputed Claims Reserve. By this Motion and its subsequent appeal, Claimants are seeking to protect their interest in ensuring that they receive what they are entitled to under the express provisions of the Plan that was heavily negotiated, confirmed by the Bankruptcy Court and deemed substantially consummated.

65.    A stay of the Cash-Out Order will not cause any substantial harm to any of the parties in the bankruptcy proceeding as all of the other creditors have either settled or adjudicated their claims and have received their pro rata share of New Common Stock pursuant to the Plan. NorthWestern will not suffer any harm either by delaying, until the appeal is decided, the cash-out of the shares of stock in the Disputed Claims Reserve. NorthWestern may continue to go forward with seeking the necessary regulatory approvals for the merger but would only be delayed in consummating the merger, which would necessarily require the cashing-out of shares from the Disputed Claims Reserve, temporarily until the appeal is decided. To the extent the Court grants Claimants' request for a stay, they will expedite the appellate process in whatever manner the Court directs so as to limit any potential harm to NorthWestern by the imposition of a stay.

66.    Moreover, as the drafter of both the Plan and the Merger Agreement with which the Plan conflicts, NorthWestern alone has caused this paradox that implicates Claimants' rights on appeal. Any inconvenience caused by possible modest delay in the actual consummation of the merger is due to NorthWestern's purported absent-mindedness and is in stark contrast to the irreparable harm that Claimants will likely suffer should NorthWestern be allowed to exchange the shares of the Disputed Claims Reserve stock prior to Claimants' day in Court.

120087.01600/40167389v.1

**4.    A Stay Pending Appeal Would Serve the Public Interest**

67.    The interest of the public in finality of court determinations, particularly in a bankruptcy proceeding context after there is a substantial consummation, will be served by the stay pending appeal. In granting the Cash-Out Motion, the Bankruptcy Court has allowed for a backdoor amendment to a substantially consummated plan that was being administered by NorthWestern as the debtor and relied upon by the creditors, including Claimants. If these types of modifications were to be permitted by the Court, NorthWestern's Plan would be without finality – which is contrary to the intent and letter of the Bankruptcy Code. The public interest will be served by properly holding that such modifications or alterations of a Chapter 11 plan is not permissible because it does not promote the finality in the reorganization process. See In re Cont'l Airlines, Inc., 91 F.3d at 561 (noting the strong public interest in the finality of bankruptcy organizations after substantial consummation is particularly compelling); In re Charterhouse, Inc., 84 B.R. at 152 (citing In re Penn. Cent. Trans. Co., 42 B.R. 657, 666-67 (E.D. Pa. 1984), aff'd 771 F.2d 762 (3d Cir. 1985)) ("Statutory termination of the right to seek modification of a Chapter 11 plan is intended to promote finality in the reorganization process").

68.    Furthermore, the Plan, as a legally binding contract, binds the party to the relief provided for therein. In re Dial Bus. Forms. Inc., 341 F.3d at 743 (quoting United States v. Lincoln Sav. Bank (In re Commercial Millwright Serv. Corp.), 245 B.R. 603, 606 (N.D. Iowa 2000) (once the plan is confirmed, it "acts like a contract that binds the parties that participate in the plan"); see also Hillis Motors, 997 F.2d at 588 (a reorganization plan should be construed as a contract)). The public undoubtedly has an interest in ensuring that parties live up to their end of the bargain.

120087 01600/40167389v.1

## NO BOND IS NECESSARY

69.     The Court has discretion to grant a stay pending appeal under Rule 8005 without requiring the posting of a bond. Fed. R. Bankr. P. 8005. See, e.g., In re Farrell Lines, Inc., 761 F.2d 796 (D.C. Cir. 1985) (involuntary debtor's appeal to district court was not dismissed for failure to post bond); In re Byrd, 172 B. R. 970, 974 (Bankr. W.D. Wash. 1994) (holding that position a bond is discretionary, and thus, not a prerequisite to granting a stay pending appeal); In re Sphere Holding Corp., 162 B.R. 639, 644-45 (E.D.N.Y. 1994) (debtor would not be required to file bond as condition to obtaining injunctive relief against creditors' pursuant of collection).

70.     Although there is no federal rule to assist courts in determining whether the posting of a bond is appropriate, it is clear that the purpose of such a bond "is to protect the adverse party from potential losses resulting from the stay." In re United Merchants & Mfrs., Inc., 138 B.R. at 430. Furthermore, where the relief sought on appeal is primarily injunctive in nature, courts are less likely to require the posting of a bond. See, e.g., In re Sphere Holding Corp., 162 B. R. at 644-45 (granting stay pending appeal and holding that appellant would not be required to post bond where appeal sought injunctive relief); In re United Merchants & Mfrs., 138 B.R. 426, 430 (D. Del. 1992) (where appellant, after confirmation, sought reallocation of undistributed shares of debtor, court held that "bond is unnecessary . . . because the Court finds that [debtor] will not likely suffer any loss as a result of a stay pending appeal.").

71.     The Court's exercise of discretion to require a bond is warranted here. As discussed above, Claimants are seeking a modest stay of the Cash-Out Order pending their appeal. If this Court permits Claimants to pursue the appeal on an expedited basis then the appeal could be heard during March 2007, when the last remaining regulatory agency is scheduled to hold its approval hearings. There is no potential loss to NorthWestern as a result of

30

the stay to warrant the imposition of a bond, as they would be free to go forward with the regulatory approval process as scheduled. Any inconvenience resulting from a delay (if at all) in the actual consummation of the Merger Agreement is *de minimis* in comparison to the real and certain harm to Claimants absent a stay.

72.    The relief Claimants seek is purely injunctive and necessary to prevent the irrevocable cashing-out of the stock in the Disputed Claims Reserve, should the Merger Agreement be approved prior to the resolution of the appeal. Claimants merely seek to maintain the status quo in order to preserve their right to seek appellate review of what were reversible errors made by the Bankruptcy Court in granting the relief sought by NorthWestern – which in of itself supports a basis for not imposing a bond. See Silverman v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA (In re Suprema Specialties, Inc.), 330 B.R. 93, 95 (S.D.N.Y. 2005) (declining to impose bond where movants "established that there is sufficiently serious legal issues meriting a stay" and the balance of harms weighed in favor of movants."). The issue of whether a Bankruptcy Court is permitted to use its broad equitable powers under the Bankruptcy Rules in a manner that is inconsistent with substantive federal statutory rights is a serious legal issue meriting appellate review and a stay of the Cash-Out Order.

73.    Requiring a bond under these facts would tip the balance of equities completely off-scale, as the issues on appeal are the result of NorthWestern's voluntary action in entering the BBI Transaction and inaction, by failing to structure the deal so as not to conflict with its chapter 11 Plan. Indeed, during the time that NorthWestern was negotiating with BBI, Claimants cautioned NorthWestern (but to no avail) about the possible conflict the Merger Agreement, as structured, would create with the Plan.

74.    Based on (i) the irreparable injury the Claimants will surely sustain absent the

31

injunctive relief it seeks; (ii) the unlikelihood of any loss to NorthWestern resulting from a brief stay pending the appeal and; (iii) the serious legal issues implicated by the appeal, this Court should not condition the stay on the posting of a bond.

## **EXPEDITED APPEAL**

75.    Claimants respectfully request that the Court establish an expedited appeal schedule with the following deadlines to commence immediately following entry of an order on the Motion, as opposed to commencing after the Bankruptcy Court furnishes the record on appeal to this Court (Claimants have already filed their designation of the record and issues):[11] (a) Claimants' opening brief due in ten (10) days, (b) NorthWestern's response brief due in ten (10) days following electronic receipt of Claimants' brief, and (c) Claimants' reply brief due in five (5) days following electronic receipt of NorthWestern's brief.  In addition, Claimants respectfully request that the Court entertain a hearing on the appeal at the Court's earliest convenience.

76.    In order to expedite this appeal, Claimants respectfully request that the Court grant the Claimants relief from this Court's Standing Order of July 23, 2004 requiring that all appeals from the Bankruptcy Court be referred to mediation and staying briefing pending such mediation.  In light of the fact that the remaining regulatory agency to approve the merger is scheduled to conduct its hearings in March, Claimants respectfully request that the parties bypass mediation to enable the parties to brief the merits of the appeal on an expedited schedule.

---

[11]    Claimants have prepared a complete set of the documents it has designated for the record on appeal and are prepared to provide the complete record to the Court upon granting of the order for an expedited appeal.

## CONCLUSION

WHEREFORE, Claimants respectfully request that the Court enter an order staying the

Cash-Out Order pending their appeal of the Order.

Dated:  Wilmington, Delaware
        February 23, 2007

BLANK ROME LLP

_Dale R. Dubé_

Dale R. Dubé (DE No. 2863)
Bonnie G. Fatell (DE No. 3809)
David W. Carickhoff, Jr. (DE No. 3715)
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone:   (302) 425-6400
Facsimile:    (302) 425-6464

- and -

Bonnie Steingart
Gary L. Kaplan
John W. Brewer
FRIED, FRANK, HARRIS, SHRIVER
& JACOBSON LLP
One New York Plaza
New York, NY 10004
Telephone:  (212) 859-8000
Facsimile:   (212) 859-4000

Counsel for Magten Asset Management
Corporation

-and -

120087.01600/40167389v.1

Kathleen M. Miller (DE No. 2898)
SMITH, KATZENSTEIN & FURLOW, LLP
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE  19899
Telephone:        (302) 652-8400
Facsimile:(302) 652-8405

- and -

John V. Snellings
Amanda Darwin
NIXON PEABODY LLP
100 Summer Street
Boston, MA  02110
Telephone:        (617) 345-1000
Facsimile:(866) 947-1732
Counsel for Law Debenture Trust Company

34

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of February, 2007, I served by email and hand delivery the BRIEF IN SUPPORT OF EMERGENCY MOTION OF MAGTEN ASSET MANAGEMENT CORPORATION AND LAW DEBENTURE TRUST COMPANY OF NEW YORK FOR (I) A STAY PENDING APPEAL OF ORDER IN AID OF EXECUTION OF PLAN OF REORGANIZATION AND (II) EXPEDITED APPEAL to the following:

Victoria Watson Counihan, Esquire
Dennis A. Meloro, Esquire
GREENBERG TRAURIG LLP
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801

Kathleen M. Miller, Esquire
SMITH KATZENSTEIN &
  FURLOW LLP
800 Delaware Avenue
P. O. Box 410
Wilmington, DE 19899

Neil B. Glassman, Esquire
Charlene D. Davis, Esquire
Eric M. Sutty, Esquire
THE BAYARD FIRM
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899

I also certify that, on this 23rd day of February, 2007, I served the aforementioned document, by e-mail and Federal Express, upon the following participants:

John V. Snellings, Esquire
Amanda D. Darwin, Esquire
NIXON PEABODY LLP
100 Summer Street
Boston, Massachusetts 02110-2131

Steven J. Reisman, Esquire
Joseph D. Pizzurro, Esquire
Nancy E. Delaney, Esquire
Miriam K. Harwood, Esquire
CURTIS, MALLET-PREVOST,
  COLT & MOSLE LLP
101 Park Avenue
New York, New York 10178-0061

Alan W. Kornberg, Esquire
Margaret A. Phillips, Esquire
Ephraim I. Diamond, Esquire
PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019

Jesse H. Austin, Esq.
PAUL, HASTINGS, JANOFSKY &
  WALKER, LLP
600 Peachtree Street, N.E.
Atlanta, GA 30308

_Dale R. Dubé_

Dale R. Dubé  (I.D. No. 2863)