# Exhibit H

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| NORTHWESTERN CORPORATION, | : | Case No. 03-12872 (CGC) |
| | : | |
| Debtor. | : | fief 2024 |

**ORDER (A) APPROVING THE DEBTOR'S SECOND AMENDED AND RESTATED DISCLOSURE STATEMENT AND SUMMARY DISCLOSURE STATEMENT, (B) SETTING A RECORD DATE FOR VOTING PURPOSES, (C) AUTHORIZING RESOLICITATION OF VOTES, (D) SCHEDULING A CONTINUED HEARING ON CONFIRMATION OF SECOND AMENDED AND RESTATED PLAN OF REORGANIZATION, (E) ESTABLISHING NOTICE REQUIREMENTS REGARDING THE CONTINUED CONFIRMATION HEARING AND APPROVING THE FORM AND MANNER OF NOTICE, AND (F) GRANTING RELATED RELIEF**

UPON the Motion dated August 18, 2004 (the "Motion")[1] of NorthWestern Corporation

("NOR" or the "Debtor"), as debtor and debtor-in-possession, for an Order (A) Approving

Debtor's Second Amended and Restated Disclosure Statement and Summary Disclosure

Statement; (B) Establishing Procedures for Resolicitation and Tabulation of Votes on Debtor's

Second Amended and Restated Plan of Reorganization; (C) Approving the Form and Manner of

Notice; and (D) Granting Related Relief; and the Court having "so ordered" the Motion and

Order to Shorten Time for Notice and Response (the "Motion to Shorten Time") with respect to

the Motion; it appearing from the affidavits of service filed herein that good and sufficient notice

under the circumstances of the Motion has been given in accordance with the Motion to Shorten

---

[1]   All capitalized terms not defined herein shall have the meaning ascribed to them in the Motion.

ATL/1056738.4

Time; and sufficient cause appearing therefor; and after due deliberation; **THE COURT HEREBY FINDS AS FOLLOWS:**

 A. The Debtor has provided good and sufficient notice of the Motion, the Second Amended Disclosure Statement and the Summary Disclosure Statement in accordance with Bankruptcy Rules 2002(b) and 3017(a), as modified by this Court by "so ordering" the Motion to Shorten Time with respect to the notice period for the Motion.

 **THEREFORE, IT IS HEREBY:**

 **ORDERED, that the Motion is GRANTED; and it is further**

 **ORDERED**, that the Second Amended Disclosure Statement, and the Summary Disclosure Statement detailing modifications in the Second Amended Disclosure Statement to the First Amended Disclosure Statement previously approved by this Court, are both hereby approved as containing "adequate information" respecting the Second Amended Plan pursuant to Section 1125 of the Bankruptcy Code; and it is further

 **ORDERED**, that the notice of the Motion is hereby deemed good and sufficient notice; and it is further

 **ORDERED**, that the Record Date of May 26, 2004, as set forth in the First Amended Disclosure Statement Order, shall be the record date pursuant to Bankruptcy Rule 3017(d), for determining which creditors holding claims in the Settling Classes are entitled to receive a Resolicitation Package to vote on the Second Amended Plan; and it is further

 **ORDERED**, that the Debtor and Kurtzman Carson Consultants, LLC (the "Balloting Agent") are authorized, pursuant to Section 1125 of the Bankruptcy Code, to resolicit acceptances or rejections of the Second Amended Plan from holders of allowed impaired claims against the Debtor in the Settling Classes by the transmission of a copy of this Order, the

2

summary Disclosure Statement, a ballot, a pre-addressed postage-paid envelope and any other materials the Debtor deems appropriate (the "Resolicitation Package") to be mailed no later than September 8, 2004; and it is further

**ORDERED**, that the forms of ballots (the "Ballots") annexed to the Certification of Counsel Seeking Entry of Revised Order dated August 31, 2004 as Exhibit H are hereby approved in all respects and may be used by the Debtor or the Balloting Agent in conjunction with the solicitation of votes on the Second Amended Plan; and it is further

**ORDERED**, that the Debtor is not required to provide all parties entitled to vote on the Second Amended Plan with another complete copy of the Second Amended Disclosure Statement or the Second Amended Plan, unless they request in writing copies of these documents from the Balloting Agent, *Kurtzman Carson Consultants, LLC, 12910 Culver Boulevard, Suite I, Los Angeles, California 90066-6709, Attention: Christopher R. Schepper, Telephone: (866) 381-9100;* and it is further

**ORDERED**, that the Debtor shall distribute or cause to be distributed, in respect to claims in Class 7 and Class 8, Resolicitation Packages to each Master Ballot Agent in sufficient number for such Master Ballot Agent to forward a Resolicitation Package to each of the Beneficial Holders for whom such Master Ballot Agent is the registered debt securities holder, and each Master Ballot Agent shall be entitled to reimbursement from the Debtor of its reasonable, actual and necessary out-of-pocket expenses associated with distribution of Resolicitation Packages to the Beneficial Holders and tabulation of Ballots received from the Beneficial Holders and preparation of a Master Ballot; and it is further

**ORDERED**, that with respect to the tabulation of Master Ballots and Ballots cast by Master Ballot Agents, for purposes of voting, the amount that will be used to tabulate acceptance

or rejection of the Second Amended Plan will be the Record Amount and the following

additional rules shall apply to the tabulation of Master Ballots and Ballots cast by Master Ballot

Agents:

    a.    votes cast by Beneficial Holders through a Master Ballot Agent will be applied against the positions held by such entities in the applicable debt securities as of the Record Date, as evidenced by the record and depository listings. Votes submitted by a Master Ballot Agent pursuant to a Master Ballot will not be counted in excess of the Record Amount of debt securities held by such Master Ballot Agent;

    b.    to the extent that conflicting votes or "overvotes" are submitted by a Master Ballot Agent pursuant to a Master Ballot, Balloting Agent will attempt to reconcile discrepancies with the Master Ballot Agent;

    c.    to the extent that "overvotes" on a Master Ballot are not reconcilable prior to the preparation of the vote certification, the Balloting Agent will apply the votes to accept and reject the Second Amended Plan in the same proportion as the votes to accept or reject the Second Amended Plan submitted on the Master Ballot that contained the overvote, but only to the extent of the Master Ballot Agent's position in the applicable debt security; and

    d.    for purposes of tabulating votes, each Master Ballot Agent or Beneficial Holder of a debt security will be deemed to have voted the principal amount of its Claim relating to such debt security.

**ORDERED,** that (a) all Master Ballots for Class 7, all Master Ballots for Class 8(a), all

Master Ballots for Class 8(b) and all Class 9 Ballots must be received by the Tabulation Agent[1]

or Balloting Agent, as identified on the applicable Ballot, on or before 5:00 p.m. (PDT), on

September 29, 2004 (the "<u>Voting Deadline</u>"), to be counted and (b) any Ballot or Master Ballot

which is received after such time will not be counted; and it is further

**ORDERED,** that all Class 9 claimants who elect to become members of the Convenience

---

[1] "<u>Tabulation Agent</u>" shall refer to Bondholder Communications Group. Master Ballots for Class 7, Class 8(a) and Class 8(b) shall be delievered ot the Tabulation Agent at the following address: Bondholder Communications Group, Attn: Nancy Calloway, 30 Broad Street, 46th Floor, New York, New York 10004.

Class shall be deemed to have voted in favor of the Second Amended Plan; and it is further

ORDERED, that with respect to Ballots or Master Ballots, as applicable, submitted by a

holder of a Claim:

a.  any votes received after the Voting Deadline shall not be counted as either an acceptance or rejection of the Second Amended Plan;

b.  any Ballot which is properly completed, executed and timely returned but does not indicate an acceptance or rejection of the Second Amended Plan and any Ballot in which both the acceptance and rejection boxes are checked shall not be counted as either an acceptance or rejection of the Second Amended Plan;

c.  any Ballot which indicates acceptance or rejection of the Second Amended Plan but which is unsigned shall not be counted as cither an acceptance or rejection of the Second Amended Plan;

d.  any Ballot of a Holder of Class 8(b) – Unsecured Subordinated Note Claims represented by the QUIPS Notes that indicates an acceptance of the Second Amended Plan but fails to select either of Option 1 or Option 2 on such Ballot shall be deemed to have selected Option 1;

e.  each creditor shall be deemed to have voted the full amount of its Claim;

f.  solely with respect to Ballots and not with respect to Master Ballots, any Ballots that partially reject or partially accept the Second Amended Plan shall not be counted as either an acceptance or rejection of the Second Amended Plan;

g.  any Ballot received by the Balloting Agent via telecopier, facsimile or other electronic communication shall not be counted as either an acceptance of rejection of the Second Amended Plan; and

h.  if no votes are received with respect to a particular class of Claims that is entitled to vote on the Second Amended Plan, such class shall be deemed to have accepted the Second Amended Plan; and it is further

ORDERED, that solely for the purpose of voting to accept or reject the Second

Amended Plan, only holders of Claims in the Settling Classes, i.e., holders of Class 7 -

Unsecured Note Claims, Class 8(a) - Unsecured Subordinated Note Claims represented by the

TOPrS Notes, Class 8(b) -- Unsecured Subordinated Note Claims represented by the QUIPS

Notes and Class 9 - General Unsecured Claims (each a "Voting Claim"), are impaired and

entitled to vote to accept or reject the Second Amended Plan through the resolicitation; and it is

further

**ORDERED,** that for voting purposes only and not for the purpose of determining who

has an Allowed Claim or who is entitled to receive a Distribution under the Second Amended

Plan, and without prejudice to the Debtor's rights in any other context, each holder of a Voting

Claim shall have an Allowed Claim, solely for the purpose of voting on the Second Amended

Plan, in an amount equal to the lesser of (a) the amount of such Claim as set forth in the

schedules of liabilities previously filed by the Debtor (as the same may be amended) as required

by Section 521 of the Bankruptcy Code (the "Schedules") or (b) the amount of such Claim as set

forth in a timely filed proof of claim. The foregoing procedures are subject to the following

exceptions:

      a.     if a Claim for which a proof of claim has been timely filed is marked as, or is by its terms, contingent, unliquidated or disputed on its face, or an objection by the Debtor has been filed to the claim for which a proof of claim has been timely filed and the objection has not been adjudicated, such Claim is temporarily allowed for voting purposes only, and not for purposes of allowance or Distribution, at $1.00;

      b.     if a Claim has been estimated or otherwise allowed for voting purposes by order of the Court, the Debtor proposes that such Claim be temporarily allowed in the amount so estimated or allowed by the Court;

      c.     if a Claim is listed in the Schedules as contingent, unliquidated or disputed and a proof of claim was not timely filed, the Debtor proposes that such Claim be temporarily disallowed for voting purposes;

      d.     if a Claim is not listed in the Schedules and a proof of claim is timely filed, the Debtor proposes that such Claim be temporarily allowed for voting purposes only, and not for purposes of allowance or Distribution, at the liquidated amount on the proof of claim; provided however, if an objection to the Claim has been filed for which a proof of claim has been filed and the objection has not been adjudicated, such Claim shall be temporarily allowed for voting purposes only, and not for purposes of

allowance or Distribution at $1.00; and

e.    if the Debtor has filed and served an objection to a Claim at least twenty (20) days before the expiration of the Voting Deadline, the Debtor proposes that such Claim be temporarily disallowed for voting purposes; and it is further

**ORDERED**, that pursuant to Section 1128 of the Bankruptcy Code and Rule 3020 of the Bankruptcy Rules, a continued Confirmation Hearing (the "Continued Hearing"), shall be held before the Honorable Charles G. Case, II, United States Bankruptcy Court Judge, at 9:30 a.m. on October 6, 2004, at the United States Bankruptcy Court for the District of Arizona, 2929 N. Central Ave, 9th Floor, Phoenix, Arizona 85012 on October 6, 2004, at 9:30 a.m., or as soon thereafter as counsel can be heard to consider confirmation of the Second Amended Plan; and it is further

**ORDERED**, that the Debtor shall serve a notice of the Continued Hearing, substantially in the form annexed as Exhibit F to the Certification of Counsel Seeking Entry of Revised Order dated August 31, 2004 (the "Continued Hearing Notice"), on or before September 8, 2004, by first class mail upon: (i) all creditors of the Debtor; (ii) all equity and debt security holders of the Debtor; (iii) all entities which are parties to executory contracts or unexpired leases with the Debtor; (iv) all applicable federal, state and local taxing authorities; (v) the Internal Revenue Service; (vi) the Securities and Exchange Commission; (vii) the Office of the United States Trustee; (viii) counsel for the Debtor's Pre-Petition Lenders; (ix) counsel for the Debtor's Post-Petition Lenders; (x) counsel for the Official Committee of Unsecured Creditors; (xi) the Federal Energy Regulatory Commission; (xii) the Montana Public Service Commission; (xiii) the South Dakota Public Utilities Commission; (xiv) the Nebraska Public Service Commission; (xv) the

ATL/1056738.4

Environmental Protection Agency; and (xvi) all parties that have requested special notice in this Chapter 11 case pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"); and it is further

**ORDERED**, that the Debtor shall cause the Continued Hearing Notice to be published once in each of the publications listed as Exhibit E to the Motion as soon as practical; and it is further

**ORDERED**, that the Continued Hearing may be adjourned from time to time without further notice to creditors or parties-in-interest other than by an announcement of the adjourned date at the Continued Hearing; and it is further

**ORDERED**, that this Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this order.

Dated: Wilmington, Delaware
      September ⎵ , 2004

                                       Honorable Charles G. Case, II
                                       United States Bankruptcy Judge

# Exhibit I

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NORTHWESTERN CORPORATION, | Case No. 03-12872 (CGC) |
| Debtor. | |

## ORDER CONFIRMING DEBTOR'S SECOND AMENDED AND RESTATED PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

NorthWestern Corporation, a Delaware corporation (the "Debtor" or "NOR"), having filed with

this Court its voluntary petition for relief under Chapter 11 of Title 11, United States Code, 11

U.S.C. §§ 101 et seq. (the "Bankruptcy Code") on September 14, 2003 (the "Petition Date"); and

the Debtor having filed with this Court its First Amended Plan of Reorganization Under Chapter

11 of the Bankruptcy Code dated May 24, 2004 (the "First Amended Plan") and Second

Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code dated

August 18, 2004 [Dkt. No. 2020] (as thereafter modified, the "Second Amended Plan" or

"Plan")[1]; and

(i) the Debtor having filed with this Court the First Amended Disclosure Statement Pursuant to

Section 1125 of the Bankruptcy Code for the Plan of Reorganization of the Debtor dated May

17, 2004 (the "First Amended Disclosure Statement"), Second Amended and Restated

Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code for the Plan of

Reorganization of the Debtor dated August 18, 2004 [Dkt. No. 2021] (the "Second Amended

Disclosure Statement" or "Disclosure Statement") and Summary Disclosure Statement Pursuant

to Section 1125 of the Bankruptcy Code dated August 18, 2004 [Dkt. No. 2023] (the "Summary

Disclosure Statement"); and

---

[1] Any capitalized term used herein but not otherwise defined shall have the meaning ascribed to such term in the Plan.

(ii) the First Amended Disclosure Statement having been approved as containing "adequate information," as such term is defined in Section 1125 of the Bankruptcy Code, by Order of this Court dated May 26, 2004 [Dkt. No. 1373] (the "Disclosure Statement Approval Order"); and

(iii) the Disclosure Statement Approval Order having, (1) authorized the Debtor to solicit acceptances or rejections of the First Amended Plan, (2) approved the form of ballots to be transmitted with the First Amended Plan and First Amended Disclosure Statement for voting purposes, (3) fixed August 2, 2004 at 5:00 p.m. (PDT) as the deadline for submitting ballots accepting or rejecting the Plan (the "Voting Deadline"), (4) fixed August 2, 2004 at 4:00 p.m. (EDT) as the deadline for objections to confirmation of the First Amended Plan to be filed and served (the "Objection Deadline"), (5) fixed August 13, 2004 at 4:00 p.m. (EDT) as the deadline for the Debtor to file and serve any response to an objection to confirmation and (6) approved the form and manner of notice of the Confirmation Hearing (as defined below) and of the Voting and Objection Deadlines; and this Court having scheduled a hearing (as such hearing may be continued, the "Confirmation Hearing") pursuant to Section 1128 of the Bankruptcy Code for

August 25, 2004 to consider confirmation of the Plan pursuant to Section 1129 of the

Bankruptcy Code; and

(iv) the Debtor having solicited votes on the First Amended Plan by transmitting copies of the First Amended Plan, First Amended Disclosure Statement, the Disclosure Statement Approval

Order, a notice of the Confirmation Hearing (the "Confirmation Hearing Notice") and an appropriate ballot to all impaired creditors entitled to vote on the First Amended Plan; and the Court having considered the Declaration of Voting Agent Regarding Tabulation of Votes in Connection with Debtor's First Amended Plan of Reorganization [Dkt. No. 1930] (the "Voting

Agent Declaration"); and

2

(v) it appearing that due notice of the Voting Deadline, the Confirmation Hearing and the

Objection Deadline has been given by the Debtor to creditors and other parties-in-interest in

accordance with the Disclosure Statement Approval Order, the Bankruptcy Code and the Federal

Rules of Bankruptcy Procedure as evidenced by the affidavits of mailing and of publication filed

with this Court; and the Disclosure Statement and Summary Disclosure Statement having been

approved as containing "adequate information," as such term is defined in Section 1125 of the

Bankruptcy Code, by Order of this Court dated September 2, 2004 [Dkt. No. 2033] (the

"Resolicitation Order"); and

(vi) the Resolicitation Order having, (1) authorized the Debtor to resolicit acceptances or

rejections of the Plan of Class 7, 8, and 9 claim holders, (2) approved the form of ballots to be

transmitted with the Summary Disclosure Statement for voting purposes, (3) fixed September

29, 2004 at 5:00 p.m. (PDT) as the deadline for submitting ballots accepting or rejecting the Plan

(the "Resolicitation Voting Deadline"), (4) fixed September 15, 2004 at 4:00 p.m. (EDT) as the

deadline for objections to confirmation of the Plan to be filed and served, (5) approved the form

and manner of notice of the continued Confirmation Hearing and of the Resolicitation Voting

Deadline; and this Court having continued the Confirmation Hearing to October 6, 2004 to

consider confirmation of the Plan pursuant to Section 1129 of the Bankruptcy Code; and

(vii) the Debtor having resolicited votes on the Plan by transmitting copies of the Summary

Disclosure Statement, the Resolicitation Order, notice of the continued Confirmation Hearing

(the "Continued Confirmation Hearing Notice") and an appropriate ballot to all impaired

creditors entitled to vote on the Plan; and the Court having considered the Declaration of Voting

Agent Regarding Tabulation of Votes in Connection with the Debtor's Second Amended Plan of

Reorganization [Dkt. No. 2170]; and

ATI/1060254.9

3

(viii) it appearing that due notice of the Resolicitation Voting Deadline and the continued

Confirmation Hearing has been given by the Debtor to creditors and other parties-in-interest in

accordance with the Resolicitation Order, the Bankruptcy Code and the Federal Rules of

Bankruptcy Procedure as evidenced by the affidavits of mailing and publication filed with this

Court; and

(ix) the Debtor having filed with this Court a Memorandum of Law in Support of Confirmation

of the Debtor's Second Amended and Restated Plan of Reorganization under Chapter 11 of the

Bankruptcy Code [Dkt. No. 1928] and Memorandum of Law in Further Support of Confirmation

of Debtor's Second Amended and Restated Plan of Reorganization under Chapter 11 of the

Bankruptcy Code and in Response to Supplemental Objections to Confirmation [Dkt. No. 2145]

(the "Supplemental Brief") filed in response to the Supplemental Objection of Magten Asset

Management Corporation to Confirmation of the Debtor's Second Amended and Restated Plan

of Reorganization [Dkt. No. 2105] (the "Magten Objection") and the Supplemental Objection of

Law Debenture Trust Company of New York to Confirmation of the Debtor's Second Amended

Plan of Reorganization [Dkt. No. 2104] (the "Law Debenture Objection"); and

(x) it appearing that the objections to confirmation filed by certain parties-in-interest have been

resolved, withdrawn or overruled; and

(xi) this Court having conducted the Confirmation Hearing on August 25, 2004 and the

continued Confirmation Hearing on October 6, 2004, and after due deliberation and

consideration and having reviewed all pleadings, proceedings and evidence heretofore presented

in this Chapter 11 case and at the respective confirmation hearings and sufficient cause

appearing therefore; and

ATL/1060234.9                                     4

IT HAVING BEEN FOUND AND DETERMINED by this Court that:

A. Findings of Fact and Conclusions of Law. The findings of fact and conclusions of law set forth herein and on the record of the Confirmation Hearing constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rule 7052 and 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. This Order incorporates the Court's oral ruling issued in the Debtor's Chapter 11 Case on October 8, 2004, which Order, among other things, confirmed the Plan in all respects and overruled all objections to confirmation not otherwise withdrawn or resolved as identified by the Debtor in Exhibit A to the Debtor's Memorandum of Law in Support of Confirmation of Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Dkt. No. 1928], as amended, Notice of Filing of Amended Exhibit A to the Memorandum of Law in Support of Confirmation of Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Dkt. No. 2156].

B. Judicial Notice. Pursuant to Federal Rule of Evidence 201, the Bankruptcy Court takes judicial notice of the documents included in the Debtor's Request to Take Judicial Notice of Certain Pleadings and Related Documents Filed with the Court filed on August 18, 2004 [Dkt. No. 1929] (the "Debtor's Request for Judicial Notice"). To the extent not included in the Debtor's Request for Judicial Notice, the Bankruptcy Court, pursuant to Federal Rule of Evidence 201, takes judicial notice of the docket of this Chapter 11 Case maintained by the Clerk of the Bankruptcy Court, including, without limitation, all pleadings and other documents filed, all orders entered, and all evidence and arguments made, proffered, or adduced at the various hearings held before the Bankruptcy Court during the pendency of the Debtor's Chapter 11 Case.

C. Offer of Proof. The Bankruptcy Court takes judicial notice of the Debtor's Offer of Proof and Outline of Evidence in Support of Adequacy of Debtor's Procedures and Notice in Conjunction with its Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Dkt. No. 1932, Debtor's Exh. 15] (the "Offer of Proof"). The Bankruptcy Court enters into evidence Debtor's Exhibits 1-90, 114-121, 127-139, 142-146 and 150, identified on the Notice of Designation of Exhibits to be Used with Respect to the Confirmation Hearing filed on August 20, 2004 [Dkt. No. 1961], as such revised exhibits were introduced at the Confirmation Hearing, Exhibits 1-6 of the Creditors' Committee, identified on the Confirmation Hearing Amended Exhibit List of the Official Committee of Unsecured Creditors filed on August 23, 2004 [Dkt. No. 1970] and Exhibits 1 and 2 of the Equity Holders introduced into evidence at the Confirmation Hearing.

Pursuant to Federal Rule of Evidence 201, the Bankruptcy Court takes judicial notice of

the Supplemental Offer of Proof and Outline of Evidence in Support of the Adequacy of the

Debtor's Procedures and Notice in Conjunction with its Second Amended and Restated Plan of

Reorganization under Chapter 11 of the Bankruptcy Code and Request to Take Judicial Notice of

Certain Pleadings Filed with the Court [Dkt. No. 2166] (the "Supplemental Offer of Proof").

The Bankruptcy Court enters into evidence Debtor's Exhibits 151-166, 180 and 185, as such

reviscd exhibits were introduced at the Confirmation Hcaring.

D. Jurisdiction and Venue. This Court has jurisdiction over this Chapter 11 Case and the subject matter of the Confirmation Hearing pursuant to 28 U.S.C. §§ 157 and 1334. The Confirmation Hearing is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2) and this Court has jurisdiction to enter a final order with respect thereto. Venue of this Chapter 11 Case in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

E. Background.

> 1.     Petition. On September 14, 2003 (the "Petition Date"), the Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code [Dkt. No. 1]. The Debtor continues to operate its businesses and manage its properties as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner in the Chapter 11 Case. The Creditors' Committee was appointed by the Office of the United States Trustce on September 30, 2003.

> 2.     Appointment of the Creditors' Committee. On October 2, 2003, the United States Trustee appointed a nine (9) member Creditors' Committee in this Chapter 11 Case pursuant to Section 1102 of the Bankruptcy Code to represent the interest of all holders of unsecured claims. The members of the Creditors' Committee were: (i) OCM Opportunities Fund IV, LP; (ii) Law Debenture Trust Company of New York, as successor Indenture Trustee to The Bank of New York; (iii) Franklin Templeton Mutual Series Fund; (iv) Wilmington Trust Co.; (v) HSBC Bank USA; (vi) Rocky Mountain Contractors, Inc.; (vii) Avenue Capital Management; (viii) AG Capital Recovery Partners III, LP; and (ix) Comanche Park, LLC [Dkt. No. 122]. By notice dated November 25, 2003, the United States Trustee added Magten Asset Management Corp. to the Creditors' Committee following Rocky Mountain Contractors, Inc. declining to serve on the Creditors' Committee [Dkt. No. 449]. By notice dated May 6, 2004, the United States Trustee removed Magten Asset Management Corp. and Law Debenture Trust Company of New York from the Creditors' Committee [Dkt. No. 1223]. By notice dated May 7, 2004, the United States Trustee removed Comanche Park, LLC from the Creditors' Committee [Dkt. No. 1238]. By notice dated July 27, 2004, the United States Trustee filed the Seventh

ATL/1060234.9                                6

Amended Notice of Appointment reflecting OCM Opportunities
Fund IV, L.P.'s resignation from the Creditors' Committee
effective July 19, 2004 [Dkt. No. 1764]. By written notice to the
United States Trustee dated October 8, 2004, AG Capital Recovery
Partners III, L.P., resigned from the Creditors' Committee
effective October 8, 2004.

As of the date of this Order, the Creditors' Committee was comprised of: (i) Franklin

Templeton Mutual Series Fund; (ii) Wilmington Trust Co.; (iii) HSBC Bank USA; and (iv)

Avenue Capital Management.

                 3.     Bar Date Order and Notice Thereof. The
Court entered an order establishing January 15, 2004 at 5:00 p.m.
(Pacific Standard Time) as the deadline for non-governmental
creditors, and establishing April 15, 2004 at 5:00 p.m. (Pacific
Standard Time) as the deadline for governmental creditors
(collectively, the "Bar Date"), to file proofs of claim for each claim
they assert against the Debtor that arose before the Petition Date
[Dkt. No. 197, Debtor's Exh. 21] (the "Bar Date Order"). The
notice of the Bar Date was mailed to all known creditors of the
Debtor and published in numerous regional and national newspapers
in accordance with the Bar Date Order. As described in the
Affidavit of Service of Bar Date Notice, sworn to by Angela M. Lo
on November 17, 2003 [Dkt. No. 406, Debtor's Exh. 22] (the "Lo
Affidavit"), copies of: (i) the Notice of Deadlines for Filing Proofs
of Claims and a personalized Proof of Claim were served on the
creditors listed on Exhibit A to the Lo Affidavit; (ii) copies of the
Notice of Deadlines for Filing Proofs of Claims and a blank Proof
Claim were served upon the 2002 Service List attached as Exhibit
B to the Lo Affidavit; and (iii) the Notice of Deadlines for Filing
Proofs of Claim was served on the list attached as Exhibit C to the
Lo Affidavit. The Court hereby finds that: (i) the transmittal of the
Notice of Deadlines for Filing Proofs of Claim was adequate and
sufficient under the circumstances of this Chapter 11 Case; (ii) such
notice was provided in compliance with the Bar Date Order, the
Bankruptcy Code and the Bankruptcy Rules; and (iii) no other or
further notice is required.

F. Debtor's Property Rights, Title and Interests in Executory Contracts, Leases, and Rights
of Way. On July 16, 2004, the Debtor filed its Notice of Contracts the Debtor intends to
Assume and/or Reject Pursuant to Section IV.F of the Debtor's First Amended
Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code for the Plan of
Reorganization [Dkt. No. 1700] and on August 9, 2004, the Debtor filed its Notice of
Amendment to Schedules of Contracts the Debtor Intends to Assume and/or Reject
Pursuant to Section IV.F of the Debtor's First Amended Disclosure Statement [Dkt. No.

ATL/1060234.9               7

1866]. Pursuant to the notices, the Debtor indicated its intent to assume certain executory contracts, leases, and rights of way. On September 22, 2004, the Debtor filed its Omnibus Motion for Court Approval to Assume Certain Executory Contracts Pursuant to Section 365 of the Bankruptcy Code and Granting Related Relief [Dkt. No. 2108].

G. Class Action Settlement. On or about April 28, 2004, the Debtor filed its Motion for Order Pursuant to Bankruptcy Rule 9019 Approving Memorandum of Understanding [Dkt. No. 1169, Debtor's Exh. 53] (the "MOU Motion"). On July 14, 2004, the Court held a hearing on the MOU Motion and on October 7, 2004 this Court entered its Memorandum Decision overruling the objection of Magten Asset Management Corporation approving the proposed settlement and finding that the proposed settlement meets the requirements of Bankruptcy Rule 9019 and applicable case law [Dkt. No. 2175].

H. The Plan.

> 1. The First Amended Plan. On May 25, 2004, the Debtor filed its proposed First Amended Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code for the Plan of Reorganization of the Debtor [Dkt. No. 1352, Debtor's Exh. 1], which amended the First Amended Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code for the Plan of Reorganization of the Debtor filed on May 14, 2004. Also on May 25, 2004, the Debtor filed its proposed First Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Dkt. No. 1351, Debtor's Exh. 2], which amended the First Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code filed on May 14, 2004. After due notice and a hearing held on May 17, 2004, this Court entered on May 26, 2004 an Order (I) Approving First Amended Disclosure Statement, (II) Authorizing the Solicitation of Votes, (III) Scheduling a Hearing on Confirmation of the Plan of Reorganization, (IV) Establishing Notice Requirements Regarding the Confirmation Hearing and Approving the Form and Manner of Notice and (V) Granting Related Relief Respecting the Debtor's First Amended Plan of Reorganization [Dkt. No. 1373, Debtor's Exh. 3] finding that the First Amended Disclosure Statement contained "adequate information" within the meaning of Section 1125 of the Bankruptcy Code and established procedures for the Debtor's solicitation of votes on the First Amended Plan. In accordance with the Disclosure Statement Order, on or about June 4, 2004 the Debtor commenced the solicitation of votes on the First Amended Plan [Dkt. No. 1469, Debtor's Exh. 31], Affidavit of Service of Solicitation Materials.

> 2. The Second Amended Plan. On August 18, 2004, the Debtor filed its Second Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Dkt. No. 1924, Debtor's Exh. 6], Second Amended Disclosure Statement Pursuant

to Section 1125 of the Bankruptcy Code for the Plan of
Reorganization of the Debtor [Dkt. No. 1926, Debtor's Exh. 8],
and Summary Amended Disclosure Statement Pursuant to Section
1125 of the Bankruptcy Code [Dkt. No. 1921, Debtor's Exh. 11].
On August 25, 2004, after due notice, the Court held a
confirmation hearing on the Debtor's Second Amended Plan. On
August 31, 2004, following the hearing, the Debtor filed its revised
Second Amended Plan [Dkt. No. 2020], Second Amended
Disclosure Statement [Dkt. No. 2021] and Summary Disclosure
Statement [Dkt. No. 2023]. After due notice, this Court entered on
September 2, 2004 an Order (A) Approving the Debtor's Second
Amended and Restated Disclosure Statement and Summary
Disclosure Statement, (B) Setting a Record Date for Voting
Purposes, (C) Authorizing Resolicitation of Votes, (D) Scheduling
a Continued Hearing on Confirmation of Second Amended and
Restated Plan of Reorganization, (E) Establishing Notice
Requirements Regarding the Continued Confirmation Hearing and
Approving the Form and Manner of Notice, and (F) Granting
Related Relief finding that the Second Amended Disclosure
Statement and Summary Disclosure Statement contained
"adequate information" within the meaning of Section 1125 of the
Bankruptcy Code and established procedures for the Debtor's
resolicitation of votes on the Second Amended Plan [Dkt. No.
2033]. In accordance with the Resolicitation Order, on or about
September 8, 2004 the Debtor commenced the resolicitation of
votes on the Second Amended Plan [Dkt. No. 2126].

I.   Notice.

1.   Compliance with Disclosure Statement
Approval Order. In accordance with the Disclosure Statement
Approval Order, the Bankruptcy Code and the Bankruptcy Rules,
as described in the Affidavit of Service, sworn to by Chris
Schepper on June 14, 2004 [Dkt. No. 1469, Debtor's Exh. 31] (the
"Schepper Affidavit"), the Debtor timely: (a) mailed (i) notice of
the date, time, and place of the Confirmation Hearing, (ii) notice of
the deadline and procedures for filing objections to confirmation of
the Plan, and (iii) an appropriate ballot for voting on the Plan, upon
the parties set forth in the Disclosure Statement Approval Order;
and (b) published notice of the Confirmation Hearing in each of
the following (i) Argus Leader, (ii) Billings Gazette, (iii) Great
Falls Tribune, (iv) the Missoulian, (v) New York Times, (vi) Rapid
City Journal, (vii) USA Today, and (viii) The Wall Street Journal
as required by the Disclosure Statement Approval Order [Debtor's
Exh. 23-31]. The Court hereby finds that: (i) the transmittal of the
Notice of the Confirmation Hearing and Ballots was adequate and
sufficient under the circumstances of this Chapter 11 Case; (ii) such
notice was provided in compliance with the Disclosure Statement

Order, the Bankruptcy Code and the Bankruptcy Rules; and (iii) no other or further notice is required.

2. Compliance with the Resolicitation Order. In accordance with the Resolicitation Order, the Bankruptcy Code and the Bankruptcy Rules, as described in the Affidavit of Service, sworn to by Chris Schepper on September 27, 2004 [Dkt. No. 2126, Debtor's Exh. 155] (the "Schepper Resolicitation Affidavit"), the Debtor timely (a) mailed: (i) notice of the date, time, and place of the continued Confirmation Hearing, (ii) the Summary Disclosure Statement; and (iii) an appropriate ballot for voting on the Plan, upon the parties set forth in the Resolicitation Order; and (b) caused to be published notice of the continued Confirmation Hearing in each of the following (i) Great Falls Tribune, (ii) the Missoulian, (iii) New York Times, (iv) Rapid City Journal, (v) USA Today, (vi) The Wall Street Journal, (vii) Billings Gazette; and (viii) Argus Leader as required by the Resolicitation Order [Dkt. Nos. 2128 - 2135, Debtor's Exh. 156 – 163]. The Court hereby finds that: (i) the transmittal of the Notice of the Continued Confirmation Hearing and Ballots for resolicitation was adequate and sufficient under the circumstances of this Chapter 11 Case; (ii) such notice was provided in compliance with the Resolicitation Order, the Bankruptcy Code and the Bankruptcy Rules; and (iii) no other or further notice is required.

J. Tabulation of Votes. As described in the Declaration of Voting Agent Regarding Tabulation of Votes in Connection with Debtor's First Amended Plan of Reorganization (the "Voting Agent Declaration") [Dkt. No. 1930, Debtor's Exh. 32], sworn to by Jonathan A. Carson on August 17, 2004, Kurtzman Carson Consultants LLC (the "Balloting Agent") distributed the solicitation packages as set forth in the Schepper Affidavit. The Balloting Agent received and tabulated the Ballots as follows: (a) each returned Ballot was opened and inspected at the Balloting Agent's office; (b) Ballots were date stamped, sorted according to Plan class, and scanned into the Bankruptcy Administration System; (c) all Ballots received by the Voting Deadline were then entered into the Bankruptcy Administration System and tabulated in accordance with the tabulation rules outlined in the Disclosure Statement Order. Voting Agent Declaration, ¶12. Classes 7, 9 and 12 accepted the First Amended Plan with respect to both numerosity and amount. Class 8 voted to reject the First Amended Plan.

K. Tabulation of Votes in Connection with the Releases. The Voting Agent Declaration sets forth the following results in connection with the releases provided under the First Amended Plan:

| Impaired Class | Total Members Voting | Members Released | Members Not Released | Abstentions | % Released |
|---|---|---|---|---|---|

| Class 7 | 261 | 215 | 46 | 264 | 82.38% |
| Class 8 | 2150 | 1429 | 721 | 266 | 66.47% |
| Class 9 | 24 | 18 | 6 | 7 | 75.00% |
| Class 12 | 28 | 20 | 8 | 0 | 71.43% |

See Voting Agent Declaration, ¶ 16.

L.  Tabulation of Votes in Connection with Resolicitation. As described in the Declaration
    of Voting Agent Regarding Tabulation of Votes in Connection with Debtor's Second
    Amended Plan of Reorganization (the "Voting Agent Resolicitation Declaration") [Dkt.
    No. 2170, Debtor's Exh. 185], sworn to by Christopher Schepper on October 5, 2004, the
    Balloting Agent distributed the resolicitation packages as set forth in the Schepper
    Resolicitation Affidavit. The Balloting Agent, with the assistance of the Bondholder
    Communication Group ("BCG"), received and tabulated the Ballots as follows: (a) each
    returned Ballot was opened and inspected; (b) Ballots were date stamped, sorted
    according to Plan class, and scanned into the Bankruptcy Administration System; (c) all
    Ballots received by the voting deadline were then tabulated in accordance with the
    tabulation rules outlined in the Resolicitation Order. Voting Agent Resolicitation
    Declaration, ¶ 10-15. Classes 7, 8(a), 9 and 12 accepted the Second Amended Plan with
    respect to both numerosity and amount. Class 8(b) voted to reject the Second Amended
    Plan.

M.  Tabulation of Class 8(b) Options. The Voting Agent Resolicitation Declaration sets forth
    the following results in connection with the holders of Class 8(b) options:

11

| Members Voted | # Members for Option 1 | # Members for Option 2 | Shares for Option 1 | Shares for Option 2 |
|---|---|---|---|---|
| 532 | 439 | 93 | 631,622 | 253,221 |

N. Tabulation of Votes in Connection with Releases on Resolicitation. The Voting Agent Resolicitation Declaration sets forth the following results in connection with the releases provided under the Second Amended Plan:

| Impaired Class | Total Members Voting | Members Released | Members Not Released | Abstentions | % Released |
|---|---|---|---|---|---|
| Class 7 | 423 | 390 | 33 | N/A | 92.20% |
| Class 8(a) | 2593 | 1963 | 630 | N/A | 75.70% |
| Class 8(b) | 656 | 499 | 157 | N/A | 76.07% |
| Class 9 | 41 | 29 | 8 | 4 | 70.73% |

See Voting Agent Declaration, ¶ 19.

O. Objections

1. Objection of Stephen R. Heflin [Dkt. No. 1779]. The objection of Stephen R. Heflin failed to provide any basis for the objection and is overruled.

2. Limited Objection of Wells Fargo, National Association ("Wells Fargo"), in its Capacity as Indenture Trustee, to Debtor's First Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code re: Docket No. 1351 [Dkt. No. 1780] and Limited Objection of U.S. Bank, National Association ("U.S. Bank"), in its Capacity as Indenture Trustee, to Debtor's First Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code re: Docket No. 1351 [Dkt. No. 1781]. Wells Fargo sought clarifying language in connection with Section 5.17 of the First Amended Plan as well as the defined terms "Secured Bonds" and "South Dakota Pollution Control Bonds," Sections 1.158 and 1.164 of the First Amended Plan, respectively. U.S. Bank sought clarifying language in connection with Section 5.17 of the First Amended Plan as well as Section 5.5 of the First Amended Plan. The Court hereby finds that both objections have been resolved pursuant to revisions made to the Second Amended Plan and the objections are overruled. See, Plan §§ 1.168 (Secured Bonds), 1.174 (South Dakota Pollution Control Bonds), 1.175 (South Dakota Pollution Control Claims), 5.5(b) (Cancellation and

Surrender of Existing Securities Agreements, and 5.18 (Indenture
Trustees Charging Lien).

      3.     Limited Objection of PPL Montana LLC
("PPLM") to Confirmation of the Debtor's First Amended Plan of
Reorganization Under Chapter 11 of the Bankruptcy Code [Dkt.
No. 1784].

      a.     The following documents
have been filed in connection with PPLM's claim: **(i)**
PPLM's proof of claim, Claim No. 714, as amended on
August 3, 2004 (the "PPLM Claim"); (ii) Debtor's
Objection to Claim of PPL Montana, LLC Pursuant to 11
U.S.C. § 502(b) and Fed. R. Bankr. P. 3007 [Dkt. No.
1658, Debtor's Exh. 85]; (iii) Motion of PPL Montana for
Abstention or in the Alternative for an Order Directing that
Resolution of the Objection to PPL Montana, LLC's Proof
of Claim be Determined by the United States District Court
for the District of Montana [Dkt. No. 1859]; (iv) Order
Granting Abstention [Dkt. No. 2159]; (v) Motion Pursuant
to Sections 105(a), 363(b) and 502(c) of the Bankruptcy
Code for Estimation of PPL Montana LLC's Claim and to
Establish Disputed Claim Reserve [Dkt. No. 2056]; and
(vi) Stipulation and Order Resolving Section III of the
Limited Objection of PPL Montana, LLC to Confirmation

14

of the Debtor's First Amended Plan of Reorganization

Under Chapter 11 of the Bankruptcy Code and the Debtor's

Motion Pursuant to Sections 105(a), 363(b) and 502(a) of

the Bankruptcy Code for Estimation of PPL Montana

LLC's Claim and Establish a Disputed Claim Reserve [Dkt.

No. 2183] (the "PPLM Stipulation").

                    b.     PPLM objected to the First

Amended Plan because it asserted that the injunctions

provided for in the First Amended Plan attempted to

extinguish its setoff rights.  Section 10.5(b)(i) of the

Second Amended Plan provides that "[n]otwithstanding

any provision of this Plan to the contrary, this Plan: (i) shall

not enjoin or extinguish any rights or claims asserted by

[PPLM] in its proof of claim dated January 13, 2004 (as

may be amended) or asserted in any other manner,

including, without limitation, [PPLM's] counterclaims and

right of setoff." The Court hereby finds that the language

in Section 10.5(b)(i) resolves PPLM's objection in

connection with the reservation of its counterclaims and

right of setoff; therefore, PPLM's objection to the

injunctions provided in the Plan is hereby overruled.

                    c.     PPLM also objected to the

implementation of the provisions of the Plan regarding the

ATL/1060234.9

15

establishment of the Disputed Claims Reserve because the Debtor made inadequate provision for the manner and timing of establishing reserves for Disputed Claims. The Debtor and PPLM entered into the PPLM Stipulation whereby the Debtor will establish a segregated reserve that will be used solely for the purpose of any distributions to be made for the PPLM Claim. The segregated reserve will be funded by shares of common stock equal to the value of $50,000,000, valued as of the Effective Date, pursuant to the terms of the PPLM Stipulation. As the Debtor and PPLM have reached a stipulation in connection with PPLM's objection, PPLM's objection is resolved pursuant to the PPLM Stipulation.

4.      Objection of Indenture Trustee to Confirmation of Debtor's First Amended Plan of Reorganization [Dkt. No. 1789] (the "Wilmington Trust Objection") and Objection by Harbert Management to Confirmation of the Debtor's First Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Dkt. No. 1790] (the "Harbert Objection"). The Wilmington Trust and Harbert Objections to confirmation have been withdrawn pursuant to a settlement agreement reached between the parties and incorporated into the Plan. Wilmington Trust's and Harbert's withdrawals of their objections to

confirmation have been filed with the Court. See Dkt. Nos. 1994
and 1982, respectively.

      5.      Objection of Official Committee of
Unsecured Creditors in Chapter 11 Case of Touch America
Holdings, Inc. (the "TA Committee") to Debtor's First Amended
Plan of Reorganization. The TA Committee objected to the First
Amended Plan to the extent that it enjoined, limited or released
any rights, claims or interests held by the TA Debtors that may
arise under any of the D&O Policies and does not release any
claims the TA Debtors may hold against any D&O Protected Party
to the extent that such claim is against an individual in his or her
capacity as a former director or officer of any of the TA Debtors or
their present or former affiliates or predecessors. The Second
Amended Plan provides that the D&O Insurance Entity Injunction
shall not enjoin any rights of the TA Debtors that may arise under
any of the D&O Policies. See Plan, § 6.9(c). The Second
Amended Plan also provides that "D&O Protected Party" shall
exclude any individual who previously served as an officer or
director of any of the TA Debtors, or their present or former
predecessors, in such individual's capacity as an officer or director
of such TA Debtor. See Plan, § 1.49. The Court hereby finds that
the objection has been resolved pursuant to revisions made to the
Second Amended Plan and the objection is overruled.

6.    Limited Objection of Touch America

Holdings, Inc., et al., Debtors in Possession, to Debtor's First

Amended Plan of Reorganization Under Chapter 11 of the

Bankruptcy Code [Dkt. No. 1872]. The TA Debtors object to the

Plan to the extent that it limits the TA Debtors' ability to receive

distributions as a Class 9 claimant on account of the portion of its

claims classified as general unsecured claims. Section 1.95 of the

Plan provides that to the extent a creditor holds a claim that is not

an Administrative Claim, Fee Claim, Priority Tax Claim,

Unsecured Priority Claim, Bank One DIP Financing Claim, CSFB

Financing Claim, Secured Claim, Unsecured Note Claim,

Unsecured Subordinated Note Claim, Unsecured Convenience

Claim, D&O Trust Claim, Other Equity Interest, Securities Claim,

Opt-Out Securities Claim or Environmental Claim, such claim

shall be a General Unsecured Claim. The TA Debtors objection

also sought to ensure that the Disputed Claim Reserve was

adequate to pay any potential Class 9 or Class 12 claims asserted

by the TA Debtors. The Court hereby finds that pursuant to

Section 1.95 of the Plan, to the extent the TA Debtors hold an

Allowed General Unsecured Claim under the Plan such claim shall

receive distributions as a Class 9, General Unsecured Claim. The

Court also finds that Sections 7.5 and 7.6 of the Plan provides for

the Disputed Claim Reserve and procedures for distributions to

Disputed Claims that become Allowed Claims. Accordingly, the Court finds that the objection of the TA Debtors has been resolved or is addressed by Sections 7.5 and 7.6 of the Plan.

7.    Limited Objection of Richard R. Hylland to Confirmation of the Debtor's First Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Hylland Objection").

a.    The Hylland Objection objects to Section 13.1 of the Plan which provides that the Bankruptcy Court will retain exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Case and the Plan. Excluding the arbitration proceedings initiated by Hylland and currently stayed, which proceedings will be permitted to proceed once the automatic stay is dissolved, the Court hereby finds that continuing jurisdiction, as provided for in the Plan, is appropriate, necessary and consistent with applicable law.

b.    The Hylland Objection also asserts that Section 10.5 of the First Amended Plan impermissibly impairs Hylland's setoff rights. Section 10.5(b)(iii) of the Second Amended Plan provides that "[n]otwithstanding any provision of this Plan to the contrary, this Plan: . . . (iii) shall not affect any setoff

19

rights, if any, of Richard Hylland." The Court hereby finds
that the language in Section 10.5(b)(iii) resolves this
portion of the Hylland Objection and such objection is
overruled

                  c.      The Hylland Objection also
objects to the Plan to the extent that the Plan does not
provide that claims not paid by the D&O Trust receive the
treatment provided to Class 7 and Class 9. The Court finds
that Section 524(e) of the Bankruptcy Code does not limit
the equitable power of the Court to enjoin suits against
third parties where the injunction is necessary to the plan
and workable reorganization. Based upon the pleadings
filed in connection with the Class Action settlement, the
provisions of the Plan and the support of the Creditors'
Committee and other parties-in-interest, including the
MPSC, the Court finds that the Plan represents a global
agreement among the parties in this case, premised on all
of the mutually interdependent elements, including the
formation and funding of the D&O Trust and the D&O
Injunctions necessary to implement the D&O Trust. See
Memorandum Decision Approving the Class Action
Settlement [Dkt. No. 2175] and Order Approving the
Stipulation and Settlement Agreement Among Debtor,

20

Montana Public Service Commission and Montana
Consumer Counsel Pursuant to Sections 105(a) and
1129(a)(4) of the Bankruptcy Code and Rule 9019 of the
Bankruptcy Rules [Dkt. No. 1706]. Upon consideration of
the provisions of the Second Amended Plan, the D&O
Trust Documents and the arguments and evidence
presented at the Confirmation Hearing, the Court overrules
Hylland's objection finding that the Debtor's transfer of its
interest in the insurance policies to the D&O Trust as
provided in Section 6.6 of the Second Amended Plan and
the Insurance Assignment Agreement provides sufficient
and adequate consideration for the channeling injunction,
that the D&O Trust is properly capitalized and that limiting
the recovery on D&O Claims to the D&O Trust provides
fair and adequate treatment to D&O Trust Claimants who
have received the benefit of the releases set forth in
Sections 6.9 and 10.5(c) of the Plan and Class Action
Settlement Documents, as consideration for the transfer of
the D&O Policies to the D&O Trust and the D&O Trust
Channeling Injunction. The Court finds the Debtor's
argument that the first in, first out ("FIFO") method of
distribution is consistent with the distribution of D&O
insurance policy proceeds being utilized to fund the D&O

Trust persuasive and hereby finds that access to the D&O
Trust as the only remedy available to a Director or Officer
for reimbursement of costs and related indemnification
claims is appropriate, necessary and consistent with the
Bankruptcy Code. Therefore, the Hylland Objection to the
injunctions provided in the Plan is hereby overruled.

d.     The Hylland Objection also
objected to the Debtor's agreement to contribute up to $2.5
million to pay Defense Costs incurred by current Officers
and Directors only (in the event the D&O Trust is
exhausted). The Debtor has presented evidence that the
agreement to contribute up to $2.5 million to pay Defense
Costs incurred by current Officers and Directors is in
recognition of the Debtor's statutory and contractual
indemnity obligations to its current Officers and Directors,
and additional consideration to the current Officers and
Directors who have continued to serve the Debtor during
this Chapter 11 Case. Upon consideration of the arguments
and evidence, the Court declines to accept the objector's
position. The Court hereby finds that Section 5.1 of the
Plan is appropriate and consistent with all applicable laws,
and the Hylland Objection to the allocation of the $2.5
million to pay Defense Costs incurred by current Officers

ATL/1060234.9                                                              22

and Directors only in the event the D&O Trust is exhausted
is overruled.

                    e.        The Hylland Objection urged
the Court to find that to the extent his claims are classified
as a Class 9 claim, Mr. Hylland's claims related to the
D&O Proceedings are not properly classified and are being
excluded from the D&O Trust. The evidence clearly shows
that Mr. Hylland's claims are properly classified and Mr.
Hylland received ballots for both Class 9 and Class 12
claims, but only returned the Class 9 ballot. See
Declaration of Voting Agent Regarding Ballots of Richard
R. Hylland in Connection with Debtor's First Amended
Plan of Reorganization [Dkt. No. 2037]. Moreover, the
Plan provides in Section 4.9 to the extent that Mr. Hylland
holds Class 9 Claims that are not D&O Trust Claims and
are ultimately determined to be Allowed General
Unsecured Claims, Mr. Hylland will receive the same
treatment as any other holder of an Allowed Class 9 Claim.
Based on the evidence presented, the Court declines to
accept Mr. Hylland's arguments and hereby overrules the
Hylland Objection alleging improper classification. Based
on the arguments of counsel and the evidence presented
and after due deliberation, the Court hereby finds that

ATL/1060234 9

23

Section 4.9 of the Plan provides that the portion of Mr. Hylland's Claims that may qualify as an Allowed D&O Trust Claims shall be treated as D&O Trust Claims and channeled to the D&O Trust and the portion of Mr. Hylland's Claims that may be determined to be an Allowed Class 9 Claim shall be treated as a Class 9 Claim.

8.     Objection of Goldman, Sachs & Co. ("Goldman Sachs") to Confirmation of Debtor's First Amended Plan of Reorganization [Dkt. No. 1795] and Objection of Milbank, Tweed, Hadley & McCloy LLP ("Milbank Tweed") to the Debtor's Second Amended Disclosure Statement [Dkt. No. 1986] (the "Milbank Objection"). Goldman Sachs and Milbank Tweed filed similar objections asserting that to the extent that the D&O Trust Channeling Injunction could be construed to impair their rights against non-Debtor parties such injunction was improper. Section 10.9 of the Plan provides that the Plan shall not enjoin, release or otherwise impair any claim of Goldman Sachs or Milbank Tweed against any person or entity other than the Debtor and the Reorganized Debtor or otherwise limit any defense, setoff, counterclaim or cross claim either Goldman Sachs or Milbank Tweed may have against any entity, except that any recovery by Goldman Sachs and Milbank Tweed on such counterclaim or cross claim against the Debtor or Reorganized Debtor shall be limited by

24

the Plan. Upon consideration of the evidence and the revisions to the Plan, the Court hereby finds that the objections have been resolved and are hereby overruled.

The Milbank Objection also asserts that the Plan cannot determine whether the MPC Policies are part of the Debtor's estate. First, the insurance policies whose proceeds are subject to the Insurance Assignment Agreement do not include the MPC Policies. See Insurance Assignment Agreement, Exh. A. Second, the Debtor has acknowledged that its interests in the MPC Policies are disputed. See Plan, Exh. C. Moreover, to the extent the McGreevey Litigation settlement is approved, the Debtor will be transferring and assigning its rights and interest in the MPC Policies. Neither the Plan nor this Confirmation Order seek to determine whether the MPC Policies are part of the Debtor's estate; therefore, Milbank Tweed's objection regarding the MPC Policies is overruled.

> 9.      Objection of the United States of America to Confirmation of the Debtor's First Amended Plan of Reorganization dated May 17, 2004 [Dkt. No. 1897]. The United States of America (the "United States") asserts that the Debtor owes undisputed pre-petition and post-petition fees under certain permits with the United States Department of Agriculture, Forest Service. The Debtor has represented that it intends to assume the obligations related to the permits. See Notice of Contracts the Debtor Intends to Assume and/or Reject Pursuant to Section IV.F of the Debtor's First Amended Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code for the Plan of

Reorganization which indicated its intent to perform the
obligations related to the permits [Dkt. No. 1700] (the
"Assumption Notice"). The United States also filed an objection
to preserve its rights in the event there is a dispute regarding the
terms of the assumption of certain contracts with the Bonneville
Power Administration. The Debtor has filed a Omnibus Motion
for Court Approval to Assume Certain Executory Contracts
Pursuant to Section 365 of the Bankruptcy Code and Granting
Related Relief [Dkt. No. 2108] (the "Assumption Motion").
Moreover, in Section 8.1 of the Plan, the Debtor provided a
procedure to object to the cure amounts as provided in the
Assumption Notice. The United States also objected to the First
Amended Plan to the extent it did not preserve the United States'
common law right to setoff mutual debts. The Second Amended
Plan provides for the preservation of the United States' setoff
rights. Plan §10.5(b). Upon consideration of the objection, the
evidence presented and representations of counsel, the Court
hereby finds that the objections of the United States have been
fully resolved.

10.     Objection of Montana Power Benefit
Restoration Plan Participants (the "BRP Participants") to Debtor's
First Amended Plan of Reorganization Under Chapter 11 of the
Bankruptcy Code [Dkt. No. 1959]. The BRP Participants assert

that the Montana Power Benefit Restoration Plan (the "BRP") is not an executory contract that can be rejected. As of the continued Confirmation Hearing, no motion is before the Court seeking to reject the BRP. The BRP Participants also objected to the implementation of the provisions of the Plan regarding the establishment of the Disputed Claims Reserve because the Debtor made inadequate provision for the manner and timing of establishing reserves for Disputed Claims. All rights of the Debtor and the BRP Participants, including the one BRP Participant seeking relief to assert a late-filed claim, and such relief is granted herein, are reserved and the policies at issue shall not be affected or terminated without further order of this Court. Accordingly, the objection of the BRP Participants is overruled in its entirety.

Objection of the Equity Holders.[2] The Equity Objections urge the Court to find that the Plan violates the absolute priority rule because Class 13 shareholders are recovering substantially less than the value of their equity interests.

The testimony elicited by the Debtor and the Creditors' Committee at the August 25, 2004 Confirmation Hearing support the treatment afforded to the Equity Holders as well as Class 8(b). As discussed in greater detail below, this Court finds persuasive

---

[2] The following objections were filed by various equity holders: (i) Objection to Plan of RCG Carpathia Master Fund, Ltd. and Kellogg Capital Group, LLC f/k/a Performance Capital (the "Equity Holders") to Debtor's First Amended Plan of Reorganization (Dkt. No. 1797) and (ii) Objection of David Fishel to Debtor's First Amended Plan of Reorganization and Joinder of David Fishel to Objection of RCG Carpathia Master Fund, Ltd. and Kellogg Capital Group, LLC f/k/a Performance Capital to Debtor's First Amended Plan of Reorganization (Dkt. No. 1800) (collectively, the "Equity Objections").

27

the testimony and evidence presented by the Debtor and the Creditors' Committee regarding valuation and, as such, the Plan complies with the "absolute priority rule" set forth in Section 1129(b)(2) because there are no claimants junior to either Equity Holders or Class 8(b) that will receive or retain any property under the Plan. See 11 U.S.C. § 1129(b)(2)(B)(ii). Moreover, under the Plan, no senior class will receive more than full compensation for its claims. See Plan, Article 4.

Both Lazard Freres & Co. LLC ("Lazard") and Houlihan, Lokey, Howard & Zukin, Inc. ("Houlihan") used the three standard valuation approaches: (i) precedent transaction analysis; (ii) discounted cash flow approach; and (iii) comparable public company analysis. See Transcript of Confirmation Hearing Before the Honorable Charles G. Case, II, United States Bankruptcy Judge, dated August 25, 2004 at 237 (the "Confirmation Hearing Transcript") (testimony of Andrew Yearley). Cf. Confirmation Hearing Transcript at 311-312, 317, 319 (testimony of Bradley Geer); see also, Debtor's Exh. 139 and 141-146. Using these generally recognized valuation methodologies, Lazard determined that the Enterprise Value of the Reorganized Debtor approximated the midpoint of the range of these methodologies, $1.5 billion. Confirmation Hearing Transcript at 237 (testimony of Andrew Yearley). Using the same methodologies, Houlihan independently

ATL/1060234.9

28

arrived at a range of value for the Reorganized Debtor of approximately $1.4 billion to 1.67 billion. See Confirmation Hearing Transcript at 315 and 325 (testimony of Bradley Geer). The valuations prepared by Lazard and Houlihan were based upon the Debtor's business plan which Lazard determined to be "reasonable" and "achievable." Confirmation Hearing Transcript at 242 (testimony of Andrew Yearley). Moreover, each of the Debtor's witnesses, William Austin, Mike Hanson and Brian Bird testified that the Debtor's business plan was reasonable and achievable. Confirmation Hearing Transcript at 106-108 (testimony of William Austin); Confirmation Hearing Transcript at 169 (testimony of Mike Hanson); Confirmation Hearing Transcript at 217 (testimony of Brian Bird). The Court finds the testimony of Mr. Yearley and Mr. Geer to be reasonable and persuasive; accordingly, the Court finds that the value of the Reorganized Debtor based on the generally recognized methodologies to be a range of approximately $1.4 to $1.67 billion.

As the testimony at the Confirmation Hearing indicated, both Lazard and Houlihan made downward adjustments to their valuations equal to the "present value of the QF liabilities," or $140 million, to take into consideration losses associated with the Debtor's QF liabilities that were reflected on the Debtor's income statements but not captured in any of the earnings figures.

ATL/1060234.9

29

Confirmation Hearing Transcript at 241, 298 (testimony of Andrew Yearley); Confirmation Hearing Transcript at 323 (testimony of Bradley Geer). Upon a review of the Disclosure Statement, the Plan and upon consideration of the testimony at the Confirmation Hearing, the Court finds that the downward adjustment to the valuation of the Reorganized Debtor was reasonable and appropriate.

Lazard and Houlihan independently concluded that the total claims threshold plus post-petition interest was approximately $2.2 to $2.3 billion. Confirmation Hearing Transcript at 250-251 (testimony of Andrew Yearley); Confirmation Hearing Transcript at 325 (testimony of Bradley Geer). The witnesses testified that at these claims levels, there would be approximate negative equity value in the Reorganized Debtor of at least $586 million to $700 million. Confirmation Hearing Transcript at 325 (testimony of Bradley Geer); Confirmation Hearing Transcript at 240 (testimony of Andrew Yearley). Moreover, Mr. Yearley testified that in order to reach a valuation where there would be positive equity several factors must be assumed including using only the discounted cash flow approach, not deducting the QF liability, and higher growth rates. Confirmation Hearing Transcript at 254 (testimony of Andrew Yearley). The Court finds that reaching a valuation where

30

there would be positive equity assumes factors that are not
supported by the evidence or the testimony.

The Equity Holders' financial advisor, Seneca Financial
Group ("Seneca"), through James Harris, testified that Seneca
relied almost exclusively on the discounted cash flow analysis and
provided no weight to the comparable transactions and the market
multiples methodologies. Confirmation Hearing Transcript at 350-
351 (testimony of James Harris). The Court finds that Seneca's
primary reliance on the discounted cash flow analysis was not

reasonable because Seneca wholly disregarded generally
recognized market-based methodologies in determining valuation.

The discounted cash flow analysis relied on by Mr. Harris is a
projection based analysis which requires a variety of assumptions
and cannot be relied upon as the sole methodology for determining
valuation. Mr. Harris also testified that, despite the fact that the
Debtor's management had included all relevant information in its
projections, Seneca chose not to rely on the key elements of the

Debtor's business plan. As such, Seneca failed to deduct the
Debtor's QF liabilities and made several assumptions regarding tax
rates, higher growth and terminal value. Confirmation Hearing
Transcript at 391 (testimony of James Harris); Confirmation
Hearing Transcript at 254 (testimony of Andrew Yearley). Mr.
Harris failed to interview management or talk to Lazard or

Houlihan about the assumptions underlying the Debtor's business
plan. Confirmation Hearing Transcript at 392 (testimony of James
Harris). In particular, the Court finds that Mr. Harris' use of a
higher growth rate to be speculative, not historically-based, and
not based on management's projections. Moreover, Mr. Harris
failed to demonstrate why Seneca chose not to deduct the Debtor's
QF liabilities notwithstanding the recordation of a $140 million
liability on the Debtor's balance sheet. Confirmation Hearing
Transcript at 394 (testimony of James Harris). The Court also
finds that Mr. Harris' reliance on the Standard & Poor Report
(Equity Holders Exh. 1) was unreasonable as such report was not
prepared for valuation purposes. Accordingly, the Court finds that
Mr. Harris' testimony as to valuation lacks credibility and is not
substantial because he chose to ignore the Debtor's business plan
and the projections on which the business plan is based.

Upon consideration of the evidence and the testimony at
the Confirmation Hearing, the Court finds that the Plan complies
with the "absolute priority rule" set forth in Section 1129(b)(2)
because there are no claimants junior to either Equity Holders or
Class 8(b) that will receive or retain any property under the Plan.
See 11 U.S.C. § 1129(b)(2)(B)(ii). Accordingly, the objections of
the Equity Holders and David Fishel are overruled in their entirety.

Magten and Law Debenture object to the classification of

claims under the Plan because the Plan (i) separately

classifies holders of TOPrS and QUIPS and (ii) classifies

the claims of the holders of the QUIPS with respect to their

claim for principal plus interest together with causes of

actions asserted by the holders of the QUIPS in the QUIPS

Litigation. The Plan segregates the claims based on the

TOPrS into Class 8(a) and the claims based on the QUIPS

into Class 8(b). See Plan, § 4.8. The Court finds that the

claims based on the TOPrS Indenture and the QUIPS

Indenture are not "substantially similar" since the claims

relating to the TOPrS and the claims related to the QUIPS

are not similar in legal character or effect. See Plan, §4.8.

Both Class 8(a) and Class 8(b) will receive the same

distribution if each respective class accepts the Plan;

accordingly, the Court finds that the Plan does not provide

for disparate treatment of Class 8(a) and Class 8(b). See

Plan, §4.8. As the Plan reflects, the Debtor reached a

settlement with Wilmington Trust Company, as indenture

trustee under the TOPrS Indenture, and Harbert

Management Corporation whereby the PUHCA[3]-related

litigation claims were settled and released in connection

with the increased distributions. See Plan, §4.8.

---

[3] The Public Utility Holdings Company Act of 1935 ("PUHCA").

33

Consistent with the treatment provided to Class 8(a), the Plan provides the holders of QUIPS the same opportunity to settle their QUIPS Litigation claims that was provided to the holders of TOPrS to settle their PUHCA-related claims. Moreover, upon consideration of the Plan and evidence, but for the settlement being offered, the holders of TOPrS and QUIPS would not be entitled to a distribution because under the express terms of the TOPrS Indenture and the QUIPS Indenture, the TOPrS and QUIPS claims are subordinated to the claims of Class 7. Upon review of the Plan, the pleadings, testimony and arguments of counsel, the Court hereby finds that there is a reasonable basis for the Plan's classification scheme with regard to Class 8(a) and Class 8(b) because the claims by holders of TOPrS are substantially similar to other claims in Class 8(a) and the claims by holders of the QUIPS are substantially similar to other claims in Class 8(b).

In addition, the Court finds that the Options provided to Class 8(b) under the Plan are appropriate. The Court hereby finds that the "going flat" transaction is all one transaction and but for the "going flat" transaction the Debtor would have no liability on the QUIPS Notes. The QUIPS Litigation Claims and the QUIPS Notes Claims are mutually exclusive and not cumulative claims; therefore, requiring Class 8(b) holders to opt for either Class 8(b) treatment or preserving their QUIPS Litigation Claims as disputed Class 9 Claims does not unfairly discriminate against such holders.

The two claims cannot coexist. As such, requiring Class 8(b) holders to pay for the option of seeking a higher monetary reward through the QUIPS Litigation is not unfairly discriminatory. The Court hereby finds that requiring Class 8(b) holders to choose either Option 1 or Option 2 is appropriate and reasonable.

Moreover, the Court finds that the classification scheme was not proposed to manipulate class voting. The voting results show that Class 8(a) accepted the Plan in both number and amount. Voting Agent Resolicitation Declaration ¶ 16 [Dkt. No. 2170, Debtor's Exh. 185]. In the event the two sub-classes were combined, the Debtor would not be required to take advantage of the cram-down provisions of Section 1129(b) and Magten and Law Debenture's vote to reject would have been subsumed by the far larger claims of the holders of TOPrS. Accordingly, the Court

hereby finds that the separate classification of Class 8(a) and Class
8(b) is consistent with the broad discretion afforded the Debtor in
formulating the Plan, was not proposed to manipulate the vote and
is consistent with the requirements of Section 1122(a) of the
Bankruptcy Code and applicable law.

a.    Magten and Law Debenture
also object to the treatment provided to Class 8(b) claims
under the Plan. The Court finds that the claims of the
Magten and Law Debenture are subordinated to the claims
of the Class 7 holders under the express language of the
QUIPS Indenture. The Court reiterates its findings
regarding valuation and finds that without the agreement of
the more-senior Class 7 holders, the holders of Class 8(b)
would not be entitled to a distribution under the Plan
because there is insufficient value for Class 8(a) or Class
8(b) to receive any distribution in accordance with the strict
priority rule. The Court finds persuasive the holding in In
re Union Financial Services Group, Inc., 303 B.R. 390,
421-22 (Bankr. E.D. Mo. 2003) and holds that there can be
no unfair discrimination where a plan allocates to a class of
junior creditors certain value to which those creditors
"[had] no right, title or interest . . . [and] which would
otherwise [have been] required by applicable law to be paid

directly to" more senior creditors. Accordingly, the Court finds that the treatment of Class 8(b) claims is consistent with the Bankruptcy Code and applicable law and does not unfairly discriminate against Magten and Law Debenture.

      b.    Magten and Law Debenture object to the D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction and assert the injunctions are not consensual and that the Debtor is abandoning potential value to the estate. As described in the Voting Agent Resolicitation Declaration, over 70% of each of the impaired classes entitled to vote consented to the releases. Voting Agent Resolicitation Declaration ¶ 19 [Dkt. No. 2170, Debtor's Exh. 185]. Moreover, the Plan, including the D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction, were approved overwhelmingly by the holders of Class 7, Class 8(a), Class 9 and Class 12 claims. Voting Agent Resolicitation Declaration ¶ 16 [Dkt. No. 2170, Debtor's Exh. 185]. Upon consideration of the evidence and arguments presented by the parties, the Court does not find Magten's and Law Debenture's arguments persuasive. The Court finds that the factors set forth in In re Master Mortgage Inv. Fund, Inc., 168 B.R 930, 935 (Bankr. W.D. Mo. 1994) and

ATL/1060234.9

37

In re Dow Corning Corp., 280 F.3d 648 (6th Cir. 2002)
weigh in favor of approving the D&O Trust Channeling
Injunction and the D&O Insurance Entity Injunction.

(1)    Identity of

Interest. Upon consideration of the evidence, the
Court finds that an identity of interest exists
between the Debtor and the parties released under
the Plan. The Debtor's Officers and Directors
share an identity of interest with the Debtor based
on statutory and contractual indemnification
rights negotiated with the Debtor and provided in
the Debtor's Certificate of Incorporation.

(2)    Substantial

Contribution to Reorganization. The Court also
finds that the post-petition Officers and Directors
have provided consideration in the form of
assigning their interest in the remaining D&O
Policies' proceeds under the Insurance
Assignment Agreement, Exhibit B to the Plan, to
the fund the D&O Trust. The Directors and
Officers have provided consideration in the form
of assigning their rights and interests in the D&O
Policies to the D&O Trust. Under Article 6 and

Section 10.5(e) of the Plan and the D&O Trust, the Officers and Directors are giving up their direct access to the D&O Policies, which they relied on when they accepted their positions with the Debtor. Moreover, the Officers and Directors are agreeing to be channeled into the D&O Trust with no guaranty that their defense costs will be paid in full. See Plan §10.5(c). The Court finds that the Officers and Directors have contributed substantially to the Debtor's Plan and to the reorganization.

(3)   Essential to Reorganization. The Court finds that the D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction are necessary to the Plan and without such injunctions the Debtor's ability to reorganize would be jeopardized. The D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction are integral elements of the Debtor's Plan and represent part of a global agreement among the parties, which is premised on all of the mutually interdependent elements, including the formation and funding of the D&O

Trust. Moreover, the Court finds that the D&O
Trust is essential to accomplish the Class Action
settlement which requires the Debtor to provide a
mechanism to make distributions to parties who
choose to opt out of that settlement. See Plan
4.15. The Court finds that without the D&O Trust
Channeling Injunction and the D&O Insurance
Entity Injunction there would be no D&O Trust
and no settlement of the Class Action;
accordingly, the Court finds that the D&O Trust
Channeling Injunction and the D&O Insurance
Entity Injunction is essential to the Debtor's
reorganization.

(4)

Overwhelming Creditor Support. As evidenced
by the Voting Agent Resolicitation Declaration,
the Plan was overwhelmingly accepted by all the
impaired classes, except for Class 8(b). Voting
Agent Resolicitation Declaration ¶ 16 [Dkt. No.
2170, Debtor's Exh. 185]. In particular, 100% of
holders of Claims in Class 12 who submitted
ballots, the only class impacted by the D&O Trust
Channeling Injunction and the D&O Insurance

Entity Injunction, voted to accept the First
Amended Plan. See Voting Agent Declaration,
¶14. In addition 71.43% of holders of Class 12
Claims who submitted ballots expressly voted to
accept the releases provided under the Plan.
Accordingly, the Court holds that this factor of
the Master Mortgage/Dow Corning test is
satisfied.

(5)    Plan Pays All

or Substantially All of the Claims Affected by the
Injunction. Article VI of the Plan and the D&O
Trust Documents provide a mechanism to pay
claimants with D&O Trust Claims in Class 12.
While the Court cannot determine at this time
what claims will be made against the D&O Trust,
and whether all such claims will be paid, the
Debtor projects that all such claims will be paid in
full.

(6)    Plan Provides

an Opportunity for those Claimants who Choose
Not to Settle to Recover in Full. Section 6.1 and
6.5 of the Plan provides holders of Class 12 D&O
Trust Claims the ability to pursue their causes of

action and present any valid claims to the D&O

Trust for distribution so long as funds remain

available for the D&O Trust.

(7)    Specific

Factual Findings. After consideration of all the

factors and the evidence, and after due

deliberation, the Court hereby reiterates its

findings above regarding the Master

Mortgage/Dow Corning factors and finds that

such factors weigh in favor of approving the D&O

Trust Channeling Injunction and D&O Insurance

Entity Injunction.

c.    The Court also finds

persuasive the Debtor's argument that the Debtor is

precluded from recovering under any applicable D&O

Policy for any such claims against its Officers and

Directors because of the "insured versus insured" exclusion

in the D&O Policies. See, e.g., Cohen v. National Union

Fire Ins. Co. (In re County Seat Stores, Inc.), 280 B.R. 319

(Bankr. S.D.N.Y. 2002). As established at the hearing on

the MOU Motion, each of the Debtor's D&O Policies

includes an express "insured versus insured" exclusion. It

is clear that in the absence of any insurance coverage, any

claims the Debtor may have against its Officers and
Directors would be essentially valueless. The Court hereby
finds that the releases provided for in the Plan, including,
but not limited to, the D&O Trust Channeling Injunction
and the D&O Insurance Entity Injunction are appropriate,
necessary and consistent with the Bankruptcy Code and all
applicable law.

        d.     Magten and Law Debenture
also contend that the Plan cannot be confirmed until the
QUIPS Litigation is finally resolved. The Debtor has filed
its Motion Pursuant to Sections 105(a), 363(b) and 502(c)
of the Bankruptcy Code for Estimation of Magten Asset
Management's Claims and to Establish Disputed Claim
Reserve [Dkt. No. 1951] (the "Magten Estimation
Motion") and its Motion Pursuant to Sections 105(a),
363(b) and 502(c) of the Bankruptcy Code for Estimation
of Claims of Law Debenture Trust Company of New York
and to Establish Disputed Claim Reserve [Dkt. No. 2093]
(the "Law Debenture Estimation Motion"). The Court
finds persuasive the reasoning in In re Continental Airlines
Corp., 60 B.R. 903, 905-06 (Bankr. S.D. Tex. 1986),
recognizing how unfair it would be to withhold payments
to creditors while a large claim is being liquidated. The

Court finds that awaiting the end of the QUIPS Litigation would hamper the efficient administration of the estate and delay distribution of allowed claims to other creditors. Accordingly, the Court overrules the objections of Magten and Law Debenture in their entirety, and adjourns both the Magten Estimation Motion and the Law Debenture Estimation Motion so that the parties could reach an agreement on the amount of the Disputed Claim Reserve. To the extent the parties are unable to agree on the amount of the Disputed Claim Reserve, upon request of one of the parties, the Court shall hold a hearing on both the Magten Estimation Motion and the Law Debenture Estimation Motion on an expedited basis solely to establish prior to the proposed Effective Date of the Plan the amount of the Disputed Claim Reserve.

e.    Magten and Law Debenture also asserted in rem property interests in the Montana Assets and that such assets were being held in a constructive trust for the benefit of the QUIPS holders. The Court finds that neither Magten nor Law Debenture took any action to impose a constructive trust on the Montana Assets and presented no evidence whatsoever as to why they should be entitled to a constructive trust with

respect to the Montana Assets.  Magten and Law Debenture
had the burden of presenting evidence on this issue
measured by a clear and convincing standard which they
failed to carry.  Moreover, Magten and Law Debenture
failed to cite a statute or case in support of their in rem
property interests.  This Court finds persuasive Section 7 of
the Uniform Fraudulent Transfer Act, as adopted in
Montana, which contemplates that money damages are an
adequate remedy for fraudulent transfer claims.
Accordingly, the Court finds that no constructive trust has
been established and that money damages are an
appropriate remedy for the holders of QUIPS Litigation
Claims.  The Court also finds that the QUIPS Litigation
Claims will be treated in the same manner as disputed
unsecured claims under Section 7.5 of the Plan.  Whatever
claims may be asserted in the QUIPS Litigation are nothing
more than general unsecured claims against the Debtor's
estate and are treated as such.  Accordingly, the Court finds
that the holders of QUIPS Litigation Claims are not entitled
to a segregated cash reserve and as stated above, such
holders shall be treated as Class 9 General Unsecured
Claims subject to the Disputed Claims Reserve.

Accordingly, the Court hereby overrules the Magten and Law Debenture Objections in their entirety.

     f.     Law Debenture also belatedly raised an objection to confirmation of Debtor's Plan based on PUHCA. Neither Magten nor Law Debenture presented any evidence in connection with their PUHCA objection. Accordingly, the Court hereby overrules the Magten and Law Debenture Objections in their entirety.

     g.     Magten and Law Debenture also asserted that the Plan unfairly discriminates against Class 8(a) and Class 8(b) claims because such claims do not receive the same treatment as Class 11, environmental claims, which Magten and Law Debenture argue should be equally ranked with Class 8. The Court finds that valid business, factual, and legal reasons exist for separately classifying Class 8 and Class 11 claims, and thus finds that the claims are not substantially similar. Accordingly, the Court finds that the Plan does not unfairly discriminate against Class 8 claim holders, and the treatment of Class 11 claims in the Plan and under the Court's Order Approving (1) Stipulation between Debtor, Clark Fork and Blackfoot, LLC, Atlantic Richfield Company, United States, State of Montana, and Salish and Kootenai Tribes and (2) Debtor's

46

Motion for Order Pursuant to Bankruptcy Rule 9019

Approving Settlement Agreement Among Debtor, Clark

Fork and Blackfoot LLC and Atlantic Richfield Company

[Dkt. No. 1674] is appropriate. Therefore, Magten's and

Law Debenture's objections are overruled in their entirety.

11. Objections to FIFO Method of Distribution

under the D&O Trust. The Hylland Objection and the Milbank

Objection object to the FIFO method of payment under the D&O

Trust as discriminatory as similarly situated creditors may receive

different treatment of their claims. Upon consideration of the

arguments and evidence, the Court finds the FIFO method of

payment provided for under the D&O Trust Documents is not only

consistent with the distribution method in place under the D&O

Policies being channeled to the D&O Trust, but also the most

equitable distribution available. The Court hereby overrules the

Hylland and Milbank Objections to the FIFO method of payment

provided for under the D&O Trust Documents.

12. Cornerstone Objections [Dkt. Nos. 2168 and

2169]. Cornerstone Propane, L.P. and Cornerstone Propane

Partners, L.P. (collectively, "Cornerstone") filed limited objections

to the Confirmation of the Debtor's Second Amended and Restated

Plan of Reorganization. The limited objections request that, in the

event the Debtor's Motion for Order Approving Compromise and

47

Settlement Among Debtor and Certain Related Affiliates and

Cornerstone Propane Partners, L.P. and Cornerstone Propane, L.P.

and Certain of Their Related Affiliates Pursuant to Rule 9019 of

the Federal Rules of Bankruptcy Procedure [Dkt. No. 2154] (the

"Cornerstone Settlement") is not granted. The Debtor will

increase the reserves for Dispute Claims as provided for in

Paragraph 27 herein. Accordingly, the Court hereby overrules the

limited objections filed by Cornerstone.

13.    Remaining Objections. To the extent not

otherwise overruled, resolved or withdrawn, the Court hereby

overrules any remaining objections to confirmation of the Debtor's

Plan in their entirety.

P. Reasonable Classification of Claims (Section 1122(a)). Valid business, factual, and legal

reasons exist for separately classifying the various Classes of Claims and Equity Interests

in Article IV of the Plan. Other than the objections of Magten and Law Debenture which

have been overruled as discussed above in Paragraph O. 12(a) and 12(b), no other

objections have been asserted to the Debtor's classification of Claims under the Plan and

the Court incorporates its findings herein. The Claims or Equity Interests in each

particular Class are substantially similar to the other Claims or Equity Interests of such

Class, and therefore the Plan satisfies the requirements of Section 1122(a) of the

Bankruptcy Code.

Q. Designation of Classes (Section 1123(a)(1)). Valid business, factual, and legal reasons

exist for the Debtor's designation of Classes of Claims and Equity Interests in Article IV

of the Plan. Other than the objections of Magten and Law Debenture which have been overruled as discussed above in Paragraph O. 12(a) and 12(b), no other objections have been asserted to the Debtor's designation of Classes under the Plan and the Court incorporates its findings herein. Article IV of the Plan properly designates all Classes of Claims and Equity Interests, and therefore the Plan satisfies the requirements of Section 1123(a)(1) of the Bankruptcy Code.

R. Specification of Unimpaired Classes (Section 1123(a)(2)). Article IV of the Plan specifies the Classes of Claims and Equity Interests which are unimpaired or impaired. The Plan provides that Classes 1 through 6, Classes 10 and 11 and Class 14, as well as Administrative Claims and Priority Tax Claims are unimpaired. Accordingly, the Plan satisfies the requirements of Section 1123(a)(2) of the Bankruptcy Code.

S. Specification of Treatment of Impaired Classes (Section 1123(a)(3)). Article IV of the Plan specifies the treatment of each impaired Class. The Plan designates Class 7, Class 8(a), Class 8(b), Class 9, Class 12, Class 13 and Class 15 as impaired. Sections 4.7, 4.8, 4.9, 4.12, 4.13, and 4.15 of the Plan specifies the treatment of the impaired classes. Accordingly, the Plan satisfies the requirements of Section 1123(a)(3) of the Bankruptcy Code.

T. No Discrimination (Section 1123(a)(4)). Article IV of the Plan provides the same treatment for each Claim or Equity Interest of a particular Class, unless the holder of a particular Claim or Equity Interest has agreed to a less favorable treatment of such Claim or Equity Interest. The Plan incorporates the settlement whereby the more-senior Class 7 shares a portion of distributions payable to it with the holders of Class 8(a) and Class 8(b). Reiterating its findings set forth in Paragraph 12 above, the Court finds persuasive

the holding in In re Union Financial Services Group, Inc., 303 B.R. 390, 421-22 (Bankr. E.D. Mo. 2003) and holds that there can be no unfair discrimination where a plan allocates to a class of junior creditors certain value to which those creditors "[had] no right, title or interest . . . [and] which would otherwise [have been] required by applicable law to be paid directly to" more senior creditors. Accordingly, the Plan does not discriminate unfairly and satisfies the requirements of Section 1123(a)(4) of the Bankruptcy Code.

U. Implementation of the Plan (Section 1123(a)(5)). Article V and the other provisions of the Plan provide adequate means for its implementation, including, but not limited to, the following provisions: (i) Section 5.1 provides for funding of the Plan; (ii) Section 5.4 provides for the issuance and distribution of New Common Stock; (iii) Section 5.1 and Article VI provide for the creation of the D&O Trust and the transfer of D&O Trust Assets and any proceeds or Causes of Action thereunder to the D&O Trust; (iv) Section 5.1 provides for the disbursement of cash payments to certain parties in accordance with the Plan; (v) Article IV and Section 5.5 provide for the cancellation of the Unsecured Notes, Unsecured Subordinated Notes and all Equity Interests; (vi) Sections 5.3, 5.7 and 9.4 provide for the continued corporate existence of the Debtor; (vii) Section 9.1 and 9.2 provide for the selection of the directors and officers of the Reorganized Debtor; and (viii) Section 9.3 provides for the necessary corporate action to be taken to effectuate the Plan. Accordingly, the Plan satisfies the requirements of Section 1123(a)(5) of the Bankruptcy Code.

V. Equity Securities (Section 1123(a)(6)). The Plan provides for the inclusion of a provision in the Reorganized Debtor Charter that prohibits the issuance of non-voting

equity securities and therefore, the Plan satisfies the requirements of Section 1123(a)(6) of the Bankruptcy Code. Plan, Section 5.3.

W. Selection of Officers and Directors (Section 1123(a)(7)). The Plan provides for the governance through a Board of Directors of Reorganized Debtor in a manner that is consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the Plan and therefore the Plan satisfies the requirements of Section 1123(a)(7) of the Bankruptcy Code.

X. Impairment or Unimpairment of Claims or Equity Interests and Modification of Rights of Secured Claims (Section 1123(b)(1) and (5)). The Plan impairs or leaves unimpaired, as the case may be, each Class of Claims or Equity Interests, and therefore complies with Section 1123(b)(1) and (5) of the Bankruptcy Code. Plan, Art. IV.

Y. Assumption or Rejection of Executory Contracts and Unexpired Leases (Section 1123(b)(2)). The Plan provides for the assumption of all executory contracts or unexpired leases that have not been rejected or otherwise treated in the Plan with the Bankruptcy Court's approval on or prior to the Confirmation Date. Plan, §8.1. The Debtor has represented that it intends to assume the obligations related to the permits. See Assumption Notice. The Debtor has also filed its Assumption Motion with the Court. In addition, in Section 8.1 of the Plan, the Debtor provided a procedure for parties to object to the cure amounts as provided in the Assumption Notice. Accordingly, the Plan complies with Section 1123(b)(2) of the Bankruptcy Code.

Z. Settlement and Compromise (Section 1123(b)(3)). The Plan provides for the settlement or adjustment of certain Claims or Equity Interests belonging to the Debtor or its estate

ATI/1060234.9                          51

which is fair and equitable and in the best interests of the Debtor, its estate and all holders of Claims and Equity Interests. In particular, the Plan incorporates the settlement whereby the more-senior Class 7 shares a portion of distributions payable to it with the holders of Class 8(a) and Class 8(b). See Plan, Art. IV. Accordingly, the Plan complies with Section 1123(b)(3) of the Bankruptcy Code.

AA.    Compliance with Provisions of the Bankruptcy Code (Section 1129(a)(1)). The Plan complies with all applicable provisions of the Bankruptcy Code including, without limitation, Sections 1122 and 1123 and, as required pursuant to Rule 3016(b) of the Bankruptcy Rules, is dated and identifies the Debtor as proponent of the Plan, and therefore the Plan satisfies the requirements of Section 1129(a)(1) of the Bankruptcy Code.

BB.    Plan Proponent's Compliance with Provisions of the Bankruptcy Code (Section 1129(a)(2)). The Debtor, as proponent of the Plan, has complied with the applicable provisions of the Bankruptcy Code including, without limitation, Sections 1125 and 1126, and therefore the Debtor has satisfied the requirements of Section 1129(a)(2) of the Bankruptcy Code.

CC.    Plan Proposed in Good Faith (Section 1129(a)(3)). The Plan has been proposed in good faith for the valid business purpose of restructuring the Debtor's indebtedness and has not been proposed by any means forbidden by law. Confirmation Hearing Transcript at 115 (testimony of William Austin); Confirmation Hearing Transcript at 170 (testimony of Mike Hanson); Confirmation Hearing Transcript at 217 (testimony of Brian Bird). Magten and Law Debenture are the only parties to contend that the Plan was not proposed in good faith and their objections have been overruled as set forth above in

ATI/1060234.9                                    52

Paragraph O. 12. Based upon the evidence presented, the arguments of counsel and after due deliberation, the Court hereby finds that the Plan was negotiated at arms' length among representatives of the Creditors' Committee and other parties-in-interest, Confirmation Hearing Transcript at 315, 328 (testimony of Bradley Geer), was proposed in good faith for a valid business purpose, Confirmation Hearing Transcript at 115 (testimony of William Austin); Confirmation Hearing Transcript at 170 (testimony of Mike Hanson); Confirmation Hearing Transcript at 217 (testimony of Brian Bird), and provides a return to unsecured creditors. Plan, §§ 4.7, 4.8, and 4.9. Accordingly, the Plan satisfies the requirements of Section 1129(a)(3) of the Bankruptcy Code.

DD.     Payment of Costs and Expenses (Section 1129(a)(4)). Any payment made or to be made by the Debtor for services or for costs and expenses in connection with this Chapter 11 Case, or in connection with the Plan and incident to this Chapter 11 Case, has been approved by, or will be subject to the approval of, this Court as reasonable, and therefore the Plan satisfies the requirements of Section 1129(a)(4) of the Bankruptcy Code.

EE. Disclosure of Identities of Officers, Directors and Insiders (Section 1129(a)(5)). The Debtor has disclosed the identity and affiliation of those individuals proposed to serve, after confirmation of the Plan, as a director, officer or trustee of the Reorganized Debtor pursuant to the Notice of Designation of Board Members for the Reorganized Debtor Pursuant to Section IV.G of the Debtor's First Amended Disclosure Statement [Dkt. No. 1878] filed with the Court on August 10, 2004. The terms of employment, and the appointment to, or continuance in such office of each designated individual is consistent with the interests of creditors and equity security holders and with public policy, and

ATL/1060234.9                                      53

therefore the Plan satisfies the requirements of Section 1129(a)(5) of the Bankruptcy Code.

FF. No Rate Change (Section 1129(a)(6)). The Plan does not contain any changes in rates subject to the jurisdiction of any governmental regulatory commission, and therefore the Plan satisfies the requirements of Section 1129(a)(5) of the Bankruptcy Code. Plan, § 12.2 and Disclosure Statement, Exhibit F-2.

GG. Best Interests of Creditors (Section 1129(a)(7)). As discussed above in Paragraph 11, the testimony elicited by the Debtor and the Creditors' Committee at the August 25, 2004 Confirmation Hearing supports the treatment afforded to the Equity Holders as well as Class 8(b). This Court finds persuasive the testimony and evidence presented by the Debtor and the Creditors' Committee regarding valuation and as such, the Plan complies with the "absolute priority rule" set forth in Section 1129(b)(2) because there are no claimants junior to either Equity Holders or Class 8(b) that will receive or retain any property under the Plan. See 11 U.S.C. § 1129(b)(2)(B)(ii). With respect to each impaired Class of Claims and Equity Interests, such Class has either accepted the Plan, or each holder of a Claim or Equity Interest will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date. Therefore, the Plan satisfies the requirements of Section 1129(a)(7) of the Bankruptcy Code.

HH. Plan Acceptance (Section 1129(a)(8)). Section 1129(a)(8) of the Bankruptcy Code requires that each Class has either accepted the Plan, or is not impaired under the Plan and thus is conclusively presumed to have accepted the Plan pursuant to Section

1126(f) of the Bankruptcy Code. Classes 1 through 6 and Classes 10, 11 and 14 are Unimpaired Under the Plan. Classes 7, 8(a), 9, and 12 have voted to accept the Plan. Classes 13 and 15 are presumed to have rejected the Plan because such classes will receive no Distribution under the Plan. Class 8(b) is the only impaired class to vote to reject the Plan. Therefore, the Plan fails to satisfy the requirements of Section 1129(a)(8) with respect to Classes 8(b), 13 and 15. Section 1129(b) of the Bankruptcy Code allows the Plan to be confirmed despite the rejection by Class 8(b) and the deemed rejection by Classes 13 and 15 because: (i) the Plan does not discriminate unfairly with respect to each non-accepting impaired class; (ii) the Plan is "fair and equitable" with respect to each non-accepting impaired class; (iii) at least one impaired class has accepted the Plan (without counting acceptances by insiders); and (iv) the Plan satisfies the requirements set forth in Section 1129(a) of the Bankruptcy Code other than Section 1129(a)(8). The Court reiterates its findings in Paragraph O.12 above where it held that the Plan did not discriminate unfairly against Class 8(b) and overruled the objections of Magten and Law Debenture. For the reasons set forth herein and above in Paragraph O.12, the Court finds that the Plan is fair and equitable. As set forth in the Voting Agent Resolicitation Declaration, Classes, 7, 8(a), 9, and 12 have voted to accept the Plan. Accordingly, the Court finds that the Plan can be confirmed under Section 1129(b) of the Bankruptcy Code.

II. Treatment of Administrative Claims, Priority Claims and Priority Tax Claims (Section 1129(a)(9)). The Plan satisfies the requirements of Section 1129(a)(9) of the Bankruptcy Code because, except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims pursuant

to Section 507(a)(1) of the Bankruptcy Code, Priority Claims pursuant to Sections 507(a)(2) through 507(a)(7) of the Bankruptcy Code and Priority Tax Claims pursuant to Section 507(a)(8) of the Bankruptcy Code, shall be treated in accordance with the applicable provisions of Section 1129(a)(9)(A), (B) or (C) of the Bankruptcy Code. Plan Sections 2.2, 2.3, and 4.1.

JJ. <u>Acceptance By at Least One Impaired Class (Section 1129(a)(10))</u>. Classes 7, 8(a), 9 and 12 are impaired under the Plan and have voted to accept the Plan. Voting Agent Resolicitation Declaration ¶ 16. Accordingly, at least one Class of Claims that is impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class, and therefore the Plan satisfies the requirements of Section 1129(a)(10) of the Bankruptcy Code.

KK.    <u>Feasibility (Section 1129(a)(11))</u>. Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or Reorganized Debtor. The Court hereby finds that given the Debtor's estimated expenses and income, and taking into account cash reserves, the Reorganized Debtor will be able to satisfy its obligations under the Plan, as well as its obligations arising in connection with its ongoing business operations. Upon review of the evidence presented at the Confirmation Hearing, particularly the testimony of William Austin (Confirmation Hearing Transcript at 116), Mike Hanson (Confirmation Hearing Transcript at 169-170) and Brian Bird (Confirmation Hearing Transcript at 218-219), and after due deliberation, the Court hereby finds that the Plan is feasible because it: (i) provides the financial wherewithal necessary to implement the Plan; and (ii) offers reasonable assurance that consummation of such Plan will not be followed by a liquidation or subsequent

56

reorganization of the Reorganized Debtor. See Plan, Art. V. Accordingly, the Plan satisfies Section 1129(a)(11) of the Bankruptcy Code.

LL. Payment of Fees (Section 1129(a)(12)). The Debtor has paid or, pursuant to Section 2.2 of the Plan, shall pay, on or prior to the Effective Date, all amounts due under 28 U.S.C. § 1930, and therefore the Plan satisfies the requirements of Section 1129(a)(12) of the Bankruptcy Code.

MM. Retiree Benefits (Section 1129(a)(13)). Pursuant to Section 8.6 of the Plan, from and after the Effective Date, the Reorganized Debtor shall continue to pay any retiree benefits (as such benefits may have been modified during the Chapter 11 Case) solely to the extent, and for the duration of the period, the Debtor is contractually or legally obligated to provide such benefits, subject to any and all rights of the Debtor under applicable law (including, without limitation, the Debtor's right to amend or terminate such benefits prior to or after the Effective Date), and therefore the Plan satisfies the requirements of Section 1129(a)(13).

NN. Cramdown (Section 1129(b)). Section 1129(b) of the Bankruptcy Code is not applicable to Classes 1, 2, 3, 4, 5, 6, 7, 8(a), 9, 10, 11, 12 and 14 because each such class has accepted (or are deemed to have accepted) the Plan. The Court reiterates its findings in Paragraph O. 12 above overruling the objections of Magten and Law Debenture. Holders of Class 8(b) claims are not discriminated against unfairly as such claims are subordinate to Class 7, Unsecured Note Claims. Section 1129(b) is satisfied with respect to holders of Class 8(b), QUIPS Claims, Class 13, Other Equity Interests, and Class 15, Opt-Out Securities Claim, because the Plan does not discriminate unfairly against such holders and no class junior to the such classes is retaining or receiving any property

ATL/1060234.9

57

under the Plan except as otherwise consented to in connection with the settlement implemented by the Plan pursuant to which Class 7 has consented to transferring a portion of the recovery they would otherwise be entitled to Class 8(a) and accepting members of Class 8(b). See Plan, §§ 4.7, 4.8 and 4.9.

OO.     No Other Plan (Section 1129(c)). No other plan of reorganization has been filed with respect to the Debtor's Chapter 11 Case.

PP. Avoidance of Taxes or Application of Securities Laws (Section 1129(d)). The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act of 1933, and no party-in-interest that is a governmental unit has objected to Plan confirmation on such grounds. Thus, the Plan satisfies the requirements of Section 1129(d) of the Bankruptcy Code.

QQ.     Good Faith Solicitation (Section 1125(e)). Based on the record before the Bankruptcy Court in this Chapter 11 Case, the Debtor and the Committee, and all of their respective members, officers, directors, agents, financial advisors, attorneys, employees, equity holders, partners, affiliates, and representatives have acted in "good faith" within the meaning of Section 1125(e) of the Bankruptcy Code in compliance with the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules in connection with all their respective activities relating to the Plan, including, but not limited to, any action or inaction in connection with their participation in the activities described in Section 1125 of the Bankruptcy Code, and are entitled to the protection afforded by Section 1125(e) of the Bankruptcy Code and the exculpation provisions set forth in the Plan. Confirmation Hearing Transcript at 170 (testimony of Mike Hanson); Confirmation Hearing Transcript at 217 (testimony of Brian Bird).

RR.    Conditions Precedent to Confirmation. The Debtor has satisfied all conditions precedent set forth in Section 11.1 of the Plan.

SS. Implementation of the Plan. All documents necessary to implement the Plan, including without limitation, the D&O Trust Documents and all other relevant and necessary documents shall, upon execution, be valid, binding and enforceable agreements in accordance with their terms, and not be in conflict with any federal or state law.

TT. Plan Transfers. All transfers of real or personal property by the Debtor are transfers under the Plan and are, therefore, free from the imposition of taxes of the kind specified in Section 1146(c) of the Bankruptcy Code. Plan, § 14.2.

UU.    Exemption from Securities Laws. All securities (specifically including the New Common Stock and the Warrants) issued in connection with the Plan shall be exempt from registration requirements to the maximum extent permitted by Section 1145 of the Bankruptcy Code and applicable non-bankruptcy laws.

VV.    Performance and Compliance. The execution, delivery or performance by the Debtor or the Reorganized Debtor, as the case may be, of the Exit Financing Facility (as defined below) on the terms contemplated by the Plan, the Commitment Letter, the Orders of the Montana Public Service Commission and the Federal Energy Regulatory Commission (collectively, the "Financing Regulatory Orders") and all relevant and related documents and agreements and compliance by the Debtor or the Reorganized Debtor, as the case may be, with the terms thereof is authorized by, and shall not conflict with, the terms of the Plan or this Confirmation Order. The financial accommodations to be extended pursuant to the documents related to the Exit Financing Facility (collectively, the "Exit Financing Facility Documents"), which shall be comprised of the

$250 million credit facility comprised of (a) revolving credit facility and (b) a term B loan credit facility (or some combination thereof, and up to $350 million of senior secured notes, all to be secured by first mortgage bonds issued under the Debtor's indenture covering its Montana public utility assets and under the Debtor's indenture covering its South Dakota public utility assets (collectively, the "Exit Financing Facility"), are being extended in good faith and for legitimate business purposes. Confirmation Hearing Transcript at 210-212 (testimony of Brian Bird).

WW.    Modification of the Plan Documents. On October 4, 2004, the Debtor filed its Notice of Filing Plan Supplement in Connection with Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Dkt. No. 2157, Debtor's Exh. 180] (the "Notice of Plan Supplement"). Attached to the Notice of Plan Supplement were revised forms of the following: (i) Insurance Assignment Agreement; (ii) D&O Protected Parties Settlement Agreement; (iii) NorthWestern Corporation D&O Trust Agreement; (iv) NorthWestern Corporation D&O Trust Distribution Procedures; (v) Certificate of Trust of the NorthWestern Corporation D&O Trust; and (vi) By-laws of the NorthWestern Corporation D&O Trust. In accordance with Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all holders of Claims who voted to accept the Plan are hereby deemed to have accepted the Plan and Plan Documents as amended. No holder of a Claim who has voted to accept the Plan shall be permitted to change its acceptance to a rejection as a consequence of the revised Plan Documents. Disclosure of the revised Plan Documents through the Notice of Plan Supplement constitutes due and sufficient notice thereof.

THEREFORE, NOW, after due deliberation, the Court
hereby ORDERS, ADJUDGES AND DECREES that:

1. Confirmation. The Plan shall be, and hereby is, confirmed having
   met the requirements of Section 1129 of the Bankruptcy Code. To
   the extent not withdrawn, or otherwise resolved, any and all
   objections to confirmation shall be and hereby are overruled in
   their entirety.

2. Implementation of the Plan. In accordance with Section 1142 of
   the Bankruptcy Code, the implementation and consummation of
   the Plan in accordance with its terms shall be, and hereby is,
   authorized and approved, and the Debtor, or the Reorganized
   Debtor, as applicable, and other Persons contemplated by the Plan
   shall be, and they hereby are, authorized, empowered and directed
   to issue, execute, deliver, file and record any document, whether or
   not any such document is specifically referred to in the Plan, the
   Disclosure Statement, or any exhibit thereto, and to take any action
   necessary or appropriate to implement and consummate the Plan in
   accordance with its terms without further application to, or order
   of, this Court including, without limitation, the execution of any
   and all documents deemed necessary or appropriate in connection
   with the Exit Financing Facility, the New Common Stock and the
   D&O Trust and the consummation of the transactions
   contemplated thereby, including without limitation, the granting of

61

the security interests in certain assets of the Reorganized Debtor;
provided, however, that no such security interest granted by this
Order or the Plan shall alter, affect or subordinate the existing
security interest of the CSFB Lenders under the CSFB Facility in
the event that the CSFB Facility is not paid in full and replaced by,
in part, the Exit Financing Facility, and all such documents shall,
upon execution, be valid, binding and enforceable agreements in
accordance with their terms and not be in conflict with any federal
or state law.

3. Binding Effect. In accordance with Section 1141(a) of the
Bankruptcy Code, the Plan and its provisions shall be, and hereby
are, binding upon the Debtor, any Person acquiring or receiving a
distribution under the Plan, any entity issuing securities under the
Plan, any lessor of property to the Debtor, any lessee of property
from the Debtor, any creditor of the Debtor and any holder of a
Claim against or Equity Interest in the Debtor, and their respective
successors and permitted assigns, whether or not the Claim or
Equity Interest of such holder is impaired under the Plan and
whether or not such holder has accepted or rejected the Plan, or
will or will not receive a distribution under the Plan.

4. Transfers Free and Clear of Liens and Exemption From Transfer
Taxes. As set forth in Section 14.2 of the Plan, in accordance with
Section 1146(c) of the Bankruptcy Code, the issuance, transfer, or

exchange of a security, including, without limitation, the New
Common Stock, or the making or delivery of an instrument of
transfer pursuant to, in implementation of, or as contemplated by
the Plan, may not be taxed under any law imposing a stamp or
similar tax.

5. Acceptance and Execution of Plan Documents. Without in any
   manner limiting the relief granted pursuant to the preceding
   decretal paragraph, each recorder of deeds or similar official for
   any county, city or governmental unit in which any instrument
   under the Plan is to be recorded is hereby directed to accept any
   and all documents and instruments necessary and appropriate to
   consummate the transactions contemplated by the Plan, without
   requiring the payment of any documentary stamp tax, deed stamps,
   stamp tax, transfer tax, intangible tax or similar tax.

6. Issuance of New Securities. Pursuant to the Plan, the Debtor is
   authorized to issue the New Common Stock and the Warrants,
   without the need for any corporate action or action by the Debtor's
   shareholders or Board of Directors.

7. Allowance of Unsecured Note Claims. Under Section 4.7(b) of the
   Plan, as of the Effective Date, the Unsecured Note Claims shall be
   deemed allowed in the aggregate amount of $898,264,683, which
   includes accrued and unpaid interest on the Unsecured Note

Claims relating to the period up to but not including the Petition Date.

8. Cancellation of Unsecured Notes and Related Instruments.

Pursuant to Section 4.7 of the Plan, as of the Effective Date: (i) all Unsecured Notes shall be cancelled and deemed null and void and of no further force and effect, and (ii) all obligations of any Person under the Unsecured Notes, the Unsecured Notes Indentures and all other agreements, instruments and documents evidencing the Unsecured Notes and the rights of the holders thereof, are hereby cancelled and deemed null and void and of no further force and effect (all without further act or action by any Person), except that such Unsecured Notes Indentures and other agreements that govern the rights of holders of the Unsecured Notes shall continue in effect solely for the purposes of allowing the Indenture Trustee, agent or servicer thereunder to make the distributions to be made on account of such Claims under the Plan, as provided in the Plan, and allowing such Indenture Trustee, agent or servicer to enforce its Indenture Trustee Charging Lien, as more particularly described in Section 5.18 of the Plan. Without limiting the foregoing, each holder of an Unsecured Note Claim is hereby deemed to consent to the cancellation and release of any guarantee, instrument, agreement or other documents respecting payment of the Unsecured Notes and the release of any and all Claims it may have

64

with respect to any property or assets of the Debtor and/or the Reorganized Debtor.

9. Allowance of Unsecured Subordinated Notes represented by the TOPrS Notes and Related Instruments. Under Section 4.8(a)(i) of the Plan, as of the Effective Date, the Unsecured Subordinated Note Claims represented by the TOPrS Notes shall be deemed Allowed in the aggregate amount of $321,069,399, which amount shall include accrued and unpaid interest on the TOPrS Notes relating to the period up to but not including the Petition Date.

10. Cancellation of Unsecured Subordinated Notes represented by the TOPrS Notes and Related Instruments. Pursuant to Section 4.8 of the Plan, as of the Effective Date: (i) all Unsecured Subordinated Notes represented by the TOPrS Notes shall be cancelled and deemed null and void and of no further force and effect, and (ii) all obligations of any Person under the Unsecured Subordinated Notes represented by the TOPrS Notes, the Unsecured Subordinated Notes Indentures and all other agreements, instruments and documents evidencing the Unsecured Subordinated Notes represented by the TOPrS Notes and the rights of the holders thereof, including any related Claims and Causes of Action, including, but not limited to, fraudulent transfer claims against the Debtor, are hereby cancelled and deemed null and void and of no further force and effect (all without further act or action by any

Person), except that such Unsecured Subordinated Notes Indentures and other agreements that govern the rights of holders of the Unsecured Subordinated Notes represented by the TOPrS Notes shall continue in effect solely for the purposes of allowing the Indenture Trustee, agent or servicer thereunder to make the distributions to be made on account of such Claims under the Plan, as provided in the Plan, and allowing such Indenture Trustee, agent or servicer to enforce its Indenture Trustee Charging Lien, as more particularly described in Section 5.18 of the Plan. Without limiting the foregoing, each holder of an Unsecured Subordinated Note Claim is hereby deemed to consent to the cancellation and release of any guarantee, instrument, agreement or other documents respecting payment of the Unsecured Subordinated Notes represented by TOPrS Notes and the release of any and all Claims it may have with respect to any property or assets of the Debtor and/or the Reorganized Debtor except as expressly provided in the Plan.

11. Allowance of Unsecured Subordinated Notes and other Claims represented by the QUIPS Notes and Related Instruments. Claims of the QUIPS holders shall be deemed allowed as provided for under Section 4.8(b) of the Plan.

12. Cancellation of Unsecured Subordinated Notes represented by the QUIPS Notes and Related Instruments.

a.       Except as provided in paragraph

12(b) below with respect to, and only with respect to, those

Claims or Causes of Action that are currently pending in

the QUIPS Litigation and being pursued by those holders

of the Unsecured Subordinated Notes represented by the

QUIPS Notes who chose or are deemed to have chosen

Option 2 pursuant to Section 4.8(b) of the Plan, and as of

the Effective Date: (i) all Unsecured Subordinated Notes

represented by the QUIPS Notes shall be cancelled and

deemed null and void and of no further force and effect,

and (ii) all obligations of any Person under the Unsecured

Subordinated Notes represented by the QUIPS Notes, the

QUIPS Indentures and all other agreements, instruments

and documents evidencing the Unsecured Subordinated

Notes represented by the QUIPS Notes and the rights of the

holders thereof, including any Claims and Causes of

Action, related thereto or arising thereunder are hereby

cancelled, released, terminated, and deemed null and void

and of no further force and effect (all without further act or

action by any Person), except that such QUIPS Indentures

and other agreements that govern the rights of holders of

the Unsecured Subordinated Notes represented by the

QUIPS Notes shall continue in effect solely for the

purposes of allowing the Indenture Trustee, agent or

servicer thereunder to make the distributions to be made on

account of such Claims under the Plan, as provided in the

Plan, and allowing such Indenture Trustee, agent or

servicer to enforce its Indenture Trustee Charging Lien, as

more particularly described in Section 5.18 of the Plan.

Without limiting the foregoing, each holder of an

Unsecured Subordinated Note Claim is hereby deemed to

consent to the cancellation and release of any guarantee,

instrument, agreement or other documents respecting

payment of the QUIPS Notes and the release of any and all

Claims that it may have with respect to any property or

assets of the Debtor and/or the Reorganized Debtor.

          b.     For those holders of Unsecured

Subordinated Notes represented by the QUIPS Notes who

have chosen Option 2, such holders shall, in accordance

with Section 4.8(b)(ii)(2) of the Plan, now be deemed to

hold disputed General Unsecured Claims against the

Debtor (i.e. Class 9 Claims) in the amount of the

indebtedness evidenced by such holders' QUIPS Notes,

and shall be entitled to receive a Pro Rata Share of

recoveries from the QUIPS Litigation, if any, upon

resolution of such QUIPS Litigation, without the necessity

ATL/1060234.9

68

of becoming plaintiffs in the QUIPS Litigation so long as

the Indenture Trustee shall be a plaintiff in the QUIPS

Litigation or as may be approved by the Court. The QUIPS

Notes and related instruments shall remain valid against the

Debtor for the limited purposes of permitting the pursuit of

those Claims or Causes of Action that are currently

pending in the QUIPS Litigation and the Debtor hereby

recognizes that the cancellation of the QUIPS Notes

hereunder shall not be a defense to the QUIPS Litigation

for any purpose.

13. Cancellation of Other Equity Interests. On the Effective Date, all

Equity Interests shall be deemed canceled, annulled and

extinguished and all other agreements, instruments and documents

evidencing the Equity Interests and the rights of the holders

thereof, shall be automatically cancelled and deemed null and void

and of no further force and effect (all without further act or action

by any Person) and holders of Equity Interests shall not be entitled

to receive or retain any property or interest in property under the

Plan on account of such Equity Interest.

14. Cessation of Trading. Related to the provisions of Paragraphs, 8,

10, 12 and 13 above, the trading of the Unsecured Notes,

Unsecured Subordinated Notes and Equity Interests shall cease at

5:00 p.m. (EST) on the Effective Date.

15. Securities Laws Exemption. Pursuant to Section 5.17 of the Plan,
the New Common Stock, the Warrants and other securities that
may be deemed to be issued pursuant to or in connection with the
Plan shall be exempt from registration requirements to the
maximum extent permitted by Section 1145 of the Bankruptcy
Code and applicable non-bankruptcy laws.

16. Indenture Trustees' Charging Lien. On the Effective Date, the
Reorganized Debtor is hereby authorized to pay the Indenture
Trustees' Fees and Expenses in full and in Cash, in an amount to
be agreed upon among the Debtor and each of the Indenture
Trustees. In the event that the parties cannot reach an agreement
on the amount thereof, any disputed amount shall be determined
by the Court, pursuant to Section 503 of the Bankruptcy Code, and
in accordance with the terms of the applicable Indenture.
Otherwise, the Indenture Trustees shall not be required to file an
application with the Court for payment of Indenture Trustees' Fees
and Expenses. Upon receipt of payment by any Indenture Trustee
of Indenture Trustees' Fees and Expenses, any Indenture Trustee
Charging Lien under the applicable Indenture shall automatically
be deemed released to the extent of payment on account of
Indenture Trustees' Fees and Expenses; to the extent any Indenture
Trustees' Fees and Expenses are not paid by the Reorganized
Debtor (whether as a result of disagreement between the Indenture

Trustee and the Reorganized Debtor, and/or following determination by the Bankruptcy Court) the Indenture Trustee Charging Lien of such Indenture Trustee shall not be impaired. Such payments shall be in full and final satisfaction of all pre- and post-petition Claims of the Indenture Trustees. Subject to the Reorganized Debtor's obligations under Section 5.18 of the Plan, distributions to holders of Unsecured Notes, Unsecured Subordinated Notes, the South Dakota Pollution Control Bond Claims, Gas Transition Bond Claims or the Montana Pollution Control Bond Obligation Claims pursuant to the Plan will not be reduced on account of payments made to the Indenture Trustees, as applicable, on account of the Indenture Trustees Charging Liens.

Notwithstanding the above, on the Effective Date, and subject only to the review of the fee auditor appointed in this Chapter 11 Case, the Debtor, and/or the Reorganized Debtor, as the case may be, is hereby authorized to pay Harbert and Wilmington Trust an aggregate amount of $2.25 million on account of their legal, advisory, consulting and other professional fees and expenses, which amount shall be allocated among Harbert and Wilmington Trust by agreement between Harbert and Wilmington Trust. Notwithstanding anything set forth herein, the fees of Goldin Associates shall not be subject to review by the fee auditor appointed in this Chapter 11 Case. Neither Wilmington

71

Trust nor Harbert shall be required to file an application with the Court for payment of such fees and expenses, provided that to the extent that the aggregate legal, advisory, consulting and other professional fees and expenses incurred by Harbert and Wilmington Trust exceed $2.25 million, Harbert and Wilmington Trust (and their professionals) may seek reimbursement of such fees and expenses by submitting an application to the Court pursuant to Section 503(b) of the Bankruptcy Code, provided that the Creditors' Committee reserves the right to object to such application or applications as set forth in Section 5.18 of the Plan. Notwithstanding anything set forth herein, if the fees and expenses of Wilmington Trust are not reimbursed in full by the estate, the deficiency shall be paid out of the distributions received by Wilmington Trust on behalf of the Class 8(a) Claims. The Plan provides that Wilmington Trust shall have the right (but not the obligation) to sell in the public market that portion of the 6.60% of the New Common Stock distributed to Class 8(a) and received by Wilmington Trust as a distribution to the extent necessary to pay legal and advisory fees and expenses incurred by Wilmington Trust that are not otherwise reimbursed by the Debtor's estate.

If the fees and expenses of the respective Indenture Trustees (other than Wilmington Trust as noted above) are not reimbursed in full by the Debtor, then any deficiency may be paid

out of the distributions received by the respective Indenture

Trustee on behalf of their respective class claimants. Such

Indenture Trustee shall have the right, but not the obligation, to

sell into the public market any portion of the New Common Stock

distributed to its respective class claimants and received by the

Indenture Trustee as a distribution to the extent necessary to pay

legal and advisory fees and expenses incurred by the Indenture

Trustee that are not otherwise reimbursed by the Debtor.

Notwithstanding anything to the contrary in this Order or

the Plan, the Reorganized Debtor shall pay in the ordinary course

of the Reorganized Debtor's business the reasonable fees and

expenses of the Indenture Trustees after the Effective Date in

connection with the Distributions to holders of the Unsecured

Notes, the Unsecured Subordinated Notes, the South Dakota

Pollution Control Bond Claims, Gas Transition Bond Claims or the

Montana Pollution Control Bond Claims under the Plan. Nothing

in Section 5.19 of the Plan shall be deemed to limit the obligations

of the Reorganized Debtor to the trustee under the indentures with

respect to any Secured Bonds which are Reinstated under the

provisions of the Plan.

17. Creation of the D&O Trust. On the Effective Date, the D&O Trust

shall be created in accordance with the Plan and the D&O Trust

Documents. The D&O Trust shall be a "qualified settlement fund"

73

within the meaning of Section 468B of the Internal Revenue Code
and the regulations issued thereunder. On the Effective Date, all
right, title and interest in and to the D&O Trust Assets and any
proceeds or Causes of Action thereunder shall be transferred to and
vested in the D&O Trust, free and clear of all Claims, Equity
Interests, Encumbrances and other interests of any Person without
further action of any Person.

18. Transfer of Claims and Demands to the D&O Trust. On the
Effective Date, all liabilities, obligations, and responsibilities
relating to all D&O Trust Claims shall be transferred to the D&O
Trust.

19. Discharge of Liabilities to Holders of D&O Trust Claims. Except
as provided in the Plan Documents, as amended by the Debtor on
October 4, 2004 [Dkt. No. 2157], and the Confirmation Order, the
transfer to, vesting in, and assumption by the D&O Trust of the
D&O Trust Assets and the D&O Insurance Assignment, as
amended by the Debtor on October 4, 2004 [Dkt. No. 2157], as
contemplated by the Plan, the D&O Protected Parties Settlement
Agreement, as amended by the Debtor on October 4, 2004 [Dkt.
No. 2157], and the Insurance Assignment Agreement, as amended
by the Debtor on October 4, 2004 [Dkt. No. 2157], among other
things, on the Effective Date shall, and hereby does, (a) discharge,
release and extinguish all obligations and liabilities of the Debtor

and the Reorganized Debtor for and in respect of all D&O Trust Claims, and (b) discharge, release and extinguish all obligations and liabilities of the Released Parties for and in respect of all D&O Trust Claims. On the Effective Date, the D&O Trust shall assume liability for any D&O Trust Claims that arise out of the D&O Proceedings and shall pay the D&O Trust Claims and Defense Costs in accordance with the TDP.

20. D&O Trust Channeling Injunction. The sole recourse of the holder of a D&O Trust Claim in respect of such Claim shall be the D&O Trust pursuant to the provisions of the D&O Trust Channeling Injunction and the TDP, and such holder shall have no right whatsoever at any time to assert its D&O Trust Claim against the Debtor, the Reorganized Debtor or any Released Party or any property or interest in property of the Debtor, the Reorganized Debtor or any Released Party; provided, however, that neither the D&O Trust Channeling Injunction nor the D&O Insurance Entity Injunction shall apply to the holders of the QUIPS, to the extent that such holders did not consent to the releases.

21. Reinstatement of Unimpaired Secured Claims. Each holder of an Allowed Bank One DIP Financing Claim, CSFB Financing Claim, Secured Bondholder Claim, or Other Secured Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge thereof, full Reinstatement of such Allowed Claim,

except to the extent that any of the aforementioned claims are paid in full or paid in accordance with the Exit Financing Facility.

22. Corporate Action, New Incentive Plan and Management Compensation. On the Effective Date, all matters provided for under the Plan that would otherwise require further action by the directors or stockholders of the Debtor or the Reorganized Debtor, including, without limitation: (i) the adoption of the Reorganized Debtor Charter and by-laws; (ii) removal of existing directors and the initial selection of directors and officers of the Reorganized Debtor; and (iii) the distribution of Cash and the issuance and distribution of New Common Stock and Warrants pursuant to the Plan; and (iv) implementation of the New Incentive Plan, including the Special Recognition Grants to management employees provided in Section 9.3(b) of the Plan, were actual, necessary costs and expenses of preserving the bankruptcy estate and shall be deemed to have occurred, be authorized, and be in effect from and after the Effective Date in each case without further action under applicable law, regulation, order, or rule, including without limitation, any action by the stockholders of the Debtor or the Reorganized Debtor.

Other than as provided in Section 9.3(b) of the Plan, the New Board, in its sole discretion, shall be authorized to decide all other issues related to the New Incentive Plan and management

compensation including, but not limited to, employment

agreements, base salaries, change of control provisions, short and

long-term incentives, benefits and the like as is normal and

customary for senior management of corporations similar to

Reorganized Debtor.

23. Reorganized Debtor Corporate Structure. The Reorganized Debtor

is hereby directed to "ring fence" its regulated energy and utility

business and assets in that such assets and businesses will be

owned by the Reorganized Debtor as the parent company. All of

the Debtor's and the Reorganized Debtor's non-regulated energy

related or other businesses will be held in wholly owned

subsidiaries of the Reorganized Debtor. Such wholly owned

subsidiaries will have no employees of their own, but will be

served by the Reorganized Debtor's utility employees whose costs

will be charged to the non-regulated subsidiaries through

intercompany transfer pricing, which pricing mechanisms shall be

subject to review by the regulatory commissions having

jurisdiction over the Reorganized Debtor's rates. Any debt

incurred by the non-regulated subsidiaries' operations will be

incurred at the subsidiary level and will be non-recourse to the

Reorganized Debtor.

24. Amendment or Modification of the Plan of Reorganization. The

Plan may be altered, amended or modified at any time before or

after the Confirmation Date and before substantial consummation, provided that the Plan, as altered, amended or modified, satisfies the requirements of Sections 1122 and 1123 of the Bankruptcy Code and the Court, after notice and a hearing, confirms the Plan, as altered, amended or modified, under Section 1129 of the Bankruptcy Code. A holder of a Claim or Equity Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Equity Interest of such holder. The Debtor specifically reserves the right to amend or modify the Plan in the event that the Court or the District Court either does not approve, in total, the settlement of the Class Action pursuant to the proposed Class Action Settlement Documents, or approves the proposed settlement of the Class Action but limits the parties to whom the Debtor may give releases pursuant to such settlement. In such event, the Debtor's claims against any parties not released as proposed in the Class Action Settlement Documents shall be preserved for the benefit of the Debtor's creditors and Estate and the Plan, as may be amended, may provide a mechanism reasonably satisfactory to the Creditors' Committee to prosecute and/or preserve such claims for the benefit of the Debtor's Estate. The Debtor may, with notice to the

78

Creditors' Committee, the DIP Lenders and the CSFB Lenders, but without notice to holders of Claims or Equity Interests insofar as it does not materially and adversely affect the interests of any such holders, correct any defect or omission in the Plan and any exhibit hereto or in any Plan Document.

25. Distributions to Holders as of the Record Date. As of the close of business on October 20, 2004 (the "Record Date"), the claims register (for Claims) and the transfer ledgers (for Secured Notes and Unsecured Notes) shall be closed, and there shall be no further changes in the record holders of any Claims or Equity Interests. The Debtor and Reorganized Debtor shall have no obligation to recognize any transfer of any Claims or Equity Interests occurring after the close of business on the Record Date, and shall instead be entitled to recognize and deal for all purposes under the Plan (except as to voting to accept or reject the Plan pursuant to Section 7.1 of the Plan) with only those holders of record as of the close of business on the Record Date.

26. Distributions to Class 10. Each holder of an Allowed Convenience Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (i) Cash equal to the amount of the Allowed Convenience Claim up to $20,000, on or as soon as practicable after the later of (1) sixty (60) days after the Effective Date and (2) the date that is ten (10) Business Days after

a Class 2 Unsecured Priority Claim becomes an Allowed
Convenience Claim by a Final Order; or (ii) such other treatment
as the Debtor and such holder shall have agreed upon in writing.

The Debtor shall file a schedule of convenience class
claims at least five (5) days prior to the Effective Date. Such
schedules shall include the holder of the Allowed Convenience
Claim and the amount of such Allowed Convenience Claim. On or
before the Effective Date, the Debtor shall segregate the funds
necessary to pay the scheduled Allowed Convenience Claims into
a segregated account. Parties-in-interest shall have ten (10) days
from the date of filing of the schedule of convenience class claims
to file objections to the amount of the Allowed Convenience
Claim. Within sixty (60) days after the Effective Date or as soon
thereafter as practicable, the Debtor shall pay such Allowed
Convenience Claims so long as no objections have been filed to
such Claim or the parties have agreed to an Allowed Convenience
Claim amount.

27. Disputed Claims Reserve. The Reorganized Debtor is hereby
directed to maintain the Disputed Claims Reserve equal to the
aggregate of any distributable amounts of New Common Stock
equal to the relevant percentage of the Distributions to which
holders of Disputed Claims would be entitled under the Plan if
such Disputed Claims were Allowed Claims in the amount of such

Disputed Claim or such lesser amount as required by a Final Order. The Debtor shall establish an initial reserve of 13.5% of New Common Stock allocated to Class 7 and Class 9 for the Disputed Claims Reserve and such reserve may be subject to adjustment prior to the Effective Date pursuant to Section 7.5 of the Plan. As to PPLM, its reserve has been established pursuant to the PPLM Stipulation [Dkt. No. 2183] entered by the Court on October 6, 2004. In the event the Cornerstone Settlement is not approved, the Reorganized Debtor shall increase both the Disputed Claim Reserve and the reserve of New Common Stock for the Disputed Claim Reserve in connection with the disputed Cornerstone claims in the amount of the Cornerstone claims or such lesser amount as may be agreed to by the parties or established by the Court.

28. Releases, Injunctions and Exculpations. The discharge, injunction, release and exculpation and other provisions contained in Article X of the Plan are approved in all respects, in accordance with the terms and conditions of this Order, and are fair, equitable, reasonable and in the best interests of the Debtor, its Estate, its creditors and other parties-in-interest in the Chapter 11 Case.

29. No Release for Certain Netexit Parties. Notwithstanding any language to the contrary contained in the Plan, Confirmation Order and/or Plan Documents including, but not limited to, the D&O

Trust Documents, no provision shall release the officers, directors, assignees, agents, employees, or attorneys of the Netexit Debtors from liability to the Netexit Debtors, or any creditor, trustee or the Official Committee of Unsecured Creditors appointed in the Netexit Cases, except to the extent any such claim, right or Cause of Action may be characterized as a D&O Proceeding or covered by the D&O Policies, the D&O Trust Channeling Injunction or the D&O Insurance Entity Injunction.

Notwithstanding any provision to the contrary in the Plan or this Confirmation Order, the Debtor's claims asserted against the Netexit Debtors shall not be released or discharged.

30. No Release, Discharge, Injunction as to Richard Hylland.

Notwithstanding any provision to the contrary set forth in the Plan, nothing in the Plan or this Confirmation Order shall be deemed to release, discharge or otherwise affect the Debtor's or Reorganized Debtor's rights to assert Claims or Causes of Action against Richard Hylland (excluding Claims for rights of indemnification and contribution with respect to the Class Action and D&O Proceedings), or defenses to any Claims which Richard Hylland has asserted or may assert against the Debtor.

31. No Release for Magten Asset Management Corporation.

Notwithstanding any language to the contrary contained in the Disclosure Statement, Plan, the Plan documents, or this

Confirmation Order, no provision shall release Magten Asset
Management Corporation, or any of its respective present or
former Affiliates, officers or directors, or any of their respective
present or former stockholders, members (in their capacity as
members only), employees, advisors, attorneys, financial advisors,
agents or Professionals in their capacities as such.

32. Mutual Releases with Respect to Wilmington Trust and Harbert.

As of the Effective Date and other than with respect to
Distributions provided for in Section 4.8 of the Plan on account of
their respective Allowed Unsecured Subordinated Note Claims and
as part of the compromise and settlement with respect to
Distributions to Class 8(a) provided for in the Plan, any and all
Claims and Causes of Action both known and unknown on behalf
of Harbert and Wilmington Trust, individually and collectively on
the one hand, and on behalf of the Debtor, the Reorganized Debtor
and the Creditors' Committee, on the other hand, and each of the
foregoing respective Affiliates and their parents, subsidiaries,
officers, directors or any of their former or present stockholders,
members (in their capacity as members only), employees, advisors,
attorneys, financial advisors, accountants, auditors, agents or
Professionals in their capacities as such, shall be deemed forever
mutually released and discharged from any and all known and
unknown Causes of Action of any nature that any Person may have

ATL/1060234.9

83

asserted, or could have asserted or could in the future assert,
directly or indirectly, against each of Harbert, Wilmington Trust
and the Debtor, the Reorganized Debtor and the Creditors'
Committee, respectively, specifically including but not limited to
claims and issues which have been raised by Harbert and
Wilmington Trust concerning the Debtor's filings with respect to
and claims of an exemption under PUHCA; provided, however,
that any claims which Wilmington Trust may have in respect of an
Indenture Trustee Charging Lien or that Wilmington Trust and/or
Harbert may have pursuant to Section 5.18 herein are excluded
from the forgoing releases subject to any objections that the
Debtor, the Reorganized Debtor or the Creditors' Committee may
assert thereto.

33. No Release as to Pension Plans. Notwithstanding any language to
the contrary in the Debtor's Plan, nothing in the Plan or this
Confirmation Order shall be construed as releasing, discharging, or
otherwise relieving the Debtor or any other party who may be a
fiduciary with respect to the Pension Plans of any potential liability
for breaches of fiduciary duties owed to the Pension Plans under
ERISA.

34. No Release as to the Securities and Exchange Commission.
Notwithstanding any language to the contrary in the Debtor's Plan,
nothing in the Plan or this Confirmation Order shall release any

84

non-Debtor, including any officer and/or director of the Debtor and/or any Non-Debtor included in the Released Parties, from liability to the United States Securities and Exchange Commission, in connection with any legal action brought by such governmental unit against such person(s).

35. No Injunction Against or Impairment of Claims of Goldman Sachs & Co. or Milbank Tweed Hadley & McCloy LLP Against Non-Debtors. Notwithstanding any language to the contrary in the Debtor's Plan, nothing in the Plan or this Confirmation Order enjoins, releases or otherwise impairs any claim of Goldman Sachs & Co. or Milbank Tweed Hadley & McCloy LLP against any person or entity other than the Debtor and the Reorganized Debtor or otherwise limits any defense, setoff, counterclaim or cross claim either may have against any person or entity, except that any recovery by Goldman Sachs & Co. or Milbank Tweed Hadley & McCloy LLP on such counterclaim or cross claim against the Debtor or Reorganized Debtor shall be limited by the Plan.

36. Preservation of Rights of TA Debtors. Notwithstanding any provisions of the Plan to the contrary, confirmation of the Plan and the occurrence of the Effective Date thereunder shall not: (i) affect or in any way impede or diminish any rights, if any, that the TA Debtors may have with respect to certain insurance policies held in the name of the Montana Power Company, (ii) affect any setoff

rights that have been asserted previously in a timely filed proof of claim or a motion filed prior to confirmation of the Plan; and (iii) limit or release in any way any claims of the TA Debtors against any individual who previously served as an officer or director of any of the TA Debtors, or their present or former predecessors, in such individual's capacity as an officer or director of such TA Debtor.

37. Limitations of Releases, Exculpation, Discharge and Injunction. Except as specifically provided for in the Plan, the releases, exculpation, discharge and injunctions (other than the D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction) with respect to non-Debtor third parties are hereby approved and shall be effective only as to those holders of Claims and Interests which vote to accept the Plan and mark their respective ballots in the place provided consenting and agreeing to the release, exculpation, discharge and injunction provisions of the Plan. The releases, exculpation, discharge and injunctions provided for in the Plan shall not be effective with respect to those releases and settlement of claims proposed to be released and settled under the Class Action Settlement Documents in the event that both this Court and the District Court do not approve such proposed settlement by final, non-appealable judgment and/or order, or approve the settlement on the condition that the Debtor limit the

ATI/1060234.9                                    86

parties to whom the Debtor may give releases pursuant to such
Class Action Settlement Documents.

In the event the Class Action Settlement is not approved by
the District Court and does not become effective: (a) the Plan and
any proposed Order confirming the Plan (i) will not release any
non-Debtor defendants in the Securities Litigation or any non-
Debtor for that matter, from the claims asserted or to be asserted in
the Securities Litigation; and (ii) will not affect, in any way, the
Class Claimants' rights to obtain relief for their claims in the

Securities Litigation; (b) the Lead Plaintiffs and the Class
Claimants shall retain their rights to pursue their claims and access
the proceeds of any available D&O Policies that provide coverage
for the claims asserted in the Securities Litigation; and (c) the

Debtor's current and former officers and directors, financial
advisors, accountants, auditors, agents or professionals will not be
released and discharged from any cause of action in connection
with the Class Action.

38. Exit Financing Facility Documents. Pursuant to the Order
Authorizing the Debtor to Enter into Certain Agreements Related
to Exit Financing Facility and to Pay Fees in Connection
Therewith Pursuant to 11 U.S.C. §§ 105, 107(b) and 363(b) and
Bankruptcy Rule 9018 entered on September 22, 2004 (the
"Commitment Letter Order"), and the Financing Regulatory

Orders, the Debtor was authorized to enter into the Commitment

Letter dated August 12, 2004 (the "Commitment Letter"). The

Commitment Letter indicated that the liens securing the Exit

Financing Facility will be secured by new first mortgage bonds

which, in part, shall replace the CSFB Facility Montana First

Mortgage Bonds and the CSFB Facility South Dakota First

Mortgage Bonds, however, nothing in this Order, the Plan or the

Commitment Letter Order shall in any way alter, affect or

subordinate the existing security interests of the CSFB Lenders

granted under the CSFB Facility in the event the CSFB Facility is

not paid in full and replaced by, in part, the Exit Financing

Facility. The Montana Indenture shall constitute a first lien on the

Montana utility business assets (and on such related or other assets

as provided in the Montana Indenture) now existing and after-

acquired subject to the exceptions permitted by the Montana

Indenture. The South Dakota Indenture shall constitute a first lien

on the South Dakota, North Dakota, Iowa and Nebraska utility

business assets (and on such related or other assets as provided in

the South Dakota Indenture) now existing and after-acquired

subject to the exceptions permitted by the South Dakota Indenture.

Consistent with Sections 1.157 and 5.2 of the Plan, nothing

contained in this Order, the Plan, or the Exit Financing Facility

Documents shall in any way violate any Secured Bonds indenture

88

covenants or otherwise alter, affect, or subordinate the existing
security interests in or liens (the "Bond Liens") upon any of the
Debtor's assets (or the priority thereof) granted under, in respect
of, or in connection with the Secured Bonds, or the indentures,
security agreements, or other documents entered into in connection
with the issuance of Secured Bonds (collectively, the "Secured
Bond Documents").

The new first mortgage bonds or any other instrument
securing the Exit Financing Facility shall not bear the legend
requested by Magten and/or Law Debenture. Any objection to the
Exit Financing Facility or confirmation of the Debtor's Plan, in
particular the objections of Magten and/or Law Debenture,
requesting that such instruments bear a legend is overruled.

39. Post-Effective Date Authority. On or after the Effective Date, the
Reorganized Debtor shall be authorized to use, acquire and dispose
of property and compromise or settle any post-Effective Date
claims or interests without supervision or approval by the Court
and free of any restrictions of the Bankruptcy Code or Bankruptcy
Rules, other than restrictions expressly imposed by the Plan or this
Order.

40. Term of Injunctions or Stay. Unless otherwise provided in the
Plan or this Order, all injunctions or stays provided for in the
Chapter 11 Case pursuant to Section 105 or 362 of the Bankruptcy

Code, or otherwise, and in existence on the date hereof, will

remain in full force and effect until the Effective Date.

Each of the injunctions relating to the D&O Proceedings

and the D&O Trust as set forth in the Plan are hereby approved

and shall become effective on the Effective Date and shall

continue in effect at all times thereafter unless otherwise provided

by the Plan. Notwithstanding anything to the contrary contained in

the Plan, all actions in the nature of those to be enjoined by such

injunctions shall be enjoined during the period between the

Confirmation Date and the Effective Date.

Any and all injunctions contemplated by the Plan shall be

limited to the extent necessary to permit the Debtor and/or the TA

Debtors, or any trustee, agent or committee of creditors acting on

behalf of or in the place of the Debtor and/or the TA Debtors, to

commence and litigate any and all Claims or Causes of Action

with respect to the alleged ownership interests in the MPC

Policies.

41. Revesting of Assets. Except as otherwise provided by the Plan,

pursuant to Section 1141(b) of the Bankruptcy Code, on the

Effective Date, title to all properties and assets of the Debtor and

its Estate shall vest in the Reorganized Debtor free and clear of all

liens, claims and encumbrances, except as expressly provided in

the Plan, and this Order shall be a judicial determination of

discharge and extinguishment of all such Claims, Liens, or Equity
Interests.

Nothing in the Plan or this Order releases or nullifies any
liability to a governmental entity under police and regulatory
statutes and regulations that any entity would be subject to as the
owner or operator of property after the Effective Date. Nothing in
the Plan or this Order shall release, discharge, or preclude any
Claim that arises after the Effective Date that the United States
Environmental Protection Agency or any state environmental
agency may have against the Debtor or any remedies of the United
State Environmental Protection Agency or state environmental
agencies that are not within the definition of Claim as set forth in
Section 101(5) of the Bankruptcy Code.

42. Revesting of Railroad Permits in Reorganized Debtor's Name. On
the Effective Date, or as soon thereafter as practicable, the
Disbursing Agent shall be authorized to pay $1,000 to Burlington
Northern Santa Fe Railroad Company, Montana Rail Link, Inc.,
Montana Western Railway Company, and Rarus Railway
Company and the Reorganized Debtor shall receive blanket
assignment of all permits currently held in the name of Montana
Power Company or NorthWestern Energy, LLC.

43. Full and Final Satisfaction. Notwithstanding anything to the
contrary in this Order or the Plan, upon receipt of and acceptance

of a full and final Distribution from the Reorganized Debtor, any and all Claims and Causes of Action as between the Debtor and the claimant accepting the Distribution shall be fully and finally resolved.

44. Avaya Indemnification Obligation. On November 24, 2003, the Court entered an Order Authorizing the Debtor to Incur and Perform Obligations Under the Expanets, Inc. Asset Purchase Agreement and All Ancillary Documents and Granting Related Relief. Pursuant to such order and this Confirmation Order, the Debtor has and is hereby deemed to assume the indemnification obligations detailed in the documents executed in connection with the sale of the Netexit, Inc.'s assets to Avaya, Inc.

45. Plan Documents. All Persons holding Claims or Equity Interests which are dealt with under the Plan, including, without limitation, the D&O Protected Parties Settlement Agreement and the Insurance Assignment Agreement, shall be, and they hereby are, directed to execute, deliver, file or record any document, and to take any action necessary to implement, effectuate and consummate the Plan in accordance with its terms, and all such Persons shall be bound by the terms and provisions of all documents to be executed by them in connection with the Plan, whether or not such documents actually have been executed by such Persons.

46. Executory Contracts and Unexpired Leases. Any unexpired lease or executory contract that has not been expressly assumed or rejected by the Debtor (or otherwise treated by the Plan) shall be, and hereby are, deemed to have been assumed by the Debtor as of the Effective Date of the Plan.

47. Distributions of Cure Amounts. The Debtor filed its Omnibus Motion for Court Approval to Assume Certain Executory Contracts Pursuant to Section 365 of the Bankruptcy Code and Granting Related Relief on September 22, 2004. The motion included the party to the contract to be assumed and the amount of the cure payment. On or before the Effective Date, the Debtor shall segregate the funds necessary to pay the cure amounts, including sufficient funds to pay any disputed cure amounts in full, into a segregated account. Within sixty (60) days after the Effective Date or as soon thereafter as practicable, the Debtor shall pay such cure amounts so long as no objections have been filed to such cure amounts or the parties have agreed to a different cure amount.

48. Payment of Fees and Expenses of the MPSC and MCC. Pursuant to the Order Approving Stipulation and Settlement Agreement Among Debtor, Montana Public Service Commission and Montana Consumer Counsel entered on July 19, 2004 [Dkt. No. 1706], the Debtor shall pay professional fees and expenses of the Montana

Public Service Commission, Montana Consumer Counsel and the
Montana Attorney General in the amount of approximately
$2,297,768.86 as of May 31, 2004 and any additional fees and
expenses of such parties incurred through the Effective Date. Such
fees and expenses shall be paid pursuant to Section 1129(a)(4) of
the Bankruptcy Code and such payments will be made no later
than the Effective Date. The Montana Public Service
Commission, Montana Consumer Counsel and the Montana
Attorney General shall not be required to file an application with
the Court for payment of such fees and expenses.

49. Written Verification of Material Non-Public Information for
    Wilmington Trust and Harbert. On the Effective Date, the Debtor
    shall deliver to Wilmington Trust and Harbert written verification
    that all material non-public information that has been disclosed to
    Wilmington Trust and/or Harbert by the Debtor and its advisors
    prior to the Effective Date has been publicly disclosed (pursuant to
    the Disclosure Statement or otherwise).

50. Effect of Failure of Conditions. In the event that one or more of
    the conditions specified in Section 11.2 of the Plan have not
    occurred on or before 120 days after the Confirmation Date, upon
    notification submitted by the Debtor to the Court, counsel for the
    Creditors' Committee, counsel for the DIP Lenders, and counsel
    for the CSFB Lenders (a) this Confirmation Order shall be

vacated, (b) no Distributions under the Plan shall be made, (c) the
Debtor and all holders of Claims and Equity Interests shall be
restored to the status quo ante as of the day immediately preceding
the Confirmation Date as though the Confirmation Date never
occurred and (d) the Debtor's obligations with respect to the
Claims and Equity Interests shall remain unchanged and nothing
contained herein shall constitute or be deemed a waiver or release
of any Claims or Equity Interests by or against the Debtor or any
other Person or to prejudice in any manner the rights of the Debtor
or any Person in any further proceedings involving the Debtor.

51. Retention of Jurisdiction. This Court hereby retains jurisdiction of
this Chapter 11 Case pursuant to, to the extent and scope of, and
for the purposes set forth in Article XIII of the Plan.

52. Professional Fees. All Persons seeking an award by the Court of
Professional Fees, or of compensation for services rendered to the
Debtor or a Committee or reimbursement of expenses incurred
through and including the Effective Date under Sections 503(b)(2),
503(b)(3), 503(b)(4), 503(b)(5) of the Bankruptcy Code, (a) shall
file their respective final applications for allowance of
compensation for services rendered and reimbursement of
expenses incurred through the Effective Date within thirty (30)
days after the Effective Date, and (b) if granted such an award by
the Court, shall be paid in full in such amounts as are Allowed by

95

the Court (i) on the later of the Effective Date or the date such
Administrative Claim becomes an Allowed Administrative Claim,
or as soon thereafter as is practicable, (ii) upon such other terms as
may be mutually agreed upon between such holder of an Allowed
Administrative Claim and the Debtor or, on and after the Effective
Date, Reorganized Debtor, or (iii) in accordance with the terms of
any applicable administrative procedures order entered by the
Court. Parties-in-interest shall have thirty (30) days after the filing
of a final fee application to object to such fee application. All
Professional Fees for services rendered in connection with the
Chapter 11 Case and the Plan after the Effective Date, including,
without limitation, those relating to the occurrence of the Effective
Date, the prosecution of Causes of Action preserved hereunder and
the resolution of Disputed Claims, shall be paid by the
Reorganized Debtor upon receipt of an invoice therefore, or on
such other terms as Reorganized Debtor may agree to, without the
need for further Bankruptcy Court authorization or entry of a Final
Order. If the Reorganized Debtor and any Professional cannot
agree on the amount of post-Effective Date fees and expenses to be
paid to such Professional, such amount shall be determined by this
Court.

53. [Final Fee Application Hearing. A hearing to consider final
Professional Fee applications shall be held before this Court on

$12 - 9$ , 200 $4$ at $9:00\,a.m.$ or as soon thereafter as counsel can be heard.]

54. Notice. Notice of entry of this Order and of the Effective Date of the Plan, substantially in the form annexed hereto as Exhibit A (which notice is hereby approved in all respects) shall be, and hereby is, deemed sufficient if (a) served by first-class mail within twenty (20) days following the Effective Date upon: (i) all person having filed a notice of appearance herein and (ii) all holders of Claims and Equity Interests which are impaired under the Plan and (b) published once in each of the following: (i) Great Falls Tribune; (ii) the Missoulian; (iii) New York Times; (iv) Rapid City Journal; (v) USA Today; (vi) The Wall Street Journal; (vii) Billings Gazette; and (viii) Argus Leader. A copy of this Order may also be obtained by submitting a written request for such document to the Debtor's noticing agent, Kurtzman Carson Consultants LLC, 12910 Culver Blvd., Suite I, Los Angeles, California 90066-6709; Attn: NorthWestern Corporation, or by viewing the documents on the noticing agent's website at http://www.kccllc.net/northwestern. In addition, copies of the this Order may be viewed on the Debtor's website, www.northwestern.com.

55. Effect of Reference to Plan in this Order. The failure to reference or discuss any particular provision of the Plan in this Order shall

have no effect on the validity, binding effect and enforceability of such provision, and each provision of the Plan shall have the same validity, binding effect and enforceability as if fully set forth in this Order.

56. Headings. Headings utilized herein are for the convenience of reference only, and shall not constitute a part of the Plan or this Order for any other purpose.

57. No Preclusive Effect. In the event that the Plan does not become effective, no findings of fact entered by this Court in connection with confirmation of this Plan will have preclusive effect in connection with confirmation of any subsequently-filed plan of reorganization.

58. Reversal. If any or all of the provisions of this Order are hereafter reversed, modified or vacated by subsequent order of the Court or any other court, such reversal, modification or vacatur shall not affect the validity of the acts or obligations incurred or undertaken under, or in connection with, the Plan prior to receipt of written notice of such order by the Debtor. Notwithstanding any such reversal, modification or vacatur of this Order, any such act or obligation incurred or undertaken pursuant to, and in reliance on, this Order prior to the effective date of such reversal, modification or vacatur shall be governed in all respects by the provisions of

98

this Order, the Plan, all documents relating to the Plan and any
amendments or modifications to any of the foregoing.

59. Inconsistencies. In the event of any discrepancies, inconsistencies
or conflicts between the Plan or other document executed under or
in connection with the Plan, the provisions of the Plan shall
govern. In the event of any discrepancies, inconsistencies or
conflicts between the Court's oral ruling on October 8, 2004 and
this Order, the provisions of the Court's October 8, 2004 oral
ruling shall govern.

60. Integration of Confirmation Order Provisions. The provisions of
this Order are integrated with each other and are non-severable and
mutually dependent.

61. Final Order. This Order is a Final Order and the period in which
an appeal must be filed shall commence immediately upon the
entry hereof. Notwithstanding Bankruptcy Rule 3020(e), this
Order shall be effective and enforceable immediately upon entry
hereof.

Dated: October 19th, 2004
Wilmington, Delaware

_Mareun flauer_

United States Bankruptcy Judge

ATI/1060234.9                              99

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re: NORTHWESTERN CORPORATION,
Debtor.

:: Chapter 11  Case No. 03-12872
:: (CGC)
::
:

## NOTICE OF (A) ENTRY OF ORDER CONFIRMING THE DEBTOR'S SECOND AMENDED AND RESTATED PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AND (B) THE OCCURRENCE OF THE EFFECTIVE DATE

### TO ALL HOLDERS OF CLAIMS, HOLDERS OF INTEREST AND OTHER PARTIES IN INTEREST:

**PLEASE TAKE NOTICE,** that on October ___, 2004, an order (the "Confirmation

Order") was entered by the Honorable Charles G. Case, United States Bankruptcy Judge,

confirming, pursuant to the provisions of Title 11, United States Code, 11 U.S.C. §§ 101 et seq.

(the "Bankruptcy Code"), the Second Amended and Restated Plan of Reorganization Under

Chapter 11 of the Bankruptcy Code (the "Plan") of NorthWestern Corporation, former debtor and

debtor-in-possession (the "Debtor"). A copy of the Confirmation Order is on file with the Clerk

of the Bankruptcy Court for the District of Delaware and is available for inspection at the Clerk's

office during normal business hours and on the Court's website at www.deb.uscourts.gov.  A

copy of the Confirmation Order may also be obtained by submitting a written request for such

documents to the Debtor's Noticing Agent, Kurtzman Carson Consultants LLC, 12910 Culver

Blvd., Suite I, Los Angeles, California 90066-6709; Attn: NorthWestern Corporation, or by

viewing the document on the noticing agent's website at www.kccllc.net/northwestern.  In

addition, copies of the Confirmation Order may be viewed on the Debtor's website at

www.northwestern.com.

**PLEASE TAKE FURTHER NOTICE**, that the Effective Date of the Plan occurred on

November ___, 2004.

Dated: Wilmington, Delaware
November _____, 2004

Respectfully submitted,

PAUL, HASTINGS, JANOFSKY &
WALKER LLP
600 Peachtree Street
Suite 2400
Atlanta, GA 30308
Jesse H. Austin, III
Karol K. Denniston
Telephone: (404) 815-2400

and

GREENBERG TRAURIG, LLP

Scott D. Cousins (No. 3079)
Victoria Watson Counihan (No.
3488) William E. Chipman, Jr. (No.
3818)
The Brandywine Building
1000 West Street, Suite 1540
Wilmington, DE 19801
Telephone: (302) 661-7000

*Co-Counsel for the Debtor and
Debtor-in-Possession*

# Exhibit J

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| NORTHWESTERN CORPORATION, | : Case No. 03-12872 |
| | : |
| Debtor. | : |
| | : |
| | : |

STIPULATION AND ORDER ESTABLISHING A
DISPUTED CLAIMS RESERVE

NorthWestern Corporation (the "Debtor") together with Law Debenture Trust Company

of New York, solely as successor trustee ("Law Debenture") to The Bank of New York as

trustee under a certain Indenture dated as of November 1, 1996, as amended, pursuant to which

The Montana Power Company issued certain 8.45% Junior Subordinated Debentures (the

"Debentures") to Montana Power Capital I, which then issued certain 8.45% Cumulative

Quarterly Income Preferred Securities, Series A (the "QUIPS") hereby stipulate and agree that:

WHEREAS, On September 14, 2003, the Debtor filed its voluntary petition for relief

under chapter 11 of title 11 of the United States Code ("the Bankruptcy Code") with the United

States District Court for the District of Delaware (the "Bankruptcy Court"); and

WHEREAS, on April 16, 2004, Magten Asset Management Corporation ("Magten") and

Law Debenture initiated an adversary proceeding against the Debtor (the "QUIPS Adversary

Proceeding") on behalf of all holders of the QUIPS asserting, among other things, that the

Debtor was the recipient of certain utility assets in a fraudulent conveyance; and

WHEREAS, on August 20, 2004, the Bankruptcy Court granted in part and denied in

part the Debtor's motion to dismiss the QUIPS Adversary Proceeding; and

WHEREAS, on August 20, 2004, the Debtor initiated an adversary proceeding against

Magten styled NorthWestern Corporation v. Magten Asset Management Corporation, Case No.

1

04-55051, United States Bankruptcy Court for the District of Delaware (the "NOR Adversary," collectively with the QUIPS Adversary Proceeding, the "Adversary Proceedings"); and

**WHEREAS**, on September 17, 2004, the Debtor filed a Motion Pursuant to Sections 105(a), 363(b) and 502(c) of the Bankruptcy Code for Estimation of Claims of Law Debenture Trust Company of New York and to Establish Disputed Claim Reserve (the "Law Debenture Estimation Motion"); and

**WHEREAS**, on September 29, 2004, Law Debenture filed an objection to the Law Debenture Estimation Motion; and

**WHEREAS**, by order dated October 19, 2004 (the "Confirmation Order"), the Bankruptcy Court confirmed the Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code dated August 18, 2004 (the "Plan"); and

**WHEREAS**, the Confirmation Order provided that holders of the QUIPS Litigation Claims would have a disputed Class 9 Claim under the Plan; and

**WHEREAS**, on or about October 25, 2004, the Debtor filed its Notice of Establishment of Claim Reserve Pursuant to Section 7.5 of the Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code and Paragraph 27 of the Confirmation Order (the "Disputed Claims Reserve Notice"). A copy of the Disputed Claims Reserve Notice is attached hereto as Exhibit A. As set forth in the Disputed Claims Reserve Notice, the Debtor included in its initial reserve of 13.5% of New Common Stock a claim of $25 million to address the claims of the QUIPS Litigation Claims holders.

**NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED,** by and among the Debtor and Law Debenture, by their respective counsel, as follows:

1.    Upon approval of this Stipulation by the Bankruptcy Court, and in accordance with the terms of the Confirmation Order and consistent with the Disputed Claims Reserve Notice, the Reorganized Debtor shall set aside a portion of its initial reserve of 13.5% of New Common Stock solely to satisfy in full a $25 million Class 9 claim of the QUIPS Litigation Claims holders (the "QUIPS Litigation Claims Reserve"). For purposes hereof, any claim by

2

any QUIPS Litigation claimant will be afforded the treatment accorded Class 9 General Unsecured Claims, as set forth in the Plan. To the extent that the Allowed QUIPS Litigation Claims ultimately exceed $25 million, the holders of such claims shall have any deficiency satisfied out of the general Disputed Claims Reserve (as such is described in the Plan and the Confirmation Order).

2.      Unless otherwise agreed by the parties, the QUIPS Litigation Claims Reserve shall be maintained and not released by the Debtor until the QUIPS Litigation claimants', by and through Law Debenture, seek a distribution from the QUIPS Litigation Claims Reserve pursuant to a final judgment in the QUIPS Adversary Proceeding or as the parties may otherwise agree to a release or reduction in the QUIPS Litigation Claims Reserve or pursuant to further court order.

3.      To the extent that the QUIPS Litigation Claims are determined by final non-appealable order in the QUIPS Adversary Proceeding to be less than $25,000,000, any additional common stock from the QUIPS Litigation Claims Reserve will be released to the Debtor for addition to the Disputed Claims Reserve (as defined in the Debtor's Plan). Likewise, to the extent the QUIPS Litigation Claims against the QUIPS Litigation Claims Reserve is more than $25,000,000, the QUIPS Litigation claimants shall be entitled to draw on any assets remaining in the Disputed Claim Reserve. The Debtor has no obligation to replenish the Disputed Claim Reserve. Moreover, to the extent that the Debtor establishes any other segregated reserve for the benefit of individual creditors, or for any other reason, once the disputed claims of those individual creditors are resolved any excess common stock in those segregated reserves, if any, shall be released to the Disputed Claim Reserve, from which the QUIPS Litigation claimants and any other holder of a disputed Class 9 claim shall be entitled to draw, in accordance with the terms set forth above.

4.      The establishment of the QUIPS Litigation Claims Reserve and the Disputed Claims Reserve (collectively, the "Reserves") is without prejudice to the claims of the QUIPS Litigation claimants and the Debtor in the Adversary Proceedings. Counterclaims,

setoff, and recoupment rights, if any, and Magten's, Law Debenture's and the Debtor's objections and defenses thereto, if any, will not be deemed to be estopped, reduced or limited in any way by the creation or maintenance of the Reserves, or by the terms set forth herein. The establishment of the QUIPS Litigation Reserve shall not be deemed an admission by either party as to the existence of any liability or as to the amount of any claim.

   5. Nothing contained herein shall be deemed an admission or concession by either party as to the extent, validity or merits of the Adversary Proceedings and the establishment of the QUIPS Litigation Claims Reserve is without prejudice to any of the rights, claims and/or defenses of the Debtor, Magten and Law Debenture in the Adversary Proceedings.

   6. Nothing contained herein shall be deemed an admission or concession by either party as to the extent, validity and merits of the Confirmation Order and this Stipulation and the establishment of the QUIPS Litigation Claims Reserve is without prejudice to any of the rights, claims and/or defenses of Magten and Law Debenture to appeal the Confirmation Order. No party to this Stipulation shall use or refer to this Stipulation or to the terms hereof for any purpose in connection with any appeal or any relief sought in connection with the Confirmation Order or in any other litigation or proceeding involving Magten or Law Debenture; provided, however, that nothing contained in this paragraph shall prevent any party to this Stipulation from using or referring to the terms hereof in connection with the enforcement of the provisions of this Stipulation.

   7. Upon the approval of this Stipulation by the Bankruptcy Court, the Law Debenture Estimation Motion shall be deemed withdrawn with prejudice.

   8. This Stipulation shall be governed and enforced by the Bankruptcy Court in accordance with the laws of the United States of America and the laws of the State of New York without giving effect to New York's choice of law or conflicts of law principles.

   9. Neither this Stipulation, nor any of its terms may be modified, altered, amended or waived, except in a writing signed by the party against whom such modification, alteration, amendment, or waiver is to be enforced.

10.    This Stipulation is subject to the approval of the Bankruptcy Court and shall be of no force and effect unless and until the Stipulation is approved by the Bankruptcy Court.

11.    Upon approval by the Bankruptcy Court, this stipulation shall be effective immediately. The Bankruptcy Court shall retain jurisdiction to hear any matters or disputes arising from or relating to this Stipulation.

12.    This Stipulation may be executed with counterpart signature pages or in more than one counterpart, all of which shall be deemed one and the same agreement. Facsimile signatures shall be binding to the same effect as originals.

13.    This Stipulation shall be binding upon and shall inure to the benefit of the Parties and their legal representatives, predecessors, successors and assigns.

[SIGNATURE ON NEXT PAGE]

Dated:   Atlanta, Georgia
         October 27, 2004

NORTHWESTERN CORPORATION
By its Attorneys,

PAUL, HASTINGS, JANOFSKY & WALKER
LLP
By:

JESSE H. AUSTIN, III
A Member of the Firm
600 Peachtree Street, N.E.,
Atlanta, GA 30308
( 404) 815-2208

Dated:   Boston, Massachusetts
         October ___, 2004

LAW DEBENTURE TRUST COMPANY OF
NEW YORK,
By its Attorneys,

NIXON PEABODY LLP
By:

JOHN SNELLINGS
A Member of the Firm
100 Summer Street
Boston, MA  02110
(617) 345-1202

**SO ORDERED** this ___ day of
November, 2004 in Wilmington, Delaware

UNITED STATES BANKRUPTCY JUDGE

# Exhibit K

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| NORTHWESTERN CORPORATION, | : Case No. 03-12872 (CGC) |
| | : |
| Debtor. | : |
| | : |
| | : |

**NOTICE OF (A) ENTRY OF ORDER CONFIRMING THE DEBTOR'S SECOND
AMENDED AND RESTATED PLAN OF REORGANIZATION UNDER
CHAPTER 11 OF THE BANKRUPTCY CODE AND (B) THE OCCURRENCE
OF THE EFFECTIVE DATE**

**TO ALL HOLDERS OF CLAIMS,
HOLDERS OF INTEREST AND OTHER PARTIES IN INTEREST:**

**PLEASE TAKE NOTICE,** that on or about October 19, 2004, an order (the

"Confirmation Order") was entered by the Honorable Charles G. Case, United States Bankruptcy

Judge, confirming, pursuant to the provisions of Title 11, United States Code, 11 U.S.C. §§ 101

et seq. (the "Bankruptcy Code"), the Second Amended and Restated Plan of Reorganization

Under Chapter 11 of the Bankruptcy Code (the "Plan") of NorthWestern Corporation, former

debtor and debtor-in-possession (the "Debtor"). A copy of the Confirmation Order is on file

with the Clerk of the Bankruptcy Court for the District of Delaware and is available for

inspection at the Clerk's office during normal business hours and on the Court's website at

www.deb.uscourts.gov. A copy of the Confirmation Order may also be obtained by submitting a

written request for such documents to the Debtor's Noticing Agent, Kurtzman Carson

Consultants LLC, 12910 Culver Blvd., Suite I, Los Angeles, California 90066-6709; Attn:

NorthWestern Corporation, or by viewing the document on the noticing agent's website at

www.kccllc.net/northwestern. In addition, copies of the Confirmation Order may be viewed on

the Debtor's website at www.northwestern.com.

   **PLEASE TAKE FURTHER NOTICE**, that the Effective Date of the Plan occurred on

November 1, 2004.

Dated: Wilmington, Delaware
       November 1, 2004

                              Respectfully submitted,

                              PAUL, HASTINGS, JANOFSKY & WALKER LLP
                              600 Peachtree Street
                              Suite 2400
                              Atlanta, GA 30308
                              Jesse H. Austin, III
                              Karol K. Denniston
                              Telephone: (404) 815-2400

                              and

                              GREENBERG TRAURIG, LLP

                              Scott D. Cousins (No. 3079)
                              Victoria Watson Counihan (No. 3488)
                              William E. Chipman, Jr. (No. 3818)
                              The Brandywine Building
                              1000 West Street, Suite 1540
                              Wilmington, DE 19801
                              Telephone: (302) 661-7000

                              *Co-Counsel for the Debtor and*
                              *Debtor-in-Possession*

# Exhibit L

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | :   Chapter 11 |
| | : |
| NORTHWESTERN CORPORATION, | :   Case No.  03-12872 (JLP) |
| | : |
| Reorganized Debtor. | : |
| | : |
| | : |

**NOTICE OF SUBSTANTIAL CONSUMMATION
OF THE DEBTOR'S SECOND AMENDED AND
RESTATED PLAN OF REORGANIZATION UNDER
CHAPTER 11 OF THE BANKRUPTCY CODE**

**TO ALL HOLDERS OF CLAIMS,
HOLDERS OF INTEREST AND OTHER PARTIES IN INTEREST:**

     **PLEASE TAKE NOTICE,** that on or about October 19, 2004, an order (the

"Confirmation Order") was entered by the Honorable Charles G. Case, United States Bankruptcy

Judge, confirming, pursuant to the provisions of Title 11, United States Code, 11 U.S.C. §§ 101

et seq. (the "Bankruptcy Code"), the Second Amended and Restated Plan of Reorganization

Under Chapter 11 of the Bankruptcy Code (the "Plan")[1] of NorthWestern Corporation, former

debtor and debtor-in-possession (the "Debtor").  A copy of the Confirmation Order is on file

with the Clerk of the Bankruptcy Court for the District of Delaware and is available for

inspection at the Clerk's office during normal business hours and on the Court's website at

www.deb.uscourts.gov.  A copy of the Confirmation Order may also be obtained by submitting a

written request for such documents to the Debtor's Noticing Agent, Kurtzman Carson

---

[1] Any capitalized terms not defined herein shall have the meaning ascribed to such term in the
Plan.

Consultants LLC, 12910 Culver Blvd., Suite I, Los Angeles, California 90066-6709; Attn:

NorthWestern Corporation, or by viewing the document on the noticing agent's website at

www.kccllc.net/northwestern. In addition, copies of the Confirmation Order may be viewed on

the Debtor's website at www.northwestern.com.

PLEASE TAKE FURTHER NOTICE, that the Effective Date of the Plan occurred on

November 1, 2004.

PLEASE TAKE FURTHER NOTICE, that pursuant to Section 1101(2) of the

Bankruptcy Code, "substantial consummation" means:

(a)     transfer all of or substantially all of the property proposed by the Plan to be
        transferred;

(b)     assumption by the debtor or by the successor to the debtor under the Plan of the
        business or of the management of all or substantially all of the property dealt with
        by the Plan; and

(c)     commencement of distribution under the Plan.

PLEASE TAKE FURTHER NOTICE, that as of November 1, 2004, the Debtor

transferred substantially all of the property proposed by the Plan to be transferred including

delivery of all the Trust Assets to the D&O Trust.

PLEASE TAKE FURTHER NOTICE, that as of November 1, 2004, the Reorganized

Debtor assumed substantially all of the property dealt with by the Plan.

PLEASE TAKE FURTHER NOTICE, that the Reorganized Debtor completed

distribution to holders of allowed claims under the Plan, including the following distributions:

1.      Class 7 Distributions. On or about November 1, 2004, consistent with Section 4.7 of the
        Debtor's Plan, 28,250,900 shares of New Common Stock were issued to the Depository
        Trust Company ("DTC") for credit in book-entry form to the accounts of the DTC
        participants representing holders of Class 7 Allowed Claims. On or about November 5,
        2004, these shares were credited by DTC to the accounts of the above-referenced DTC
        participants.

2.    Class 8(a) Distributions.

    (a)    On or about November 1, 2004, consistent with Section 4.8(a) of the Debtor's Plan, 2,278,769 shares were issued to DTC for credit in book entry form to the accounts of the DTC participants representing holders of Class 8(a) Allowed Claims. On or about November 5, 2004, these shares were credited by DTC to the accounts of the above-referenced DTC participants.

    (b)    On or about November 1, 2004, consistent with Section 4.8(a) of the Debtor's Plan, 4,366,092 warrants were issued to DTC for credit in book-entry form to the accounts of the DTC participants representing holders of Class 8(a) Allowed Claims. On or about November 5, 2004, these warrants were credited by DTC to the accounts of the above-referenced DTC participants.

    (c)    On November 1, 2004, consistent with Section 5.18 of the Debtor's Plan, 55,640 shares were issued to DTC for credit to Wilmington Trust Company pursuant to its exercise of its Indenture Trustee Charging Lien.

3..    Class 8(b) Distributions. On or about December 23, 2004, mindful of its obligation to deliver shares of Common Stock and Warrants to holders of Class 8(b) claims who elected, or were deemed to have elected, Option 1 under Section 4.8(b) of the Debtor's Plan and Law Debenture Trust Company of New York's exercise of its Indenture Trustee Charging Lien, the Debtor authorized its transfer agent, LaSalle Bank National Association, to transfer (i) physical stock certificates issued in the name of "Law Debenture Trust Company of New York" 136,965 shares of Common Stock and (ii) physical warrant certificate in the name of "Law Debenture Trust Company of New York" 254,241 Warrants to purchase shares of Common Stock pursuant to Section 4.8(b) and Section 5.18 of the Debtor's Plan.

4.    Class 9 Distributions. The following actions have been taken by the Debtor with respect to Allowed Class 9 claims:

    (a)    Issuance of a physical certificate to Comanche Park LLC in the amount of 23,620 shares for its Allowed Class 9 Claim; and

    (b)    Establishment of a Disputed Claims Reserve. Consistent with Section 7.5 of the Debtor's Plan, the Debtor reserved 4,409,100 shares for potential future distribution to holders of Allowed Class 9 Claims. This Disputed Claims Reserve includes specific reserves as follows: (i) shares of common stock equal to the value of $50,000,000, valued as of the Effective Date, in connection with PPL Montana LLC's disputed claim; and (ii) a $25,000,000 Class 9 claim in connection with the disputed QUIPS Litigation Claims.

    (c)    Issuance to DTC of 614,125 shares for credit to the account of CRT Capital Group LLC, in resolution of the $19,500,000 allowed Class 9 claims of the Cornerstone Propane entities.

5.   Class 10 Distribution.   The Debtor made 100% of the payments to holders of Allowed Convenience Class Claims pursuant to Section 4.10 of the Debtor's Plan.  The Debtor has paid $954,443.89 to holders of Allowed Convenience Class Claims.

6.   Cure Payments in Connection with Assumed Contracts.  The Debtor made 100% of the undisputed cure payments in connection with assumed contracts pursuant to Section 8.1 of the Debtor's Plan.  The Debtor has paid approximately $2,170,341.64 in undisputed cure payments in connection with assumed contracts.

**PLEASE TAKE FURTHER NOTICE**, that on or about December 7, 2004, consistent with Section 9.3 of the Debtor's Plan in connection with the Special Recognition Grants, physical certificates in the amount of (i) 103,360 shares of Common Stock were issued to certain executive officers, members of the extended leadership team and executive-level key managers (not subject to tax withholding at this time); and (ii) 7,630 shares of Common Stock were issued to non-executive-level key managers (subject to tax withholding at this time).   The Debtor withheld 3,174 shares of Common Stock to satisfy the tax withholding liability of the individuals comprising the non-executive-level key manager group resulting from the stock issuance.

**PLEASE TAKE FURTHER NOTICE**, that, as described above, the Debtor has substantially consummated its Plan.

**[Signature on next page]**

Dated: Wilmington, Delaware
    December 29, 2004

Respectfully submitted,

PAUL, HASTINGS, JANOFSKY & WALKER LLP
600 Peachtree Street
Suite 2400
Atlanta, GA 30308
Jesse H. Austin, III
Karol K. Denniston
Telephone: (404) 815-2400

and

GREENBERG TRAURIG, LLP

Scott D. Cousins (No. 3079)
William E. Chipman, Jr. (No. 3818)
The Brandywine Building
1000 West Street, Suite 1540
Wilmington, DE 19801
Telephone: (302) 661-7000

*Co-Counsel for NorthWestern Corporation*

# Exhibit M

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NORTHWESTERN CORPORATION, | Case No. 03-12872 (JLP) |
| Debtor. | Objection Deadline: March 2, 2005 @ 5:00 p.m.<br>Hearing Date: March 8, 2005 @ 9:30 a.m. |

**JOINT MOTION OF MAGTEN ASSET MANAGEMENT
CORPORATION AND LAW DEBENTURE TRUST COMPANY OF
NEW YORK AS INDENTURE TRUSTEE FOR ORDER PURSUANT
TO RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY
PROCEDURE APPROVING A SETTLEMENT BETWEEN
NORTHWESTERN CORPORATION, MAGTEN ASSET
MANAGEMENT CORPORATION, AND LAW DEBENTURE TRUST
COMPANY OF NEW YORK**

Magten Asset Management Corporation ("Magten") and Law Debenture Trust Company of New York as Indenture Trustee and Guarantee Trustee (the " Indenture Trustee" and together with Magten, the "Movants"), respectfully submit this joint motion (the "Motion") for entry of an order pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure approving the settlement (the "Settlement Agreement") among NorthWestern Corporation ("NorthWestern"), Magten and the Indenture Trustee (NorthWestern, Magten and the Indenture Trustee are collectively referred to herein as the "Parties") regarding the compromise and settlement of all pending and threatened claims, causes of actions, appeals and disputes among the Parties. In support of the Motion, the Movants respectfully state as follows:

### Preliminary Statement

1.     Throughout NorthWestern's chapter 11 case, Magten has continuously asserted that the holders of the Series A 8.45% Quarterly Income Preferred Securities (the "QUIPS") are victims of a scheme orchestrated by NorthWestern to defraud the creditors of Clark Fork and

1

Blackfoot LLC, NorthWestern's subsidiary, by transferring to NorthWestern certain electric, natural gas and propane utility assets for inadequate consideration at a time when NorthWestern was insolvent and was not financially capable of performing its obligations under the indenture governing the QUIPS (the "Transfer"). In April 2004, after this Court granted Magten and the Indenture Trustee relief from the automatic stay to commence an adversary proceeding, Magten and the Indenture Trustee filed a complaint against NorthWestern seeking to avoid the fraudulent transfer of the utility assets (the "Fraudulent Conveyance Proceeding").

2.    The Fraudulent Conveyance Proceeding has been the central issue in NorthWestern's reorganization. Counsel to NorthWestern asserted that the Fraudulent Conveyance Proceeding is the "penultimate piece of litigation" and counsel to the Official Committee of Unsecured Creditors, and now counsel to the Plan Committee, represented to this Court that the Fraudulent Conveyance Proceeding is "at the heart of this case." See Declaration of Gary L. Kaplan filed contemporaneously herewith (the "Kaplan Declaration") Exh. A. pp. 6 and 81. Moreover, NorthWestern has disclosed in its filings with the Securities and Exchange Commission (the "SEC") that the "litigation could adversely affect [NorthWestern's] business, results of operations and financial condition and [its] ability to continue normal operations." See Kaplan Declaration Exh. B at p. 52.

3.    The Fraudulent Conveyance Proceeding has spawned numerous additional causes of action and proceedings and resulted in a contentious chapter 11 case. These causes of action and proceedings include (i) Magten's objection to and appeal from the order confirming the Second Amended and Restated Plan of Reorganization (the "Plan"); (ii) Magten's objection to and appeal from the order approving the Memorandum of Understanding with respect to the settlement of the securities class action; (iii) Magten's motion to disqualify Paul, Hastings,

2

Janofsky & Walker LLP ("Paul Hastings") as general bankruptcy counsel to NorthWestern and its appeal from the denial of that motion; (iv) Magten's suit against the officers of Clark Fork and Blackfoot LLC ("Clark Fork") for breach of their fiduciary duties with respect to the fraudulent transfer of the Montana utility assets that was commenced in the United States District Court for the District of Montana; (v) Magten's suit against Paul Hastings for aiding and abetting the fraudulent transfer that is pending before the United States District Court for the District of Delaware; (vi) NorthWestern's adversary proceeding against Magten and Talton Embry to reduce or subordinate Magten's claim as a result of Magten's trading activity (the "Magten Adversary"); (vii) Magten's motion to withdraw the reference from the Bankruptcy Court to the District Court as to the Fraudulent Conveyance Proceeding and the Magten Adversary; (viii) Magten's objection to the final fee application of Paul Hastings; and (ix) NorthWestern's objections to payment of the Indenture Trustee's fees. All of these various claims and causes of action not only put NorthWestern and certain of its officers and advisors at risk of substantial liability, and put NorthWestern at risk that its plan of reorganization may be unwound, but also will inevitably lead to months and even years of expensive and time consuming litigation.

4.      In January 2005, during the course of discovery in connection with the Magten Adversary, counsel to NorthWestern approached counsel to Magten and suggested that counsel to Magten make a settlement proposal that included (i) payment to non-accepting holders of QUIPS of amounts in excess of the amount provided to such holders in the Plan; (ii) payment of the fees of the Indenture Trustee; and (iii) payment of fees to Magten for its substantial efforts on behalf of the holders of the QUIPS. Following the submission of a proposal, the Parties engaged in arms length negotiation over a two-week period and during that time reached an agreement that would resolve all outstanding claims and litigations. On January 27, 2005, the Parties

3

reached an agreement in principle, the terms of which were reduced to writing in the Settlement Agreement dated as of January 27, 2005 and executed by the Parties on February 9, 2005, that was drafted by NorthWestern.[1] The Settlement Agreement by its own terms was "binding upon and inure[d] to the benefit of the Parties." See Kaplan Declaration at Exh. C.

5.     As discussed in greater detail below, the settlement provides substantial benefits to NorthWestern, its estate and all of its creditors. The settlement will resolve approximately ten suits, appeals and objections and will prevent future litigation. The settlement fairly compromises the significant litigation risk facing all of the parties, by providing a recovery to the holders of the QUIPS that is greater than that which was provided for in NorthWestern's Chapter 11 plan, but that is significantly less than the QUIPS holders would receive if they succeed in some, let alone all of the litigation instituted on their behalf.

6.     After the Settlement Agreement was executed by all of the parties, NorthWestern informed both the Court and the public of the Settlement Agreement, by among other things, (i) filing a notice with the Court canceling the upcoming trial in the Magten Adversary as a result of the Settlement, (See Kaplan Declaration at Exh. D), (ii) sending a letter to the mediator assigned to mediate the pending district court appeals stating that the parties to the appeals have reached a global settlement and, thus, there is no need to proceed with mediation, (See Kaplan Declaration at Exh. E), (iii) issuing a press release entitled "NorthWestern Settles Litigation and Bankruptcy Claims with Magten Asset Management and Law Debenture" that disclosed the general terms of the Settlement, (See Kaplan Declaration at Exh. F), and (iv) stated to the Court at the status

---

[1]     The Settlement Agreement is comprised of two agreements: (i) an agreement between NorthWestern, Magten, and the Trustee (the "Settlement") setting forth the general terms of the agreement in principle reached with respect to the compromise and settlement of all pending and threatened claims, causes of action, appeals and disputes among the Parties, and (ii) a letter agreement (the "Distribution Letter") between Magten and the Trustee contemplated by the Settlement Agreement setting forth the terms of the allocation of the stock and warrants to be distributed to the holders of the QUIPS pursuant to the terms of the Settlement. A copy of the Distribution Letter was sent to NorthWestern shortly after its execution.

4

conference held on February 10, 2005 that the Settlement is in the best interest of the estate (See Kaplan Declaration at Exh. A at pp. 5-15). Although NorthWestern later repudiated the Settlement Agreement and subsequently determined not to file a motion seeking approval of the Settlement Agreement, since the Settlement Agreement is a binding contract among NorthWestern, Magten and the Indenture Trustee, by this Motion, the Movants seek entry of an order approving the Settlement Agreement.

## Background

7.      On September 14, 2003, NorthWestern filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code.

8.      NorthWestern is a publicly traded Delaware corporation that was incorporated in 1923. NorthWestern, together with its direct and indirect non-debtor subsidiaries, comprise one of the largest providers of electricity and natural gas in the upper Midwest and Northwest regions of the United States, serving approximately 608,000 customers throughout Montana, South Dakota and Nebraska.

9.      The Indenture Trustee is a limited purpose trust company organized under the laws of New York and is the successor trustee to the Bank of New York under the Indenture governing the QUIPS.

10.     On August 31, 2004, NorthWestern filed the Plan and disclosure statement in support of the Plan. Over the objections of Magten, the Indenture Trustee and NorthWestern's equity holders, on October 19, 2004, the Court entered an order confirming the Plan (the "Confirmation Order"). The effective date of the plan was November 1, 2004.

5

A.    Ongoing Litigation and Causes of Action

11.    On April 16, 2004, after this Court granted Magten and the Indenture Trustee

relief from the automatic stay, Magten, together with the Indenture Trustee, filed a complaint

against NorthWestern in the Bankruptcy Court on behalf of the holders of the QUIPS seeking to

set aside the fraudulent conveyance of the Montana utility assets. The Fraudulent Conveyance

Proceeding contends that Northwestern wrongfully appropriated certain assets of a subsidiary

and that the holders of the QUIPS (as direct creditors of that subsidiary as well as NorthWestern)

had the right to have their claims paid in full before those assets could be made available to

satisfy the claims of NorthWestern's other creditors.

12.    On May 14, 2004, NorthWestern filed a motion to dismiss the Fraudulent

Conveyance Proceeding. Following completion of briefing, on August 20, 2004, the Court,

denied NorthWestern's motion to dismiss.

13.    On October 4, 2004, Magten filed an amended complaint in the Fraudulent

Conveyance Proceeding. Then, on November 17, 2004, Magten filed a motion to withdraw the

reference with respect to the Fraudulent Conveyance Proceeding (the "Withdrawal Motion") in

the District Court of Delaware (the "District Court"). The Withdrawal Motion is currently

pending in the District Court and the Bankruptcy Court has stayed the Fraudulent Conveyance

Proceeding pending a decision on the Withdrawal Motion.

14.    Following the commencement of the Fraudulent Conveyance Proceeding, Magten

has pursued numerous claims and causes of action arising from or related to the Transfer,

including:

- On April 19, 2004, Magten filed a complaint in the United States District Court for
  the District of Montana against the officers and directors of Clark Fork,
  NorthWestern's subsidiary, for breach of their fiduciary duties in fraudulently
  transferring the Montana utility assets to NorthWestern for inadequate consideration

6

at a time when NorthWestern was insolvent. The defendants filed a motion for summary judgment, and on January 27, 2005, the same day the Settlement Agreement was reached, the Montana district court denied defendants summary judgment motion.[2]

- On May 20, 2004, Magten filed a complaint against Paul, Hastings in Montana state court, for breach of its duties to Clark Fork and Clark Fork's creditors in connection with its involvement in the fraudulent conveyance of the Montana utility assets. The proceeding has been removed to federal court and is currently pending in the District Court.

- On June 18, 2004, Magten filed a motion seeking to disqualify Paul Hastings as bankruptcy counsel to NorthWestern due to Paul Hastings conflict of interest and lack of disinterestedness as a result of its involvement in the fraudulent transfer. The Court denied the motion, as well as Magten's subsequent motion for reconsideration. Magten appealed the Court's decision and the appeal is currently pending in the District Court. The District Court has assigned the appeal to a mediator.

- On October 26, 2004, Magten filed a motion with the United States District Court for the District of Delaware seeking to stay the Confirmation Order pending an appeal. The District Court denied the motion and Magten has appealed the Confirmation Order (the "Confirmation Appeal") as well as and the Order approving the Memorandum of Understanding (the "MOU Appeal"). Both the Confirmation Appeal and the MOU Appeal are pending in the District Court and have been assigned by the District Court to a mediator.

- On January 3, 2005, Magten filed an objection to the final fee application of Paul Hastings as a result of Paul Hastings' conflict of interest and lack of disinterestedness as a result of its involvement in the fraudulent transfer of the Montana utility assets.

- Additionally, as a result of Magten's and the Indenture Trustee's efforts, NorthWestern filed an action against Magten and its principal, Talton Embry, and objected to the payment of the Indenture Trustee's fees and expenses. Specifically, On August 20, 2004, NorthWestern initiated an adversary proceeding against Magten and its principal, Talton Embry, seeking damages and equitable relief relating to Magten's trading activities regarding the QUIPS. On November 2, 2004, the Court held a status conference with respect to both the Fraudulent Conveyance Proceeding and the Magten Adversary. At that status conference, the Court stayed the Fraudulent Conveyance Proceeding and set forth an expedited discovery schedule for the Magten Adversary with a trial date of February 7, 2005.

- On January 3, 2005, NorthWestern filed an objection to the Indenture Trustee's request for payment of fees and reimbursement of expenses.

---

[2]    Ironically, Magten received this decision after the settlement was reached among the parties. As a result of this decision, Magten's litigation position improved significantly.

7

B.    The Settlement Agreement

15.    In the course of conducting discovery for the trial in the Magten Adversary, NorthWestern and Magten had a "meet and confer" at the end of which NorthWestern, through its counsel, solicited Magten to make an offer to settle all pending claims and causes of actions. In response, Magten submitted an initial settlement proposal to NorthWestern that NorthWestern took under advisement.

16.    Thereafter, two weeks of extensive settlement discussions ensued, and on January 27, 2005, the Parties reached an agreement in principal concerning the settlement of the claims of NorthWestern, the Indenture Trustee, Magten and the holders of the QUIPS that did not accept NorthWestern's Plan.[3]  NorthWestern drafted the Settlement Agreement, put it in final form, obtained executed copies of the Settlement Agreement from the Parties, and on February 10, 2005, presented the terms of the settlement to the Court.  At the same time, Magten and the Indenture Trustee executed the Distribution Letter, which provides for the distribution of the stock and warrants pursuant to the Settlement Agreement.  See Kaplan Declaration at Exh. G.

C.    NorthWestern's Efforts to Withdraw from the Settlement Agreement

17.    After the Settlement Agreement was presented to this court and made public through the issuance by NorthWestern of a press release, NorthWestern received a letter from one of its large shareholders objecting to the terms of the settlement.  In addition, counsel to the Plan Committee also objected to the terms of the settlement.[4]  The Settlement Agreement, which

---

[3]    By way of background, under the Plan, holders of the QUIPS were placed in Class 8(b) and the QUIPS holders were given the option of either (i) receiving a $.15 recovery in stock and warrants in full satisfaction of all their claims against NorthWestern, including the release of their claims in the fraudulent conveyance litigation, or (ii) receiving no recovery under the Plan and retain their right to pursue the fraudulent conveyance litigation with any recovery to be treated as a Class 9 claim.

[4]    Magten understands that the Plan Committee is currently comprised of one entity, Wilmington Trust Company ("Wilmington"), indenture trustee for the TOPrS.  Harbert Distressed Investment Master Fund, Ltd. ("Harbert") was the largest holder of the TOPrS and throughout NorthWestern's chapter 11 case,

8

was drafted by counsel to NorthWestern is clear that "the Settlement outlined herein shall be binding upon and inure to the benefit of the respective successors and assigns of each of the parties hereto." See Kaplan Declaration Exh. C. Nevertheless, on February 16, 2004, NorthWestern elected to disavow the Settlement Agreement and advised Magten and the Indenture Trustee by letter that it would not honor the terms of the Settlement Agreement. See Kaplan Declaration at Exh. H.

18.     On February 17, 2005, Magten sent a letter to chambers requesting a chambers conference to obtain guidance from the Court as to whether Magten should seek approval of the settlement or whether it should sue NorthWestern and others for their role in connection with NorthWestern's wrongful breach of the Settlement Agreement. See Kaplan Declaration at Exh. I. In addition, Magten also sent a letter to NorthWestern on February 18, 2005, informing NorthWestern that (i) the Settlement Agreement was binding on all parties and that NorthWestern's attempts to avoid its obligations under the Settlement Agreement were wrongful, and (ii) its public disclosure suggesting that it had the unilateral right to withdraw the settlement was misleading. See Kaplan Declaration at Exh. J. Thereafter, the Court informed the parties that a motion seeking approval of the Settlement Agreement should be filed and that the Court would hear the motion at the next omnibus hearing. Accordingly, by this Motion, Magten and the Indenture Trustee seek entry of an order approving the terms of the Settlement Agreement.

---

Wilmington and Harbert worked together on all litigation endeavors. The so-called "objection" to the settlement by the Plan Committee is nothing more than an echo of Harbert's dissatisfaction with the settlement, which Harbert has also made publicly known by sending a letter to NorthWestern and filing that letter with the SEC. See Kaplan Declaration at Exh. H. Magten further understands that counsel to the Plan Committee was informed of the terms of the settlement in advance of NorthWestern's execution of the Settlement Agreement and voiced no objection to the settlement. Moreover, the Plan Committee does not have the right to veto the settlement. Rather, pursuant to Section 7.9 of the Plan, the Plan Committee has the right to object to any settlement that provides for an allowed claim in excess of than $100,001, but the Plan does not require the approval of the Plan Committee as condition precedent to settling claims.

9

## Jurisdiction

19.    The Bankruptcy Court has jurisdiction over this matter as a core proceeding under 28 U.S.C. §§1334(b) and 157(b).  The relief requested herein is predicated on Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  Venue in this district is proper pursuant to 28 U.S.C. §§1408 and 1409.

## Relief Requested

20.    Pursuant to Bankruptcy Rule 9019, the Movants respectfully request that the Court enter an order substantially in the form attached hereto as Exhibit 1, that, among other things, (i) approves the Settlement Agreement; (ii) directs NorthWestern to comply with its terms and (iii) directs NorthWestern to pay all fees and expenses incurred by Magten and the Indenture Trustee in pursuing this Motion.

21.    As discussed more fully below, the Settlement Agreement provides numerous present and future benefits to NorthWestern.  The salient terms the Settlement Agreement are as follows:[5]

- NorthWestern will distribute to the Indenture Trustee for its own benefit and on behalf of Magten and the non-accepting Class 8(b) QUIPS holders the 382,732 shares of common stock at the reorganization plan value of $20.00 per share ("Plan Value") and the 710,449 warrants not yet distributed to Class 8(b) claimants that would have been distributed to Magten and the non-accepting Class 8(b) QUIPS holders had they accepted NorthWestern's confirmed Plan.

- NorthWestern will distribute to the Indenture Trustee for its own benefit and on behalf of Magten and the other non-accepting Class 8(b) QUIPS holders (a) those shares of common stock of reorganized NorthWestern set aside for such QUIPS holders in the reserve established pursuant to that certain Stipulation and Order Establishing a Disputed Claim Reserve entered as Docket #2298 on November 1, 2004, which stock has a Plan Value of $17.1 million, plus (b) an additional $300,000 of common stock of reorganized NorthWestern at Plan Value, which additional stock

---

[5]    To the extent that this Motion and the terms of the Settlement Agreement are inconsistent, the terms of the Settlement Agreement shall control.

10

will be distributed from the general reserves set aside in Class 9 for pending litigation claims.

- All agreed distributions shall be: (i) made to the Indenture Trustee promptly upon approval by the Bankruptcy Court of the Settlement Agreement, but in any event no later than 15 business days following entry of such Order, provided that the making of such distributions pursuant to the Stipulation and Order and this Settlement are not stayed by Order of a court following an appeal, if any, of the Stipulation and Order; and (ii) subject to the Charging Lien of the Indenture Trustee as ratified by the Plan and the Order confirming the Plan. Nothing in the Settlement Agreement shall impair the rights given the Indenture Trustee to seek satisfaction of its fees and expenses and those of its counsel from any and all distributions made pursuant to the Settlement Agreement and/or the Plan.

- All fees and expenses, including but not limited to attorneys fees and costs, incurred by the Indenture Trustee on behalf of itself and the holders of QUIPS through the date of entry of an order approving the Settlement Agreement will be paid from the sale, disposition or liquidation of common stock and/or warrants to be distributed above. The Parties agree that the Indenture Trustee shall have the right to sell into the public market that portion of the common stock and/or warrants distributed to the Indenture Trustee on behalf of QUIPS holders, whether such distribution is through the Plan or the Settlement Agreement, to the extent necessary to pay its fees and expenses and those of its counsel.

- The fees and expenses of Magten shall be paid from distributions made pursuant to this Settlement on account of the non-accepting Class 8(b) QUIPS holders in an amount and in a manner as may be agreed to between Magten and the Indenture Trustee.

- All of the Parties will mutually release between and among each other any and all claims and causes of action (specifically including third party actions initiated by Magten and actions instituted against Magten and Talton Embry), whether or not threatened or pending from the beginning of time through the date of any order approving the Settlement Agreement as entered by the United States Bankruptcy Court for the District of Delaware, and will dismiss with prejudice all pending litigation and appeals and withdraw with prejudice pending objections to various claims, and will not file any claims or objections or lawsuits in the future relating to arising out of or from the allegations made or that could have been made in any of the ten matters referenced on Schedule 1 of the Settlement Agreement.

- The common stock received pursuant to the Settlement Agreement will be distributed in the following manner:

  o First, to distribute to the Indenture Trustee that number of shares of common stock which when sold on the public market are sufficient, in the sole but reasonable discretion of the Indenture Trustee, to pay in full (i) all of the fees, costs and expenses which it has incurred in connection with the Bankruptcy

11

Proceeding; (ii) the fees, costs and expenses associated with the liquidation of such shares; and (iii) a reasonable reserve to be agreed upon by Magten and the Indenture Trustee;

o    Second, to distribute to Magten 255,000 shares as payment in full for all of the fees, costs and expenses, and the effort and risk which Magten has incurred in connection with the bankruptcy proceeding;

o    Third, to distribute to the holders of the QUIPS in accordance with the terms of the Letter Agreement.

## Applicable Authority

22.    Bankruptcy Rule 9019 provides, in relevant part, as follows:

(a)  Compromise.  On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States Trustee, the debtor, and indenture trustee as provided in Rule 2002 and to any other entity as the court may direct.

Fed. R. Bankr. P. 9019(a).

23.    The Movants believe and as made clear by NorthWestern's public statements and presentation to this Court, NorthWestern believes that (i) an order approving the Settlement Agreement is in the best interests of NorthWestern, its estate, its creditors and its shareholders, (ii) the Settlement Agreement is fair and reasonable and strikes an appropriate compromise of the various claims and actions, and (iii) if the Settlement Agreement is not approved, expensive and time-consuming litigation will occur and NorthWestern may be forced to unwind the Plan.

A.    The Settlement Agreement is Fair and Equitable and is in the Best Interest of the Estate

24.    The Settlement Agreement provides for a compromise and settlement of numerous claims, causes of actions, objections and appeals.  Rule 9019(a) of the Bankruptcy Rules grants the Court broad authority to approve a compromise and settlement.  Bankruptcy Rule 9019.  See, e.g., In re Sherman Homes, Inc., 28 B.R., 176, 177 (Bankr. D. Me. 1983).

12

25.     The Supreme Court has held that in order to approve a compromise or settlement a court must find the settlement fair and equitable. TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424, 88 S. Ct. 1157, 1163 (1968); See e.g., In re Ionosphere Clubs, Inc., 156 B.R. 414 (S.D.N.Y. 1993), aff'd 17 F.3d 600 (2d Cir. 1994); In re Fugazy, 150 B.R. 103 (Bankr. S.D.N.Y. 1993). In order to reach a decision, the Court must be apprised "of all facts necessary for an intelligent and objective opinion" of whether the claim will be successful, the likely expense, length and the degree of complexity of the litigation, the potential difficulties of collecting on a judgment "and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." TMT Trailer Ferry, 390 U.S. at 424-425.

26.     A settlement should be approved unless it "fall[s] below the lowest point in the range of reasonableness." In re Teltronics Servs., Inc., 762 F.2d 185, 189 (2d Cir. 1985). Settlements and compromises are generally favored in bankruptcy because it "expedites the administration of a bankruptcy estate." In re Coram Healthcare Corp., 315 B.R. 321, 329 (Bankr. D. Del. 2004). Moreover, when approving a settlement, "the court does not have to be convinced that that settlement is the best possible compromise...rather, the court must only conclude that the compromise or settlement falls within the reasonable range of litigation possibilities. Id. at 330; see also Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1993) (the responsibility of the bankruptcy judge is not to decide the numerous questions of law and fact "but rather to canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness'"). In determining the fairness, reasonableness and adequacy of a proposed settlement agreement the Court should generally consider the following factors:

a.     The probability of success in litigation;

13

b.    The difficulties, if any, to be encountered in collecting any judgment rendered;

c.    The complexity of the litigation involved and the expense, inconvenience and delay necessarily attendant to it; and

d.    The paramount interest of the creditors with proper deference to their reasonable views in the premises.

In re Pennsylvania Truck Lines, Inc., 150 B.R. 595, 598 (E.D. Pa. 1992), aff'd, 8 F.3d 812 (3d Cir. 1993); see also Jeffrey v. Desmond, 70 F.3d 183, 185 (1st Cir. 1995) (recognizing applicability of factors set forth above).

27.    Additionally, the Court should consider the fair and reasonable course of action for NorthWestern's estate giving consideration to the interest of creditors and the avoidance of burdening the estate with undue waste or needless or fruitless litigation.  In re Del Grosso, 106 B.R. 165, 167-168 (Bankr. N.D.Ill. 1989) (citations omitted).  See, also In re United Shipping Company, 1989 Bankr. LEXIS 2775, at *15 (Bankr. D. Minn. Feb. 16, 1989) ("the purpose of a compromise under Rule 9019 is to allow the debtor and the creditor to avoid the expenses and burdens associated with litigating sharply contested and dubious claims."); In re Culmtech, Ltd., 118 B.R. 237, 238 (Bankr. N.D. Ohio 1990); In re Bell & Beckwith, 93 B.R. 569, 575-75 (Bankr. N.D. Ohio 1988).

28.    The Movants respectfully submit that the Settlement Agreement falls well within the range of reasonableness.  In consideration of all of the factors to be weighed in approving a settlement, and in light of the extensive litigation to ensue in the absence of approval of the Settlement Agreement, the Settlement Agreement is fair and equitable and falls well above the lowest level of reasonableness and, therefore, should be approved pursuant to Rule 9019.

29.    Absent a settlement, the numerous claims and causes of action initiated by Magten and the Indenture Trustee would continue at substantial cost to all parties involved and

14

delay NorthWestern's efforts to put the chapter 11 cases behind it. In addition, continuance of these lawsuits subjects NorthWestern and each of its creditors and equity holders to the risk that (i) the Plan will be unwound, (ii) certain valuable utility assets (around which NorthWestern has based its entire reorganization) will be returned to Clark Fork; (iii) the order approving the settlement embodied in the Memorandum of Understanding will be overturned; and (iv) Northwestern may be required to pay to Magten and the holders of the QUIPS cash in excess of $50 million.

30.    Moreover, if the Settlement Agreement is not approved, the result will be needless, time consuming, expensive, and uncertain litigation due to the complexity of the outstanding litigations, particularly the Fraudulent Conveyance Proceeding. Without the benefits of such a settlement, NorthWestern will be exposed to continuous litigation in various courts and jurisdictions with no end in sight. The Settlement Agreement provides NorthWestern with a benefit above and beyond what could be achieved through litigating all outstanding causes of action by providing for a consensual agreement among the Parties that will benefit NorthWestern, its estate, its creditors and its shareholders. As NorthWestern's president and Chief Executive officer recognized, "[w]e believe this settlement is in the best interest of the Company and its shareholders as it removes the uncertainty associated with this protracted legal dispute that, if continued, would have resulted in significant cost to the Company." See Kaplan Declaration at Exh. F.

31.    The Settlement provides for the holders of the QUIPS to receive more than they would have received had they simply accepted the Plan, but provides them with substantially less than they could receive if they are successful in the Fraudulent Conveyance Proceeding and other litigations. Specifically, under the Settlement Agreement, the holders of the QUIPS will receive

15

1,252,732 shares of common stock at the reorganization plan value of $20 per share and (i.e., shares worth approximately $25 million at the reorganization value) and (b) warrants to purchase an additional 710,449 shares of common stock. Absent the Settlement, if Magten and the Indenture Trustee are successful in their litigation, the QUIPS could receive in excess of $50 million in cash plus the fees and expenses incurred by the Indenture Trustee.

           B.      The Settlement Agreement is Binding and Enforceable

        32.      On February 16, 2005, NorthWestern notified the Movants of its intention not to seek Court approval of the Settlement Agreement and not to proceed with the settlement. Thereafter, less than one week after NorthWestern issued its initial press release and presented the Settlement Agreement to the Court, NorthWestern attempted to walk away from the Settlement Agreement; a settlement that it had initiated and consistently pursued, supported and endorsed.

        33.      NorthWestern then issued a second press release announcing that because it is not proceeding with the Settlement Agreement, NorthWestern will be (i) canceling the warrants not distributed to the non-accepting Class 8(b) holders and (ii) distributing to classes 7 and 9 the stock that was not distributed to non-accepting Class 8(b) creditors. See Kaplan Declaration at Exh. K. The purported basis for NorthWestern's decision not to go forward with the Settlement Agreement and distribute the securities that are the subject of that agreement to other constituencies is the complaints asserted by Harbert, a former creditor and current shareholder of NorthWestern. These objections, however, do not give NorthWestern the right to release itself from its obligations under the Settlement Agreement -- if NorthWestern's current shareholders or other parties in interest oppose the Settlement Agreement, they are free to object to a motion seeking approval of the settlement. Now, because of NorthWestern's refusal to seek Court

16

approval of the Settlement Agreement, and because the Settlement Agreement is a valid, binding and enforceable contract, the Movants have filed the instant Motion without the support of NorthWestern.

34.    By the terms of the Settlement Agreement and NorthWestern's statements in its initial press release and its filings with and representations to this Court, there can be no doubt that a binding contract was executed by each of the Parties containing all of the material terms of the Settlement Agreement and that settlement is in the best interests of NorthWestern. Moreover, as noted above, the Settlement Agreement itself plainly states that the "Settlement shall be binding upon" the Parties. See Kaplan Declaration Exh. C. In entering the Settlement Agreement, NorthWestern has induced the Movants to suspend its litigation efforts and convinced the Court to adjourn the trial that was scheduled to begin on February 7, 2005. In addition to the harm and delay caused by this suspension, by publicly seeking to avoid the Settlement Agreement and refusing to bring this Motion, Northwestern and its officers and directors are not only breaching NorthWestern's contractual obligations under the Settlement Agreement, but are also about to cause irreparable harm to Magten and the other QUIPS holders by dissipating the currency that is to be paid to Magten and the other QUIPS holders by unilaterally cancelling warrants and distributing stock that, as contemplated under the Settlement Agreement, belong to the holders of the QUIPS. As a result of this breach and wrongful conduct, Magten and the holders of the QUIPS hold liable NorthWestern, the members of its board of directors, its management, its shareholders and all other parties that induced and facilitated the breach of the Settlement Agreement and the conversion of the stock and warrants that are to be distributed to the holders of the QUIPS pursuant to the Settlement Agreement. In

17

that regard, by withdrawing its support of the Settlement Agreement the litigation exposure and potential liabilities of NorthWestern have increased.

35.     NorthWestern's position that it has the right to "walk away" from the settlement that it negotiated, executed and presented to the Court is unfounded and is contrary to law. The Third Circuit Court of Appeals has repeatedly held that settlement agreements should be treated as contracts and when parties enter into a settlement agreement, they enter into a contract. <u>D.R. by M.R. v. East Brunswick Bd. of Educ.</u>, 109 F.3d 896, 901 (3d Cir. 1997); <u>See also, Halderman v. Pennhurst State Sch. & Hosp.</u>, 901 F.2d 311, 318 (3d Cir. 1990) (construing a final settlement agreement as a contract); <u>Loppert v. Windsortech, Inc.</u>, 2004 Del. Ch. LEXIS 121 * 5 (Del. Ch., June 25, 2004)("a settlement agreement is enforceable as a contract").

36.     Moreover, Delaware law is clear that "a contract 'comes into existence if a reasonable person would conclude, based on the objective manifestations of assent and the surrounding circumstances, that the parties intended to be bound by their agreement on all essential terms.'" <u>Leonard v. University of Delaware</u>, 204 F.Supp.2d 784, 787 (D. Del. May 24, 2002) (citing <u>Intellisource Group, Inc. v. Williams</u>, 1999 U.S. Dist. LEXIS 12446 (D. Del., 1999) (citations omitted)); <u>See also, Loppert</u>, 2004 Del. Ch. LEXIS 121 * 5 (a contract is formed when "a reasonable negotiator in the position of one asserting the existence of a contract would have concluded, in that setting, that the agreement reached constituted agreement on all of the terms that the parties themselves regarded as essential and thus that that agreement concluded the negotiations"). "In other words, an enforceable contract exists if the parties have reached a definite agreement on all essential terms." <u>Leonard</u>, 204 F.Supp. 2d. at 787.

37.     Bankruptcy Courts have adopted this line of reasoning, holding that an agreement by a debtor to compromise litigation should also be binding upon all parties to the agreement.

18

"The absence of court approval does not mean that the parties did not agree to the settlement. It only means that the court has not yet approved it." United Shipping, 1989 Bankr. LEXIS 2775 at *15. In fact, "a debtor can be compelled to file a motion to approve the settlement even if the debtor has changed its mind." 10 Collier on Bankruptcy, ¶9019.02 (15th Ed. 1996). Absent actual or constructive fraud, which has not occurred here, settlement agreements are binding pending bankruptcy court approval. See In re Lyons Transportation Lines, Inc., 163 B.R. 474, 476 (Bankr. W.D. Pa. 1994). See also In re Tidewater Group, Inc., 8 B.R. 930, 933 (Bankr. N.D. Ga. 1981) ("an agreement by a debtor-in-possession to compromise litigation should also be binding upon all parties to the agreement pending a Court determination as to whether or not to approve the agreement."); In re Frye, 216 B.R. 166, 174 (Bankr. E.D.Va. 1997) (holding that it would be inequitable to allow a party to an otherwise enforceable agreement to "revoke an offer after it had been accepted merely because the court had not yet heard the motion to approve the compromise of the claim."); In re Cotton, 136 B.R. 888, 890 (M.D. Ga. 1992); rev'd on other grounds, 992 F.2d 311 (11th Cir. 1993) ("debtor's agreement to compromise is binding upon all parties to the agreement pending court approval of the agreement").

38.    Here, by the terms of the Settlement Agreement, NorthWestern's subsequent statements in its press release, and its filings with and representations to this Court, there can be no doubt that a binding contract was executed by each of the parties containing all of the material terms of the Settlement.[6]  NorthWestern has publicly acknowledged that its only reason for failing to move forward with the Settlement Agreement is the objections asserted by its controlling shareholder, "Our decision [to cancel the settlement] was strictly based on the objections and we will no longer pursue it because several parties planned to object in court."

---

[6]        The Movants hereby reserve the right to submit a memorandum of law in support of the Motion addressing the enforceability of the Settlement Agreement and all other issues in connection with the Motion.

19

See Kaplan Declaration at Exh. L. Accordingly, upon the filing of a 9019 motion, creditors have

the opportunity to object and, as previously explained, it is up to the court to determine the

reasonableness of the settlement – not the debtor.

39.    NorthWestern has already informed the Court and the public that the settlement is

in the best interests of the estate. It is undisputed that the Settlement Agreement was negotiated

in good faith. Therefore, NorthWestern should be required to honor the Settlement Agreement

they solicited, negotiated, drafted and executed. In addition, NorthWestern is required to

proceed to seek Court approval, and at that time creditors may have the opportunity to object

based on valid grounds. Because NorthWestern has not sought approval of the Settlement

Agreement, the Movants seek to have the Court approve the Settlement Agreement because it is

plainly in the best interest of all parties. Lastly, because NorthWestern's conduct in refusing to

honor the terms of the Settlement Agreement is wrongful and vexatious, NorthWestern should be

obligated to pay all fees and expenses incurred by the Movants in seeking approval of the

Settlement Agreement. See Leonard v. Univ. of Del., 204 F. Supp. 2d 784, 789 (D. Del. 2002)

(awarding costs to defendants for enforcing the terms of a settlement agreement when plaintiff

attempted to avoid his obligations under that agreement).

## Notice

40.    The Movants have provided notice of this Motion to: (i) the Office of the United

States Trustee; (ii) Paul, Weiss, Rifkind, Wharton & Garrison LLP as counsel to the Official

Committee of Unsecured Creditors and the Plan Committee; (iii) the sole registered holder of the

QUIPS, Cede & Co., and those holders of the QUIPS holding by and through Cede & Co. as

participants; and (iv) all other parties that have requested notice in NorthWestern's chapter 11

case pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested herein, and

20

the likelihood that such notice will effectively reach all parties likely to want to be heard on this

matter Magten submits that no other or further notice is required.[7]

### No Prior Request

41.    No request for the relief sought herein has been previously made to this or any

other court.

### Conclusion

WHEREFORE, Magten and the Indenture Trustee respectfully request entry of an order,

substantially in the form of Exhibit 1 attached to this Motion, approving the Settlement

Agreement, directing NorthWestern to pay the costs and expenses incurred in enforcing the

terms of the settlement and granting such other and further relief as is just and proper.

Dated:  Wilmington, Delaware         BLANK ROME LLP
        February 22, 2005

                                     Elio Battista, Jr. (DE No. 3814)
                                     1201 Market Street, Suite 800
                                     Wilmington, DE 19801
                                     Telephone:  (302) 425-6400
                                     Facsimile:  (302) 425-6464

                                            - and -

                                     FRIED, FRANK, HARRIS, SHRIVER &
                                            JACOBSON LLP
                                     Bonnie Steingart
                                     Gary Kaplan
                                     One New York Plaza
                                     New York, NY 10004
                                     Telephone:  (212) 859-8000
                                     Facsimile:  (212) 859-4000

                                     Counsel for Magten Asset Management
                                            Corporation

---

[7] Magten and the Indenture Trustee currently intend to publish notice of the Motion in one or more newspapers to ensure that all effected parties receive notice.

21

- and -

SMITH, KATZENSTEIN & FURLOW, LLP


*/s/ Kathleen M. Miller*
Kathleen M. Miller (I.D. No. 2898)
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE  19899
Telephone: (302) 652-8400
Facsimile:  (302) 652-8405

- and -

NIXON PEABODY LLP
Amanda D. Darwin (BBO No. 547654)
John V. Snellings (BBO No. 548791)
Lee Harrington (DE 4046)
100 Summer Street
Boston, MA  02110
Telephone: (617) 345-1000
Facsimile:  (617) 345-1300

Counsel for Law Debenture Trust Company of New
York

22

# Exhibit N

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                                      )
                                            )
NORTHWESTERN CORPORATION,                    )    Case No. 03-12872 (JLP)
                                            )
                    Reorganized Debtor.      )    Re: Docket No. 2832
                                            )
_____   )

### MEMORANDUM OPINION DENYING JOINT MOTION OF MAGTEN ASSET MANAGEMENT CORPORATION AND LAW DEBENTURE TRUST COMPANY OF NEW YORK

Magten Asset Management Corporation ("Magten") and Law Debenture Trust Company

of New York as Indenture Trustee (the "Indenture Trustee") submitted, pursuant to this Court's

direction, a motion for entry of an order under Federal Rule of Bankruptcy Procedure 9019[1]

approving a proposed settlement agreement (the "Settlement Agreement") with Northwestern

Corporation (the "Debtor") involving litigation and claims by each of the parties [Docket No.

2832] (the "Motion"). Prior to the filing of the Motion, the Debtor had received correspondence

from the Plan Committee, which was established under section 7.9 of the Debtor's Confirmed

Amended Chapter 11 Plan of Reorganization,[2] and certain other creditors objecting to the terms

of the proposed settlement. On February 16, 2005, the Debtor advised Magten and the Indenture

Trustee that it would not honor or comply with the proposed Settlement Agreement on grounds

_____

[1] Federal Rule of Bankruptcy Procedure 9019 invokes the authority of the court to approve a compromise or settlement upon motion by the trustee. Under 11 U.S.C. § 1107, a debtor-in-possession in a chapter 11 case has the power of a trustee. However, in this case, the plan of reorganization has been confirmed, and under section 1141(b), the confirmation of the plan vests all of the property of the estate in the debtor. Thus, there is no longer a debtor-in-possession, *i.e.*, trustee. The present motion is filed pursuant to the terms of the settlement agreement and the Court may, under these circumstances, adopt and utilize the criteria commonly employed to approve or reject compromise agreements.

[2] The Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code was approved on October 29, 2004 [Docket No. 2238].

1

that the agreement required consent of the Class 7 creditors and that such consent could not be obtained.

After the Court signed an order directing Magten *et al.* to file a motion for approval of the settlement agreement, the Motion was set for hearing for March 8, 2005. In response to the Motion, objections to approval of the Settlement Agreement were filed by the Debtor, the Plan Committee and the Ad Hoc Committee of Class 7 Creditors.[3] To these objections, Magten and the Indenture Trustee filed a joint reply. At the hearing, counsel for the respective parties presented oral argument in support of their respective positions.

The Settlement Agreement arises from a series of ongoing litigation between Magten, the Debtor, the Debtor's officers and counsel involving ten separate, but interrelated, matters. At the outset, I determine that the pending matter is properly before the Court, as the Court invited the present motion to resolve NorthWestern's representations at a prior hearing that a settlement had been reached and required formal application for court approval. I further determine that Magten's argument that the agreement is binding on the parties without court approval is without merit. Indeed, the settlement documents plainly state that the agreement was subject to Bankruptcy Court approval. Thus, case authority dealing with section 363 of the Bankruptcy Code[4] (sale of property of the estate outside the ordinary course of business), *Northview Motors, Inc. v. Chrysler Motors Corp.*, 186 F.3d 346 (3d Cir. 1999), or the fact that the Plan has vested

---

[3] The Ad Hoc Committee consists of Avenue Capital Partners, Drawbridge Special Opportunities Advisors LLC, Greenwich International Ltd., Harbert Distressed Investment Master Fund, Ltd., SOF Investments, L.P., Nationwide Life Insurance Company, Nationwide Mutual Insurance Company, and P. Schoenfeld Asset Management LLC.

[4] Unless otherwise indicated, all citations to statutory sections are to the Bankruptcy Code ("Code"), 11 U.S.C. § 101 *et seq.*

2

the property in the Debtor and there is no longer a debtor-in-possession, *In re W.R.M.J. Johnson Fruit Farm, Inc.*, 107 B.R. 18 (Bankr. W.D. N.Y. 1989); *In re Nelson Co.*, 117 B.R. 813 (Bankr. E.D. Pa. 1990), are beside the point. Indeed, the issues raised by the objections make clear that the Court must decide whether the Settlement Agreement violates or is consistent with the terms of the Confirmed Plan in order to approve or reject the agreement. This is particularly true because section 7.9 of the Confirmed Plan provides that the Plan Committee was created for "the purpose of overseeing the remaining Claims reconciliation and settlement process," and if a settlement exceeds $100,001, which the present settlement surely does, the Debtor must settle in accordance with the Plan Committee By-Laws, "which provides the Plan Committee with, among other things, the right to object [to] such claims." Finally, it is clear from oral argument that the settlement provisions do impact the rights of Class 7 and Class 9 creditors, and thus court supervision is essential to protect such rights.

The present argument essentially involves the application of claims arising under unsecured subordinated notes called QUIPS, which were allowed in the Plan in the amount of $69,537,873.00. The Indenture Trustee administers such notes and Magten is one of the holders of such notes. Article IV, section 4.8(b)(ii) of the Plan provides that QUIPS note claimants may opt to receive payment of their notes in full under one of two options, but not both, namely:

(1) a Pro Rata Share of 505,591 shares of New Common Stock . . ., plus Warrants exercisable for an additional 2.3% of New Common Stock (collectively, "Option 1"); or

(2) a Pro Rata Share of recoveries, if any, upon resolution of the QUIPS Litigation ("Option 2").

Option 2 is involved in the settlement language. Under Option 2, such holders of claims shall be treated as a Class 9 General Unsecured Claim, "subject to estimation and reserves of Disputed

3

Claims as provided in section 7.5 of the Plan, with Distributions to holders of Class 8(b) Unsecured Subordinated Note Claims which choose Option 2 being made, if at all, only upon entry of a Final Order resolving the QUIPS Litigation (unless otherwise agreed to by the Debtor and the Committee); . . . ."

The QUIPS Litigation involves an action by Magten and the Indenture Trustee seeking to upset a transfer of assets to the Debtor from an entity known as Clark Fork and Blackfoot LLC, under circumstances alleged to occur through actual fraud (Adv. Pro. No. 04-53324). Allied with this adversary action is Magten's and the Indenture Trustee's appeal of the confirmation order, actions against an officer of the company, action against counsel for the Debtor and objections to the award of attorney's fees of said counsel, among other pending matters.

The settlement proposal calls for termination of all litigation and provides allocation and payment of the following by NorthWestern to Magten and the Indenture Trustee: (1) distribution of 382,732 shares of common stock at the reorganization plan value of $20.00 per share, plus 710,449 warrants at a value of $4.50 each; and (2) distribution of those shares of common stock of set aside in a disputed claim reserve pursuant to a stipulation and court order establishing such reserve [Docket No. 2298, November 1, 2004], having a Plan value of $17.1 million, plus $300,000 of common stock from the general reserve set aside for Class 9 claimants. From these distributions, Magten and the Indenture Trustee would pay their own attorney's fees and costs (over $2 million) from the sale of such shares, the parties would execute mutual releases and all litigation would come to an end.

In the stipulation approved November 1, 2004, the parties agreed that Magten's proof of claim of $50 million would result in a reserve of 50% of the proof of claim, equaling $25 million of the Class 9 reserved shares, but to the extent that the litigation claim exceeded $25 million,

4

the "holders of such claims shall have any deficiency satisfied out of the general Disputed Claims Reserve" described in the Plan. That general Class 9 reserve set aside $140 million of shares for over forty disputed claims, only two of which have been resolved.

While the Plan Committee and the Ad Hoc Committee challenge the amount, and therefore the reasonableness of the settlement, the crux of the real objection comes from the manner in which Magten's shares are being distributed, its impact on Class 7 and Class 9 creditors and the violation of section 4.8(b)(ii) of the Plan.

The Plan provides that to the extent shares allocated to Class 8(b) are not distributed to Option 2 holders, those shares are to be distributed to Class 7 and Class 9 creditors. *See* Debtor's Second Amended and Restated Plan of Reorganization, Section 4.8(b)(ii). Thus, Magten and the other non-accepting QUIPS holders who took Option 2 received only a Class 9 claim, not a distribution from the 505,591 shares allocated to Option 1 holders. To grant, as the Settlement Agreement does, both types of recovery requires the consent of the Class 7 and Class 9 creditors, either by way of amendment to the Plan or absence of any objections from those classes. But a plan amendment is not legally available because the Plan has been substantially consummated and objection to the distribution has been presented vigorously by Class 7.

A confirmed plan may be modified or amended after confirmation, but only before substantial consummation has taken place. Section 1127(b) provides: "The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan . . . ." Indeed, Notice of Substantial Consummation of the Plan was filed on December 29, 2004 [Docket No. 2519], and the notice received widespread publication.

5

As to consent by Class 7 creditors, as set forth in the Ad Hoc Committee objection, their veto right to the settlement has been clearly stated.    Moreover, it is clear that the parties to the settlement realized that the Debtor could not, as it states, "dip into" the Class 9 disputed claim reserve, which is in excess of the Magten reserve of $25 million, to distribute stock to Magten and the Indenture Trustee for the benefit of Magten. Yet, it is admitted that this general reserve is clearly where the 382,732 shares must come from. To do so would not only set Options 1 and 2 on their head after confirmation, and therefore violate the Plan, but would, according to the Debtor, have a serious potential adverse impact on the reserve for other disputed claims. For example, PPL Montana's disputed claim of $140 million was reserved at $50 million by stipulation, claims from rejection of pension plan exceed $12 to $15 million, and Hyland's claim of $30 million is still unresolved. To date, Cornerstone's claim of $19.5 million and Comanche Park of $750,000 have been resolved, with distributions made from the general reserve. To resolve the remaining claims, which have an asserted amount of $120 million, there remains 3,720,600 shares with a Plan value of $74,412,000. Such financial dilemma surely means that it is imprudent to distribute the 382,732 shares to Magten from the Class 9 reserve over and above the reserve fixed by the November 1, 2004 Stipulation.

I conclude that the Debtor and Magten *et al.* entered into the Settlement Agreement in good faith, knowing nevertheless that the Plan provisions required the consent of the Class 7 and Class 9 creditors, and certainly both later realized the Plan, at this late date, cannot be amended to accommodate the settlement terms.

Had the settling parties agreed upon a settlement amount which equaled the amount of the Magten/Indenture Trustee reserve of $25 million, the agreement may have been able to carry the day, for the parties recognize that approval of a proposed settlement is within the "sound

6

discretion" of the Court, and the Court is not burdened to decide numerous questions of law or fact, but rather canvases the issues and circumstances attending the litigation, including cost, to determine whether the agreement falls below the lowest point in range of reasonableness. *In re Martin*, 91 F.3d 389 (3d Cir. 1996); *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983).

Since the Debtor has now concluded the settlement is not in the best interests of the estate, that it violates express provisions of the Plan and therefore cannot be implemented, particularly where Class 7 and Class 9 creditors vigorously object, as does the Plan Committee, the only conclusion for the Court is that the proposed Settlement Agreement must be rejected for the reasons set forth above. This memorandum does not foreclose further settlement negotiations, and indeed it may be in the best interest of all parties to revisit the present proposal within the limits of the Magten/Indenture Trustee reserve, with a potential supplement from other sources of new common stock, particularly where one of the objectors have taken note that an officer of the company was also the beneficiary of the proposed settlement.[5]

For the reasons set forth above, the Joint Motion of Magten and Law Debenture to approve the Settlement Agreement is DENIED without prejudice. A separate order denying the Motion shall enter.

Dated: March 10, 2005

The Honorable John L. Peterson
United States Bankruptcy Judge

---

[5] One unsettling fact, as stated at the hearing by counsel for the Indenture Trustee, is that the Option 1 bond holders who overwhelmingly voted in favor of the Plan have not received distribution of their shares of new Common Stock due to the dispute over payment and allocation of the Indenture Trustee's attorney's fees. Thus, that class is being held hostage by the continuing litigation, which apparently does not bother the objecting parties.

7

# Exhibit O

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| NORTHWESTERN CORPORATION, | ) Case No. 03-12872 (JLP) |
| | ) |
| | ) **Hearing Date: March 8, 2005 at 9:30 a.m.** |
| Reorganized Debtor. | ) **Objection Deadline: March 2, 2005 at 5:00** |
| | ) **p.m.** |
| | ) |

**NORTHWESTERN CORPORATION'S OBJECTION TO THE JOINT MOTION OF
MAGTEN ASSET MANAGEMENT CORPORATION AND LAW DEBENTURE TRUST
COMPANY OF NEW YORK AS INDENTURE TRUSTEE FOR ORDER PURSUANT
TO RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE
APPROVING A SETTLEMENT BETWEEN NORTHWESTERN CORPORATION,
MAGTEN ASSET MANAGEMENT CORPORATION, AND LAW DEBENTURE
TRUST COMPANY OF NEW YORK**

NorthWestern Corporation ("NorthWestern," or the "Debtor"), by and through its

undersigned counsel, hereby submits its Objection (the "Objection") to the Joint Motion of

Magten Asset Management Corporation and Law Debenture Trust Company of New York as

Indenture Trustee for Order Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure

Approving a Settlement Between NorthWestern Corporation, Magten Asset Management

Corporation, and Law Debenture Trust Company of New York (the "Motion"), which was filed

on February 22, 2005 [Docket No. 2832], and in support thereof respectfully represents as

follows:

**SUMMARY OF OBJECTION**

1.      As described in greater detail further below, NorthWestern negotiated the terms of

a proposed settlement with Magten Asset Management Corporation ("Magten") and Law

Debenture Trust Company of New York ("Law Debenture," together with Magten, the

"Movants")[1] that was reduced to writing in a settlement letter (the "Settlement Letter"), dated as of January 27, 2005.[2]

2.      The Settlement Letter is expressly subject to bankruptcy court approval, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and contingent upon the Parties entering into a mutually acceptable separate stipulation and order of settlement.

3.      In its Motion, Magten erroneously states that the proposed settlement consists of the Settlement Letter and a letter agreement between Magten and Law Debenture, referred to in the Motion as the "Distribution Letter." *See* Motion, page 4, n. 1. The Distribution Letter is only between Magten and Law Debenture. NorthWestern is not a party to the proposed Distribution Letter and had expressed no comments on the Distribution Letter as of the date NorthWestern withdrew its support for the proposed settlement at issue in the Motion. NorthWestern believes that the proposed allocation of stock and warrants in the Distribution Letter is inconsistent with the distribution scheme provided for under the Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Plan").[3] Had the Parties proceeded with implementation of the Settlement Letter, NorthWestern would have objected to the proposed Distribution Letter.

4.      Consistent with its belief that matters between the Parties were subject to the Settlement Letter, on or about January 31, 2005, NorthWestern filed notice that the trial in the NorthWestern Adversary Proceeding (as defined below) had been cancelled by the Court as a

---

[1] The parties to this proposed settlement, which include Magten, Law Debenture and NorthWestern, are collectively referred to herein as the "Parties."

[2] A copy of the Settlement Letter is attached as Exhibit A to the Affidavit of Karol K. Denniston (the "Denniston Affidavit"), filed contemporaneously herewith.

[3] On October 8, 2004, the Court entered an oral ruling confirming the Debtor's Plan, and on October 19, 2004, the Court entered the final Order Confirming the Debtor's Plan. The Effective Date of the Debtor's Plan was November 1, 2004. A copy of the Plan (without exhibits) is attached to the Denniston Affidavit as Exhibit B. Any term used but not defined herein shall have the meaning ascribed to it in the Plan.

result of the proposed settlement, and that the Court would hold a status conference to discuss the terms of the proposed settlement on February 10, 2005 (the "Trial Notice").[4]

5.      On or about February 8, 2005, counsel to NorthWestern sent a letter to Mr. Collins J. Seitz, Jr., the mediator assigned by the United Stated District Court for the District of Delaware to mediate Civil Action Numbers 04-1508 (JJF), 04-1389 (JJF) and 04-1279 (JJF) (collectively, the "Appeals"), advising that a global settlement had been reached between the parties to the Appeals and that Mr. Seitz's mediation services would no longer be needed (the "Mediation Notice").[5]

6.      On or about February 9, 2005, after NorthWestern's investor relations officer received telephone calls indicating that the terms of the proposed settlement had been made public by a third party outsider, NorthWestern issued a press release entitled "NorthWestern Settles Litigation and Bankruptcy Claims with Magten Asset Management Corporation and Law Debenture," which set forth the material terms of the Settlement Letter (the "Settlement Press Release").[6]

7.      On February 10, 2005, at a status conference held before the Bankruptcy Court (the "Status Conference"), the Debtor's counsel informed the Court of the settlement negotiations with Magten and Law Debenture and outlined the general terms of the agreement in principle reached among the parties with respect to the Settlement Letter.[7]

8.      On or about February 15, 2005, after the Settlement Press Release was issued, NorthWestern's Board of Directors received a letter from Harbert Distressed Investment Master Fund, Ltd. ("Harbert"), in which Harbert vehemently objected to the terms of the proposed settlement and asserted that it violated the terms of the confirmed and substantially consummated

---

[4] A copy of the Trial Notice is attached to the Denniston Affidavit as Exhibit C.
[5] A copy of the Mediation Notice is attached to the Denniston Affidavit as Exhibit D.
[6] A copy of the Settlement Press Release is attached to the Denniston Affidavit as Exhibit E.
[7] A copy of the pertinent pages from the February 10, 2005 hearing transcript (the "Transcript") is attached to the Denniston Affidavit as Exhibit F.

Plan ( the "Harbert Letter").[8]  H arbert o wns a pproximately 2 3% o f reorganized N orth Western

Corporation's stock, having acquired such position through ownership of a significant amount of

Class 7 Claims.  The Harbert Letter had been preceded by numerous telephone calls to the chair

and other members of NorthWestern's Board of Directors by Harbert and other similar Class 7

holders of claims voicing stringent opposition to the disclosed proposed settlement with Magten

and Law Debenture.

9.    On or about February 15, 2005, Harbert also filed with the United States

Securities and Exchange Commission its first amendment to Schedule 13D, originally filed by

Harbert on November 12, 2004 with respect to the common stock of NorthWestern, asserting

NorthWestern through the proposed settlement had taken actions that violated the terms of the

confirmed and substantially consummated Plan (the "Schedule 13D Amendment").[9]

10.    On o r about F ebruary 1 5, 2 005, H arbert followed i ts Letter a nd S chedule 1 3D

Amendment with a press release which stated it believed the Settlement Letter violated the terms

of the confirmed and substantially consummated Plan (the "Harbert Press Release").[10]

11.    On information and belief, holders of Class 7 Claims whose Allowed Claims were

converted to common stock in the reorganized NorthWestern and whose stock holdings, when

combined with Harbert's, represent over 50% of NorthWestern's outstanding common stock

joined Harbert's opposition to the proposed settlement.

12.    On or about February 16, 2005, NorthWestern, through its counsel, received a

letter from the Plan Committee, through its counsel, objecting to the Settlement Letter and

asserting that the terms of the proposed settlement violated the terms of the confirmed and

substantially consummated Plan and could not be approved as a matter of law (the "Plan

---

[8] A copy of the Harbert Letter is attached to the Denniston Affidavit as <u>Exhibit G</u>.
[9] A copy of the Schedule 13D Amendment (without exhibits) is attached to the Denniston Affidavit as <u>Exhibit H</u>.
[10] A copy of the Harbert Press Release is attached to the Denniston Affidavit as <u>Exhibit I</u>.

Committee Objection").[11]   More specifically, the Plan Committee Objection asserted, "[t]he Proposed Settlement is neither fair nor reasonable; moreover, it violates the terms of the Plan," and demanded "NorthWestern Corporation immediately cease all actions in pursuit of consummation of the Proposed Settlement."[12]

13.    At the time NorthWestern entered into the Settlement Letter, it understood that the proposed settlement terms set forth in the Settlement Letter were acceptable to the Plan Committee.    NorthWestern acknowledges, however, that there may have been miscommunications with the Plan Committee as to the terms of the proposed settlement and the Plan Committee's acquiescence thereof. Irrespective, NorthWestern also had a good faith belief that the terms of the proposed settlement were fair and reasonable and that entry into the proposed settlement was in the Reorganized Debtor's best interest and in the best interest of the bankruptcy estate.

14.    After receiving the communications described above, and considering the objections of Harbert and the Plan Committee on behalf of Classes 7 and 9, NorthWestern determined it could not, in good faith, proceed with implementation of the proposed settlement over the objection of Classes 7 and 9.  As discussed below, the Settlement Letter sets forth terms that, if approved, would reduce the recovery to Classes 7 and 9 under the terms of the confirmed Plan.

15.    In fact, Article IV, § 4.8(b)(ii) of the Plan provides, in part:

> If a holder of a Class 8(b) Unsecured Subordinated Note Claim votes to accept or reject the Plan and chooses Option 2, then: (i) such holder's claims shall be treated as a Class 9 General Unsecured Claim, subject to estimation and reserves for Disputed Claims as provided for by Section 7.5 of the Plan, with Distributions to holders of Class 8(b) Unsecured Subordinated Note Claims which choose Option 2 being made, if at all, only upon entry of a Final Order resolving the QUIPS Litigation (unless

---

[11] A copy of the Plan Committee Objection is attached to the Denniston Affidavit as Exhibit J.
[12] See Plan Committee Objection, page 1, ¶ 2.

otherwise agreed to by the Debtor and the Committee); and (ii) any New Common Stock which otherwise would have been distributable to such holder if such holder had chosen Option 1, shall be distributed, pro rata to Class 7 and Class 9, and the Warrants which otherwise would have been distributable will be canceled.

16.     The Settlement Letter provided that Magten and Law Debenture were to receive the distribution under both (i) Section 4.8(b)(ii) of the Plan as if Magten and the non-accepting QUIPS holders had accepted the Plan and chosen Option 1 and (ii) a distribution from Class 9 within the $25 million claim reserved for Magten in the Disputed Claim Reserve.[13]

17.     The substantially consummated Plan prohibits, absent the consent of Classes 7 and 9, the distribution of the remaining distribution to Class 8(b) for non-accepting QUIPS holders.[14]

18.     Specifically, Article IV, § 4.8(b)(ii) provides, "any New Common Stock which otherwise would have been distributable to such holder if such holder had chosen Option 1, shall be distributed, pro rata to Class 7 and Class 9, and the Warrants which otherwise would have been distributable will be canceled."

19.     In short, NorthWestern could not continue to pursue the proposed settlement because, absent the consent of Harbert and the Plan Committee on behalf of Classes 7 and 9, because the proposed settlement is fatally flawed structurally from a legal basis to the extent it nonconsensually alters the substantially consummated Plan's distribution scheme.[15]

---

[13] *See* Settlement Letter, page 2, ¶1. On or about October 25, 2005, the Debtor filed its Notice of Establishment of Claim Reserve Pursuant to Section 7.5 of Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code and Paragraph 27 of the Confirmation Order [Docket No. 2270], wherein the Debtor served notice that "consistent with Section 7.5 of the Plan, the Debtor has included in the initial reserve of 13.5% of New Common Stock a claim of $25 million to address the claims of the QUIPS Litigation Claims holders," (the "Magten Reserve"), and on or about November 1, 2004, the Court entered that certain Stipulation and Order Establishing a Disputed Claim Reserve [Docket. No. 2298 and Docket No. 2317].

[14] On December 29, 2004, NorthWestern filed its Notice of Substantial Consummation of the Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Notice of Substantial Consummation") [Docket No. 2519]. A copy of the Notice of Substantial Consummation is attached to the Denniston Affidavit as Exhibit K.

[15] Harbert and the Plan Committee's counsel also demanded that NorthWestern immediately distribute the remaining 8(b) shares and cancel the undistributed warrants in accordance with the terms of the Plan. Threatened

20.    On or about February 16, 2005, NorthWestern's counsel advised Magten and Law Debenture in writing that the Debtor was withdrawing from the proposed settlement for the reasons set forth above (the "Withdrawal Letter").[16]

21.    On or about February 17, 2005, NorthWestern issued a press release entitled "NorthWestern Provides Update on Bankruptcy Issues," wherein NorthWestern announced that it would not present the proposed settlement to the Court for approval because of the strong objections asserted by Harbert and the Plan Committee on behalf of Classes 7 and 9 (the "February 17 Press Release").[17]

22.    Thereafter, on or about February 18, 2005, counsel to Magten sent a letter to counsel to NorthWestern informing NorthWestern that it believes that (i) the proposed settlement was binding on all parties and that NorthWestern's withdrawal of the proposed settlement was "wrongful and ineffective" and (ii) the press release issued by NorthWestern with respect to the withdrawal of the proposed settlement was misleading (the "February 18 Letter").[18]

23.    On or about February 22, 2005, NorthWestern's counsel responded to Magten's February 18 Letter, further informing Magten and Law Debenture that the Debtor could no longer, in good faith, seek the Court's approval of the proposed settlement, due to the objections asserted by Harbert and the Plan Committee on behalf of Classes 7 and 9 (the "February 22 Letter").[19]    Specifically, NorthWestern's counsel advised that the Settlement Letter "made the

---

with litigation forcing such action, on or about February 16, 2005, NorthWestern issued instructions to its transfer agent to distribute the remaining 8(b) shares. NorthWestern issued the instructions to its transfer agent because Harbert and the Plan Committee demanded that NorthWestern comply with the Plan's terms, which state as to distribution to Class 8(b): "On the Effective Date, . . . any New Common Stock which otherwise would have been distributable to such holder if such holder had chosen Option 1, shall be distributed, pro rata to Class 7 and Class 9, and the Warrants which otherwise would have been distributable will be canceled." Because the Plan is substantially consummated and clear and unambiguous, and objections are now evident, the holders of Class 7 Allowed Claims would not vote in favor of a Plan amendment to Section 4.8(b)(ii), and in order to avoid litigation by Harbert and the Plan Committee to enforce the Plan, the Debtor issued the instructions to distribute the remaining Class 8(b) shares and cancel the undistributed warrants, as required under the Plan.

[16] A copy of the Withdrawal Letter is attached to the Denniston Affidavit as Exhibit L.
[17] A copy of the February 17 Press Release is attached to the Denniston Affidavit as Exhibit M.
[18] A copy of the February 18 Letter is attached to the Denniston Affidavit as Exhibit N.
[19] A copy of the February 22 Letter is attached to the Denniston Affidavit as Exhibit O.

settlement terms and any enforcement thereof expressly contingent upon obtaining bankruptcy court approval of a mutually agreed upon Stipulation and Order (as defined in the [Settlement Letter])," and that "NorthWestern cannot be expected to continue to seek approval of a settlement that, absent the consent of Classes 7 and 9, cannot be approved."[20]    Counsel to NorthWestern further advised Magten that "[w]ith respect to the Appeals, NorthWestern will take steps to advise the mediator that the settlement cannot be consummated . . . and ask that the mediator expeditiously reschedule the mediation process."[21]    In addition, counsel to NorthWestern advised Magten that NorthWestern "is in the process of finalizing and filing a motion to dismiss the [NorthWestern Adversary Proceeding (as defined below)] in its entirety."[22]

24.    On or about February 25, 2005, NorthWestern filed the Joint Motion (I) For Order Allowing The Debtor To Dismiss Its Complaint Against Magten Asset Management Corporation and Talton R. Embry, With Prejudice, Pursuant To Rule 7041(a) of the Federal Rules Of Bankruptcy Procedure and Rule 41(a) of The Federal Rules of Civil Procedure, and (II) for Leave to Amend Answer and Affirmative Defenses and to Withdraw Counterclaims to First Amended Complaint to Avoid the Transfer (the "Motion to Dismiss") in the Magten Adversary Proceeding [Adv. Pro. Dkt. No. 63], as well as in an adversary proceeding commenced by NorthWestern against Magten and Talton R. Embry ("Embry"), the 100% owner and Chairman of Magten, styled as NorthWestern Corporation v. Magten Asset Management Corporation and Talton R. Embry [Adv. Pro. No. 04-55051-JLP] (the "NorthWestern Adversary Proceeding"). NorthWestern also filed a Motion and Order to Shorten Notice, seeking to have the Motion to Dismiss heard along with Magten's Motion on March 8, 2005 at 9:30 a.m.

---

[20] *See* February 22 Letter.
[21] *Id.* On or about February 28, 2005, NorthWestern's counsel sent a letter to Mr. Collins J. Seitz, the mediator assigned to the Appeals, advising that the proposed settlement has been terminated because of Harbert's and the Plan Committee's objections and requesting that the mediation process be reinstated as soon as possible (the "Mediation Reinstatement Letter").  A copy of the Mediation Reinstatement Letter is attached to the Denniston Affidavit as Exhibit P.
[22] *Id.*

25.    As the direct result of Harbert's and the Plan Committee's lack of consent, and the obvious lack of majority support for any Plan amendment, were NorthWestern able to present such an amendment, demonstrated by the strong opposition to the Settlement Letter by holders of Class 7 and Class 9 Allowed Claims, NorthWestern cannot and could not, in good faith, continue to pursue the implementation of the proposed settlement agreement.

26.    Moreover, Magten's and Law Debenture's Motion must be denied, because as fully discussed below, the Settlement Letter and the settlement terms provided for therein cannot be enforced over the objections of Harbert and the Plan Committee on behalf of the holders of Class 7 and Class 9 claims under the terms of the confirmed and substantially consummated Plan or under controlling Third Circuit law.

## JURISDICTION, VENUE AND BURDEN OF PROOF

27.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of this Chapter 11 case and the Objection are proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. As the proponents of the Motion, Magten and Law Debenture bear the burden of proving that the proposed settlement is fair and equitable and in the best interest of NorthWestern's Chapter 11 estate. *See Morris v. National Union Fire Ins. Co. (In re Eastwind Group, Inc.)*, 303 B.R. 743, 750 (Bankr. E.D. Pa. 2004); *Valucci v. Glickman, Berkovitz, Levinson & Weiner (In re Glickman, Berkovitz, Levinson & Weiner)*, 204 B.R. 450, 455 (E.D. Pa. 1997); *In re Matco Elecs. Group, Inc.*, 287 B.R. 68, 77 (Bankr. N.D.N.Y. 2002); *In re Trism, Inc.*, 286 B.R. 744 (Bankr. W.D. Mo. 2002).  A major consideration for this Court in deciding the Motion is the interests of the Class 7 and Class 9 claimants as represented by the Plan Committee and Harbert and their anticipated opposition to the Motion. *In re Matco Elecs. Group, Inc.*, 287 B.R. at 76-77; *In re Trism, Inc.*, 286 B.R. at 751-53.

## BACKGROUND

### The Magten Claim and Magten Adversary Proceeding

28.     Magten filed a proof of claim which was designated claim number 842 by the Debtor's claims agent (the "Magten Claim"). The Magten Claim asserts unliquidated claims against the Debtor's estate for (i) the face amount of the approximately 40% of the Debtor's Series A 8.45% Quarterly Income Preferred Securities ("QUIPS") that were held by Magten as of the Petition Date and (ii) damages resulting from the alleged fraudulent transfer of the utility assets of NorthWestern Energy, LLC to NorthWestern on November 15, 2002 (the "QUIPS Litigation Claim").

29.     On or about April 16, 2004, after this Court granted Magten and Law Debenture relief from the automatic stay to commence an adversary proceeding, Magten and Law Debenture filed their Complaint (the "Magten Complaint") [Adv. Pro. Dkt. No. 1] to Avoid the Transfer of Assets of Clark Fork and Blackfoot LLC (f/k/a NorthWestern Energy, LLC) to NorthWestern Corporation, thereby commencing the adversary proceeding styled as Magten Asset Management Corporation & Law Debenture Trust Company of New York v. NorthWestern Corporation [Adv. Pro. No. 04-53324-JLP] (the "Magten Adversary Proceeding"). The Magten Complaint seeks to avoid the transfer of assets of Clark Fork and Blackfoot LLC (f/k/a NorthWestern Energy) ("Clark Fork") pursuant to what has been referred to as the "going flat" transaction, and asserted causes of action for (i) intentional fraudulent transfer pursuant to Montana Code Annotated ("MCA") § 31-2-333, (ii) constructive fraudulent transfer pursuant to MCA § 31-2-334, and (iii) unjust enrichment.

30.     On or about May 14, 2004, the Debtor filed its motion to dismiss the Magten Adversary Proceeding (the "Magten Adversary Motion to Dismiss") [Adv. Pro. Dkt. No. 5].

31.    Following the completion of briefing, on August 20, 2004, the Court granted in part and denied in part the Magten Adversary Motion to Dismiss and held that Magten and Law Debenture lack standing as creditors of Clark Fork to pursue a fraudulent conveyance action against the Debtor, unless they can prove under applicable law that the release given to the Debtor was obtained through actual fraud or as part of a fraudulent scheme [Adv. Pro. Dkt. No. 25].

32.    On or about October 4, 2004, Magten and Law Debenture filed their First Amended Complaint to Avoid the Transfer of Assets of Clark Fork and Blackfoot LLC (f/k/a NorthWestern Energy, LLC) (the "Amended Magten Complaint") [Adv. Pro. Dkt. No. 27].

33.    On or about November 17, 2004, Magten filed a motion to withdraw the reference with respect to the Magten Adversary Proceeding (the "Withdrawal Motion") in the United States District Court for the District of Delaware (the "District Court"). The Withdrawal Motion is currently pending in the District Court and the Bankruptcy Court has stayed the Magten Adversary Proceeding pending a decision on the Withdrawal Motion.

34.    On or about November 19, 2004, NorthWestern filed its Answer, Affirmative Defenses and Counterclaims to the Amended Magten Complaint (the "NorthWestern Answer") [Adv. Pro. Dkt. No. 41].

35.    On or about February 25, 2005, NorthWestern filed its Motion to Dismiss in the NorthWestern Adversary Proceeding [Adv. Pro. Dkt. No. 89]. The motion is currently set for hearing on March 8, 2005.

36.    With respect to the Magten Adversary Proceeding, the Motion to Dismiss seeks authorization for NorthWestern to file an amended answer in the Magten Adversary Proceeding and withdraw its counterclaims asserted in the NorthWestern Answer, while preserving the objection to the QUIPS Litigation Claim.

**The NorthWestern Adversary Proceeding**

37.     On or about August 20, 2004, the Debtor filed the NorthWestern Adversary Proceeding, seeking to subordinate Magten's Claim, actual damages and equitable relief, and objecting to the Magten Claim, based on Magten's alleged improper trading of the QUIPS while serving as a member of the Committee and while in possession of the Debtor's material, non-public information.

38.     In reviewing documents obtained through the discovery process in the NorthWestern Adversary Proceeding from the Committee's advisors, Committee members and Magten, the Debtor determined that while it can prove that the Debtor provided material non-public information to the Committee's advisors, the discovery produced by the Committee does not clearly establish what material, non-public, information was actually conveyed to the members of the Committee or when such information was provided. Faced with the lack of such documentation by the Committee, the Debtor determined it no longer makes economic sense for the Debtor to continue the NorthWestern Adversary Proceeding.

39.     Accordingly, on or about February 25, 2005, the Debtor filed its Motion to Dismiss in the NorthWestern Adversary Proceeding, as set forth above.

**The Settlement Proposal**

40.     During the discovery process in the NorthWestern Adversary Proceeding, the Parties participated in settlement discussions. In early February 2005, the Parties executed the Settlement Letter (which was dated as of January 27, 2005) setting forth the proposed settlement terms to which the Parties agreed. The Settlement Letter was expressly identified as a settlement communication protected by Federal Rule of Evidence 408. The Settlement Letter was also expressly conditioned upon (i) the Parties' preparation and execution of a mutually acceptable stipulation and order to be presented to the Bankruptcy Court and (ii) obtaining an order from the

Bankruptcy Court, in compliance with Bankruptcy Rule 9019, approving the proposed settlement.[23]

     41.     The Settlement Letter specifically states:

> As discussed, this Settlement will be implemented by way of a motion pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure seeking approval of an agreed upon stipulation and order (the "Stipulation and Order") approving the Settlement, the terms of which are to be mutually acceptable to all parties.[24]

     42.     The Settlement Letter also provides:

> In reaching agreement on the Settlement as outlined herein, all litigation by and among the parties currently scheduled, or which may be scheduled, for hearing will be continued by mutual agreement until the Bankruptcy Court can hold a hearing to consider approval of the Settlement. Assuming the Settlement is thereafter approved, such litigation will be dismissed or withdrawn as provided for pursuant to the terms of the Settlement.[25]

     43.     At the Status Conference held on February 10, 2005, the Debtor's counsel informed the Court of the settlement negotiations with Magten and Law Debenture, and the terms of the agreement in principle reached among the parties with respect to the Settlement Letter. The Transcript of the Status Conference specifically provides in pertinent part:

> The parties reached an agreement in principal [sic] concerning the settlement of the claims of Law Debenture as the Indenture Trustee, Magten as the holder of the QUIPS securities, and the non-accepting holders of the QUIPS securities.

Transcript, page 6, lines 18-21.

> In the process of litigating, as I noted, Your Honor, we received a settlement proposal from Magten on behalf of itself and all of the non-accepting QUIPS holders which[,] as a result[,] we entered into negotiations as well as while we were preparing for trial that

---

[23] *See* Settlement Letter.
[24] *Id.*
[25] *Id.*

> ultimately resulted in an agreement in principal [*sic*] which has
> been evidenced now by a settlement letter. . .

Transcript, page 7, lines 18-24.

> We anticipate that we then will file a motion under Rule 9019 to
> seek approval of this settlement.

Transcript, page 11, lines 14-16.

44.     The Debtor's counsel further advised the Court that certain objections to the proposed settlement were anticipated from certain Class 7 Claimants and certain holders of the reorganized NorthWestern's common stock.     The Transcript of the Status Conference specifically provides in pertinent part:

> . . .[W]e are well aware that certain Class 7 holders or certain
> holders of the company's common stock they [*sic*] received that
> stock as a result of holding Class 7 claims are, to say the least, not
> happy with this settlement, and we anticipate we may receive some
> objections to the settlement.

Transcript, page 12, lines 13-17.

**Objections to the Proposed Settlement**

45.     As discussed above, both Harbert and the Plan Committee, on behalf of Class 7 and Class 9, formally communicated to NorthWestern their objection to the proposed settlement in writing.

46.     In the Harbert Letter, Harbert asserted that "[t]he proposed settlement appears to be contrary to the interests of NorthWestern and its shareholders," and that "the proposed settlement violates the express terms of the Company's confirmed Plan of Reorganization."[26] More specifically, Harbert objected to the proposed settlement and asserted that "[t]he proposed settlement would contravene NorthWestern's express obligations under Section 4.8(b)(ii) of the Plan - - specifically, its obligations (i) to distribute to members of Class 7 and Class 9 the new common stock that would have been distributed to holders electing Option 2 had they chosen

---

[26] *See* Harbert Letter, page 2 and page 4.

Option 1, and (ii) to cancel the warrants that would have been distributed to such holders had they chosen Option 1. There is no basis in the Plan for NorthWestern's continued failure to distribute these shares and cancel these warrants."[27]

47.    In addition, the Plan Committee, in the Plan Committee Objection, objected to the proposed settlement and asserted that "[t]he Proposed Settlement is neither fair nor reasonable; moreover, it violates the terms of the Plan," and demanded that "NorthWestern Corporation immediately cease all actions in pursuit of consummation of the Proposed Settlement."[28]

**The Debtor's Forced Withdrawal From Pursuing the Proposed Settlement**

48.    At the time it negotiated and executed the Settlement Letter, NorthWestern believed, in the reasonable exercise of its business judgment, that the economic terms of the proposed settlement were reasonable. NorthWestern continues to believe that a settlement is in the best interest of the Debtor. But for the fatal objections of Harbert and the Plan Committee, on behalf of Classes 7 and 9, from NorthWestern's perspective, the proposed settlement would conclusively resolve all of the litigation commenced by and involving the Parties, including appeal of the confirmation order. This would, in the Debtor's reasoned business judgment, greatly facilitate NorthWestern's business goals, which include a timely return to investment grade status, with the benefit of significantly reduced borrowing costs and improved access to capital markets. Resolution of the extensive litigation involving the Parties would significantly reduce NorthWestern's legal fees and costs and the drain on senior management's time, permitting NorthWestern's senior management and its Board of Directors to focus on continuing to improve NorthWestern's business operations and efficient management thereof without the distraction of continuing non-productive and very costly litigation with the Parties.

---

[27] *See* Harbert Letter, page 4.
[28] *See* Plan Committee Objection, page 1, ¶ 2.

49.    However, after the Debtor received the Harbert Letter and Plan Committee Objection objecting to the proposed settlement, it became apparent that the proposed settlement, absent the consent of Harbert and the Plan Committee, on behalf of Classes 7 and 9, was fatally flawed and could not be pursued.  As set forth in the Withdrawal Letter, NorthWestern withdrew from the proposed settlement because Harbert's and the Plan Committee's objections cannot be cured or otherwise resolved.  The settlement, absent creditor consent, cannot be approved because by its terms it reduces distributions provided for in the confirmed and substantially consummated Plan.  For the same reasons, a Plan amendment, if one could be proposed, would be equally unacceptable to Harbert and the Plan Committee.

50.    The objections are fatal because of limits on distributions provided for in the confirmed Plan.  Specifically, the Plan provides that Class 8(b) could accept the treatment provided to Class 8(b) as an Option 1 holder or accept treatment as a QUIPS Litigation Claim Holder – but that it could not accept and receive both.  The Plan specifically provides for one distribution or the other.[29]

51.    Article IV, § 4.8(b)(ii) of the Plan provides, in part, as follows:

> On the Effective Date, or as soon thereafter as practicable, each holder of an Unsecured Subordinated Note Claim represented by the Q UIPS N otes a nd r elated C laims a nd C auses o f A ction w ho accepts or rejects the Plan may opt to receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim either, **but not both**:
>
> (1)    a Pro Rata Share of 505,591 shares of New Common Stock (such 505,591 shares representing 1.4% of the New Common Stock to be issued and outstanding on the Effective Date prior to any dilution resulting from shares of New Common Stock issued pursuant to the New Incentive Plan and exercise of the Warrants), plus Warrants exercisable for an additional 2.3% of New Common Stock (collectively, "Option 1"); or

---

[29] See Plan, Article IV, § 4.8(b)(ii).

(2)    a Pro Rata Share of recoveries, if any, upon resolution of the QUIPS Litigation ("Option 2").[30]

52.    The Plan also provides that to the extent shares allocated to Class 8(b) are not distributed to Option 2 holders, those shares are to be distributed to Classes 7 and 9. The Plan specifically provides "any New Common Stock which otherwise would have been distributable to such holder if such holder had chosen Option 1, shall be distributed, pro rata to Class 7 and Class 9, and the Warrants which otherwise would have been distributable will be canceled."[31]

53.    The Plan is explicit – Magten and the non-accepting QUIPS holders could have accepted the Plan and received the Class 8(b) distribution or, by rejecting the Plan they would receive only a Class 9 claim. To give them both types of recoveries as structured in the proposed settlement requires the consent of Classes 7 and 9 either by way of an amendment to the Plan or the absence of objections to the proposed settlement. A Plan amendment, as discussed below, is not feasible because the Plan has been substantially consummated and the opposition to the proposed settlement terms is self evident.

54.    The express language of the Plan, and NorthWestern's substantial consummation thereof, preclude a plan amendment that would change distributions to creditors that were approved and implemented by the Debtor's substantial consummation of the confirmed Plan.[32] Under existing, controlling, case law, as discussed below, this Court should not approve the proposed settlement absent the consent of Harbert and the Plan Committee, on behalf of Classes 7 and 9.

---

[30] *Id.* (emphasis in bold added).
[31] *Id.*
[32] See *In re Northampton Corp.*, 39 B.R. 955, 956 (Bankr. E.D. Pa. 1984), *aff'd*, 59 B.R. 963 (E.D. Pa. 1984), *accord, In re H & L Developers, Inc.*, 178 B.R. 77 (Bankr. E.D. Pa. 1994), *see also In re Tillotson*, 266 B.R. 565 (Bankr. W.D.N.Y. 2001).

## ARGUMENT AND CITATION OF AUTHORITIES

**A.    THE SETTLEMENT LETTER IS CONTINGENT UPON BANKRUPTCY COURT APPROVAL AND CANNOT BE ENFORCED ABSENT ENTRY OF A BANKRUPTCY COURT ORDER**

The Third Circuit Requires Court Approval of Settlements Outside the Debtor's Ordinary Course

55.    In the Third Circuit, settlements outside a debtor's ordinary course of business require bankruptcy court approval before such settlements become contractually binding and can be enforced.  Consistent with this approach, the Settlement Letter, by its terms, is expressly subject to Bankruptcy Court approval and expressly contingent upon the Parties' negotiation and execution of a mutually acceptable proposed stipulation and order to be presented to the Bankruptcy Court and obtaining Bankruptcy Court approval.

56.    The Debtor, believing the proposed settlement was reasonable and in the estate's best interest, took the initial steps to implement the settlement by advising the Court of the proposed settlement terms and certain opposition to the settlement.  Only when it became clear that the objections of Harbert and the Plan Committee on behalf of Classes 7 and 9 could not be resolved or the settlement otherwise enforced over their collective objections did the Debtor withdraw from the proposed settlement.

57.    In *Northview Motors, Inc. v. Chrysler Motors Corp.*, 186 F.3d 346 (3d Cir. 1999), the Third Circuit analyzed whether a settlement agreement involved "the (1) use or sale of (2) estate property (3) out of the ordinary course of business." *Northview Motors, Inc.*, 186 F.3 at 350.  The *Northview* case involved a proposed settlement agreement that the trustee was ordered to abandon based on the fact that the claims belonged to certain secured creditors of the estate.  After the abandonment, Chrysler (the other settling party) sought to enforce the settlement of its claims against the secured creditors as successors to the trustee.  Concluding that the estate's claims against Chrysler constituted estate property within the meaning of Section 363, the Third Circuit reasoned that the trustee's act of agreeing to settle the claim constituted a "sale" of that

claim. *Id.*, citing to *In re Telesphere Communications, Inc.*, 179 B.R. 544, 552, n. 7 (Bankr. N.D. Ill. 1994) ("There is no difference in the effect on the estate between the sale of a claim (by way of assignment) to a third party and a settlement of the claim with the adverse party."). Based on this analysis, the Third Circuit determined the settlement was outside of the debtor's ordinary course of business and held:

> Thus, the Bankruptcy Code contemplates notice, a hearing, and bankruptcy court approval in this situation. These requirements afford due process protections to parties interested in the disposition of the estate but who did not themselves enter into the settlement agreement.

*Id.*

58.    The Third Circuit concluded that the settlement agreement was not binding on anyone because the settlement agreement between the trustee and Chrysler had not been approved by the bankruptcy court. *Northview Motors, Inc.*, 186 F.3 at 352. Here, while there was an agreement in principle, the proposed settlement terms were expressly subject to Bankruptcy Court approval, which has not occurred. Thus, like the trustee in *Northview*, NorthWestern cannot be bound by the terms of the proposed settlement because the settlement is clearly outside NorthWestern's ordinary course of business and, as addressed below, should not be approved by the Bankruptcy Court.

59.    The Third Circuit's decision in *Northview* is supported by its earlier decision in *Myers v. Martin (In re Martin)*, 91 F.3d 389 (3d Cir. 1996). In *Martin*, the Third Circuit considered whether a trustee breached the duty of good faith and fair dealing by entering into a settlement based on a good faith belief the settlement was in the estate's best interest and, subsequently repudiating the settlement when the circumstances changed and the settlement was no longer in the estate's best interest.

60.    The Court determined that a trustee cannot be required to choose between its contractual duties to a party to a settlement agreement and its fiduciary duty to all creditors of the

estate and held the bankruptcy court did not abuse its discretion when it denied approval of the

settlement agreement. *Id.* at 396. In considering the dilemma confronting the trustee, who had

made an agreement with the third party and repudiated it when the facts changed, the Third

Circuit concluded:

> Thus, this trustee was faced with a conflict between her fiduciary
> duty to the creditor body as a whole and the alleged duty to go
> forward with a settlement agreement favoring one creditor but
> otherwise detrimental to the estate.
>
> We cannot require a trustee herself to choose between these
> conflicting legal obligations. Rather, Rule 9019(a) demonstrates
> the legislature's intent to place this responsibility with the
> bankruptcy court. In order to make such a determination, the
> bankruptcy court must be apprised of all relevant information **that
> will enable it to determine what course of action will be in the
> best interest of the estate**.

*Id.* at 394 (emphasis added). *See also In re Cincinnati Microwave, Inc.*, 210 B.R. 130, 133

(Bankr. S.D. Ohio 1997) (until there is approval by the Bankruptcy Court of a post-bankruptcy

settlement, there is no effective agreement); *In re Sparks*, 190 B.R. 842, 845 (Bankr. N.D. Ill.

1996) (settlements are not enforceable absent Bankruptcy Court approval).

61.    *Martin* applies here. In the present circumstances, NorthWestern entered into the

Settlement Letter with the good faith belief that the settlement terms made economic sense and

that the proposed settlement was in NorthWestern's best interest and in the best interest of the

creditor body as a whole, given the expected costs to the estate from protracted litigation with

Magten and Law Debenture and the economic advantages that would result to the Debtor from

resolving major continuing litigation claims, including the appeal of the confirmation order.

62.    As in *Martin*, the circumstances changed dramatically after the Settlement Letter

was executed and the proposed settlement terms became public. As a result of Harbert's and the

Plan Committee's objections on behalf of Classes 7 and 9, the Debtor cannot continue to support

the Settlement Letter because the settlement cannot be implemented absent the consent of the

creditors impaired thereby.  The terms of the proposed settlement, as set forth in the Settlement

Letter, provide the following recoveries to Magten and Law Debenture:

> (i)  NorthWestern will cause to be distributed to the Indenture
> Trustee [Law Debenture] for its own benefit and on behalf of
> Magten and the non-accepting Class 8(b) QUIPS holders the
> 382,732 shares of common stock at the reorganization plan value
> of $20.00 per share ("Plan Value") and the 710,449 warrants not
> yet distributed to Class 8(b) claimants that would have been
> distributed to Magten and the non-accepting Class 8(b) QUIPS
> holders had they accepted NorthWestern's confirmed plan of
> reorganization (the "Plan"); and
>
> (ii)  NorthWestern will distribute to the Indenture Trustee [Law
> Debenture] for its own benefit and on behalf of Magten and the
> other non-accepting Class 8(b) QUIPS holders (a) those shares of
> common stock of reorganized NorthWestern set aside for such
> QUIPS holders in the reserve established pursuant to that certain
> Stipulation and Order Establishing a Disputed Claim Reserve
> entered as Docket #2298 on November 1, 2004, which stock has a
> Plan Value of $17.1 million, plus (b) and additional $300,000 of
> common stock of reorganized NorthWestern at Plan Value, which
> additional stock will be distributed from the general reserves set
> aside in Class 9 for pending litigation claims.

*See* Settlement Letter.

63.    The Debtor cannot continue to pursue implementation of the proposed settlement

over the objection of creditors whose claims are senior to those of Magten and Law Debenture

and whose distributions under the Plan will be adversely impacted by the proposed settlement.

*See In re AWECO, Inc.*, 725 F.2d 293 (5th Cir. 1984) (court cannot approve a settlement unless

priority of payments will be respected as to objecting senior creditors).

64.    Moreover, because the Debtor has substantially consummated the Plan, it cannot

amend the Plan.  11 U.S.C. § 1127(b) (2000), *see In re Northampton Corp.*, 39 B.R. 955, 956

(Bankr. E.D. Pa. 1984), *aff'd*, 59 B.R. 963 (E.D. Pa. 1984), *accord, In re H & L Developers, Inc.*,

178 B.R. 77 (Bankr. E.D. Pa. 1994), *see also In re Tillotson*, 266 B.R. 565 (Bankr. W.D.N.Y.

2001).  Such amendment, even if proposed, would be a useless act as Harbert and the Plan

Committee, on behalf of Classes 7 and 9, would oppose the amendment for the same reasons they oppose the proposed settlement.

65.     Movants' position as reflected in their proposed order approving the Motion that implementation of the proposed settlement would not require a Plan amendment, but could be accomplished by a combination of payment of cash and/or distributing additional stock from the Class 9 reserve in lieu of the proposed distribution of the Class 8(b) stock and warrants, is without merit and such proposal cannot be accomplished. In the negotiations with respect to the proposed settlement it was made very clear to both Magten and Law Debenture that NorthWestern could not utilize cash to resolve Magten's and Law Debenture's claims.  It was also made very clear that NorthWestern could not "dip into" the Class 9 reserve in excess of the Magten Reserve in any significant way to distribute additional stock to Magten and Law Debenture on behalf of the non-accepting QUIPS to implement the settlement because there is currently no significant amount of "excess" stock in the Class 9 reserve.

66.     In establishing the Class 9 reserve, NorthWestern generally estimated contingent unliquidated claims, such as those presented by Magten and the non-accepting QUIPS, at 50% of the face amount of the stated claim.  For example, by that stipulation dated October 29, 2004, NorthWestern agreed with Law Debenture to establish a reserve for a claim of $25 million with respect to the approximately $50 million of unresolved claims of Magten and the non-accepting QUIPS which resulted in $17.1 million of common stock at plan value of $20.00 per share being held back from immediate pro rata distribution on account of Class 7 and Class 9 Allowed Claims by NorthWestern's stock transfer agent.[33]  This treatment was similar to the treatment provided with respect to PPL Montana, LLC's ("PPL") filed claims of approximately $140 million where NorthWestern by stipulation dated October 4, 2004 provided for a Class 9 claim reserve of only $50 million of Plan valued stock on account of PP&L's stated claims of $140

---

[33] *See* Stipulation and Order Establishing A Disputed Claim Reserve [Docket No. 2298 and 2317].

million.[34]  Of the significant claims classified as Class 9 general unsecured claims only the claims of Cornerstone Propane Partners LLC in the amount of $19,500,000 and Comanche Park LLC in the amount of $750,000 have been resolved and distributions on account of their respective allowed claims made from the Class 9 reserve.  All other Class 9 claims remain unresolved, including, by way of example, the claims of Magten, the non-accepting QUIPS and PP&L, claims arising from rejection of the non-qualified pension and retirement plans and the significant claims asserted by Richard Hylland, NorthWestern's former President and Chief Executive Officer.  To resolve these claims with an aggregate asserted amount of approximately $120 million there remains stock of approximately 3,720,600 shares having a Plan value of $74,412,000.  As a result, it should be readily apparent that NorthWestern cannot now utilize any currently reserved, undistributed stock from the Class 9 reserve in excess of the Magten Reserve to implement the proposed settlement in lieu of the alternative of amending the Plan.

    67.    For the reasons set forth above, the Debtor was forced to withdraw from pursuing the proposed settlement.

The Authorities Cited by Magten in the Motion are Inapposite and Inconsistent with the Law in the Third Circuit

    68.    In the Motion, Magten and Law Debenture cite cases they assert stand for the proposition that a settlement involving a trustee or debtor in possession in bankruptcy proceedings is binding notwithstanding a lack of bankruptcy court approval.  The Movants are wrong and their Motion does not accurately describe the controlling law in the Third Circuit.  Indeed, the cases cited by Magten and Law Debenture, while considered by the Third Circuit, have not been followed, as made abundantly clear by *In re Martin*:

---

[34] *See* Stipulation and Order Resolving Section III of the Limited Objection of PPL Montana, LLC to Confirmation of the Debtor's First Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code and the Debtor's Motion Pursuant to Sections 105(a), 363(b) and 502(a) of the Bankruptcy Code for estimation of PPL Montana, LLC's Claim and to Establish Disputed Claim Reserve [Docket No. 2183].

> While we recognize that some jurisdictions have concluded that a stipulation of settlement is binding upon the parties pending approval of the settlement by the bankruptcy court, *see, e.g.*, *In re Lyons Transp. Lines, Inc.*, 163 B.R. 474, 476 (Bankr. W.D. Pa. 1994); *In re Columbus Plaza, Inc.*, 79 B.R. 710, 715 (Bankr. S.D. Ohio 1987); *In re Tidewater Group*, 8 B.R. 930, 933 (Bankr. N.D. Ga. 1981); *but see In re Sparks*, 190 B.R. 842, 845 (Bankr. N.D. Ill. 1996) (holding bankruptcy court approval a prerequisite to enforceability), we think that such a rule is inapplicable to the unique facts of this case.

*In re Martin*, 91 F.3d at 395.

69.    Furthermore, even assuming, *arguendo*, that the authorities cited by the Movants[35] applied to the instant case, these cases are limited to the issue of whether a settlement agreement subject to bankruptcy court approval can be rescinded during the period the parties are seeking bankruptcy court approval. In a surprising lack of candor to this Court, Magten and Law Debenture not only fail to disclose the Third Circuit's *Martin* and *Northview* decisions, but also fail to mention decisions holding contrary to the line of cases to which they cite. *See, e.g, In re Sparks*, 190 B.R. at 845 (settlement agreement requires bankruptcy court approval to be enforceable); *accord, In re Cincinnati Microwave, Inc.*, 210 B.R. at 133 (until there is approval by the Bankruptcy Court of a post-bankruptcy settlement, there is no effective agreement); *In re Pugh*, 167 B.R. 251, 253-54 (Bankr. M.D. Fla. 1994) (same); *Billingham v. Wynn & Wynn, P.C. (In re Rothwell)*, 159 B.R. 374, 379 (Bankr. D. Mass. 1993) (same); *In re Bell & Beckwith*, 50 B.R. 422, 431 (Bankr. N.D. Ohio 1985) (same); *see also Rinehart v. Stroud Ford, Inc. (In re Stroud Ford, Inc.)*, 205 B.R. 722 (Bankr. M.D. Pa. 1996) (debtor not bound by post-petition sales contract entered into outside of ordinary course of business, and non-debtor party to contract not entitled to damages resulting from debtor's withdrawal of motion to approve the sale).

70.    None of the cases cited by Magten and Law Debenture in any way modify or vitiate the Third Circuit's position that bankruptcy court approval is necessary to make a

---

[35] See Motion, ¶ 37.

settlement binding. While the Third Circuit declined to comment on whether parties are bound by the terms of a settlement pending final bankruptcy court approval, it severely criticized the district court's analysis of the trustee's duties, stating:

> We note that the starting point of the district court's reasoning was predicated on the proposition that the trustee was contractually bound to the appellees pending approval by the bankruptcy court. However, the district court relied only on bankruptcy court cases supporting the notion of contractual liability prior to court approval, and did not discuss contrary authority. Moreover, there was no discussion of 11 U.S.C. § 363 or of the teachings of *In re Roth American, Inc.*, 975 F.2d 949, 953 (3d Cir. 1992).

*In re Martin*, 91 F.3d at 395, n. 3.

71.    As discussed in greater detail below, the settlement proposed in the Settlement Letter is outside of the Debtor's ordinary course of business pursuant to Section 363(b) based on the standards established in *In re Roth American, Inc.*, 975 F.2d 949, 953 (3d Cir. 1992), and thus requires bankruptcy court approval to be effective and enforceable.

## B.    THE PROPOSED SETTLEMENT IS OUTSIDE OF THE ORDINARY COURSE

72.    Under Section 363(b)(1) of the Bankruptcy Code, any use of property of the estate that is "outside of the ordinary course of business" may occur only after notice and a hearing.[36] 11 U.S.C. § 363(b)(1). In *In re Roth American, Inc.*, 975 F.2d 949 (3d Cir. 1992), the court analyzed Section 363(b)(1) in the context of whether a post-petition amendment to an union agreement was made in the ordinary course of business and thus enforceable against the debtor. The Third Circuit found that "[n]either the Bankruptcy Code nor its legislative history provides a framework for analyzing whether particular transactions are in the ordinary course of a debtor's business for the purpose of section 363." *In re Roth American, Inc.*, 975 F.2d at 952. The Third Circuit held that   two-step inquiry is needed to determine whether a transaction is "in the

---

[36] As explained by the Third Circuit in *In re Roth American, Inc.*, 975 F.2d 949 (3d Cir. 1992), "[n]either the Bankruptcy Code nor its legislative history provides a framework for analyzing whether particular transactions are in the ordinary course of a debtor's business for the purpose of section 363." *In re Roth American. Inc.*, 975 F.2d at 952.

ordinary course of business": a "horizontal dimension" test and a "vertical dimension" test. *Id.* A transaction that does not satisfy the criteria of both the horizontal and vertical tests cannot be deemed to have been undertaken in the ordinary course of business. *See Logan v. Basic Distrib. Corp. (In re Fred Hawes Org., Inc.)*, 957 F.2d 239, 245 (6th Cir. 1992); *Moore v. Manson (In re Springfield Furniture, Inc.)*, 145 B.R. 520, 536 (Bankr. E.D. Va. 1992).

73.    The horizontal dimension test compares the debtor's business to those of like kind in its industry to see whether, from an industry wide perspective, the transaction is ordinary for its type of business. *See In re Roth American, Inc.*, 975 F.2d at 953.

74.    The vertical dimension test focuses upon the creditor's reasonable expectations and analyzes the transaction "from the vantage point of a hypothetical creditor and [the inquiry is] whether the transaction subjects a creditor to economic risk of a nature different from those he accepted when he decided to extend credit." *Id.* This test focuses upon the "interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business." *Id.*

75.    The proposed settlement provides for aggregate consideration to Magten and other non-accepting Class 8(b) QUIPS holders of approximately $25,054,640, in the form of common stock in reorganized NorthWestern at a Plan value of $20.00 per share, not including the value of the warrants, in exchange for dismissal of all of the litigation identified in the Settlement Letter. The magnitude of the proposed settlement, and the fact it involves the settlement of major litigation, involving pre-petition claims asserted against this Debtor's bankruptcy estate, as well as, an appeal of the confirmation order, renders it outside of the ordinary course of business under both the vertical dimension and horizontal dimension test.

76.    Indeed, it is for these reasons that the Settlement Letter was made contingent upon obtaining Bankruptcy Court approval.

**C.     THE PROPOSED SETTLEMENT CANNOT BE APPROVED OVER
        HARBERT'S AND THE PLAN COMMITTEE'S OBJECTIONS, AND,
        AS A RESULT, CANNOT BE CONSUMMATED.**

77.     Harbert and the Plan Committee, on behalf of Classes 7 and 9, have objected to
the proposed settlement, asserting that it dilutes the distributions to which they are entitled under
the Plan.   Under Section 4.8(b)(ii) of the Plan, Class 8(b) Claimants could either accept the
treatment provided to Class 8(b) as an Option 1 holder or accept Option 2 treatment as a QUIPS
Litigation Claim Holder - but they could not accept and receive both.   Moreover, under Section
4.8(b)(ii) of the Plan, Classes 7 and 9 are to receive the unissued shares allocated to Class 8(b).[37]
Harbert and the Plan Committee, on behalf of Classes 7 and 9, object to the proposed settlement
because it would modify the substantially consummated Plan and impermissibly dilute the
distributions to which Classes 7 and 9 are entitled pursuant to the terms of the Plan.   A confirmed
plan may be modified only before substantial consummation, but not after.   11 U.S.C. § 1127(b),
see In re Northampton Corp., 39 B.R. 955, 956 (Bankr. E.D. Pa. 1984), aff'd, 59 B.R. 963 (E.D.
Pa. 1984), accord, In re H & L Developers, Inc., 178 B.R. 77 (Bankr. E.D. Pa. 1994), see also In
re Tillotson, 266 B.R. 565 (Bankr. W.D.N.Y. 2001).   Absent consent of the Plan Committee and
Class 7 creditors, as represented by Harbert and similarly situated holders of claims and stock,
the proposed settlement cannot be approved.

78.     Furthermore, absent their consent, Harbert and the Plan Committee have asserted
that the proposed settlement violates the "fair and equitable" standard.   As soon as a debtor files
a petition for relief, fair and equitable settlement of creditors' claims becomes a goal of the
proceedings.   In re AWECO, Inc., 725 F.2d 293, 298 (5th Cir. 1984).   The words "fair and
equitable" are terms of art - - they mean that "senior interests are entitled to full priority over
junior ones."  SEC v. American Trailer Rentals Co., 379 U.S. 594 (1965).   In AWECO, the Fifth

---

[37] See Plan, Article IV, § 4.8(b)(ii).

Circuit held that "a bankruptcy court abuses its discretion in approving a settlement with a junior creditor unless the court concludes that priority of payment will be respected as to objecting senior creditors." *In re AWECO, Inc.*, 725 F. 2d at 298; *see also In re Central R.R. Co. of New Jersey*, 579 F.2d 804, 810 (3d Cir. 1978) ("The priority standard requires that claimants and creditors of a bankrupt estate of the same class receive the full value of their debts from the property of the debtor before junior creditors and shareholders are paid.").

79.    NorthWestern's pursuit of the proposed settlement, in light of the objections asserted by Harbert and the Plan Committee on behalf of Classes 7 and 9, is a pointless act as the proposed settlement cannot be approved over their objections.  The law does not require the doing of vain or useless acts.  *See Abdallah v. Abdallah*, 359 F.2d 170, 175 (3d Cir. 1966) ("Under such circumstances, the law, which is eminently practical, does not require the doing of a vain thing."); *In re Hughes Steel Erection Co.*, 225 F. Supp. 66, 67 (E.D. Pa. 1964) ("To hold that petitioner, under such circumstances, was obliged to refile his earlier petition or to file its facsimile would impose on petitioner a duty to perform a vain or useless act, a view repugnant to the law.").

**D.    NO PREJUDICE TO MAGTEN AND LAW DEBENTURE HAS RESULTED FROM NORTHWESTERN'S WITHDRAWAL OF THE PROPOSED SETTLEMENT AND THIS COURT SHOULD NOT AWARD FEES AND EXPENSES AS REQUESTED BY MOVANTS**

80.    As indicated above, the Magten Adversary Proceeding has been stayed pending determination by the District Court of the Withdrawal Motion.  The only litigation that was moving forward prior to the parties negotiating the proposed settlement was the NorthWestern Adversary Proceeding.  However, as discussed above, NorthWestern has filed the Motion to Dismiss with respect to the NorthWestern Adversary Proceeding.

81.    Moreover, the appeals filed by Magten from the order confirming the Plan and the order approving the Memorandum of Understanding that are both referred to in the Motion,[38] and which were in the process of being mediated prior to the proposed settlement, can now be resumed with a new scheduling order. Thus, no prejudice results to Magten or Law Debenture from returning the parties to the status quo.

82.    Further, because Magten and Law Debenture cannot carry their burden of proof by showing that the proposed settlement is in the best interest of NorthWestern's Chapter 11 estate, there is no basis by which this Court should grant the Movants' request requiring NorthWestern to pay the fees and expenses incurred by the Movants in filing the Motion.[39] *See Agassi v. Planet Hollywood Int'l, Inc. (In re Planet Hollywood Int'l, Inc.)*, 269 B.R. 543, 552 (D. Del. 2001) (attorneys' fees are not independently recoverable under the Bankruptcy Code, but they may be recovered in bankruptcy proceedings under state law if the parties' contractual arrangement provides for the recovery of attorney's fees). Where the litigated issues do not involve enforcement of explicit contractual provisions providing for payment of attorneys' fees and costs to prevailing parties and instead involve litigated issues peculiar to federal bankruptcy law, attorney's fees will not be awarded "absent bad faith or harassment by the losing party." *Id.*; citing to *Fobian v. Western Farm Bank (In re Fobian)*, 951 F.2d 1149, 1153 (9th Cir. 1991). None of the facts presented here or in the Motion in any way support a finding of bad faith or harassment on NorthWestern's part. The Movants' request for attorneys' fees and costs should be denied in its entirety because there is no contractual basis for any such award and no evidence to support an award based on bad faith or harassment.

---

[38] *See* Motion, ¶ 14, page 7, 3rd bullet point.
[39] NorthWestern also objects to the form of the proposed order presented by Magten and Law Debenture granting the Motion which proposed order was attached as Exhibit 1 to the motion. NorthWestern shows that the proposed order is not supported by either the law or the facts and that the form of the order is overreaching and should not be entered under the circumstances.

## NOTICE AND PRIOR APPLICATION

83.     Notice of this Objection has been provided to: (i) the Office of the United States Trustee, (ii) counsel for the Debtor's Pre-Petition Lenders, (iii) counsel for the Debtor's Post-Petition Lenders, (iv) counsel for the Plan Committee, (v) the Securities and Exchange Commission, (vi) the Federal Energy Regulatory Commission, (vii) the Montana Public Service Commission, (viii) the South Dakota Public Utilities Commission, (ix) the Nebraska Public Service Commission, (x) counsel for Magten, (xi) counsel for Law Debenture, (xii) counsel for Harbert, (xiii) counsel for Wilmington Trust and (xiv) all parties that have requested special notice in this Chapter 11 case pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is required.

[concluded on next page]

## CONCLUSION

Based on the foregoing, the Debtor respectfully requests that this Court deny the Motion and all requests for relief contained therein, and grant NorthWestern such other relief as is just and appropriate.


Dated: March 2, 2005

NORTHWESTERN CORPORATION

By its attorneys,

GREENBERG TRAURIG, LLP

By: _____
Scott D. Cousins (No. 3079)
Victoria W. Counihan (No. 3488)
William E. Chipman, Jr. (No. 3818)
The Brandywine Building
1000 West Street, Suite 1540
Wilmington, DE 19801
(302) 661-7000 (telephone)

- and -

Jesse H. Austin, III, Esquire
Karol K. Denniston, Esquire
PAUL, HASTINGS, JANOFSKY
& WALKER LLP
600 Peachtree Street, N.E., 24th Floor
Atlanta, GA 30308
(404) 815-2400 (telephone)

*Counsel For Reorganized Debtor*

# Exhibit P

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------- x
                                          :
In re:                                    :      Chapter 11
                                          :
NORTHWESTERN CORPORATION,                 :
                                          :      Case No. 03-12872 (JLP)
                      Debtor.             :
                                          :
                                          :
                                          :
------------------------------------------------------------- x
```

### NOTICE OF APPEAL

*PLEASE TAKE NOTICE* that Magten Asset Management Corporation and Law Debenture Trust Company of New York, by and through their undersigned counsel, hereby appeal to the United States District Court for the District of Delaware from the Order Denying Joint Motion of Magten Asset Management Corporation and Law Debenture Trust Company of New York (the *"Order"*), which was entered by United States Bankruptcy Judge John L. Peterson on March 10, 2005 [Docket No. 2911]. Copies of the Order appealed from, and the Memorandum Opinion Denying Joint Motion of Magten Asset Management Corporation and Law Debenture Trust Company of New York, are attached hereto as Exhibits "A" and "B", respectively.

The names of all parties to the order appealed from and the names, addresses and telephone numbers of their respective attorneys are as follows:

1

| Parties | Attorneys | |
|---|---|---|
| Magten Asset Management Corporation | Mark J. Packel, Esq.<br>Elio Battista, Jr., Esq.<br>Blank Rome LLP<br>1201 Market Street, Suite 800<br>Wilmington, DE 19801<br>Telephone: (302) 425-6400 | Bonnie Steingart, Esq.<br>Gary L. Kaplan, Esq.<br>Fried, Frank, Harris, Shriver & Jacobson LLP<br>One New York Plaza<br>New York, NY 10004<br>Telephone: (212) 859-8000 |
| Law Debenture Trust Company of New York | Kathleen M. Miller, Esq.<br>Smith, Katzenstein & Furlow, LLP<br>800 Delaware Avenue, 7th Floor<br>P.O. Box 410<br>Wilmington, DE 19899<br>Courier 19801<br>Telephone: (302) 652-8400 | Amanda D. Darwin, Esq.<br>John V. Snellings, Esq.<br>Lee Harrington, Esq.<br>Nixon Peabody LLP<br>100 Summer Street<br>Boston, MA 02110<br>Telephone: (617) 345-1000 |
| NorthWestern Corporation | Scott D. Cousins, Esq.<br>William E. Chipman, Jr., Esq.<br>Greenberg Traurig, LLP<br>The Brandywine Building<br>1000 West Street, Suite 1540<br>Wilmington, DE 19801<br>Telephone: (302) 661-7000 | Jesse H. Austin, III, Esq.<br>Karol K. Denniston, Esq.<br>Paul, Hastings, Janofsky & Walker LLP<br>600 Peachtree Street, Suite 2400<br>Atlanta, GA 30308<br>Telephone: (404) 815-2400 |
| The Plan Committee | Neil B. Glassman, Esq.<br>Charlene Davis, Esq.<br>Eric Sutty, Esq.<br>The Bayard Firm<br>222 Delaware Avenue, Suite 900<br>P.O. Box 25130<br>Wilmington, DE 19899<br>Telephone: (302) 655-5000 | Alan W. Kornberg, Esq.<br>Margaret A. Phillips, Esq.<br>Ephraim I. Diamond, Esq.<br>Paul, Weiss, Rifkind, Wharton & Garrison LLP<br>1285 Avenue of the Americas<br>New York, NY 10019<br>Telephone: (212) 373-3000 |
| The Ad Hoc Committee of Class 7 Debtholders | Adam G. Landis, Esq.<br>Landis, Rath & Cobb LLP<br>919 Market Street, Suite 600<br>Wilmington, DE 19801<br>Telephone: (302) 467-4400 | Philip Bentley, Esq.<br>Mathew J. Williams, Esq.<br>Kramer, Levin, Naftalis & Frankel LLP<br>919 Third Avenue<br>New York, NY 10022<br>Telephone: (212) 715 -9100 |

2

120087.01600/40151649v1

Cornerstone Propane
Operating LLC

Allan S. Brilliant, Esq.
Paul D. Malek, Esq.
Milbank, Tweed, Hadley &
McCloy LLP
One Chase Manhattan Plaza
New York, NY 10005
Telephone: (212) 530 - 5000

Dated: March 17, 2005

**BLANK ROME LLP**

Mark J. Packel (DE No. 4048)
Elio Battista, Jr. (DE No. 3814)
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone:    (302) 425-6400
Facsimile:    (302) 425-6464

- and -

**FRIED, FRANK, HARRIS, SHRIVER &
    JACOBSON LLP**
Bonnie Steingart
Gary L. Kaplan
One New York Plaza
New York, NY 10004
Telephone:    (212) 859-8000
Facsimile:    (212) 859-4000

Counsel for Magten Asset Management
    Corporation

- and -

**SMITH, KATZENSTEIN & FURLOW, LLP**

_/s/ Kathleen M. Miller_
Kathleen M. Miller (I.D. No. 2898)
800 Delaware Avenue, 7th Floor
Wilmington, DE  19801
Telephone:    (302) 652-8400
Facsimile:    (302) 652-8405

3

120087.01600/40151649v1

- and -

**NIXON PEABODY LLP**
Amanda D. Darwin, BBO No. 547654
John V. Snellings, BBO No. 548791
Lee Harrington, DE No. 4046
100 Summer Street
Boston, MA  02110
Telephone:    (617) 345-1000
Facsimile:    (617) 345-1300


Counsel for Law Debenture Trust Company of New
York


491312

4

120087.01600/40151649v1

# Exhibit Q

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                                 :
                                       : Chapter 11
NORTHWESTERN CORPORATION,              :
                                       : Case No. 03-12872 (JLP)
          Reorganized Debtor.          :
                                       :
_____
                                       :
MAGTEN ASSET MANAGEMENT                :
CORPORATION AND LAW DEBENTURE          :
TRUST COMPANY OF NEW YORK,             :
                                       :
          Appellants,                  :
                                       :
     v.                                : Civil Action No. 05-209-JJF
                                       :
NORTHWESTERN CORPORATION,              :
                                       :
          Appellee.                    :
_____

Bonnie Steingart, Esquire and Gary Kaplan, Esquire of FRIED,
FRANK, HARRIS, SHRIVER & JACOBSON LLP, New York, New York.
Mark J. Packel, Esquire and Elio Battista, Jr., Esquire of BLANK
ROME LLP, Wilmington, Delaware.

Attorneys for Appellant, Magten Asset Management Corporation.


Amanda D. Darwin, Esquire; John V. Snellings, Esquire and Lee
Harrington, Esquire of NIXON PEABODY LLP, Boston, Massachusetts.
Kathleen M. Miller, Esquire, of SMITH KATZENSTEIN & FURLOW LLP,
Wilmington, Delaware.

Attorneys for Appellant, Law Debenture Trust Company of New York.

Jesse H. Austin, III of PAUL, HASTINGS, JANOFSKY & WALKER LLP,
Atlanta, Georgia.
Kristine M. Shryock, Esquire of PAUL, HASTINGS, JANOFSKY &
WALKER, LLP, New York, New York.
Victoria Watson Counihan, Esquire and William E. Chipman, Jr.,
Esquire of GREENBERG TRAURIG, LLP, Wilmington, Delaware.
Attorneys for Debtor/Appellee, Northwestern Corporation.

Alan W. Kornberg, Esquire; Margaret A. Phillips, Esquire and
Ephraim I. Diamond, Esquire of PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP, New York, New York.
Neil B. Glassman, Esquire and Charlene Davis, Esquire of THE
BAYARD FIRM, Wilmington, Delaware.

Attorneys for Appellee, the Plan Committee.

## MEMORANDUM OPINION

September 29, 2006
Wilmington, Delaware

Farnan, District Judge.

Presently before the Court is an appeal by Magten Asset Management Corporation ("Magten") and Law Denture Trust Company of New York ("Law Debenture") (collectively, "Appellants") from the March 10, 2005 Order issued by the United States Bankruptcy Court for the District of Delaware, denying Appellant's Motion filed pursuant to Federal Rule of Bankruptcy Procedure 9019 seeking approval of a global compromise and settlement in the Debtors' chapter 11 case (the "Rule 9019 Motion"). For the reasons set forth below, the Court will affirm the Bankruptcy Court's Order.

**I. PARTIES' CONTENTIONS**

By this appeal, Appellants contend that the Bankruptcy Court erred in concluding that the Settlement Agreement negotiated by Appellants and the Debtors was not a binding contract upon its execution. Specifically, Appellants contend that because the Debtors have reorganized, they are no longer constrained by Section 363 of the Bankruptcy Code, and therefore, the Settlement Agreement did not require the approval of the Bankruptcy Court to be effective. Appellants also contend that the plain language of the Settlement Agreement demonstrates that the Agreement was meant to be binding upon execution and that further approval of the

1

Bankruptcy Court was not required for the agreement to take effect.

In addition, Appellants contend that the Bankruptcy Court erred in concluding that the Settlement Agreement was inconsistent with the Debtors' Plan of Reorganization (the "Plan"). Appellants contend that the Debtors drafted both the Plan and the Settlement Agreement and represented to the Bankruptcy Court through their counsel that the Settlement Agreement was consistent with the terms of the Plan. Appellants also contend that the Settlement Agreement provided the non-accepting holders of the Series A 8.45% Quarterly Income Preferred Securities (the "QUIPS") with a recovery that was less than the amount that QUIPS holders would receive under their Class 9 treatment under the Plan, and therefore, an amendment to the Plan was not required to implement the Settlement Agreement.

In response, the Debtors contend that they still believe a settlement of this litigation would be in the best interests of the estate, but that they could not pursue the Settlement Agreement they had arranged with Appellants once objections were lodged by the Plan Committee, on behalf of Class 7 and Class 9 claimants and, and Harbert Distressed Investment Master Fund, Ltd., on behalf of Class 7 claimants.  In light of these

2

objections, the Debtors contend that the Settlement Agreement,
which they refer to as the Settlement Letter[1], required the
approval of the Bankruptcy Court, as well as the execution of
additional documents to become effective.  The Debtors also
contend that the terms of the Settlement Letter are inconsistent
with the Plan, because the Plan gives non-accepting QUIPS holders
the option of either (1) accepting the Plan and receiving a Class
8(b) distribution, or (2) rejecting the Plan and receiving only a
Class 9 claim.  In contrast, the Debtors contend that the proposed
settlement  provides non-accepting QUIPS holders with both types
of recoveries and therefore, amendment of the plan or the consent
of the Class 7 and Class 9 claimants was required.  However, the
Debtors point out that the Plan has been confirmed and
substantially consummated by the Debtors, and therefore, the
Debtors contend that amendment to the Plan is not feasible.

   The Plan Committee makes arguments similar to those advanced
by the Debtors and contends that Appellants, particularly Magten,
have plagued the Debtor with litigation aimed at obtaining some
value for debatable claims which they hold at the expense of other
creditors.  The Plan Committee contends that Bankruptcy Court
approval was a condition precedent to the implementation of the

_____

   [1]    The Court will use the term "Settlement Agreement" and
"Settlement Letter" interchangeably.

Settlement Agreement.  However, because the Settlement Agreement

directly contravenes the Plan by giving nonaccepting QUIPS shares

of the Debtors' new common stock, which are supposed to be

distributed to Class 7 and Class 9 creditors, the Plan Committee

contends that the Bankruptcy Court correctly declined to approve

the Settlement Agreement.[2]

## II.  STANDARD OF REVIEW

The Court has jurisdiction to hear appeals from the

Bankruptcy Court pursuant to 28 U.S.C. §158(a).  The Court reviews

the Bankruptcy Court's findings of fact under a "clearly

erroneous" standard, and reviews its legal conclusions de novo.

See Am. Flint Glass Workers Union v. Anchor Resolution Corp., 197

F.3d 76, 80 (3d Cir. 1999).  In reviewing mixed questions of law

and fact, the Court accepts the Bankruptcy Court's findings of

"historical or narrative facts unless clearly erroneous, but

exercise[s] 'plenary review of the trial court's choice and

interpretation of legal precepts and its application of those

---

[2]    Appellants contend that the Plan Committee does not
have standing to join this appeal and its brief should be
disregarded.  In the Court's view, resolution of the Plan
Committee's standing is not necessary to address this appeal,
because Appellee has advanced the same position as the Plan
Committee.  To the extent that Appellants suggest that the Court
strike the brief of the Plan Committee, the Court declines to do
so.

precepts to the historical facts.'" <u>Mellon Bank, N.A. v. Metro</u>
<u>Communications, Inc.</u>, 945 F.2d 635, 642 (3d Cir. 1991) (quoting
<u>Universal Mineral, Inc. v. C.A. Hughes & Co.</u>, 669 F.2d 98, 101-02
(3d Cir. 1981)).  The appellate responsibilities of the Court are
further understood by the jurisdiction exercised by the Third
Circuit, which focuses and reviews the Bankruptcy Court decision
on a de novo basis in the first instance.  <u>Baroda Hiss Inv., Inc.</u>
<u>v. Telegroup Inc.</u>, 281 F.3d 133, 136 (3d Cir. 2002).

## III.  DISCUSSION

Reviewing the decision of the Bankruptcy Court in light of
the applicable standard of review and the parties' respective
arguments, the Court concludes that the Bankruptcy Court did not
err in concluding that the Settlement Agreement was not binding on
the parties without the approval of the Bankruptcy Court.  The
Court agrees with the Bankruptcy Court's conclusion that the
Settlement Letter, which expressed the parties intention to enter
into a settlement, expressly provided for certain conditions
precedent to the implementation of that settlement, namely the
Bankruptcy Court's approval of the Settlement.  In pertinent part,
the Settlement Letter provides:

> As discussed, this Settlement will be
> implemented by way of a motion pursuant to
> Rule 9019 of the Federal Rule of Bankruptcy
> Procedure seeking approval of an agreed upon
> stipulation and order (the "Stipulation and
> Order") approving the Settlement, the terms of

5

> which are to be mutually acceptable to all
> parties.
>
>          * * *
>
> In reaching agreement on the Settlement as
> outlined herein, all litigation by and among
> the parties currently scheduled, or which may
> be scheduled, for hearing will be continued by
> mutual agreement until the Bankruptcy Court
> can hold a hearing to consider approval of the
> Settlement. <u>Assuming the Settlement is
> thereafter approved</u>, such litigation will be
> dismissed or withdrawn as provided for
> pursuant to the terms of the Settlement.

Appellants' Ex. 248 (Kaplan Declaration at Ex. D) (emphasis

added). Because the parties' Settlement Letter expressly provides

for Bankruptcy Court approval of the settlement, the Court further

agrees with the Bankruptcy Court that Appellants' arguments

related to Section 363 of the Bankruptcy Code and the Appellee's

status as a reorganized entity are irrelevant to the question of

whether Bankruptcy Court approval of the Settlement Agreement was

required.

    Having concluded that the Bankruptcy Court correctly

determined that the Settlement Agreement was not binding on the

parties absent its approval, the Court must next consider whether

the Bankruptcy Court erroneously concluded that the terms of the

Settlement Agreement contradicted the Plan. Pursuant to Article

IV, section 4.8(b)(ii) of the Plan, QUIPS holders may select one of two options.  Specifically, QUIPS holders may either select:

> (1) a pro rata share of 505,591 shares of New Common Stock . . . ., plus Warrants exercisable for an additional 2.3% of New Common Stock (collectively, "Option 1"), or

> (2) a pro rata share of recoveries, if any upon resolution of the QUIPS Litigation ("Option 2").

Appellants' Ex. 138 (Plan).  The Plan also provides that, to the extent shares allocated to Class 8(b) claimants are not distributed to Option 2 holders, those shares are to be distributed to Class 7 and Class 9 claimants.  As the Bankruptcy Court correctly noted, however, the Settlement Agreement conflicts with this disbursement scheme by providing QUIPS holders electing Option 2 with the full amount of stock set aside for them in the disputed claims reserve and the stock they would have received if they elected Option 1, stock which is to be divided among the Class 7 and Class 9 claimants.  Because the settlement dilutes the distributions to which Class 7 and Class 9 claimants are entitled, an amendment to the Plan would be necessary for the Settlement Agreement to be consistent with the Plan.  Here, such an amendment is not feasible, because the Plan has been substantially consummated[3], and in any event, such an amendment would be opposed

---

[3]    11 U.S.C. § 1127(b) (allowing for modification of plan any time after confirmation, but before substantial consummation of the plan); In re Continental Airlines, Inc., 91 F.3d 553, 570

by Harbert and the Plan Committee.  Accordingly, the Court agrees
with the rationale espoused by the Bankruptcy Court and concludes
that the Bankruptcy Court's decision to deny Appellant's 9019
Motion was not erroneous.

**IV.   CONCLUSION**

     For the reasons discussed, the Court will affirm the
Bankruptcy Court's March 10, 2005 Order.

     An appropriate order will be entered.

---

(3d Cir. 1996) (noting that § 1127(b) "dramatically curtails the
power of a bankruptcy court to modify a plan of reorganization
after its confirmation and 'substantial consummation'"), <u>cert.
denied sub nom. Bank of New York v. Continenal Airlines, Inc.</u>,
519 U.S. (1997).

8

# Exhibit R

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NORTHWESTERN CORPORATION, | ) | Case No. 03-12872 (JLP) |
| | ) | |
| Reorganized Debtor. | ) | **Objection Deadline: October 12, 2005 at 4:00 p.m.** |
| | | **Hearing date: October 19, 2005 at 10:30 a.m.** |

**MOTION OF THE PLAN COMMITTEE IN AID OF
CONSUMMATION AND IMPLEMENTATION OF THE PLAN
FOR ORDER AUTHORIZING AND DIRECTING NORTHWESTERN
CORPORATION TO DISTRIBUTE SURPLUS DISTRIBUTIONS**

The Plan Committee (the "Plan Committee") appointed in the

above-captioned chapter 11 case of NorthWestern Corporation ("NOR" or the

"Reorganized Debtor") pursuant to Section 7.9 of NOR's Second Amended and Restated

Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Plan"),[1] by and

through its undersigned counsel, hereby moves the Court, pursuant to sections 105(a) and

1142(b) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 3020(d)

of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules") and in aid of

consummation and implementation of the Plan, for the entry of an order authorizing and

directing NOR to distribute Surplus Distributions on the Subsequent Distribution Date in

accordance with Section 7.7 of the Plan. In support of this motion (the "Motion"), the

Plan Committee respectfully represents as follows:

---

[1]    All capitalized terms used herein but not defined shall have the meanings ascribed to them in the Plan.

603454v1

## JURISDICTION

1.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

2.    On September 14, 2003 (the "Petition Date"), NOR filed with the Bankruptcy Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

3.    After hearings held on August 25, 2004, and October 6, 2004, the Bankruptcy Court issued a decision confirming the Plan on October 8, 2004 [Docket No. 2276]. Subsequently, the Bankruptcy Court entered an order dated October 19, 2004, confirming the Plan (the "Confirmation Order") [Docket No. 2238].

4.    The Plan became effective as of November 1, 2004 (the "Effective Date"), and was substantially consummated, as evidenced by NOR's filing of the Notice of (A) Entry of Order Confirming The Debtor's Second Amended and Restated Plan of Reorganization under Chapter 11 of the Bankruptcy Code and (B) The Occurrence of the Effective Date [Docket No. 2300] and the Notice of Substantial Consummation of the Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code filed by the Debtor on December 29, 2004 [Docket No. 2519].

5.    The terms of the Plan provide that NOR shall continue to settle Disputed Claims after the Effective Date. Upon Disputed Claims becoming Allowed Claims, they are to be satisfied from shares of New Common Stock held in the Disputed Claims Reserve established pursuant to Section 7.5 of the Plan. In connection therewith, on October 25, 2004, NOR filed its Notice of Establishment of Claim Reserve Pursuant

to Section 7.5 of the Plan and Paragraph 27 of the Confirmation Order [Docket No. 2270], establishing a reserve containing approximately 13.5% of the New Common Stock issued on the Effective Date.

6.      On or about October 8, 2004, this Court entered that certain Stipulation and Order Resolving Section III of the Limited Objection of PPL Montana, LLC ("PPL Montana") to Confirmation of the Debtor's First Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code and the Debtor's Motion Pursuant to Sections 105(a), 363(b) and 502(a) of the Bankruptcy Code for Estimations of PPL Montana LLC's Claim and to Establish Disputed Claims Reserve [Docket No. 2183] (the "PPL Reserve Stipulation") establishing a segregated sub-reserve (the "PPL Segregated Reserve") within the Disputed Claims Reserve containing shares of New Common Stock having a value of $50,000,000 (the "PPL Segregated Shares").[2]

7.      Pursuant to the PPL Reserve Stipulation, the PPL Segregated Shares are specifically set aside to satisfy the Disputed Claim of PPL Montana. To the extent that the PPL Montana's Disputed Claim is Allowed in an amount that is less than the PPL Segregated Reserve, the unused portion of the PPL Segregated Shares is to be released to the Debtor for addition to the Disputed Claims Reserve. See PPL Reserve Stipulation at ¶ 4. Once released from the PPL Segregated Reserve, such shares are to be distributed in accordance with the Plan.

---

[2]    As set forth in the PPL Settlement Motion (as defined below), the PPL Segregated Reserve contained approximately 2,204,550 shares of New Common Stock. See PPL Settlement Motion at ¶ 31.

**Surplus Distributions**

8.　　Section 7.7 of the Plan sets forth the mechanism by which the Debtor is required to make supplemental distributions from the Disputed Claims Reserve. Specifically, the Plan provides that to the extent a Disputed Claim is settled for less than the amount set aside for such Disputed Claim in the Disputed Claims Reserve, such surplus shall constitute a Surplus Distribution to be distributed to the holders of Allowed Claims.[3] Shares designated as Surplus Distributions are not available to settle other outstanding Disputed Claims. Rather they are to be distributed for the benefit of holders of Allowed Claims on the next occurring Subsequent Distribution Date. See Plan at § 7.7.

**Approval of PPL Motion**

9.　　On September 14, 2005, NOR filed its Motion (the "PPL Settlement Motion") for Order Pursuant to Bankruptcy Rule 9019 Authorizing and Approving Settlement Agreement (the "Proposed PPL Settlement") with PPL Montana, LLC and PPL Global, LLC [Docket No. 3297]. According to the terms of the Proposed PPL Settlement, in exchange for the transfer of certain assets to PPL Montana, PPL Montana will withdraw its Proof of Claim, dismiss (with prejudice) a pending lawsuit against NOR, and pay NOR $9 million. In addition, the parties thereto will provide

---

[3]　Specifically, Section 7.7 of the Plan provides as follows: "The following assets shall constitute Surplus Distributions: (i) Unclaimed Property; and (ii) to the extent that a Disputed Claim is not Allowed or becomes an Allowed Claim in an amount less than the Disputed Claim Amount, any excess of the amount of Cash or New Common Stock in the Disputed Claims Reserve attributable to such Disputed Claim over the amount of Cash or New Common Stock actually distributed on account of such Disputed Claim plus any interest, dividends or other Distributions earned thereon. On each Subsequent Distribution Date, the holders of Allowed Claims shall receive a Pro Rata Share in the Surplus Distributions attributable to such holders' Class..." Plan at § 7.7.

mutual releases to one another. Finally, PPL Montana will release any claim or interest it has with respect to the PPL Segregated Reserve, thus allowing the PPL Segregated Shares to be released into the Disputed Claims Reserve.

        10.    By order dated September 29, 2005 [Docket No. 3307] (the "PPL Order"), the Court approved the Proposed PPL Settlement and among other things ordered all of the PPL Segregated Shares to be released into the Disputed Claims Reserve. See PPL Order at third decretal paragraph.[4] In accord with Section 7.7 of the Plan, because the PPL Segregated Shares were "attributable" to PPL Montana's Disputed Claim, the 2,204,550 shares of New Common Stock released from the PPL Segregated Reserve pursuant to the PPL Order constitute Surplus Distribution.

## RELIEF REQUESTED

        11.    Because of NOR's successful efforts to settle Disputed Claims, including the PPL Settlement, the Disputed Claims Reserve contains sufficient shares designated as Surplus Distributions (i.e., shares having an aggregate market value in excess of $50,000.00)[5] to warrant a supplemental distribution. Therefore, the Plan Committee, by this Motion, requests an order[6] (i) designating the shares of New

---

[4]    In addition to releasing the PPL Segregated Shares, the PPL Order provided that any party in interest seeking a supplemental distribution from the Disputed Claims Reserve must file a motion with the Court seeking such relief. See PPL Order at fourth decretal paragraph. While the Plan itself does not require specific Court approval for supplemental distributions, in light of the language in the PPL Order and out of abundance of caution, the Plan Committee has brought this Motion.

[5]    Section 7.7 of the Plan provides that "Reorganized Debtor shall not be under any obligation to make a Surplus Distributions on a Subsequent Distribution Date unless the aggregate market value of the Surplus Distributions (which value shall be determined based on the intrinsic value as of the Effective Date) to be distributed on such Subsequent Distribution Date exceeds $50,000 in any class..."

[6]    A proposed form of Order is attached hereto as Exhibit A.

Common Stock released from the PPL Segregated Reserve as Surplus Distributions,
(ii) directing NOR to provide the Plan Committee with information regarding the total
number of shares within the Disputed Claims Reserve constituting Surplus Distributions
and (iii) authorizing and directing NOR to make a supplemental distribution of all
Surplus Distributions to holders of Allowed Claims in accordance with Section 7.7 of the
Plan on the next Subsequent Distribution Date, November 1, 2005.

## ARGUMENT

12.     The Court has ample authority to grant the relief requested by this
Motion under sections 105(a) and 1142 of the Bankruptcy Code and Bankruptcy Rule
3020(d).  Section 105(a) of the Bankruptcy Code provides in pertinent part "[t]hat the
court may issue any order, process or judgment that is necessary or appropriate to carry
out the provisions of this title."  Under section 105(a) of the Bankruptcy Code, the Court
has expansive equitable powers to fashion any order or decree required to consummate a
confirmed plan of reorganization.  See Beal Bank, S.S.B. v. Jack's Marine, 201 B.R. 376,
379 (D. Pa. 1996) (affirming the bankruptcy court's use of its equitable powers to require
debtor to make payment pursuant to the terms of the reorganization plan and "to protect
the confirmation order and to aid in the implementation of the [p]lan").

13.     Section 1142(b) of the Bankruptcy Code provides in pertinent part
that the bankruptcy court "[m]ay direct the debtor and any other necessary party . . . to
join in the execution or delivery of any instrument required to effect a transfer of property
dealt with by a confirmed plan, and to perform any other act . . . that is necessary for the
consummation of the plan."  See also Resorts Int'l, Inc. v. Price Waterhouse & Co., LLP
(In re Resorts Int'l, Inc.), 372 F.3d 154, 166-67 (3d Cir. 2004) ("[m]atters that affect the
interpretation, implementation, consummation, execution, or administration of the

603454v1                                        6

confirmed plan will typically have the requisite close nexus" to warrant post-confirmation bankruptcy court jurisdiction). Bankruptcy Rule 3020(d) provides that "[n]otwithstanding the entry of the order of confirmation, the court may issue any other order necessary to administer the estate." Further, Section 13.1(e) of the Plan provides that the Court shall have jurisdiction for the purposes of sections 105(a) and 1142 of the Bankruptcy Code to enforce the provisions of the Plan. Absent a stay, it is clear that this Court has the authority to ensure implementation of the Confirmation Order. See In re Hutter, 221 B.R. 632, 642 (Bankr. D. Conn. 1998) (a court "retains the authority to implement or enforce previous orders absent a stay pending appeal").

14.     The relief requested by this Motion has the requisite nexus required by the Third Circuit in Resorts Int'l, Inc. because it will aid in the implementation of the Plan by authorizing and directing NOR to make a supplemental distribution in accordance with Section 7.7 of the Plan. Such supplemental distribution will ensure that NOR's unsecured creditors receive their rightful recoveries provided for under the Plan. Absent such relief, NOR's unsecured creditors will be denied the full benefit of their bargain contained in the Plan.

## NOTICE

15.     Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) counsel for NOR; (iii) counsel for Law Debenture Trust Company of New York; (iv) counsel for Magten Asset Management Corporation; and (v) all parties that have requested special notice in this Chapter 11 case pursuant to Bankruptcy Rule 2002.

**PRIOR RELIEF**

16.    No previous motion has been made for the relief requested herein

has been made to this or any other court.

WHEREFORE the Plan Committee requests that this Court grant the relief

requested by this Motion and such other and further relief as this Court deems just and

appropriate.

Dated: September 29, 2005

THE BAYARD FIRM

By: _Eric M. Sutty_____

Neil B. Glassman (No. 2087)
Charlene Davis (No. 2336)
Eric M. Sutty (No. 4007)
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE  19899

-and-

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Alan W. Kornberg
Margaret A. Phillips
Ephraim I. Diamond
1285 Avenue of the Americas
New York, New York  10019
Telephone No.:  (212) 373-3000
Facsimile No.:  (212) 757-3990

Attorneys for the Plan Committee

# Exhibit S

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| NORTHWESTERN CORPORATION, | : Case No. 03-12872 (JLP) |
| | : |
| Reorganized Debtor. | : Relates to Docket No. 3308 |
| | : |
| | : |

**ORDER DENYING MOTION OF THE PLAN COMMITTEE IN AID OF
CONSUMMATION AND IMPLEMENTATION OF THE PLAN FOR ORDER
AUTHORIZING AND DIRECTING NORTHWESTERN CORPORATION TO
DISTRIBUTE SURPLUS DISTRIBUTIONS**

UPON consideration of the Motion of the Plan Committee in Aid of Consummation and Implementation of the Plan for Order Authorizing and Directing NorthWestern Corporation to Distribute Surplus Distributions [Docket No. 3308] (the "Motion"); and the Court having reviewed the Motion and the related responses; and a hearing having been held on January 11, 2006 (the "Hearing") with respect to the Motion; and the Court having heard the statements of counsel regarding the relief requested in the Motion at the Hearing; and after due deliberation and sufficient cause appearing therefor, it is hereby

**THE COURT FINDS AND CONCLUDES THAT:**

A.     The findings of fact and conclusions of law set forth herein and on the record at the January 11, 2006 hearing constitute this Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rule 7052 and 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.     The Court has jurisdiction over this case under 28 U.S.C. § 1334(b).

C.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

i- 6-001 5i50AMiUSBC MONTANA　　　　　　　　　;400 762 1179　　# 2/ 4

D.　　Due and adequate notice has been given to all parties entitled thereto, including the Securities and Exchange Commission, and no other or further notice is necessary or required.

E.　　The Court has reviewed the Motion and all pleadings related thereto, including, but not limited to, the following:

- Joinder of Ad Hoc Committee of Class 7 Debtholders to Motion of Plan Committee in Aid of Consummation and Implementation of the Plan for Order Authorizing and Directing NorthWestern Corporation to Distribute Surplus Distributions [Docket No. 3322];

- Joint Objection of Magten Asset Management Corp. and Law Debenture Trust Company of New York to Motion of the Plan Committee in Aid of Consummation and Implementation of the Plan for Order Authorizing and Directing NorthWestern Corporation to Distribute Surplus Distributions [Docket No. 3325];

- Response of Richard R. Hylland to Plan Committee's Motion for Order Authorizing and Directing NorthWestern Corporation to Distribute Surplus Distribution [Docket No. 3327];

- Response of First Interstate Bank and Missoula Parking Commission to Plan Committee's Motion for Order Authorizing and Directing NorthWestern Corporation to Distribute Surplus Distributions [Docket No. 3329];

- Response of NorthWestern Corporation to Motion of Plan Committee in Aid of Consummation and Implementation of the Plan for Order Authorizing and Directing NorthWestern Corporation to Distribute Surplus Distributions [Docket No. 3405]; and

- Plan Committee's Omnibus Reply to (I) Joint Objection of Magten Asset Management Corporation and Law Debenture Trust Company and (II) NorthWestern Corporation's Response to Motion of Plan Committee in Aid of Consummation and Implementation of the Plan for Order Authorizing and Directing NorthWestern Corporation to Distribute Surplus Distributions [Docket No. 3415].

F.　　The Court has reviewed NorthWestern Corporation's ("NorthWestern") Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Plan")[1] and the Order Confirming Debtor's Second Amended and Restated Plan of

---

[1] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Plan.

2

6ᵗ 8-06; 8:60AM;USBC MONTANA    ;406 782 1178    # 8/ 4

"Plan")[1] and the Order Confirming Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code entered on or about October 19, 2004 (the "Confirmation Order").

      G.    The Court has reviewed the following stipulations (collectively, the "Stipulations"):

      &bull;    Stipulation and Order Resolving Section III of the Limited Objection of PPL Montana, LLC to Confirmation of the Debtor's First Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code and the Debtor's Motion Pursuant to Sections 105(a), 363(b) and 502(a) of the Bankruptcy Code for Estimation of PPL Montana, LLC's Claim and to Establish Disputed Claim Reserve [Docket No. 2183]; and

      &bull;    Stipulation and Order Establishing a Disputed Claims Reserve [Docket No. 2317] (the "QUIPS Litigation Reserve Stipulation").

      H.    The Motion is premature in view of the litigation surrounding the unresolved and disputed claims of Magten Asset Management Corporation ("Magten") and Law Debenture Trust Company of New York ("Law Debenture").

      I.    There are surplus shares in the Disputed Claim Reserve established pursuant to Section 7.5 of the Plan. *At the date of HEARING, subject however to the MAGTEN Litigation for FINAL SURPLUS determination.*

      J.    Section 7.7 of the Plan requires full resolution of all disputed claims before there can be any Surplus Distribution and does not require NorthWestern to distribute Surplus Distribution from the Disputed Claims Reserve every six (6) months from the Effective Date of the Plan.

      K.    The QUIPS Litigation Reserve Stipulation applies to protect potential distribution to Magten and Law Debenture in the event their recovery exceeds the segregated reserve provided for therein.

      L.    Section 7.7 of the Plan and the QUIPS Litigation Reserve Stipulation preclude any distribution from the Disputed Claim Reserve until the disputed claims of Magten and Law Debenture with respect to the QUIPS Litigation are resolved.

---

[1] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Plan.

M.    Due and adequate notice was provided to the SEC and the SEC did not file any responsive pleadings in connection with the Motion or appear before the Court on January 11, 2006.

**THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.    The Motion is DENIED.

2.    The SEC is barred from asserting any claim against NorthWestern pursuant to the Bar Date Order, the Plan and the Confirmation Order.

3.    Notwithstanding anything to the contrary herein, consistent with Section 10.8 of the Plan, nothing in this Order shall release any non-Debtor, including any officer and/or director of the Debtor and/or any Non-Debtor included in the Released Parties, from liability to the SEC, in connection with any legal action brought by such governmental unit against such person(s).

4.    This Order shall take effect immediately upon its entry.

5.    This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

Dated:  Wilmington, Delaware
        February 2, 2006

THE HONORABLE JOHN L. PETERSON
UNITED STATES BANKRUPTCY JUDGE

# Exhibit T

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NORTHWESTERN CORPORATION, | ) | Case No. 03-12872 (JLP) |
| | ) | |
| Reorganized Debtor. | ) | |
| | ) | |

**NOTICE OF APPEAL**

The Plan Committee (the "Plan Committee") appointed in the

above-captioned chapter 11 case of NorthWestern Corporation ("NOR") pursuant to

Section 7.9 of NOR's Second Amended and Restated Plan of Reorganization Under

Chapter 11 of the Bankruptcy Code, by and through its undersigned counsel, hereby

appeals, pursuant to 28 U.S.C. § 158(a)(1) and Fed. R. Bankr. P. 8001(a), the Order with

respect to the Motion of the Plan Committee in Aid of Consummation and

Implementation of the Plan for Order Authorizing and Directing NorthWestern

Corporation to Distribute Surplus Distributions [Docket No. 3438], entered on the docket

by this Court on February 7, 2006, and attached hereto as Exhibit A.

The names of all parties to the Order appealed from and the names,

addresses and telephone numbers of their respective attorneys are as follows:

**Attorneys for the Plan Committee**

| | |
|---|---|
| Alan W. Kornberg, Esq. | Neil B. Glassman, Esq. |
| Margaret A. Phillips, Esq. | Charlene D. Davis, Esq. |
| Ephraim I. Diamond, Esq. | The Bayard Firm |
| Paul, Weiss, Rifkind, Wharton | 222 Delaware Avenue, Suite 900 |
| & Garrison, LLP | Wilmington, DE 19899 |
| 1285 Avenue of the Americas | Tel: (302) 655-5000 |
| New York, NY 10019-6064 | |
| Tel: (212) 373-3000 | |

616781v1

**Attorneys for NOR, the Reorganized Debtor**

Jesse H. Austin, Esq.
Karol K. Denniston, Esq.
Paul, Hastings, Janofsky & Walker, LLP
600 Peachtree Street, N.E.
Atlanta, GA 30308-2222
Tel: (404) 815-2400

Victoria Watson Counihan, Esq.
Dennis Merlo, Esq.
Greenberg Traurig LLP
The Brandywine Building
1000 West Street, Suite 1540
Wilmington, DE 19801
Tel: (302) 661-7000

**Attorneys for Magten Asset Management Corporation**

Bonnie K. Steingart, Esq.
Gary L. Kaplan, Esq.
Fried, Frank, Harris, Shriver
& Jacobson LLP
One New York Plaza
New York, NY 10004
Tel: (212) 859-8000

Mark J. Packel, Esq.
Elio Battista, Jr., Esq.
Blank Rome LLP
1201 Market Street, Suite 800
Wilmington, DE 19801
Tel: (302) 425-6400

**Attorneys for Law Debenture Trust Company of New York**

John V. Snellings, Esq.
Amanda D. Darwin, Esq.
Lee Harrington, Esq.
Nixon Peabody LLP
100 Summer Street
Boston, MA 02110
Tel: (617) 345-1000

Kathleen M. Miller, Esq.
Smith, Katzenstein & Furlow LLP
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE 19899
Tel: (302) 652-8400

616781v1

2

**Attorneys for the Ad-Hoc Committee**

Philip Bentley
Matthew J. Williams
Kramer Levin Naftalis
& Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
Tel: (212) 715-9100

Adam G. Landis
Landis Rath & Cobb LLP
919 Market Street, Suite 600
Wilmington, DE 19899
Tel: (302) 467-4400

Dated:    February 7, 2006

THE BAYARD FIRM

By: _____
Neil B. Glassman (No. 2087)
Charlene Davis (No. 2336)
Eric M. Sutty (No. 4007)
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE  19899

-and-

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Alan W. Kornberg
Margaret A. Phillips
Ephraim I. Diamond
1285 Avenue of the Americas
New York, New York  10019
Telephone No.:  (212) 373-3000
Facsimile No.:  (212) 757-3990

Attorneys for the Plan Committee

616781v1

3

# Exhibit U

**EXECUTION COPY**

AGREEMENT AND PLAN OF MERGER

among

BABCOCK & BROWN INFRASTRUCTURE LIMITED,

BBI US HOLDINGS PTY LTD.,

BBI US HOLDINGS II CORP.,

BBI GLACIER CORP.

and

NORTHWESTERN CORPORATION

Dated as of April 25, 2006

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| **ARTICLE I** | THE MERGER | 1 |
| SECTION 1.01 | Certain Definitions | 1 |
| SECTION 1.02 | The Merger | 8 |
| SECTION 1.03 | Closing | 9 |
| SECTION 1.04 | Effective Time | 9 |
| SECTION 1.05 | Effects of the Merger | 9 |
| SECTION 1.06 | Certificate of Incorporation and Bylaws | 9 |
| SECTION 1.07 | Directors | 10 |
| SECTION 1.08 | Officers | 10 |
| **ARTICLE II** | EFFECT OF THE MERGER ON THE CAPITAL STOCK OF THE CONSTITUENT CORPORATIONS; EXCHANGE OF CERTIFICATES | 10 |
| SECTION 2.01 | Effect on Capital Stock | 10 |
| SECTION 2.02 | Exchange of Certificates | 12 |
| SECTION 2.03 | Disputed Claims Reserve | 14 |
| **ARTICLE III** | REPRESENTATIONS AND WARRANTIES | 15 |
| SECTION 3.01 | Representations and Warranties of the Company | 15 |
| SECTION 3.02 | Representations and Warranties of Parent Group | 26 |
| **ARTICLE IV** | COVENANTS | 30 |
| SECTION 4.01 | Conduct of Business of the Company | 30 |
| SECTION 4.02 | Control of Other Party's Business | 33 |
| **ARTICLE V** | ADDITIONAL AGREEMENTS | 34 |
| SECTION 5.01 | Preparation of Proxy Statement; Stockholders' Meeting | 34 |
| SECTION 5.02 | No Solicitation | 35 |
| SECTION 5.03 | Access to Information; Confidentiality | 37 |
| SECTION 5.04 | Regulatory Matters; Reasonable Best Efforts | 37 |
| SECTION 5.05 | Fees and Expenses | 39 |
| SECTION 5.06 | Indemnification; Directors' and Officers' Insurance | 39 |
| SECTION 5.07 | Public Announcements | 41 |

SECTION 5.08   Transfer Taxes                                          41

SECTION 5.09   State Takeover Laws                                     41

i

| | | Page |
|---|---|---|
| SECTION 5.10 | Notification of Certain Matters | 41 |
| SECTION 5.11 | Employees | 41 |
| SECTION 5.12 | Delisting | 43 |
| SECTION 5.13 | Rule 16b-3 | 43 |
| SECTION 5.14 | Financing | 43 |
| SECTION 5.15 | No Agreements with Company Stockholders | 44 |
| SECTION 5.16 | Letter of Credit | 45 |
| **ARTICLE VI** | CONDITIONS | 46 |
| SECTION 6.01 | Conditions to Each Party's Obligation to Effect the Merger | 46 |
| SECTION 6.02 | Additional Conditions to Obligations of Parent Group | 46 |
| SECTION 6.03 | Additional Conditions to Obligations of the Company | 47 |
| **ARTICLE VII** | TERMINATION, AMENDMENT AND WAIVER | 47 |
| SECTION 7.01 | Termination | 47 |
| SECTION 7.02 | Effect of Termination | 49 |
| SECTION 7.03 | Amendment | 51 |
| SECTION 7.04 | Extension; Waiver | 51 |
| **ARTICLE VIII** | GENERAL PROVISIONS | 51 |
| SECTION 8.01 | Nonsurvival of Representations and Warranties | 51 |
| SECTION 8.02 | Notices | 51 |
| SECTION 8.03 | Interpretation | 53 |
| SECTION 8.04 | Counterparts | 53 |
| SECTION 8.05 | Entire Agreement; Third Party Beneficiaries | 53 |
| SECTION 8.06 | Governing Law | 54 |
| SECTION 8.07 | Severability | 54 |
| SECTION 8.08 | Assignment | 54 |
| SECTION 8.09 | Submission To Jurisdiction; Waivers | 54 |
| SECTION 8.10 | Enforcement | 55 |
| Exhibit A | Letter of Credit | |

THIS AGREEMENT AND PLAN OF MERGER (this "Agreement"), dated as of April 25, 2006, is among Babcock & Brown Infrastructure Limited, an Australian public company with company number ACN 100 364 234 (" Parent "), BBI US Holdings Pty Ltd., an Australian Company with company number ACN 119 325 950 and a direct wholly-owned subsidiary of Parent (" Holding Company "), BBI US Holdings II Corp., a Delaware corporation and direct wholly-owned subsidiary of Holding Company (" Holdings "), BBI Glacier Corp., a Delaware corporation and direct wholly-owned subsidiary of Holdings (" Sub "), and Glacier Corporation, a Delaware corporation (the " Company ").

WHEREAS, the respective boards of directors of each of Parent, Holding Company, Holdings, Sub and the Company have (i) approved and declared advisable this Agreement, the merger of Sub with and into the Company on the terms and subject to the conditions set forth in this Agreement (the " Merger ") and the other transactions contemplated hereby and (ii) determined that the Merger and the other transactions contemplated by this Agreement are fair to, and in the best interest of, their respective corporations and stockholders.

WHEREAS, each of Parent, Holding Company, Holdings, Sub and the Company desire to make certain representations, warranties, covenants and agreements in connection with the Merger and also to prescribe various conditions to the Merger.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth in this Agreement, and intending to be legally bound hereby, Parent, Holding Company, Holdings, Sub and the Company hereby agree as follows:

## ARTICLE I

## THE MERGER

SECTION 1.01    Certain Definitions. As used in this Agreement, the following terms shall have the meanings indicated below.

(a)    "1935 Act" means the Public Utility Holding Company Act of 1935, as amended, including the rules and regulations promulgated thereunder.

(b)    "affiliate" of any person means another person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such first person. For purposes of this definition, " control " when used with respect to any specified person means the power to direct the management and policies of such person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms " controlling " and " controlled " have meanings correlative to the foregoing.

(c)    "Affiliate Group" means any affiliated group with the meaning of Section 1504(a) of the Code filing a consolidated federal income tax Return, or any similar group filing a consolidated, combined, or unitary tax Return under a comparable provision of state, local or foreign law.

(d)    "BEA" means the Bureau of Economic Analysis of the U.S. Department of Commerce.

(e)    "beneficial ownership" or "beneficially own" shall have the meaning under Section 13(d) of the Exchange Act.

(f)    "Benefit Plans" means, with respect to any person, each material employee benefit plan, program, arrangement and contract (including, without limitation, any " employee benefit plan ," as defined in Section 3(3) of ERISA and any bonus, deferred compensation, stock bonus, stock purchase, restricted stock, stock option, employment, termination, stay agreement or bonus, retiree medical or life insurance, change-in-control and severance plan, program, policy, arrangement and contract (whether written or unwritten) in effect on the date of this Agreement to which such person or its Subsidiary is a party, which is maintained or contributed to by such person, or with respect to which such person could incur material liability under Section 4069, 4201 or 4212(c) of ERISA or otherwise.

(g)    "Blackstone" means The Blackstone Group L.P.

(h)    "Business" means the businesses of the Company or its Subsidiaries.

(i)    "Business Day" means any day on which banks are not required or authorized to close in the City of New York.

(j)    "Charter Documents" means the Company's certificate of incorporation and bylaws, as such may be amended from time to time.

(k)    "COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

(l)    "Code" means the Internal Revenue Service Code of 1986, as amended.

(m)    "Company Board" means the board of directors of the Company and any committees thereof.

(n)    "Company Common Stock" means the common stock, par value US$.01 per share, of the Company, together with the associated Company Rights.

(o)    "Company Credit Facility" means the Company's unsecured senior revolving credit facility in an aggregate principal amount of US$200 million pursuant to the Amended and Restated Credit Agreement, dated June 30, 2005, between the Company and the several lenders from time to time parties thereto.

(p)    "Company Preferred Stock" means the preferred stock, par value US$.01 per share, of the Company.

(q)    "Company Rate Review" means the requirement set forth in the Consent Order and Section 4(a) of the Settlement Agreement, pursuant to which not later than September

2

30, 2006, based on a 2005 test year, the Company shall file complete documents complying with the minimum electric and gas rate filing standards provided in ARM 38.5.106 through 38.5.195.

(r)    "Company Rights" means the rights distributed to the holders of Company Common Stock pursuant to the Company Rights Agreement.

(s)    "Company Rights Agreement" means the Rights Agreement, dated as of December 5, 2005, between the Company and LaSalle Bank National Association, as Rights Agent.

(t)    "Company Stockholders" means the holders of the outstanding shares of Company Common Stock.

(u)    "Company Stockholder Approval" means the affirmative vote of the holders of a majority of the outstanding shares of Company Common Stock required to adopt this Agreement.

(v)    "Confidentiality Agreement" means the letter agreement, dated December 16, 2005 between Parent and the Company.

(w)    "Credit Suisse" means Credit Suisse Securities (USA) LLC.

(x)    "Deferred Director Plan" means the Company's 2005 Deferred Compensation Plan for Non-Employee Directors.

(y)    "DGCL" means the Delaware General Corporation Law.

(z)    "Disputed Claims Reserve" has the meaning assigned to such term in the Reorganization Plan. Such Disputed Claim Reserve is held by LaSalle Bank National Association.

(aa)    "Disputed Claims Reserve Shares" means, collectively, shares of Company Common Stock held immediately prior to the Effect Time in the Disputed Claims Reserve.

(bb)    "Dissenting Shares" means any shares of Company Common Stock that are outstanding immediately prior to the Effective Time, the holders of which shall have properly delivered a written demand for payment of the fair cash value of such shares of Company Common Stock in accordance with Section 262 of the DGCL.

(cc)    "DSUs" means deferred stock units entitling the holder thereof to shares of Company Common Stock.

(dd)    "Electronic Data Room" means the electronic data room maintained on IntraLinks as of 4:30 P.M. EST on April 24, 2006. An index of the contents of such Electronic Data Room is disclosed in Section 1.01(dd) of the Company Disclosure Letter.

3

(ee)    "Employee Restricted Stock Plan" means the Company's 2005 Employee Restricted Stock Grant Plan.

(ff)    "Environmental Laws" means all Laws as in effect on or prior to the date hereof relating to the protection of human health, safety, or welfare or the environment, including any emission, discharge, generation, storage, treatment, disposal, abatement, Release, threatened Release, reporting, licensing, permitting, investigation, cleanup, mitigation, remediation, transportation, or other handling of any Hazardous Materials, including the following federal Laws as amended and their state counterparts: (i) the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601, et seq.; the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901, et seq.; the Clean Water Act, 33 U.S.C. §§ 1251, et seq.; the Clean Air Act, 42 U.S.C. §§ 7401, et seq.; and the Toxic Substances Control Act, 15 U.S.C. §§ 2601, et. seq.; and (ii) all other requirements pertaining to protection of air, surface water, groundwater or land and subsurface, natural resources, and related human health, safety, or welfare.

(gg)    "Environmental Liabilities and Costs" means all damages, natural resource damages, claims, losses, expenses, costs, obligations, and liabilities (collectively, " Environmental Losses ") imposed by, under or pursuant to Environmental Laws, including all Environmental Losses related to Remedial Actions, and all fees, compliance costs, disbursements, penalties, fines and expenditures necessary to cause property, the Company, any Significant Subsidiary or the Business to be in compliance with the requirements of Environmental Laws.

(hh)    "Environmental Permits" means any federal, state or local permit, license, registration, consent, order, administrative consent order, certificate, approval, waiver or other authorization necessary for the conduct of the Business as currently conducted under any applicable Environmental Law.

(ii)    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

(jj)    "Exchange Act" means the Securities Exchange Act of 1934, as amended, including the rules and regulations promulgated thereunder.

(kk)    "Expenses" means all out-of-pocket expenses (including, without limitation, all fees and expenses of counsel, accountants, investment bankers, experts and consultants to a party hereto and its affiliates) incurred by a party or on its behalf in connection with or related to the authorization, preparation, negotiation, execution and performance of this Agreement and the transactions contemplated hereby, including (i) the preparation, printing, filing and mailing of the Proxy Statement and the solicitation of the Company Stockholder Approval, (ii) the preparation and filing of all applications, notices, registrations, declarations, petitions and filings with any Governmental Entity in connection with the Required Statutory Approvals and (iii) all other matters related to the transactions contemplated hereby.

(ll)    "FERC" means the Federal Energy Regulatory Commission.

4

(mm)    "Final Order" means any action by a relevant Governmental Entity that has not been reversed, stayed, enjoined, set aside, annulled or suspended, with respect to which any waiting period (a "Final Order Waiting Period") prescribed by Law before the transactions contemplated hereby may be consummated has expired, and as to which all conditions to the consummation of such transactions prescribed by Law have been satisfied.

(nn)    "GAAP" means generally accepted accounting principles of the United States.

(oo)    "Governmental Entity" means any national, state, municipal, local or foreign government, any instrumentality, subdivision, court, administrative agency or commission or other authority thereof, or any quasi-governmental or private body exercising any regulatory, taxing, importing or other governmental or quasi-governmental authority.

(pp)    "Hazardous Materials" means any substance that (a) is defined, listed, identified or otherwise regulated under any Law, as in effect on or prior to the date hereof, relating to the protection of the environment (including "hazardous" and "toxic" substances and wastes, radioactive substances including radon gas, polychlorinated-biphenyls, asbestos and petroleum), or (b) requires investigation, remediation, or other protective measures under such Law.

(qq)    "HSR Act" means the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended, and the rules and regulations promulgated thereunder.

(rr)    "IISA" means the International Investment Survey Act of 1976, now known as the International Investment and Trade Services Survey Act.

(ss)    "Intellectual Property Right" means any trademark, service mark, trade name, copyright, patent, software license, other database, invention, trade secret, know-how (including any registrations or applications for registration of any of the foregoing) or any other similar type of proprietary intellectual property right.

(tt)    "IRS" means the Internal Revenue Service.

(uu)    "known," "knowingly" or "Knowledge" means, with respect to the Company, the actual knowledge of the persons listed on Schedule 1.01(uu).

(vv)    "known," "knowingly" or "Knowledge" means, with respect to Parent Group, the actual knowledge of the following persons: Steven Boulton, Jeffrey Kendrew, Michael Ryan and Michael Garland.

(ww)    "Laws" mean all (A) statutes, laws, rules, regulations, ordinances or codes of any Governmental Entity and (B) orders, decisions, injunctions, judgments, awards and decrees of any Governmental Entity.

(xx)    "Liens" means all mortgages, liens, pledges, encumbrances, charges and security interests.

5

(yy)    "Material Adverse Effect" means, with respect to the Company, an effect, event, development or change (i) which is materially adverse to the business, assets, properties, financial condition, or results of operations of the Company and its Subsidiaries, taken as a whole, other than any effect, event, development or change arising out of or resulting from (A) changes or conditions in the U.S. or global economy or capital or financial markets generally, including changes in interest or exchange rates, (B) general changes to or developments in the industries in which the Company and its Subsidiaries operate (except to the extent that such changes or developments have had a disproportionate effect on the Company and its Subsidiaries, taken as a whole, as compared to other persons in the industries in which the Companies and its Subsidiaries operate), (C) changes in general legal, tax, regulatory, political or economic conditions affecting companies in general, (D) changes in GAAP (or any interpretation thereof) or Regulation S-X of the SEC, (E) the execution, announcement or performance of, or compliance with, this Agreement or the consummation of the transactions contemplated herein, including the impact thereof on relationships, contractual or otherwise, with Governmental Entities, customers, suppliers, licensors, distributors, partners or employees, (F) the commencement, occurrence, continuation or intensification of any war, sabotage, armed hostilities or acts of terrorism that does not directly affect the assets or properties of, or the communities served by, the Company and its Subsidiaries, taken as a whole, (G) any change in the Company's stock price or trading volume on the NASDAQ National Market or (H) any matter disclosed in (x) the Company SEC Documents prior to the date of this Agreement, (y) the Company Disclosure Letter, including in each case, any adverse effect or adverse event, development or change that occurs after the date of this Agreement but that arises out of or results from any such matter or (z) the Electronic Data Room ( *provided* , that in the case of (x), (y) and (z), the extent that the magnitude and significance of such adverse effect or adverse event, development or change was reasonably discernable to Parent prior to the date hereof based on the disclosure made to Parent in the Company SEC Documents, the Company Disclosure Letter or the Electronic Data Room, as the case may be), or (ii) that prevents or materially delays (to a date beyond the Final Date) the consummation of the Merger and the other transactions contemplated hereby, or prevents or materially delays (to a date beyond the Final Date) the ability of the Company to perform its obligations hereunder.

(zz)    "MPSC" means the Montana Public Service Commission.

(aaa)    "NASDAQ" means the National Association of Securities Dealers Automated Quotations.

(bbb)    "NLRB" means the National Labor Relations Board.

(ccc)    "NPSC" means the Nebraska Public Service Commission.

(ddd)    "other party" means, with respect to the Company, Parent Group, and with respect to Parent Group, the Company, unless the context otherwise requires.

(eee)    "Parent Group"  means collectively Parent, Holding Company, Holdings and Sub.

6

(fff)    "Parent Material Adverse Effect" means an effect, event, development or change which prevents or materially delays (to a date beyond the Final Date) the consummation of the Merger and the other transactions contemplated hereby or prevents or materially delays the ability of Parent Group to perform their respective obligations hereunder.

(ggg)    "person" means an individual, corporation, limited liability company, partnership, association, trust, unincorporated organization, other entity or group (as defined in the Exchange Act).

(hhh)    "Proxy Statement" means, collectively, the preliminary and definitive proxy statements (as amended or supplemented from time to time) relating to the Company Stockholder Approval.

(iii)    "Release" means any releasing, spilling, disposing or other discharging of Hazardous Materials into the environment (including air, soil, subsurface, surface water and groundwater).

(jjj)    "Remedial Action" means all actions required by any Governmental Entity pursuant to the Environmental Laws to investigate, monitor, clean up, remove, treat or in any other way remediate any Release.

(kkk)    "Reorganization Plan" means the Company's Second Amended and Restated Plan of Reorganization under Chapter 11 of the Bankruptcy Code, dated August 18, 2004, affirmed by the United States Bankruptcy Court for the District of Delaware on October 19, 2004.

(lll)    "Representatives" means with respect to any party, any director, officer or employee of, or any investment banker, attorney or other advisor or representative of such party.

(mmm)    "Restricted Shares" means each share of Company Common Stock that is subject to restrictions on ownership, transferability, or vesting or other lapse restrictions pursuant to the Special Recognition Plan or the Employee Restricted Stock Plan.

(nnn)    "Returns" means all federal, state, local and foreign returns, estimates, information statements and reports relating to Taxes.

(ooo)    "SDPUC" means the South Dakota Public Utilities Commission.

(ppp)    "SEC" means the Securities and Exchange Commission.

(qqq)    "Securities Act" means the Securities Act of 1933, as amended, including the rules and regulations promulgated thereunder.

(rrr)    "Senior Notes" means the Senior Secured Notes, 5.875% Series A due 2014, limited in aggregate principal amount of US$225 million and the Senior Secured Notes, 5.875% Exchange Series A due 2014, limited in aggregate principal amount of US$225 million, issued pursuant to the Senior Note Indenture, dated as of November 1, 2004, between the

7

Company and U.S. National Bank Association, as trustee, as supplemented and amended by Supplemental Indenture No. 1 dated as of November 1, 2004.

(sss)     "Settlement Agreement" means that certain Stipulation and Settlement Agreement, dated as of July 8, 2004, by and among the Company, the MPSC and the Montana Consumer Counsel.

(ttt)     "Special Recognition Plan" means the Company's 2004 Special Recognition Grant Restricted Stock Plan.

(uuu)     "Statement of Factors" means that certain Statement of Factors for Evaluating Proposals to Acquire Northwestern Energy issued by the MPSC as of October 18, 2004.

(vvv)     "Stockholders' Meeting" means a meeting of Company Stockholders (which may be the regular annual meeting) for the purposes of obtaining the Company Stockholder Approval.

(www)     "Subsidiary," when used with respect to any party, means any corporation or other organization, whether incorporated or unincorporated, (i) of which such party or any other Subsidiary of such party is a general partner (excluding partnerships, the general partnership interests of which held by such party or any Subsidiary of such party do not have a majority of the voting interests in such partnership) or (ii) at least a majority of the securities or other interests of which, having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation or other organization, is directly or indirectly owned or controlled by such party or by any one or more of its Subsidiaries, or by such party and one or more of its Subsidiaries.

(xxx)     "Supplemental Dividend" means an amount in cash equal to the product of:  (A) the total number of days between the eighteen (18) month anniversary of the date of this Agreement and the date on which such dividend is declared by the Company Board and (B) the product of (i) $1,369,324,350 and (ii) the quotient of 3.50% and 360.

(yyy)     "Taxes" means any and all federal, state, local and foreign taxes, including, without limitation, gross receipts, income, profits, sales, use, occupation, value added, ad valorem, transfer, franchise, withholding, payroll, recapture, employment, excise and property taxes, assessments, governmental charges and duties together with all interest, penalties and additions imposed with respect to any such amounts.

(zzz)     "Transfer Taxes" means all stock transfer, real estate transfer, property, documentary, stamp, recording and other similar Taxes incurred in connection with the transactions contemplated by this Agreement.

Other capitalized terms defined elsewhere in this Agreement and not defined in this Section 1.01 shall have the meanings assigned to such terms in this Agreement.

SECTION 1.02     The Merger. Upon the terms and subject to the conditions set forth in this Agreement, and in accordance with the DGCL, Sub shall be merged with and

into the Company at the Effective Time (as defined below). Following the Effective Time, the separate corporate existence of Sub shall cease and the Company shall continue as the surviving corporation (the "Surviving Corporation") and shall continue its corporate existence under the laws of the State of Delaware and shall succeed to and assume all of the rights and obligations of the Company and Sub in accordance with the DGCL. As a result of the Merger, the Surviving Corporation shall become a wholly-owned indirect subsidiary of Parent. The effects and consequences of the Merger shall be as set forth in Section 1.05.

SECTION 1.03    Closing. The closing of the Merger (the "Closing") shall take place at 8:00 a.m. local time on a date to be specified by the parties hereto, which shall be no later than the second Business Day after satisfaction or, to the extent permitted by this Agreement and applicable Law, waiver of the conditions set forth in Article VI of this Agreement (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or, to the extent permitted by this Agreement and applicable Law, waiver of those conditions), at the offices of LeBoeuf, Lamb, Greene & MacRae LLP, 125 West 55th Street, New York, NY 10019, unless another time, date or place is agreed to in writing by Parent and the Company. The date on which the Closing occurs is referred to in this Agreement as the "Closing Date ."

SECTION 1.04    Effective Time. Subject to the provisions of this Agreement, the parties shall prepare, and on the Closing Date the parties shall file with the Delaware Secretary of State, a certificate of merger or other appropriate documents as provided in Section 251 of the DGCL (in any such case, the "Certificate of Merger") executed in accordance with the relevant provisions of the DGCL and shall make all other filings or recordings required under the DGCL to effectuate the Merger. The Merger shall become effective at such time as the Certificate of Merger is duly filed with the Delaware Secretary of State, or at such later time as the parties hereto may agree and specify in the Certificate of Merger (the time and date the Merger becomes effective being hereinafter referred to as the "Effective Time ").

SECTION 1.05    Effects of the Merger. The Merger shall have the effects set forth in this Agreement and the applicable provisions of the DGCL. Without limiting the generality of the foregoing, and subject thereto, at the Effective Time, all the property, rights, privileges, immunities, powers, franchises and authority of the Company and Sub will be vested in the Surviving Corporation, and all debts, liabilities and duties of the Company and Sub will become the debts, liabilities and duties of the Surviving Corporation.

SECTION 1.06    Certificate of Incorporation and Bylaws.

(a)    Subject to Section 5.06, the certificate of incorporation of Sub, as in effect immediately prior to the Effective Time, shall be the certificate of incorporation of the Surviving Corporation until thereafter changed or amended as provided therein or by applicable Law.

(b)    Subject to Section 5.06, the bylaws of Sub as in effect immediately prior to the Effective Time shall be the bylaws of the Surviving Corporation, until thereafter changed or amended as provided therein or by applicable Law.

9

SECTION 1.07    Directors. From and after the Effective Time, the directors of Sub shall become the directors of the Surviving Corporation and shall serve on the Surviving Corporation's board of directors until the earlier of their resignation or removal or until their respective successors are duly elected and qualified.

SECTION 1.08    Officers. The officers of the Company immediately prior to the Effective Time shall be the officers of the Surviving Corporation, until the earlier of their resignation or removal or until their respective successors are duly elected or appointed or qualified.

## ARTICLE II

### EFFECT OF THE MERGER ON THE CAPITAL STOCK OF THE CONSTITUENT CORPORATIONS; EXCHANGE OF CERTIFICATES

SECTION 2.01    Effect on Capital Stock. As of the Effective Time, by virtue of the Merger and without any action on the part of the Company, Parent Group or the holders of any of the following securities:

(a)    Capital Stock of Sub. Each issued and outstanding share of capital stock of Sub shall be converted into and become one fully paid and nonassessable share of common stock, par value US$.01 per share, of the Surviving Corporation.

(b)    Cancellation of Treasury Stock and Parent Owned Stock. Each share of Company Common Stock that is owned by the Company as treasury stock and each share of Company Common Stock that is owned by Parent, Holding Company, Holdings or Sub, or any other Subsidiary of Parent, Holding Company or Holdings (collectively, the "Canceled Shares") shall automatically be canceled and retired and shall cease to exist, and no consideration shall be delivered in exchange therefor.

(c)    Conversion of Company Common Stock. Each share of Company Common Stock issued and outstanding (other than the Canceled Shares, Dissenting Shares (except as provided in paragraph (d) below), Disputed Claims Reserve Shares and Restricted Shares) shall be converted into the right to receive US$37.00 in cash, without interest (the "Merger Consideration"), less any required withholding taxes. As of the Effective Time, all such shares of Company Common Stock shall no longer be outstanding and shall automatically be canceled and retired and shall cease to exist, and each holder of a certificate representing any such shares of Company Common Stock shall cease to have any rights with respect thereto, except the right to receive the Merger Consideration and declared but unpaid dividends, without interest, upon surrender of such certificate in accordance with, or as otherwise contemplated by, Section 2.02 of this Agreement.

(d)    Dissenting Shares. Notwithstanding anything in this Agreement to the contrary, Dissenting Shares shall not be converted into or represent the right to receive the Merger Consideration as provided in this Section 2.01. As of the Effective Time, the Dissenting Shares shall no longer be outstanding and shall automatically be canceled and retired and shall cease to exist, and each holder of any Dissenting Shares shall be entitled only to such rights as

10

are granted under Section 262 of the DGCL, except that all Dissenting Shares held by persons who fail to perfect or who effectively waive, withdraw or lose their rights as a dissenting shareholder in respect of such shares of Company Common Stock under Section 262 of the DGCL shall thereupon be deemed converted as of the Effective Time into the right to receive the Merger Consideration as provided in this Article II.

(e)    Warrants. Each holder (each, a "Warrantholder") of a warrant (each, a "Warrant") to purchase Company Common Stock shall be entitled to receive an amount (the "Warrant Consideration") in cash, without interest, equal to the product obtained by multiplying (x) the total number of shares of Company Common Stock issuable upon the exercise in full of such Warrant held by such Warrantholder by (y) the excess, if any, of the amount of the Merger Consideration over the exercise price per share of Company Common Stock under such Warrant (with the aggregate amount of such payment round up to the nearest cent), less any required withholding taxes. As of the Effective Time, all such Warrants shall no longer be outstanding and shall automatically be canceled and retired and shall expire and cease to exist and each Warrantholder shall cease to have any rights with respect thereto, except the right to receive the Warrant Consideration, without interest, upon the surrender of an original copy of the Warrant to the Paying Agent in accordance with Section 2.02(j).

(f)    Restricted Stock. Each Restricted Share that is issued and outstanding immediately prior to the Effective Time shall vest in full, become free of restrictions and shall be converted into the right to receive the Merger Consideration, less any required withholding taxes. As of the Effective Time, all such Restricted Shares shall no longer be outstanding and shall automatically be canceled and retired and shall cease to exist, and each holder of a certificate representing any such Restricted Shares shall cease to have any rights with respect thereto, except the right to receive the Merger Consideration, without interest, upon surrender of such certificate in accordance with, or as otherwise contemplated by, Section 2.02 of this Agreement.

(g)    Deferred Stock Units. Each DSU which is outstanding immediately prior to the Effective Time shall automatically be converted into the right to receive from the Company or the Surviving Corporation (as applicable), at the time previously selected by the holder thereof pursuant to the terms of any deferral election made with respect to such DSU, an amount in cash equal to the product of (i) the number of shares of Company Common Stock subject to such DSU (including, without limitation, those shares corresponding to previously declared and paid dividends that resulted in an increase in the number of shares of Company Common Stock subject to DSUs) and (ii) the Merger Consideration, less any required withholding taxes, subject to the terms and conditions set forth in the Deferred Director Plan, including the terms and conditions with respect to distributions and timing of payment thereunder and in compliance with Section 409A of the Code.

(h)    Deferred Director Plan. All account balances under the Deferred Director Plan will be paid out in cash, less any required withholding taxes, by the Company or the Surviving Corporation (as applicable) to participants therein, at the time previously selected by the holder thereof pursuant to the terms of any deferral election made with respect to such account balance, subject to the terms and conditions set forth in the Deferred Director Plan, including the terms and conditions with respect to distributions and timing of payment thereunder and in compliance with Section 409A of the Code.

(i)        Disputed Claim Reserve Shares. Each Disputed Claims Reserve Share shall be converted into the right to receive the Merger Consideration (the aggregate amount of such consideration, the "Disputed Claims Merger Consideration"). As of the Effective Time, all Disputed Claims Reserve Shares shall no longer be outstanding and shall automatically be canceled and retired and shall cease to exist, and all persons that, pursuant to the Reorganization Plan, would have been entitled to receive distribution of any Disputed Claims Reserve Shares shall instead be entitled to receive, from the Disputed Claims Reserve, the Merger Consideration therefore.

SECTION 2.02    Exchange of Certificates.

(a)        Paying Agent. Prior to the Effective Time, Parent Group shall designate a federally insured bank or trust company, reasonably acceptable to the Company, to act as paying agent in the Merger (the "Paying Agent") and, prior to the Effective Time, Parent Group shall enter into an agreement with Paying Agent, which agreement shall provide that Parent Group shall deposit with the Paying Agent, prior to the Effective Time, for the benefit of the holders of shares of Company Common Stock (other than the Disputed Claims Reserve Shares) and the Warrantholders, immediately available funds in an aggregate amount necessary for the payment of (i) the Merger Consideration (excluding the Disputed Claims Merger Consideration), (ii) the aggregate amount of cash dividends, if any, that (A) were declared after the date hereof and are expressly permitted hereunder to have been so declared, (B) have a record date prior to the Effective Time and (C) are unpaid at the Effective Time (such dividends, the "Outstanding Dividends") and (iii) the Warrant Consideration, upon surrender of certificates representing shares of Company Common Stock or an original copy of a Warrant, as the case may be, pursuant to this Section 2.02 (it being understood that any and all interest earned on funds made available to the Paying Agent pursuant to this Agreement shall be turned over to Parent). Any cash deposited with the Paying Agent shall hereinafter be referred to as the "Exchange Fund." The agreement with the Paying Agent shall identify specific time limits by when the transmittal materials and cash are to be mailed to holders of Certificates (as defined below) as specified in paragraph (b) of this Section 2.02.

(b)        Exchange Procedures for Certificates. As of or promptly following the Effective Time, Parent, Holding Company and Holdings shall cause the Paying Agent to mail to each holder of record of a certificate or certificates which immediately prior to the Effective Time represented shares of Company Common Stock (the "Certificates") whose shares were converted into the right to receive the Merger Consideration pursuant to Section 2.01, (i) a letter of transmittal in a form mutually agreed upon by Parent Group and the Company, which shall specify that delivery shall be effected, and risk of loss and title to the Certificates shall pass, only upon delivery of the Certificates to the Paying Agent and (ii) instructions for effecting the surrender of the Certificates in exchange for the Merger Consideration. Upon surrender of a Certificate for cancellation to the Paying Agent, together with such letter of transmittal, duly executed, and such other documents as may reasonably be required by the Paying Agent, Parent, Holding Company, Holdings and the Surviving Corporation shall cause the Paying Agent to promptly pay, to the holder of such Certificate in exchange therefor the amount of cash into which the shares of Company Common Stock theretofore represented by such Certificate shall have been converted pursuant to Section 2.01 and the amount of Outstanding Dividends due thereon, and the Certificate so surrendered shall forthwith be canceled. In the event of a transfer

12

of ownership of shares of Company Common Stock that is not registered in the transfer records of the Company, payment may be made to a person other than the person in whose name the Certificate so surrendered is registered, if such Certificate shall be properly endorsed or otherwise be in proper form for transfer. Until surrendered as contemplated by this Section 2.02, each Certificate shall be deemed at any time after the Effective Time to represent only the right to receive upon such surrender the amount of cash, without interest, into which the shares of Company Common Stock theretofore represented by such Certificate shall have been converted pursuant to Section 2.01 and the amount of Outstanding Dividends due thereon. No interest will be paid or will accrue on the cash payable upon the surrender of any Certificate.

        (c)    <u>No Further Ownership Rights in Company Common Stock</u>. All cash paid upon the surrender of Certificates in accordance with the terms of this Section 2.02 shall be deemed to have been paid in full satisfaction of all rights pertaining to the shares of Company Common Stock theretofore represented by such Certificates. At the Effective Time, the stock transfer books of the Company shall be closed, and there shall be no further registration of transfers on the stock transfer books of the Surviving Corporation of the shares of Company Common Stock that were outstanding immediately prior to the Effective Time. If, after the Effective Time, Certificates are presented to the Surviving Corporation or the Paying Agent for any reason, they shall be canceled and exchanged as provided in this Article II.

        (d)    <u>Termination of Exchange Fund</u>. Any portion of the Exchange Fund which remains undistributed to holders of Certificates for twelve (12) months after the Effective Time shall be delivered to Parent, and any holders of Certificates who have not theretofore complied with this Article II shall thereafter look only to Parent for the Merger Consideration and Outstanding Dividends with respect to such Certificates.

        (e)    <u>Investment of the Exchange Fund</u>. The Paying Agent may invest any cash included in the Exchange Fund, as directed by Parent or the Surviving Corporation. Any interest and other income resulting from such investments shall be paid to Parent or the Surviving Corporation. To the extent that there are losses with respect to such investments, or the Exchange Fund diminishes for other reasons below the level required to make prompt payments of the Merger Consideration, Outstanding Dividends and Warrant Consideration as contemplated hereby, Parent, Holding Company, Holding shall cause the Surviving Corporation to, and the Surviving Corporation shall, promptly replace or restore the portion of the Exchange Fund lost through investments or other events so as to ensure that the Exchange Fund is, at all times, maintained at a level sufficient to make such payments.

        (f)    <u>No Liability</u>. None of Parent Group, the Company, the Surviving Corporation or the Paying Agent or any of their respective directors, officers, employees and agents shall be liable to any person with respect to any Merger Consideration from the Exchange Fund delivered to a public official pursuant to any applicable abandoned property, escheat or similar Law. If any Certificate shall not have been surrendered prior to five (5) years after the Effective Time (or immediately prior to such earlier date on which any cash in respect of such Certificate would otherwise escheat to or become the property of any Governmental Entity), any such cash in respect of such Certificate shall, to the extent permitted by applicable Law, become the property of Parent, free and clear of all claims or interest of any person previously entitled thereto.

13

(g)    Lost Certificates. If any Certificate shall have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the person claiming such Certificate to be lost, stolen or destroyed and, if required by Parent, the posting by such person of a bond in such reasonable amount as Parent may direct as indemnity against any claim that may be made against it with respect to such Certificate, the Paying Agent shall deliver, in exchange for such lost, stolen or destroyed Certificate, the applicable Merger Consideration and Outstanding Dividends with respect thereto.

(h)    Withholding Tax. Parent and the Surviving Corporation shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement to any holder of shares of Company Common Stock outstanding immediately prior to the Effective Time such amounts as may be required to be deducted and withheld with respect to the making of such payment under the applicable Tax Law, and shall promptly remit all withheld amounts to the applicable taxing authority. To the extent that amounts are so withheld, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the holder of the shares of Company Common Stock outstanding immediately prior to the Effective Time in respect of which such deduction and withholding was made.

(i)    Certain Adjustments. If, between the date of this Agreement and the Effective Time, the outstanding Company Common Stock shall have been changed into a different number of shares or different class by reason of any reclassification, recapitalization, stock split, split-up, combination or exchange of shares or a stock dividend or dividend payable in any other securities shall be declared with a record date within such period, or any similar event shall have occurred, the Merger Consideration shall be equitably adjusted to eliminate the effects of such event.

(j)    Exchange Procedure for Warrants. Upon the surrender to the Paying Agent of an original copy of a Warrant, the Paying Agent shall pay to such Warrantholder the Warrant Consideration. The procedures and other provisions set forth in this Section 2.02 shall apply to any surrender of a Warrant.

SECTION 2.03    Disputed Claims Reserve. Prior to the Effective Time, Parent Group shall enter into an agreement (the " LaSalle Agreement ") with LaSalle Bank National Association, a national banking association (" LaSalle "), which agreement shall provide that Parent Group shall deposit with LaSalle, prior to the Effective Time, immediately available funds in an aggregate amount equal to the sum of (a) the Disputed Claims Merger Consideration and (b) the aggregate amount of Outstanding Dividends due with respect to the Disputed Claims Reserve Shares ((a) and (b) collectively, the " Disputed Claims Consideration "). Any distributions of the Disputed Claims Consideration shall be made in accordance with the terms of this Agreement and the Reorganization Plan. Such terms shall be explicitly set forth in an "instruction letter," which shall be set forth as an exhibit to the LaSalle Agreement.

14

# ARTICLE III

# REPRESENTATIONS AND WARRANTIES

SECTION 3.01    Representations and Warranties of the Company. The Company represents and warrants to Parent Group, except as set forth in: (i) the Company SEC Documents filed prior to the date hereof; (ii) the disclosure letter delivered by the Company to Parent on April 25, 2006 (with specific reference to the representations and warranties in this Section 3.01 to which the information in such letter relates) (the " Company Disclosure Letter ") or (iii) the Electronic Data Room, in connection with the transactions contemplated by this Agreement:

(a)    Organization.

(i)    The Company is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware, and has all requisite power and authority to conduct its business as it is now being conducted, except where the failure to have such power and authority would not have a Material Adverse Effect. The Company is duly qualified or licensed to do business and is in good standing in each jurisdiction in which the property owned, leased or operated by it or the nature of the business conducted by it makes such qualification or licensing necessary, except in such jurisdictions where the failure to be so duly qualified or licensed and in good standing would not have a Material Adverse Effect. The copies of the Charter Documents, which were previously furnished or made available to Parent, are true, complete and correct copies of such documents as in effect on the date of this Agreement.

(ii)    Each Significant Subsidiary (as defined in Rule 1-02 of Regulation S-X of the SEC) of the Company is an entity duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization (to the extent such concept is recognized in such jurisdictions) and has all necessary powers required to carry on its business as it is now being conducted, except where the failure to have such power and authority would not have a Material Adverse Effect.

(b)    Capitalization. As of the date of this Agreement, the authorized capital stock of the Company consists of (A) 200,000,000 shares of Company Common Stock and (B) 50,000,000 shares of Company Preferred Stock, of which 100,000 shares have been designated Series A Junior Participating Preferred Shares which may be issued upon the exercise of the Company Rights. As of the date of this Agreement, (A) 35,493,141 shares of Company Common Stock were issued and outstanding, of which 3,144,642 were Claims Reserve Shares, (B) 313,547 shares of Company Common Stock were held in the treasury of the Company, (C) no shares of Company Preferred Stock were outstanding, (D) 35,164 were Restricted Shares issued and outstanding under the Special Recognition Plan and (E) no Restricted Shares were outstanding under the Employee Restricted Stock Plan. All issued and outstanding shares of the capital stock of the Company are duly authorized, validly issued, fully paid and non-assessable, and no class of capital stock is entitled to preemptive rights. There are no bonds, debentures, notes or other indebtedness of the Company having the right to vote (or convertible into, or exchangeable for, securities having the right to vote) on any matters on which Company

15

Stockholders may vote. As of the date of this Agreement, there are no options, warrants, preemptive or other outstanding rights, stock appreciation rights, conversion rights, redemption rights, repurchase rights, agreements, arrangements or commitments of any kind to which the Company or its Significant Subsidiaries is a party, or by which the Company or its Significant Subsidiaries are bound, obligating the Company or its Significant Subsidiaries to issue, deliver or sell, or cause to be issued, delivered or sold, any shares of capital stock or other securities of the Company or its Significant Subsidiaries or any securities or obligations convertible or exchangeable into or exercisable for, or giving any person a right to subscribe for or acquire, any securities of the Company or its Significant Subsidiaries, and no securities or obligations evidencing such rights are authorized, issued or outstanding other than (x) Company Rights, (y) Warrants representing the right to purchase 4,839,018 shares of Company Common Stock, and (z) 35,190 DSUs issued and outstanding under the Deferred Director Plan.

        (c)     Authority. The Company has the requisite corporate power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby, subject, in the case of the consummation of the Merger, to obtaining the Company Stockholder Approval. The execution, delivery and performance of this Agreement and the consummation by the Company of the Merger and of the other transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of the Company and no other corporate action on the part of the Company is necessary to authorize the execution, delivery and performance of this Agreement by the Company or to consummate the transactions so contemplated, in each case, subject to, with respect to the Merger, the Company Stockholder Approval. This Agreement has been duly executed and delivered by the Company and, assuming this Agreement constitutes a valid and binding obligation of Parent Group, constitutes a valid and binding obligation of the Company enforceable against the Company in accordance with its terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws of general application affecting enforcement of creditors' rights generally and (ii) as limited by Laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

        (d)     No Conflicts; Consents and Approvals.

        (i)     The execution, delivery or performance of this Agreement by the Company does not or will not, as the case may be, and the consummation by the Company of the transactions contemplated hereby, including the Merger, does not or will not (x) conflict with or result in a violation pursuant to any provision of the Charter Documents or any provision of the organizational documents of any Significant Subsidiary, in each case, as amended to the date of this Agreement, (y) subject to obtaining or making the consents, approvals, notices, orders, authorizations, registrations, declarations and filings referred to in paragraph (ii) below, contravene any Law or any order, writ, judgment, injunction, decree, determination or award currently in effect, or (z) conflict with or result in a breach of, or default under, any loan or credit agreement, note, bond, mortgage, indenture, lease, license, benefit plan, contract, agreement or other instrument, permit, concession, or obligation applicable to the Company, any Significant Subsidiary or their respective properties or assets, except, with respect to clauses (y) and (z) above, for any such contraventions, conflicts, breaches, defaults or other occurrences which would not have, individually or in the aggregate, a Material Adverse Effect.

16

(ii)        Except for (A) compliance with, and filings under, the HSR Act; (B) the filing with the SEC of (i) the Proxy Statement and (ii) such reports under the Exchange Act as may be required in connection with this Agreement and the transactions contemplated by this Agreement; (C) the filing of the Certificate of Merger and other appropriate merger documents required by the DGCL with the Secretary of State of the State of Delaware and appropriate documents with the relevant authorities of other states in which the Company or its Significant Subsidiaries is qualified to do business; (D) any filings and approvals pursuant to the rules and regulations of the NASDAQ; (E) applicable requirements, if any, of state securities or "blue sky" Laws; (F) application to, and the consent and approval of, the FERC, or an order from the FERC disclaiming jurisdiction over the transactions contemplated hereby; (G) to the extent required, notice to and approval of, (i) the SDPUC, (ii) the MPSC, and (iii) the NPSC; (H) required pre-approvals of license transfers with the Federal Communications Commission; (I) to the extent applicable, consents, approvals and actions of, filings with, and notices to, any Governmental Entity pursuant to the Exon-Florio Act (such items set forth above in clauses (A) through (I) collectively, the " Required Statutory Approvals "); and (J) the filing of a report with the BEA pursuant to the IISA, no consent, approval, notice, order or authorization of, or registration, declaration or filing with, any Governmental Entity, is necessary or required to be obtained or made in connection with the execution and delivery of this Agreement by the Company, the performance by the Company of its obligations hereunder or the consummation of the Merger and the other transactions contemplated hereby, other than such items that the failure to make or obtain, as the case may be, would not have a Material Adverse Effect.

(e)        SEC Reports, Financial Statements and Utility Reports.

(i)        The Company has filed with the SEC all forms, reports, schedules, statements and other documents required to be filed by it since December 31, 2005, pursuant to the Exchange Act or the Securities Act (such forms, reports, schedules, statements and other documents, including any financial statements or schedules included therein, are collectively referred to herein as the " Company SEC Documents "). The Company SEC Documents, as of their respective dates of filing (giving effect to any amendments or supplements thereto), (x) did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading and (y) complied as to form in all material respects with the applicable requirements of the Exchange Act and the Securities Act, as the case may be, and, to the extent applicable, the Sarbanes-Oxley Act of 2002 (it being understood that the foregoing does not cover future events resulting from public announcement of the Merger). The audited consolidated financial statements and the unaudited quarterly financial statements of the Company included in the Company SEC Documents comply as to form in all material respects with the published rules and regulations of the SEC with respect thereto in effect on the date of filing, have been prepared in accordance with GAAP, except as may be indicated in the notes thereto or, in the case of such unaudited statements, as permitted by Form 10-Q and Form 8-K of the SEC, and fairly present (subject, in the case of the unaudited statements, to normal, recurring audit adjustments), in all material respects, the consolidated financial position of the Company and its

consolidated Subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods then ended.

(ii)    All filings (other than immaterial filings) required to be made by the Company or its Subsidiaries since January 1, 2005 under the 1935 Act, the Federal Power Act, as amended, the Communications Act of 1934, as amended by the Telecommunications Act of 1996, and applicable state Laws have been filed with the SEC, the FERC, the Federal Communications Commission, the Department of Energy, the MPSC, the NPSC or the SDPUC, as the case may be, including all forms, statements, reports, agreements (oral or written) and all documents, exhibits, amendments and supplements appertaining thereto, including all rates, tariffs, franchises, service agreements and related documents and all such filings complied, as of their respective dates, with all applicable requirements of the applicable statute and the rules and regulations thereunder, except for filings the failure of which to make or the failure of which to make in compliance with all requirements of the applicable statute and the rules and regulations thereunder, individually or in the aggregate, would not have a Material Adverse Effect.

(iii)    Neither the Company nor any of its Subsidiaries is a party to, or has any commitment to become a party to, any joint venture, off-balance sheet partnership or similar contract or arrangement (including any contract relating to any transaction or relationship between or among the Company and any of its Subsidiaries, on the one hand, any unconsolidated affiliate, including any structured finance, special purpose or limited purpose entity or person, on the other hand, or any "off-balance sheet arrangements" (as such term is defined in Item 303(a) of Regulation S-K of the SEC)), where the result, purpose or effect of such contract is to avoid disclosure of any material transaction involving, or material liabilities of, the Company or any of its Subsidiaries, in the Company's audited consolidated financial statements or other Company SEC Documents.

(f)    No Undisclosed Liabilities. Except as reflected, reserved against or otherwise disclosed in the consolidated financial statements of the Company (including the notes thereto and related management discussion and analysis) included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2005, to the Knowledge of the Company, neither the Company nor any of its Subsidiaries has any liabilities or obligations (whether absolute, accrued, fixed, contingent or otherwise) required to be set forth in the Company's consolidated balance sheet under GAAP, other than liabilities (i) incurred in the ordinary course of business since December 31, 2005, (ii) incurred pursuant to the transactions contemplated by this Agreement, (iii) discharged or paid in full prior to the date of this Agreement in the ordinary course of business or (iv) which would not have, individually or in the aggregate, a Material Adverse Effect.

(g)    Sarbanes-Oxley.

(i)    The management of the Company has (x) designed and implemented disclosure controls and procedures (as defined in Rule 13a-15(e) of the Exchange Act), or caused such disclosure controls and procedures to be designed and

18

implemented under their supervision, to ensure that material information relating to the Company, including its consolidated Subsidiaries, is made known to the management of the Company by others within those entities and (y) has disclosed, based on its most recent evaluation of internal control over financial reporting (as defined in Rule 13a-15(f) of the Exchange Act), to the Company's outside auditors and the audit committee of the Company Board (A) any significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which could reasonably be expected to adversely affect the Company's ability to record, process, summarize and report financial information and (B) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting. Since December 31, 2005, any material change in internal control over financial reporting required to be disclosed in any Company SEC Document has been so disclosed.

(ii)    Since December 31, 2005, (A) neither the Company nor any of its Subsidiaries nor, to the Knowledge of the Company, any Representative of the Company or any of its Subsidiaries has received or otherwise obtained knowledge of any material complaint, allegation, assertion or claim, whether written or oral, regarding the accounting or auditing practices, procedures, methodologies or methods of the Company or any of its Subsidiaries or their respective internal accounting controls relating to periods after December 31, 2005, including any material complaint, allegation, assertion or claim that the Company or any of its Subsidiaries has engaged in questionable accounting or auditing practices (except for any of the foregoing received after the date of this Agreement which have no reasonable basis), and (B) to the Knowledge of the Company, no attorney representing the Company or any of its Subsidiaries, whether or not employed by the Company or any of its Subsidiaries, has reported evidence of a material violation of securities Laws, breach of fiduciary duty or similar violation, relating to periods after December 31, 2005, by the Company or any of its officers, directors, employees or agents to the Company Board or any committee thereof or to any director or executive officer of the Company.

(h)    Absence of Certain Changes or Events. Since December 31, 2005, (i) through the date of this Agreement, each of the Company and its Subsidiaries has conducted its business only in the ordinary course consistent with past practice, and (ii) there has not been any event or occurrence that would reasonably be expected to have a Material Adverse Effect.

(i)    Information Supplied. None of the information supplied or to be supplied by or on behalf of the Company for inclusion or incorporation by reference in (i) the Proxy Statement or (ii) any other document filed or to be filed with the SEC in connection with the transactions contemplated by this Agreement (the " Other Filings ") will, on each relevant filing date and in the case of the Proxy Statement, on the date of mailing to the Company Stockholders and at the time of the Stockholders' Meeting, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading. The Proxy Statement and the Other Filings will comply as to form in all material respects with the provisions of the Exchange Act. Notwithstanding the foregoing, the Company makes no

19

representation or warranty with respect to any information supplied by Parent Group that is contained in the Proxy Statement.

(j)    Employee Benefit Plans.

(i)    Section 3.01(j)(i) of the Company Disclosure Letter sets forth all Benefit Plans maintained or contributed to by the Company and any of its Subsidiaries, or for which the Company or any of its Subsidiaries could incur any liability, true, complete and correct copies of which have been provided or otherwise made available to Parent. The Company has also provided or otherwise made available to Parent with respect to each Benefit Plan (to the extent applicable) copies of: the trust agreement, the most recently filed annual report on IRS Form 5500 (including all schedules and audited financial statements), the most recently received IRS determination letter, the most recently prepared actuarial report and financial statement, the most recent summary plan description, any summaries of material modification, any employee handbooks, and any material written communications by the Company or its Subsidiaries to any current or former employees, consultants or directors of the Company or any of its Subsidiaries concerning the extent of the benefits provided under a Benefit Plan.

(ii)    Except where failure to comply would not have a Material Adverse Effect, each Benefit Plan maintained by the Company and any Subsidiary of the Company has been operated and administered in compliance with its terms and applicable Law. Each Benefit Plan that is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter from the IRS that the Benefit Plan is so qualified, and, to the Knowledge of the Company, no fact or circumstances exists that would result in the revocation of such letter. Neither the Company nor any of its Subsidiaries has incurred or reasonably expects to incur, either directly or indirectly (including as a result of an indemnification obligation), any liability under Title I or IV of ERISA or the penalty, excise tax or joint and several liability provisions of the Code or any regulations relating to employee benefit plans (including, without limitation, Sections 406, 409, 502(i), 502(1), 4069 or 4212(c) of ERISA, or Sections 4971, 4975 or 4976 of the Code). Neither the Company nor any of its Subsidiaries nor any "party in interest" or "disqualified person" in respect of the Benefit Plans has engaged in a "prohibited transaction" (within the meaning of Section 4975 or Section 406 of ERISA) that would reasonably be expected to have a Material Adverse Effect.

(iii)    Except for the continuation coverage requirements of COBRA, neither the Company nor any Subsidiary of the Company has any liability or potential liability for benefits to any employees following termination of employment or retirement under any of the Benefit Plans that are employee welfare benefit plans.

(iv)    The execution of this Agreement and the consummation of the Merger will not constitute an event under any Benefit Plan maintained by the Company or any Subsidiary of the Company that will or may result in any payment, acceleration, termination, forgiveness of indebtedness, vesting, distribution, increase in compensation or benefits or obligation to fund benefits with respect to any employee of the Company or any Subsidiary of the Company which would reasonably be expected to have a Material

20

Adverse Effect. The execution of this Agreement and the consummation of the Merger will not give rise to any excise tax under Section 4999 of the Code or a loss of deduction under Section 280G of the Code. Except as would not have a Material Adverse Effect, all contributions and other payments required to be made by the Company or its Subsidiaries by Law or by the terms of any Benefit Plan with respect to any period ending before the Closing Date have been timely made to any funds or trusts established thereunder or in connection therewith, or reserves adequate for such contributions or other payments have been or will be set aside therefor and have been or will be reflected in financial statements, and no accumulated funding deficiencies exist in any of such plans subject to Section 412 of the Code.

(v)     Except as would not have a Material Adverse Effect, there are no existing (or, to the Knowledge of the Company, threatened) lawsuits, claims or other controversies, other than claims for information or benefits in the normal course, with respect to any Benefit Plan maintained by the Company or any Subsidiary of the Company. Neither the Company nor any Subsidiary of the Company has incurred, nor reasonably expects to incur, any liability under Title IV of ERISA (other than liability for premium payments to the Pension Benefit Guaranty Corporation arising in the ordinary course) other than those liabilities which would not result in a Material Adverse Effect.

(k)     Litigation. There is no suit, claim, action, proceeding (at law or in equity) or any investigation, arbitration, administrative or other proceeding by or before any Governmental Entity or, to the Knowledge of the Company, threatened against or affecting the Company or any Subsidiary of the Company or any of their respective properties or assets or any of their respective officers, employees or directors in their capacity as such, except for any such suit, claim, action, proceeding or investigation as would not have a Material Adverse Effect. As of the date of this Agreement, neither the Company nor its Subsidiaries is subject to any outstanding order, writ, judgment, injunction, decree, rule or order of any Governmental Entity that would reasonably be expected to have a Material Adverse Effect.

(l)     Permits. Other than with respect to Environmental Laws, which are governed by Section 3.01(o), each of the Company and its Significant Subsidiaries holds all permits, licenses, authorizations, certificates, rights, variances, exemptions, orders and approvals of all Governmental Entities that are required pursuant to any Laws and necessary for the lawful conduct of its business as of the date of this Agreement (the " Company Permits "), except for failures to hold such Company Permits that would not have a Material Adverse Effect. Each of the Company and its Significant Subsidiaries is in compliance with the terms of the Company Permits, except where the failure to so comply, individually or in the aggregate, would not have a Material Adverse Effect.

(m)     Tax Matters.

(i)     Each of the Company and its Subsidiaries has timely filed all Returns required to be filed by it with any Tax authority prior to the date hereof either separately or as a member of an Affiliated Group, pursuant to applicable Law except for such Returns that would not have a Material Adverse Effect. As of the time of filing, all such Returns were true, correct and complete in all material respects. Each of the

21

Company and its Subsidiaries has paid all amounts in respect of Taxes shown to be due and payable on such Returns and all such amounts required to be paid to any Governmental Entity or other person on or before the date hereof.

(ii)    All material Taxes that each of the Company and its Subsidiaries is or was required by Law to withhold or collect have been duly withheld or collected, and have been timely paid over to the proper Governmental Entity or other person to the extent due and payable.

(iii)    Each of the Company and its Subsidiaries is not delinquent in the payment of any material Tax nor is there any material Tax deficiency outstanding, proposed or assessed against the Company or its Subsidiaries, nor has the Company or its Subsidiaries executed any unexpired waiver of any statute of limitations on or extending the period for the assessment or collection of any Tax.

(iv)    To the Knowledge of the Company, no audit or other examination of any Return of the Company or its Subsidiaries by any Tax authority is presently in progress. Neither the Company nor its Subsidiaries has been notified of any request for such an audit or other examination.

(v)    No material adjustment to the Tax liability of the Company relating to any Return filed by the Company or its Subsidiaries has been proposed in writing, formally or informally, by any Tax authority to the Company, its Subsidiaries or any representative thereof.

(vi)    Neither the Company nor its Subsidiaries has any liability for any unpaid Taxes which have not been accrued for or reserved on the Company's most recent balance sheet included in the Company SEC Documents, whether asserted or unasserted, contingent or otherwise, other than any liability for unpaid Taxes that may have accrued since the end of the most recent fiscal period covered by such balance sheet in connection with the operation of the Business in the ordinary course of business.

(n)    <u>Labor Relations and Employment.</u>

(i)    Except where failure to comply would not have a Material Adverse Effect, the Company and each Subsidiary is in compliance with all applicable Laws respecting employment and employment practices, terms and conditions of employment and wages and hours, including, without limitation, the Immigration Reform and Control Act, the WARN Act, any Laws respecting employment discrimination, sexual harassment, disability rights or benefits, equal opportunity, plant closure issues, affirmative action, workers' compensation, labor relations, wage and hour standards, occupational safety and health requirements and unemployment insurance, and is not engaged in any unfair labor practices.

(ii)    Neither the Company nor any of its Subsidiaries is a party to any collective bargaining agreement or other labor union agreement applicable to individuals employed by the Company or any of its Subsidiaries, nor are there any formal activities or proceedings of any labor union to organize any such employees.

22

(iii)        Except as would not have a Material Adverse Effect, there are no complaints, charges or claims against the Company or any of its Subsidiaries pending, or to the Knowledge of the Company, threatened to be brought or filed with the NLRB or any Governmental Entity based on, or arising out of, in connection with, or otherwise relating to the employment (including unfair labor practice complaints, grievances or charges) or termination of employment of any individual by the Company or any of its Subsidiaries.

(o)        Environmental Matters. Except as provided in this Section 3.01(o), the Company makes no representation or warranty, express or implied, as to any environmental matters, including Environmental Laws and Environmental Permits.

(i)        Each of the Company and its Subsidiaries is in compliance with all applicable Environmental Laws, except for such violations and defaults as would not have a Material Adverse Effect.

(ii)        Except as would not have a Material Adverse Effect, the Company and its Subsidiaries have obtained or applied in a timely manner for all Environmental Permits necessary for the conduct of their operations as of the date of this Agreement, as applicable, and all such Environmental Permits are in full force and effect or, where applicable, a renewal application has been timely filed and is pending agency approval. There are no pending or, to the Knowledge of the Company, threatened proceedings to revoke or enforce such Environmental Permits and each of the Company and its Subsidiaries is in compliance with all terms and conditions thereof, except where the failure to possess or comply with such Environmental Permits or the failure for such Environmental Permits to be in full force and effect would not have a Material Adverse Effect.

(iii)        Except for matters that would not have a Material Adverse Effect, neither the Company nor its Subsidiaries has received any written notification that the Company or any such Subsidiary, any property currently owned, leased or operated, any property formerly owned, leased or operated, is the subject of any proceeding, investigation, claim, lawsuit or order by any Governmental Entity or other person seeking (i) any Remedial Action or (ii) to impose any Environmental Liabilities and Costs on the Company or any such Subsidiary.

(iv)        Except as would not have a Material Adverse Effect, neither the Company nor its Subsidiaries is required to (i) implement or pay for any Remedial Action, (ii) reimburse costs incurred by third parties with respect to any Remedial Action, or (iii) incur Environmental Liabilities and Costs.

(v)        With respect to any property currently owned, leased or operated by the Company or any of its Subsidiaries or, to the Knowledge of the Company, with respect to any property formerly owned, leased or operated by the Company or any of its Subsidiaries, there has not been any Release that would reasonably be expected to result in any Environmental Liabilities and Costs that would have a Material Adverse Effect.

23

(p)    Material Contracts.

(i)    As of the date hereof, except for this Agreement, neither the Company nor its Subsidiaries is a party to, and none of their respective properties or other assets is subject to, any contract:

(A)    that would be required to be filed by the Company as a "material contract" pursuant to Item 601(b)(10) of Regulation S-K of the SEC; or

(B)    that contain a minimum annual purchase requirement of US$1,000,000 or more which has a term of more than one (1) year and that cannot be canceled on less than ninety (90) days notice.

Each such Contract described in clauses (A) and (B) is referred to herein as a "Material Contract."

(ii)    All Material Contracts are valid, binding and in full force and effect, except to the extent they have previously expired in accordance with their terms or to the extent the failure to be in full force and effect would not have a Material Adverse Effect. The Company is not, and has not received any written notice or has any Knowledge that any other party is, in default in any respect under any such Material Contract, except for those defaults which would not have a Material Adverse Effect, and there has not occurred any event that, with the lapse of time or the giving of notice or both, would constitute such a material default.

(q)    Property. All properties and assets of the Company and its Subsidiaries, real and personal, material to the conduct of its business are, except for changes in the ordinary course of business consistent with past practice since December 31, 2005, reflected in the most recent balance sheet of the Company included in the Company SEC Documents, and each of the Company and its Subsidiaries has legal title to, or a leasehold interest, license or easement in, its real and personal property reflected on such balance sheet or acquired by it since the date of such balance sheet, free and clear of all Liens other than those Liens which are of record as of the date hereof and those Liens which would not result in a Material Adverse Effect.

(r)    Intellectual Property. The Company owns or possesses adequate licenses or other rights to use all Intellectual Property Rights necessary to conduct the business of the Company and its Subsidiaries as currently conducted, except where failure to own or possess such licenses or rights would not have a Material Adverse Effect. To the Knowledge of the Company, the Intellectual Property Rights of the Company do not conflict with or infringe upon any Intellectual Property Rights of others to the extent that, if sustained, such conflict or infringement would reasonably be expected to have a Material Adverse Effect.

(s)    Insurance. All material insurance policies (the "Insurance Policies") carried by or covering the Company and its Subsidiaries with respect to their business, assets and properties are in full force and effect, and no notice of cancellation, or threatened cancellation, has been received by the Company or its Subsidiaries with respect to any Insurance Policy which has not been cured by the payment of premiums that are due, except where such failure to cure would not have a Material Adverse Effect. All premiums due on the Insurance Policies have

24

been paid in a timely manner and the Company and its Subsidiaries have complied in all material respects with the terms and provisions of the Insurance Policies.

(t)        No Ownership of Nuclear Power Plants. Neither the Company nor its Subsidiaries owns, directly or indirectly, any interest in any nuclear generation station or manages or operates any nuclear generation station.

(u)        State Takeover Statutes. Assuming the accuracy of Parent's representation in Section 3.02(g), no "moratorium," "control share," "fair price," "business combination" or other anti-takeover Laws are applicable to the Merger or any of the other transactions contemplated by this Agreement.

(v)        Brokers. No broker, investment banker, financial advisor or other person, other than Credit Suisse and Blackstone the fees and expenses of which will be paid by the Company, is entitled to any broker's, finder's, financial advisor's or other similar fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Company.

(w)        Opinion of the Company's Financial Advisors. The Company Board has received an opinion from each of Credit Suisse (the " CS Fairness Opinion ") and Blackstone (the " Blackstone Fairness Opinion "), to the effect that, as of the date of this Agreement, the Merger Consideration to be received by the holders of Company Common Stock pursuant to the Merger is fair from a financial point of view to such holders.

(x)        Board Approval. At a meeting duly called and held, the Company Board (i) determined that this Agreement and the transactions contemplated hereby, including the Merger, are fair to and in the best interests of the Company and the Company Stockholders, (ii) approved, authorized and adopted this Agreement and approved and authorized the transactions contemplated hereby, including the Merger, (iii) resolved to recommend that this Agreement be submitted for consideration by the Company Stockholders at the Stockholders' Meeting and (iv) resolved to recommend adoption by the Company Stockholders of this Agreement.

(y)        Vote required. Assuming the accuracy of Parent's representation in Section 3.02(g), the Company Stockholder Approval is the only vote of the holders of any class or series of the Company capital stock necessary to adopt this Agreement and approve the Merger and the other transactions contemplated hereby.

(z)        Company Rights Agreement. The Company has amended the Company Rights Agreement in accordance with its terms to render it inapplicable to this Agreement, the Merger and other transactions contemplated by this Agreement.

(aa)        Completion of Transaction. As of the date of this Agreement, the Company has no Knowledge of any fact or circumstances relating to or affecting the Company that it reasonably believes would prevent the Company from fulfilling its material obligations under this Agreement and completing the transactions contemplated hereby or that would, without the incurrence of undue expense or time, prevent the Company from obtaining all Required Statutory Approvals.

25

(bb)     No Other Representations and Warranties. Except for the representations and warranties contained in this Section 3.01, none of the Company, any affiliate of the Company or any other person makes any representations or warranties, and the Company hereby disclaims any other representations or warranties, whether made by the Company, any affiliate of the Company, or any of their respective officers, directors, employees, agents or representatives, with respect to the negotiation, execution and delivery of this Agreement or the transactions contemplated hereby, notwithstanding the delivery or disclosure, in writing or orally, to the Parent, Sub or any of their officers, directors, employees, agents or representatives of any documentation or other information.

SECTION 3.02     Representations and Warranties of Parent Group. Each constituent of Parent Group jointly and severally represent and warrant to the Company as follows:

(a)     Organization.

(i)     Each of Parent and Holding Company is a legal entity duly organized, validly existing and in good standing under the laws of Australia and has all requisite power and authority to carry on its business as now being conducted and to enter into and carry out its obligations under this Agreement, except where the failure to have such power and authority would not have a Parent Material Adverse Effect.

(ii)     Each of Holdings and Sub is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite corporate power and authority to carry on its business as now being conducted and to enter into and carry out its obligations under this Agreement, except where the failure to have such power and authority would not have a Parent Material Adverse Effect.

(b)     Authority. Each constituent of Parent Group has the requisite power and authority (corporate or otherwise) to execute and deliver this Agreement and to consummate the transactions contemplated hereby. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary action (corporate or otherwise) on the part of each constituent of Parent Group and no other proceedings (corporate or otherwise, including any shareholder action) on the part of Parent, Holding Company, Holdings or Sub are necessary to authorize this Agreement or to consummate such transactions. This Agreement has been duly executed and delivered by each constituent of Parent Group and, assuming this Agreement constitutes a valid and binding obligation of the Company, constitutes a valid and binding obligation of each constituent of Parent Group enforceable against them in accordance with its terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws of general application affecting enforcement of creditors' rights generally and (ii) as limited by Laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

(c)     No Conflicts; Consents and Approvals.

(i)     The execution, delivery or performance of this Agreement by each constituent of Parent Group does not or will not, as the case may be, and the consummation by each constituent of Parent Group of the transactions contemplated hereby, including the Merger, does not or will not (x) conflict with or result in a violation pursuant to any provision of the organizational documents of Parent, Holding Company, Holdings or Sub, in each case, as amended to the date of this Agreement, (y) subject to obtaining or making the consents, approvals, notices, orders, authorizations, registrations, declarations and filings referred to in paragraph (ii) below, contravene any Law or any order, writ, judgment, injunction, decree, determination or award currently in effect, or (z) conflict with or result in a breach of, or default under, any loan or credit agreement, note, bond, mortgage, indenture, lease, license, benefit plan, contract, agreement or other instrument, permit, concession, or obligation applicable to Parent, Holding Company, Holdings or Sub or their respective properties or assets, except, with respect to clauses (y) and (z) above, for any such contraventions, conflicts, breaches, defaults or other occurrences which would not have, individually or in the aggregate, a Parent Material Adverse Effect.

(ii)     Other than the Required Statutory Approvals and the filing of a report with the BEA pursuant to the IISA, no consent, approval, order or authorization of, or registration, declaration or filing with, any Governmental Entity is required by or with respect to Parent, Holding Company, Holdings or Sub in connection with the execution and delivery of this Agreement by Parent, Holding Company, Holdings or Sub or the consummation of the Merger and the other transactions contemplated hereby, other than such consents, approvals, orders, authorizations, registrations, declarations or filings that the failure to obtain or make would not have a Parent Material Adverse Effect.

(d)     Litigation. No legal action, suit or proceeding or judicial, administrative or governmental investigation is pending, or to the Knowledge of Parent, threatened against Parent, Holding Company, Holdings or Sub that (i) questions the validity of this Agreement or the transactions contemplated hereby, including, but not limited to, the Merger, or any actions taken or to be taken by Parent, Holding Company, Holdings or Sub pursuant hereto or seeks to enjoin or otherwise restrain the transactions contemplated hereby or (ii) would have a Parent Material Adverse Effect. As of the date of this Agreement, neither Parent, Holding Company, Holdings nor Sub is subject to any outstanding order, writ, judgment, injunction, decree, rule or order of any Governmental Entity that would have a Parent Material Adverse Effect.

(e)     Information Supplied. None of the information supplied or to be supplied by or on behalf of Parent Group for inclusion in (i) the Proxy Statement and (ii) Other Filings will, on each relevant filing date, and in the case of the Proxy Statement, on the date of mailing to the Company Stockholders and at the time of the Stockholders' Meeting, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading. Notwithstanding the foregoing, Parent Group makes no representation or warranty with respect to any information supplied by the Company which is contained in the Proxy Statement.

27

(f)    Interim Operations of Holding Company, Holdings and Sub.    Each of Holding Company, Holdings and Sub was formed solely for the purpose of engaging in the transactions contemplated hereby and, except for activities incidental to its organization and maintenance of corporate existence, has engaged in no other business activities and has conducted its operations only as contemplated hereby.

(g)    No Ownership Interest.    Neither Parent, Holding Company, Holdings, Sub, nor any of their respective affiliates owns, beneficially or of record, any shares of capital stock of the Company.

(h)    Financing Arrangements.

(i)    Parent Group has delivered to the Company true and correct copies of financing letters with respect to debt financing of US$505,000,000 (the "Financing Commitments").

(ii)    None of the Financing Commitments has been amended or modified prior to the date of this Agreement, and the respective financing commitments contained in the Financing Commitments have not been withdrawn or rescinded in any respect. The Financing Commitments are in full force and effect. There are no conditions precedent or other contingencies related to the funding of the full amount of the financing contained in the Financing Commitments, other than as set forth in, or contemplated by, the Financing Commitments.

(iii)    As of the date of this Agreement, no event (including, without limitation, the failure to pay any and all commitment fees and other fees required by the Financial Commitments) has occurred which, with or without notice, lapse of time or both, would constitute a default or breach on the part of Parent, Holding Company, Holdings or Sub under any term or condition of the Financing Commitments.

(iv)    The aggregate proceeds contemplated by the Financing Commitments, together with (x) cash currently on hand and available to Parent Group and (y) cash Parent Group reasonably believes is available to it from other sources of debt and equity financing ((x) and (y) in the aggregate, the "Available Cash"), are sufficient (A) to pay (or provide the funds for the Surviving Corporation to pay) the aggregate Merger Consideration, the aggregate Warrant Consideration and Outstanding Dividends, (B) to pay (or provide the funds for the Surviving Corporation to pay) all amounts contemplated by Sections 2.01(g), (h) and (i) when due, (C) to refinance any indebtedness or other obligation of the Company which may become due, and to finance any "change of control" offer that may be required under any indebtedness of the Company, in each case, as a result of this Agreement, the Merger, or any of the transactions contemplated hereby, and (D) to pay all related fees and expenses, arising solely out of the Merger when due.

(v)    As of the date of this Agreement, Parent Group does not have any reason to believe that any of the terms of or conditions to the Financing Commitments will not be satisfied on a timely basis or that the full amount of the financing contained in

28

the Financing Commitments and the Available Cash will not be available to the Parent Group on the Closing Date.

(i)     Letter of Credit.  The Letter of Credit (as defined in Section 5.16 below) is in full force and effect. There are no conditions precedent or other contingencies related to the funding of the full amount of the Letter Credit, other than as set forth in, or contemplated by, the Letter of Credit. No event has occurred which, with or without notice, lapse of time or both, would constitute a default or breach on the part of Parent, Holding Company, Holdings or Sub with respect to any term or condition of the Letter of Credit.

(j)     Completion of Transaction.  As of the date of this Agreement, Parent Group has no Knowledge of any fact or circumstances relating to or affecting Parent, Holding Company, Holdings or Sub that it reasonably believes would prevent Parent, Holding Company, Holdings or Sub from fulfilling their material obligations under this Agreement and completing the transactions contemplated hereby or that would, without the incurrence of undue expense or time, prevent Parent, Holding Company, Holdings or Sub from obtaining all Required Statutory Approvals.

(k)     Certain Issues Relating to the MPSC.

(i)     Parent Group acknowledge and agree that they have been provided by the Company, and have reviewed and analyzed, the Settlement Agreement, including the Consent Order (as defined in the Settlement Agreement), and the Statement of Factors.

(ii)     Parent Group acknowledge the agreements, covenants and obligations of the Company contained in the Settlement Agreement and the Consent Order, and will exercise reasonable best efforts to address such agreements, covenants and obligations of the Company and the concerns of the MPSC, as reflected in such documents.

(iii)     Parent Group have no Knowledge of any fact or circumstances relating to or affecting Parent Group or any of their respective Subsidiaries, this Agreement, the Merger or the consummation of the other transactions contemplated by this Agreement that it reasonably believes would prevent Parent Group or the Surviving Corporation and its Subsidiaries from having a preponderance of the elements and characteristics of an acquirer as outlined by the MPSC in the Statement of Factors.

(l)     Fairness Opinions.  Parent Group acknowledge and agree that they may not rely on the CS Fairness Opinion or the Blackstone Fairness Opinion.

(m)     No Agreements with Company Stockholders.  As of the date of this Agreement, neither Parent, Holding Company, Holdings nor Sub nor any of their respective Representatives or affiliates has entered into any agreement, arrangement or understanding (in each case, whether oral or written), or authorized, committed or agreed to enter into any agreement, arrangement or understanding (in each case, whether oral or written), pursuant to which any Company Stockholder would be entitled to receive consideration of a different

29

amount or nature than the Merger Consideration or pursuant to which a Company Stockholder agrees to vote to adopt this Agreement or agrees to vote against any Superior Proposal.

(n)     No Other Representations and Warranties.   Except for the representations and warranties contained in this Section 3.02, none of Parent, Holding Company, Holdings, Sub, any affiliate of Parent, Holding Company, Holdings or Sub or any other person makes any representations or warranties, and Parent Group hereby disclaim any other representations or warranties, whether made by Parent, Holding Company, Holding Company, Holdings, Sub, any affiliate of Parent, Holding Company, Holdings, Sub or any of their respective officers, directors, employees, agents or representatives, with respect to the negotiation, execution and delivery of this Agreement or the transactions contemplated hereby, notwithstanding the delivery or disclosure, in writing or orally, to the Company or any of its officers, directors, employees, agents or representatives of any documentation or other information.

## ARTICLE IV

## COVENANTS

SECTION 4.01    Conduct of Business of the Company.   Except as set forth in Section 4.01 of the Company Disclosure Letter (with specific reference to the covenants in this Section 4.01 to which the information in such letter relates), contemplated or permitted by this Agreement, required by a Governmental Entity of competent jurisdiction or as expressly agreed to in writing by Parent (which consent shall not be unreasonably withheld or delayed), the Company will, and will cause its Subsidiaries to, conduct its operations in all material respects according to its ordinary course of business consistent with past practice and use its commercially reasonable efforts to preserve intact its current business organization, to keep available the services of its current officers and employees and to preserve its relationships with customers, suppliers, licensors, licensees, advertisers, distributors and others having business dealings with it. In this Section 4.01, "ordinary course of business consistent with past practice" shall include actions (the " Plan Actions ") that are specifically provided for in, or undertaken pursuant to, the Reorganization Plan; *provided* , *however* , that " ordinary course of business consistent with past practice " shall not include actions that are substantially similar to Plan Actions, but are not specifically provided for in, or undertaken pursuant to, the Reorganization Plan. Without limiting the generality of the foregoing, except as set forth in Section 4.01 of the Company Disclosure Letter (with specific reference to the covenants in this Section 4.01 to which the information in such letter relates) and, except as (x) contemplated or permitted by this Agreement or (y) required by Law, the Company will not and will cause its Subsidiaries not to, without the consent of Parent, which consent shall not be unreasonably withheld or delayed:

(i)     except with respect to bonuses or other incentive compensation made in the ordinary course of business consistent with past practice (including, without limitation, an annual bonus or compensation plan adopted for fiscal year 2007 consistent with annual plans for prior years), adopt or amend in any material respect, any bonus, profit sharing, compensation, severance, change-in-control, termination, stock option, restricted stock, stock purchase, stock appreciation right, pension, retirement, employment or other employee benefit agreement, trust, plan or other arrangement for the benefit or welfare of any director, officer or employee of the Company or its Subsidiaries

30

or increase in any manner the compensation or fringe benefits of any director, officer or employee of the Company or its Subsidiaries (except, in each case, for annual increases and cost of living increases for the benefit of officers and employees of the Company or its Subsidiaries which, in the aggregate, are consistent with past practice);

(ii)    sell, lease, license, mortgage or otherwise encumber or subject to any Lien or otherwise dispose of any of its properties or assets other than immaterial properties or assets (or immaterial portions of properties or assets), except in the ordinary course of business, and other than Liens (A) arising as a matter of Law, (B) granted in connection with the incurrence, assumption or guaranteed of any indebtedness permitted under clause (ix) below and (C) as required by after acquired property covenants in contracts evidencing indebtedness of the Company or its Subsidiaries and Liens created in connection with the refinancing of indebtedness of the Company or its Subsidiaries that are no less favorable to the Company and its Subsidiaries than those Liens that were created in connection with the indebtedness that is being refinanced;

(iii)    (x) declare, set aside or pay any dividends on, or make any other distributions in respect of, any of its capital stock, (y) split, combine or reclassify any of its capital stock or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for shares of its capital stock or (z) purchase, redeem or otherwise acquire any shares of capital stock of the Company or its Subsidiaries or any other securities thereof or any rights or warrants to acquire any such shares or other securities, except that (A) the Company may continue the declaration and payment of regular cash dividends per share of Company Common Stock, not to exceed $0.31 per quarter up to and including the third quarter of 2006 and, thereafter, not to exceed $0.34 per quarter, in each case, with usual record and payment dates for such dividends in accordance with past dividend practice, (B) the Company may declare and pay a Supplemental Dividend on Company Common Stock on a quarterly basis for the period commencing on the eighteen (18) month anniversary of the date hereof through the Effective Time, (C) the Company may declare and pay a special cash dividend on Company Common Stock with a record date in the fiscal quarter in which the Effective Time occurs in a per share amount up to the amount of the regular cash dividend declared per share by the Company in the immediately preceding fiscal quarter multiplied by a fraction, the numerator of which is the number of days elapsed in the then current fiscal quarter over the total number of days in the then current fiscal quarter, (D) any Subsidiary of the Company may pay dividends to the Company (and any intermediate holding company) and (E) the Company may purchase Company Common Stock for the purpose of funding or providing benefits under employee benefit plans, stock option and other incentive compensation plans, directors plans and stock purchase and dividend reinvestment plans in accordance with past practice or as may be permitted by Section 4.01(i) or 4.01(iv);

(iv)    authorize for issuance, issue, deliver, sell or agree or commit to issue, sell or deliver (whether through the issuance or granting of options, warrants, commitments, subscriptions, rights to purchase or otherwise), pledge or otherwise encumber any shares of its capital stock, any other voting securities or any securities convertible into, or any rights, warrants or options to acquire, any such shares, voting

31

securities or convertible securities or any other securities or equity equivalents (including, without limitation, stock appreciation rights) other than issuances upon exercise of Warrants or Company Rights or in connection with stock-based awards outstanding as of the date hereof or granted after the date hereof in accordance with the terms of any Benefit Plan (including the grant of Restricted Shares pursuant to the Employee Restricted Stock Plan or the issuance of DSUs pursuant to the Deferred Director Plan) or as permitted under Section 4.01(i);

(v)     amend its Charter Documents;

(vi)     acquire (x) by merging or consolidating with, or by purchasing a substantial portion of the assets of, or by any other manner, any business or any corporation, partnership, joint venture, association or other business organization or division thereof or (y) any assets, including real estate, except (A) acquisitions of assets (other than capital expenditures) in the ordinary course of business; and (B) the making of capital expenditures (1) in accordance with, and in an amount not materially greater than, the Company's capital expenditures plan set forth in Section 4.01(vi) of the Company Disclosure Letter, (2) in connection with the repair or replacement of facilities destroyed or damaged due to casualty or accident (whether or not covered by insurance) or (3) otherwise, in an aggregate amount for all such capital expenditures made pursuant to this clause (3) not to exceed US$20 million;

(vii)     pay, discharge, settle or satisfy any claims, liabilities, obligations or litigation (absolute, accrued, asserted or unasserted, contingent or otherwise), other than the payment, discharge, settlement or satisfaction, in the ordinary course of business or in accordance with their terms;

(viii)     make or rescind any Tax elections that, individually or in the aggregate, could be reasonably likely to adversely affect in any material respect the Tax liability or Tax attributes of the Company or its Significant Subsidiaries, settle or compromise any material income tax liability or, except as required by applicable Law, materially change any method of accounting for Tax purposes or prepare or file any Return in a manner inconsistent with past practice;

(ix)     incur, assume or guarantee any indebtedness for borrowed money or enter into any "keep well" or other agreement to maintain any financial condition of another person or enter into any arrangement having the economic effect of any of the foregoing (including any capital leases, "synthetic" leases or conditional sale or other title retention agreements), other than (1) in the ordinary course of business consistent with past practice (including, without limitation, under the Credit Agreement), (2) borrowings made to finance capital expenditures and other acquisitions permitted pursuant to clause (vi) above, (3) borrowings made in connection with the refinancing of any indebtedness existing on the date hereof (including, without limitation, the Senior Notes and the Company Credit Facility) or permitted to be incurred hereunder and that will result in "investment-grade" style covenants (including with respect to restrictions on dividend payments and "change of control" provisions), (4) borrowings in an amount not

32

materially greater than as set forth in Section 4.01(ix) of the Company Disclosure Letter and (5) other borrowings in an aggregate amount not to exceed US$20 million;

(x)     other than in the ordinary course of business consistent with past practice and on terms not materially adverse to the Company and its Subsidiaries, taken as whole, enter into, modify or terminate any Material Contract or waive, release or assign any rights or claims or exercise any options thereunder;

(xi)     not make or implement any changes to the Company's or its Subsidiaries rates or charges, standards of service or execute any agreement with respect thereto except (1) in the ordinary course of business consistent with past practice, (2) as required under the Settlement Agreement or the Consent Order or (3) as required by a Governmental Entity of competent jurisdiction. The Company shall, and shall cause its Subsidiaries to, deliver to Parent a copy of each such filing or agreement at least four (4) Business Days prior to the filing or execution thereof;

(xii)     make any material changes in its accounting methods, except (i) as required by changes in GAAP (or any interpretation thereof) or Regulation S-X of the SEC, in each case as required by the Company's independent public accountants, (ii) as may be required by a change in applicable Law, (iii) as disclosed in the Company SEC Documents filed prior to the date hereof, (iv) or as required by a Governmental Entity (including the FASB or other similar organization);

(xiii)     amend, modify or waive any material provision of the Company's risk management program as currently in effect;

(xiv)     other than as contemplated by this Agreement in connection with the Merger or as required pursuant to a decree, temporary restraining order, preliminary or permanent injunction or other order issued by any Governmental Entity of competent jurisdiction terminate, amend, modify or waive any provision of (1) any confidentiality or standstill agreement in respect of the Company and its Subsidiaries to which it is a party or (2) the Company's Rights Agreement;

(xv)     fail to maintain in full force and effect or fail to use commercially reasonable efforts to, replace with financial responsible insurers, or renew, the Insurance Policies existing as of the date hereof;

(xvi)     enter into any agreements that limit or otherwise restrict the Company or any of its Subsidiaries or any successor thereto from engaging or competing, in any material respect, in any line of business or in any geographic area; or

(xvii)     authorize, or commit or agree to take, any of the foregoing actions.

SECTION 4.02     Control of Other Party's Business.  Nothing contained in this Agreement shall give the Company, directly or indirectly, the right to control or direct Parent's operations prior to the Effective Time. Nothing contained in this Agreement shall give Parent, directly or indirectly, the right to control or direct the Company's operations prior to the Effective Time. Prior to the Effective Time, each of the Company and Parent shall exercise,

33

consistent with the terms and conditions of this Agreement, complete control and supervision over its respective operations.

**ARTICLE V**

**ADDITIONAL AGREEMENTS**

SECTION 5.01     Preparation of Proxy Statement; Stockholders' Meeting.

(a)     As soon as reasonably practicable following the date of this Agreement, but in no event later than forty-five (45) days after the date hereof, the Company shall prepare and file with the SEC the Proxy Statement, and the Company shall use all commercially reasonable efforts to respond as promptly as practicable to any comments of the SEC with respect thereto and to cause the Proxy Statement to be mailed to the Company Stockholders as promptly as practicable following the date of this Agreement. The Company shall promptly notify Parent upon the receipt of any comments from the SEC or the staff of the SEC or any request from the SEC or the staff of the SEC for amendments or supplements to the Proxy Statement and shall provide Parent with copies of all correspondence between the Company and its Representatives, on the one hand, and the SEC and the staff of the SEC, on the other hand, relating to the Proxy Statement. Notwithstanding the foregoing, prior to filing or mailing the Proxy Statement or responding to any comments of the SEC or the staff of the SEC with respect thereto, the Company (i) shall provide Parent a reasonable opportunity to review and comment on such document or response and (ii) shall include in such document or response all comments reasonably proposed by Parent. Whenever any event occurs which is required to be set forth in an amendment or supplement to the Proxy Statement, the Company or Parent, as the case may be, will promptly inform the other of such occurrence and cooperate in filing with the SEC and/or mailing to Company Stockholders such amendment and supplement.

(b)     The Company shall, as soon as reasonably practicable following the date of this Agreement, establish a record date for, duly call, give notice of, convene and hold the Stockholders' Meeting. Subject to Section 5.02, the Company shall, through the Company Board, recommend that the Company Stockholders vote in favor of the adoption of this Agreement and shall include such recommendation in the Proxy Statement. Subject to Section 5.02, the Company will use all reasonable efforts to solicit from Company Stockholders proxies in favor of the adoption of this Agreement. Notwithstanding anything to the contrary contained in this Agreement, the Company may adjourn or postpone the Stockholders' Meeting to the extent necessary to ensure that any necessary supplement or amendment to the Proxy Statement is provided to Company Stockholders in advance of a vote on the adoption of this Agreement or, if as of the time for which the Stockholders' Meeting is originally scheduled (as set forth in the Proxy Statement) there are insufficient shares of Company Common Stock represented (either in person or by proxy) to constitute a quorum necessary to conduct the business of such Stockholders' Meeting; *provided*, *however*, that any Stockholders' Meeting so adjourned or postponed shall be held as promptly as permitted by the Charter Documents and applicable Law.

34

SECTION 5.02    No Solicitation.

(a)    Subject to the remainder of this Section 5.02, from the date of this Agreement until the earlier of the Effective Time and the termination of this Agreement pursuant to Article VII, the Company shall not, and shall use its reasonable best efforts not to permit any Representative of the Company or its Subsidiaries to, (i) solicit, initiate or knowingly encourage, directly or indirectly, the submission of any Acquisition Proposal (as defined below), (ii) enter into any agreement with respect to any Acquisition Proposal, or (iii) participate in any discussions or negotiations regarding, or furnish to any person any non-public information with respect to, or knowingly take any other action to, directly or indirectly, facilitate any inquiries or the making of any proposal that constitutes, or may reasonably be expected to lead to, any Acquisition Proposal.

(b)    Notwithstanding anything to the contrary in this Agreement, the Company may, in response to an Acquisition Proposal that was not the result of any actions prohibited in paragraph (a) above and that was received at any time prior to the receipt of the Company Stockholder Approval, and which the Company Board determines, in good faith, after consultation with its outside legal counsel and financial advisor, may reasonably be expected to lead to a Superior Proposal (as defined below) and the following actions are required for the Company Board to act in a manner consistent with its fiduciary duties to the Company Stockholders under applicable Law, (x) enter into a customary confidentiality agreement with the person making such Acquisition Proposal having terms and conditions not in the aggregate materially more favorable to such person than the terms of the Confidentiality Agreement are to Parent, (y) furnish, and authorize and permit its Representatives to furnish, information with respect to the Company and its Subsidiaries to the person making such Acquisition Proposal and its Representatives pursuant to such customary confidentiality agreement and (z) participate in discussions or negotiations with such person and its Representatives regarding any Acquisition Proposal; *provided, however*, that the Company shall promptly provide to Parent any non-public information concerning the Company or any Subsidiary that is provided to the person making such Acquisition Proposal or its Representatives which was not previously provided to Parent; *provided further*, *however*, that the Company shall also promptly (and in any event within 48 hours) notify Parent of the receipt of each Acquisition Proposal, set forth in reasonable detail the material terms and conditions of the Acquisition Proposal (including, without limitation, information relating to the financing) and, to the extent not prohibited by any confidentiality agreement or other similar agreement in existence as of the date of this Agreement, identify the party submitting the Acquisition Proposal, and thereafter shall keep Parent reasonably informed of the status and material terms and conditions of such Acquisition Proposal.

(c)    Neither the Company Board nor any committee thereof shall (i) withdraw (or modify in a manner adverse to Parent), or publicly propose to withdraw (or modify in a manner adverse to Parent), the recommendation of this Agreement by the Company Board or any such committee, (ii) approve or recommend, or publicly propose to approve or recommend, the approval or adoption of any Acquisition Proposal, or resolve or agree to take any such action, or (iii) cause or permit the Company or any of its Subsidiaries to execute or enter into, any letter of intent, memorandum of understanding, agreement in principle, merger agreement, acquisition agreement, option agreement, joint venture agreement, partnership agreement or other similar agreement constituting or related to, or that is intended to or may reasonably be expected to lead

35

to, any Acquisition Proposal, other than any confidentiality agreement referred to in Section 5.02(b).

    (d)    Notwithstanding the foregoing, at any time prior to the time when the Company Stockholder Approval has been obtained:

    (i)    upon having received an Acquisition Proposal that the Company Board concludes constitutes a Superior Proposal, the Company Board may withhold, withdraw or modify its recommendation of this Agreement and the Merger, approve or recommend the Superior Proposal or terminate this Agreement pursuant to Section 7.01(c) and shall promptly notify Parent in writing of any such determination.

    (ii)    In circumstances other than as provided in Section 5.02(d)(i) above, the Company Board may, if it determines in good faith, after consulting with outside legal counsel, that the failure to take such action could result in a breach of the Company Board's fiduciary obligations under applicable Law, withhold, withdraw or modify, or propose publicly to withhold, withdraw or modify, the recommendation by the Company Board or any committee thereof of this Agreement and the Merger, but only after (A) the Company has notified Parent in writing that the Company Board is prepared to make the determination set forth in this clause (ii), (B) for a period of five (5) Business Days following Parent's receipt of the notice set forth in clause (A) of this sentence, the Company negotiates with Parent in good faith to make such adjustments to the terms and conditions of this Agreement as would enable the Company Board to proceed with its recommendation of this Agreement and the Merger and (C) at the end of such five (5) Business Day period the Company Board maintains its determination described in this clause (ii) (after taking in account such adjustments to the terms and conditions of this Agreement).

    (e)    Nothing contained in this Section 5.02 shall prohibit the Company from taking and disclosing to the Company Stockholders a position contemplated by Rule 14d-9 or Rule 14e-2(a) promulgated under the Exchange Act or from making any required disclosure to the Company Stockholders if, in the good faith judgment of the Company Board, after consultation with outside legal counsel, failure so to disclose would be inconsistent with its fiduciary obligations under applicable Law.

    For purposes of this Agreement, "Acquisition Proposal" means any inquiry, proposal or offer from any person (other than Parent Group) relating to (i) any direct or indirect acquisition or purchase of more than 20% of the outstanding shares of Company Common Stock; (ii) any tender offer or exchange offer that, if consummated, would result in any person beneficially owning more than 20% of the outstanding shares of Company Common Stock; (iii) the acquisition of assets of the Company or its Subsidiaries representing more than 20% of the consolidated assets of the Company; and (iv) a merger, consolidation, business combination, recapitalization, liquidation, dissolution or other similar transaction involving the Company or any Significant Subsidiary, in each case other than the transactions contemplated by this Agreement.

    For purposes of this Agreement, "Superior Proposal" means an Acquisition

Proposal for more than 50% of the equity interest in, or more than 50% of the consolidated assets of, the Company or that provides for a merger between the Company and another person as a result of which holders of equity interests of such person would own more than 50% of the equity interests of the entity surviving or resulting from such merger, and that the Company Board determines in its good faith judgment, after consideration of all relevant material terms of such proposal with its outside legal counsel and financial advisor, is (x) reasonably capable of being completed, taking into account all legal, financial, regulatory and other aspects of the Acquisition Proposal and the person submitting such proposal and (y) more favorable to the Company Stockholders from a financial point of view than the Merger and the other transactions contemplated by this Agreement.

SECTION 5.03    Access to Information; Confidentiality.    To the extent permitted by applicable Law, the Company agrees that upon reasonable notice it shall (and shall cause its Significant Subsidiaries to) afford Parent Group's Representatives reasonable access, during normal business hours throughout the period prior to the Effective Time, to such information regarding the Company and its Subsidiaries as may reasonably be requested by Parent and shall cause its executive officers to be reasonably available to Parent Group to respond to reasonable questions regarding such information and, if requested, the Company agrees to assist Parent and its Representatives in developing a transition or integration plan to be utilized by Parent and its Representatives following the consummation of the Merger and the other transactions contemplated by this Agreement; *provided, however* , that the Company may restrict the foregoing access and assistance to the extent that, in the reasonable judgment of the Company, (A) any applicable Law requires the Company or its Subsidiaries to restrict or prohibit access to any such properties or information, (B) the information is subject to confidentiality obligations to a third party ( *provided* , that the Company shall use its best efforts to obtain a waiver of such confidentiality obligations to permit Parent Group to have access) or (C) disclosure of any such information or document could result in the loss of attorney-client privilege; *provided further, however* , that with respect to this clause (C), if requested by Parent, the Company will enter into joint defense agreements or other arrangements with Parent to allow such disclosure, but only if the Company determines, with the advice of its outside legal counsel, but in its sole discretion, that so doing will fully preserve the attorney-client privilege; *provided further* , *however* , that any information provided to Parent Group pursuant to this Section 5.03 shall be subject to the Confidentiality Agreement, the terms of which shall continue to apply, except as otherwise agreed by the Company, notwithstanding termination of this Agreement. In the event of any conflict between the terms of this Section 5.03 (other than clause (C) above) and the terms of the Confidentiality Agreement, the terms of the Confidentiality Agreement shall control. No review of information pursuant to this Agreement will affect any of the representations or warranties of the parties hereto contained in this Agreement or the conditions hereunder to the obligations of the parties hereto.

SECTION 5.04    Regulatory Matters; Reasonable Best Efforts. (a)    Each party hereto shall cooperate and promptly prepare and file all necessary documentation to effect all necessary applications, notices, petitions and filings, and shall use reasonable best efforts to take or cause to be taken all actions, and do or cause to be done all things, in order to obtain all approvals and authorizations of all Governmental Entities, necessary or advisable to consummate and make effective, in the most expeditious manner reasonably practicable, the Merger and the other transactions contemplated by this Agreement, including the Required Statutory Approvals

37

and the filing of a report with the BEA pursuant to the IISA. The Company shall have the right to review and approve in advance all characterizations of the information relating to the Company, and Parent shall have the right to review and approve in advance all characterizations of the information relating to Parent Group, in either case, that appear in any application, notice, petition or filing made in connection with the Merger or the other transactions contemplated by this Agreement, it being understood and agreed that neither party shall unreasonably withhold or delay its approval. Parent Group and the Company agree that they will (i) consult and cooperate with each other with respect to the obtaining of all such necessary approvals and authorizations of Governmental Entities and in connection with any investigation or other inquiry, including any proceedings initiated by a third party, (ii) promptly inform the other party of any communication received by such party from, or given by such party to, any Governmental Entity regarding any of the transactions contemplated hereby, (iii) permit the other party, or the other party's legal counsel, to review any communication given by it to, and consult with each other in advance of any meeting or conference with any Governmental Entity and (iv) to the extent agreed or not objected to by the relevant Governmental Entity, give the other party the opportunity to attend and participate in such meetings and conferences.

(b)     Upon the terms and subject to the conditions set forth in this Agreement, each of the parties agrees to use its reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other parties in doing, all things reasonably necessary or advisable to consummate and make effective, in the most expeditious manner reasonably practicable, the Merger and the other transactions contemplated by this Agreement, including (i) the defending of any lawsuits or other legal proceedings, whether judicial or administrative, challenging this Agreement or the consummation of the transactions contemplated by this Agreement, including seeking to have any stay or temporary restraining order entered by any court or other Governmental Entity vacated or reversed, and (ii) the execution and delivery of any additional instruments necessary to consummate the transactions contemplated by this Agreement. Notwithstanding the foregoing, as used in this Section 5.04, " reasonable best efforts " shall not include nor require any party to (A) sell, or agree to sell, hold or agree to hold separate, or otherwise dispose or agree to dispose of any asset, in each case if such sale, separation or disposition or agreement with respect thereto would reasonably be expected to have a Material Adverse Effect or Parent Material Adverse Effect (as applicable), or (B) conduct or agree to conduct its business in any particular manner if such conduct or agreement with respect thereto would reasonably be expected to have a Material Adverse Effect or Parent Material Adverse Effect (as applicable).

(c)     Parent Group shall not, and shall cause their respective Subsidiaries not to, enter into, engage in or agree to engage in any transaction or series of transactions that would present a significant risk of making it more difficult for Parent Group or the Company to obtain any approval or authorization required in connection with the Merger or otherwise prevent or materially delay the consummation of the Merger and the other transactions contemplated hereby.

(d)     Parent Group shall not, and shall cause their respective Subsidiaries not to, enter into, engage in or agree to engage in any transaction or series of transactions that would prevent Parent Group and the Surviving Corporation from complying with the Settlement Agreement, including the Consent Order, and the Statement of Factors.

38

SECTION 5.05     Fees and Expenses.  Subject to Section 7.02, whether or not the Merger is consummated, all Expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such Expenses; *provided , however* , that each of Parent Group and the Company shall bear and pay one-half of the costs incurred in connection with the filing fees with respect to the pre-merger notification and report forms under the HSR Act; *provided further , however* , that Parent shall pay all Expenses incurred in connection with the preparation and filing of all applications, notices, registrations, declarations, petitions and filings with any Governmental Entity in connection with the Required Statutory Approvals.

SECTION 5.06     Indemnification; Directors' and Officers' Insurance.

(a)     Following the Effective Time, Parent, Holding Company and Holdings shall cause the Surviving Corporation to, and the Surviving Corporation shall, to the fullest extent permitted by Law, indemnify and hold harmless, and provide advancement of expenses to, all past and present directors, officers, employees and agents of the Company and its Subsidiaries and all other persons who may presently serve or have served at the request of the Company or any of its Subsidiaries as a director, officer, employee or agent of another person, including as a fiduciary with respect to an employee benefit plan (the " Indemnified Parties "), in each case, for acts or failures to act in such capacity, against any costs or expenses (including reasonable attorney's fees), judgments, amounts paid in settlement, fines, losses, claims, damages or liabilities incurred in connection with any claim, action, suit, proceeding or investigation, whether civil or criminal, administrative or investigative, arising out of or pertaining to matters existing or occurring at or prior to the Effective Time (including for acts or omissions occurring in connection with the approval of this Agreement and the consummation of the Merger and the other transactions contemplated hereby), whether asserted or claimed prior to, at or after the Effective Time, to the same extent such individuals are indemnified or have the right to advancement of expenses as of the date of this Agreement by the Company or such Subsidiary pursuant to its Charter Documents, or similar organizational documents, as applicable, and the indemnification agreements identified in Section 5.06(a) of the Company Disclosure Letter.

(b)     Any Indemnified Party wishing to claim indemnification under paragraph (a) of this Section 5.06, upon receiving written notification of any such claim, action, suit, proceeding or investigation, shall promptly notify Parent or the Surviving Corporation thereof, but the failure to so notify shall not relieve the Surviving Corporation of any liability it may have to such Indemnified Party except if, and only to the extent that, such failure materially and irreversibly prejudices Parent. In the event of any such claim, action, suit, proceeding or investigation, (i) Parent, Holding Company and Holdings shall cause the Surviving Corporation to, and the Surviving Corporation shall, pay the fees and expenses of counsel selected by the Indemnified Party, promptly after statements therefor are received, and otherwise advance to such Indemnified Party upon request reimbursement of documented expenses reasonably incurred, and (ii) Parent, Holding Company and Holdings shall cause the Surviving Corporation to, and the Surviving Corporation shall, cooperate in the defense of any such matter.

(c)     Parent, Holding Company and Holdings shall cause the Surviving Corporation to, and the Surviving Corporation shall, maintain a policy or policies of officers' and directors' liability insurance and fiduciary liability insurance for acts and omissions occurring

prior to the Effective Time ("D&O Insurance") from an insurance carrier with the same or better credit rating as the Company's current insurance carrier with coverage in amount and scope at least as favorable as the Company's existing directors' and officers' liability insurance and fiduciary liability insurance coverage for the period ending on the later of (i) six (6) years and one (1) month after the Effective Time and (ii) the applicable statute of limitations for such acts and omissions; *provided , however ,* that in lieu of such coverage, the Surviving Corporation may substitute a prepaid "tail" policy for such coverage, which it may cause the Company to obtain prior to the Closing.

(d)    In determining whether an Indemnified Party is entitled to indemnification under Section 5.06(a), if requested by such Indemnified Party, such determination shall be made in a written opinion by independent counsel mutually acceptable to Parent and the Indemnified Party, which counsel shall not have, at the time of such determination, otherwise performed services for the Surviving Corporation or Parent or their respective Subsidiaries or affiliates during the preceding three (3) years.

(e)    If Parent, Holding Company, Holdings or the Surviving Corporation or any of their respective successors or assigns shall (i) consolidate with or merge into any other person and shall not be the continuing or surviving corporation or entity of such consolidation or merger or (ii) transfers all or substantially all of its properties and assets to any person, then, and in each such case, proper provisions shall be made so that the successors and assigns of Parent, Holding Company, Holdings or the Surviving Corporation, as the case may be, shall assume all of the obligations of Parent, Holding Company, Holdings and the Surviving Corporation set forth in this Section 5.06.

(f)    The rights of each Indemnified Party under this Section 5.06 shall be in addition to any right such person might have under the Charter Documents of the Company or the similar organizational documents of any of its Subsidiaries, or under applicable Law (including the DGCL), or under any agreement of any Indemnified Party with the Company or its Subsidiaries. The provisions of this Section 5.06 are intended to be for the benefit of, and shall be enforceable by, each of the Indemnified Parties, their respective heirs and representatives.

(g)    The obligations of Parent, Holding Company, Holdings and the Surviving Corporation under this Section 5.06 shall not be terminated or modified in such a manner as to adversely affect any indemnitee to whom this Section 5.06 applies without the written consent of such affected indemnitee (it being expressly agreed that the indemnitees to whom this Section 5.06 applies shall be third-party beneficiaries of this Section 5.06).

(h)    The Company (or, after the Effective Time, the Surviving Corporation) shall indemnify any Indemnified Party against all reasonable costs and expenses (including reasonable attorneys' fees and expenses), such amounts to be payable in advance upon request as provided in this Section 5.06, relating to the enforcement of such Indemnified Party's rights under this Section 5.06 or under the Charter Documents or existing indemnification agreements. Any amounts due pursuant to the preceding sentence shall be payable upon request by the Indemnified Party.

SECTION 5.07    Public Announcements.    Parent Group and the Company shall use commercially reasonable efforts to develop a joint communications plan and each party shall use commercially reasonable efforts to ensure that all press releases and other public statements with respect to the transactions contemplated hereby shall be consistent with such joint communications plan. Unless otherwise required by applicable Law or by obligations pursuant to any listing agreement with or rules of any securities exchange, and except for any matters referred to in Section 5.02(c) or 5.02(d), (x) prior to the issuance by the Company of any press release or other public statement or disclosure concerning this Agreement or the transactions contemplated hereby, the Company shall obtain the consent of Parent, which consent shall not be unreasonably withheld or delayed, and (y) prior to the issuance by Parent Group of any press release or other public statement or disclosure concerning this Agreement or the transactions contemplated hereby, Parent Group shall obtain the consent of the Company, which consent shall not be unreasonably withheld or delayed. In addition to the foregoing, except to the extent disclosed in or consistent with the Proxy Statement in accordance with the provisions of Section 5.01, or unless otherwise required by applicable Law or by obligations pursuant to any listing agreement with or rules of any securities exchange or NASDAQ, neither Parent Group nor the Company shall issue any press release or otherwise make any public statement or disclosure concerning the other party or the other party's business, financial condition or results of operations without the consent of the other party, which consent shall not be unreasonably withheld or delayed.

SECTION 5.08    Transfer Taxes.    All Transfer Taxes shall be paid by either Sub or the Surviving Corporation, and the Company shall cooperate with Parent Group in preparing, executing and timely filing any Returns with respect to such Transfer Taxes.

SECTION 5.09    State Takeover Laws.    If any "fair price," "business combination" or "control share acquisition" statute or other similar statute or regulation is or may become applicable to the transactions contemplated hereby, the Company and Parent Group shall each take such actions as are necessary so that the transactions contemplated hereby may be consummated as promptly as practicable on the terms contemplated hereby and otherwise act to eliminate or minimize the effects of any such statute or regulation on the transactions contemplated hereby.

SECTION 5.10    Notification of Certain Matters.    The Company shall give prompt notice to Parent, and Parent shall give prompt notice to the Company, of the occurrence, or non-occurrence, of any event the occurrence, or non-occurrence, of which is likely to result in any failure of such party at Closing to comply with or satisfy any condition to be satisfied hereunder; *provided, however* , that the delivery of any notice pursuant to this Section 5.10 shall not limit or otherwise affect the remedies available hereunder to any of the parties sending or receiving such notice.

SECTION 5.11    Employees.

(a)    For the period commencing at the Effective Time and ending no earlier than the third (3rd) anniversary thereof, Parent, Holding Company and Holdings shall cause the Surviving Corporation and its Subsidiaries to maintain, and the Surviving Corporation and its Subsidiaries shall maintain, compensation, employee benefit plans and arrangements and

41

severance pay and benefits (the "Comparable Benefits") for employees of the Company and its Subsidiaries ("Affected Employees") that are, in the aggregate, no less favorable than as provided under the compensation arrangements, Benefit Plans, severance plans and current policies or practices of the Company and its Subsidiaries as in effect on the date hereof; *provided , however*, that, subject to obligations under applicable Law and applicable collective bargaining agreements, commencing on the second (2nd) anniversary of the Effective Time, the Surviving Corporation and its Subsidiaries shall not have to maintain Comparable Benefits if a Governmental Entity of competent jurisdiction determines that such Comparable Benefits are unreasonably high and, as result, the Surviving Corporation determines in its good faith judgment (after consultation with such Governmental Entity) that the Comparable Benefits would have a negative impact on a rate review or similar proceeding.

(b)    Parent, Holding Company and Holdings shall cause the Surviving Corporation and its Subsidiaries to honor, and the Surviving Corporation and its Subsidiaries shall honor, all Benefit Plans (including any obligations with respect to deferral elections previously made pursuant to such Benefit Plan that are not terminated and settled as of the Effective Time) and other contractual commitments, including, without limitation, severance and change-in-control agreements, in effect immediately prior to the Effective Time between the Company and Affected Employees, retirees or former employees of the Company, as set forth on Section 5.11(b) of the Company Disclosure Letter. In addition to and without limiting the generality of the foregoing, Parent, Holding Company and Holdings shall cause the Surviving Corporation and its Subsidiaries to, and the Surviving Corporation and its Subsidiaries shall, (i) pay all annual bonuses that are payable to the Affected Employees, retirees and former employees of the Company and its Subsidiaries with respect to the fiscal year in which the Effective Time occurs, including bonuses accrued on the consolidated financial statements of the Company (whether or not then earned by or vested in Affected Employees) under the Company's 2006 Employee Incentive Plan (and any successor to such plan for subsequent years), (ii) continue the Deferred Director Plan until such time as all outstanding obligations thereunder are satisfied in accordance with their terms and (iii) honor all vacation, holiday, sickness and personal days accrued by Affected Employees and, to the extent applicable, former employees of the Company or any Subsidiary as of the Effective Time.

(c)    Subject to its obligations under applicable Law and applicable collective bargaining agreements, Parent, Holding Company and Holdings shall cause the Surviving Corporation and its Subsidiaries to give, and the Surviving Corporation and its Subsidiaries shall give, all Affected Employees full credit for purposes of benefit accrual, eligibility and vesting under any employee benefit plan arrangement maintained by Parent, Holding Company, Holdings or the Surviving Corporation or any Subsidiary thereof for such Affected Employees' service with the Company or any Subsidiary (or any prior employer) to the same extent recognized by the Company or any Subsidiary or any Benefit Plan immediately prior to the Effective Time; *provided , however*, that such crediting of service shall not result in any duplication of benefits.

(d)    Subject to its obligations under applicable Law and applicable collective bargaining agreements, Parent, Holding Company and Holdings shall cause the Surviving Corporation and its Subsidiaries to, and the Surviving Corporation and its Subsidiaries shall, (i) with respect to any life, health or long-term disability insurance plan, waive all limitations as to

42

preexisting conditions, exclusions and waiting periods with respect to participation and coverage requirements under any welfare benefit plan established to replace any Benefit Plan in which such Affected Employees may be eligible to participate after the Effective Time, other than limitations or waiting periods that are already in effect with respect to such Affected Employee and that have not been satisfied as of the Effective Time under any plan maintained for the Affected Employee immediately prior to the Effective Time, (ii) with respect to any health insurance plan, provide each Affected Employee with credit for any co-payments and deductibles paid prior to the Effective Time in satisfying any applicable deductible or out-of-pocket requirements under any such plan that such Affected Employees are eligible to participate in after the Effective Time and (iii) with respect to any life or long-term disability plan, waive any medical certification otherwise required in order to assure the continuation of coverage at a level not less than that in effect immediately prior to the implementation of such plan (but subject to any overall limit on the maximum amount of coverage under such plans).

(e)     For the period commencing at the Effective Time and ending no earlier than the second (2nd) anniversary thereof, (i) Parent, Holding Company and Holdings shall cause the Surviving Corporation and its Subsidiaries to employ, and the Surviving Corporation and its Subsidiaries shall employ, in the aggregate, approximately the same number of employees as employed by the Company immediately prior to the Effective Time, including substantially all of the Affected Employees, and (ii) Parent, Holding Company and Holdings shall not permit the Surviving Corporation to effect, and the Surviving Corporation shall not effect, any material reductions in employee work force of the Surviving Corporation and its Subsidiaries. Notwithstanding sub-clauses (i) and (ii) above, the Surviving Corporation and its Subsidiaries may terminate an Affected Employee for breach of employment terms, fraud, theft and misconduct.

SECTION 5.12     Delisting.  Each of the parties agrees to cooperate with each other in taking, or causing to be taken, all actions necessary to delist the Company Common Stock from NASDAQ and to terminate registration under the Exchange Act; *provided*, *however*, that such delisting and termination shall not be effective until after the Effective Time.

SECTION 5.13     Rule 16b-3.  Prior to the Effective Time, the Company may approve, in accordance with the procedures set forth in Rule 16b-3 promulgated under the Exchange Act and certain SEC No-Action Letters, any dispositions of equity securities of the Company (including derivative securities with respect to equity securities of the Company) resulting from the transactions contemplated by this Agreement by each officer or director of the Company who is subject to Section 16 of the Exchange Act with respect to equity securities of the Company.

SECTION 5.14     Financing.

(a)     Parent and Holding Company shall cause Holdings and Sub to use its reasonable best efforts to obtain the full amount of the financing contained in the Financing Commitments consistent with the terms specified and described in the Financing Commitments delivered to the Company by Parent Group; *provided*, *however*, it is expressly understood and agreed that Parent Group's obligations to consummate the Merger on the terms and conditions specified herein are not subject to a financing condition or the results of Parent Group's efforts to

43

obtain the full amount of the financing required to effect the Closing pursuant to Section 1.03 hereof and to satisfy their obligations under Article II hereof, including, depositing (or causing to be deposited) with the Paying Agent and LaSalle sufficient funds to make all payments pursuant to Article II hereof.

(b)     Parent Group will keep the Company reasonably informed of the status of the Financing Commitments and the Available Cash and any material developments with respect thereto.

(c)     The Company shall provide, and will cause its officers and employees to provide, all necessary cooperation and information in connection with the arrangement and obtaining of the financing contained in the Financing Commitment as may be reasonably requested by Parent, including, without limitation, facilitating customary due diligence and arranging senior officers, as selected by Parent, to meet with prospective lenders and investors in customary presentations (including "road show" presentations and sessions with rating agencies), cooperation in the preparation and filing of any offering documents, the issuance of any comfort letter, the receipt of any auditors' consents, certifications of the chief financial officer with respect to solvency matters, the delivery of consolidated pro forma financial information and the use of commercially reasonable efforts to cause each independent auditor to so cooperate or otherwise. Parent shall not amend, supplement, modify or terminate (whether unilaterally or by mutual consent), in a manner either materially adverse to the Company or to the consummation of the Merger, any Financing Commitment, or waive any rights thereunder, prior to the termination of this Agreement, without the written consent of the Company.

(d)     The Company acknowledges that, prior to the Effective Time, Parent may, and Parent may request that the Company and its Subsidiaries, take actions with respect to (i) prepaying, redeeming and/or obtaining the consent of the holders of the Company's outstanding Senior Notes in accordance with the terms of the indenture pursuant to which such notes were issued or (ii) restructuring the Company Credit Facility. The Company agrees to cooperate with such efforts and provide such information or take such actions as may be reasonably requested by Parent Group with respect thereto, including call for prepayment or redemption, or to renegotiate, as the case may be, the Senior Notes; *provided*, that (i) no such prepayment or redemption shall actually be made until substantially contemporaneous with or after, or, in the case of the call for prepayment, immediately prior to or contemporaneous with, the Effective Time and (ii) no such call for prepayment or redemption shall be required prior to the Effective Time unless the Company is permitted to condition such call for prepayment or redemption on the occurrence of the Effective Time or to withdraw such call for prepayment or redemption if the Effective Time shall not have occurred on or prior to the applicable scheduled prepayment or redemption date; and *provided*, *further*, that the Company shall not be required to enter into any bank commitment that will become effective prior to the Effective Time.  .

SECTION 5.15     No Agreements with Company Stockholders.     Neither Parent, Holding Company, Holdings nor Sub will, nor will they authorize or permit any of their affiliates or Representatives to, enter into any agreement, arrangement or understanding (in each case, whether oral or written), or to authorize, commit or agree to enter into any agreement, arrangement or understanding (in each case, whether oral or written), pursuant to which any Company Stockholder would be entitled to receive consideration of a different amount or nature

44

than the Merger Consideration or pursuant to which a Company Stockholder agrees to vote to adopt this Agreement or agrees to vote against any Superior Proposal.

SECTION 5.16     Letter of Credit.

(a)     In consideration for the Company entering into, and as an inducement and condition to the willingness of the Company to enter into, this Agreement, Parent Group has delivered to the Company an irrevocable letter of credit duly issued by Australia and New Zealand Banking Group Limited, New York Branch in an amount equal to US$70,000,000 with a termination date of April 25, 2007 in the form of Exhibit A hereto (the "Letter of Credit").

(b)     No later than 5:00 P.M. New York City time on January 25, 2007 (the "LC Date"), Parent Group shall deliver, or caused to be delivered, to the Company an irrevocable substitute letter of credit duly issued by Australia and New Zealand Banking Group Limited, New York Branch, or another financial institution reasonably acceptable to the Company, in a form exactly the same as Exhibit A hereto, except that such substitute letter of credit shall have a termination date that is thirty (30) Business Days following the Final Date (the "Substitute Letter of Credit"). The Substitute Letter of Credit shall be in full force and effect. There shall be no conditions precedent or other contingencies related to the funding of the full amount of the Substitute Letter of Credit, other than as set forth in, or contemplated by, the Substitute Letter of Credit. As of the date of delivery of the Substitute Letter of Credit, no event shall have occurred which, with or without notice, lapse of time or both, shall constitute a default or breach on the part of Parent, Holding Company, Holdings or Sub with respect to any term or condition of the Substitute Letter of Credit. If the Substitute Letter of Credit is delivered to the Company prior to an LC Default Draw (as defined below), the Company will promptly return the Letter of Credit to Parent Group.

(c)     The Company and Parent Group agree that if Parent Group fails to deliver, or fails to cause to be delivered, the Substitute Letter of Credit on or before the LC Date (an "LC Default"), then unless and until Parent Group delivers the Substitute Letter of Credit to the Company, the Company shall have the right to immediately draw (without any further action on the part of Parent Group) upon the Letter of Credit in an amount equal to the Business Interruption Fee (such actual draw by the Company, the "LC Default Draw"); provided, however, that in no event shall a LC Default be considered an event of termination pursuant to Section 7.01 hereof; provided further, however, that a LC Default Draw shall be deemed to be payment of a Business Interruption Fee within the meaning of Section 7.02(c)(i). The LC Default Draw funds shall be held by the Company in a separate interest bearing account, segregated from all other funds of the Company (such account, the "Separate Account"). All LC Default Draw funds, together with all interest thereon (collectively, the "Funds"), shall be held by the Company until the earliest of (i) delivery of a Substitute Letter of Credit, (ii) a Return Event or (iii) a termination of this Agreement as described in Section 7.02(c) hereof. If Parent Group shall deliver the Substitute Letter of Credit to the Company after a LC Default Draw, or there shall have occurred a Return Event, the Company shall within two (2) Business Days return the Funds to Parent Group. In no event shall such return affect the right of the Company to draw upon the Substitute Letter of Credit thereafter in accordance with this Agreement. If a termination of this Agreement as described in Section 7.02(c) hereof shall have occurred, the Company shall have the right to withdraw the Funds from the Separate Account and retain an

45

amount of such Funds equal to the Business Interruption Fee. The Company shall promptly return any excess to the Parent.

(d)      The Letter of Credit or the Substitute Letter of Credit, as the case may be, shall serve as a source of funds for Parent Group's obligations under Section 7.02(c) hereof. The Company agrees to return the Letter of Credit or the Substitute Letter of Credit, as the case may be, to Parent Group (or its designee), upon the earlier to occur of (i) the receipt of the Merger Consideration, Outstanding Dividends and Warrant Consideration by the Paying Agent and the receipt of the Disputed Claims Consideration by LaSalle or, if later, the Effective Time or (ii) the termination of this Agreement under circumstances where the Company is not entitled to the Business Interruption Fee pursuant to Section 7.02 (a " Return Event ").

## ARTICLE VI

## CONDITIONS

SECTION 6.01      Conditions to Each Party's Obligation to Effect the Merger.  The respective obligation of each party to effect the Merger shall be subject to the satisfaction or waiver at or prior to the Closing Date of each of the following conditions:

(a)      Stockholder Approval.  The Company Stockholder Approval shall be obtained.

(b)      No Injunctions or Restraints.    No material statute, rule, regulation, executive order, decree, temporary restraining order, preliminary or permanent injunction or other order issued by any court of competent jurisdiction or other Governmental Entity or other legal restraint or prohibition (collectively, the " Restraints ") shall be in effect (i) having the effect of making the Merger illegal or (ii) otherwise preventing or prohibiting the consummation of the Merger.

(c)      HSR Approval.  The applicable waiting periods (and any extension thereof) under the HSR Act shall have expired or been terminated.

(d)      Governmental and Regulatory Approvals.  Other than the filing provided for under Section 1.04 and filings pursuant to the HSR Act, all consents, approvals and actions of, filings with and notices to any Governmental Entity required of Parent Group, the Company or any of their respective Subsidiaries, including, without limitation, Final Orders with respect to the Required Statutory Approvals, to consummate the Merger and the other transactions contemplated hereby, the failure of which to be obtained or taken would reasonably likely to have a Material Adverse Effect, shall have been obtained and such Final Orders shall not contain any condition, limitation or restriction that would reasonably be likely to result in a Material Adverse Effect, a Parent Material Adverse Effect or a material adverse effect on the financial condition of Parent Group.

SECTION 6.02      Additional Conditions to Obligations of Parent Group.  The obligations of Parent Group to effect the Merger shall be subject to the satisfaction (or waiver by Parent) at or prior to the Effective Time of each of the following additional conditions:

46

(a)    _Representations and Warranties_.    Each of the representations and warranties of the Company set forth in this Agreement shall have been true and correct as of the date hereof and shall be true and correct as of the Closing Date (except as to any such representation or warranty which speaks as of a specific date, which must only be true and correct as of such specific date), except where the failure to be so true and correct (without giving effect to any limitation as to "materiality" or "material adverse effect" or similar terms or phrases in any such representation or warranty) would not, individually or in the aggregate with all such failures, constitute a Material Adverse Effect.

(b)    _Performance of Obligations of the Company_.    The Company shall have performed or complied in all material respects with all material agreements and covenants required to be performed by it under this Agreement at or prior to the Closing Date.

(c)    _Officer's Certificate_.    Parent Group shall have received a certificate signed by an executive officer of the Company, dated the Closing Date, to the effect that the conditions set forth in Sections 6.02(a) and 6.02(b) have been satisfied or waived.

SECTION 6.03    _Additional Conditions to Obligations of the Company_.    The obligations of the Company to effect the Merger shall be subject to the satisfaction (or waiver by the Company) at or prior to the Effective Time of each of the following additional conditions:

(a)    _Representations and Warranties_.    Each of the representations and warranties of Parent Group set forth in this Agreement shall have been true and correct as of the date hereof and shall be true and correct as of the Closing Date (except as to any such representation or warranty which speaks as of a specific date, which must only be true and correct as of such specific date), except where the failure to be so true and correct (without giving effect to any limitation as to "materiality" or "material adverse effect" or similar terms or phrases in any such representation or warranty) would not, individually or in the aggregate with all such failures, constitute a Parent Material Adverse Effect.

(b)    _Performance of Obligations of Parent Group_.    Each constituent of Parent Group shall have performed or complied in all material respects with all material agreements and covenants required to be performed by it under this Agreement at or prior to the Closing Date.

(c)    _Officer's Certificate_.    The Company shall have received certificates signed by an executive officer of each of Parent, Holding Company, Holdings and Sub, dated the Closing Date, to the effect that the conditions set forth in Sections 6.03(a) and 6.03(b) have been satisfied or waived.

**ARTICLE VII**

**TERMINATION, AMENDMENT AND WAIVER**

SECTION 7.01    _Termination_.    This Agreement may be terminated at any time prior to the Effective Time, whether before or after the Company Stockholder Approval shall have been obtained:

47

(a)    by mutual written consent of Parent and the Company, if the Board of Directors of each party so determines by a vote of a majority of the members of its entire Board;

(b)    by either the Company or Parent, if:

(i)    the Company Stockholder Approval shall not have been obtained at a meeting duly convened therefor or at any adjournment or postponement thereof; or

(ii)    any Restraint having any of the effects set forth in Section 6.01(b) shall be in effect and have become final and nonappealable; *provided, however* , that the party seeking to terminate this Agreement shall have used its reasonable best efforts to remove or lift such Restraint; or

(iii)    the Merger shall not have been consummated on or before the date that is twelve (12) months after the date of this Agreement (the " Outside Date ");  provided , that if on the Outside Date the conditions to Closing set forth in Sections 6.01(c) or 6.01(d) shall not have been fulfilled but all other conditions to the Closing shall have been fulfilled or shall be capable of being fulfilled (including in the case of Parent Group, the ability to effect the Closing pursuant to Section 1.03 hereof and to satisfy their obligations under Article II hereof, including depositing (or causing to be deposited) with the Paying Agent and LaSalle sufficient funds to make all payments pursuant to Article II hereof), then either party may (on one or more occasions) extend the Outside Date for up to six (6) months (the " Extended Outside Date ");  provided , further , that, if the Outside Date (as it may be extended to an Extended Outside Date) shall occur during any Final Order Waiting Period, the Outside Date or Extended Outside Date, as the case may be, shall be extended until the third (3 rd ) Business Day after the expiration of such Final Order Waiting Period; provided , further , that either party may terminate this Agreement if the Merger shall not have been consummated on or before the date that is twenty-four (24) months after the date of this Agreement (the " Final Date "); and  provided , further , that the right to terminate this Agreement pursuant to this Section 7.01(b)(iii) shall not be available to any party whose failure to perform any of its obligations under this Agreement results in the failure of the Merger to be consummated by the Outside Date, the Extended Outside Date or the Final Date.

(c)    by the Company prior to when Company Stockholder Approval has been obtained, if the Company Board determines in good faith (after consultation with its outside legal and financial advisors), in the exercise of its fiduciary duties, that an Acquisition Proposal constitutes a Superior Proposal; *provided* , *however* , that the Company may not terminate this Agreement pursuant to this clause (c) until after the fifth (5 th ) Business Day following Parent's receipt of a written notice (a " Notice of Superior Proposal ") from the Company advising Parent that the Company intends to take such action and specifying the reason thereof, including the material terms and conditions of such Superior Proposal and, to the extent not prohibited by any confidentiality agreement or other similar agreement in existence as of the date of this Agreement, identifying the person making such Superior Proposal (it being understood and agreed that in determining whether an Acquisition Proposal constitutes a Superior Proposal, the Company Board shall take into account any changes to the terms and conditions of this Agreement proposed by Parent in response to a Notice of Superior Proposal); *provided further* ,

48

*however*, that the Company's ability to terminate this Agreement pursuant to this clause (c) is conditioned upon the payment by the Company to Parent of any amounts owed by it pursuant to Section 7.02(b).

(d)    by Parent, if, prior to when Company Stockholder Approval has been obtained, the Company Board shall have (i) withheld, withdrawn or materially modified in a manner adverse to Parent, its recommendation of the Merger or this Agreement, (ii) approved or recommended any Acquisition Proposal, (iii) publicly proposed to approve or recommend any Acquisition Proposal or (iv) resolved to effect any of the foregoing;

(e)    by Parent, if the Company breaches or fails to perform any of its representations, warranties or covenants contained in this Agreement, which breach or failure to perform (i) would give rise to the failure of a condition set forth in Section 6.02(a) or 6.02(b) and (ii) cannot be cured by the Outside Date, ( *provided* , that neither Parent nor Sub is then in material breach of any representation, warranty or covenant contained in this Agreement); or

(f)    by the Company, if Parent, Holding Company, Holdings or Sub breaches or fails to perform any of its representations, warranties or covenants contained in this Agreement, which breach or failure to perform (i) would give rise to the failure of a condition set forth in Section 6.03(a) or 6.03(b) and (ii) cannot be cured by the Outside Date ( *provided* , that the Company is not then in material breach of any representation, warranty or covenant contained in this Agreement).

SECTION 7.02    Effect of Termination.

(a)    In the event of a termination of this Agreement pursuant to Section 7.01, this Agreement shall forthwith become null and void and there shall be no liability or obligation on the part of Parent Group or the Company or their respective officers or directors, except with respect to the last proviso of the first sentence of Section 5.03 ( Confidentiality ), Section 5.05 ( Fees and Expenses ), this Section 7.02 ( Effect of Termination ) and Article VIII ( General Provisions ), which provisions shall survive such termination.

(b)    *Termination Fee.*

(i)    In the event that (x) this Agreement is validly terminated pursuant to Section 7.01(c) or (d) or (y) (A) prior to the obtaining of the Company Stockholder approval, an Acquisition Proposal has been publicly proposed and not publicly withdrawn by any person (other than Parent Group or any of their respective affiliates), (B) thereafter this Agreement is terminated by either Parent or the Company pursuant to Section 7.01(b)(iii) (but only if the Stockholders' Meeting has not been held prior to such time) or Section 7.01(b)(i) and (C) any person (other than Parent Group or any of their respective affiliates) shall enter into a definitive agreement to consummate, or consummate, an Acquisition Proposal with the Company within twelve (12) months following the termination of this Agreement, then the Company shall pay to Parent, by wire transfer of same day funds, a termination fee of US$50,000,000 (the " Termination Fee ") on the date such person and the Company enter into such definitive agreement or, if earlier, consummate an Acquisition Proposal, as applicable; *provided* , *however* , that,

49

subject to Section 7.02(b)(ii) below, the Company shall have no liability under this Agreement in the event that the Company pays Parent the Termination Fee; *provided further* , *however* , that for the purpose of this Section 7.02(b)(i)(y)(C), the term " Acquisition Proposal " shall have the meaning assigned to such term in Section 5.02, except that references to "more than 20%" shall be deemed to be references to "more than 50%."

      (ii)      The Company acknowledges that the agreements contained in this Section 7.02 are an integral part of the transactions contemplated by this Agreement, that the damages resulting from the termination of this Agreement under circumstances where a Termination Fee is payable are uncertain and incapable of accurate calculation and that the amounts payable pursuant to Section 7.02(b)(i) are reasonable forecasts of the actual damages which may be incurred and constitute liquidated damages and not a penalty, and that, without these agreements, Parent Group would not enter into this Agreement; accordingly, if the Company fails to promptly pay the Termination Fee, and, in order to obtain such payments Parent Group commences a suit which results in a judgment against the Company for the Termination Fee, the Company shall pay to Parent Group its costs and expenses (including reasonable attorney's fees) in connection with such suit.

      (c)      *Business Interruption Fee.*

      (i)      In the event that this Agreement is validly terminated by the Company pursuant to Section 7.01(f) (including, without limitation, as a result of Parent Group breaching their obligation to effect the Closing pursuant to Section 1.03 hereof or failing to satisfy their obligations under Article II hereof including, depositing (or causing to be deposited) with the Paying Agent and LaSalle sufficient funds to make all payments pursuant to Article II hereof), then Parent Group shall pay US$70,000,000 (the " Business Interruption Fee" ) to the Company. Contemporaneously with such termination, the Company shall be entitled to immediately draw (without any further action on the part of Parent Group) upon the Letter of Credit or the Substitute Letter of Credit, as the case may be, in an amount equal to the Business Interruption Fee. Such amount shall be credited to the payment of the Business Interruption Fee by Parent Group to the Company. If, for any reason, the funds available under the Letter of Credit or the Substitute Letter of Credit, as the case may be, are insufficient to satisfy Parent Group's obligation to pay the Business Interruption Fee, then Parent Group shall pay the balance of the Business Interruption Fee owing to the Company by wire transfer in immediately available funds to an account specified by the Company in writing to Parent as promptly as reasonably practicable (and, in any event, within two (2) Business Days following such termination); *provided* , *however* , that, subject to Section 7.02(c)(ii) below, Parent Group shall have no liability under this Agreement in the event that Parent pays the Company the Business Interruption Fee.

      (ii)      Parent Group acknowledge that the agreements contained in this Section 7.02 are an integral part of the transactions contemplated by this Agreement, that the damages resulting from the termination of this Agreement under circumstances where a Business Interruption Fee is payable are uncertain and incapable of accurate calculation and that the amounts payable pursuant to Section 7.02(c)(i) are reasonable forecasts of

the actual damages which may be incurred and constitute liquidated damages and not a penalty, and that, without these agreements, the Company would not enter into this Agreement; accordingly, if Parent Group fails to promptly pay the Business Interruption Fee, and, in order to obtain such payments the Company commences a suit which results in a judgment against Parent Group for the Business Interruption Fee, Parent shall pay to the Company its costs and expenses (including reasonable attorney's fees) in connection with such suit.

SECTION 7.03    Amendment.  This Agreement may be amended by the parties hereto, by action taken or authorized by their respective boards of directors, at any time before or after approval of the matters presented in connection with the Merger by the Company Stockholders, *provided, however* , that after any such approval, no amendment shall be made which by Law requires further approval by such Company Stockholders without obtaining such further approval of such Company Stockholders. This Agreement may not be amended except by an instrument in writing signed on behalf of each of the parties hereto.

SECTION 7.04    Extension; Waiver.  At any time prior to the Effective Time, each party hereto, by action taken or authorized by its board of directors, may, to the extent legally allowed, (i) extend the time for the performance of any of the obligations or other acts of the other party hereto, (ii) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant to this Agreement or (iii) waive compliance with the agreements or conditions for the benefit of such party contained herein. Any agreement on the part of a party hereto to any such extension or waiver shall be valid only if set forth in a written instrument signed on behalf of such party. The failure of any party hereto to assert any of its rights hereunder or otherwise shall not constitute a waiver of those rights.

## ARTICLE VIII

## GENERAL PROVISIONS

SECTION 8.01    Nonsurvival of Representations and Warranties.  None of the representations, warranties, covenants and other agreements in this Agreement or in any instrument delivered pursuant to this Agreement, including any rights arising out of any breach of such representations, warranties, covenants and other agreements, shall survive the Effective Time, except for those covenants and agreements contained herein and therein (including Section 5.06) that by their terms apply or are to be performed in whole or in part after the Effective Time; *provided* , *however* , that Parent shall have no direct liability with respect to Sections 5.06 and 5.11 after the Effective Time other than in its capacity as the direct or indirect shareholder of Holding Company, Holdings and the Surviving Corporation and then only to the extent of its rights as such shareholder.

SECTION 8.02    Notices.  All notices and other communications hereunder shall be in writing and shall be deemed duly given (a) on the date of delivery if delivered personally, or by telecopy or facsimile, upon confirmation of receipt, (b) on the first Business Day following the date of dispatch if delivered by a recognized next-day courier service, or (c) on the tenth Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid. All notices hereunder shall be delivered as set

51

forth below, or pursuant to such other instructions as may be designated in writing by the party to receive such notice:

        (a)     if to Parent Group to:

BBI US Holdings II Corp.
BBI Glacier Corp.

c/o Babcock & Brown LP

2 Harrison Street
San Francisco, CA 94105

Telephone: (415) 512-1515
Facsimile: (415) 512-1515
Attention: Michael M. Garland

                with copies (which shall not constitute notice) to:

Babcock & Brown Infrastructure Limited
The Chifley Tower, Level 39
2 Chifley Square
Sydney NSW 2000
Australia
Telephone: 61-2-9229-1800

Facsimile: 61-2-9231-5619

Attention: Michael Ryan

                and

LeBoeuf, Lamb, Greene & MacRae LLP

125 West 55th Street

New York, NY 10019-5389

Telephone: (212) 424-8072
Facsimile: (212) 424-8500
Attention: Sheri E. Bloomberg, Esq.

                and

        (b)     if to the Company, to:

NorthWestern Corporation
125 South Dakota Avenue 57104-6403
Telephone: (605) 978-2903
Facsimile: (605) 351-1112
Attention: Michael Hanson, President and CEO

                with copies to (which shall not constitute notice):

11355 West Olympic Blvd.

Manatt, Phelps & Phillips, LLP

Los Angeles, California

Telephone: (310) 312-4000
Facsimile: (310) 312-4224
Attention: Gordon M. Bava, Esq.

SECTION 8.03    Interpretation.  When a reference is made in this Agreement to Sections, Exhibits or Schedules, such reference shall be to a Section of, or an Exhibit to, or Schedule to, this Agreement unless otherwise indicated. The table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. All terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neutral genders of such terms. Any agreement, instrument or statute defined or referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein. References to a person are also to its permitted successors and assigns. All parties will be considered drafters of this Agreement and accordingly any ambiguity shall not be construed against any particular party.

SECTION 8.04    Counterparts.  This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties, including delivery by facsimile, it being understood that all parties need not sign the same counterpart.

SECTION 8.05    Entire Agreement; Third Party Beneficiaries.

(a)    This Agreement (including the documents and instruments referred to herein and the Company Disclosure Letter) and the Confidentiality Agreement constitute the entire agreement, and supersede all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof.

(b)    This Agreement shall be binding upon and inure solely to the benefit of each party hereto, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other person any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement, other than Section 5.06 (which is intended to be for the benefit of the persons covered thereby and may be enforced by such persons).

53

SECTION 8.06    Governing Law.   This Agreement shall be governed by, and construed in accordance with, the Laws of the State of Delaware (without giving effect to choice of Law principles thereof).

SECTION 8.07    Severability.   If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible to the fullest extent permitted by applicable law in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

SECTION 8.08    Assignment.   Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties, in whole or in part (whether by operation of Law or otherwise), without the prior written consent of the other party, which consent may be withheld for any reason by such other party in its sole discretion, and any attempt to make any such assignment without such consent shall be null and void and of no effect whatsoever. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and assigns.

SECTION 8.09    Submission To Jurisdiction; Waivers.   Each of the parties irrevocably agrees that any legal action or proceeding with respect to this Agreement or for recognition and enforcement of any judgment in respect hereof brought by the other party hereto or its successors or assigns shall be brought and determined exclusively in the Delaware Court of Chancery (and if the Delaware Court of Chancery shall be unavailable, any court of the State of Delaware or the federal court of the United States of America sitting in the Sate of Delaware), and each of the parties hereby irrevocably submits with regard to any such action or proceeding for itself and in respect to its property, generally and unconditionally, to the exclusive jurisdiction of the aforesaid courts. Each of the parties hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, counterclaim or otherwise, in any action or proceeding with respect to this Agreement, (a) any claim that it is not personally subject to the jurisdiction of the above-named courts for any reason other than the failure to lawfully serve process, (b) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in any such court (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise), and (c) to the fullest extent permitted by applicable Law, that (i) the suit, action or proceeding in any such court is brought in an inconvenient forum, (ii) the venue of such suit, action or proceeding is improper and (iii) this Agreement, or the subject matter hereof, may not be enforced in or by any such court. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of the above-named courts. Without limiting the foregoing, each party agrees that service of process on such party as provided in Section 8.02 shall be deemed effective service of process on such party.

SECTION 8.10   Enforcement.   The parties agree that irreparable damage would occur and the parties would not have any adequate remedy at law in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to (i) an injunction or injunctions to prevent breaches of this Agreement and to (ii) specific performance of the terms hereof, this being in addition to any other remedy to which they are entitled at Law or in equity.

55

IN WITNESS WHEREOF, Parent, Holding Company, Holdings, Sub and the Company have caused this Agreement to be signed by their respective officers thereunto duly authorized as of the date first written above.

BABCOCK & BROWN
INFRASTRUCTURE LIMITED

By:  /s/ Jeffrey Kendrew
    Name: Jeffrey Kendrew
    Title: COO, Energy


BBI US HOLDINGS PTY LTD.

By:  /s/ Jeffrey Kendrew
    Name: Jeffrey Kendrew
    Title: Director


BBI US HOLDINGS II CORP.

By:  /s/ Michael M. Garland
    Name: Michael M. Garland
    Title: President


BBI GLACIER CORP.

By:  /s/ Michael M. Garland
    Name: Michael M. Garland
    Title: President


NORTHWESTERN
CORPORATION

By:  /s/ Michael J. Hanson
    Name: Michael J. Hanson
    Title: President and Chief
        Executive Officer

56

## AMENDMENT NO. 1 TO RIGHTS AGREEMENT

This Amendment No. 1 to Rights Agreement (this "**Amendment**") is entered into as of April 25, 2006 (to become effective on the date set forth in Section 5.0 of this Amendment), between Northwestern Corporation, a Delaware corporation (the " **Company** "), and LaSalle Bank National Association, a national banking association, as Rights Agent (the " **Rights Agent** "), and amends the Rights Agreement dated as of December 5, 2005, between the Company and the Rights Agent (the " **Rights Agreement** ").

WHEREAS, the Company desires to amend the Rights Agreement to prevent certain Persons acting with the approval of the Board of Directors of the Company to acquire all of the equity interests in the Company from becoming Acquiring Persons; and

WHEREAS, this Amendment is entered into pursuant to Section 27 of the Rights Agreement prior to the time that any Person, to the knowledge of the Company, has become an Acquiring Person.

NOW, THEREFORE, in consideration of the premises and the mutual agreements herein set forth, the parties hereto agree as follows:

**1.0  Defined Terms**. Terms defined in the Rights Agreement and used and not otherwise defined herein shall have the meanings given to them in the Rights Agreement.

**2.0  Additional Definitions**. Section 1 of the Rights Agreement is hereby amended to add the following definitions, which shall be inserted into Section 1 in alphabetical order:

"**Merger Agreement**" shall mean the Agreement and Plan of Merger made and entered into as of April 25, 2006, by and among Parent, Holding Company, Holdings, Sub and the Company.

"**Parent**" shall mean Babcock & Brown Infrastructure Limited, an Australian public company.

"**Holding Company**" shall mean BBI US Holdings Pty Ltd. Company, an Australian Company and direct wholly-owned subsidiary of Parent.

"**Holdings**" shall mean BBI US Holdings II Corp., a Delaware corporation and direct wholly-owned subsidiary of Holding Company.

"**Sub**" shall mean BBI Glacier Corp., a Delaware corporation and direct wholly-owned subsidiary of Holdings.

**3.0  Amendment of Section 7.** Paragraph (a) of Section 7 of the Rights Agreement is amended by:

    **3.1**      deleting the word "or" immediately preceding clause (iii) thereof and by adding a "," immediately preceding clause (iii) thereof; and

    **3.2**      by adding the following new phrase immediately following clause (iii) thereof: "or (iv) immediately prior to the Effective Time (as defined in the Merger Agreement). "

**4.0  Addition of a New Section 35.** The Rights Agreement is amended by adding a Section 35 thereof which shall read as follows:

    "Section 35. Exception For Merger Agreement. Notwithstanding any provision of this Agreement to the contrary, neither a Flip-In Event, an event described in clauses (a)(i), (ii), or (iii) of Section 13; a Distribution Date, nor a Stock Acquisition Date shall be deemed to have occurred, none of Parent, Holding Company, Holdings, Sub nor any of their Affiliates or Associates shall be deemed to have become an Acquiring Person, and no holder of any Rights shall be entitled to exercise such Rights under, or be entitled to any rights pursuant to, any of Sections 3(a), 7(a), 11(a) or 13 of this Agreement, in any such case by reason of (a) the approval, execution or delivery of the Merger Agreement or any amendments thereof, or (b) the commencement or, prior to termination of the Merger Agreement, the consummation of any of the transactions contemplated by the Merger Agreement, including the Merger (as defined in the Merger Agreement)."

**5.0  Effectiveness.** This Amendment shall be deemed effective as of the time immediately prior to the signing of the Merger Agreement. Except as amended hereby, the Rights Agreement shall remain in full force and effect and shall be otherwise unaffected hereby.

**6.0  Miscellaneous.** This Amendment shall be deemed to be a contract made under the laws of the State of Delaware and for all purposes shall be governed by and construed in accordance with the laws of such state. This Amendment may be executed in any number of counterparts, each of such counterparts shall for all purposes be deemed an original and all such counterparts shall together constitute but one and the same instrument. If any term, provision, covenant or restriction of this Amendment is held by a court of competent jurisdiction or other authority to be invalid, illegal, or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Amendment shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment No. 1 to the Rights Agreement to be duly executed as of the day and year first above written.

NORTHWESTERN CORPORATION

By: /s/ Michael J. Hanson
_____

Name: Michael J. Hanson
Title: President and Chief Executive Officer


LASALLE BANK NATIONAL ASSOCIATION,
solely as Rights Agent herein under and not within its
individual capacity,


By: /s/ Joseph Pellicore
_____

Name: Joseph Pellicore
Title: Assistant Vice President

S-1

# Exhibit V

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| NORTHWESTERN CORPORATION, | : | Case No. 03-12872 (KJC) |
| | : | |
| Reorganized Debtor. | : | **Hearing Date: January 4, 2007 at 1:30 p.m.** |
| | : | **Objection Deadline: December 27, 2006 at 4:00 p.m.** |
| | : | |

### REORGANIZED NORTHWESTERN'S MOTION PURSUANT TO 11 U.S.C. §§ 105(a) AND 1142(b), AND RULE 3020(d) OF THE BANKRUPTCY RULES, SEEKING ENTRY OF AN ORDER IN AID OF EXECUTION OF CONFIRMED PLAN OF REORGANIZATION

COMES NOW NorthWestern Corporation ("NorthWestern" or the "Reorganized NorthWestern"), as a reorganized debtor, and hereby moves the Court, pursuant to 11 U.S.C. §§ 105(a) and 1142(b), and Rule 3020(d) of the Federal Rules of Bankruptcy Procedure, seeking an order directing LaSalle Bank, N.A., the transfer agent (the "Transfer Agent") holding issued and outstanding shares of the Reorganized NorthWestern allocated to the Disputed Claims Reserve[1], upon tender of such shares in exchange for cash in accordance with the terms of an approved Merger Agreement (as defined herein), to invest any cash received in such exchange in accordance with Section 345 of the Bankruptcy Code. A proposed order granting this motion is attached hereto as Exhibit A. In support of this Motion, NorthWestern shows the Court as follows:

### JURISDICTION AND VENUE

1.     This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334. Additionally, Section 13.1 of NorthWestern's Second Amended and Restated Plan of Reorganization under Chapter 11 of the Bankruptcy Code (the "Plan") and Paragraph 51 of the

---

[1] Capitalized terms not defined herein shall have the same meaning as defined in the Plan (as defined herein).

Court's Order confirming the Plan (the "Confirmation Order") specifically provide this Court with retained jurisdiction to consider the Motion. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of this matter is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## RELIEF REQUESTED

2.      On April 25, 2006, Reorganized NorthWestern's Board of Directors approved a merger agreement (as amended or modified, the "Merger Agreement") which provides for the acquisition of Reorganized NorthWestern's outstanding and issued common stock by Babcock & Brown Infrastructure Limited, an Australian public company, ("Babcock & Brown") through a "cash out" merger under Delaware Law.[2] NorthWestern seeks an order from the Court providing direction to the Transfer Agent holding the New Common Stock in the Disputed Claims Reserve for investing the funds received which  must be tendered for each share of New Common Stock upon the effectiveness of the Merger Agreement, plus any dividends paid on such shares prior to the effective date of the Merger Agreement between NorthWestern and Babcock & Brown. Through this Motion, NorthWestern is not seeking permission to effect the merger with Babcock & Brown – the merger will become effective pursuant to controlling Delaware law following applicable approvals as noted in Paragraphs 6 and 7 below.

## FACTUAL BACKGROUND

3.      On September 14, 2003, NorthWestern filed its petition for relief under Chapter 11 of the Bankruptcy Code. On October 19, 2004, the Court entered the Confirmation Order. The Debtor's Plan became effective on November 1, 2004 and a notice of substantial consummation of the Plan was filed on December 29, 2004. It is uncontested that NorthWestern's Plan has become effective and has been substantially consummated.

---

[2] A true and correct copy of the Merger Agreement is attached hereto as Exhibit B.

4.      Under the Plan, the holders of Unsecured Note Claims (e.g., Class 7), Unsecured Subordinated Note Claims (e.g., Class 8), and General Unsecured Claims (e.g., Class 9) received their Pro Rata Share of 35.5 million shares of New Common Stock issued pursuant to the Plan to the respective Classes 7, 8 and 9, which New Common Stock was distributed to allowed claim holders in the designated classes or to the Transfer Agent in accordance with the Plan.

5.      Upon the occurrence of the Effective Date, the New Common Stock was distributed according to the provisions of the Plan.    Section 7.5 of the Plan requires NorthWestern to maintain a Disputed Claims Reserve of any distributable amounts of Cash and New Common Stock equal to the relevant percentage of the Distributions to which holders of Disputed Claims would be entitled under the Plan (the "Plan Recovery").  Section 7.6 of the Plan provides that the holder of a Disputed Claim which subsequently becomes an Allowed Claim after the Effective Date is entitled to receive Distributions from the Disputed Claims Reserve equal to the amount of the Plan Recovery and any Supplemental Distribution in accordance with the Plan.

6.      NorthWestern issued the New Common Stock as required under the Plan, with the shares designated for the Disputed Claims Reserve being issued to the Transfer Agent.  Initially, 4,409,100 shares of New Common Stock were issued, collectively, to Class 9 Allowed General Unsecured Claims or the Transfer Agent for the Disputed Claims Reserve.  As of the date of this Motion, there are approximately 3,144,642 shares of New Common Stock remaining in the Disputed Claims Reserve pending resolution, among other claims, of the remaining disputed claims asserted with respect to the QUIPs Litigation by Magten Asset Management Corporation ("Magten") and Law Debenture Trust Company of New York ("Law Debenture") as Trustee for the non-accepting holders of the QUIPs Notes.

7.    Reorganized NorthWestern is a Delaware corporation. Since November 1, 2004 its common stock issued pursuant to the Plan has been, and is, publicly traded on the Nasdaq stock market under the symbol NWEC, and its market price, as of the close of the market on December 1, 2006, was $35.78 per share.

8.    Under the terms of the Merger Agreement, each share of Reorganized NorthWestern's New Common Stock will be cancelled and converted into the right to receive $37.00 cash. In compliance with Delaware law, on August 2, 2006 NorthWestern's shareholders adopted and approved the Merger Agreement between NorthWestern and Babcock & Brown. *See* NorthWestern Corp., Form 8-K (Aug. 3, 2006), attached hereto as <u>Exhibit C</u>.[3]

9.    In addition to the Merger Agreement being conditional upon approval by NorthWestern shareholders, the Merger Agreement is also subject to approval by certain regulatory authorities. At this time, the Federal Trade Commission, the Federal Energy Regulatory Commission ("FERC") and the Nebraska Public Service Commission have approved NorthWestern's merger with Babcock & Brown. The Federal Communications Commission ("FCC"), the South Dakota Public Utilities Commission ("SDPUC") and the Montana Public Service Commission ("MPSC") also must review the Merger Agreement. The SDPUC has dropped any prior stated opposition to the merger at FERC and will decide in December 2006 whether or not it has jurisdiction over the merger. The FCC and the MPSC are expected to review the Merger Agreement during first quarter 2007. Assuming approval of the Merger Agreement by the SDPUC, the FCC and the MPSC, then all conditions precedent to completion

---

[3] The Transfer Agent holding the shares in the Disputed Claims Reserve did not vote the shares in person or by proxy at NorthWestern's annual meeting on August 2, 2006, giving the shares the same effect as a vote against the adoption of the Merger Agreement. Irrespective, the Merger Agreement was approved.

of the Merger Agreement other than closing the transaction and tendering the cash for Reorganized NorthWestern's outstanding shares will have been completed.

10.    Section 7.5 of the Plan provides that NorthWestern shall maintain in the Disputed Claims Reserve New Common Stock equal to the relevant percentage of the Distributions to which holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims or such other amount as the holder of such Disputed Claim may agree with NorthWestern. While Reorganized NorthWestern has fully complied with this section of the Plan, should the merger with Babcock & Brown ultimately receive applicable regulatory approval and become final, pursuant to Delaware law all outstanding New Common Stock of Reorganized NorthWestern, including those shares in the Disputed Claims Reserve, will be cancelled and converted into the right to receive $37.00 cash for each share of such stock. The Plan does not specifically address, upon a cash-out merger of Reorganized NorthWestern, how cash received in exchange for stock in the Disputed Claims Reserve is to be invested. Nevertheless, pursuant to Sections 105(a) and 1142 (b) of the Bankruptcy Code the Court has the power to issue an order addressing the matter which is the subject of this Motion.

## ARGUMENT AND CITATION OF AUTHORITIES

**A.    This Court has the Authority to Grant the Relief Sought Herein.**

11.    Bankruptcy Courts have the authority to clarify a plan of reorganization when it is silent on a matter. *In re Beal Bank, S.S.B. v. Jack's Marine Inc. and Jack's Neshaminy Marina, Inc.*, 201 B.R. 376, 380 (E.D. Pa. 1996); *U.S.A. v. APT Industries, Inc.*, 128 B.R. 145 (W.D.N.C. 1991). The Plan is silent as to how the Transfer Agent is to invest cash received in exchange for the New Common Stock remaining in the Disputed Claims Reserve upon the effective date of a cash-out merger. The Transfer Agent needs direction as to how it is to invest the cash that it will

receive upon tendering the New Common Stock in the Disputed Claims Reserve to Babcock & Brown, and the dividends that have been or will be paid on these shares, or else such cash may not earn any interest pending resolution, for example, of the disputes with Magten and Law Debenture.

12.    Both the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure provide the Court with the authority to grant the relief requested by this Motion. Section 105 of the Bankruptcy Code provides that the bankruptcy court "may issue any order . . . that is necessary to or appropriate to carry out the provisions" of Title 11.  11 U.S.C. § 105(a).  Section 1142 of the Bankruptcy Code provides that the bankruptcy court may direct any necessary party to perform any act necessary for the consummation of a plan of reorganization.  11 U.S.C. § 1142(b).  Further, Federal Rule of Bankruptcy Procedure 3020(d) provides that, notwithstanding the entry of the confirmation order, the bankruptcy court is empowered to issue any other order necessary to administer the debtor's estate.  Fed. R. Bankr. P. 3020(d).  *See In re Resorts International, Inc.*, 199 B.R. 113, (Bankr. D.N.J. 1996); *In re Terracor*, 86 B.R. 671 (D. Utah 1988).  The order which NorthWestern seeks by this Motion is an order directing the Transfer Agent upon receipt of the cash upon effectiveness of the Merger Agreement and the dividends it holds which have been paid on the stock in the Disputed Claims Reserve to invest such cash in accordance with Section 345 of the Bankruptcy Code.  The purpose of providing direction to the Transfer Agent on how to invest these cash proceeds and the dividends is to assure that (a) the proceeds and dividends are protected and (b) some interest will be earned on the corpus until final determination is made concerning any allowance of the QUIPs Litigation claims asserted by Magten and Law Debenture.

13.    Section 13.1 of the Plan specifically provides that the Court has the exclusive jurisdiction over all matters arising out of and relating to NorthWestern's Chapter 11 Case and the Plan for the purposes of, among other things, to cure any omission in the Plan or in the Confirmation Order as may be necessary to carry out its purpose and intent.  Additionally, the Court has the inherent jurisdiction to interpret and enforce the Confirmation Order.  *See In re Chateaugay Corp.*, 201 B.R. 48, 62 (Bankr. S.D.N.Y. 1996) (noting that bankruptcy courts have inherent or ancillary jurisdiction to interpret and enforce their own orders wholly independent of the statutory grant of jurisdiction under 28 U.S.C. § 1334).  The Plan did not contemplate a cash-out merger of Reorganized NorthWestern while undistributed New Common Stock remained in the Disputed Claims Reserve and what to do with cash received in exchange for such stock.  This New Common Stock must, under Delaware law, be tendered upon the effectiveness of the Merger Agreement.  *The Union Ill. 1995 Investment Ltd. Partnership v. Union Financial Group, Ltd.*, 847 A.2d 340, 366 (Del. Ch. 2004) (noting that shareholder had no option after the merger vote approving the merger but to be cashed out).  Pursuant to this Motion, NorthWestern seeks an order of the Court directing the Transfer Agent to invest the proceeds of the New Common Stock in the Disputed Claims Reserve plus dividends paid on such stock in a manner that "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment," until such time as the remaining disputed claims are resolved.[4]  *See* 11 U.S.C. § 345(a).

---

[4] Arguably, Court approval is not necessary for NorthWestern to direct the Transfer Agent to invest the proceeds of the New Common Stock in the Disputed Claims Reserve in accordance with Section 345 of the Bankruptcy Code. However, in an abundance of caution, NorthWestern has decided to seek this Court's approval in directing the Transfer Agent on the investment of the proceeds of the New Common Stock in the Disputed Claims Reserve and attendant dividends following the consummation of the Merger Agreement.

14.    Even though NorthWestern's Chapter 11 estate has not yet been closed because the disputed claims of Magten and Law Debenture remain unresolved, NorthWestern is a reorganized entity and has exited Chapter 11. NorthWestern, as a Delaware corporation, post reorganization is governed by the provisions of Delaware corporate law. If a merger is approved by a Delaware corporation's requisite shareholders, upon that merger becoming effective, shareholders whose shares have been extinguished or canceled generally only have a right to the merger consideration specified in the applicable merger agreement and no longer have rights as shareholders of the former corporation. See, e.g., Kramer v. Western Pacific Industries, Inc., 546 A.2d 348 (Del. 1988); Lewis v. Anderson, 477 A.2d 1040 (Del. 1983). Thus, in this instance the Transfer Agent has no choice but to tender upon the effectiveness of the Merger Agreement with Babcock & Brown the shares in the Disputed Claim Reserves in exchange for the merger consideration of $37.00 per share. Upon such exchange, the Transfer Agent will then be holding cash of approximately $116,352,000, plus dividends paid on the New Common Stock in the Disputed Claims Reserve and any interest earned on cash held prior to the exchange. It is these funds which need to be invested for future distribution upon resolution of the pending Disputed Claims.

15.    The relief NorthWestern seeks is not contrary to the existing provisions in the Plan. It simply seeks an order directing the Transfer Agent to maximize recovery for those determined to be entitled to these funds by providing for the investment of the cash to be received upon tender of the shares. If and when the remaining Disputed Claims have been resolved, the holder of any allowed claim will be entitled to its pro rata share of the cash received and held by the Transfer Agent, including a pro rata share of the interest earned from the

investment of the merger proceeds; any unallocated share value will be distributed in accordance with the Plan as a Supplemental Distribution.

**B.    The Proposed Limitation on the Transfer Agent's Options for Investing the Proceeds Received from the Stock Tender are in Accordance with Section 345 of the Bankruptcy Code.**

16.    Through this Motion, NorthWestern seeks an order requiring the Transfer Agent to invest the proceeds received from the tender of the stock in the Disputed Claims Reserve in money market accounts with financial institutions insured or guaranteed by the United States or one of its departments or agencies. Given the amount of the cash to be received in exchange for the tendered shares (in excess of $116 million) and the unknown time period the Transfer Agent will be holding the cash, it is prudent to invest the funds in one or more accounts earning interest for the benefit of the ultimate recipients of the funds. Both the amount of funds subject to investment and the duration of the remaining administration of the Disputed Claim Reserves are factors to be considered in determining whether NorthWestern, as a reorganized debtor, is implementing appropriate action to maximize the recovery on its remaining chapter 11 estate's funds upon completion of the merger, e.g., the cash received. *Kalyna v. Swaine (In the Matter of Accomazzo)*, 226 B.R. 426, 429 (D. Az. 1998).

17.    NorthWestern seeks an order requiring the investment of the stock proceeds in such a manner which complies with Section 345 of the Bankruptcy Code and avoids the need for the posting of any bond by the Transfer Agent. *See* 11 U.S.C. § 345(b). Specifically, NorthWestern seeks an order requiring the proceeds be invested in money market accounts of federally-insured depository institutions. NorthWestern also seeks to have the Court waive the requirement that a bond be posted in conjunction with the investments of the proceeds of the New Common Stock in the Disputed Claims Reserve. The waiver of the requirement that a bond

be posted is appropriate given that NorthWestern seeks to limit the Transfer Agent's ability to invest the tendered funds such that the funds may only be deployed in conservative investments.

18.     Ultimately, should Magten's and Law Debenture's Disputed Claims be resolved as allowed claims, the Transfer Agent will pay them an amount determined by using the same formula which has heretofore been used to determine distributions from the Disputed Claims Reserve – e.g., dividing the dollar amount of the resulting Allowed Claim by $140,000,000 (the estimated amount for Class 9 claims) and then multiplied by 4,409,100 (the pro rata allocation of shares to Class 9 claims including the Disputed Claims Reserve).  The resulting number represents the number of shares of New Common Stock to which Magten and Law Debenture would have been entitled for the Disputed Claims Reserve.  The Transfer Agent will then simply multiply the number of shares of New Common Stock to which Magten and Law Debenture were entitled by the $37.00 tender offer price to ascertain the amount of cash due to them and distribute such amount, plus a pro rata share of cash dividends and any interest earned on such sums, to Magten and Law Debenture.  Any remaining funds held by the Transfer Agent would then be distributed in accordance with the provisions of the Plan.[5]

## CONCLUSION

19.     The relief sought by this Motion would maximize the value of NorthWestern's remaining bankruptcy estate and assure that holders of Disputed Claims have the opportunity to

---

[5] Nothing in this Motion shall be deemed to prejudice NorthWestern from seeking a determination of the Court that the interest earned on the funds in the Disputed Claims Reserve is not property of the claims holders, but instead are available to NorthWestern to satisfy fees and expenses associated with resolving the remaining Disputed Claims and any costs and expenses incurred by the Transfer Agent to administer the investment of the cash to be received upon the effectiveness of the Merger Agreement.  NorthWestern recognizes that the Plan Committee disagrees with this reservation by NorthWestern, and may oppose any effort by NorthWestern to seek to recover from interest earned on the Disputed Claims Reserve for fees and expenses incurred with resolving the remaining Disputed Claims and other costs and expenses of the Transfer Agent to administer the investment of the cash to be received upon the effectiveness of the Merger Agreement.  These issues, however, are not before the Court in this Motion, and, as such, need not be decided at this time.

maximize the recovery on their claims should their claims ultimately be classified as Allowed Claims, and to maximize recovery for any claimants entitled to any Supplemental Distribution. The Court has the authority under the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure to interpret the Plan on this matter. The relief is appropriate and NorthWestern's motion for an order granting such relief should be granted.

WHEREFORE, NorthWestern requests that this Court inquire into and grant the relief requested herein, and such other relief as this Court deems just and appropriate.

Dated:  Wilmington, Delaware
        December 6, 2006

                              Respectfully submitted,

                              PAUL, HASTINGS, JANOFSKY & WALKER LLP
                              600 Peachtree Street
                              Suite 2400
                              Atlanta, GA 30308
                              Jesse H. Austin, III
                              Telephone: (404) 815-2400

                              - and -

                              GREENBERG TRAURIG, LLP

                              _____
                              Victoria Watson Counihan (No. 3488)
                              Dennis A. Meloro (No. 4435)
                              The Nemours Building
                              1007 North Orange Street, Suite 1200
                              Wilmington, DE 19801
                              Telephone: (302) 661-7000

                              *Counsel for NorthWestern Corporation*

# Exhibit W

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| NORTHWESTERN CORPORATION, | ) Case No. 03-12872 (KJC) |
| | ) |
| Debtor. | ) **Hearing Date: January 19, 2007 @ 3:00 p.m.** |
| | ) **Re: Docket No. 3544** |

**JOINT OBJECTION OF MAGTEN ASSET MANAGEMENT CORP.
AND LAW DEBENTURE TRUST COMPANY OF NEW YORK TO
REORGANIZED NORTHWESTERN'S MOTION PURSUANT TO 11
U.S.C. §§ 105(a) AND 1142(b), AND RULE 3020(d) OF THE
BANKRUPTCY RULES, SEEKING ENTRY OF AN ORDER IN AID
OF EXECUTION OF CONFIRMED PLAN OF REORGANIZATION
[DOCKET NO. 3544]**

Magten Asset Management Corporation ("Magten") and Law Debenture Trust Company

of New York, in its capacity as Indenture Trustee for the QUIPS ("Law Debenture", together

with Magten, the "Claimants"), hereby object (the "Objection") to the Motion of Reorganized

NorthWestern (the "Motion")[1] Pursuant to 11 U.S.C. §§ 105(a) and 1142(b) and Rule 3020(d) of

the Bankruptcy Rules, Seeking Entry of an Order in Aid of Execution of Confirmed Plan of

Reorganization and respectfully states as follows:

### I.      INTRODUCTION

1.    By its Motion, NorthWestern seeks an order directing La Salle Bank, N.A., the

transfer agent holding issued and outstanding shares of Reorganized NorthWestern allocated to

the Disputed Claims Reserve (the "Transfer Agent"), to invest the cash to be received upon

tender of the shares in the Disputed Claims Reserve upon consummation of the merger between

NorthWestern and Babcock & Brown Infrastructure, Ltd. ("BBI"), in accordance with section

---

[1]    All capitalized terms not expressly defined herein have the meanings ascribed to them in NorthWestern
Corporation's ("NorthWestern") Second Amended and Restated Plan of Reorganization Under Chapter 11
of the Bankruptcy Code (the "Plan").

1

345 of the Bankruptcy Code. See Motion, p. 1. NorthWestern attempts to downplay the significance of this Motion by presenting it as a request to aid in the administration of NorthWestern's estate. See Motion at ¶ 12. NorthWestern is in fact seeking to have the Court endorse NorthWestern's argument that the substitution of cash in lieu of the shares in the Disputed Claims Reserve and the holding and investing of such cash by the Transfer Agent is permitted without an amendment to NorthWestern's Plan. By its Motion, NorthWestern is therefore attempting to a effectuate a backdoor amendment of a substantially consummated Plan in violation of section 1127(b) of the Bankruptcy Code.

2.  NorthWestern argues that the New Common Stock in the Disputed Claims Reserve "must, under Delaware law, be tendered upon the effectiveness of the Merger Agreement." See Motion at ¶13. NorthWestern, however, ignores the fact that it is seeking to amend the terms of the Plan. By having the Court direct the Transfer Agent to invest the cash received upon the tender of the shares, the Court in effect will be also concluding that the Plan allows for the substitution of cash for the New Common Stock. While the Delaware law formalities and the results of a cash-out merger are clear from a Delaware corporation law perspective, that does not address the fact that such a result is inconsistent with the Plan and the Plan's purpose and intent. First, the Plan does not permit a cash-out of the Disputed Claims Reserve and any cash-out would be an impermissible modification of the Plan. Second, tendering the shares in the Disputed Claims Reserve in exchange for the merger consideration results in different treatment to holders of claims within the same class – a direct violation of section 1123(a)(4) of the Bankruptcy Code. Under the Plan, holders of claims in Class 9 were entitled to receive shares of New Common Stock and the creditors whose claims have been Allowed have received such stock. Magten and the QUIPS holders (including Magten) that chose to pursue the fraudulent

2

conveyance litigation (the "Non-Accepting QUIPS Holders") cannot receive different treatment simply because their claims are not yet Allowed. Indeed, as discussed in detail below, the Third Circuit has held that where state law conflicts with the terms of a confirmed plan, the terms of the plan govern. As such, notwithstanding Delaware corporate law, Magten and Non-Accepting QUIPS Holders must receive the New Common Stock explicitly provided for in the Plan.

3.   NorthWestern also asserts that section 13.1 of the Plan allows the Court to "cure any omission in the Plan or in the Confirmation Order as may be necessary to carry out its purpose and intent." See Motion at ¶13. NorthWestern, however, cannot argue that it is seeking to cure an omission in the Plan as such issue was squarely before NorthWestern. Prior to, during, and immediately following confirmation of its Plan, NorthWestern was receiving and actively considering numerous offers to purchase the company and/or its assets and discovery will confirm these facts.[2]  Accordingly, in spite of its knowledge and ongoing consideration of offers, NorthWestern determined not to include a mechanism in the Plan to enable NorthWestern to, if necessary, cash-out the shares in the Disputed Claims Reserve. Instead, NorthWestern chose to propose and confirm a plan that provided for stock and that does not provide for the shares of stock to be cashed out. Now that the Plan has been confirmed and substantially consummated, it cannot be amended.

4.   Moreover, NorthWestern is judicially estopped from seeking to cash-out the shares in the Disputed Claims Reserve. In connection with a prior failed settlement among NorthWestern

---

[2]   The Claimants have sought limited discovery directly relevant to the issues presented in the Motion. In addition, Claimants noticed NorthWestern's employee, Mr. Michael Hanson, for deposition in connection with the Motion and NorthWestern has refused to produce Mr. Hanson for deposition. While Claimants' requested discovery was narrowly tailored to address the issues raised by the Motion, NorthWestern has refused to comply with the requests and has filed a motion for a protective order with this Court. In light of Claimants' right to obtain relevant discovery under the Federal Rules of Civil Procedure, Claimants respectfully request that the Court adjourn the hearing on the Motion to allow time to conduct the requested limited discovery.

and the Non-Accepting QUIPS Holders, NorthWestern took the position before this Court and the District Court that because the Plan was substantially consummated, Magten and the Non-Accepting QUIPS Holders could not receive any consideration other than stock in satisfaction of their claims. See Declaration of Bonnie Steingart dated January 15, 2007 filed contemporaneously herewith (the "Steingart Decl."), Ex. A, ¶ 65. Now, in direct opposition to NorthWestern's previous position, which this Court and the District Court accepted and relied upon, including in making findings adverse to Magten, NorthWestern now seeks to provide Magten and the Non-Accepting QUIPS Holders with cash in lieu of the shares to which they are entitled under the terms of the Plan. See Motion at ¶ 10. Given its prior position, NorthWestern is judicially estopped from arguing that the claims of Magten and Law Debenture can be satisfied by any consideration other than New Common Stock.

## II.  FACTUAL BACKGROUND

5.  Magten holds approximately 40% of the QUIPS. Law Debenture is the Indenture Trustee for the QUIPS.

6.  On April 16, 2004, after obtaining relief from the Bankruptcy Court, Magten and Law Debenture commenced an adversary proceeding in the Bankruptcy Court based on NorthWestern's fraudulent transfer of substantially all of the utility assets of its directly owned subsidiary, Clark Fork & Blackfoot LLC ("Clark Fork"), to NorthWestern for inadequate consideration (the "Transfer") on November 15, 2002 (the "Fraudulence Conveyance Action"). See Steingart Decl. Ex. B.  Though the Clark Fork assets had a value well in excess of $1 billion, the total consideration received for the Transfer was the assumption of approximately $700 million of liabilities by NorthWestern. See Steingart Decl. Ex. B, ¶ 2. As a result of this Transfer, Clark Fork was rendered insolvent. See Steingart Decl. Ex. B, ¶ 3.  Based on the

4

Transfer, Magten and Law Debenture filed the Fraudulent Conveyance Action against NorthWestern on behalf of the QUIPS holders seeking to set aside the fraudulent conveyance of the Clark Fork utility assets to NorthWestern. The QUIPS represented debt obligations of Clark Fork, which, but for the Transfer, would have remained solvent.

7.    On August 19, 2004, NorthWestern filed its Plan and the Second Amended and Restated Disclosure Statement (the "Disclosure Statement"). See Disclosure Statement [docket no. 1986]. On August 31, 2004, NorthWestern filed its revised Plan and Disclosure Statement, see Plan and Disclosure Statement [docket nos. 2020 and 2021, respectively], and on September 2, 2004, the Bankruptcy Court entered an order approving the Disclosure Statement. See Order Approving the Revised Disclosure Statement [docket no. 2033]. Pursuant to the Plan, once their claims are Allowed, Magten and the Non-Accepting QUIPS Holders will have an Allowed Class 9 Claim for which they will receive New Common Stock from the Disputed Claims Reserve. See Steingart Decl. Ex. C, pp. 36-37, § 4.8(b)(ii). Specifically, the Plan provides, in relevant part, that Class 9 creditors "shall receive in full satisfaction, settlement, release, extinguishment and discharge ... its Pro Rata Share of: (a) 32,660,000 shares of New Common Stock ... plus (b) the 505,591 shares of New Common Stock allocated to Class 8(b) if Class 8(b), as a class, votes to reject the Plan." See Steingart Decl. Ex. C, pp. 40, § 4.8(c)(1)(i).

8.    On October 19, 2004, the Bankruptcy Court entered an order confirming the Plan (the "Confirmation Order"). See Confirmation Order [docket no. 2238]. The Confirmation Order required NorthWestern to "establish an initial reserve of 13.5% of New Common Stock

5

allocated to Class 7 and Class 9 for the Disputed Claims Reserve . . . pursuant to Section 7.5 of the Plan."[3] See Steingart Decl. Ex. D, p. 80-81.

9.  As can be seen from public documents and as will be further developed through discovery, in the period immediately preceding the Plan confirmation process, during its pendency and immediately thereafter, several parties made a public expression of interest in acquiring the company or merging with NorthWestern.  For example, on November 17, 2003, MDU Resources Group Inc. and three major cooperative organizations announced their interest in buying a significant portion of NorthWestern's utility assets.  See Steingart Decl. Ex. E.  In February 2004, Minnesota-based 1 Otter Tail Power publicly announced its interest in purchasing NorthWestern's South Dakota utility operations.  See Steingart Decl. Ex. F.  Shortly thereafter, in March 2004, Montana's major cities announced that they were preparing to make a bid to buy NorthWestern's Montana utility assets.  See Steingart Decl. Ex. G.  On May 12, 2004, the non-profit organization Montana Public Power Authority submitted a preliminary $1.26 billion bid to buy NorthWestern's Montana electric and natural gas systems.  See Steingart Decl. Ex. H.  This was followed by the September 2004 announcement of the formation of the South Dakota Public Power Authority organized to study the possibility of a bid for NorthWestern's assets.  See Steingart Decl. Ex. I.

10. On November 1, 2004, pursuant to section 7.5 of the Plan providing that "[i]n lieu of estimating, fixing or liquidating the amount of any Disputed Claim . . . such amount may be fixed *by an agreement in writing by and between the Debtor and the holder of a Disputed Claims*", (see Steingart Decl. Ex. C, p. 59 (emphasis added)), NorthWestern and Law Debenture

---

[3]    The 13.5% reserve proposed by NorthWestern was predicated on representation that 13.5% of the stock was an amount equal to the relevant percentage of Distributions to which the holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims in the amount of such Disputed Claim or such lesser amount as required by Final Order, as required by Section 7.5 of the Plan.

filed the QUIPS Stipulation with the Bankruptcy Court. See QUIPS Stipulation [docket no. 2298]. After notice of the QUIPS Stipulation was provided to parties and no party objected to the QUIPS Stipulation, on November 3, 2004, the Bankruptcy Court held a hearing and approved the QUIPS Stipulation. See Steingart Decl. Ex. J. Pursuant to the QUIPS Stipulation, NorthWestern agreed to set aside a portion of the Disputed Claims Reserve "solely to satisfy in full a $25 million Class 9 claim of the QUIPS Litigation Claims holders" (the "QUIPS Claims Reserve") and set forth the rights of the litigation claims pertaining to the QUIPS holders to recover on account of an Allowed Claim in excess of that amount. See Steingart Decl. Ex. J, pp. 2-3.

11. NorthWestern emerged from bankruptcy on November 1, 2004, and the Plan became effective (the "Effective Date"). See Notice of the Confirmation Order and The Occurrence of the Effective Date [docket no. 2300].

12. Pursuant to a settlement agreement (the "Settlement Agreement"), dated as of January 27, 2005, Magten, Law Debenture, on behalf of the QUIPS holders, and NorthWestern agreed to compromise and settle at a Plan value of approximately $25.5 million, or approximately a 51% recovery based on the face amount of the QUIPS' $50 million Class 9 Claim (not including accrued interest, fees and expenses), rather than the approximately 63% to which the Non-Accepting QUIPS Holders are entitled under the Plan, in exchange for the cessation of litigation between the Parties. See Steingart Decl. Ex. K, ¶ 21.

13. After the Settlement Agreement was negotiated and executed, and after NorthWestern presented the settlement to the Bankruptcy Court and made it public through a

7

press release, on February 16, 2005, NorthWestern advised Magten and Law Debenture by letter that it would not honor the terms of the Settlement Agreement.[4] See Steingart Decl. Ex. L, p. 1

14.    At the direction of the Bankruptcy Court, Claimants filed the 9019 motion (the "9019 Motion") seeking approval of the Settlement Agreement. Subsequently, NorthWestern, the Plan Committee and the ad hoc committee of class 7 debtholders filed objections to the 9019 Motion. The primary basis of the objections was that the Settlement violated the Plan insofar as it provided to the holders of the QUIPS a recovery under both Option 1 and Option 2, when the Plan required holders of the QUIPS to choose between such options. Moreover, NorthWestern, in its objection (the "9019 Objection"), stated that "in the negotiations with respect to the proposed settlement it was made very clear to both Magten and Law Debenture that NorthWestern could not utilize cash to resolve Magten's and Law Debenture's claims." See Steingart Decl. Ex. A at ¶ 65.

15.    On March 10, 2005, the Bankruptcy Court entered an order (the "9019 Order"), denying the 9019 Motion, finding that "a plan amendment is not legally available because the Plan had been substantially consummated [since] [a] confirmed plan may be modified or amended after confirmation, but only before substantial consummation has taken place." See Steingart Decl. Ex L, p. 5.

16.    Following the Bankruptcy Court's denial of the 9019 Motion, Claimants timely filed the 9019 appeal (the "9019 Appeal"). See Notice of Appeal, [docket no. 2919]. On appeal, the

---

[4]    In a press release issued by NorthWestern after reaching the settlement agreement with Claimants, NorthWestern publicly announced that it "believe[s] this settlement is in the best interest of the Company and its shareholders as it removes the uncertainty associated with this protracted legal dispute that, if continued, would have resulted in significant cost to the Company." See Steingart Decl. Ex. M. Although NorthWestern subsequently repudiated the settlement agreement, in its opposition papers to the 9019 Motion filed with the Bankruptcy Court, NorthWestern stated that it continues to believe that the "settlement is in the best interest of the Debtor" and that the proposed settlement would "greatly facilitate NorthWestern's business goals." See Steingart Decl. Ex. A, p. 15.

District Court affirmed the Bankruptcy Court's ruling, holding that an amendment to the Plan would be necessary to implement the settlement, but that such amendment was not feasible, as the Plan had been substantially consummated. See Steingart Decl. Ex. N.

17. On September 29, 2005, the Plan Committee filed a Motion In Aid of Consummation and Implementation of the Plan for an Order Authorizing and Directing NorthWestern to Distribute Surplus Distributions (the "Surplus Distribution Motion") [docket no. 3308]. Pursuant to the Surplus Distribution Motion, the Plan Committee sought an order authorizing and directing NorthWestern to designate certain shares in the Disputed Claims Reserve as surplus distributions and to distribute such shares to holders of Allowed Claims under Section 7.7 of the Plan. See Surplus Distribution Motion, pp. 5-6.

18. On February 2, 2006, the Bankruptcy Court denied the Surplus Distribution Motion (the "Order Denying the Surplus Distribution Motion") on the grounds that Section 7.7 of the Plan and the QUIPS Stipulation precluded any distribution from the Disputed Claims Reserve until the disputed claims of Magten and Law Debenture with respect to the QUIPS litigation were resolved. See Steingart Decl. Ex. O, p. 3 [docket no. 3438]. In rendering its decision, the Bankruptcy Court correctly concluded that "[t]he [Surplus Distribution] Motion was premature in view of the litigation surrounding the unresolved and disputed claims of Magten . . . and Law Debenture . . . ." Id.

19. On March 9, 2006, the Plan Committee filed a Notice of Appeal of the Order Denying the Surplus Distribution Motion in the District Court. See Notice of Appeal [docket no. 3441]. On appeal the Plan Committee seeks to have the District Court overturn the Bankruptcy Court's denial of the Plan Committee's request for a "surplus" distribution of New Common Stock out of the Disputed Claims Reserve even though certain substantial Disputed Claims –

namely Claimants' – remain outstanding and there is, therefore, no way to determine that a surplus even exists. See Plan Committee Appellate Brief, United States District Court for the District of Delaware, case no. 06-157, [docket no. 13], pp. 2-3. Briefing of the Plan Committee Appeal has been completed, however, no decision has been rendered by the District Court.

20. In a Form 8-K issued by NorthWestern on April 26, 2006, NorthWestern announced that it had signed a definitive agreement (the "Merger Agreement") to be acquired by BBI for $37 per share of common stock in an all cash transaction that values NorthWestern at approximately $2.2 billion (the "BBI Transaction"). Pursuant to section 2.01(i) of the Merger Agreement, each share of common stock in the Disputed Claims Reserve will be converted into $37 in cash – the value of the merger consideration. See Motion at ¶ 10. NorthWestern's Plan does not, however, provided for a cash-out of the shares in the Disputed Claims Reserve.

III.    **OBJECTION**

A.    **NorthWestern Cannot Substitute Cash in the Disputed Claims Reserve**

1.    <u>The Plan May Not Be Modified Because It Has Been Substantially Consummated</u>

Section 1127(b) of the Bankruptcy Code provides, in relevant part, that:

> The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan....[5]

11 U.S.C. § 1127(b).

Courts have uniformly interpreted section 1127(b) as imposing a bar to modification of a chapter 11 plan once substantial consummation of the plan has occurred. See Magten Asset

---

[5]    Substantial consummation, as defined in section 1101(2) means: (A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of the distribution under the plan. 11 U.S.C. §1101(2).

10

Mgmt. Corp. v. NorthWestern Corp. (In re NorthWestern Corp.), No. 05-209 (D. Del. Sept. 29,

2006) (affirming Bankruptcy Court's denial of the 9019 Motion because an amendment to the

Plan is not feasible because the Plan was substantially consummated); In re NorthWestern Corp.,

No. 03-12872 (Bankr. D. Del. March 10, 2005) (order denying the 9019 Motion stating that a

plan amendment is not legally possible because the Plan has been substantially consummated);

See also U.S. Brass Corp. v. Travelers Ins. Group, Inc. (In re U.S. Brass Corp.), 301 F.3d 296,

307 (5th Cir. 2002) (holding that a modification of a plan is prohibited once substantial

consummation has occurred); In re Eddington Thread Mfg. Co., 189 B.R. 898, 904 (E.D. Pa.

1995) (stating a plan may be modified after its confirmation only if substantial consummation

has not yet occurred); Almeroth v. Innovative Clinical Solutions Ltd. (In re Innovative Clinical

Solutions, Ltd.), 302 B.R. 136, 144 (Bankr. D. Del. 2003) (finding that 1127(b) is the sole means

for modifying a confirmed plan and that the plan could not be modified because it had been

substantially consummated); In re H&L Developers Inc. 178 B.R. 77, 82 (Bankr. E.D. Pa. 1994)

(concluding that since the confirmed plan was substantially consummated pursuant to section

1101(2), a modification would not be permitted under section 1127(b)); In re Charterhouse, Inc.,

84 B.R. 147, 151 (Bankr. D. Minn. 1988) (noting that section 1127(b) operates to prohibit

modification once substantial consummation has occurred); 7 Collier on Bankruptcy, P 1127.04

(15th Ed. Rev. 2006) (explaining that a chapter 11 plan may not be modified after substantial

consummation).  Specifically, the Third Circuit has stated that section 1127(b) "dramatically

curtails the power of a bankruptcy court to modify a plan of reorganization after its confirmation

and 'substantial consummation.'" In re Cont'l Airlines, Inc., 91 F.3d 553, 570 (3d. Cir. 1996).  It

is irrelevant whether the plan modification sought is an explicit, direct modification of the plan,

or whether it is to be effectuated through a purported post-confirmation transaction. See In re

11

U.S. Brass Corp., 301 F.3d at 307-08 (concluding that a proposed settlement agreement would impermissibly modify a plan in contravention of the Bankruptcy Code). Accordingly, any relief sought that in fact modifies a confirmed plan or produces a result at odds with a specific provisions of a plan is subject to the bar imposed by section 1127(b). See In re Tillotson, 266 B.R. 565, 571-72 (Bankr. W.D.N.Y. 2001); In re Northampton Corp., 39 B.R. 955, 956 (Bankr. E.D. Pa. 1984), aff'd 59 B.R. 963 (E.D. Pa. 1984).

It is the law of the case that the Plan has been substantially consummated. Not only has NorthWestern represented to the Bankruptcy Court and the District Court numerous times that the Plan has been substantially consummated, but both the Bankruptcy Court and the District Court have issued orders finding that the Plan has been substantially consummated.[6] Specifically, in connection with the 9019 Motion, the Bankruptcy Court held that the Plan could not be amended because the Plan had been substantially consummated, noting that the Notice of Substantial Consummation had been filed and it had received widespread publication. See March 10, 2005 Opinion of Bankruptcy Court, p. 5. The District Court echoed this finding when it affirmed the Bankruptcy Court's decision by finding that a modification of the Plan was impermissible because the Plan had been substantially consummated. See September 29, 2006 Opinion of the District Court, p. 7.

Because the Plan has been substantially consummated, it cannot be amended. In seeking this Court's imprimatur of the cashing out of the stock in the Disputed Claims Reserve, NorthWestern is seeking to modify the terms of the Plan. Section 4.9(c) of the Plan provides the following treatment for holders of unsecured claims, including Magten:

---

[6]     See Notice of Substantial Consummation, filed on December 29, 2004 [docket no. 2519]; Motion at ¶ 3; Steingart Decl. Ex. L, p. 5 (March 10, 2005 Opinion of Bankruptcy Court denying 9019 Motion); Steingart Decl. Ex. N, p. 7 (September 29, 2006 Opinion of the District Court denying the 9019 Appeal); Steingart Decl. Ex. A, ¶ 64 (NorthWestern's Objection to 9019 Motion).

> On the Effective Date, or as soon thereafter as practicable, each
> holder of an Allowed General Unsecured Claim . . . shall receive in
> full satisfaction, settlement, release, extinguishment and discharge
> of such Claim its Pro Rata Share of: (i) 32,660,000 shares of New
> Common Stock (such 32,660,000 shares representing 92% of the
> New Common Stock issued and outstanding on the Effective Date
> prior to any dilution resulting from shares of New Common Stock
> issued pursuant to the New Incentive Plan and exercise of the
> Warrants), plus (ii) the 505,591 shares of New Common Stock
> allocated to Class 8(b) if Class 8(b) as a class, votes to reject the
> Plan.

By seeking to substitute cash in the Disputed Claims Reserve for the stock, NorthWestern

is in essence seeking to modify section 4.9 of the Plan to provide that while all other holders of

Class 9 Claims will receive their pro rata share of New Common Stock, Magten and the Non-

Accepting QUIPS Holders will receive cash.

Moreover, the interest of the public in finality of court determinations, as well as this

Court's interest in the integrity of its remedies, would be undermined by allowing

NorthWestern's modification of the Plan more than two years after Plan has been substantially

consummated.  See In re Cont'l Airlines, Inc., 91 F.3d at 561 (noting the strong public interest in

the finality of bankruptcy organizations after substantial consummation is particularly

compelling); In re Charterhouse, Inc. 84 B.R. at 152 (citing In re Penn. Cent. Trans. Co., 42 B.R.

657, 666-7 (E.D. Pa. 1984), aff'd 771 F.2d 762 (3d. Cir. 1985)) ("Statutory termination of the

right to seek modification of a Chapter 11 plan is intended to promote finality in the

reorganization process").  Furthermore, the Plan, as a legally binding contract, binds the parties

to the relief provided for therein.  GECC v. Dial Bus. Forms, Inc. (In re Dial Bus. Forms, Inc.),

341 F.3d 738, 743 (8th Cir. 2003) (quoting In re Commercial Millwright Serv. Corp., 245 B.R.

603, 606 (N.D. Iowa 2000) (once the plan is confirmed, it "acts like a contract that binds the

parties that participate in the plan"); see also Hills Motors, Inc. v. Haw. Auto. Dealers' Ass'n,

13

997 F.2d 581, 588 (9th Cir. 1993) (a reorganization plan should be construed as a contract)). Not only is NorthWestern's Plan a contract, it is also an order of the Bankruptcy Court. See GECC v. Dial Bus. Forms, Inc., 341 F.3d at 744; Off. Comm. of Unsecs. Creditors v. Dow Chem. Corp. (In re Dow Corning Corp.), 456 F.3d 668, 676 (6th Cir. 2006) (in finding that the interpretation of a plan is analogous to a contract, if a plan term is unambiguous, it must be enforced as written). Like a contract that cannot be changed once it has been definitively executed, NorthWestern cannot change the terms of the Plan post-substantial consummation to suit its own interests.

     2.     Substituting Cash for Stock in the Disputed Claims Reserve Would Violate Section 1123(a)(4) of the Bankruptcy Code.

While holders of Class 9 Claims whose claims have become Allowed would have received shares of New Common Stock, by exchanging the shares in the Disputed Claims Reserve for cash, the Non-Accepting QUIPS Holders, who are the only parties with claims against the Disputed Claims Reserve, would receive different treatment than other similarly situated creditors. Affording the Non-Accepting QUIPS Holders treatment that differs from that provided for Class 9 Claimants in the Plan and that was afforded to holders of Allowed Class 9 Claims violates the clear statutory requirement of Section 1123(a)(4) of the Bankruptcy Code, which provides that a plan shall:

> "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest . . ."

11 U.S.C. § 1123(a)(4).

Because Magten and the Non-Accepting QUIPS Holders are being forced to receive cash in lieu of shares of New Common Stock, claimants within the same class – Class 9 – will be

14

receiving non-consensual disparate treatment. By cashing out the shares in the Disputed Claims

Reserve, claimants in Class 9 are being treated differently depending upon when their claim

became allowed. Although 1123(a)(4) permits discriminatory treatment if claimants within a

class opt to be treated differently, Magten and the Non-Accepting QUIPS Holders have never

consented to be treated differently nor have they consented to receive less favorable treatment

than other QUIPS holders. See Hawley Fuel Coalmart, Inc. v. Hawley Fuel Coal, Inc. (In re

AOV Indus., Inc.), 792 F.2d 1140, 1151-52 (D.C. Cir. 1986) (finding that equal treatment of

class members is a basic premise of bankruptcy law); In re Granada Wines, Inc., 26 B.R. 131,

134 (Bankr. D. Mass. 1983) (stating that the debtor is not permitted to unfairly discriminate

against a member of a class). Without the consent of Magten and the Non-Accepting QUIPS

Holders, the Plan cannot provide one treatment to some holders and a different treatment to

others in the same class. In fact, the Plan could never have been confirmed if the Non-Accepting

QUIPS Holders received cash while the remaining Class 9 Claimants received New Common

Stock. Now, to substitute cash for shares post-confirmation would alter the bargain that Magten

and Law Debenture received under the Plan, would provide varying treatment of claimants

within Class 9 and violates Section 1123(a)(4) of the Bankruptcy Code.

> B.     **The Terms of the Plan Control and Trump Delaware Corporate Law**

NorthWestern, by its Motion, asserts that a tendering of the shares of New Common

Stock in exchange for cash is not a modification of the Plan but is permitted by operation of

Delaware corporate law. NorthWestern, it its Motion, states that "NorthWestern is not seeking

permission to effect the merger with Babcock & Brown – the merger will become effective

pursuant to controlling Delaware law following applicable approvals." See Motion at ¶ 2.

NorthWestern is playing hide the ball from the Court. The question is not whether the Court

needs to approve the merger. Rather, the question is whether the purported effect of the merger,

15

*i.e.* the conversion of the New Common Stock in the Disputed Claims Reserve into cash upon consummation of a merger in compliance with the procedural rules of Delaware corporate law, can be effected without an amendment to the Plan. The answer to that question is no. NorthWestern ignores the fact that Delaware corporate law conflicts with the Plan. While Claimants do not disagree that ordinarily a Delaware corporation may cash out its stock in the context of a merger, here, there is a direct conflict with the terms of the Plan.

The Court of Appeals for the Third Circuit has addressed the issue of a conflict between state law and a confirmed plan of reorganization and concluded that "if a provision of the [p]lan, a creature of federal law, conflicts with the law of a state and the state law 'frustrates the full effectiveness of federal law, [the state law] is rendered invalid by the Supremacy Clause'". Jones v. Keene Corp., 933 F.2d 209, 214 (3d. Cir. 1991) (internal quotations omitted). In Jones v. Keene Corp., the Third Circuit, in reviewing the right of asbestos claimants to receive post-judgment interest on their award, addressed the issue of whether a confirmed plan of reorganization's restriction on post-judgment interest trumps Pennsylvania's state law post-judgment interest statute which would grant interest in that case. The Third Circuit concluded that the Plan "squarely conflict[ed]" with Pennsylvania state law and held that "it is the Plan that controls." Id. Despite the economic repercussions of its decision on the claimants, the Third Circuit found that the terms of the Plan governed by virtue of the Supremacy Clause. Id. See also Consumer Realty & Dev. Co. v. Goetze) (In re Consumers Realty & Development Co., Inc.), 238 B.R. 418, 426 (8th Cir. 1999) (finding that the provisions of a confirmed plan will govern if contrary to state law); Ocasek v. Manville Corp. Asbestos Disease Comp. Fund, 956 F.2d 152, 154 (7th Cir. 1992) (holding that because the provisions of a plan bind all parties, the

16

terms of the plan will govern and appellant cannot rest on contradictory Illinois state law for an award of interest).

In the same vein, the treatment of creditors under NorthWestern's Plan, confirmed by the Bankruptcy Court and substantially consummated, cannot be altered by virtue of a state corporate law that provides for different treatment to holders of those claims. See In re Roach, 824 F.2d 1370, 1373 (3d. Cir. 1987) ("any state legislation [that] frustrates the full effectiveness of federal law is rendered invalid by the Supremacy Clause ..."); Hechinger Inv. Co. of Del. v. Fleet Retail Fin. Group, 274 B.R. 71, 95-97 (D. Del. 2002) (stating that state law may be preempted when it conflicts or stands as an obstacle to the implementation of specific provisions of the Bankruptcy Code). See also In re Roach, 824 F.2d at 1373 ("[Under] Article I, § 8 of the Constitution, Congress has the power to establish uniform bankruptcy laws [in] the United States [and] "where Congress has chosen to exercise its authority, contrary provisions of state law must accordingly give way."); In re Princeton-New York Investors, Inc., 219 B.R. 55, 59 (Bankr. D. N.J. 1998) (noting that where Congress chose to exercise its authority, contrary provisions of state law must give way). With respect to the BBI Transaction, enforcing a provision of Delaware corporate law that permits a cash-out of the shares in the Disputed Claims Reserve frustrates the Bankruptcy Code's very purpose and intent in prohibiting a modification of a substantially consummated plan. Allowing Delaware corporate law to override the express terms of the Plan and the provisions of the Bankruptcy Code obstructs the operation of federal law thereby violating the Supremacy Clause.

NorthWestern has created its own quandary. NorthWestern's need to cash out the shares in the Disputed Claims Reserve is the result of a voluntary transaction entered into by NorthWestern with BBI. NorthWestern negotiated the terms of the BBI Transaction and could

17

have avoided this precise predicament when determining how to deal with the remaining

Disputed Claims and the shares in the Disputed Claims Reserve. Since the transaction was first

announced, Magten has repeatedly informed NorthWestern that the stock cannot be cashed out

under the Plan. Any apparent conflict between Delaware law and the Bankruptcy Code and Plan

is self created.

### C.  The Potential for a Merger was Squarely Presented Pre-Confirmation and NorthWestern Chose Not to Provide for it in the Plan

As previously discussed, NorthWestern suggests that there is no conflict between the

Plan and their proposed intention to cash-out the Disputed Claims Reserve in connection with the

BBI Transaction, but rather argues that permitting the cash-out is merely curing an "omission in

the Plan or in the Confirmation Order as may be necessary to carry out its purpose and intent."

See Motion at ¶13.[7] As discovery will show, NorthWestern actively discussed the sale or

merger of the company before, during and immediately following the Plan confirmation process

and, thus, knew that this issue would arise. Therefore, to the extent that it is an omission in the

Plan, it is an intentional omission that this Court cannot on legal or equitable grounds correct.

Throughout NorthWestern's chapter 11 process, NorthWestern received numerous offers

to purchase the company's assets and had intimate knowledge that the company might be sold or

merged post confirmation. For example, on November 17, 2003, MDU Resources Group Inc.

and three major cooperative organizations announced their interest in buying a large piece of

NorthWestern's utility assets. See Steingart Decl. Ex. E. In February 2004, Minnesota-based 1

Otter Tail Power publicly announced its interest in purchasing NorthWestern's South Dakota

---

[7]  NorthWestern wrongfully asserts that the only omission in the Plan is the Plan's silence on how the Transfer Agent is to invest the proceeds of the New Common Stock upon a tender of the shares in a merger. However, the Plan does not contemplate a cash-out of the shares of New Common Stock, so it is absurd to say that the only omission is how to invest the proceeds upon a cash-out when a cash-out itself is not permitted.

18

utility operations. See Steingart Decl. Ex. F. Shortly thereafter, in March 2004, it was announced that Montana's major cities were preparing to make a bid to buy NorthWestern's Montana utility assets. See Steingart Decl. Ex. G. On May 12, 2004, the non-profit organization Montana Public Power Authority submitted a preliminary $1.26 billion bid to buy NorthWestern's Montana electric and natural gas systems. See Steingart Decl. Ex. H. This was followed by the September 2004 announcement of the formation of the South Dakota Public Power Authority organized to study the possibility of a bid for NorthWestern's assets. See Steingart Decl. Ex. I.

The substantial interest by third parties to purchase NorthWestern and the ongoing consideration of such expressions meant that the sale or merger of the company post-confirmation was squarely before NorthWestern. NorthWestern even acknowledged in its Disclosure Statement filed with the Bankruptcy Court that the company received offers of interest to purchase its assets and that NorthWestern "has undertaken an extensive review of these indications of interest and has consulted with the Creditors' Committee with respect to such proposals." See Steingart Decl. Ex. P, p. 48. NorthWestern explained that while "the indications of interest presented thus far either did not equal the value distributable to creditors pursuant to the Debtor's plan or did not present a significant premium over such value to justify the time, cost and expense to pursue its sale of the Debtor's assets during the Chapter 11 proceedings, . . . [NorthWestern] has received separate unsolicited statements of interest for its South Dakota and Nebraska operations, and for its Montana assets and operations. . . [and] is currently evaluating and analyzing these more recent proposals." Id. Given the level of activity concerning the sale or merger, NorthWestern, as drafters of the Plan, had every opportunity to create a mechanism in the Plan that would enable NorthWestern to cash-out the shares in the Disputed Claim Reserve

19

prior to resolving all Disputed Claims. NorthWestern deliberately chose not to build such a

mechanism into its Plan and instead chose to propose and confirm a plan that provides for

Disputed Claimants to receive stock, and only stock.

In addition, when NorthWestern wanted to include in the Plan a mechanism to address

future merger or sale transactions, it did so. For example, the warrant agreement governing the

warrants issued under the Plan contained an entire negotiated section entitled "Reclassification,

Consolidation, Purchase, Combination, Sale or Conveyance." See Steingart Decl. Ex. Q, pp. 9-

10. That section provides for, among other things, that upon a merger or sale of the company,

NorthWestern may elect to pay each holder of the warrants cash in lieu of the stock to which

such holders would be entitled. NorthWestern could have included a similar provision in the

Plan for the New Common Stock in the Disputed Claims Reserve, but elected not to do so.

NorthWestern cannot, at this very late stage, modify the Plan to permit for the cashing out of the

Disputed Claims Reserve.

      D.      **Judicial Estoppel Prevents NorthWestern from Arguing That NorthWestern Can Exchange the Shares in the Disputed Claims Reserve for Cash**

NorthWestern cannot argue that it may cash-out the Disputed Claims Reserve and

provide Magten and the Non-Accepting QUIPS Holders with cash in lieu of shares, because it

has previously taken an irreconcilable and wholly inconsistent position – a position that was

adopted by the Bankruptcy Court in denying Magten and the Non-Accepting QUIPS Holders the

relief they sought. See Steingart Decl. Ex. A, ¶ 64, 65. Based on NorthWestern's arguments, the

Court found that the proposed Settlement Agreement should be rejected because a Plan

amendment was not available, since the Plan had been substantially consummated. See Steingart

Decl. Ex. L, p. 5. Likewise, the District Court found that an amendment was necessary for the

proposed Settlement Agreement to be consistent with the Plan, but such an amendment was

unavailable since the Plan had been substantially consummated. See Steingart Decl. Ex. N, p. 7.

Accordingly, NorthWestern is judicially estopped from asserting the contrary position in order to

consummate the BBI Transaction.

     Under the doctrine of judicial estoppel, a party is precluded from assuming a position in a

legal proceeding that is inconsistent with one previously asserted. See In re Armstrong World

Indus., 432 F.3d 507, 517 (3d. Cir. 2005) ("judicial estoppel can be applied when a party asserts

a certain position in a legal proceeding and prevails, only to assert a contrary position later on

because of changed interests"); Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d

355, 358 (3d. Cir. 1995) ("[t]he basic principle [of judicial estoppel] … is that absent any good

explanation, a party should not be allowed to gain an advantage by litigation on one theory, and

then seek an inconsistent advantage by pursuing an incompatible theory"); Off. Comm. Of

Unsec. Creditors v. Aust (In re Network Access Solutions Corp.) 330 B.R. 67, 77 (Bankr. D.

Del. 2005) (noting that judicial estoppel prevents a party from obtaining relief under one theory

from later taking a contrary position). In essence, the doctrine is intended to prevent parties from

playing "fast and loose" with the court by asserting inconsistent positions. See Krystal Cadillac-

Oldsmobile GMC Truck, Inc. v. GM Corp., 337 F.3d 314, 319 (3d. Cir. 2003); Ryan, 81 F.3d at

361.

     For the doctrine of judicial estoppel to apply, a three-part inquiry must be undertaken:

(1) has the party to be estopped taken two positions that are irreconcilably inconsistent; (2) has

that party changed his or her position in bad faith, (i.e. with intent to play fast and loose with the

court); and (3) is there no lesser sanction available under either statute or the applicable federal

rules of procedure that would adequately remedy the damage done by the litigant's misconduct.

See Krystal Cadillac, 337 F.3d at 319; Montrose Med. Group Participating Sav. Plan v. Bulger,

243 F.3d 773, 779-80 (3d Cir. 2001); Off. Comm. of Unsec. Creditors v. DVI Bus. Credit, Inc. (In re DVI, Inc.), 326 B.R. 301, 308 (Bankr. D. Del. 2005).[8]  All three prongs of this test are met here.

First, as previously noted, in connection with the 9019 Motion, NorthWestern took the position that Magten and the Non-Accepting QUIPS Holders could not receive any consideration other than stock in satisfaction of their claims. See Steingart Decl. at ¶ 65.[9]  That position is irreconcilable from its current position that Magten and the Non-Accepting QUIPS Holders can receive cash in lieu of the shares to which they are entitled under the terms of the Plan.

Second, there can be no doubt that NorthWestern changed its position in bad faith to further its own agenda. By asserting the position that Magten and Law Debenture's claims could not be satisfied by a cash payout, NorthWestern clearly sought to gain an advantage in the prior litigation, in which it was successful. Now, NorthWestern would like the same Court to adopt a theory that directly controverts the theory previously espoused in order to facilitate the contemplated merger transaction. NorthWestern should not be permitted to gain an advantage by asserting one theory in the earlier litigation and prevail to then turn around and assert a completely contrary theory in this Motion to advance its self-serving interests.

Finally, there is no lesser sanction available under either statute or the applicable federal rules of procedure that would adequately remedy the damage done by NorthWestern's conduct. Judicial estoppel is an equitable remedy, which will apply when there is a "sense of fundamental

---

[8]    Notably, "the application of judicial estoppel does not turn on whether the estopped party actually benefited from its attempt to play fast and loose with the court." Krystal Cadillac, 337 F.3d at 324; see also T. Copeland and Sons v. SLM Int'l Inc. (In re SLM Int'l., Inc.), 248 B.R. 240, 248 (D. Del. 2000).  Instead, any such benefit is only a factor in determining whether the evidence would support a conclusion of bad faith under the second prong of the inquiry. Id. (quoting Ryan, 81 F.3d at 361).

[9]    At the hearing to consider Claimants' 9019 Motion, the Bankruptcy Court noted that "there is not going to be any cash paid.  That's not even contemplated by the agreement." See Steingart Decl. Ex. R, p. 41 lines 12-13.

unfairness." <u>Pickett v. Integrated Health Servs., Inc. (In re Integrated Health Servs., Inc.)</u>, 304

B.R. 101, 110 (Bankr. D. Del. 2004). In this instance, the application of the doctrine of judicial

estoppel is appropriate to address the harm suffered by Magten and Law Debenture, including

the incurrence of additional fees and expenses, as a result of NorthWestern asserting contrary

positions in these litigations.


CONCLUSION

WHEREFORE, Claimants respectfully request that the Motion be denied for the reasons

set forth herein and the Court grant any such other relief it deems just and proper.[10]

Dated:   Wilmington, Delaware
         January 15, 2007


                              BLANK ROME LLP

                              _____
                              Dale Dubé (DE No. 2863)
                              Mark Packel (DE No. 4048)
                              1201 Market Street, Suite 800
                              Wilmington, DE 19801
                              Telephone:   (302) 425-6400
                              Facsimile:   (302) 425-6464

                                   - and -

---

[10]   Claimants also join in the Plan Committee's Limited Objection to the Motion with respect to
       NorthWestern's comment in Footnote 5 of the Motion in which NorthWestern states that it intends to seek
       a determination from this Court that, among other things, the "interest earned on the funds in the Disputed
       Claims Reserve is not property of the claims holders, but instead available to NorthWestern to satisfy fees
       and expenses associated with resolving remaining Disputed Claims." As the Plan Committee correctly
       points out, the interest and dividends earned on the shares in the Disputed Claims Reserve are to be held in
       trust for the creditors and are not to be used as NorthWestern's "personal piggy bank." Claimants, thus,
       reserve any and all rights, claims and objections with respect to the interest and/or dividends earned on the
       shares in the Disputed Claims Reserve.

23

FRIED, FRANK, HARRIS, SHRIVER &
    JACOBSON LLP
Bonnie Steingart
Gary L. Kaplan
John W. Brewer
One New York Plaza
New York, NY 10004
Telephone:  (212) 859-8000
Facsimile:  (212) 859-4000

Counsel for Magten Asset Management
    Corporation


SMITH, KATZENSTEIN & FURLOW, LLP
Kathleen M. Miller (DE No. 2898)
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE  19899
Telephone:    (302) 652-8400
Facsimile:    (302) 652-8405

- and -

NIXON PEABODY LLP
John V. Snellings
Amanda Darwin
100 Summer Street
Boston, MA  02110
Telephone:    (617) 345-1201
Facsimile:    (866) 947-1732
Counsel for Law Debenture Trust Company

24

# Exhibit X

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

------------------------------------------------------------------- x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| NORTHWESTERN CORPORATION, | : | Case No. 03-12872 (KJC) |
|  | : |  |
| Reorganized Debtor. | : |  |
|  | : | **Hearing Date: TBD** |
|  | : | **Objection Deadline:  TBD** |

-------------------------------------------------------------------X

---

**EMERGENCY MOTION OF MAGTEN ASSET MANAGEMENT
CORPORATION AND LAW DEBENTURE TRUST COMPANY FOR A
STAY PENDING APPEAL OF ORDER IN AID OF EXECUTION OF
PLAN OF REORGANIZATION**

---

Pursuant to Rule 8005 of the Federal Rules of Bankruptcy Procedure and Rule 62 of the

Federal Rules of Civil Procedure, Magten Asset Management Corporation ("Magten"), and Law

Debenture Trust Company of New York  ("Law Debenture"), in its capacity as Indenture Trustee

for the QUIPS, together with Magten, ("Claimants"), hereby, submit this Emergency Motion (the

"Motion") seeking a Stay of the Order In Aid of Execution of Confirmed Plan of Reorganization

(the "Cash-Out Order")[1] pending their appeal from that order.

---

[1]     See Declaration of John W. Brewer dated February 9, filed contemporaneously herewith (the "Brewer
Decl."), Ex. A.

## SUMMARY OF ARGUMENT

1.      By its Cash-Out Order, this Court has materially altered a substantially

consummated chapter 11 plan and has deprived Claimants of the common stock to which they

are entitled.  The Cash-Out Order directs La Salle Bank, the transfer agent (the "Transfer

Agent") holding issued and outstanding shares of Reorganized NorthWestern[2], allocated to the

Disputed Claims Reserve, to invest the cash to be received upon tender of the shares in the

Disputed Claims Reserve upon consummation of an impending merger between NorthWestern

and Babcock & Brown Infrastructure, Ltd. ("BBI") (the "BBI Transaction"), in accordance with

section 345 of the Bankruptcy Code.  See Brewer Decl. Ex. A, p. 1.

2.      While at first glance, the Cash-Out Order appears to resolve an administrative

issue, actually entry of the Order impermissibly amends NorthWestern's substantially

consummated chapter 11 Plan, which does not provide or allow for cash to be substituted for

shares in the Disputed Claims Reserve.  It is black letter law that once a chapter 11 plan is

substantially consummated, it cannot be modified.  And, it is the law of the case that

NorthWestern's Plan has been substantially consummated: both this Court and the District Court

have held that the Plan has been substantially consummated.  Moreover, NorthWestern's current

position that the Plan may be altered in this manner is 180 degrees inconsistent with the position

it took before the District Court on previous appeals – arguing then that because the Plan was

substantially consummated, Magten and the Non-Accepting QUIPS Holders (whose interests are

represented by Law Debenture) could not receive any consideration other than stock in

satisfaction of their claims.  This Court erred by not judicially estopping NorthWestern from

---

[2]      All capitalized terms not expressly defined herein have the meanings ascribed to them in Reorganized
NorthWestern Corporation's ("NorthWestern") Second Amended and Restated Plan of Reorganization  (the
"Plan") Under Chapter 11 of the Bankruptcy Code.

arguing (because now it suits them) that the shares in the Disputed Claims Reserve can be cashed-out. A stay of the Cash-Out Order is necessary to afford the District Court the opportunity to review this Court's ruling.

      3.     The terms of the Plan that relate to this Motion are simple and are not in dispute. Once their claims are Allowed, Claimants, as the holders of certain securities called QUIPS (Qualified Income Preferred Securities), are entitled to their pro rata share of New Common Stock of NorthWestern. There is no provision in the Plan allowing for substitution of cash in lieu of stock in the Disputed Claims Reserve. The Cash-Out Order, however, modifies the plan so that once their claims are Allowed, the Claimants will receive cash not stock.

      4.     The potential irreparable harm to Claimants is real and certain if a stay pending appeal is not granted. NorthWestern is actively seeking regulatory approval[3] to consummate the BBI Transaction, whereby the stock in the Disputed Claims Reserve will be cashed-out. It appears that NorthWestern might be in a position to consummate the transaction as early as the middle of March. Claimants will seek an expedited briefing schedule that would allow the appeal to be fully briefed, argued, and ready for decision prior to March 14, 2007, which is the date that the last remaining regulatory agency to approve the Merger Agreement is beginning its approval hearings[4]. The stay will only potentially delay NorthWestern to the extent the District Court needs additional time to consider the issues before ruling on the merits. Unless a stay of the Cash-Out Order is granted, Claimants face a substantial risk that once the BBI Transaction is

---

[3]      In seeking a stay of the Cash-Out Order pending appeal, Claimants are not requesting that the Court prevent NorthWestern from continuing to go forward with the regulatory approval process. Claimants seek only a modest stay of the Order pending appeal so that once NorthWestern obtains necessary regulatory approval, it will be delayed from consummating the Merger Agreement, which would require the cashing-out of NorthWestern common stock in the Disputed Claims Reserve, until the merits of the appeal are decided.

[4]      See Brewer Decl. Ex. B, p. 3; See also Brewer Decl. Ex. C. , p. 11 (lines 14-17)

approved, and the shares in the Disputed Claims Reserve are surrendered and converted to cash, they will be without any recourse, as any subsequent appeal of the Cash-Out Order will be rendered moot. A stay of the Cash-Out Order, therefore, is necessary to preserve the status quo pending appeal.

5.     Magten and the Law Debenture as indenture trustee for the QUIPS are the only remaining Claimants for the Disputed Claims Reserve. If the merger is consummated during the pendency of their appeal, Magten and Law Debenture will also be irreparably deprived of their right as creditors under the Bankruptcy Code to receive the same treatment as other similarly situated creditors. Claimants with Allowed claims in the same class as Magten and the Law Debenture already received their pro rata shares of New Common Stock. However, if the stay is not ordered and the merger is consummated, Magten and the Law Debenture will be forced to receive a treatment different than that provided under the Plan without any appellate review. Thus, a stay pending appeal is necessary to preserve the status quo to provide for meaningful appellate review.

## FACTUAL AND PROCEDURAL BACKGROUND

6.     NorthWestern is a publicly traded corporation that was incorporated in 1923. NorthWestern, together with its subsidiaries, comprise one of the largest providers of electricity and natural gas in the upper Midwest and Northwest regions of the United States, serving approximately 608,000 customers throughout Montana, South Dakota and Nebraska.

7.     Magten holds approximately 40% of the QUIPS issued by Montana Capital I (the "Trust"). Law Debenture is the Indenture Trustee for the QUIPS. The Trust is a business trust established pursuant to the Delaware Business Trust Act. The Trust was established by the Montana Power Company ("Montana Power"), predecessor in interest to Clark Fork & Blackfoot

3

LLC ("Clark Fork") (f/k/a NorthWestern Energy, LLC), as a financing vehicle. The only assets of the Trust are the 8.4% Junior Subordinated Debentures due 2036 issued by Montana Power.

8.    On September 29, 2000, Montana Power entered into a unit purchase agreement with NorthWestern, pursuant to which NorthWestern agreed to purchase the Montana Utility Assets. In order to facilitate the assets sale to NorthWestern, Montana Power created a subsidiary, Montana Power Company LLC.

9.    On November 15, 2002, NorthWestern orchestrated the transfer of substantially all of the utility assets of its directly owned subsidiary, Clark Fork, to NorthWestern for inadequate consideration (the "Transfer"). Though the Clark Fork assets had a value in excess of $1.4 billion, the total consideration received for the Transfer was the assumption of approximately $700 million of liabilities by NorthWestern. (This discrepancy in value has not been disputed in any filings by NorthWestern). As a result of this Transfer, Clark Fork was rendered insolvent.

10.    On September 14, 2003, NorthWestern filed a voluntary petition for relief under chapter 11 of title 11 of the Bankruptcy Code.

11.    On April 16, 2004, Claimants commenced an adversary proceeding in the Bankruptcy Court based on NorthWestern's fraudulent transfer of substantially all of the utility assets of Clark Fork. See Declaration of Bonnie Steingart dated January 15 (the "Steingart Decl."), filed with the Joint Objection of Magten Asset Management Corp. and Law Debenture Trust Company of New York to Reorganized NorthWestern's Motion Pursuant to 11 U.S.C. §§ 105(a) and 1142(b) and Rule 3020(d) of the Bankruptcy Rules, Seeking Entry of an Order in Aid of Execution of Confirmed Plan of Reorganization [docket no. 3557] (the "Cash-Out Objection"), Ex. B.

4

12.    On August 19, 2004, NorthWestern filed its Plan and the Second Amended and Restated Disclosure Statement (the "Disclosure Statement"). See Disclosure Statement [docket no. 1986]. On August 31, 2004, NorthWestern filed its revised Plan and Disclosure Statement, see Plan and Disclosure Statement [dockets nos. 2020 and 2021, respectively], and on September 2, 2004, the Bankruptcy Court entered an order approving the Disclosure Statement. See Order Approving the Revised Disclosure Statement [docket no. 2033].

13.    Pursuant to the Plan, Magten and the Non-Accepting QUIPS Holders (whose interests are represented by Law Debenture), if successful, would receive an Allowed Class 9 Claim of New Common Stock to be satisfied from the Disputed Claims Reserve. See Steingart Decl. Ex. C, pp. 36-37, § 4.8(b)(ii). Specifically, the Plan provides, in relevant part, that Class 9 creditors "shall receive in full satisfaction, settlement, release, extinguishment and discharge ... its Pro Rata Share of: (a) 32,660,000 shares of New Common Stock ... plus (b) the 505,591 shares of New Common Stock allocated to Class 8(b) if Class 8(b), as a class, votes to reject the Plan. See Steingart Decl. Ex. C, pp. 40, § 4.8(c)(1)(i).

14.    On October 19, 2004, the Bankruptcy Court entered an order confirming the Plan (the "Confirmation Order"). See Confirmation Order [docket no. 2238]. The Confirmation Order required NorthWestern to "establish an initial reserve of 13.5% of New Common Stock allocated to Class 7 and Class 9 for the Disputed Claims Reserve . . . pursuant to Section 7.5 of the Plan."[5] See Steingart Decl. Ex. D, p. 80-81.

15.    On November 1, 2004, pursuant to section 7.5 of the Plan providing that "[i]n lieu of estimating, fixing or liquidating the amount of any Disputed Claim . . . such amount may be

---

[5]    The 13.5% reserve proposed by NorthWestern was predicated on representation that 13.5% of the stock was an amount equal to the relevant percentage of Distributions to which the holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims in the amount of such Disputed Claim or such lesser amount as required by Final Order, as required by Section 7.5 of the Plan.

5

fixed *by an agreement in writing by and between the Debtor and the holder of a Disputed Claims*", (see Steingart Decl. Ex. C, p. 59 (emphasis added)), NorthWestern and the Indenture Trustee filed the QUIPS Stipulation with the Bankruptcy Court. See QUIPS Stipulation [docket no. 2298]. Pursuant to the QUIPS Stipulation, NorthWestern agreed to set aside a portion of the Disputed Claims Reserve "solely to satisfy in full a $25 million Class 9 claim of the QUIPS Litigation Claims holders" (the "QUIPS Claims Reserve") and set forth the rights of the QUIPS holders with respect to their litigation claims (the "QUIPS Litigation Claims") to recover on account of an Allowed Claim in excess of that amount. See Steingart Decl. Ex. J, pp. 2-3.

16.    NorthWestern emerged from bankruptcy on November 1, 2004, and the Plan became effective (the "Effective Date"). See Notice of the Confirmation Order and The Occurrence of the Effective Date [docket no. 2300]. A notice of substantial consummation of the Plan was filed on December 29, 2004. See Notice of Substantial Consummation [docket no. 2519]. It is law of the case that NorthWestern's Plan has become effective and has been substantially completed.

17.    Pursuant to a settlement agreement (the "Settlement Agreement"), dated as of January 27, 2005, Magten, Law Debenture, on behalf of the QUIPS holders, and NorthWestern agreed to a compromise and settle at a Plan value of approximately $25.5 million, or approximately a 51% recovery based on the face amount of the QUIPS' $50 million Class 9 Claim (not including accrued interest, fees and expenses), rather than the approximately 63% they are entitled to under the Plan in exchange for the cessation of litigation between the Parties. See Steingart Decl. Ex. K, ¶ 21.

18.    After the Settlement Agreement was negotiated and executed, presented to the Bankruptcy Court and made public through NorthWestern's press release, on February 16, 2005,

6

NorthWestern advised Magten and Law Debenture by letter that it would not honor the terms of the Settlement Agreement. See Steingart Decl. Ex. L, p. 1.

19.    At the direction of the Bankruptcy Court, Claimants filed a Rule 9019 motion (the "9019 Motion") seeking approval of the Settlement Agreement. See Steingart Decl. Ex. A. Subsequently, NorthWestern, the Plan Committee and the ad hoc committee of class 7 debtholders filed objections to the 9019 Motion. The primary basis of the objections was that the Settlement violated the Plan insofar as it provided to the holders of the QUIPS a recovery under both Option 1 and Option 2, when the Plan required holders of the QUIPS to choose between such options. Moreover, NorthWestern, in its objection (the "9019 Objection"), stated that "in negotiations with respect to the proposed settlement it was made very clear to both Magten and the Law Debenture that NorthWestern could not utilize cash to resolve Magten's and Law Debenture's claims." See Steingart Decl. Ex. A, ¶ 65.

20.    On March 10, the Bankruptcy Court entered an order (the "9019 Order"), denying the 9019 Motion, finding that "a plan amendment is not legally available because the Plan has been substantially consummated [since] [a] confirmed plan may be modified or amended after confirmation, but only before substantial consummation has taken place." See Steingart Decl. Ex. L, p. 5.

21.    Following the Bankruptcy Court's denial of the 9019 Motion, Claimants timely filed an appeal (the "9019 Appeal"). See Notice of Appeal, [docket no. 2919]. On appeal, the District Court affirmed the Bankruptcy Court's ruling, holding that an amendment to the Plan would be necessary to implement the settlement, but that such an amendment was not feasible, as the Plan had been substantially consummated. See Steingart Decl. Ex. N, p. 7.

7

22.    On September 29, 2005, the Plan Committee filed a Motion In Aid of

Consummation and Implementation of the Plan for an Order Authorizing and Directing

NorthWestern to Distribute Surplus Distributions (the "Surplus Distribution Motion") [docket

no. 2208].  Pursuant to the Surplus Distribution Motion, the Plan Committee sought an order

authorizing and directing NorthWestern to designate certain shares in the Disputed Claims

Reserve as surplus distributions and to distribute such shares to holders of Allowed Claims under

Section 7.7 of the Plan.  See Surplus Distribution Motion, pp. 5-6.

23.    On February 2, 2006, the Bankruptcy Court denied the Surplus Distribution

Motion (the "Order Denying the Surplus Distribution Motion") on the grounds that Section 7.7

of the Plan and the QUIPS Claims Reserve Stipulation precluded any distribution from the

Disputed Claims Reserve until the disputed claims of Magten and Law Debenture with respect to

the QUIPS litigation were resolved.  See Steingart Decl. Ex. O, p. 3.  In rendering its decision,

the Bankruptcy Court correctly concluded that "[t]he [Surplus Distribution] Motion was

premature in view of the litigation surrounding the unresolved and disputed claims of Magten . . .

and Law Debenture . . . ."  Id.  On March 9, 2006, the Plan Committee filed a Notice of Appeal

of the Order Denying the Surplus Distribution Motion in the District Court.  See Notice of

Appeal [docket no. 3441].  Briefing of the Plan Committee Appeal has been completed,

however, no decision has been rendered by the District Court.

24.    In a Form 8-K issued by NorthWestern on April 26, 2006, NorthWestern

announced that it had signed a definitive agreement (the "Merger Agreement") to be acquired by

BBI for $37 per share of common stock in an all cash transaction that values NorthWestern at

approximately $2.2 billion.  Pursuant to section 2.01(i) of the Merger Agreement, each share of

common stock in the Disputed Claims Reserve will be converted into $37 in cash – the value of

8

the merger consideration. See Brewer Decl. Ex. D, ¶ 10. NorthWestern's Plan, however, does not provide for a cash-out of the shares in the Disputed Claims Reserve.

25.    On December 6, 2006, NorthWestern filed its Cash-Out Motion pursuant to 11 U.S.C. §§ 105(a) and 1142(b) before this Court, seeking entry of an "Order In Aid of Execution of Confirmed Plan Of Reorganization, ... directing the Transfer Agent holding issued and outstanding shares of the Reorganized NorthWestern allocated to the Disputed Claims Reserve, upon tender of such shares in exchange for cash in accordance with the terms of an approved Merger Agreement, to invest any cash received in such exchange in accordance with Section 345 of the Bankruptcy Code." See Brewer Decl. Ex. D, p. 1.

26.    On January 15, 2007, Claimants filed an objection to NorthWestern's Cash-Out Motion. See Brewer Decl. Ex. E. On February 1, 2007, this Court held a hearing on the Cash-Out Motion, and granted the motion. See Brewer Decl. Ex. C.

27.    On February 2, 2007, this Court entered the Cash-Out Order that is the subject of this Motion. See Brewer Decl. Ex. A.

## JURISDICTION AND VENUE

28.    The Bankruptcy Court has jurisdiction over this matter as a core proceeding under 28 U.S.C. §§1334(b) and 157(b)(2). The relief requested herein is predicated on Rule 8005 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). Venue in this district is proper pursuant to 28 U.S.C. §§1408 and 1409.

## RELIEF REQUESTED

29.    Bankruptcy Rule 8005 empowers the Court to stay any judgment or order pending appeal. "[A] stay may be appropriate in a case where the threat of irreparable injury to the applicant is immediate and substantial, the appeal raises serious and difficult questions of law in

an area where the law is somewhat unclear and the interests of the other parties and the public are not harmed substantially." Evans v. Buchanan, 435 F. Supp. 832, 844 (D. Del. 1977).

30.    The Third Circuit has recognized that "a myriad of circumstances can occur that would necessitate the grant of a stay pending appeal in order to preserve a party's position." In re Highway Truck Drivers & Helpers Local Union #107, 888 F.2d 293, 298 (3d Cir. 1989). The granting of a motion for a stay pending appeal is committed to the bankruptcy court's sound discretion. In re United Merchants & Mfrs., Inc., 138 B.R. 426, 430 (D. Del. 1992).

31.    To obtain a stay pending appeal, the Court must consider the following well known four factors: (i) whether the moving party has a strong likelihood of success on the merits of the appeal; (ii) whether the movant will be irreparably harmed absent a stay; (iii) whether the issuance of the stay will substantially injure the other parties interested in the proceeding; and (iv) where the public interest lies. Republic of the Phil. v. Westinghouse Elec. Corp., 949 F.2d 653, 658 (3d Cir. 1991); see also In re Del. & Hudson Ry. Co., 90 B.R. 90, 91 (Bankr. D. Del. 1988). The analysis contemplates "individualized judgments in each case," id., such that no single factor is outcome determinative. In re Allegheny Health, Educ. & Research Found., 252 B.R. 309, 321 (W.D. Pa. 1999); see also Evans v. Buchanan, 455 F. Supp. 705, 708 (D. Del. 1978); In re Edwards, 228 B.R. 573 (Bankr. E.D. Pa. 1999) (balancing all factors in making the determination whether to grant a stay); Pension Benefit Guar. Corp. v. Sharon Steel Corp. (In re Sharon Steel Corp.), 159 B.R. 730, 733 (Bankr. W.D. Pa. 1993) (finding that the court can balance the factors "in light of the overall circumstances of the case").

32.    There is strong support for the proposition that courts should give serious consideration to motions seeking a preservation of the status quo pending appeal in the bankruptcy context. See, e.g., In re Gucci (Paolo v. Sinatra), 105 F. 3d 837 (2d Cir. 1997),

10

where the Second Circuit expressed concern that the district court's denial of a stay request

effectively denied meaningful review on appeal and cautioned:

> On this motion to dismiss an appeal involving a bankruptcy sale, we write to alert district judges to a major and perhaps unappreciated significance of their action, after denying a stay pending appeal, in denying even a one-day stay to permit a party to seek a stay pending appeal from the Court of Appeals.

The Second Circuit added that

> where an appellant timely moves to stay a judicially authorized sale, a district court's denial of that motion will similarly limit the issues on appeal. Although an appellant's challenge to a sale authorization might raise meritorious arguments, a district court's denial of a requested stay has the effect of precluding this court from reviewing those issues, other than the good faith of the purchaser, if the sale has closed in the interim. *It becomes important for district judges to appreciate the special consequences of denying a stay of a bankruptcy sale, even a very brief stay to permit this Court time to consider whether a stay pending appeal is warranted.*

Id. at 840 (emphasis added).

## ARGUMENT

## I.    Claimants Will Likely Succeed on the Merits of their Appeal from the Order

33.    The first prong of the standard – a likelihood of success on the merits – requires

the movant to have a "'substantial case,' or a strong case on appeal." In re Columbia Gas Sys.,

1992 U.S. Dist. LEXIS 3253 at *4 (D. Del. Mar. 10, 1992) (citation omitted) (quoting In re

Public Serv. Co., 116 Bankr. 347, 349 (Bankr. D.N.H. 1990)); Morgan v. Polaroid Corp. (In re

Polaroid Corp.), Civil Action No. 02-1353 (JJF), 2004 U.S. Dist. LEXIS 1917 at *4 (D. Del. Feb.

9, 2004). The "likelihood-of-success" standard, however, does not require that the  court have

"serious doubts concerning the correctness of [the] decision in order to grant a stay pending

appeal." Goldstein v. Miller, 488 F. Supp. 156, 172 (D. Md. 1980), aff'd, 649 F.2d 863, aff'd

sub. nom. Overbrook Egg Nog Corp. v. Miller, 649 F.2d 864 (4th Cir. 1981). See also O'Bryan

v. Estelle, 691 F.2d 706, 708 (5th Cir. 1982) (movant need not always show probability of

success; substantial case on merits and serious legal question, coupled with balance of equities,

weighs heavily in favor of granting stay).   This prong merely reflects a court's "intent to restrict

appellate review to those parties with colorable claims while at the same time conserving judicial

resources by eliminating frivolous appeals." See Citizens Nat'l Bank (In re Turner), 207 B.R.

373, 376-77 (B.A.P. 2d Cir. 1997) (citing Hirschfeld v. Bd. of Elections, 984 F.2d 35 (2d Cir.

1993)).  Regarding the likelihood of success prong, the District Court in Evans v. Buchanan, 435

F. Supp. 832 (D. Del. 1977), explained that

> [i]n a case where the movant will suffer irreparable injury in the absence of a
> stay, consideration of the merits of the movant's appeal permits an evaluation
> of whether that injury is likely to occur in any event.  It seems illogical,
> however, to require that the court in effect conclude that its original decision in
> the matter was wrong before a stay can be issued.

Id. at 844.

34.    Claimants will likely succeed on the merits of their appeal because:

(i)    the proposed cash-out of the Disputed Claims Reserve (which
this Court endorsed by entering an order directing the Transfer
Agent to invest in said cash upon tendering the stock in the
Disputed Claims Reserve) violates the Bankruptcy Code.
Specially, the proposed cash-out violates sections 1127(b) and
1123(a)(4) of the Bankruptcy Code.

(ii)    the terms of the plan that were deemed substantially
consummated pursuant to the Bankruptcy Code control as
federal statutory law and trump Delaware Corporate Law and
the Bankruptcy Court's general equitable powers.  There is also
no authority or discretion for the Court to authorize the cash-
out of shares under sections 105(a) and 1142(b) of the
Bankruptcy Code and Rule 3020 of the Federal Rules of
Bankruptcy Procedure.

(iii)    the potential for a merger was squarely presented pre-
confirmation and NorthWestern determined not to provide for
it in the Plan; and

12

(iv)    judicial estoppel precludes NorthWestern from arguing that it
can exchange the shares in the Disputed Claims Reserve for
cash.

A.    **NorthWestern Cannot Substitute Cash in the Disputed Claims
Reserve**

1.    The Plan May Not Be Modified Because It Has Been
Substantially Consummated

35.    Section 1127(b) of the Bankruptcy Code provides, in relevant part, that:

The proponent of a plan or the reorganized debtor may modify
such plan at any time after confirmation of such plan and before
substantial consummation of such plan....[6]

11 U.S.C. § 1127(b).

36.    Courts have uniformly interpreted section 1127(b) as imposing a bar to

modification of a chapter 11 plan once substantial consummation of the plan has occurred. See

U.S. Brass Corporation v. Travelers Insurance Group, Inc. (In re U.S. Brass Corporation), 301

F.3d 296, 307 (5th Cir. 2002) (holding that a modification of a plan is prohibited once substantial

consummation has occurred); In re H&L Developers Inc. 178 B.R. 77, 82 (Bankr. E.D. Pa. 1994)

(concluding that since the confirmed plan was substantially consummated pursuant to section

1101(2), a modification would not be permitted under section 1127(b)); In re Innovative Clinical

Solutions, Ltd. (Almeroth v. Innovative Clinical Solutions Ltd.), 302 B.R. 136, 144 (Bankr. D.

Del. 2003) (finding that 1127(b) is the sole means for modifying a confirmed plan and that the

plan could not be modified because it had been substantially consummated); Matter of Eddington

Thread Mfg. Co. Inc., 189 B.R. 898, 904 (E.D. Pa. 1995) (stating a plan may be modified after

its confirmation only if substantial consummation has not yet occurred); In re Charterhouse, Inc.,

---

[6]    Substantial consummation, as defined in section 1101(2) means: (A) transfer of all or
substantially all of the property proposed by the plan to be transferred; (B) assumption by
the debtor or by the successor to the debtor under the plan of the business or of the
management of all or substantially all of the property dealt with by the plan; and (C)
commencement of the distribution under the plan. 11 U.S.C. §1101(2).

13

84 B.R. 147, 151 (Bankr. D. Minn. 1998) (noting that section 1127(b) operates to prohibit modification once substantial consummation has occurred); 7 Collier on Bankruptcy, P 1127.04 (15th Ed. Rev. 2006) (explaining that a chapter 11 plan may not be modified after substantial consummation). Specifically, the Third Circuit has stated that section 1127(b) "dramatically curtails the power of a bankruptcy court to modify a plan of reorganization after its confirmation and 'substantial consummation.'" In re Continental Airlines, Inc., 91 F.3d 553, 570 (3d. Cir. 1996). It is irrelevant whether the plan modification sought is an explicit, direct modification of the plan, or whether it is to be effectuated through a purported post-confirmation transaction. See In re U.S. Brass Corp., 301 F.3d at 307-08 (concluding that a proposed settlement agreement would impermissibly modify a plan in contravention of the Bankruptcy Code). Accordingly, any relief sought that in fact modifies a confirmed plan or produces a result at odds with specific provisions of a plan is subject to the bar imposed by Section 1127(b). See In re Tillotson, 266 B.R. 565, 571-72 (Bankr. W.D.N.Y. 2001); In re Northampton Corp., 39 B.R. 955, 956 (Bankr. E.D. Pa. 1984), aff'd 59 B.R. 963 (E.D. Pa. 1984). See also Steingart Decl. Ex. N, p. 7 (wherein the District Court, affirming this Court's ruling on the 9019 Motion, held that "an amendment to the Plan would be necessary to implement the settlement" but that "such an amendment was not feasible as the Plan has been substantially consummated.")

37.    It is law of the case that the Plan has been substantially consummated: both this Court and the District Court have issued orders finding that the Plan has been substantially consummated.[7] Specifically, in connection with the 9019 Motion, this Court held that the Plan could not be amended because the Plan had been substantially consummated, noting that the

---

[7]    See Notice of Substantial Consummation, filed on December 29, 2004 [docket no. 2519]; Steingart Decl. Ex. L, p. 5 (March 10, 2005 Opinion of Bankruptcy Court); Steingart Decl. Ex. N , p. 7 (September 29, 2006 Opinion of the District Court).

14

Notice of Substantial Consummation had been filed and it had received widespread publication. See Steingart Decl. Ex. L, p. 5. The District Court echoed this finding when it affirmed this Court's decision by finding that modification of the Plan was impermissible because the Plan had been substantially consummated. See Steingart Decl. Ex. N, p. 7. Because the Plan has been substantially consummated, it cannot be amended, modified, or contradicted.

38.     Section 4.9(c) of the Plan provides the following treatment for holders of unsecured claims, including Claimants:

> On the Effective Date, or as soon thereafter as practicable, each holder of an Allowed General Unsecured Claims . . . shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim its Pro Rata Share of: (i) 32,660,000 shares of New Common Stock (such 32,660,000 shares representing 92% of the New Common Stock issued and outstanding on the Effective Date prior to any dilution resulting from shares of New Common Stock issued pursuant to the New Incentive Plan and exercise of the Warrants), plus (ii) the 505, 591 shares of New Common Stock allocated to Class 8(b) if Class 8(b) as a class, votes to reject the Plan.

39.     By permitting the substitution of cash in the Disputed Claims Reserve for the stock, NorthWestern is modifying section 4.9 of the Plan to provide that while all other holders of Class 9 Claims will have received their pro rata share of New Common Stock, Claimants will receive cash. Not only does such a result directly contravene section 4.9(a) of the Plan and therefore violate section 1127(b) of the Bankruptcy Code, it also means that Claimants will not receive the same treatment as other similarly situated claimants, thus also violating section 1123(a) of the Code discussed below.

2.     Substituting Cash for Stock in the Disputed Claims Reserve
       Would Violate Section 1123(a)(4) of the Bankruptcy Code.

40.     While holders of Class 9 Claims whose claims have become Allowed will have received shares, by exchanging the shares in the Disputed Claims Reserve for cash, holders of

15

Disputed Claims, by virtue of when their Claims become Allowed, will receive a wholly different treatment under the Plan. Affording the Non-Accepting QUIPS Holders treatment that differs from that provided for Class 9 Claimants in the Plan and that was afforded to holders of Allowed Class 9 Claims violates the clear statutory requirement of Section 1123(a)(4) of the Bankruptcy Code that a plan shall:

> provide the same treatment for each claims or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest . . .

11 U.S.C. §1123(a)(4).

41.    Because Magten and the Non-Accepting QUIPS Holders are being forced to receive cash in lieu of shares of New Common Stock, claimants within the same class – Class 9 – will be receiving non-consensual disparate treatment. By cashing out the shares in the Disputed Claims Reserve, claimants in Class 9 are being treated differently depending upon when their claim became allowed. Although 1123(a)(4) permits discriminatory treatment if claimants within a class opt to be treated differently, Magten and the Non-Accepting QUIPS Holders have never consented to be treated differently nor have they consented to receive less favorable treatment than other QUIPS holders. See Hawley Fuel Coalmart, Inc. v. Hawley Fuel Coal, Inc. (In re AOV Indus., Inc., 792 F.2d 1140, 1151-52 (D.C. Cir. 1986)) (finding that equal treatment of class members is a basic premise of bankruptcy law); In re Granada Wines, Inc., 26 B.R. 131, 134 (Bankr. D. Mass. 1983) (stating that the debtor is not permitted to unfairly discriminate against a member of a class). Without the consent of Claimants, the Plan cannot provide one treatment to some holders and a different treatment to others in the same class. In fact, the Plan could never have been confirmed if the Non-Accepting QUIPS Holders received cash while the remaining Class 9 Claimants received New Common Stock. Now, more than two

16

years later, to substitute cash for shares post-confirmation would alter the bargain that Claimants

received under the Plan, and would provide varying treatment of claimants within Class 9.

Claimants believe they will be able to successfully argue that the Cash-Out Order violates

Section 1123(a)(4) of the Bankruptcy Code in their appeal.

      B.      **The Terms Of The Plan Control and Trump Delaware Corporate Law, and the Bankruptcy Court's General Equitable Powers.**

      42.     In seeking to obtain the relief requested in the Cash-Out Order, NorthWestern

argued that tendering the shares of New Common Stock in exchange for cash is not a

modification of the Plan but is permitted by operation of Delaware corporate law. The Cash-Out

Motion states that "NorthWestern is not seeking permission to effect the merger with Babcock &

Brown – the merger will become effective pursuant to controlling Delaware law following

applicable approvals." See Brewer Decl. Ex. D, ¶ 2. In granting the relief requested by

NorthWestern, this Court failed to realize that the issue before it was not whether the Court

needs to approve the merger. Rather, the question is whether the purported effect of the merger,

i.e., the conversion of the New Common Stock in the Disputed Claims Reserve into cash upon

consummation of the merger in compliance with the procedural rules of Delaware corporate law,

can be effected without an amendment to the Plan. The answer to that question is clearly "no."

      43.     The Third Circuit has noted that "if a provision of the [p]lan, a creature of federal

law, conflicts with the law of a state and the state law 'frustrates the full effectiveness of federal

law, [the state law], is rendered invalid by the Supremacy Clause.'" Jones v. Keene Corp., 933

F.2d 209, 214 (3d. Cir. 1991) (internal quotations omitted). See also Consumer Realty & Dev.

Co. v. Goetze) (In re Consumers Realty & Development Co., Inc.), 238 B.R. 418, 426 (8th Cir.

1999) (finding that the provisions of a confirmed plan will govern if contrary to state law);

17

Ocasek v. Manville Corp. Asbestos Disease Comp. Fund, 956 F.2d 152, 154 (7th Cir. 1992)

(holding that because the provisions of a plan bind all parties, the terms of the plan will govern

and appellant cannot rest on contradictory Illinois state law for an award of interest).

      44.    Similarly here, the treatment of creditors under NorthWestern's Plan, confirmed

by the Bankruptcy Court and substantially consummated, cannot be altered by virtue of a state

corporate law that provides for different treatment to holders of those claims. See In re Roach,

824 F.2d 1370, 1373-1374 (3d. Cir. 1987) ("any state legislation that frustrates the full

effectiveness of federal law is rendered invalid by the Supremacy Clause ..."); Hechinger

Investment Co. of Delaware v. Fleet Retail Finance Group, et. al., 274 B.R. 71, 95-97 (D. Del.

2002) (stating that state law may be preempted when it conflicts or stands as an obstacle to the

implementation of specific provisions of the Bankruptcy Code). In BFP v. Resolution Trust

Corp., 511 U.S. 531 (1994), the Supreme Court noted that "when the meaning of the Bankruptcy

Code's text is itself clear . . . its operation is unimpeded by contrary state law or prior practice"

and that "the Bankruptcy Code can of course override by implication when the implication is

unambiguous." Id. at 546. See also In re Roach, 824 F.2d at 1373 ("Under Article I, § 8 of the

Constitution, Congress has the power to establish uniform bankruptcy laws in the United States

and "where Congress has chosen to exercise its authority, contrary provisions of state law must

accordingly give way"); In the Matter of Princeton-New York Investors, Inc., 219 B.R. 55, 59

(Bankr. D. N.J. 1998) (noting that where Congress chose to exercise its authority, contrary

provisions of state law must give way). With respect to the BBI Transaction, enforcing a

provision of Delaware corporate law that permits a cash-out of the shares in the Disputed Claims

Reserve frustrates the Bankruptcy Code's very purpose and intent in prohibiting a modification

of a substantially consummated plan. Allowing Delaware corporate law to override the express

18

terms of the Plan and the provisions of the Bankruptcy Code obstructs the operation of federal law thereby violating the Supremacy Clause.

45.    Northwestern has created its own quandary.  NorthWestern's need to cash-out shares in the Disputed Claims Reserve is the result of a voluntary transaction entered into by NorthWestern and BBI.  NorthWestern negotiated the terms of the BBI Transaction and could have avoided this precise predicament when determining how to deal with the remaining Disputed Claims and the shares in the Disputed Claims Reserve.  Since the transaction was first announced, Claimants has repeatedly informed NorthWestern that the stock cannot be cashed out under the Plan.  See Brewer Decl. Ex. F and G.  Any apparent conflict between Delaware law and the Bankruptcy Code and Plan is self-created.

46.    By its motion, NorthWestern also contends that sections 105(a) and 1142(b) of the Bankruptcy Code and Rule 3020(d) of the Federal Rules of Bankruptcy Procedure provide the Bankruptcy Court with the authority to grant the relief requested in the Cash-Out Motion.  See Brewer Decl. Ex. D, ¶ 12.  Notably, this Court during the hearing on the Cash-Out Motion, recognized that section 1142 of the Bankruptcy Code, which provides that the bankruptcy court may direct any necessary party to perform any act necessary for the consummation of a plan of reorganization (11 U.S.C. § 1142 (b)) was not applicable, acknowledging that it was "too broad of a reading" of the statute.  See Brewer Decl. Ex. C, p. 43, (line 20).  This Court relied on Rule 3020 of the Federal Rules of Bankruptcy Procedure in granting the relief sought by NorthWestern.  See Brewer Decl. Ex. C, p. 43, (lines 18-21).  Any reliance on Rule 3020, or section 105 of the Code (argued by NorthWestern but not specifically addressed by this Court), however, ignores well-settled and necessary limitations that are placed on the bankruptcy courts' broad equitable powers granted under those provisions.

19

47.    Rule 3020 provides that "[n]otwithstanding the entry of the order of confirmation, the court may issue any other order necessary to administer the estate." Fed. R. Bankr. P. 3020(d).  This Court's reliance on this provision to provide it with the authority to enter the Cash-Out Order is misplaced.  It is well-settled that the Bankruptcy Court's broad equitable power under the Federal Rules is superseded by substantive rights under the Bankruptcy Code, a creature of federal statutory law.  See Branchburg Plaza Associates v. Fesq (In re Fesq), 153 F.3d 113, 116 (3d Cir. 1998) (finding that "when Congress accorded the Supreme Court authority to promulgate the Bankruptcy Rules, it stated 'such rules shall not abridge, enlarge, or modify any substantive right.'") (quoting 28 U.S.C. § 2075).  The Third Circuit explained in In re Fesq, 153 F.3d at 116, that "as a general matter, the Code defines the creation, alteration or elimination of substantive rights but the Bankruptcy Rules define the process by which these privileges may be effected." (internal quotations omitted).  Id.  The Third Circuit held that the Bankruptcy Rules could not validly provide the creditor in that case with a substantive remedy that would be foreclosed by a provision of the Bankruptcy Code.  See id. See also In re Caldor Corp., (Term Loan Holder Committee v. Ozer Group, LLC.), 303 F.3d 161, 171 (2d Cir. 2002) (recognizing that the Rules Enabling Act places "the rules in a subsidiary position to the Code.").  This Court erred by relying on Rule 3020 to enter the Cash-Out Order because it is inconsistent with and therefore superseded by an explicit substantive provision of the Code.

48.    Section 1142(b) of the Bankruptcy Code is explicit that there can be no modification of a chapter 11 plan after substantial consummation.  As discussed above, NorthWestern's chapter 11 Plan does not provide for the cashing-out of shares in the Disputed Claims Reserve.  By its Cash-Out Order, directing the Transfer Agent on how to proceed upon a

20

cash-out when a cash-out itself is not permitted, this Court has in effect relied on a Bankruptcy

Rule to abridge an explicit substantive right of the Code, in direct contradiction to 28 U.S. C. §

2075.

    49.    Furthermore, to the extent that NorthWestern or this Court rely on section 105 of

the Bankruptcy Code, which provides that the bankruptcy court may "issue any order . . . that is

necessary to or appropriate to carry out the provisions" of Title 11.  11 U.S.C. § 105(a), such

reliance is similarly misplaced.  Section 105(a), although giving bankruptcy courts general

equitable powers to issue orders necessary and appropriate to carry out the provisions of the

Code, must be exercised in a manner consistent with the Code and does not give bankruptcy

courts power to create rights that would otherwise be unavailable under the Code.  See In re

Conxus Communications, Inc., 262 B.R. 893, 899 (D.Del. 2001) (holding that"[w]hile Section

105(a) gives a bankruptcy court general equitable powers, those powers are limited by the

provisions of the Bankruptcy Code.") (citing In re Morristown & Erie R.R.Co., 885 F.2d 98, 100

(3d Cir. 1989) (recognizing that Section 105(a) must be "applied in a manner consistent with the

Code.").  See also Southern Ry. Co. v. Johnson Bronze Co., 758 F.2d 137, 141 (3d Cir. 1985)

(holding that Section 105(a) does not give a bankruptcy court "the power to create substantive

rights that would otherwise be unavailable under the Code."); In re Henthorn Jr. v. GMAC

Mortgage Corporation, 299 B.R. 351, 355 (E.D. Pa. 2003) ("Although Section 105(a) of the

Bankruptcy Code supplements courts' specifically enumerated bankruptcy powers by

authorizing orders necessary or appropriate to carry out provisions of the Bankruptcy Code, it

has a limited scope) (internal citations omitted).

    50.    Now that the Plan has been deemed substantially consummated, section 1127(b),

a substantive provision of the Bankruptcy Code prohibits any subsequent modification of the

Plan. By permitting NorthWestern to effectuate a cash-out of the stock in the Disputed Claims

Reserve, this Court has created a substantive right for NorthWestern to which it would not

otherwise be entitled. Such use of the Court's equitable powers is simply not permitted and

likely will be admonished by the District Court on appeal.

C.    **The Potential for a Merger was Squarely Presented Pre-
Confirmation and NorthWestern Chose Not to Provide for it in
the Plan**

51.    NorthWestern suggested in its Cash-Out Motion that there is no conflict between

the Plan and their proposed intention to cash-out is merely an "omission in the Plan or in the

Confirmation Order as may be necessary to carry out its plan and intent." See Brewer Decl. Ex.

D, ¶ 13. It was undisputed at the bankruptcy hearing regarding the Cash-Out Motion that

NorthWestern was actively involved in discussions concerning the sale or merger of the

company before, during and immediately following the Plan confirmation process[8] and, thus,

knew that this issue would arise. Therefore, to the extent that it is an omission in the Plan, it is

an intentional omission that this Court should not have on legal or equitable grounds corrected

by granting the relief requested by NorthWestern.

D.    **Judicial Estoppel Prevents NorthWestern from Exchanging the
Shares in the Disputed Claims Reserve for Cash**

52.    Under the doctrine of judicial estoppel, a party is precluded from assuming a

position in a legal proceeding that is inconsistent with one previously asserted. See Ryan

Operations. G.P. v. Santium Midwest Lumber Co., 81 F.3d 355, 358 (3d. Cir. 1995) ("[t]he basic

principal of judicial estoppel … is that absent any good explanation, a party should not be

allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage

by pursuing an incompatible theory"); In re Network Access Solutions Corp. and NASOP, Inc.

---

[8]    See also Brewer Decl. Ex. C; Steingart Decl. Ex. E-I.

(Off. Comm. Of Unsecs. Creditors v. Aust); 330 B.R. 67, 77 (Bankr. D. Del. 2005) (noting that judicial estoppel prevents a party from obtaining relief under one theory from later taking a contrary position).

53.    NorthWestern, by seeking to cash out the Disputed Claims Reserve and provide Magten and the Non-Accepting QUIPS Holders with cash in lieu of shares, has knowingly and willfully taken an irreconcilable and wholly inconsistent position from its previous assertion that Magten's claims can only be satisfied with shares of NorthWestern's New Common Stock. See Steingart Decl. Ex. A, ¶ 65. NorthWestern had argued before this Court and the District Court that Magten and the Non-Accepting QUIPS Holders are not entitled to receive cash in satisfaction of their claim without amending the Plan. Accordingly, this Court[9] erred by failing to judicially estop NorthWestern from asserting a contrary position in order to consummate the BBI Transaction.

54.    At a minimum, for the reasons set forth above, Claimants have met their burden by establishing a strong likelihood of success on the merits with respect to the this Court's grant of the relief requested in the Cash-Out Motion. As such, there is a sufficient basis for the Court to conclude that Claimants will likely succeed on appeal.

## II.    Claimants Will Suffer Irreparable Harm if a Stay is Not Granted

55.    If a stay is not granted, Claimants will suffer irreparable harm. In addition to the Merger Agreement being conditional upon approval by NorthWestern shareholders, the Merger Agreement must also be approved by certain regulatory authorities. See Brewer Decl. Ex. D, ¶ 9.

---

[9]    Its worth noting that this Court also took a contrary position prior to granting the relief requested by NorthWestern. At the hearing to consider Claimants' 9019 Motion, the Bankruptcy Court noted that "there is not going to be any cash paid. That's not even contemplated by the agreement." See Steingart Decl. Ex. R, p. 41 lines 12-13. Inexplicably, however, by entering the Cash-Out Order this Court is now allowing for cash to be paid out that is not contemplated by the Plan agreement.

23

To that end, NorthWestern is actively seeking regulatory approval to consummate the BBI Transaction. See id. It appears that the last remaining regulatory hurdle to consummation of the transaction is the approval by the Montana Public Service Commission (the "MPSC"). The approval hearings by MPSC are scheduled to commence on March 14, 2007. See Brewer Decl. Ex. B. Even if expedited[10], there is no guarantee that an appeal from the Cash-Out Order will be resolved by the time NorthWestern has obtained the necessary regulatory approvals and can therefore consummate the transaction. If the merger is consummated before Claimants' appeal can be decided, NorthWestern will likely assert that the appeal will be rendered moot by virtue of the fact that upon consummation of the Merger Agreement, the existing shares of New Common Stock in the Disputed Claims Reserve (to which Claimants are explicitly entitled under the Plan once their claims are Allowed) will be forever gone. Thus, in the absence of a stay pending appeal, Claimants may be denied the ability to exercise meaningfully (or at all) their appeal rights. See In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 150 n.6 (3d Cir. 1986) ("[A]ppeal must be dismissed as moot when an event occurs that prevents the appellate court from granting any effective relief" (citations omitted)).

56.     Such loss of appellate review has been recognized as the consummate form of irreparable injury. See, e.g., John Doe Agency v. John Doe Corp., 488 U.S. 1306, 1309 (1989) (finding irreparable injury where the issue on an appeal would be moot absent the stay) ("[t]he fact that disclosure would moot that part of the Court of Appeal's decision requiring disclosure of the Vaughn index would also create an irreparable injury") (citations omitted); Providence Journal Co. v. FBI, 595 F.2d 889, 890 (1st Cir. 1979) (stating that "[w]hile we give weight to the

---

10      As previously stated herein, Claimants will seek an expedited briefing schedule that would allow the appeal to be fully briefed, argued, and ready for a decision prior to March 14, 2007, the date the MPSC hearings are scheduled to begin. Notwithstanding Claimants desire to expedite the process, they recognize they do not have control over whether the District Court will permit such a schedule, or the speed with which the appeal will ultimately be resolved.

24

views of the district court, the Constitution and laws entitle litigants to have their cases

independently reviewed by an appellate tribunal."). In determining whether to stay the district

court's order to disclose certain documents, the Court of Appeals in Providence, recognized that

"[m]eaningful review entails having the reviewing court take a fresh look at the decision of the

trial court before it becomes irrevocable." Id. See also Country Squire Assocs. of Carle Place,

L.P. v. Rochester Cmty. Sav. Bank (In re Country Squire Assocs. of Carle Place L.P.) 203 B.R.

182, 183 (B.A.P. 2d Cir. 1996) (finding result that absent a stay pending appeal the foreclosure

sale will proceed rendering the appeal moot as the quintessential form of prejudice) (internal

quotations omitted). The only way to prevent irreparable injury on these facts where following

the consummation of the Merger Agreement, the stock in the Disputed Claims Reserve will be

gone is by staying the Cash-Out Order until Claimant's appeal is addressed.

**III.    Granting a Stay Will Not Substantially Injure Other Parties**

57.    As previously stated, Magten and the Non-Accepting QUIPS Holders are the only

Claimants remaining that are entitled to the shares of stock in the Disputed Claims Reserve. By

this Motion and its subsequent appeal, Claimants are seeking to protect their interest in ensuring

that they receive what they are entitled to under the express provisions of the Plan that was

heavily negotiated, confirmed by the Bankruptcy Court and deemed substantially consummated.

58.    A stay of the Cash-Out Order will not cause any substantial harm to any of the

parties in the bankruptcy proceeding as all of the other creditors have either settled or

adjudicated their claims and have received their pro rata share of New Common Stock pursuant

to the Plan. NorthWestern will not suffer any harm either by delaying, until the appeal is

decided, the cash-out of the shares of stock in the Disputed Claims Reserve. NorthWestern may

continue to go forward with seeking the necessary regulatory approvals for the merger but would

only be delayed in consummating the merger, which would necessarily require the cashing-out of shares from the Disputed Claims Reserve, temporarily until the appeal is decided. To the extent this Court grants Claimants' request for a stay, they will expedite the appellate process in whatever manner the District Court directs so as to limit any potential harm to NorthWestern by the imposition of a stay.

59.    Moreover, as the drafter of both the Plan and the Merger Agreement with which the Plan conflicts, NorthWestern alone has caused this paradox that implicates Claimants' rights on appeal. Any inconvenience caused by possible modest delay in the actual consummation of the merger is due to NorthWestern's purported absent-mindedness and is in stark contrast to the irreparable harm that Claimants will likely suffer should NorthWestern be allowed to exchange the shares of the Disputed Claims Reserve stock prior to Claimants' day in Court.

## IV.    A Stay Pending Appeal Would Serve the Public Interest

60.    The interest of the public in finality of court determinations, particularly in a bankruptcy proceeding context after there is a substantial consummation, will be served by the stay pending appeal. In granting the Cash-Out Motion, this Court has allowed for a backdoor amendment to a substantially consummated plan that was being administered by NorthWestern as the debtor and relied upon by the creditors, including Claimants. If these types of modifications were to be permitted by the Court, NorthWestern's Plan would be without finality -- which is contrary to the intent and letter of the Bankruptcy Code. The public interest will be served by properly holding that such modifications or alterations of a Chapter 11 plan is not permissible because it does not promote the finality in the reorganization process. See In re Cont'l Airlines, Inc., 91 F.3d 553, 561 (3d Cir. 1996) (noting the strong public interest in the finality of bankruptcy organizations after substantial consummation is particularly compelling);

26

In re Charterhouse, Inc., 84 B.R. at 152 (citing In re Penn. Cent. Trans. Co., 42 B.R. 657, 666-7

(E.D. Pa. 1984), aff'd 771 F.2d 762 (3d Cir. 1985)) ("Statutory termination of the right to seek

modification of a Chapter 11 plan is intended to promote finality in the reorganization process").

61.    Furthermore, the Plan, as a legally binding contract, binds the party to the relief

provided for therein. GECC v. Dial Bus. Forms, Inc. (In re Dial Bus. Forms. Inc.), 341 F.3d 738,

743 (8th Cir. 2003) (quoting In re Commercial Millwright Serv. Corp., 245 B.R. 603, 606 (N.D.

Iowa 2000) (once the plan is confirmed, it "acts like a contract that binds the parties that

participate in the plan"); see also Hills Motors, Inc. v. Hawaii Auto. Dealers' Ass'n, 997 F.2d

581, 588 (9th Cir. 1993) (a reorganization plan should be construed as a contract)). The public

undoubtedly has an interest in ensuring that parties live up to their end of the bargain.

### NO BOND IS NECESSARY

62.    The Court has discretion to grant a stay pending appeal under Rule 8005 without

requiring the posting of a bond. Fed. R. Bankr. P. 8005. See, e.g., In re Farrell Lines, Inc., 761

F.2d 796 (D.C. Cir. 1985) (involuntary debtor's appeal to district court was not dismissed for

failure to post bond); In re Byrd, 172 B. R. 970, 974 (Bankr. W.D. Wash. 1994) (holding that

position a bond is discretionary, and thus, not a prerequisite to granting a stay pending appeal);

In re Sphere Holding Corp., 162 B.R. 639, 644-45 (E.D.N.Y. 1994) (debtor would not be

required to file bond as condition to obtaining injunctive relief against creditors' pursuant of

collection).

63.    Although there is no federal rule to assist courts in determining whether the

posting of a bond is appropriate, it is clear that the purpose of such a bond "is to protect the

adverse party from potential losses resulting from the stay." In re United Merchants & Mfrs.,

Inc., 138 B. R. 426, 430 (D. Del. 1992). Furthermore, where the relief sought on appeal is

27

primarily injunctive in nature, courts are less likely to require the posting of a bond. See, e.g., In re Sphere Holding Corp., 162 B. R. at 644-45 (granting stay pending appeal and holding that appellant would not be required to post bond where appeal sought injunctive relief); In re United Merchants & Mfrs., 138 B.R. at 430 (where appellant, after confirmation, sought reallocation of undistributed shares of debtor, court held that "bond is unnecessary . . . because the Court finds that [debtor] will not likely suffer any loss as a result of a stay pending appeal.").

64.    The Court's exercise of discretion to require a bond is warranted here. As discussed above, Claimants are seeking a modest stay of the Cash-Out Order pending their appeal. If the District Court permits Claimants to pursue the appeal on an expedited basis then the appeal could be heard prior to March 14, 2007, when the last remaining regulatory agency is scheduled to commence approval hearings. There is no potential loss to NorthWestern as a result of the stay to warrant the imposition of a bond, as they would be free to go forward with the regulatory approval process as scheduled. Any inconvenience resulting from a delay (if at all) in the actual consummation of the Merger Agreement is *de minimis* in comparison to the real and certain harm to Claimants absent a stay.

65.    The relief Claimants seek is purely injunctive and necessary to prevent the irrevocable cashing-out of the stock in the Disputed Claims Reserve, should the Merger Agreement be approved prior to the resolution of the appeal. Claimants merely seek to maintain the status quo in order to preserve their right to seek appellate review of what were reversible errors made by the Bankruptcy Court in granting the relief sought by NorthWestern – which in of itself supports a basis for not imposing a bond. See In re Suprema Specialities, Inc., (Silverman v. Nat'l Union Fire Ins. Co. of Pittsburg, PA), 330 B.R. 93, 95 (S.D.N.Y. 2005) (declining to impose bond where movants "established that there is sufficiently serious legal issues meriting a

28

stay" and the balance of harms weighed in favor of movants."). The issue of whether a

Bankruptcy Court is permitted to use its broad equitable powers under the Bankruptcy Rules in a

manner that is inconsistent with substantive federal statutory rights is a serious legal issue

meriting appellate review and a stay of the Order.

66.    Requiring a bond under these facts would tip the balance of equities completely

off-scale, as the issues on appeal are the result of NorthWestern's voluntary action in entering the

BBI transaction and inaction, by failing to structure the deal so as not to conflict with its chapter

11 Plan. Indeed, during the time that NorthWestern was negotiating with BBI, Claimants

cautioned NorthWestern (but to no avail) about the possible conflict the Merger Agreement, as

structured, would create with the Plan.

67.    Based on (i) the irreparable injury the Claimants will surely sustain absent the

injunctive relief it seeks; (ii) the unlikelihood of any loss to NorthWestern resulting from a brief

stay pending the appeal and; (iii) the serious legal issues implicated by the appeal, this Court

should not condition the stay on the posting of a bond.

29

## CONCLUSION

WHEREFORE, Claimants respectfully requests that the Court enter an order staying the

Cash-Out Order pending their appeal of the Order.

Dated:  Wilmington, Delaware
        February 9, 2007

BLANK ROME LLP

/s/ David W. Carickhoff
Bonnie Glantz Fatell (DE No. 3809)
David W. Carickhoff (DE No. 3715)
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone:    (302) 425-6400
Facsimile:    (302) 425-6464

- and -

FRIED, FRANK, HARRIS,
    SHRIVER & JACOBSON LLP
Bonnie Steingart
Gary L. Kaplan
John W. Brewer
One New York Plaza
New York, NY 10004
Telephone:  (212) 859-8000
Facsimile:  (212) 859-4000

Counsel for Magten Asset
    Management Corporation

AND

30

120087.01600/40167159v.1

SMITH, KATZENSTEIN & FURLOW, LLP
Kathleen M. Miller (DE No. 2898)
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE  19899
Telephone:     (302) 652-8400
Facsimile:     (302) 652-8405

- and -

NIXON PEABODY LLP
John V. Snellings
Amanda Darwin
100 Summer Street
Boston, MA  02110
Telephone:     (617) 345-1000
Facsimile:     (866) 947-1732


Counsel for Law Debenture Trust Company

31

# Exhibit Y

IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| NORTHWESTERN CORPORATION, | Case No. 03-12872 (KJC) |
| Reorganized Debtor. | Ref. Docket No. 3600, 3581, 3591 |

## ORDER DENYING EMERGENCY MOTION OF MAGTEN ASSET MANAGEMENT CORPORATION AND LAW DEBENTURE TRUST COMPANY FOR A STAY PENDING APPEAL OF ORDER IN AID OF EXECUTION OF PLAN OF REORGANIZATION

Upon consideration of the Emergency Motion of Magten Asset Management Corporation and Law Debenture Trust Company for a Stay Pending Appeal of Order in Aid of Execution of Plan of Reorganization (the "Motion"); and a hearing (the "Hearing") having been held with respect to the Motion; and the Court having heard the statements of counsel regarding the relief requested in the Motion at the Hearing; and the Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and due notice of the Motion having been given under the circumstances, it is hereby ORDERED as follows:

1.  The Motion is DENIED for the reasons set forth on the record at the Hearing.

2.  This Court shall retain jurisdiction to hear and determine all matters arising from the interpretation or implementation of this Order.

Dated: February 22, 2007

Honorable Kevin J. Carey
United States Bankruptcy Judge

# Exhibit Z

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------------- x
                                                         :
In re:                                                   :        Chapter 11
                                                         :
NORTHWESTERN CORPORATION,                                :
                                                         :        Case No. 03-12872 (KJC)
                          Reorganized Debtor.            :
                                                         :
                                                         :        Re: Docket No. 3575
                                                         :
-------------------------------------------------------------------- x

### NOTICE OF APPEAL

PLEASE TAKE NOTICE that Magten Asset Management Corporation and Law

Debenture Trust Company of New York, by and through their undersigned counsel, hereby

appeal to the United States District Court for the District of Delaware from the Order In Aid of

Execution of Plan Directing Transfer Agent to Invest Proceeds Received from Stock Tender

Upon Consummation of Merger in Accordance with 11 U.S.C. § 345 (the "Cash-Out Order"),

which was entered by United States Bankruptcy Judge Kevin J. Carey on February 2, 2007

(Docket No. 3575). A copy of the Cash-Out Order appealed from is attached hereto as Exhibit

A.

The names of all parties to the order appealed from and the names, addresses and

telephone numbers of their respective attorneys are as follows:

**Parties**                              **Attorneys**

Magten Asset           Bonnie Fatell, Esq.              Bonnie Steingart, Esq.
Management Corporation Dale Dubé, Esq.                  Gary L. Kaplan, Esq.
                       David Carickhoff, Esq.           Fried, Frank, Harris, Shriver &
                       Blank Rome LLP                   Jacobson LLP
                       1201 Market Street, Suite 800    One New York Plaza
                       Wilmington, DE 19801             New York, NY 10004
                       Telephone:   (302) 425-6400      Telephone: (212) 859-8000

1

| | | |
|---|---|---|
| Law Debenture Trust Company of New York | Kathleen M. Miller, Esq.<br>Smith, Katzenstein & Furlow, LLP<br>800 Delaware Avenue, 7th Floor<br>P.O. Box 410<br>Wilmington, DE 19899<br>Telephone:   (302) 652-8400 | John V. Snellings, Esq.<br>Amanda D. Darwin, Esq.<br>Nixon Peabody LLP<br>100 Summer Street<br>Boston, MA  02110<br>Telephone: (617) 345-1000 |
| NorthWestern Corporation | Victoria Watson Counihan, Esq.<br>Dennis A. Meloro., Esq.<br>Greenberg Traurig, LLP<br>The Nemours Building<br>1007 North Orange Street, Suite 1200<br>Wilmington, DE 19801<br>Telephone:  (302) 661-7000 | Jesse H. Austin, III, Esq.<br>Paul, Hastings, Janofsky & Walker LLP<br>600 Peachtree Street, Suite 2400<br>Atlanta, GA 30308<br>Telephone:  (404) 815-2400 |
| The Plan Committee | Neil B. Glassman, Esq.<br>Charlene Davis, Esq.<br>Eric Sutty, Esq.<br>The Bayard Firm<br>222 Delaware Avenue, Suite 900<br>P.O. Box 25130<br>Wilmington, DE 19899<br>Telephone: (302) 655-5000 | Alan W. Kornberg, Esq.<br>Kelley A. Cornish, Esq.<br>Margaret A. Phillips, Esq.<br>Paul, Weiss, Rifkind, Wharton & Garrison LLP<br>1285 Avenue of the Americas<br>New York, NY 10019<br>Telephone: (212) 373-3000 |

Dated:  Wilmington, Delaware
         February 12, 2007

                    BLANK ROME LLP

                    */s/ David W. Carickhoff*
                    Bonnie Glantz Fatell (DE No. 3809)
                    Dale Dubé (DE No. 2863)
                    David W. Carickhoff (DE No. 3715)
                    1201 Market Street, Suite 800
                    Wilmington, DE 19801
                    Telephone:   (302) 425-6400
                    Facsimile:   (302) 425-6464

                         -and -

2

FRIED, FRANK, HARRIS, SHRIVER &
 JACOBSON LLP
Bonnie Steingart, Esq.
Gary L. Kaplan, Esq.
One New York Plaza
New York, NY 10004
Telephone:  (212) 859-8000
Facsimile:  (212) 859-4000

Counsel for Magten Asset Management
 Corporation

   - and -

SMITH, KATZENSTEIN & FURLOW, LLP

*/s/ Kathleen M. Miller*
Kathleen M. Miller (DE No. 2898)
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE  19899
Courier 19801
Telephone: (302) 652-8400
Facsimile:  (302) 652-8405

   – and –

NIXON PEABODY LLP
John V. Snellings, Esq.
Amanda D. Darwin, Esq.
Nixon Peabody LLP
100 Summer Street
Boston, MA  02110
Telephone: (617) 345-1000
Facsimile:  (617) 345-1300

Counsel for Law Debenture Trust Company
 of New York

3

# Exhibit AA

# FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

One New York Plaza
New York, NY 10004-1980
Tel: 212.859.8000
Fax: 212.859.4000
www.friedfrank.com

Direct Line: 212.859.8019
Fax: 212.859.8583
schelbr@ffhsj.com

May 16, 2006

Manatt, Phelps & Phillips LLP
11355 West Olympic Boulevard
Los Angeles, California 90064
Attn: Gordon Bava, Esq.
     David Huard, Esq.

LeBoeuf, Lamb, Greene & MacRae LLP
125 West 55th Street
New York, NY 10019
Attn: Sheri Bloomberg

Richards Layton & Finger PA
One Rodney Square
920 North King Street
Wilmington, DE 19801
Attn: Don Bussard, Esq.

Re:    Magten Asset Management Corporation ("Magten");
NorthWestern Corporation ("NorthWestern"), and together
with any and all of its subsidiaries and affiliates, including all
predecessors and successors and any and all of their respective
present and former officers, directors, agents, advisors, and
<u>representatives (the "NorthWestern Entities")</u>

Dear Ms. Bloomberg and Messrs. Bava, Huard and Bussard:

Together with Storch Amini & Munves, P.C., we are counsel for Magten in
connection with Magten's claims and rights relating to the NorthWestern Entities,
including all adversary proceedings, contested matters, appeals and other actions.

Based upon the Form 8-K issued by NorthWestern on April 26, 2006, we
understand that NorthWestern has signed a definitive agreement (the "Merger
Agreement") to be acquired by Babcock & Brown Infrastructure Ltd. ("BBI") for $37
per share of common stock in an all cash transaction that values NorthWestern at
approximately $2.2 billion (the "Merger").

As you may be aware, Magten holds in excess of 40% of the 8.45% Quarterly
Income Preferred Securities (the "QUIPS") originally issued by Montana Power
Capital I and purportedly assumed by NorthWestern. As the largest holder of the

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

May 16, 2006
Page 2

QUIPS, Magten has a substantial interest in the value of NorthWestern. As you also
may know, Magten and Law Debenture Trust Company of New York, the QUIPS'
Indenture Trustee (the "Indenture Trustee"), have asserted a myriad of claims and
causes of action arising from and in connection with the fraudulent transfer by Clark
Fork and Blackfoot LLC ("Clark Fork"), a subsidiary of NorthWestern, of utility assets
valued at between $1.15 billion and $1.4 billion (the "Montana Utility Assets") to
NorthWestern for no cash and the assumption of only approximately $700 million of
liabilities.

      Rather than belabor this letter with a detailed summary of the numerous
claims, actions and appeals to which Magten, the Indenture Trustee and NorthWestern
are a party, attached as Exhibit A is a brief summary of such claims, causes of actions
and appeals. In addition, we have established a data room containing all information
concerning the claims and litigation of Magten and the Indenture Trustee, including all
adversary proceedings, contested matters, appeals, and other actions, related to, arising
from and in connection with the NorthWestern Entities, and you are welcome to visit
the data room to conduct due diligence.

      By way of background only, following the commencement of NorthWestern's
chapter 11 case, Magten and the Indenture Trustee initiated an adversary proceeding
seeking, among other things, the imposition of a constructive trust on the Montana
Utility Assets (the "Fraudulent Conveyance Proceeding"). The Fraudulent Conveyance
Proceeding spawned numerous claims and litigations, including an appeal of the
Bankruptcy Court's order confirming NorthWestern's chapter 11 plan which, if
successful, could unravel NorthWestern's chapter 11 plan and return the Montana
Utility Assets to Clark Fork. Magten and the Indenture Trustee have pursued the
Fraudulent Conveyance Proceeding and other claims on behalf of approximately $55
million in QUIPS (including accrued interest through the effective date of
NorthWestern's chapter 11 plan). Had stock holders received the full amount of their
claims as they were entitled, they would have received 2.75 million shares of common
stock at a value of $20 per share. At the Merger price, the total value of the claims
represented by Magten and the Indenture Trustee are approximately $102 million, or
approximately 4.6% of the total cash consideration under the Merger. Magten and the
Indenture Trustee are the only remaining entities with a primary claim to the shares in
the Disputed Claims Reserve.

      Given that the order confirming NorthWestern's chapter 11 plan remains the
subject of a pending appeal and given that the Fraudulent Conveyance Proceeding is in
the early stages of discovery, we trust that NorthWestern made known to you the risks
posed by the litigations and appeals.

      We are not writing this letter to engage in debate. Rather, we are writing to
ensure that BBI is aware of the claims and interests of Magten and the Indenture
Trustee and to preserve, protect and maximize value for all parties. Putting aside all of
the existing claims and appeals and the ramifications of such claims and appeals,

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

May 16, 2006
Page 3

Magten is supportive of the sale of NorthWestern to BBI.  Nevertheless, we have reason to believe that the current structure of the Merger Agreement may impair the rights of Magten and the Indenture Trustee.  Pursuant to section 2.01(i) of the Merger Agreement, each share of common stock in the Disputed Claims Reserve will be converted into $37 in cash – the value of the merger consideration.  While we understand BBI's desire to cash out all shares, it is not clear that a cash out of the shares in the Disputed Claims Reserve is permitted under the terms of NorthWestern's chapter 11 plan.

To the extent that BBI desires to explore alternatives to permit the cashing out of the shares in the Disputed Claims Reserve or to better understand Magten and the Indenture Trustee's claims and appeals, we would be happy to meet with BBI and its advisors and would welcome and encourage the participation of NorthWestern's management and advisors in all meetings with BBI.

Very truly yours,

Brad Eric Scheler

cc:    Magten Asset Management Corporation
Bijan Amini, Esq. (special litigation counsel for Magten)
John Snellings, Esq.  (counsel for Law Debenture, the Indenture Trustee)
Patrick Healy (Law Debenture)
Thomas J. Knapp, Esq. (General Counsel, NorthWestern)
Michael Ryan, Esq. (Corporate Counsel, BBI)

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

**For Settlement Purposes Only**

## EXHIBIT A

All of the actions and litigations discussed below have as their root the transfer of the Montana Utility Assets by Clark Fork to NorthWestern for inadequate consideration. By way of background, in August 2002, only 13 months before commencing its chapter 11 case, NorthWestern, as the sole equity holder of Clark Fork, caused Clark Fork to transfer the Montana Utility Assets to NorthWestern at a time when NorthWestern was hopelessly insolvent (the "Transfer"). However, despite its insolvency, at the time of the Transfer, NorthWestern's public financial statements overstated NorthWestern's revenue by $878 million. Eight months after the Transfer, NorthWestern admitted that (i) the financial statements used in connection with the Transfer were materially misleading[1] and (ii) NorthWestern was insolvent. Thus, holders of the QUIPS went from being creditors of a solvent entity to being creditors of an overleveraged insolvent entity.[2]

### The Litigations and Appeals

I.    The Fraudulent Conveyance Proceeding

There can be no doubt not only that the Fraudulent Conveyance Proceeding has merit – but also that it is and was at the heart of NorthWestern's Chapter 11 case. The time entries of the professionals during NorthWestern's bankruptcy show that a significant amount of time was expended investigating the issues surrounding the Transfer. Counsel to NorthWestern has recognized that the Fraudulent Conveyance Proceeding is the "penultimate piece of litigation" and counsel to the Official Committee of Unsecured Creditors (the "Committee"), and now counsel to the Plan Committee, likewise recognized that it is "at the heart of this case."

The Bankruptcy Court denied NorthWestern's motion to dismiss the Fraudulent Conveyance Proceeding and found Magten's arguments to have merit. Subsequently, the Bankruptcy Court stayed the Fraudulent Conveyance Proceeding pending the outcome of Magten's Confirmation Appeal. On September 22, 2005, the United States District Court for the District of Delaware (the "District Court") granted the joint motion of Magten and the Indenture Trustee to withdraw the reference from the Bankruptcy Court. The Fraudulent Conveyance Proceeding is in the early stages of the discovery process before the District Court. If Magten and the Indenture Trustee prevail, there exists the risk that the District Court may find that the Montana Utility Assets, which comprise a substantial portion of NorthWestern's assets, are being held in constructive trust for the creditors of Clark Fork.

---

[1]    On April 16, 2003, NorthWestern issued a press release concerning the $878 million in negative charges. Shortly thereafter, NorthWestern announced an ongoing SEC investigation into these issues.

[2]    This summary does not include the following actions brought by Storch Amini & Munves, PC, as special litigation counsel for Magten: (i) a complaint filed against Paul Hastings Janofsky & Walker LLP ("Paul Hastings") alleging aiding and abetting the breach of fiduciary duties owed to creditors in the zone of insolvency, aiding and abetting the Transfer, conspiracy to effect the Transfer and malpractice in its representation of Clark Fork; and (ii) a motion to disqualify Paul Hastings as counsel in NorthWestern's chapter 11 case due to material misrepresentations regarding its lack of disinterestedness. Any questions with respect to these actions should be directed to Storch Amini & Munves, PC.

II.    The Montana Litigation

One of the litigations closely related to the Fraudulent Conveyance Proceeding is the Montana Litigation against the officers of Clark Fork (the "Clark Fork Defendants"). The crux of this litigation is that because Clark Fork was in the zone on insolvency at the time of the fraudulent transfer of the Montana Utility Assets, the officers of Clark Fork owed fiduciary duties to Clark Fork's creditors not to engage in any transaction that would render Clark Fork insolvent and unable to perform its objections with respect to the QUIPS.

The Clark Fork Defendants made a motion to dismiss the Montana Litigation pursuant to Federal Rule of Civil Procedure 12(b)(6). While that motion was still pending, the Clark Fork Defendants made a motion for summary judgment. As with the denial of NorthWestern's motion to dismiss the Fraudulent Conveyance Proceeding, both of these motions were denied by the Montana District Court. The Montana Litigation has been transferred to Delaware and is in the early stages of the discovery process before the District Court.

III.   The Confirmation Appeal

A.    The Appeal From the Confirmation Order

On October 19, 2004, the Bankruptcy Court confirmed NorthWestern's Second Amended and Restated Plan of Reorganization (the "Plan"), which order has been appealed by Magten.[3] Under the Plan, holders of the QUIPS did not receive the same recovery as the holders of NorthWestern's other junior subordinated debt, but instead were required to choose between (i) a recovery on account of their QUIPS holdings – thereby foregoing any claim or right with respect to the Fraudulent Conveyance Proceeding, or (ii) a recovery in the Fraudulent Conveyance Proceeding – thereby forgoing any distribution on account of their QUIPS holdings. This was a choice other, similarly situated creditors were not required to make.

B.    The Appeal from the Memorandum of Understanding

The issues surrounding Magten's objection to the MOU are directly related, not only to the Fraudulent Conveyance Proceeding, but also to the appeal of the Confirmation Order. The MOU purported to settle certain outstanding class action litigations (the "Securities Litigations") brought by former equity holders of the Montana Power

---

[3]    This appeal has been consolidated with Magten's appeal of the order approving the Memorandum of Understanding (the "MOU") providing for settlement and dismissal of the Securities Litigation. The basis of Magten's objection to the MOU was procedural because NorthWestern was attempting to circumvent the plan process by seeking separate approval of the MOU, which purported to distribute estate assets. Thereafter, the substantive portions of Magten's objection were raised in its objection to the confirmation order, which is now embodied in the Confirmation Appeal. Magten's overarching objection to the distributions afforded by the MOU was that it settled litigation claims brought by equity holders, whose interests were subordinated to that of the QUIPS.

2

Company, NorthWestern's predecessor-in-interest.

Although the claims on account of the Securities Litigations are subordinated under section 510(b) of the Bankruptcy Code, the Plan/MOU provided for the holders of such claims to receive more than $37 million in distributions of estate property, thereby violating the doctrine of absolute priority under the Bankruptcy Code. Despite the fact that the holders of the QUIPS did not receive a full (or in most cases any) recovery on account of the QUIPS, the parties to the MOU received a distribution of estate property at the expense of more senior creditors.

IV.    The 9019 Appeal

After over two years of litigation over numerous issues, all stemming from the Fraudulent Conveyance Proceeding, on January 27, 2005, Magten, the Indenture Trustee and NorthWestern reached an agreement in principle to settle all outstanding litigations (the "Settlement"). The terms of the Settlement were reduced to writing in the settlement agreement dated as of January 27, 2005 (the "Settlement Agreement") and executed by the Parties on February 9, 2005. The Settlement Agreement, which was drafted by counsel to NorthWestern made it clear that "the Settlement outlined herein shall be binding upon and inure to the benefit of the respective successors and assigns of each of the parties hereto." On February 9, 2005, NorthWestern issued a press release in which NorthWestern's President and CEO stated "[w]e believe this settlement is in the best interest of the Company and its shareholders as it removes the uncertainty associated with this protracted legal dispute that, if continued, would have resulted in significant cost to the Company." Thereafter, on February 10, 2005, NorthWestern disclosed the terms of the Settlement to the Bankruptcy Court.

On February 16, 2005, less than one week after NorthWestern issued its press release touting the benefits of the Settlement, NorthWestern repudiated the Settlement – a Settlement that it had initiated and consistently pursued and endorsed. There can be no doubt that a binding contract was executed by each of the Parties containing all of the material terms of the Settlement. In fact, NorthWestern publicly acknowledged that its reason for failing to move forward with the Settlement Agreement was the objection asserted by Harbinger Capital Partners Offshore Manager, L.L.C. (f/k/a/ Harbert Distressed Investment Master Fund, Ltd.). However, the objections of third parties to the Settlement did not give NorthWestern the right to release itself from its obligations under the Settlement Agreement.

Despite the binding nature of the Settlement Agreement, the Bankruptcy Court did not approve the Settlement because representatives of NorthWestern and the Plan Committee represented to the Court that there was insufficient stock in the Disputed Claims Reserve to honor the terms of the Settlement. This fact was admitted at the hearing on the 9019 motion by counsel for the Plan Committee and counsel for the ad hoc committee of noteholders. In its order denying the 9019 Motion, the insufficiency of the reserve was addressed by the Court, which found that NorthWestern faced a "financial dilemma" because of its failure to comply with the terms of the Plan regarding the establishment of a reserve.

3

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

As a result of NorthWestern's breach of the Settlement Agreement and its admitted conduct in improperly funding the Disputed Claims Reserve, Magten and the Indenture Trustee filed a complaint seeking to revoke the confirmation order for fraud in establishing the Disputed Claims Reserve.

V.    The Magten Fee Appeal

NorthWestern filed an adversary proceeding (the "NOR Adversary") against Magten alleging that Magten and Mr. Embry had improperly traded QUIPS while a member of the Committee, without any evidence and without investigating the underlying claims. After NorthWestern repudiated the Settlement and on the eve of an expedited trial in the NOR Adversary, NorthWestern dismissed the complaint with prejudice and acknowledged that there were insufficient facts to support the allegations pled in its complaint.

Thereafter, given the frivolous nature of the actions, Magten made a motion for reimbursement of fees and expenses incurred in connection with defending the baseless allegations raised in the NOR Adversary. The Bankruptcy Court denied this motion and Magten appealed that denial (the "Magten Fee Appeal"). The Magten Fee Appeal is currently pending in Delaware before the District Court.

* * * * *

4

# Exhibit BB

# FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

One New York Plaza
New York, NY 10004-1980
Tel: 212.859.8000
Fax: 212.859.4000
www.friedfrank.com

Direct Line: 212.859.8019
Fax: 212.859.8583
schelbr@ffhsj.com

July 14, 2006

Manatt, Phelps & Phillips LLP
11355 West Olympic Boulevard
Los Angeles, California 90064
Attn: Gordon Bava, Esq.
　　　David Huard, Esq.

LeBoeuf, Lamb, Greene & MacRae LLP
125 West 55th Street
New York, NY 10019
Attn: Sheri Bloomberg

Richards Layton & Finger PA
One Rodney Square
920 North King Street
Wilmington, DE 19801
Attn: Don Bussard, Esq.

Re:　Magten Asset Management Corporation ("Magten");
NorthWestern Corporation ("NorthWestern"), and together
with any and all of its subsidiaries and affiliates, including all
predecessors and successors and any and all of their respective
present and former officers, directors, agents, advisors, and
representatives (the "NorthWestern Entities")

Dear Ms. Bloomberg and Messrs. Bava, Huard and Bussard:

　　　As you are aware, together with Storch Amini & Munves, P.C., we are
counsel for Magten in connection with Magten's claims and rights relating to the
NorthWestern Entities, including all adversary proceedings, contested matters, appeals
and other actions.

　　　Based upon the Notice of Annual Meeting and Proxy Statement issued by
NorthWestern on June 9, 2006, we understand that NorthWestern will be holding its
annual meeting of stockholders on August 2, 2006, at which time NorthWestern's
stockholders of record will be asked, among other things, to adopt the merger
agreement (the "Merger Agreement") providing for the acquisition of NorthWestern by
Babcock & Brown Infrastructure Ltd. ("BBI") for $37 per share of common stock in an
all cash transaction (the "Merger").

New York • Washington • London • Paris • Frankfurt
A Delaware Limited Liability Partnership

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

July 14, 2006
Page 2

As noted in our prior letter dated May 16, 2006 ("May 16 Letter"), we believe that the current structure of the Merger Agreement may impair the rights of Magten and Law Debenture Trust Company of New York, in its capacity as Indenture Trustee for the QUIPS. Pursuant to section 2.01(i) of the Merger Agreement, each share of common stock in the Disputed Claims Reserve will be converted into $37 in cash – the value of the merger consideration. As we explained in our May 16 Letter, we believe that a cash out of the shares in the Disputed Claims Reserve is not permitted under the terms of NorthWestern's chapter 11 plan.

As you may be aware, Section 251 of the Delaware General Corporation Law governs the merger or consolidation of domestic corporations. Specifically, Section 251(d) provides, in relevant part:

> Any agreement of merger or consolidation may contain a provision that the boards of directors of the constituent corporations may amend the agreement at any time prior to the time that the agreement (or a certificate in lieu thereof) filed with the Secretary of State becomes effective in accordance with § 103 of this title, provided that an amendment made subsequent to the adoption of the agreement by the stockholders of any constituent corporation shall not (1) alter or change the amount or kind of shares, securities, cash, property and/or rights to be received in exchange for or on conversion of all or any of the shares of any class or series thereof of such constituent corporation.

8 Del. C. §251(d) (2006).

Pursuant to this provision, once the Merger Agreement is adopted by NorthWestern's shareholders, the Merger Agreement may not be amended to "alter or change the amount or kind of shares . . . to be received in exchange for or conversion of all or any of the shares" of NorthWestern. Therefore, to the extent that, after the adoption of the Merger Agreement, a court finds that the terms of section 2.01(i) of the Merger Agreement violate the terms of the Plan, NorthWestern and BBI cannot amend the Merger Agreement to adjust the provision that provides for the cashing out of the Disputed Claims Reserve. Rather, NorthWestern's only option would be to terminate the Merger Agreement or for NorthWestern to convene another shareholder meeting – at significant expense and time – to adopt an amended form of the Merger Agreement.

Accordingly, it is premature for NorthWestern to incur the considerable expense of holding its shareholder meeting unless and until NorthWestern and BBI make the appropriate amendment to section 2.01(i). Should NorthWestern proceed with its shareholder meeting as planned, NorthWestern's officers and directors face the risk that they may be subject to claims and causes of action stemming from their pursuit of a

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

July 14, 2006
Page 3

shareholder meeting to adopt an invalid Merger Agreement.

Please share this letter with each member of the Board of Directors of your respective clients and confirm in writing that you have done so.

We look forward to hearing from you in the near term.

Sincerely,

Brad Eric Scheler

cc:     Magten Asset Management Corporation
        Bijan Amini, Esq. (special litigation counsel for Magten)
        John Snellings, Esq. (counsel for Law Debenture, the Indenture Trustee)
        Patrick Healy (Law Debenture)
        Thomas J. Knapp, Esq. (General Counsel, NorthWestern)
        Michael Ryan, Esq. (Corporate Counsel, BBI)
        Jesse H. Austin, III, Esq. (counsel to NorthWestern)
        Steven Reisman, Esq. (counsel to NorthWestern)

# Exhibit CC

Copyright 2003 Associated Press
All Rights Reserved

The Associated Press State & Local Wire

November 18, 2003, Tuesday, BC cycle

**SECTION:** State and Regional

**LENGTH:** 654 words

**HEADLINE:** MDU, **Basin Electric explore** buying South Dakota utility

**BYLINE:** By DALE WETZEL, Associated Press Writer

**DATELINE:** BISMARCK, N.D.

**BODY:**

Two power company executives are exploring a bid to serve almost 600,000 NorthWestern Corp. utility customers, saying their companies offer stable management for ratepayers whipsawed by bankruptcy proceedings.

MDU Resources Group Inc. and Basin Electric Power Cooperative, both of which are based in Bismarck, are preparing an offer to buy NorthWestern's utility properties, their chief executives said at a Monday news conference here.

"We bring stability and reliability to the energy future for NorthWest energy customers," said Ron Harper, Basin Electric's chief executive officer.

NorthWestern, which is based in Sioux Falls, S.D., has almost 600,000 electric and natural gas customers in South Dakota, Montana and Nebraska.

NorthWestern filed for bankruptcy protection on Sept. 14. It was saddled with $2.2 billion in debt. Company officials blamed its financial problems in part on ill-fated acquisitions of other businesses, including a heating and air conditioning contractor and a data network provider.

Harper and Martin White, chief executive officer of MDU Resources, said Basin and MDU have allied themselves with rural electric cooperatives in South Dakota and Montana to make the offer. White called the alliance "a natural fit."

"Adding more utility customers to our electric and natural gas systems will allow us to take advantage of operating efficiencies, and help ensure rate stability for each customer we serve," White said.

For the utilities to prevail, their offer will have to be accepted by NorthWestern's creditors and a bankruptcy judge.

NorthWestern's executives have said they do not want to sell the company, and they are working on their own reorganization plan. White said he did not know of other bidders for NorthWestern's assets.

Spokesman Roger Schrum said breaking up NorthWestern's operations would make them less efficient, and that cooperatives would pay less in property taxes than does NorthWestern, which is a stockholder-owned company.

"We believe our plan of reorganization will be in the best interest of customers, employees and creditors," he said.

MDU Resources is an investor-owned utility, while Basin is a cooperative, owned by its rural electric membership. Basin supplies wholesale electric power to 124 cooperatives in nine states, including North Dakota, South Dakota, Montana and Nebraska.

MDU Resources' shares fell 31 cents, to $22.75, on Monday in New York Stock Exchange trading. Standard & Poor's, a credit rating agency, said the debt ratings of MDU and Basin would not be initially affected by the announcement.

Harper said Basin and the rural cooperatives are interested only in NorthWestern's electric properties, which include transmission and distribution lines, along with the customers the utility serves.

MDU is interested in some of the electric properties, along with NorthWestern's natural gas customers and distribution network. White and Harper said it was too early to predict whether the proposed acquisitions would mean more jobs in the utilities' Bismarck headquarters.

White said he and Harper have regular lunches to discuss issues, and began talking about the possibility of buying NorthWestern's utility properties about a month before the company filed for bankruptcy protection.

"We anticipated it would go into Chapter 11, and we were concerned what would happen to those assets," White said. "We think those are assets and customers that we could serve very well."

NorthWestern serves most of Montana, the result of its $1.1 billion acquisition of Montana Power Co.'s energy transmission and distribution business last year. It provides gas and electric service to Billings, Bozeman, Helena, Great Falls, Butte, Missoula and other Montana cities.

The company also serves eastern South Dakota, including the communities of Aberdeen, Brookings, Huron, Mitchell and Yankton.

# Exhibit DD

Copyright 2004 Elsevier Science
THE ELECTRICITY DAILY

**February** 9, 2004, Monday

**SECTION:** Vol. 22, No. 26

**LENGTH:** 521 words

**HEADLINE:** Otter Tail Joins the Hunt for Bankrupt NWC

**BODY:**

In what could portend a reshuffling of the utility deck in the north central U.S., a second company has joined the fray in bidding for the assets of NorthWestern Corp.

Bankrupt NWC itself insists that its own reorganization plan, when it is filed next month, will offer the best option for shareholders of the financially distressed firm.

Minnesota-based 1 **Otter Tail Power** announced Wednesday that it wants to buy NorthWestern Corp. s South Dakota **utility** operations, including both electric and natural gas **utilities** in both South Dakota and Nebraska. Otter Tail is not interested in NWC s **Montana** operations.

We ve got a good balance sheet, bond ratings and utility-grade securities, said Otter Tail President Chuck MacFarlane. By and large, we think we can make the transition smoothly and keep the customers rates low, MacFarlane told the *Argus Leader* of Sioux Falls, S.D.

**Otter Tail Power,** a division of Otter Tail Corp., is based in Fergus Falls, Minn., and has **utility** operations in Minnesota, South Dakota and North Dakota. It has retained Merrill Lynch to negotiate with NorthWestern s unsecured creditors.

The South Dakota-based operations of NorthWestern provides services to customers in South Dakota and Nebraska, and include part ownership of three generating plants in North Dakota, South Dakota, and Iowa. Otter Tail Power is a co-owner with NorthWestern in the North Dakota and South Dakota plants and operates both plants. Otter Tail serves a 6,000-square-mile territory in South Dakota adjacent to NorthWestern s South Dakota distribution territory.

While its details are not yet clear, Otter Tail s bid could be at least partly competitive with a possible bid to acquire some of NWC s assets by MDU Utilities and Basin Electric Power Cooperative, both of Bismarck, N.D. (*2 ED, Nov. 19, 2003*).

MDU and Basin announced last November that they would likely submit a bid for the company s electric **utilities** in South Dakota and **Montana,** along with electric cooperative organizations in those states. The two have said that they must first do a due-diligence study to determine if acquiring the assets would be a good investment, but that

they can t do the study or submit a bid until NWC files its reorganization plan, probably in March.

Dan Sharp, public relations manager for MDU, said his consortium never expected to be the only interested party and insisted that the Otter Tail offer would not deter it. It appears that the two buyers could come into competition with each other and with NorthWestern itself over the company s South Dakota utility operations.

NorthWestern continues to maintain that its own reorganization plan will best serve the interests of shareholders, and that neither the company nor its assets are for sale. The Otter Tail announcement does not change our objective to reorganize the company, said NorthWestern spokesman Roger Schrum.

Despite NWC s assertions, however, the company and its assets are clearly in play; its bankruptcy filing last September put it in that position. [RM]

# Exhibit EE

Copyright 2004 Great Falls Tribune (Great Falls, MT)
All Rights Reserved
Great Falls Tribune (Great Falls, MT)

**March** 17, 2004 Wednesday

**SECTION:** A-SECTION; Pg. 19A

**LENGTH:** 681 words

**HEADLINE:** Cities hoping to buy utility

**BYLINE:** Mike Dennison, Staff

**BODY:**

By MIKE DENNISON Tribune Capitol Bureau

HELENA - **Montana's** major cities, including Great Falls, are preparing to make an offer to buy NorthWestern Corp.'s **Montana utility** operations, which are in bankruptcy.

The cities hope to form a public power authority that could buy and operate the **utility** system that serves more than 300,000 electric and natural gas customers in **Montana.**

"If the city offer is accepted, the gas and electric systems will be operated by and for Montanans, with no profit margin (charged to consumers)," said Alec Hansen, executive director of the Montana League of Cities and Towns.

But if the cities hope to succeed with their offer, they'll have to convince NorthWestern Corp.'s major creditors and the U.S. Bankruptcy Court to accept the deal.

Assistant Great Falls City Manager Cheryl Patton said Tuesday the cities believe they have a chance.

"We think we'll be able to offer a bid that will be in the best interest of the creditors - as well as allowing us to keep rates stable and allowing us to put money back into the system that hasn't been put in recently," she said.

The Great Falls City Commission will consider April 6 whether the city wants to join an "interlocal agreement" setting up the public power authority that would bid on NorthWestern's **Montana utility** assets and operate the **utility.**

The city already has committed $15,000 toward the effort, and may have to contribute an additional $25,000 to $75,000, Patton said. The six cities involved -Great Falls, Helena, Billings, Missoula, Bozeman and Butte - would split evenly the costs of evaluating and preparing a bid, she added.

The power authority would issue revenue bonds to buy the utility assets. The bonds would be repaid by revenue from rates charged for electricity and natural gas.

A purchase price probably would be in the neighborhood of $1 billion, which is what NorthWestern paid when it bought the assets from the old Montana Power Co. in 2002.

NorthWestern, based in Sioux Falls, S.D., filed for bankruptcy last September, unable to recover from $900 million in losses caused by investments in nonutility subsidiaries.

Last week, the company filed its proposal to reorganize the firm's finances, shedding $1.3 billion of its $2.2 billion of debt and transferring ownership of the company to major debt-holders.

These creditors, which are mostly large investment firms that recently bought up NorthWestern's debt, would become the major stockholders of the company.

NorthWestern officials have said the company is not for sale, and that they can operate the reorganized company at a profit, returning value to the new creditor-owners.

But it's the creditors and the bankruptcy court that will make the final decision on who controls the reorganized company and whether to sell it to another bidder.

**MDU Resources Group** of Bismarck, N.D., and a coalition of rural electric co-ops plan to bid on NorthWestern's **utility** properties in **Montana,** South Dakota and Nebraska.

The group of six Montana cities now also will be making a bid, directed at the creditors committee. Other parties could enter the bidding fray as well.

Alan Kornberg, a New York attorney who is the committee's chief counsel, could not be reached for comment Tuesday.

Hansen said city officials want to bid on the property because they believe Montana ownership of this "vital economic asset" should be a consideration in the bankruptcy proceeding. The case is before Judge Charles Case II in U.S. Bankruptcy Court in Delaware.

"Municipal leaders believe public ownership offers the best long-term possibility of stable rates and high-quality service," Hansen said.

The cities have organized a team of legal and financial experts to assist them with the bid, he added.

The team includes the Helena law firm of Luxan & Murfitt; bond counsel Lukins & Annis of Spokane; financial adviser Springsted Inc. of St. Paul, Minn., consulting engineering firm RW Beck of Seattle; and investment bankers Citigroup Global Markets (formerly Salomon Smith Barney).

# Exhibit FF

Copyright 2004 Great Falls Tribune (Great Falls, MT)
All Rights Reserved
Great Falls Tribune (Great Falls, MT)

**May** 13, 2004 Thursday

**SECTION:** A-SECTION; Pg. 18A

**LENGTH:** 863 words

**HEADLINE:** Cities offer $1.26 billion for **utility's Montana** assets

**BYLINE:** Mike Dennison, Staff

**BODY:**

By MIKE DENNISON Tribune Capitol Bureau

HELENA - A coalition of five **Montana** cities Wednesday put $1.26 billion on the table to buy NorthWestern Corp.'s **utility** assets in **Montana,** saying it's a solid deal for the company and the state.

Missoula Mayor Mike Kadas, chairman of the newly created Montana Public Power Authority, said the price is a better value for NorthWestern creditors than the company's own bankruptcy reorganization plan.

And, more importantly, it will put Montanans in control of a vital electric and natural gas utility system that serves much of the state, he said.

"This gas and electricity system is one of the fundamental cornerstones of our Montana economy," Kadas said. "We've seen that cornerstone eroded over the last few years. We believe it's time for Montanans to step forward and stop that erosion."

Although the cities made their offer public Wednesday, there's no guarantee it will be considered by NorthWestern or its creditors, who are calling the shots in the company's bankruptcy.

Still, city officials said they're hoping the sizeable offer will get a serious look.

"I think it's the best offer we could make," said Great Falls Assistant City Manger Cheryl Patton, an interim board member for the authority. "We're very hopeful it can get the attention of the creditors' committee."

The creditors' committee, controlled by large investment firms that hold most of NorthWestern's $1.3 billion in unsecured debt, is a key player in deciding how NorthWestern will emerge from bankruptcy.

Alan Kornberg, a New York attorney who is chief counsel for the committee, did not return a telephone message Wednesday.

NorthWestern Corp. has prepared its own plan to reorganize the company's debt. Its executives have said they're not interested in selling the company.

It also released a statement raising questions about the cities' proposal, such as whether a publicly owned utility could hold rates steady, effectively buy power for consumers, or pay the same amount of taxes paid by NorthWestern.

"We remain focused on our own plan of reorganization," said Roger Schrum, NorthWestern spokesman in Sioux Falls, S.D. "If the creditors' committee is interested in following up on the (cities') proposal, we will have further discussions."

NorthWestern's **utility** system serves about 305,000 electric and gas customers in central and western **Montana.**

The cities - Great Falls, Missoula, Helena, Bozeman and Butte - are proposing to operate the system as a publicly owned, non-profit corporation. The utility would be regulated by the Public Service Commission initially, but eventually could be a self-regulated, public power entity, Kadas said.

Wednesday's offer has three parts: $900 million in cash, assumption of $218.5 million in debt, and assumption of $140 million worth of electric-supply contracts from a dozen smaller independent power plants in Montana.

The cities would finance the cash portion by selling bonds and would pay off the bonds and other debt with income from utility customers.

John Miller, managing director in Philadelphia for Citigroup Global Markets, an investment banking firm working with the cities, said his firm is confident the deal can be financed.

Kadas also said the deal is premised on freezing part of the electric and gas rates for at least three years.

The portion of rates that would be frozen pays for delivery of gas and electricity, which is about half of electric rates and 40 percent of natural gas rates.

The other portion of rates pays for the actual electricity and natural gas, which must be purchased by the utility on the open market.

Kadas said the cities can't make any guarantees on those rates for the future, but did say the public-power entity would be more stable financially, and thus better able to arrange good deals for buying electricity and gas.

Jeff Krause, Bozeman city councilman, also said a publicly owned power system wouldn't be involved in any "pie-in-the-sky investment schemes" that led to the financial woes of NorthWestern and its predecessor, Montana Power Co.

"Our business will be public power and not something else," he said.

Advisers to the cities said if the cities' offer is considered and all goes according to plan, the deal could be completed in a year or so.

The cities have spent about $105,000 on the effort so far. If the NorthWestern creditors' committee takes the offer seriously and allows the cities to investigate NorthWestern finances further, the cities are prepared to spend another $400,000 preparing the final offer, said Alec Hansen, president of the Montana League of Cities and Towns.

NorthWestern's statement said there's no assurance the cities could buy power for customers as effectively as NorthWestern. It also said its plan calls for emerging from bankruptcy by the end of this year, while the cities' proposal could take more than a year to complete.

"Because of these uncertainties and concerns, we do not believe the (cities') proposal would be in the best interest of the company's creditors, customers, employees or communities served by NorthWestern," the company said.