IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| NORTHWESTERN CORPORATION, | : | Bankruptcy Case No. 03-12872 (KJC) |
| | : | |
| Reorganized Debtor. | : | |
| | : | |
| | : | |
| MAGTEN ASSET MANAGEMENT | : | |
| CORPORATION and LAW DEBENTURE | : | |
| TRUST COMPANY OF NEW YORK, | : | |
| | : | |
| Appellants/Movants, | : | Appeal No. 07-00114-JJF |
| | : | |
| v. | : | |
| | : | |
| NORTHWESTERN CORPORATION, | : | |
| | : | |
| Appellee/Respondant. | : | |

---

**BRIEF OF APPELLEE NORTHWESTERN CORPORATION IN
OPPOSITION TO THE EMERGENCY MOTION OF MAGTEN ASSET
MANAGEMENT CORPORATION AND LAW DEBENTURE TRUST COMPANY OF
NEW YORK FOR (I) A STAY PENDING APPEAL OF ORDER IN AID OF
EXECUTION OF PLAN OF REORGANIZATION AND (II) EXPEDITED APPEAL**

---

**CURTIS, MALLET-PREVOST,**
**COLT & MOSLE LLP**
Joseph D. Pizzurro
Steven J. Reisman
Nancy E. Delaney
Miriam K. Harwood
101 Park Avenue
New York, New York 10178
Telephone: (212) 696-6000

**GREENBERG TRAURIG, LLP**

Victoria Watson Counihan (No. 3488)
Dennis A. Meloro (No. 4435)
The Nemours Building
1007 North Orange Street
Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 661-7000

*Co-Counsel for NorthWestern Corporation*

Dated: March 6, 2007
Wilmington, Delaware

3473566v1

## TABLE OF CONTENTS

Page #

INTRODUCTION ......................................................................................................... 1

FACTUAL BACKGROUND .......................................................................................... 2

ARGUMENT.................................................................................................................. 9

    I. THE BANKRUPTCY COURT AND THIS COURT DO NOT HAVE
    JURISDICTION TO GRANT APPELLANTS' REQUEST TO ENJOIN THE
    MERGER.................................................................................................................. 9

    II. THROUGH THE EMERGENCY STAY MOTION, MAGTEN AND LAW
    DEBENTURE SEEK TO STAY CONSUMMATION OF THE BBI MERGER
    EVEN THOUGH THAT ISSUE WAS NEVER BEFORE THE BANKRUPTCY
    COURT .................................................................................................................. 10

    III. APPELLANTS' APPLICATION IS BARRED BY LACHES ................................. 12

    IV. THE EMERGENCY MOTION SHOULD BE DENIED  BECAUSE
    APPELLANTS HAVE FAILED TO SATISFY THE REQUISITE ELEMENTS
    TO SUPPORT THEIR REQUEST FOR A STAY......................................................... 15

    V. IF THE COURT DETERMINES THAT A STAY IS WARRANTED
    APPELLANTS MUST POST A BOND TO PROTECT THOSE PARTIES
    WHOSE INTERESTS WILL BE HARMED BY THE STAY ...................................... 25

    VI. APPELLANTS' REQUEST FOR EXPEDITED APPEAL SHOULD BE
    DENIED.................................................................................................................. 27

CONCLUSION............................................................................................................. 28

3473566v1

# TABLE OF AUTHORITIES

## CASES

Bacine v. Scharffenberger, et al.,
   No. 7862 & 7866, 1984 Del. Ch. LEXIS 501 (Del. Ch. Dec. 11, 1984) ............................... 13

Citibank, N.A. v. Citytrust,
   756 F.2d 273 (2d Cir. 1985)................................................................................ 22

Evans v. Buchanan,
   435 F. Supp. 832 (D. Del. 1977)......................................................................... 16

Fed. United Corp. v. Havender,
   11A.2d 331 (Del. 1940) .................................................................................... 13

Fike v. Ruger,
   752A.2d 112 (Del. 2000) .................................................................................. 13

First Fidelity Bank, N.A. v. Jason Realty, L.P. (In re Jason Realty, L.P.),
   59 F.3d 423 (3d Cir. 1995)................................................................................. 17

Gillman v. Continental Airlines (In re Continental Airlines),
   203 F.3d 203 (3d Cir. 2000)............................................................................... 16

Hubbard Feeds v. Animal Feed Supplement,
   182 F.3d 598 (8th Cir. 1999) ............................................................................. 22

In re Alwan Bros. Co., Inc.,
   112 B.R. 294 (Bankr. C.D. Ill. 1990).................................................................. 26

In re Columbia Gas Sys., Inc.,
   No. 92-127-SLR, 1992 U.S. Dist. LEXIS 3253 (D. Del. Mar. 10, 1992)............................ 16

In re etoys, Inc.,
   331 B.R. 176 (Bankr. D. Del. 2005) ................................................................... 10

In re Great Barrington Fair & Amusement, Inc.,
   53 B.R. 237 (Bankr. D. Mass. 1985) .................................................................. 21

In re Integrated Health Servs., Inc.,
   281 B.R. 231 (Bankr. D. Del. 2002) ................................................................... 25

In re Jewelcor Inc.,
   150 B.R. 580 (Bankr. M.D. Pa. 1992) ............................................................ 10, 17

In re JMP-Newcor Int'l., Inc.,
    225 B.R. 462 (Bankr. N.D. Ill. 1998) ................................................................. 17

In re Polaroid Corp.,
    2004 WL 253477 (D. Del. Feb. 9, 2004) ........................................................... 15

In re Public Serv. Co.,
    116 B.R. 347 (Bankr. D.N.H. 1990) ........................................................... 16, 21

In re Resorts Int'l, Inc.,
    372 F.3d 154 (3d Cir. 2004) .................................................................................. 9

In re Smoldt,
    68 B.R. 533 (Bankr. N.D. Iowa 1986) .............................................................. 25

In re Jersey City Med. Ctr.,
    817 F.2d 1055 (3d Cir. 1987) ............................................................................ 16

Pettibone Corp. v. Easley,
    935 F.2d 120 (7th Cir. 1991) ............................................................................ 17

Prince v. Clare,
    67 B.R. 270 (N.D. Ill. 1986) ....................................................................... 17, 24

Quince Orchard Valley Citizens Ass'n., Inc. v. Hodel,
    872 F.2d 75 (4th Cir. 1989) .............................................................................. 22

Republic of the Philippines v. Westinghouse Elec. Corp.,
    949 F.2d 653 (3d Cir. 1991) ............................................................................. 15

## INTRODUCTION

1.     NorthWestern Corporation ("NorthWestern") once again is before this Court to respond to a frivolous and baseless request for relief filed by Magten Asset Management Corporation ("Magten") and Law Debenture Trust Company of New York ("Law Debenture," and collectively with Magten, the "Appellants"). Through the *Emergency Motion of Magten Asset Management Corporation and Law Debenture Trust Company of New York for (I) a Stay Pending Appeal of Order in Aid of Execution of Plan of Reorganization and (II) Expedited Appeal* (the *"Emergency Stay Motion"*), Appellants seek relief – enjoining the cash merger between NorthWestern and Babcock and Brown Infrastructure Limited ("BBI") – unrelated to the Order of the Bankruptcy Court from which Magten and Law Debenture now appeal. NorthWestern's application to the Bankruptcy Court, and the resulting Order, was simply to permit LaSalle Bank, N.A. ("LaSalle"), the transfer agent holding the shares of common stock in the Disputed Claims Reserve, to invest the cash it will receive upon the effectiveness of the merger. The Bankruptcy Court was not asked to rule, and did not rule, on the approval of the merger.[1] Appellants may not, in the guise of a motion for a stay pending appeal, seek to enjoin a merger already approved by NorthWestern's shareholders over seven months ago in accordance with Delaware law.

2.     Furthermore, Appellants seek to enjoin the merger on an emergency basis when the only emergency here is one of their own making. Appellants, by their own admission, have been aware of the merger and its terms for 10 months, yet they did nothing. This alone is a sufficient basis in equity to deny the relief requested.

---

[1] See Transcript of February 20, 2007 Hearing ("Feb. 20 Tr."), pp. 42-43, attached as Exhibit L to the Affidavit of Joseph. D. Pizzurro, dated March 6, 2007 ("Pizzurro Aff."), submitted contemporaneously herewith.

3.     Not only is the Emergency Stay Motion procedurally defective and barred by laches, the motion should be denied because the Appellants have failed in all respects to establish irreparable harm or likelihood of success on the merits of the appeal.  To the contrary, the evidence in the record before this Court shows that the balance of harm weighs heavily in favor of NorthWestern, its shareholders and those creditors who have a remaining interest in the shares in the Disputed Claims Reserve.  The issuance of a stay as requested by the Appellants would impair the successful completion of NorthWestern's reorganization in that it would prevent implementation of a shareholder approved merger in accordance with Delaware law, which merger provides significant value to NorthWestern's shareholders.  The primary goal of the Emergency Stay Motion is clear – Appellants seek to gain leverage to force a settlement of their contingent, disputed claims against NorthWestern's bankruptcy estate.  (Transcript of Feb. 1, 2007 Hearing ("Feb. 1 Tr."), p. 23-25, Pizzurro Aff. Ex. J.)  The issuance of a stay pending appeal under these circumstances would be neither fair nor equitable.  Nor have the Appellants shown any basis for why the appeal of the Bankruptcy Court's Order should be expedited.  The motion should be denied in its entirety.

## FACTUAL BACKGROUND

4.     On September 14, 2003, NorthWestern filed its petition for relief under Chapter 11 of the Bankruptcy Code.  The Bankruptcy Court subsequently confirmed NorthWestern's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Plan") by Order dated October 19, 2004 (the "Confirmation Order").  The Plan

2

3473566v1

became effective on November 1, 2004 (the "Effective Date") and was substantially

consummated as of December 29, 2004.[2]

### The QUIPS Claims

5.    Magten and Law Debenture filed claims against NorthWestern's bankruptcy

estate, based on asserted rights under certain securities known as "QUIPS," pursuant to which

they seek to recover approximately $50 million (the "QUIPS Claims"). To date, the QUIPS

Claims have not yet been resolved, and they are the subject of the litigation currently pending

before this Court, styled *Magten Asset Management Corp. and Law Debenture Trust Co. of New

York v. NorthWestern Corp., Civ. Action No. 04-1494-JJF.*

6.    Magten and Law Debenture vigorously opposed NorthWestern's Plan in the

Bankruptcy Court, but the Plan was confirmed over their objections. Magten then appealed the

Confirmation Order to this Court on October 25, 2004. Magten also sought to stay the

Confirmation Order pending appellate review, and was denied such relief twice, first by the

Bankruptcy Court on October 25, 2004 and then by this Court on October 29, 2004. Thereafter,

on September 29, 2006, this Court entered an Order dismissing Magten's appeal of the

Confirmation Order.

### The Disputed Claims Reserve

7.    Pursuant to Section 7.5 of the Plan, NorthWestern set aside a reserve (the

"Disputed Claims Reserve") for the purpose of satisfying outstanding disputed unsecured claims

that had been filed against its bankruptcy estate but not yet resolved as of the Effective Date, in

the event such claims were later deemed to be "Allowed Claims" payable from the estate. The

Disputed Claims Reserve was to be maintained "equal to the aggregate of any distributable

---

[2] Capitalized terms not defined herein shall have the same meaning as defined in the Plan (as defined herein).

amounts of Cash and New Common Stock equal to the relevant percentage of the Distributions to which holders of Disputed Claims would be entitled under this Plan if such Disputed Claims were Allowed Claims in the amount of such Disputed Claim or such lesser amount as required by a Final Order." (Plan, Section 7.5.)  LaSalle serves as transfer agent with respect to the shares of common stock in the Disputed Claims Reserve, and is charged with making distributions to holders of Allowed Claims upon NorthWestern's direction.

8.    When the Disputed Claims Reserve was established as of November 1, 2004, it was funded with 4,409,100 shares of NorthWestern New Common Stock, that is, common stock issued by the Reorganized NorthWestern post-confirmation, which is listed on NASDAQ and publicly traded.[3]  At present, there are 3,144,642 shares remaining in the Disputed Claims Reserve.  At the merger price of $37 per share which is expected to be paid upon consummation of the merger between NorthWestern and BBI, the value of the shares in the Disputed Claims Reserve is approximately $116 million, exclusive of dividends.

9.    If the QUIPS Claims were to be deemed "Allowed Claims" in the total alleged amount of $50 million which is being sought, the distribution on such claims would be approximately 1.6 million shares of New Common Stock, exclusive of attorneys' fees.  Thus, there is a surplus in the Disputed Claims Reserve over and above the amount needed to pay the QUIPS Claims in full.

10.    Any balance which remains in the Disputed Claims Reserve after the resolution of all outstanding claims does not revert to NorthWestern, but must be distributed pro rata as

---

[3] Approximately 35 million shares of New Common Stock have been issued by the Reorganized NorthWestern post-confirmation, with a total value exceeding $1.2 billion, including the amount held in the Disputed Claims Reserve.  The Plan estimated the value of the New Common Stock at $20 per share, which is considered "Plan Value."  During the last 52-weeks, the lowest price of NorthWestern New Common Stock has been approximately $30, and the highest price has been approximately $36.  (Pizzurro Aff. Ex. O.)

4

"surplus" distributions to the holders of Allowed Claims in Class 7 and Class 9 under the Plan. The interests of those Class 7 and Class 9 unsecured creditors who have rights to the residual assets of the Disputed Claims Reserve are represented by the Plan Committee.

### *The Anticipated Merger between NorthWestern and BBI*

11.    On April 25, 2006, NorthWestern's Board of Directors approved and publicly announced a merger agreement (as amended or modified, the "Merger Agreement") which provides for the acquisition of all of NorthWestern's outstanding and issued common stock by BBI, an Australian public company, through a cash merger, under which each share of NorthWestern's New Common Stock will be cancelled and converted into the right to receive $37 cash (the "BBI Merger").

12.    The BBI Merger was disclosed in NorthWestern's 8-K, filed on April 26, 2006, which attached a copy of the Merger Agreement.  (Pizzurro Aff. Ex. E.)

13.    In response to the numerous public disclosures of the BBI Merger, including independent press reports, Magten wrote letters to counsel for NorthWestern and BBI on two occasions – May 16, 2006 and again on July 14, 2006 – noting that "Magten is supportive of the sale of NorthWestern to BBI," but raising issues with respect to the impact of the merger upon Magten's interests in NorthWestern's estate.  (Pizzurro Aff. Exs. F and G.)

14.    On August 2, 2006, in compliance with Delaware law, NorthWestern's shareholders adopted and approved the Merger Agreement at NorthWestern's Annual Shareholders Meeting.  (Pizzurro Aff. Ex.H.)

15.    Following its shareholders' approval and adoption of the Merger Agreement, NorthWestern proceeded to file applications for approval from regulatory authorities which are necessary due to its status as a regulated public utility.  All such approvals have been obtained

5

except for that of the Montana Public Service Commission ("MPSC"), before which
NorthWestern's application is still pending.

16.    On December 20, 2006, Magten sent a letter to the MPSC, setting forth in detail
its claims against NorthWestern in the bankruptcy case, and reciting other facts and events prior
to and after the bankruptcy case which Magten asserted "the Commission should take into
account in considering NorthWestern's application for regulatory approval" of the BBI merger.
(Pizzurro Aff. Ex. I.)

### NorthWestern's Aid of Execution Motion

17.    Recognizing that the Plan did not expressly provide for a mechanism under which
the proceeds of shares of New Common Stock received upon consummation of the BBI Merger
could be invested pending completion of distributions to creditors from the Disputed Claims
Reserve, NorthWestern filed in the Bankruptcy Court *Reorganized NorthWestern's Motion
Pursuant to 11 U.S.C. §§ 105(a) and 1142(b), and Rule 3020(d) of the Bankruptcy Rules,
Seeking Entry of an Order in Aid of Execution of Confirmed Plan of Reorganization* (the "Aid of
Execution Motion") on December 6, 2006.

18.    In the Aid of Execution Motion, NorthWestern sought only the entry of an order
directing LaSalle to invest the cash it will receive upon the effectiveness of the BBI Merger in
exchange for the tender of the 3,144,642 shares of New Common Stock which are currently in
the Disputed Claims Reserve, plus any dividends received prior to the effective date of the
merger, into interest-bearing accounts with federally-regulated depository institutions in the
United States. The Aid of Execution Motion did not seek Bankruptcy Court approval to
consummate the Merger Agreement, nor did it seek Bankruptcy Court approval to convert the
shares of New Common Stock currently in the Disputed Claims Reserve into cash.

6

19.    The Plan Committee, which represents the Class 7 and Class 9 claims holders who have rights to surplus distributions from the Disputed Claims Reserve, supported the Aid of Execution Motion in respect of the investment of the cash proceeds received in exchange for the shares and dividends in the Disputed Claims Reserve.

20.    Magten and Law Debenture filed a joint objection to the Aid of Execution Motion and also sought to engage in discovery. On December 27, 2006, Magten and Law Debenture served document requests upon NorthWestern, seeking certain documents allegedly relevant to the Aid of Execution Motion. The following day, they served a notice of the deposition of Michael J. Hanson with regard to the Aid of Execution Motion. Finally, on December 29, 2006, Magten and Law Debenture issued a subpoena to LaSalle seeking to inspect documents and depose a representative of LaSalle regarding the treatment of shares in the Disputed Claims Reserve. NorthWestern filed a Motion for a Protective Order and also sought to quash the subpoena served upon LaSalle.

21.    On February 1, 2007, the Bankruptcy Court conducted a hearing on the Aid of Execution Motion and, for the reasons stated on the record, issued an Order, also dated February 1, 2007, granting that motion (the "Order"). (Pizzurro Aff. Ex. K.) The Order directs LaSalle to invest any proceeds it may receive in exchange for the shares of New Common Stock in accordance with 11 U.S.C. § 345 and relieves it from any requirement to post a bond in conjunction with the investment of the proceeds invested. The Bankruptcy Court also granted NorthWestern's request for a Protective Order as to the requested discovery and issued a separate Order on that issue.[4]

---

[4] In light of the Bankruptcy Court's Order granting NorthWestern's request for a protective order, Magten voluntarily withdrew the subpoena directed to LaSalle.

7

22.    On February 9, 2007, the Appellants filed an Emergency Stay Motion in the Bankruptcy Court (the "First Emergency Stay Motion"), seeking to stay the Order pending their anticipated appeal of such order in the District Court.   In the First Emergency Stay Motion, Appellants specifically requested that the Bankruptcy Court enjoin consummation of the BBI Merger and prohibit the surrender and conversion of shares of New Common Stock in the Disputed Claims Reserve to cash – issues which were not before the Bankruptcy Court in the Aid of Execution Motion and over which the Bankruptcy Court does not have jurisdiction – pending review of the Order by the District Court.

23.    On February 12, 2007, Appellants filed their Notice of Appeal of the Order to the District Court.

24.    On February 20, 2007, the Bankruptcy Court heard arguments on the First Emergency Stay Motion on an expedited basis.  The Bankruptcy Court recognized that the extraordinary relief which Appellants were requesting in the First Emergency Stay Motion – to enjoin consummation of the BBI Merger – was not related to the "narrow" relief requested in NorthWestern's Aid of Execution Motion and the equally narrow scope of the Bankruptcy Court's Order granting such motion, which is the subject of this appeal.  Specifically, the Bankruptcy Court noted that "I was not asked to approve the [BBI] merger" and "the relief that's requested [by Appellants] doesn't match the order." (Feb. 20 Tr. at p. 43-44, Pizzurro Aff. Ex. L.)  Nevertheless, the Bankruptcy Court  proceeded to consider the relief requested by the Appellants and held that they had failed to satisfy the requisite elements to obtain a stay. Notably, the Bankruptcy Court stated that it saw "no irreparable harm" to the Appellants, while it did see injury to third parties, stating:  "to hold up a merger…would visit undue harm to the shareholders and the Creditors of the Debtor here." (Feb. 20 Tr. at p. 45, Pizzurro Aff. Ex. L.)

8

Moreover, the Bankruptcy Court found that "public policy weighs strongly in favor of denying this relief." Id.

25.    Accordingly, on Feb. 22, 2007, the Bankruptcy Court entered its Order denying the First Emergency Stay Motion. (Pizzurro Aff. Ex. M.)

26.    On February 23, 2007, Appellants filed an Emergency Motion in this Court for a stay of the Order pending appeal (the "Emergency Stay Motion"). Appellants also seek an expedited appeal in this Court.

27.    Also on February 23, 2007, Appellants filed a Petition for Intervention in the proceedings before the Montana Public Service Commission, in which NorthWestern's application for regulatory approval of the BBI Merger is pending, arguing that such approval should be conditioned upon NorthWestern's resolution of the QUIPS Claims, which are the subject of pending litigation before this Court. (Pizzurro Aff. Ex. N.)

## ARGUMENT

### I.

### THE BANKRUPTCY COURT AND THIS COURT DO NOT HAVE JURISDICTION TO GRANT APPELLANTS' REQUEST TO ENJOIN THE MERGER

28.    A Bankruptcy Court's jurisdiction after the confirmation and effective date of a confirmed Reorganization Plan is limited to jurisdiction retained under the plan and for purposes of overseeing implementation of the plan. See, e.g., In re Resorts Int'l, Inc., 372 F.3d 154, 165 (3d Cir. 2004); In re etoys, Inc., 331 B.R. 176, 185 (Bankr. D. Del. 2005). Post-confirmation jurisdiction does not, however, embrace all facets of a reorganized debtor's operations such that the debtor is forever tethered to the Bankruptcy Court. See In re Jewelcor Inc., 150 B.R. 580, 583 (Bankr. M.D. Pa. 1992). Simply put, neither the Bankruptcy Court nor this Court has

9

jurisdiction to grant the Appellants the relief requested in their two "emergency" stay motions –
namely, to enjoin the BBI Merger.

29.    Approval of the BBI Merger was not at issue in the Aid of Execution Motion, and
is therefore not presented in this appeal of the Bankruptcy Court's Order granting that motion.
The merger has been already been duly approved by NorthWestern's shareholders under
Delaware corporate law and by all requisite regulatory authorities, save for one.  Nevertheless,
through their First Emergency Stay Motion, Appellants expressly asked the Bankruptcy Court to
enjoin the merger pending their appeal of the Order concerning the investment of cash proceeds
by LaSalle.  The Bankruptcy Court correctly denied such relief.  Yet Appellants persist, filing
another Emergency Stay Motion in this Court.  Neither the Bankruptcy Court nor the District
Court should serve as a forum for Appellants to advance all manner of efforts to obstruct and
impede the post-confirmation operation of NorthWestern's business.  The main reason
NorthWestern's Chapter 11 case remains open at this time at all is because Appellants' disputed
unsecured claims, which are the subject of ongoing litigation in this Court, are still pending
against the bankruptcy estate.  However, the consummation of the BBI merger is not an issue
within the Bankruptcy Court's post-confirmation jurisdiction, nor is it within this Court's
jurisdiction sitting in appellate review of the Bankruptcy Court.  Appellants' inappropriate and
misguided effort to stay the merger pending this appeal should be denied.

## II.

### THROUGH THE EMERGENCY STAY MOTION, MAGTEN AND LAW DEBENTURE SEEK TO STAY CONSUMMATION OF THE BBI MERGER EVEN THOUGH THAT ISSUE WAS NEVER BEFORE THE BANKRUPTCY COURT

30.    The relief sought by NorthWestern in its Aid of Execution Motion and set forth in
the Order was narrowly limited to (i) allowing LaSalle to invest cash proceeds it receives from

3473566v1

BBI in connection with the merger, upon tendering the New Common Stock held in the Disputed Claims Reserve in accordance with 11 U.S.C. § 345, into interest-bearing accounts at federally regulated depository institutions, and (ii) relieving LaSalle from any requirement it might otherwise have to post any bond in connection with its investment of the funds invested in the interest-bearing accounts. The Aid of Execution Motion did not seek the Bankruptcy Court's approval to consummate the Merger Agreement, nor did it seek approval to tender and convert the shares in the Disputed Claims Reserve to cash. The motion was merely directed to the transfer agent's investment of the cash proceeds after conversion of the shares.

31.     Nevertheless, in the First Emergency Stay Motion, Magten and Law Debenture asked the Bankruptcy Court to enjoin NorthWestern from consummating the BBI Merger. As stated by the Appellants, the relief they seek herein is merely "a <u>modest</u> stay of the Order pending appeal so that once NorthWestern obtains necessary regulatory approval, it will be <u>delayed</u> <u>from</u> <u>consummating</u> <u>the</u> <u>Merger</u> <u>Agreement</u>". Emergency Stay Motion, p. 2 n. 3 (<u>emphasis</u> <u>supplied</u>).

32.     There is nothing modest about this request. NorthWestern did not seek Bankruptcy Court approval for the merger in the Aid of Execution Motion and the motion did not address the merits of the merger. Nevertheless, the Appellants are now asking this Court not only to overrule the Bankruptcy Court's narrow ruling authorizing the transfer agent to invest cash proceeds received in exchange for shares, but also to stay the merger itself and the conversion of shares to cash, when those issues were not, and have not been, before the Bankruptcy Court. The Appellants are seeking to use the current Emergency Stay Motion to again enjoin implementation of NorthWestern's Plan – relief which both this Court and the Bankruptcy Court have previously denied on numerous occasions.

11

33.     As the Bankruptcy Court has made clear, nothing in either NorthWestern's original motion, nor in the Order from which Appellants now appeal, implicates the propriety of the merger, and the relief requested by Appellants is far beyond a stay of the Bankruptcy Court's Order. (Feb. 20 Tr. at p. 42-43, Pizzurro Aff. Ex. L.)  A stay of the actual Order appealed from would only result in the possibility that the transfer agent could not invest the approximately $116 million it will receive when it tenders the shares in the Disputed Claims Reserve, something it must do as a matter of Delaware corporate law.  Clearly there is no reason for a stay of the Order.  As stated by Judge Carey:

> [T]he fact that the Movants now are asking for in essence a stay of the merger tells me that [NorthWestern] here [is] right when [it] argue[s] that what's being requested is something far beyond a stay of the order that I entered.

(Feb. 20 Tr. at p. 43, Pizzurro Aff. Ex. L.)

### III.

### APPELLANTS' APPLICATION IS BARRED BY LACHES

34.     As stated above, Appellants' Emergency Stay Motion is unrelated to the Order and is really an attempt to enjoin NorthWestern's merger with BBI.  Even if it is assumed *arguendo* that the Bankruptcy Court, and this Court, were the appropriate fora for such an application, there can be no doubt that the equitable relief sought is barred by the doctrine of laches.  Plaintiffs have known about the merger and its terms for 10 months and have done nothing to vindicate whatever rights they may think they have.  They have let the merger progress through a shareholder vote and through the various regulatory processes, waiting until

3473566v1

the eleventh hour to seek an injunction.[5] The law is clear that parties who sleep on their rights in such a manner cannot be accorded equitable relief.

35.    Under Delaware law, the essential elements of laches are that the plaintiff must have knowledge of the claim and there must be prejudice to the defendant arising from an unreasonable delay by the plaintiff in bringing the action. See Fed. United Corp. v. Havender, 11A.2d 331, 347 (Del. 1940); Fike v. Ruger, 752A.2d 112, 113 (Del. 2000); Bacine v. Scharffenberger, et al., No. 7862 & 7866, 1984 Del. Ch. LEXIS 501, at *1 (Del. Ch. Dec. 11, 1984). These elements are clearly established in this case.

36.    Appellants' knowledge of the merger, and all of its terms, is beyond dispute. The merger was announced in a Form 8K filed by NorthWestern on April 26, 2006. (Pizzurro Aff. Ex. E.) Three weeks later on May 16, 2006, counsel for Magten wrote a letter to counsel for NorthWestern and BBI about the merger and stated "it is not clear that a cash out of the shares in the Disputed Claims Reserve is permitted under the terms of NorthWestern's chapter 11 plan." (Pizzurro Aff. Ex. F.) Yet the Appellants took no action to challenge the terms of the Merger Agreement. Magten's counsel wrote another letter on July 14, 2006, this time referencing the stockholders' vote on the merger which was scheduled for August 2, 2006. (Pizzurro Aff. Ex. G.) In this letter, counsel raised the possibility that the validity of the merger agreement may be in doubt and subject to termination and urged the parties to reconsider proceeding with the shareholder vote unless some accommodation could be reached with Appellants with regard to their disputed claims. (Id.) Again, Appellants took no legal action to vindicate their so-called rights. In fact, the shareholder vote proceeded as planned and the merger agreement was

---

[5] Appellants have now, belatedly, sought to derail regulatory approval of the merger by the Montana Public Service Commission by seeking to intervene in those proceedings on February 23, 2007. (Pizzurro Aff. Ex. N.) In their papers, Appellants assert that the merger should be conditioned upon the satisfaction by NorthWestern of the QUIPS Claims presently pending in this Court.

overwhelmingly approved by over 99% of the shares which voted. After the shareholders voted to approve the terms of the merger agreement, the only remaining obstacles to consummation of the merger were various regulatory approvals. Again, while this approval process proceeded, Appellants took no legal action whatsoever.

37.     It is equally indisputable that a 10-month delay is both unreasonable and prejudicial. Research has revealed no case under Delaware law in which a party that has failed to act for as long as the Appellants here has been granted an injunction of a merger. And the Appellants have no excuse for this unreasonable delay. They knew of the merger, they knew of its terms, and they had even articulated the legal theory upon which they rely in this application, almost a year ago. If Appellants thought they had a valid basis to challenge the merger, it was incumbent upon them to act long before now.[6]

38.     Finally, the prejudice to NorthWestern from Appellants' delay is manifest. If a stay is granted and as a result the merger cannot close before April 26, 2007, the Merger Agreement may be subject to termination. Courts have found such a possibility sufficient prejudice to bar equitable relief. See Bacine, supra, at *10. Furthermore, there is a distinct possibility that a stay will result in substantial harm to both NorthWestern's shareholders and BBI. If Appellants were to succeed in obtaining a stay at this juncture, the market price of NorthWestern's stock would certainly decline, causing injury to its investors and shareholders who overwhelmingly approved the merger in accordance with Delaware Law. BBI's substantial investment of time and resources in the impending merger would also be jeopardized. Indeed, it appears that Appellants may have purposely delayed any challenge to the merger until the last

---

[6] The only excuse offered by Appellants for their delay was the statement by counsel for Magten during the February 20 hearing before Judge Carey that such an application could have exposed Appellants to a claim of interference with contract. (Feb. 20 Tr. at p. 6, Pizzurro Aff. Ex. L.) This admission speaks volumes about Appellants' views of the merits of this motion.

14

minute in order to threaten the highest potential damage to NorthWestern, and thus maximize their leverage to accomplish their real objective here – a settlement of their disputed claims. Under these circumstances it is clear that this application for equitable relief should be denied.

## IV.

### THE EMERGENCY MOTION SHOULD BE DENIED BECAUSE APPELLANTS HAVE FAILED TO SATISFY THE REQUISITE ELEMENTS TO SUPPORT THEIR REQUEST FOR A STAY

39.     Because Appellants cannot meet the test required in the Third Circuit, a stay pending appeal cannot be issued.  Aside from producing <u>no</u> evidence to support their request for relief, Appellants have not shown – and indeed, cannot show – (1) a likelihood of success of the merits; (2) irreparable harm to Appellants in absence of the issuance of the stay pending appeal; (3) no harm to NorthWestern and other interested parties if the stay pending appeal were granted; and (4) that the public interest favors granting the stay pending appeal.  This Court may deny the Emergency Stay Motion if Appellants fail "to establish one of the four prongs."  <u>In re Polaroid Corporation</u>, 2004 WL 253477, at *1 (D. Del. Feb. 9, 2004) (citations omitted); <u>Republic of the Philippines v. Westinghouse Elec. Corp.</u>, 949 F.2d 653, 658 (3d Cir. 1991).  Here Appellants have failed to establish <u>any</u> of the required prongs.

#### A.     Appellants have Failed to Establish a Likelihood of Success or That They Have a Strong Case on Appeal

40.     In the Third Circuit, the first factor Appellants are required to establish before a stay pending appeal may be considered is a "strong likelihood of success" on appeal.  To meet their burden, Appellants are required to submit substantial evidence of "serious and difficult questions of law in an area where the law is somewhat unclear," <u>Evans v. Buchanan</u>, 435 F. Supp. 832, 844 (D. Del. 1977), or that they have a "'substantial case,' or a strong case on appeal." <u>In re Columbia Gas Sys., Inc.</u>, No. 92-127-SLR, 1992 U.S. Dist. LEXIS 3253, at *4 (D.

15

Del. Mar. 10, 1992) (quoting In re Public Serv. Co., 116 B.R. 347, 349 (Bankr. D.N.H. 1990)).

In determining the strength of Appellants' case, this Court should conduct a *de novo* review of

the Bankruptcy Court's conclusions of law and a review of the findings of facts for clear error.

Gillman v. Continental Airlines (In re Continental Airlines), 203 F.3d 203, 208 (3d Cir. 2000)

(citation omitted); In re Jersey City Med. Ctr., 817 F.2d 1055, 1059 (3d Cir. 1987).

41.    Appellants have failed to carry their burden on the first prong of the test. In fact,

rather than focusing their argument on the potential success of the appeal, Appellants focus on

debating NorthWestern's ability to perform the merger itself and not on the sole issue that was

before the Bankruptcy Court – the ability (or inability) of LaSalle to invest the proceeds it may

receive in exchange for the shares of New Common Stock in the Disputed Claims Reserve in

accordance with Section 345 of the Bankruptcy Code.  As the Bankruptcy Court has already

noted, "there's nothing in the plan that precludes [NorthWestern] from pursuing a merger, and

there's nothing in the plan which . . . gives some right [in] perpetuity for distributees of the stock

to have it be in that form . . . ." (Feb. 1 Tr. at p. 43, Pizzurro Aff. Ex. J.)

42.    As the Third Circuit has recognized, the objective of a Chapter 11 reorganization

is to preserve the debtor as an ongoing business when possible.  First Fidelity Bank, N.A. v.

Jason Realty, L.P. (In re Jason Realty, L.P.), 59 F.3d 423, 429 (3d Cir. 1995).  NorthWestern is a

shining example of a successful reorganization.  Now, in accordance with Section 1141(b) of the

Bankruptcy Code, all estate assets not otherwise distributed under the Plan vested in

NorthWestern as a reorganized debtor.  Where NorthWestern's Plan has become effective and

substantially consummated, NorthWestern is free to facilitate commercial transactions regarding

the company without the need to seek permission from the Bankruptcy Court.  Prince v. Clare,

67 B.R. 270, 272 (N.D. Ill. 1986) (recognizing that revesting property of the bankruptcy estate

16

with the reorganized debtor makes the reorganized debtor the "master of his own fate in the commercial world").

43.    Post-confirmation, NorthWestern, as a reorganized debtor and absent a specific prohibition in the Plan, is free to conduct a strategic review of the company and enter into and effect mergers without first seeking Bankruptcy Court approval. See, e.g., Pettibone Corp. v. Easley, 935 F.2d 120, 122 (7th Cir. 1991) (post-confirmation debtor may go about its business without further supervision); In re JMP-Newcor Int'l., Inc., 225 B.R. 462, 465 (Bankr. N.D. Ill. 1998) (noting that after a plan of reorganization is confirmed, the debtor is free to go about its business without further supervision or bankruptcy court approval); In re Jewelcor Inc., 150 B.R. at 583 (post-confirmation authority is restricted only to those matters pending at confirmation; debtor is not in permanent tutelage to the Bankruptcy Court subject to supervision and control over all aspects of corporate conduct.)  In fact, various sections of the Plan itself provide NorthWestern with the freedom to entertain potential mergers.  Section 5.7 of the Plan revests all of NorthWestern's assets into the reorganized company.  Additionally, Section 5.14 of the Plan provides that "[a]fter the Effective Date, Reorganized Debtor may operate its business, and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules . . . ."  Finally, Section 9.1 of the Plan provides that on the Effective Date, the management and control of the Reorganized Debtor becomes the responsibility of the directors of the Reorganized Debtor who are entrusted with the general responsibility for maintaining operations in accordance with applicable law.

44.    In accordance with the terms of the Plan, NorthWestern's current management and its Board of Directors have managed reorganized NorthWestern in a manner that has substantially increased the value of NorthWestern's shares, which value has inured to the benefit

17

of all NorthWestern's shareholders, as well as Magten and Law Debenture as claimants with a potential interest in the Disputed Claims Reserve. This delivery of value to shareholders is manifest in BBI'S $37 per share all-cash merger offer to NorthWestern's shareholders. In the last 52-weeks, NorthWestern's common stock has traded in the range of $30 to the most recent high of $36 per share. The most recent market price of $36 undoubtedly reflects the anticipated consummation of the $37 per share BBI Merger, which is in the last stages of the regulatory approval process.

45.    It should be noted that Appellants' ability to obtain a recovery on their claims is not impaired by the Order and the cash payment for shares. If Appellants obtain Allowed Claims before the effective date of the merger, they would receive their appropriate pro rata allocation of shares of New Common Stock as provided under the Plan, and upon consummation of the merger, they would have to tender their shares and would receive the merger consideration of $37 per share in cash under the procedures specified in the Merger Agreement. If Appellants obtain a recovery after the Merger Agreement becomes effective, then they will receive cash equal to the product of (a) the number of shares of New Common Stock allocated to their Allowed Claims pursuant to the Plan multiplied by (b) the merger price of $37 per share.

46.    The Appellants are disingenuous at best when they assert that NorthWestern is judicially estopped from seeking to cash out shares in the Disputed Claims Reserve. Their assertion that NorthWestern has previously maintained that the QUIPS claims should be satisfied by stock rather than cash is inaccurate and taken out of context. This issue was raised in connection with Magten's attempt to enforce a proposed settlement agreement which the Bankruptcy Court found violated the terms of the Plan. At that time, Magten itself argued that if NorthWestern could not pay the QUIPS claims in New Common Stock, NorthWestern could

18

simply pay the claims in cash. NorthWestern noted that favoring the QUIPS claimants with cash payments not received by other unsecured creditors would constitute disproportionate and disparate treatment. That is clearly not the issue presently at hand, where all NorthWestern shareholders will receive cash in accordance with the terms of the Merger Agreement, as will the Class 7 and Class 9 Allowed Claims holders who are entitled to receive surplus distributions from the Disputed Claims Reserve under the Plan and the QUIPS Claimants, should they succeed in obtaining Allowed Claims.

47.     Indeed, if any parties are judicially estopped in this case, it is Appellants who are estopped from arguing now that cash, particularly $37 a share, is not a suitable substitute for the New Common Stock in the Disputed Claims Reserve. Appellants have previously taken the position on more than one occasion that their claims against NorthWestern's bankruptcy estate could be satisfied by payment in cash – i.e., in their own words, the "economic equivalent" of the value of shares that would otherwise be distributed on their claims. Appellants made this argument on at least the following occasions:

> (i) At the October 29, 2004 hearing on Magten's Motion For a Stay of the Confirmation Order Pending Appeal, Magten argued that NorthWestern should set aside a larger reserve for the QUIPS claims, stating:
>
>> "It can be cash, it can be stock, it can be any currency whatsoever."
>
> (Pizzurro Aff. Ex. A, at p. 10.)
>
> (ii) Again, in their March 4, 2005 brief filed in the Bankruptcy Court in connection with their 9019 motion to enforce a proposed settlement agreement with NorthWestern, Appellants argued:
>
>> "If NorthWestern determines not to use the shares in the class 9 reserve to satisfy its obligations under the Settlement Agreement," it could satisfy the QUIPS Claims through "the economic equivalent of the distributions" by various means, including cash. "Alternatively, NorthWestern has unrestricted cash in excess of

100 million and can easily pay in cash the current market value of
the 382,732 shares and 710,449 warrants."

(Pizzurro Aff. Ex. B, at p. 17.)

(iii)  Likewise, in its June 30, 2005 Brief filed in this Court in its appeal of the
Confirmation Order, Magten stated:

"Specifically, to satisfy Magten's claim, NorthWestern can use its
available cash on hand, issue new stock or provide the value from
any other available source."

(Pizzurro Aff. Ex. C, at p. 17.)

(iv)  In their June 30, 2005 brief filed in the Bankruptcy Court in their action to
Revoke the Confirmation Order under Rule 1144 of the Bankruptcy Code,
Appellants again stated:

"Northwestern can issue New Common Stock to satisfy Plaintiffs'
[QUIPS] Claims, and/or pay cash to satisfy the full value of these
claims."

(Pizzurro Aff. Ex. D, at p. 2.)

48.    The current flip flop in Appellants' position concerning the adequacy of a cash

payment on their claims highlights the lack of good faith in this motion and Appellants' real

motives.  Appellants do not want, and have never wanted, shares in NorthWestern.  What they

want is to exert pressure to leverage a settlement of their disputed fraudulent conveyance claim

by creating what they hope will be a threat to the completion of a two billion dollar merger.

Appellants' counsel admitted as much at the February 1 hearing before the Bankruptcy Court

(Feb. 1 Tr. at p. 24-25, Pizzurro Aff. Ex. J.)  The doctrine of judicial estoppel is designed to

prevent a party from benefiting from precisely this type of bad faith change of position, and is

reason alone to deny Appellants' motion.

20

**B.    Appellants Will Not be Irreparably Harmed if a Stay is Not Issued**

49.    With regard to the second prong of the test – the likelihood of irreparable harm to the movant if the stay is denied – the Appellants suggest that without the stay, the BBI merger may be completed before their appeal is heard, thereby making it moot.  While that may in fact be the case, this is not sufficient to establish irreparable harm.  See, e.g., In re Public Serv. Co., 116 B.R. at 350 (noting that a contention of mootness was not enough to show sufficient injury to the appellant to warrant the requested stay); In re Great Barrington Fair & Amusement, Inc., 53 B.R. 237, 240 (Bankr. D. Mass. 1985) (observing that something more than possible mootness is required to demonstrate irreparable injury) .

50.    Indeed, the Appellants' interests will not be harmed because they will receive, if they can ever establish an Allowed Claim, the same value as all other similarly situated Class 9 creditors and the same value they would receive if they were already holders of NorthWestern's shares and the Merger became effective.  The Appellants have provided no evidence that there is anything special about NorthWestern's common stock that gives it enhanced value over holding the cash equivalent of such stock.  As NorthWestern made clear at the February 1, 2007 hearing before the Bankruptcy Court, NorthWestern's stock distributed under the Plan was plain vanilla common stock with no enhanced rights to a holder thereof.  The Bankruptcy Court agreed, stating: "There's no attribute of the stock that was issued under the plan that's been described to me today that shows that it's [sic] value is or would be enhanced over that of having cash." (Feb. 1 Tr. at p. 43, Pizzurro Aff. Ex. J.)

51.    Also damaging to the Appellants' contention that they will suffer irreparable harm if the Emergency Stay Motion is not granted is the fact that they will actually benefit from the terms of the Order in the event that they are ever successful in having their disputed, contingent

claims against NorthWestern allowed.  The Order provides that LaSalle must invest the proceeds it receives for the shares of New Common Stock in interest bearing accounts.  The interest will ultimately be paid to those creditors having allowed claims, which creditors may include the Appellants.

52.     Finally, Appellants' own failure to act for almost a year clearly demonstrates that there is no irreparable injury here.  Courts reviewing requests for injunctive relief have found that the moving party's failure to act diligently to protect its interests casts doubt as to whether irreparable harm exists at all.  Quince Orchard Valley Citizens Ass'n., Inc. v. Hodel, 872 F.2d 75, 79-80 (4th Cir. 1989); Citibank, N.A. v. Citytrust, 756 F.2d 273, 276 (2d Cir. 1985); Hubbard Feeds v. Animal Feed Supplement, 182 F.3d 598, 603 (8th Cir. 1999) (noting that a movant's delay in seeking relief or objecting to the actions that the movant now seeks to enjoin "belies any claim of irreparable injury pending trial").  Appellants cannot now in good faith assert that they will suffer irreparable injury absent an emergency stay when they did nothing to bring the alleged controversy to the attention of any court from April 2006 until now.

**C.     NorthWestern, its Shareholders and its Creditors will be Irreparably Injured if the Emergency Stay Motion is Granted**

53.     Under the third prong of the test, NorthWestern, its shareholders, and its other creditors will definitely incur losses and be irreparably injured should this Court stay the Order. When the Disputed Claims Reserve was established, it was funded with 4,409,100 shares of New Common Stock, of which 3,144,642 shares currently remain in the reserve.  (Feb. 1 Tr. at p. 13, Pizzurro Aff. Ex. J.)  Even if Appellants ultimately succeeded in having their claims allowed in full, the QUIPS Claims would receive a distribution of approximately 1.6 million shares of New Common Stock from the Disputed Claims Reserve (or, with a generous allowance for attorneys'

3473566v1

fees and costs, no more than 1.8 million shares) (Id. at 32).[7] The remaining shares would be redistributed to the constituents represented by the Plan Committee, i.e., the Class 7 and Class 9 Allowed Claims holders, as a Surplus Distribution pursuant to Section 7.7 of the Plan (Id. at 32). The Plan Committee supported the Aid of Execution Motion, and it supports NorthWestern's opposition to the instant appeal of the Order granting that motion.  If the cash proceeds are not invested, those constituents would lose a significant amount of interest on a supplemental distribution of their claims if the Order is stayed.  Appellants' assertion that granting a stay will not injure other parties because Appellants are the only claimants remaining who are entitled to shares of stock in the Disputed Claims Reserve is simply untrue.

54.    Moreover, NorthWestern's shareholders will clearly be harmed if this Court grants the Emergency Stay Motion.  Enjoining the merger would cause harm to NorthWestern's current shareholders, who own 32.57 million shares of outstanding common stock and who voted to approve the Merger Agreement, under which they expect to receive the $37 per share cash consideration.  In this instance, it is the tail, with Appellants' disputed contingent interest in approximately 1.6 million shares, representing approximately 5% percent of all of NorthWestern's outstanding stock, attempting to wag the dog, i.e., the shareholders who currently own 32.57 million shares.  Clearly NorthWestern's shareholders will suffer immediate, irreparable injury if the merger is enjoined, they do not receive the $37 cash per share payment,

---

[7] Under the Plan, the number of shares distributed on the QUIPS Claims assumes a "Plan Value" of $20 per share, and a recovery of approximately 68% of the amount of the claims.  Given the marked increase in the market value of NorthWestern stock over Plan Value, the actual value which Appellants would obtain on a distribution of 1.6 million shares is $59.2 million – well over 100% of the total amount of the $50 million QUIPS Claims which they asserted against NorthWestern's bankruptcy estate.  Thus, not only are Appellants fully protected with respect to a potential recovery on their as-yet unproven, undisputed claims after the shares in the Disputed Claims Reserve are converted to cash in the BBI Merger, they will be facing a windfall recovery on their claims.  This illustration of a potential recovery is made without prejudice to, and with a full reservation of all rights, with respect to NorthWestern's ongoing defense of the pending QUIPS Claims.

and the price of their stock holdings fall. This injury far outweighs any asserted harm to the

Appellants' interests. Thus, where the Appellants do not satisfy the third test to obtain a stay

pending appeal, the stay is properly denied.

**D.    Issuance of Stay Pending Appeal Will Harm the Public Interest**

55.    The fourth and final factor in weighing whether to grant a stay pending appeal is

whether such a stay will harm the public interest. In this case, it will. A primary public policy

underlying the bankruptcy laws is the successful reorganization of a debtor and the just and fair

administration and distribution of value from a debtor's estate.

56.    The public interest, as evidenced by the policy of the Bankruptcy Code, strongly

favors the reorganization and rehabilitation of troubled companies, preservation of jobs, and

preservation and enhancement of going-concern values. This has been particularly true in this

case where there is a strong public interest in having a regulated utility emerge from Chapter 11

bankruptcy proceedings as quickly as possible.

57.    NorthWestern has fulfilled the policies of the Bankruptcy Code by reorganizing

its estate and exiting Chapter 11 in record time, and delivering substantial value to creditors who

converted their claims to New Common Stock in reorganized NorthWestern. That stock, which

was forecasted to have a value of approximately $20 per share on the Effective Date of the Plan,

has risen in value to where BBI now offers $37 per share in an all-cash merger. NorthWestern

has honored its obligations under the Plan in that it has preserved jobs, continued to operate its

assets in an efficient and appropriate manner, and has increased the value of its stock to its

shareholders such that it is now an attractive merger candidate. NorthWestern's shareholders

have agreed with this return of value by overwhelmingly approving the Merger Agreement.

24

58.    As has been previously discussed, upon confirmation and unless specifically prohibited by its plan of reorganization, a reorganized debtor may engage in business activities free of bankruptcy court oversight. Prince, 67 B.R. at 272. Public policy, and indeed the objectives of the Bankruptcy Code itself, support the reorganization of distressed companies. In re Integrated Health Servs., Inc., 281 B.R. 231, 239 (Bankr. D. Del. 2002) ("In the context of a bankruptcy case, promoting a successful reorganization is one of the most important public interests"). As Judge Carey stated at the February 20 hearing where he denied Appellants' First Emergency Stay Motion:

> And I think public policy weighs strongly in favor
> of denying this relief. Because, as [NorthWestern] I
> think here has correctly argued supported by the
> Plan Committee, it fosters the distribution of value
> to Creditors of this Estate, which ultimately is the
> overriding goal in Chapter 11 reorganization.

(Feb. 20 Tr. at p. 45, Pizzurro Aff. Ex. L.)

59.    Issuance of a stay pending appeal as requested by the Appellants would frustrate this public policy. Failing to satisfy the fourth test, the Emergency Stay Motion should be denied.

## V.

### IF THE COURT DETERMINES THAT A STAY IS WARRANTED APPELLANTS MUST POST A BOND TO PROTECT THOSE PARTIES WHOSE INTERESTS WILL BE HARMED BY THE STAY

60.    Not surprisingly, the Appellants assert that they not only pass the four pronged test to obtain a stay pending appeal, but that they should not be required to post any bond. However, even if Appellants could overcome the hurdles and demonstrate that a stay is warranted, they should nevertheless be required to post a supersedeas bond to protect those parties who will be damaged by any stay. The purpose of a supersedeas bond is to provide

25

indemnity to those who will suffer damages resulting from the stay. See, e.g., In re Alwan Bros. Co., Inc., 112 B.R. 294, 296 (Bankr. C.D. Ill. 1990); In re Smoldt, 68 B.R. 533, 535 (Bankr. N.D. Iowa 1986). As previously mentioned, those creditors represented by the Plan Committee and NorthWestern's shareholders have a vested interest in having the Order effective as it would ultimately result in their receiving, respectively, additional monies for their claims and current cash consideration for their shares. A stay preventing LaSalle from investing the proceeds it receives for the shares of New Common Stock in the Disputed Claims Reserve in interest bearing accounts means interest will be forever lost while the Appellants continue their quest to disrupt the merger with BBI and NorthWestern's post-confirmation business operations.

61. Because of the irreparable harm that would be caused to NorthWestern, its shareholders, holders of Allowed Claims, BBI and other parties in interest if the Emergency Stay Motion is granted, a substantial supersedeas bond should be required to be posted by the Appellants as a condition to imposing any stay pending appeal. The supersedeas bond should be sufficient to cover not only the interest lost due to LaSalle being unable to invest proceeds it receives for the shares of New Common Stock, but also any lost value which may result if the Merger Agreement cannot be completed. Additionally, the supersedeas bond should cover the costs and expenses of NorthWestern and other parties-in-interest in responding to the frivolous appeal. In light of the substantial potential harm posed by the relief they have requested, Appellants should be required to post a supersedeas bond of no less than $250 million.

3473566v1

# VI.

## APPELLANTS' REQUEST FOR
## EXPEDITED APPEAL SHOULD BE DENIED

62.     There is no justification for an expedited appeal in this matter. As discussed in Point III above, Appellants have slept on their rights for over ten months, during which time they had full knowledge of the terms of the Merger Agreement, which was publicly disclosed on April 25, 2006, and a copy of which was included with NorthWestern's 8-K filed on that same date. The relief which Appellants seek at this time – to block the consummation of the BBI Merger at the eleventh hour – is an extraordinary and unwarranted measure. The only "emergency" has been created by Appellants' last-minute ploy to block the merger, a tactic which is nothing more than another attempt to force NorthWestern to settle the QUIPS Claims under duress. Such an "emergency," created solely by Appellants' imaginative and aggressive litigation tactics, does not merit expedited appellate review by this Court.

63.     Indeed, the only practical effect which the Order will have is that the transfer agent will invest the cash proceeds it receives for shares of New Common Stock in interest-bearing accounts, rather than merely holding such cash proceeds. Surely, Appellants cannot argue that they will be harmed by the earning of interest on the cash proceeds of the Disputed Claims Reserve shares. Those proceeds will continue to be held in reserve by the transfer agent for the benefit of the Appellants (as well as those creditors who have a residual interest in surplus distributions), in the same way the transfer agent has been holding the shares in reserve heretofore, to satisfy any potential judgment which Appellants may obtain if they succeed in proving their QUIPS Claims or in reaching a settlement.

64.     Accordingly, Appellants' request for expedited appeal should be denied.

27

## CONCLUSION

65.     For the reasons set forth above it is respectfully submitted that the Emergency

Stay Motion and request for expedited appeal be denied.  Alternatively, Appellants should be

required to post a supersedeas bond in excess of $250 million as a precondition for any stay.[8]

Dated:  Wilmington, Delaware
        March 6, 2007

                                        Respectfully submitted,

                                        **GREENBERG TRAURIG, LLP**

                                        Victoria Watson Counihan (No. 3488)
                                        Dennis A. Meloro (No. 4435)
                                        The Nemours Building
                                        1007 North Orange Street, Suite 1200
                                        Wilmington, DE 19801
                                        Telephone:  (302) 661-7000

                                                - and -

                                        **CURTIS, MALLET-PREVOST, COLT
                                        & MOSLE LLP**

                                        Joseph D. Pizzurro
                                        Steven J. Reisman
                                        Nancy E. Delaney
                                        Miriam K. Harwood
                                        101 Park Avenue
                                        New York, New York 10178
                                        Telephone:  (212) 696-6000

                                        *Co-Counsel for NorthWestern Corporation*

---

[8] NorthWestern reserves the right to seek sanctions and assessment of costs and expenses against Appellants for these motions and their unfounded appeal.

28

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| NORTHWESTERN CORPORATION, | : | Bankruptcy Case No. 03-12872 (KJC) |
| | : | |
| Reorganized Debtor. | : | |
| | : | |
| MAGTEN ASSET MANAGEMENT | : | |
| CORPORATION and LAW DEBENTURE | : | |
| TRUST COMPANY OF NEW YORK, | : | |
| | : | |
| Appellants/Movants, | : | Appeal No. 07-00114-JJF |
| | : | |
| v. | : | |
| | : | |
| NORTHWESTERN CORPORATION, | : | |
| | : | |
| Appellee/Respondant. | : | |

## CERTIFICATE OF SERVICE

I, Dennis A. Meloro, being duly sworn according to law, deposes and says that I am employed by Greenberg Traurig, LLP, which is counsel for Northwestern Corporation and hereby certify that on the 6th day of March 2007, I caused copies of the following to be served upon the parties on Exhibit A, attached hereto via Hand Delivery upon Local Counsel and U.S. Mail upon the remaining parties.

- Brief of Appellee Northwestern Corporation In Opposition to the Emergency Motion of Magten Asset Management Corporation and Law Debenture Trust Company of New York For (I) a Stay Pending Appeal of Order In Aid of Execution of Plan of Reorganization and (II) Expedited Appeal
- Affidavit of Joseph D. Pizzurro in Support of Brief of Appellee Northwestern Corporation In Opposition to the Emergency Motion of Magten Asset Management Corporation and Law Debenture Trust Company of New York For (I) a Stay Pending Appeal of Order In Aid of Execution of Plan of Reorganization and (II) Expedited Appeal

Dated: March 6, 2007

Dennis A. Meloro (No. 4435)
Greenberg Traurig, LLP
1007 North Orange Street, Suite 1200
The Nemours Building
Wilmington, DE 19801

**EXHIBIT A**

Alan W. Kornberg, Esq.
Paul, Weis, Rifkind,
Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019

Neil B. Glassman, Esq.
Charlene D. Davis, Esq.
The Bayard Firm
222 Delaware Avenue
Wilmington, DE 19801

Kathleen M. Miller, Esquire
Smith Katzenstein & Furlow LLP
800 Delaware Avenue, 7th Floor
Wilmington, DE  19801
(Law Debenture)

John V. Snellings, Esq.
Amanda Darwin, Esq.
Nixon & Peabody LLP
100 Summer Street
Boston, Massachusetts  02100
(Law Debenture)

Dale Dube, Esq.
Blank Rome LLP
1201 Market Street
Suite 800
Wilmington DE 19801
(Magten)

Bonnie Steingart, Esq.
John W. Brewer, Esq.
Gary L. Kaplan, Esq.
Joanna Palacios, Esq.
Fried Frank Harris Shriver & Jacobson LLP
One New York Plaza
New York NY 10004
(Magten)

# **UNREPORTED DECISIONS**

LEXSEE 1984 DEL. CH. LEXIS 501



Analysis
As of: Mar 06, 2007

**Bacine, et al. v. Scharffenberger, et al., Tampco Enterprises, Inc., et al. v. City
Investing Company, et al.**

**Civil Action No. 7862, Civil Action No. 7866**

**Court of Chancery of Delaware**

*1984 Del. Ch. LEXIS 501*

**December 10, 1984, Submitted
December 11, 1984**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff shareholders
sought preliminary and permanent injunctive relief
against the holding of a special shareholder meeting of
defendant corporation and against the consummation of
an announced sale of assets and liquidation of the corpo-
ration.

**OVERVIEW:** The corporation agreed to sell three
wholly owned subsidiaries, and the shareholders sought
to enjoin the sale. The corporation disseminated a proxy
statement to the shareholders with information regarding
the proposed liquidation. The shareholders argued that
the proposed sale could not be legally effected by a spe-
cial shareholder meeting, but rather must be submitted to
a vote of the shareholders pursuant to *Del. Code Ann. tit.
8, § 275.* They also contended that the proxy statement
was false and misleading. The court held that the share-
holders failed to demonstrate entitlement to injunctive
relief. The three subsidiaries did not constitute "substan-
tially all" of the corporation's assets. The sale of the as-
sets did not mandate the liquidation of the corporation.
Rather, it simply caused the corporation's management to
recommend liquidation to the shareholders because of
advantageous tax consequences. The court also held that
laches applied because the shareholders could not make
last-minute demands to enjoin a transaction that was in
the public knowledge for three months. Finally, the court
held that the language of the proxy statement, although
coercive, was not misleading.

**OUTCOME:** The court denied injunctive relief to the
shareholders. The announced sale of assets was not sub-
stantially all of the corporation's assets and could be
voted on at a special shareholder meeting. The proxy
statement was not misleading.

**LexisNexis(R) Headnotes**

*Business & Corporate Law > Corporations > Dissolu-
tion & Receivership > Termination & Winding Up >
General Overview*
*Business & Corporate Law > Corporations > Share-
holders > Meetings & Voting > Voting Shares > Fun-
damental Changes*
*Governments > Local Governments > Administrative
Boards*
[HN1] A plan to liquidate the corporation must be sub-
mitted to the vote of the shareholders pursuant to *Del.
Code Ann. tit. 8, § 275.*

*Business & Corporate Law > Corporations > Dissolu-
tion & Receivership > Termination & Winding Up >
General Overview*
*Business & Corporate Law > Corporations > Share-
holders > Meetings & Voting > Voting Shares > Fun-
damental Changes*
*Governments > Local Governments > Administrative
Boards*

[HN2] Where a sale of assets will substantially affect the existence and purpose of the corporation, then it is beyond the power of the board of directors to dispose of them without shareholder approval.

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
[HN3] The granting or withholding of preliminary injunctive relief is always discretionary.

**COUNSEL:** [*1]

Joseph A. Rosenthal, Esquire, Morris & Rosenthal, P.A., P.O. Box 1070, Wilmington, Delaware 19899

Lawrence Ashby, Esquire Ashby, McKelvie & Geddes P.O. Box 1150 Wilmington, Delaware 19899

R. Franklin Balotti, Esquire Richards, Layton & Finger P.O. Box 551 Wilmington, Delaware 19899

Robert K. Payson, Esquire Potter, Anderson & Corroon P.O. Box 951 Wilmington, Delaware 19899

A. Gilchrist Sparks, III, Esquire Morris, Nichols, Arsht & Tunnell P.O. Box 1347 Wilmington, Delaware 19899

**OPINION:**

These two actions, brought by different shareholders of City Investing Company, seek preliminary and permanent injunctive relief against the holding of a special meeting of shareholders of City Investing Company (hereafter "City") scheduled for tomorrow, December 12, 1984, and against the consummation of an announced sale of assets of City as well as against the consummation of a proposed plan of liquidation of City which is to be submitted to the vote of City's shareholders at the aforesaid meeting. The two actions have been consolidated for the purpose of the preliminary injunction application. This is the decision thereon. In view of the obvious time constraints, I [*2] make no effort to set forth the facts of the matter in any detail.

Suffice it to say that plaintiffs seek injunctive relief against two different things for basically three different reasons. On August 23, 1984 City, which is a diversified holding company involved in six separate areas of business, agreed to sell three wholly-owned subsidiary companies comprising its manufacturing and printing divisions to Kohlberg Kravis Roberts & Co. for $1.251 billion. Plaintiffs seek to enjoin the consummation of this sale. On September 26, 1984 the board of directors of City further determined to liquidate the corporation and to make a final distribution to shareholders. Under date of November 9, 1984 a proxy statement was disseminated setting forth information relevant to the proposed

liquidation and fixing December 12, 1984 as the date of a special meeting to receive the vote of the shareholders thereon. Plaintiffs seek to enjoin this vote as well as the proposed plan of liquidation as it has been announced.

Plaintiffs argue that in the present context of City's ongoing business operations, the sale of the three printing and manufacturing companies constitutes a sale of substantially [*3] all of the assets of City and that under *8 Del.C. § 271* such a sale of assets cannot be legally effected in the absence of the affirmative vote of the shareholders of the corporation. Alternatively, plaintiffs argue that the sale of the three subsidiaries, as initially proposed, constituted the first step of [HN1] a plan to liquidate the corporation and that accordingly, being a part of a plan of liquidation, the sale must be submitted to the vote of the shareholders pursuant to *8 Del.C. § 275.* Since the board of directors of City has not sought shareholder approval of the sale and has no intention of doing so, plaintiffs say that consummation of the sale will be illegal and that it should be enjoined.

As to the special meeting of shareholders being called to vote on the planned liquidation of the company, plaintiffs contend that the proxy statement issued by City's management is false and misleading in several material respects. For this reason plaintiffs ask that the shareholders meeting be enjoined until such time as complete disclosure of all relevant factors required for an informed decision can be made to City's shareholders.

Thirdly, plaintiffs contend that [*4] the manner in which the liquidation proposal is to be submitted to the shareholders at the special meeting is both improperly coercive and illegal. The proxy statement indicates that it is the sale of the three manufacturing and printing companies that makes the liquidation of the corporation advisable due to adverse tax consequences that would otherwise flow from the sale. The proxy statement further indicates that unless the plan of liquidation is approved, the corporation will incur a tax of $134 million on the sale of the three subsidiaries which, in turn, will result in a cost of $3.40 per share for each shareholder.

Also, on October 10, 1984, after having decided on a course of liquidation for the company, City's board agreed to sell yet a fourth subsidiary - Motel 6 - to Kohlberg Kravis, this one for $565 million. This proposed sale, however, has been made subject to shareholder approval as being a part of the liquidation plan. Finally, the plan of liquidation proposes that three current officers and directors of City be named as liquidating trustees and that City's board, or the trustees as the case may be, be given authority to arrange for the sale and disposition [*5] of City's remaining assets in such manner as they deem appropriate.

All three of these propositions, i.e., the decision to liquidate the company, the proposed sale of Motel 6 to Kohlberg Kravis for $565 million, and the designation of the three named persons as the liquidating trustees for the company's remaining assets, are to be submitted to the shareholders in one vote. Plaintiffs argue that this is improper. They say that three separate subject matters are involved requiring a separate vote for each. Plaintiffs also contend that other means exist to negate or lessen the tax on the sale of the three subsidiaries, for example, the sale of one or more other subsidiaries of City which are operating at a loss and which would give City a loss to set off against the taxable gain that would be realized from the proposed sale of the three manufacturing and printing companies to Kohlberg Kravis. Thus, plaintiffs argue that it is misleading and coercive to attempt to frighten the shareholders into casting one vote for all three liquidation propositions in order to avoid a $3.40 loss per share when other means exist to avoid such a loss without liquidation of the corporation. [*6]

Having considered the various arguments put forth by the plaintiffs in support of these contentions as well as the arguments offered by the defendants in opposition, I reach the conclusion that on the present record plaintiffs have failed to demonstrate an entitlement to the drastic interim injunctive relief that they would have the Court enter.

As to the sale of the three subsidiaries to Kohlberg Kravis, defendants point out that it is to be handled through the merger mechanism as opposed to being a straight sale of the assets of the subsidiaries. Because of this, they argue that City, as the parent of the wholly-woned subsidiaries, is the only shareholder whose approval is required. In other words, defendants say that the transaction is not a sale of assets governed by § 271 but rather it is a merger transaction governed by *8 Del.C. § 251.* In reliance on the doctrine of "independent legal significance" they contend that the transaction cannot be controlled by the requirements of a statute different than the one under which the action is being taken. *Orzeck v. Englehart, Del. Ch., 192 A.2d 36 (1963),* aff'd, *Del. Supr., 195 A.2d 331 (1963); Field v.* [*7] *Allyn, Del. Ch., 457 A.2d 1089 (1983),* aff'd, *Del. Supr., 467 A.2d 1274 (1983).* Thus, they say that there is no legal requirement that the transaction first be submitted to the vote of City's shareholders.

Plaintiffs counter this traditional argument by suggesting that equity looks to the substance of a transaction and not to its form, and that the realities of modern business are such that the stock of wholly-owned subsidiary corporations necessarily constitutes the assets of a holding company such as City. I must admit that I find considerable logic in this proposition. However, conceding without deciding that it is true for the purpose of argu-

ment, I find that the transaction is still not one which appears to require the approval of City's shareholders. I say this because I cannot find from the facts of record that the transfer of the three subsidiaries will constitute a sale of "substantially all" of City's assets.

City owns other companies as well, and it appears from the sworn statements of record that for the years 1981, 1982 and 1983 the three printing and manufacturing companies provided, at most, 29% of its consolidated revenues, 35% of its operating income, [*8] and 13% of its asset base. For the nine-month period ending September 30, 1984, these figures increased to 32%, 53% and 13%. However, it appears that the revenues and operating income figures for this nine-month period are directly attributable in large part to an unusually bad year for City's insurance subsidiary.

Plaintiffs contend that the three subsidiaries have historically accounted for more than 50% of City's net income, and that for the third quarter of 1984 they accounted for 100% of City's net income. Thus, plaintiffs argue that under the "quantitatively vital" standard alluded to in *Gimbel v. Signal Corporation, Del. Ch., 316 A.2d 599 (1974),* aff'd, *Del. Supr., 316 A.2d 619 (1974)* shareholder approval is required pursuant to § 271 in order to dispose of such assets. However, the right of the plaintiffs to rely on these percentages as they have extrapolated them from City's financial information is at least arguable, and overall I am not convinced that the plaintiffs have demonstrated that the three subsidiaries constitute "substantially all" of City's assets within the meaning of the statute.

Plaintiffs also rely on Gimbel for the proposition [*9] that [HN2] where a sale of assets will substantially affect the existence and purpose of the corporation, then it is beyond the power of the board of directors to dispose of them without shareholder approval. *316 A.2d 606.* They say that the sale of the three subsidiaries here clearly affects the very purpose and existence of City since it is the sale of these companies that has caused City's board to determine that the corporation should be liquidated. However, as I see it, the sale of these assets has not mandated the liquidation of the corporation. It has simply caused City's management to recommend liquidation to its shareholders because of advantageous tax consequences that would flow therefrom. This is not to say that City could not continue on as a viable company with its remaining assets even if liquidation was voted down and the $134 million tax obligation paid.

Finally, I agree with the defendants that laches enters into this aspect of the matter. There is no dispute at this point that the $1.251 billion offered by Kohlberg Kravis is fair and that it represents a good deal for City. The signing of the agreement took place on August 23.

The execution of the definitive [*10] merger agreement took place on September 26. There is no question that plaintiffs were aware of these developments at the time. Yet for some reason which is not clear to me, they delayed until November 27 to institute these actions to prevent the consummation for the transaction which, under its terms, permits Kohlberg Kravis to withdraw if it is not completed by December 31, 1984. It is common knowledge that large sums of money are tied up in transactions of this type and that many investors change their position in anticipation of the completion of such a transaction. Under the circumstances here, I find that the plaintiffs' last-minute demand to temporarily enjoin the transaction some three months after it was public knowledge comes too late.

Accordingly, to the extent that plaintiffs' motion seeks to preliminarily enjoin the consummation of the sale of the three subsidiaries to Kohlberg Kravis, it will be denied.

Furthermore, I am not persuaded that I should enjoin the special meeting of shareholders scheduled for tomorrow. Specifically, I am not persuaded by plaintiffs' contention that three separate votes are required with regard to the liquidation plan as [*11] opposed to the one vote that is scheduled to be taken. Nor am I persuaded that plaintiffs have demonstrated that they will be able to establish on the merits of the matter that the proxy statement is materially misleading and inaccurate in the respects contended by them.

It is certainly arguable, as defendants maintain, that they are submitted only one liquidation plan to the shareholders, namely, a proposal that the corporation be liquidated by first selling Motel 6 to Kohlberg Kravis for $565 million and by thereafter authorizing the board of directors to dispose of the remaining assets of the corporation under the best terms available, including a transfer of remaining assets to a liquidating trust for the benefit of the shareholders in order to take advantage of the applicable income tax provisions, such trust to be administered by the three persons proposed as trustees. Since this is all part of one overall plan - for example, Motel 6 will not be sold to Kohlberg Kravis unless it is done pursuant to the plan of liquidation as I understand it - I can see no basis for dividing the components of the plan into three separate votes in view of the likelihood that the [*12] veto of one of the components will reject the plan as a whole anyway. Presumably, a shareholder who does not favor any one of the components can vote against the plan as a whole under the one-vote format and bring about the same results. In other words, so long as management will only take steps to liquidate under the three-pronged plan as proposed, the matter works out to being about as broad as it is long.

Plaintiffs have cited no convincing authority that would require separate votes under such circumstances and I am aware of none.

As to the proxy materials, I concede that the word given to shareholders, that because of the sale of the three subsidiaries to Kohlberg Kravis City "would be subject to approximately $134 million (approximately $3.40 per Common Share) of additional income tax" if the plan of liquidation is not approved, has a certain coercive ring to it. However, on the record I cannot find that plaintiffs will be able to establish that it is misleading. While in theory there may have been alternatives to liquidation - such as selling off other subsidiaries at a loss-available to avoid the tax consequences attributable to the sale of the three subsidiaries, [*13] there is record indication that City's management explored these alternatives and had an arguably justifiable basis for not attempting them. Thus, as I see it, the decision made by management is to either go with the liquidation or else pay the tax if shareholder approval for the liquidation cannot be obtained. In this sense, management's business decision may be subject to criticism but its advice to shareholders as to the consequences of a failure to approve the liquidation plan would appear to be accurate even if it does leave some shareholders between the rock and the hard spot, as the saying goes.

Time does not permit any extended discussion of the plaintiffs' other proxy contentions. Suffice it to say that the defendants are not without answer to them and that on balance, at least in my view in the limited time in which the Court has been given to digest arguments of such length and intricacy, the plaintiffs have failed to convincingly demonstrate that upon a final analysis they will be able to establish that the proxy statement contains material misstatements or omissions. Of course, this too is attributable in large part to the eleventh-hour presentation of [*14] such an application when weighed against the traditional reluctance of this Court to interfere with the holding of meetings of shareholders. *Lenahan v. National Computer Analysts Corp., Del. Ch., 310 A.2d 661 (1973); Campbell v. Lowe's, Inc., Del. Ch., 134 A.2d 565 (1957).*

[HN3] The granting or withholding of preliminary injunctive relief is always discretionary. *Data General Corp. v. Digital Computer Controls, Inc., Del. Supr., 297 A.2d 437 (1972).* Discretion dictates here that it is better to permit the meeting of City's shareholders to go forward as opposed to enjoining it until a later date based upon the less than clear status of the plaintiffs' proxy statement contentions.

Accordingly, the motion and application of the plaintiffs for a preliminary injunction are denied. IT IS SO ORDERED.

1984 Del. Ch. LEXIS 501, *

In so doing, however, I wish to make it clear that the allegations of the plaintiffs as to the so-called "golden parachute" benefits that will apparently be triggered in favor of City's board and management by shareholder approval of the very liquidation plan that has been pro- posed by City's board and management have not been urged by the plaintiffs as a basis for injunctive [*15] relief in the present proceedings, and that I have in no way passed indirectly upon the propriety of any such alleged benefits in rendering the decision herein.

LEXSEE 1992 U.S. DIST. LEXIS 3253



Analysis
As of: Mar 06, 2007

IN RE: THE COLUMBIA GAS SYSTEM, INC. and COLUMBIA GAS
TRANSMISSION CORPORATION, Debtors. THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF THE COLUMBIA GAS TRANSMISSION
CORPORATION, Appellant, THE COLUMBIA GAS SYSTEM, INC. and
COLUMBIA GAS TRANSMISSION CORPORATION, Appellees.

Civil Action No. 92-127-SLR

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

*1992 U.S. Dist. LEXIS 3253*

March 10, 1992, Decided

**PRIOR HISTORY:** [*1] Chapter 11, Case Nos. 91-803, 91-804

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** The court considered the emergency motion of appellant creditors that sought a stay pending appeal to prevent appellee debtors from excluding certain refunds and prepetition surcharges from the bankruptcy estate.

**OVERVIEW:** The creditors filed an emergency motion for a stay pending appeal pursuant to *Fed. R. Bankr. P. 8005*. The creditors challenged the retention by the debtors of customer refund monies that the debtor held in trust for the customers. The court granted the creditors' emergency motion for stay pending appeal. The court held that the debtor was not required to place the funds into a trust account to protect the funds against any potential loss as a result of the creditors' appeal. The court held that requirements for such relief were: 1) the party was likely to prevail on the merits of its appeal, 2) the party would suffer irreparable injury absent a stay, 3) a stay would not cause substantial harm to other interest parties, and 4) a stay would not harm the public interest. The court determined that the creditors satisfied all of the requirements and were entitled to a stay pending appeal.

**OUTCOME:** The court granted the creditors' emergency motion for a stay pending appeal on the issue of whether the customer refunds and prepetition charges were part of the bankruptcy estate.

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Case Administration > Administrative Powers > Stays > Appeals*
*Bankruptcy Law > Case Administration > Administrative Powers > Stays > Relief From Stays > Cause*
*Bankruptcy Law > Practice & Proceedings > Appeals > Procedures*
[HN1] To be entitled to a stay pending appeal pursuant to *Fed. R. Bankr. P. 8005*, party must demonstrate that: 1) it is likely to prevail on the merits of its appeal; 2) it will suffer irreparable injury absent a stay; 3) a stay will not cause substantial harm to other interested parties, and 4) a stay will not harm the public interest.

**COUNSEL:** James L. Patton, Jr, Esquire, of Young, Conaway, Stargatt & Taylor, Wilmington, Delaware, attorney for Debtors and for Appellees The Columbia Gas System, Inc. and Columbia Gas Transmission Corporation.

Kevin Gross, Esquire, of Rosenthal, Monhait & Gross, Wilmington, Delaware, attorney for Appellant The Official Committee of Unsecured Creditors for the Columbia Gas Transmission Corporation.

1992 U.S. Dist. LEXIS 3253, *

**JUDGES:** ROBINSON

**OPINION BY:** SUE L. ROBINSON

**OPINION:**

### MEMORANDUM OPINION

ROBINSON, U.S. District Judge

### INTRODUCTION

Pending before the Court is the emergency motion of the Official Unsecured Creditors Committee of the Columbia Gas Transmission Corporation ("the Committee") for stay pending appeal ("the motion"). The Committee has filed an appeal of the February 13, 1992 order of the Bankruptcy Court approving, inter alia, payment of "category one refunds and prepetition GRI surcharges on a pro-rata basis . . . to the extent of $ 3.3 million." Said order is based upon the Bankruptcy Court's conclusion that the "category one refunds and prepetition GRI surcharges" are not property of the Debtor's bankruptcy estate, rather, that said refunds and surcharges when received [*2] are held by the Debtor "in trust" for the benefit of its customers.

The Committee bases its motion on two arguments. First, the Committee contends that, pursuant to Bankruptcy Rule 7062, which incorporates *Fed.R.Civ.P. 62(d)*, it is entitled to a stay as a matter of right so long as suitable means are implemented to protect non-appealing parties from any loss occasioned by a stay. In this case, the Committee argues that the Debtor's retention of customer refund monies in an interest bearing escrow account insures that neither the Debtor nor its customers will be harmed by a stay. Alternatively, the Committee argues that a stay is warranted pursuant to Bankruptcy Rule 8005 because the Committee has satisfied all the requirements for such discretionary relief.

Responses in opposition to the motion have been filed by Columbia Gas Transmission Corporation (the "Debtor"); West Ohio Gas Company, Virginia Natural Gas, Inc. and the Peoples Natural Gas Company; the Columbia Gas Distribution Companies; The Official Committee of Customers; and the Pennsylvania Public Utility Commission. For the reasons that follow, a stay will be granted pending an expedited appeal.

### DISCUSSION [*3]

This Court has jurisdiction pursuant to *28 U.S.C. § 1334*(b). I conclude that the issues at bar are primarily legal in nature and, therefore, subject to de novo review. *In Re Public Service Co. of New Hampshire, 116 Bankr. 347, 349 n.2 (Bankr. D.N.H. 1990)*.

With respect to the Committee's first argument for relief, I decline to hold that the Committee is entitled to a stay as a matter of right. The Committee has not posted a bond, as required by *Fed.R.Civ.P. 62(d)*. I find no support for the proposition that the Debtor, the prevailing party below, be required to place into escrow funds judicially determined to belong to its customers, in order to afford the Debtor and its customers protection against any loss as a result of the Committee's appeal.

The Committee submits that it is nevertheless [HN1] entitled to a stay pending appeal pursuant to Bankruptcy Rule 8005. In order to obtain a discretionary stay, the Committee must demonstrate that: 1) it is likely to prevail on the merits of its appeal; 2) it will suffer irreparable injury absent a stay; 3) a stay will not cause substantial harm to other interested parties; and 4) a stay will not harm the public interest. [*4] See, e.g., In the *Matter of Delaware & Hudson Rv. Co., 90 Bankr. 90, 91 (Bankr. D.Del. 1988)*. The Court will examine each of these four factors seriatim.

### Probable Success on the Merits

The Court concludes that the Committee has carried its burden of demonstrating the first factor, probable success on the merits. Probable success on the merits means that "the movant has a 'substantial case,' or a strong case on appeal." *In Re Public Service Co. of New Hampshire, 116 Bankr. at 349*. There is no dispute that the issues presented are novel and complex. I have concluded that the issues are entitled to de novo review. I, therefore, embrace the observations of the Court in *In Re Mader, 100 Bankr, 989, 991 (N.D.Ill. 1989)*, as follows:

> This Court does not intend to go so far as to actually determine the merits of the legal issues which will be presented on appeal. Suffice it to say, however, that we have not found, nor been cited to, any controlling authority on this precise question, and the novel legal issue presented is not one in which the debtor has no likelihood of success. This case will [*5] likely present an issue of first impression and, on balance, the likelihood of success on the merits does not appear to weigh too heavily in favor of, or against, any of the parties to this proceeding.

See also *In Re Gleasman, 111 Bankr. 595, 601-02 (Bankr. W.D.Texas 1990)*.

### Irreparable Harm

1992 U.S. Dist. LEXIS 3253, *

The Court finds that the Committee has carried its burden as well as to the irreparable harm factor. It is apparent that, absent a stay, the funds subject to the Bankruptcy Court's February 13, 1992 order will be disbursed to the Debtor's customers. In dispute is the question whether there is a mechanism in place to recover such funds in the event the Bankruptcy Court's order is reversed. I decline to resolve that question on the record before me. Given the complexity of the question, however, I conclude that the irreparable injury factor weighs more heavily in favor of granting the stay pending an expedited appeal.

### Harm to Other Parties

The parties filing in opposition to this stay argue that a stay exposes the Debtor "to the unnecessary risk of diminution of the estate due to interest payments and substantial tax liability that could be easily [*6] avoided if [the Debtor] timely flows through the refunds." (D.I. 6 at 19) Accepting such representations as accurate, I nev-

ertheless conclude that the interests of the Debtor and the bankruptcy estate can be accommodated by an expedited appeal.

### Public Interest

Although the Court acknowledges that the refund of overcharges to individual customers represents a significant public interest, as does the public interest in enforcing the laws promulgated by Congress, I conclude that the public interest will not be adversely affected if the stay is granted pending an expedited appeal.

## CONCLUSION

For the reasons stated, the Court will granted the Committee's emergency motion for stay pending appeal.

An appropriate order will be entered.

SUE L. ROBINSON

**Westlaw.**

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2004 WL 253477 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
In re Polaroid Corp.D.Del.,2004.Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
In re: POLAROID CORPORATION, et al., Debtors.
Stephen J. MORGAN, Appellant,
v.
POLAROID CORPORATION, et al., Appellees.
**No. Civ.A. 02-1353 JJF, 01-10864 PJW.**

Feb. 9, 2004.

Stephen J. Morgan, Appellant, pro se.
Gregg M. Galardi, Mark L. Desgrosseilliers, of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware, Eric W. Kaup, of Skadden, Arps, Slate, Meagher & Flom LLP, Chicago, Illinois, for Debtors and Debtors-in-Possession, Appellees, of counsel.
Joseph Malfitano, of Young Conaway Stargatt & Taylor LLP, Wilmington, Delaware, Nava Hazan, of Akin Gump Strauss Hauer & Feld, LLP, New York, New York, Co-Counsel to the Plan Administrator, of counsel.

*MEMORANDUM OPINION*
FARNAN, J.
**\*1** Presently before the Court is the "Emergency" Motion For Stay Pending Appeal filed by Appellant Stephen J. Morgan. (D.I.31.) For the reasons discussed below, the Court will deny Appellant's request for a stay pending appeal.

BACKGROUND

**\*1** The instant action is a bankruptcy appeal arising from the voluntary bankruptcy filing by Polaroid Corporation and certain of its subsidiaries and affiliates (collectively the "Debtors") in October of 2001. By his Motion, the Appellant requests the Court to stay the implementation of the Debtors'

plan for reorganization. The Bankruptcy Court denied an identical request for a stay by Appellant on December 16, 2003.

I. Parties' Contentions

**\*1** The Appellant contends that the Court should stay the implementation of the reorganization plan because it is not in the best interest of Polaroid shareholders. The Appellant alleges that the auction of Polaroid's assets was fraudulent and that the value of Polaroid's assets far exceeded their sale price. Further, the Appellant contends that his appeal is likely to be successful because there remain unanswered questions about value and damaged shareholder and bondholder interests. The Appellant contends that if the Court denies his request for stay, he and other shareholders will be deprived of their right to appeal and their financial stakes in Polaroid. The Appellant also contends that a stay is in the public interest, because in light of recent corporate scandals, a resolution of the instant appeal is required.

**\*1** In response, the Appellee contends that the Court should deny Appellant's request for an emergency stay because he has not satisfied the standards for entitlement to a stay pending appeal. Further, the Appellee contends that the Appellant's request is equitably moot. The Appellee also contends that Appellant failed to properly serve it and its counsel as required by the Federal Rules of Civil Procedure.

DISCUSSION

**\*1** Federal Bankruptcy Rule 8005 enables a reviewing court to issue a stay pending appeal from a judgment, order, or decree of a bankruptcy judge. Courts interpreting Federal Bankruptcy Rule 8005 have established a four prong test for an appellant to obtain a stay: 1) a strong likelihood of success on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 2

Not Reported in F.Supp.2d, 2004 WL 253477 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

the merits of the appeal; 2) the movant will suffer irreparable harm if the stay is denied; 3) substantial harm will not be suffered to non-moving parties if the stay is granted; and 4) issuance of the stay will not harm the public interest. *In re 421 Willow Corp.,* 2003 WL 22318022 at *3 (E.D.Pa. Oct. 9, 2003). If a party fails to establish one of the four prongs, a court may deny the requested stay. *In re ANC Rental Corp.,* 2002 WL 1058196 at *2 (D.Del. May 22, 2002) (citing *In re Blackwell,* 162 B.R. 117, 120 (E.D.Pa.1993)). Because the Court concludes that Appellant has not established a likelihood of success on the merits, the Court will deny the request for stay pending appeal.

**\*1** Likelihood of success on the merits means that a movant has a " 'substantial case,' or a strong case on appeal." *In re The Columbia Gas Sys., Inc.,* 1992 U.S. Dist. LEXIS 3253 at *4 (D.Del. March 10, 1992) (quoting *In re Public Serv. Co. of N.H.,* 116 BR 347, 349 (Bankr.D.N.H.1990). Appellant contends that "unanswered questions about value ... once answered will favor the appeal." (D.I. 31 at 3.) However, in the instant motion the Appellant does not identify for the Court any order, decree, or judgment by the Bankruptcy Court that was erroneous, and thus, potentially reversible on appeal. Moreover, Appellant has not identified any potentially incorrect factual finding or legal conclusion reached by the Bankruptcy Court.

**\*2** Absent specific challenges to actions taken by the Bankruptcy Court, the Court must conclude that Appellant has not demonstrated a strong likelihood of success on the merits. The Court will not speculate as to what errors, if any, were committed by the Bankruptcy Court. Therefore, because the Court concludes that Appellant has failed to establish the first prong of the test for entitlement to a stay, the Court will deny Appellant's Motion.[FN1]

> FN1. Based on this conclusion, the Court will not address Appellee's remaining bases for denial.

**\*2** An appropriate Order will be entered.

### ORDER

**\*2** At Wilmington, this 9th day of February, 2004, for the reasons discussed in the Memorandum Opinion issued this date;

**\*2** NOW THEREFORE, IT IS HEREBY ORDERED that the "Emergency" Motion For Stay Pending Appeal filed by Appellant Stephen J. Morgan (D.I.31) is *DENIED.*

D.Del.,2004.
In re Polaroid Corp.
Not Reported in F.Supp.2d, 2004 WL 253477 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:02CV01353 (Docket) (Aug. 02, 2002)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.