**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| NORTHWESTERN CORPORATION, | ) | C.A. No. 03-12872 (KJC) |
| Reorganized Debtor. | ) | Re: D.I. 3575 |
| MAGTEN ASSET MANAGEMENT CORP. and LAW DEBENTURE TRUST COMPANY OF NEW YORK, | ) | |
| Appellants/Movants, | ) | |
| v. | ) | Appeal No. 07- 114-JJF |
| NORTHWESTERN CORPORATION, | ) | |
| Appellee/Respondent. | ) | |

## OPENING BRIEF OF APPELLANTS


**FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP**
One New York Plaza
New York, NY 10004
Telephone: (212) 859-8000
Facsimile: (212) 859-4000

- and –

**BLANK ROME LLP**
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 425-6400
Facsimile: (302) 425-6464

Counsel for Magten Asset Management Corporation

**NIXON PEABODY LLP**
100 Summer Street
Boston, MA 02110
Telephone: (617) 345-1000
Facsimile: (617) 345-1300

- and-

**SMITH, KATZENSTEIN & FURLOW, LLP**
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 652-8400
Facsimile: (302) 652-8405

Counsel for Law Debenture Trust Company of New York

**TABLE OF CONTENTS**

**PRELIMINARY STATEMENT** .......... 1

**BASIS OF APPELLATE JURISDICTION** .......... 5

**ISSUES PRESENTED** .......... 5

**STANDARD OF APPELLATE REVIEW** .......... 5

**STATEMENT OF THE CASE** .......... 6

**ARGUMENT** .......... 13

I. THE BANKRUPTCY COURT ERRED IN NECESSARILY DECIDING THAT NORTHWESTERN CAN SUBSTITUTE CASH IN THE DISPUTED CLAIMS RESERVE .......... 13

A. NorthWestern's Chapter 11 Plan Cannot Be Modified Because It Has Been Substantially Consummated. .......... 13

B. Substituting Cash For Stock in the Disputed Claims Reserve Would Violate Section 1123(a)(4) of the Bankruptcy Code. .......... 18

C. The Potential for a Merger was Squarely Presented Pre-Confirmation and NorthWestern Chose Not to Provide for it in the Plan .......... 20

D. The Bankruptcy Court erred in relying on Rule 3020(d) of the Federal Rules of Bankruptcy Procedure as the basis for entering the Cash-Out Order. .......... 22

E. The Bankruptcy Code trumps Delaware State law and any conflict between the terms of the Plan and Delaware State law is self-inflicted by NorthWestern .......... 26

II. THE BANKRUPTCY COURT ERRED IN FAILING TO CONCLUDE THAT NORTHWESTERN WAS JUDICIALLY ESTOPPED FROM ARGUING THAT CASH IN LIEU OF STOCK MAY BE PLACED IN THE DISPUTED CLAIMS RESERVE .......... 30

**CONCLUSION** .......... 32

# TABLE OF AUTHORITIES

**CASES** **Page(s)**

Almeroth v. Innovative Clinical Solutions Ltd. (In re Innovative Clinical Solutions, Ltd.), 302 B.R. 136 (Bankr. D. Del. 2003) .......... 14

In re Armstrong World Indus., Inc. 348 B.R. 136 (D. Del. 2006) .......... 27

BFP v. Resolution Trust Corp., 511 U.S. 531 (1994) .......... 29

Branchburg Plaza Assocs., L.P. v. Fesq (In re Fesq), 153 F.3d 113 (3d Cir. 1998) .......... 23, 24

In re Charterhouse, Inc., 84 B.R. 147 (Bankr. D. Minn. 1988) .......... 14, 17

In re Chicago, Milwaukee, St. Paul and Pac. R.R. Co., 891 F.2d 159 (7th Cir. 1989) .......... 27

Consumers Realty & Dev. Co. v. Goetze (In re Consumers Realty & Dev. Co.), 238 B.R. 418 (B.A.P. 8th Cir. 1999) .......... 28

In re Cont'l Airlines, Inc., 91 F.3d 553 (3d. Cir. 1996) .......... 14, 17

In re Eddington Thread Mfg. Co., 189 B.R. 898 (E.D. Pa. 1995) .......... 14

First Union Nat'l Bank v. Gibbons (In re Princeton-New York Investors, Inc.), 219 B.R. 55 (D.N.J. 1998) .......... 29

GECC v. Dial Bus. Forms, Inc. (In re Dial Bus. Forms Inc.), 341 F.3d 738 (8th Cir. 2003) .......... 17

In re Granada Wines, Inc., 26 B.R. 131, 134 (Bankr. D. Mass. 1983), *aff'd* 748 F.2d 42 (1st Cir. 1984) .......... 19

Hawley Fuel Coalmart, Inc. v. AOV Indus., (In re AOV Indus., Inc.), 792 F.2d 1140 (D.C. Cir. 1986) .......... 19

Henthorn v. GMAC Mortgage Corp. (In re Henthorn), 299 B.R. 351 (E.D. Pa. 2003), *aff'd* 127 Fed. Appx. 15 (3d Cir. 2005) .......... 25, 26

Hillis Motors, Inc. v. Haw. Auto. Dealers' Ass'n, 997 F.2d 581 (9th Cir. 1993) .......... 17

In re H&L Developers Inc., 178 B.R. 77 (Bankr. E.D. Pa. 1994) .......... 13

Jones v. Keene Corp., 933 F.2d 209 (3d. Cir. 1991) .......... 28

Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp., 337 F.3d 314 (3d. Cir. 2003), *cert. denied*, 541 U.S. 1043 (2004) .......... 30

Manus Corp. v. NRG Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 188 F.3d 116 (3d Cir. 1999) .......... 5, 6

MFS Telecom, Inc. v. Motorola, Inc. (In re Conxus Commc'ns, Inc.), 262 B.R. 893 (D. Del. 2001) ........ 25

Montrose Med. Group Participating Sav. Plan v. Bulger, 243 F.3d 773 (3d Cir. 2001) ........ 30

In re Morristown & Erie R.R.Co., 885 F.2d 98 (3d Cir. 1989) ........ 25

Murdock v. Holquin, 323 B.R. 275 (N.D. Cal. 2005) ........ 18

In re Northampton Corp., 39 B.R. 955 (Bankr. E.D. Pa. 1984), *aff'd* 59 B.R. 963 (E.D. Pa. 1984) ........ 14

Ocasek v. Manville Corp. Asbestos Disease Comp. Fund, 956 F.2d 152 (7th Cir. 1992) ........ 28

Official Comm. of Unsecured Creditors v. Aust (In re Network Access Solutions Corp.), 330 B.R. 67 (Bankr. D. Del. 2005) ........ 30

Official Comm. Of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.), 456 F.3d 668 (6th Cir. 2006), petition for cert. filed, 75 USLW 3295 (Nov. 21, 2006) (No. 06-705) ........ 18

Official Comm. Of Unsecured Creditors v. DVI Bus. Credit (In re DVI, Inc.), 326 B.R. 301 (Bankr. D. Del. 2005) ........ 30

Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of Del., Inc. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co. of Del.), 274 B.R. 71 (D. Del. 2002) ........ 29

In re Penn. Cent. Transp. Co., 42 B.R. 657 (E.D. Pa. 1984), *aff'd* 771 F.2d 762 (3d Cir. 1985) ........ 17

Pickett v. Integrated Health Servs., Inc. (In re Integrated Health Servs., Inc.), 304 B.R. 101 (Bankr. D. Del. 2004) ........ 32

In re Roach, 824 F.2d 1370 (3d. Cir. 1987) ........ 28, 29

Pro-Tec Servs., LLC v. Inacom Corp. (In re Inacom Corp.), 2004 U.S. Dist. LEXIS 20822, (D. Del. Oct. 4, 2004) ........ 5, 6

Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355 (3d. Cir. 1996) ........ 30

Safety Nat'l Cas. Corp. v. Kaiser Aluminum & Chem. Corp. (In re Kaiser Aluminum Corp.), 303 B.R. 299 (D. Del. 2003) ........ 5

Southern Ry. Co. v. Johnson Bronze Co., 758 F.2d 137 (3d Cir. 1985) ........ 25

T. Copeland and Sons v. SML Int'l, Inc. (In re SLM Int'l, Inc.), 248 B.R. 240 (D. Del. 2000) ........ 30

Term Loan Holder Comm. v. Ozer Group, LLC (In re Caldor Corp.), 303 F.3d 161 (2d Cir. 2002) ........ 24

In re Tillotson, 266 B.R. 565 (Bankr. W.D.N.Y. 2001) .......... 14

U.S. Brass Corp. v. Travelers Ins. Group, Inc. (In re U.S. Brass Corp.), 301 F.3d 296 (5th Cir. 2002) .......... 13, 14

United States v. Towers (In re Pac. Atl. Trading Co.), 33 F.3d 1064 (9th Cir. 1994) .......... 24

United States v. Lincoln Sav. Bank (In re Commercial Millwright Serv. Corp.), 245 B.R. 603, (N.D. Iowa 2000) .......... 17. 27

In re Wolfberg, 255 B.R. 879 (B.A.P. 9th Cir. 2000), *aff'd* 37 Fed. Appx. 891 (9th Cir. 2002) .......... 24

**OTHER AUTHORITIES**

11 U.S.C. § 105(a) .......... 1, 12, 25, 26

11 U.S.C. § 345 .......... 1, 12

11 U.S.C. § 1101(2) .......... 13, 14

11 U.S.C. §1123(a)(4) .......... passim

11 U.S.C. § 1127(b) .......... passim

11 U.S.C. § 1142(b) .......... passim

11 U.S.C. § 1330(a) .......... 24

28 U.S.C. § 158(a)(1) .......... 5

28 U.S.C. § 2075 .......... 23, 25

Fed. R. Bankr. P. 3020 .......... 23

Fed. R. Bankr. P. 3020(d) .......... passim

Fed. R. Bankr. P. 8001(a) .......... 5

Fed. R. Bankr. P. 8002 .......... 5

Fed. R. Bankr. P. 9024 .......... 24

Fed. R. Bankr. P. 9030 .......... 23

7 Collier on Bankruptcy, P 1127.04 (15th Ed. Rev. 2006) .......... 14

## PRELIMINARY STATEMENT

This appeal (the "Appeal") by Law Debenture Trust Company ("Law Debenture") and Magten Asset Management Corporation ("Magten" and together with Law Debenture, the "Appellants") arises from the Order In Aid of Execution of Confirmed Plan of Reorganization (the "Cash-Out Order"), entered by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on February 2, 2007. The Cash-Out Order directs La Salle Bank, the transfer agent (the "Transfer Agent") holding issued and outstanding shares of Reorganized NorthWestern[1], allocated to the Disputed Claims Reserve, to invest the cash to be received upon tender of the shares in the Disputed Claims Reserve upon consummation of an impending merger between NorthWestern and Babcock & Brown Infrastructure, Ltd. ("BBI") (the "BBI Transaction"), in accordance with section 345 of the Bankruptcy Code. See App. Exh. 108.[2]

The Cash-Out Order should be reversed on appeal because it impermissibly alters NorthWestern's substantially consummated chapter 11 Plan and deprives Appellants of the common stock to which they are entitled. The terms of the Plan that relate to this Appeal are simple and are not in dispute. Once their claims are Allowed, Appellants, as the holders of certain securities called QUIPS (Qualified Income Preferred Securities), are entitled to their pro rata share of New Common Stock of NorthWestern to be held in the Disputed Claims Reserve. The Cash-Out Order, however, modifies the Plan so that once Appellants' claims are Allowed, the Appellants will receive cash not stock. It is black letter law that once a chapter 11 plan is

---

1 All capitalized terms not expressly defined herein have the meanings ascribed to them in Reorganized NorthWestern Corporation's ("NorthWestern") Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Plan").

2 References to items identified in Appellants' Designation of Items to be Included in the Record on Appeal and Statement of Issues to be Presented on Appeal of Magten and Law Debenture [Docket No. 11] are referred to as "App. Exh. __"

substantially consummated, it cannot be modified. And, it is law of the case that NorthWestern's Plan has been substantially consummated: both the Bankruptcy Court and this Court have held that the Plan has been substantially consummated. While NorthWestern tried to frame the relief it sought in its motion (the "Cash-Out Motion") as a request to permit it to invest proceeds received upon the merger, the Bankruptcy Court recognized that before such relief can be granted it must first determine the permissibility of the merger under the terms of the Plan. However, the Bankruptcy Court committed reversible error by determining that the Plan could be modified to provide for Appellants to receive cash in lieu of stock and by entering the Cash-Out Order directing the Transfer Agent how to invest cash received from the BBI Transaction.

Section 1127(b) of the Bankruptcy Code's prohibition on modifying a substantially consummated chapter 11 plan is explicit and without any applicable exceptions. As discussed herein, the language in the Plan is clear and unambiguous that the only currency in the Disputed Claims Reserve is NorthWestern's common stock and that upon allowance of a Disputed Claim, "Distributions shall be made in accordance with this Plan based upon the Distributions that would have been made to such holder under this Plan if the Disputed Claim had been an Allowed Claim on or prior to the Effective Date plus any interest, dividends or other Distributions earned thereon." See App. Exh. 9, p. 59. Accordingly, to substitute cash for shares when the Plan mandates that Disputed Claimants receive the same recovery as if their Claims were allowed on the Effective Date, would modify the Plan. Moreover, the overwhelming evidence that was before the Bankruptcy Court demonstrates that the potential for a merger and the impact on the Plan was squarely presented pre-confirmation and NorthWestern determined not to provide for it in the Plan. Tellingly, when NorthWestern wanted to expressly provide in the Plan a mechanism for a cash pay-out, it did so. The warrant agreement provision under the Plan expressly provides

that, in the event of a merger or acquisition, NorthWestern may elect to pay each holder of the warrants cash in lieu of the stock to which such holders would be entitled. Therefore, to the extent NorthWestern sought by its Cash-Out Motion to address an omission in the Plan, it was an intentional omission that the Bankruptcy Court did not have the authority or discretion to cure.

Furthermore, NorthWestern – even as a reorganized entity – is still contractually bound by the terms of its chapter 11 Plan and may not circumvent that limitation by voluntarily entering into a transaction that would necessarily result in inconsistencies with the Plan and the Plan's purpose and intent. Pursuant to the Plan, NorthWestern was contractually obligated to provide Appellants (upon their claims being Allowed) the form of relief expressly provided for in the Plan – which was stock, and only stock. Accordingly, Magten and the Non-Accepting Holders (whose interest are represented by Law Debenture) have a contractual right to receive the New Common Stock – and the attendant benefits and rights associated with being a holder of such stock – explicitly provided for in the Plan.

Moreover, tendering the shares in the Disputed Claims Reserve in exchange for the merger consideration results in different treatment to holders of claims within the same class – a direct violation of section 1123(a)(4) of the Bankruptcy Code. Under the Plan, holders of claims in Class 9 were entitled to receive shares of New Common Stock and the creditors whose claims have been Allowed have received such stock. Magten and the QUIPS holders that chose to pursue the fraudulent conveyance litigation (the "Non-Accepting QUIPS Holders") cannot receive different treatment simply because their claims are not yet Allowed.

The Bankruptcy Court recognized that it has no authority under <u>any</u> provision of the Bankruptcy Code for granting the relief sought by Reorganized NorthWestern. The Bankruptcy Court committed reversible error in seeking to rely on Rule 3020(d) of the Federal Rules of

Bankruptcy Procedure as the basis to grant the Cash-Out Motion after already conceding no authority existed under the statute to enter the Cash-Out Order. It is well-settled law that the bankruptcy rules cannot abridge, enlarge or modify the substantive rights afforded by the Bankruptcy Code. By necessarily deciding that NorthWestern may substitute cash for the stock in the Disputed Claims Reserve (where the substitution of cash in lieu of stock is not provided for in the Plan and would result in disparate treatment of similarly situated claimants under the Plan), the Bankruptcy Court has abridged the substantive provisions of sections 1127(b) and 1123(a)(4) of the Bankruptcy Code. As further discussed herein, reliance on Rule 3020 to modify the Plan was erroneous and thus the Cash-Out Order should be summarily reversed on appeal.

Lastly, and of equal importance, the Bankruptcy Court committed reversible error by failing to find that NorthWestern was judicially estopped from seeking to cash-out the shares in the Disputed Claims Reserve. In connection with a prior failed settlement among NorthWestern and the Non-Accepting QUIPS Holders, NorthWestern took the position before the Bankruptcy Court and this Court that because the Plan was substantially consummated, Magten and the Non-Accepting QUIPS Holders could not receive any consideration other than stock in satisfaction of their claims. See App. Exh. 46. Now, in direct opposition to NorthWestern's previous position, which the Bankruptcy Court and this Court accepted and relied upon, including in making findings adverse to Appellants, NorthWestern argues that Magten and the Non-Accepting QUIPS Holders may receive cash. NorthWestern simply cannot have it both ways and the doctrine of judicial estoppel is intended to preclude a litigant from obtaining relief under one theory and then later taking a contrary position. The Bankruptcy Court erred by failing to recognize the self-serving and irreconcilable positions taken by NorthWestern in this litigation.

## BASIS OF APPELLATE JURISDICTION

This is an appeal of the Cash-Out Order. In accordance with Fed. R. Bankr. P. 8001(a) and 8002, on February 12, 2007, Appellants timely filed the Notice of Appeal of the Cash-Out Order. This Court, therefore, has jurisdiction over this case pursuant to 28 U.S.C. § 158(a)(1) and Fed. R. Bankr. P. 8001(a).

## ISSUES PRESENTED

1. Whether the Bankruptcy Court's entry of an order pursuant to Rule 3020(d) that permits the Reorganized Debtor to distribute cash to Claimants on account of their claims instead of shares of New Common Stock as explicitly required by the Plan was an error because it (i) unlawfully modified a substantially consummated plan and (ii) violated section 1123(a)(4) of the Bankruptcy Code by permitting disparate treatment between the various claimants in Class 9.

2. Whether the Bankruptcy Court erred in failing to conclude that NorthWestern was judicially estopped from arguing that cash in lieu of stock may be placed in the Disputed Claims Reserve to satisfy the claims of Magten and the Non-Accepting QUIPS Holders, when NorthWestern knowingly and willfully has taken an irreconcilable and wholly inconsistent position from its previous assertion that the claims of Magten and the Non-Accepting QUIPS can only be satisfied with shares of NorthWestern's New Common Stock absent a Plan amendment.

## STANDARD OF APPELLATE REVIEW

When considering an appeal from a ruling by the United States Bankruptcy Court, a "district court reviews the Bankruptcy Court's legal determinations *de novo*, its factual findings for clear error, and its exercise of discretion for abuse." Pro-Tec Servs., LLC v. Inacom Corp. (In re Inacom Corp.), 2004 U.S. Dist. LEXIS 20822, at *3 (D. Del. Oct. 4, 2004) (citing Manus Corp. v. NRG Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 188 F.3d 116, 122 (3d Cir. 1999); Safety Nat'l Cas. Corp. v. Kaiser Aluminum & Chem. Corp. (In re Kaiser Aluminum Corp.), 303 B.R. 299, 302 (D. Del. 2003) ("In undertaking a review of the issues on appeal, the Court applies a clearly erroneous standard to the Bankruptcy Court's findings of fact and a plenary standard to its legal conclusions."). "A bankruptcy court abuses its discretion when its ruling is founded

on an error of law or misapplication of law to the facts. In determining whether an error exists, the bankruptcy court's application of the law to the facts is reviewed de novo." Pro-Tec Servs., LLC. 2004 U.S. Dist. LEXIS 20822, at *3-4 (citing Manus Corp., 188 F.3d at 122)).

## STATEMENT OF THE CASE

PARTIES

A. NorthWestern

NorthWestern is a publicly traded Delaware corporation that was incorporated in 1923. NorthWestern, together with its direct and indirect non-debtor subsidiaries, comprise one of the largest providers of electricity and natural gas in the upper Midwest and Northwest regions of the United States, serving approximately 608,000 customers throughout Montana, South Dakota, and Nebraska. On September 14, 2003 (the "Petition Date"), NorthWestern filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On October 19, 2004, the Bankruptcy Court entered an order confirming the Plan (the "Confirmation Order"). See App. Exh. 25. On November 1, 2004, the Plan became effective and NorthWestern ceased to operate as a debtor in possession.

B. Law Debenture

Law Debenture is a limited purpose trust company organized under the laws of New York and is the successor trustee to the Bank of New York under the Indenture governing the QUIPS.

C. Magten

Magten holds in excess of 40% of NorthWestern's Series A 8.45% QUIPS issued by Montana Capital I (the "Trust"). Law Debenture is the Trustee for the QUIPS. The Trust is a business trust established pursuant to the Delaware Business Trust Act. The Trust was established by The Montana Power Company ("Montana Power"), predecessor in interest to

Clark Fork (f/k/a NorthWestern Energy, LLC), as a financing vehicle. The sole assets of the Trust are the 8.45% Junior Subordinated Debentures due 2036 issued by Montana Power.

THE SUBJECT OF THE LITIGATION: THE FRAUDULENT TRANSFER

On September 29, 2000, Montana Power entered into a unit purchase agreement with NorthWestern, pursuant to which NorthWestern agreed to purchase the Montana Utility Assets. In order to facilitate the assets sale to NorthWestern, Montana Power created a subsidiary, The Montana Power Company LLC.

On November 15, 2002, NorthWestern orchestrated the transfer of substantially all of the utility assets of its directly owned subsidiary, Clark Fork, to NorthWestern for inadequate consideration (the "Transfer"). Though the Clark Fork assets had a value in excess of $1.4 billion, the total consideration received for the Transfer was the assumption of approximately $700 million of liabilities by NorthWestern. (This discrepancy in value has not been disputed in any filings by NorthWestern.) As a result of this Transfer, Clark Fork was rendered insolvent. On September 14, 2003, NorthWestern filed a voluntary petition for relief under chapter 11 of title 11 of the Bankruptcy Code.

On April 16, 2004, Appellants commenced an adversary proceeding in the Bankruptcy Court based on NorthWestern's fraudulent Transfer of substantially all of the utility assets of Clark Fork. See App. Exh. 123. On September 22, 2005, this Court withdrew the reference and the litigation is currently pending before this Court.

NORTHWESTERN'S CHAPTER 11 PLAN AND THE DISPUTED CLAIMS RESERVE

On January 13, 2004 Magten timely filed a proof of claim (the "Proof of Claim") for damages associated with the fraudulent conveyance with respect to the Transfer and for the amount owed on account of the QUIPS. The Proof of Claim was designated claim number 842 by NorthWestern's claims agent.

On August 19, 2004, NorthWestern filed its Plan and the Second Amended and Restated Disclosure Statement (the "Disclosure Statement"). See Declaration of Dale R. Dubé [docket no. 7, Exh. E]. On August 31, 2004, NorthWestern filed its revised Plan and Disclosure Statement, see App. Exh. 9 and Exh. 10, respectively, and on September 2, 2004, the Bankruptcy Court entered an order approving the Disclosure Statement. See App. Exh. 13.

Pursuant to the Plan, Magten and the Non-Accepting QUIPS Holders, if successful, would receive an Allowed Class 9 Claim of New Common Stock to be satisfied from the Disputed Claims Reserve. See App. Exh. 9, pp. 36-37, § 4.8(b)(ii). Specifically, the Plan provides, in relevant part, that Class 9 creditors "shall receive in full satisfaction, settlement, release, extinguishment and discharge ... its Pro Rata Share of: (a) 32,660,000 shares of New Common Stock ... plus (b) the 505,591 shares of New Common Stock allocated to Class 8(b) if Class 8(b), as a class, votes to reject the Plan. See App. Exh. 9, pp. 40, § 4.9(c)(i).

In addition, under the Plan, Magten and the Non-Accepting QUIPS Holders would also be entitled to any interest, dividends or other Distributions earned from the stock in the Disputed Claims Reserve as if their claim had been an Allowed Claim on or prior to the Effective Date. Specifically, Section 7.6 provides, in relevant part, that "the holder of a Disputed Claim that becomes an Allowed Claim . . . shall receive Distributions . . . based upon the Distributions that would have been made to such holder under the Plan if the Disputed Claim had been an Allowed Claim on or prior to the Effective Date plus any interest, dividends or other Distributions earned thereon." See App. Exh. 9, pp. 59, § 7.6.

The Confirmation Order requires NorthWestern to "establish an initial reserve of 13.5% of New Common Stock allocated to Class 7 and Class 9 for the Disputed Claims Reserve . . . pursuant to Section 7.5 of the Plan."[3] See App. Exh. 25, p. 80-81.

On November 1, 2004, pursuant to section 7.5 of the Plan providing that "[i]n lieu of estimating, fixing or liquidating the amount of any Disputed Claim . . . such amount may be fixed *by an agreement in writing by and between the Debtor and the holder of a Disputed Claims*", (see App. Exh. 9, p. 59 (emphasis added)), NorthWestern and the Indenture Trustee filed the QUIPS Stipulation with the Bankruptcy Court. See App. Exh. 34. Pursuant to the QUIPS Stipulation, NorthWestern agreed to set aside a portion of the Disputed Claims Reserve "solely to satisfy in full a $25 million Class 9 claim of the QUIPS Litigation Claims holders" (the "QUIPS Claims Reserve") and set forth the rights of the QUIPS holders with respect to their litigation claims (the "QUIPS Litigation Claims") to recover on account of an Allowed Claim in excess of that amount. See App. Exh. 34, pp. 2-3.

NorthWestern emerged from bankruptcy on November 1, 2004, and the Plan became effective (the "Effective Date"). See App. Exh. 33. A notice of substantial consummation of the Plan was filed on December 29, 2004. See App. Exh. 37. It is law of the case that NorthWestern's Plan has become effective and has been substantially consummated.

THE SETTLEMENT AGREEMENT AND NORTHWESTERN'S PRIOR INCONSISTENT POSITION THAT APPELLANTS ARE NOT ENTITLED TO ANY OTHER CONSIDERATION THAN STOCK.

Pursuant to a settlement agreement (the "Settlement Agreement"), dated as of January 27, 2005, Magten, Law Debenture, on behalf of the QUIPS holders, and NorthWestern agreed to a

---

3 The 13.5% reserve proposed by NorthWestern was predicated on the representation that 13.5% of the stock was an amount equal to the relevant percentage of Distributions to which the holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims in the amount of such Disputed Claim or such lesser amount as required by Final Order, as required by Section 7.5 of the Plan.

compromise and settlement at a Plan value of approximately $25.5 million, or approximately a 51% recovery based on the face amount of the Non-Accepting QUIPS Holders' $50 million Class 9 Claim (not including accrued interest, fees and expenses), rather than the approximately 63% they are entitled to under the Plan in exchange for the cessation of litigation between the Parties. See App. Exh. 42, ¶ 21. However, after the Settlement Agreement was negotiated and executed, presented to the Bankruptcy Court and made public through NorthWestern's press release, on February 16, 2005, NorthWestern advised Magten and Law Debenture by letter that it would not honor the terms of the Settlement Agreement. See App. Exh. 53, p. 1.

At the direction of the Bankruptcy Court, Appellants filed a Rule 9019 motion (the "9019 Motion") seeking approval of the Settlement Agreement. See App. Exh. 42. Subsequently, NorthWestern, the Plan Committee and the ad hoc committee of class 7 debtholders filed objections to the 9019 Motion. The primary basis of the objections was that the Settlement violated the Plan insofar as it provided to the holders of the QUIPS a recovery under both Option 1 and Option 2, when the Plan required holders of the QUIPS to choose between such options. Moreover, NorthWestern, in its objection (the "9019 Objection"), stated that "in negotiations with respect to the proposed settlement it was made very clear to both Magten and Law Debenture that NorthWestern *could not utilize cash to resolve Magten's and Law Debenture's claims*." See App. Exh. 46, ¶ 65 (emphasis added).

On March 10, the Bankruptcy Court entered an order (the "9019 Order"), denying the 9019 Motion, finding that "a plan amendment is not legally available because the Plan has been substantially consummated [since] [a] confirmed plan may be modified or amended after confirmation, but only before substantial consummation has taken place." See App. Exh. 53, p. 5. Following the Bankruptcy Court's denial of the 9019 Motion, Appellants timely filed an

appeal (the "9019 Appeal"). See App. Exh. 55. On appeal, this Court affirmed the Bankruptcy Court's ruling, holding that an amendment to the Plan would be necessary to implement the settlement, but that such an amendment was not feasible, as the Plan had been substantially consummated. See App. Exh. 82, p. 7.

On September 29, 2005, the Plan Committee filed a Motion In Aid of Consummation and Implementation of the Plan for an Order Authorizing and Directing NorthWestern to Distribute Surplus Distributions (the "Surplus Distribution Motion"). See App. Exh. 69. Pursuant to the Surplus Distribution Motion, the Plan Committee sought an order authorizing and directing NorthWestern to designate certain shares in the Disputed Claims Reserve as surplus distributions and to distribute such shares to holders of Allowed Claims under Section 7.7 of the Plan. See App. Exh. 69, pp. 5-6.

On February 2, 2006, the Bankruptcy Court denied the Surplus Distribution Motion (the "Order Denying the Surplus Distribution Motion"). On March 9, 2006, the Plan Committee filed a Notice of Appeal of the Order Denying the Surplus Distribution Motion in the District Court. See App. Exh. 80. This Court has entered an order reversing the Bankruptcy Court's order on the Surplus Distribution Motion and remanding the matter for further findings.

THE BBI TRANSACTION AND NORTHWESTERN'S ATTEMPT TO MODIFY ITS CHAPTER 11 PLAN BY CASHING-OUT THE SHARES IN THE DISPUTED CLAIMS RESERVE

In a Form 8-K issued by NorthWestern on April 26, 2006, NorthWestern announced that it had signed a definitive agreement (the "Merger Agreement") to be acquired by BBI for $37 per share of common stock in an all cash transaction that values NorthWestern at approximately $2.2 billion. See Declaration of Dale R. Dubé [docket no. 7, Exh. U]. Pursuant to section 2.01(i) of the Merger Agreement, each share of common stock in the Disputed Claims Reserve will be converted into $37 cash – the value of the merger consideration. See App. Exh. 86, ¶ 10.

NorthWestern's Plan, however, does not provide for a cash-out of the shares in the Disputed Claims Reserve.

On December 6, 2006, NorthWestern filed its Cash-Out Motion pursuant to 11 U.S.C. §§ 105(a) and 1142(b) before the Bankruptcy Court, seeking entry of an "Order In Aid of Execution of Confirmed Plan Of Reorganization, ... directing the Transfer Agent holding issued and outstanding shares of the Reorganized NorthWestern allocated to the Disputed Claims Reserve, upon tender of such shares in exchange for cash in accordance with the terms of an approved Merger Agreement, to invest any cash received in such exchange in accordance with Section 345 of the Bankruptcy Code." See App. Exh. 86, p. 1.

On January 15, 2007, Appellants filed an objection to NorthWestern's Cash-Out Motion. See App. Exh. 98. On February 1, 2007, the Bankruptcy Court held a hearing on the Cash-Out Motion, and granted the motion. See App. Exh. 112. At the hearing, the Bankruptcy Court held that nothing in NorthWestern's chapter 11 Plan precluded a merger and that it could grant the relief sought by NorthWestern based on Rule 3020(d) of the Federal Rules of Bankruptcy Procedure. See App. Exh. 112, p. 43 (lines 6-7; 21-22). On February 2, 2007, the Bankruptcy Court entered the Cash-Out Order that is the subject of this Appeal. See App. Exh. 108.

On February 9, 2007, Appellants filed with the Bankruptcy Court an Emergency Motion (the "Emergency Stay Motion") for a Stay Pending Appeal of the Cash-Out Order. See App. Exh. 110. On February 12, 2007, Appellants filed a notice of appeal of the Cash-Out Order in the Bankruptcy Court. See App. Exh. 113. On February 20, 2007, the Bankruptcy Court held a hearing on the Emergency Stay Motion and denied Appellants' Emergency Stay Motion. See App. Exh. 119, 120.

After the Bankruptcy Court denied Appellants' Emergency Stay Motion, Appellants filed its (1) Emergency Motion for Stay Pending Appeal of Order in Aid of Execution of Plan of Reorganization and (2) Expedited Appeal (the "District Court Emergency Stay Motion") on February 23, 2007 with this Court. See District Court Emergency Stay Motion [docket no. 2]. On March 9, 2007, this Court denied the District Court Emergency Stay Motion and set a briefing schedule for Appellants' appeal of the Cash-Out Order. See Memorandum Order Denying the Emergency Motion For Stay Pending Appeal [docket no. 17].

## ARGUMENT

### I. THE BANKRUPTCY COURT ERRED IN NECESSARILY DECIDING THAT NORTHWESTERN CAN SUBSTITUTE CASH IN THE DISPUTED CLAIMS RESERVE

#### A. NorthWestern's Chapter 11 Plan Cannot Be Modified Because It Has Been Substantially Consummated.

Section 1127(b) of the Bankruptcy Code provides, in relevant part, that:

> The proponent of a plan or the reorganized debtor may modify such plan at any time *after* confirmation of such plan and *before* substantial consummation of such plan....[4]

11 U.S.C. § 1127(b) (emphasis added).

Courts have uniformly interpreted section 1127(b) as imposing a bar to modification of a chapter 11 plan once substantial consummation of the plan has occurred. See U.S. Brass Corp. v. Travelers Ins. Group, Inc. (In re U.S. Brass Corp.), 301 F.3d 296, 307 (5th Cir. 2002) (holding that a modification of a plan is prohibited once substantial consummation has occurred); In re H&L Developers Inc., 178 B.R. 77, 82 (Bankr. E.D. Pa. 1994) (concluding that since the

---

4 Substantial consummation, as defined in section 1101(2) means: (A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of the distribution under the plan. 11 U.S.C. §1101(2).

confirmed plan was substantially consummated pursuant to section 1101(2), a modification would not be permitted under section 1127(b)); Almeroth v. Innovative Clinical Solutions Ltd. (In re Innovative Clinical Solutions, Ltd.), 302 B.R. 136, 144 (Bankr. D. Del. 2003) (finding that 1127(b) is the sole means for modifying a confirmed plan and that the plan could not be modified because it had been substantially consummated); In re Eddington Thread Mfg. Co., 189 B.R. 898, 904 (E.D. Pa. 1995) (stating a plan may be modified after its confirmation only if substantial consummation has not yet occurred); In re Charterhouse, Inc., 84 B.R. 147, 151 (Bankr. D. Minn. 1988) (noting that section 1127(b) operates to prohibit modification once substantial consummation has occurred); 7 Collier on Bankruptcy, P 1127.04 (15th Ed. Rev. 2006) (explaining that a chapter 11 plan may not be modified after substantial consummation). Specifically, the Third Circuit has stated that section 1127(b) "dramatically curtails the power of a bankruptcy court to modify a plan of reorganization after its confirmation and 'substantial consummation.'" In re Cont'l Airlines, Inc., 91 F.3d 553, 570 (3d. Cir. 1996).

It is irrelevant whether the plan modification sought is an explicit, direct modification of the plan, or whether it is to be effectuated through a purported post-confirmation transaction. See In re U.S. Brass Corp., 301 F.3d at 307-08 (concluding that a proposed settlement agreement would impermissibly modify a plan in contravention of the Bankruptcy Code). Accordingly, any relief sought that in fact modifies a confirmed plan or produces a result at odds with a specific provisions of a plan is subject to the bar imposed by Section 1127(b). See In re Tillotson, 266 B.R. 565, 571-72 (Bankr. W.D.N.Y. 2001); In re Northampton Corp., 39 B.R. 955, 956 (Bankr. E.D. Pa. 1984), aff'd 59 B.R. 963 (E.D. Pa. 1984) ("The filing of a chapter 11 petition, with an eye toward curing defaults arising under a previously confirmed chapter 11 plan, is so akin to modifying the previous plan within the meaning of § 1127(b) that we deemed the filing of a new

chapter 11 petition an attempted modification under that section.") (emphasis added); See also App. Exh. 82, p. 7 (wherein this Court, affirming the Bankruptcy Court's ruling on the 9019 Motion, held that "an amendment to the Plan would be necessary to implement the settlement" but that "such an amendment was not feasible as the Plan has been substantially consummated.").

It is law of the case that NorthWestern's Plan has been substantially consummated: both the Bankruptcy Court and this Court have issued orders to that effect.[5] Specifically, in connection with the 9019 Motion, the Bankruptcy Court held that the Plan could not be amended because the Plan had been substantially consummated, noting that the Notice of Substantial Consummation had been filed and it had received widespread publication. See App. Exh. 53, p. 5. This Court affirmed the Bankruptcy Court's finding, holding that modification of the Plan was impermissible because the Plan had been substantially consummated. See App. Exh. 82, p. 7. Therefore, because NorthWestern's Plan has been substantially consummated, it cannot be amended, modified, or contradicted.

The specific terms of the Plan relevant to this Appeal are not in dispute. Section 4.9(c) of the Plan provides the following treatment for holders of unsecured claims, including Appellants:

> On the Effective Date, or as soon thereafter as practicable, each holder of an Allowed General Unsecured Claims . . . *shall receive* in full satisfaction, settlement, release, extinguishment and discharge of such Claim *its Pro Rata Share of: (i) 32,660,000 shares of New Common Stock (such 32,660,000 shares representing 92% of the New Common Stock* issued and outstanding on the Effective Date prior to any dilution resulting from shares of New Common Stock issued pursuant to the New Incentive Plan and exercise of the Warrants), plus (ii) the 505,591 shares of New Common Stock allocated to Class 8(b) if Class 8(b) as a class, votes to reject the Plan.

---

5 See App. Exh. 37 (Notice of Substantial Consummation, filed on December 29, 2004); App. Exh. 53, p. 5 (March 10, 2005 Opinion of Bankruptcy Court); App. Exh. 82, p. 7 (September 29, 2006 Opinion of the District Court).

Also, section 7.6 of the Plan provides in relevant part that:

> The holder of a Disputed Claim that becomes an Allowed Claim subsequent to the Effective Date shall receive Distributions from the Disputed Claims Reserve as soon as practical following the date on which such Disputed Claim becomes an Allowed Claim pursuant to a Final Order. Such Distributions shall be made in accordance with this Plan based upon the Distributions that would have been made to such holder under this Plan if the Disputed Claim had been an Allowed Claim on or prior to the Effective Date plus any interest, dividends or other Distributions earned thereon. (emphasis added)

Section 4.9(c) of the Plan, therefore, expressly entitles Appellants – as holders of a Disputed Claim – to receive the allocation of stock – and only stock – from the Disputed Claims Reserve. And, section 7.6 entitles Appellants to receive not only stock but any interest or dividends earned from the stock as if their claims became Allowed on or before the Effective Date. By permitting the substitution of cash in the Disputed Claims Reserve for the stock, the Bankruptcy Court has impermissibly modified sections 4.9 and 7.6 of the Plan to provide that while all other holders of Class 9 Claims will have received their pro rata share of New Common Stock (including the right to the interest and dividends earned thereon), Appellants will receive cash. In connection with the appeal of the Order Denying the Surplus Distribution Motion, this Court recently concluded that the

> Plan language is clear and unambiguous and that Surplus Distributions are mandated without regard to the status of any other Disputed Claims … [t]o hold otherwise would, in the Court's view allow the QUIPS Stipulation to modify Section 7.7 of the Plan, a result which is prohibited by Section 1127(b) of the Bankruptcy Code because the Plan has been confirmed and substantially consummated.

See Memorandum Opinion, United States District Court for the District of Delaware case no. 06-157 and 06-158 [docket nos. 21 and 12], p. 5.

This Court's analysis and conclusion in the Surplus Distribution appeal addresses the

crux of the issue before this Court on this Appeal – that the Cash-Out Order erroneously permits a result that ignores the plain and unambiguous language of the Plan, resulting in action that contravenes sections 4.9(a) and 7.6 of the Plan and violates section 1127(b) of the Bankruptcy Code.

Moreover, allowing for a modification of the Plan more than two years after it has been substantially consummated undermines the interest of the public in the finality of court determinations, which is particularly important in a bankruptcy proceeding context. In granting the Cash-Out Motion, the Bankruptcy Court has allowed for a backdoor amendment to a substantially consummated plan that was being administered by NorthWestern as the debtor and relied upon by the creditors, including Appellants. If these types of modifications were to be permitted by the Court, NorthWestern's Plan would be without finality – which is contrary to the letter and intent of the Bankruptcy Code. See In re Cont'l Airlines, Inc., 91 F.3d at 561 (noting the strong public interest in the finality of bankruptcy organizations after substantial consummation is particularly compelling); In re Charterhouse, Inc., 84 B.R. at 152 (citing In re Penn. Cent. Transp. Co., 42 B.R. 657, 666-67 (E.D. Pa. 1984), aff'd 771 F.2d 762 (3d Cir. 1985)) ("Statutory termination of the right to seek modification of a Chapter 11 plan is intended to promote finality in the reorganization process").

In the same vein, the Plan, as a legally binding contract, binds the party to the relief specifically provided for therein. GECC v. Dial Bus. Forms, Inc. (In re Dial Bus. Forms Inc.), 341 F.3d 738, 743 (8th Cir. 2003) (quoting United States v. Lincoln Sav. Bank (In re Commercial Millwright Serv. Corp.), 245 B.R. 603, 606 (N.D. Iowa 2000) (once the plan is confirmed, it "acts like a contract that binds the parties that participate in the plan"); see also Hillis Motors, Inc. v. Haw. Auto. Dealers' Ass'n, 997 F.2d 581, 588 (9th Cir. 1993) (a

reorganization plan should be construed as a contract); Murdock v. Holquin, 323 B.R. 275, 282 (N.D. Cal. 2005) ("[A] Chapter 11 plan of reorganization constitutes a new contract between a debtor and his or her creditors."); Official Comm. Of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.), 456 F.3d 668, 676 (6th Cir. 2006), petition for cert. filed, 75 USLW 3295 (Nov. 21, 2006) (No. 06-705) (in finding that the interpretation of a plan is analogous to a contract, if a plan term is unambiguous, *it must be enforced as written*) (emphasis added). Therefore, once NorthWestern's Plan was confirmed, it is treated as a contract that binds the parties that participate in the plan. Pursuant to the Plan contract, Appellants are entitled to relief in the form of stock in the Disputed Claims Reserve and only stock. The Cash-Out Order, however, impermissibly deprives Appellants of the stock and the attendant rights and benefits associated with being a holder of the stock (i.e., the value of the upside of the shares, voting rights, etc). Like a contract that cannot be changed once it has been definitely executed, NorthWestern cannot change the terms of the Plan post-substantial consummation to suit its own interest.

B. Substituting Cash For Stock in the Disputed Claims Reserve Would Violate Section 1123(a)(4) of the Bankruptcy Code.

Entry of the Cash-Out Order also violates section 1123(a)(4) of the Bankruptcy Code. Section 1123(a)(4) states that a plan shall:

> provide the same treatment for each claims or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest . . .

11 U.S.C. §1123(a)(4).

While holders of Class 9 Claims whose claims have become Allowed will have received shares, by exchanging the shares in the Disputed Claims Reserve for cash, holders of Disputed

Claims, by virtue of when their claims become Allowed, will receive a wholly different treatment under the Plan.

Because Magten and the Non-Accepting QUIPS Holders are being forced to receive cash in lieu of shares of New Common Stock, claimants within the same class – Class 9 – will be receiving non-consensual disparate treatment. By cashing out the shares in the Disputed Claims Reserve, claimants in Class 9 are being treated differently depending upon when their claim became allowed. Although section 1123(a)(4) of the Bankruptcy Code permits discriminatory treatment if claimants within a class opt to be treated differently, Magten and the Non-Accepting QUIPS Holders have never consented to be treated differently nor have they consented to receive less favorable treatment than other QUIPS holders. See Hawley Fuel Coalmart, Inc. v. AOV Indus., (In re AOV Indus., Inc.), 792 F.2d 1140, 1151-52 (D.C. Cir. 1986)) (finding that equal treatment of class members is a basic premise of bankruptcy law); In re Granada Wines, Inc., 26 B.R. 131, 134 (Bankr. D. Mass. 1983), *aff'd* 748 F.2d 42 (1st Cir. 1984) (stating that the debtor is not permitted to unfairly discriminate against a member of a class). Without the consent of Appellants, the Plan cannot provide one treatment to some holders and a different treatment to others in the same class. In fact, the Plan could never have been confirmed if the Non-Accepting QUIPS Holders received cash while the remaining Class 9 claimants received New Common Stock. Now, more than two years later, to substitute cash for shares post-confirmation would alter the bargain that Appellants received under the Plan, and would provide varying treatment of claimants within Class 9. The Cash-Out Order therefore, violates section 1123(a)(4) of the Bankruptcy Code.

At the hearing concerning the Cash-Out Motion, the Bankruptcy Court erroneously found that "the proposed relief gives the same treatment to the objectors as to all other Class 9

claimants" in that "it grants them the same rights they'd have under state law, which wouldn't permit them to hold onto the stock." See App. Exh. 112, p. 43 (lines 15-18). The Bankruptcy Court erred in finding that the proposed relief gives the same treatment to Appellants as to all other Class 9 claimants. Indeed, a simple comparison of what the other Class 9 claimants received (the New Common Stock) versus what Appellants will receive once their claims are Allowed (cash in lieu of stock) shows the disparate treatment to Appellants. Section 1123(a)(4) of the Code prohibits such treatment without the consent of Appellants.

Furthermore, as discussed in more detail in Section I.E, infra, the Bankruptcy Court's reference to the operation of state law (presumably Delaware corporate law and its treatment of mergers) not allowing Appellants to hold onto the stock, ignores the fact that at the time it entered into the Merger Agreement with BBI (thereby implicating Delaware law), NorthWestern had existing obligations to creditors, including Appellants, under the Plan. Irrespective of the formalities under Delaware law concerning the results of a cash-out merger, NorthWestern was first, contractually obligated to provide Appellants (once their claims are Allowed) with the stock in the Disputed Claims Reserve as the form of relief under the Plan.

C. The Potential for a Merger was Squarely Presented Pre-Confirmation and NorthWestern Chose Not to Provide for it in the Plan

The Bankruptcy Court did not find that the relief sought – the conversion of New Common Stock to cash – was an inadvertent omission, nor could it. As discussed above, a substantially consummated chapter 11 plan may not be modified, even to address an inadvertent omission or cure a default. Moreover, there was substantial indisputable evidence before the Bankruptcy Court that NorthWestern's omission was far from inadvertent but was intentional and with purpose.

Throughout NorthWestern's chapter 11 process, NorthWestern received numerous offers

to purchase the company's assets and had intimate knowledge that the company might be sold or merged post-confirmation. For example, on November 17, 2003, MDU Resources Group Inc. and three major cooperative organizations announced their interest in buying a large piece of NorthWestern's utility assets. See Declaration of Dale R. Dubé [docket no. 7, Exh. CC]. In February 2004, Minnesota-based 1 Otter Tail Power publicly announced its interest in purchasing NorthWestern's South Dakota utility operations. See Declaration of Dale R. Dubé [docket no. 7, Exh. DD]. Shortly thereafter, in March 2004, it was announced that Montana's major cities were preparing to make a bid to buy NorthWestern's Montana utility assets. See Declaration of Dale R. Dubé [docket no. 7, Exh. EE]. On May 12, 2004, the non-profit organization Montana Public Power Authority submitted a preliminary $1.26 billion bid to buy NorthWestern's Montana electric and natural gas systems. See Declaration of Dale R. Dubé [docket no. 7, Exh. FF]. This was followed by the September 2004 announcement of the formation of the South Dakota Public Power Authority organized to study the possibility of a bid for NorthWestern's assets. See Declaration of Dale R. Dubé [docket no. 7, Exh. GG].

The substantial interest by third parties to purchase NorthWestern – a deal that conceivably would not have closed until after the Plan had been confirmed – demonstrates NorthWestern's knowledge of the very real possibility that the company might be sold or merged post-confirmation. In that regard, NorthWestern, as drafter of the Plan, could have easily created a mechanism in the Plan that would enable NorthWestern to cash-out the shares in the Disputed Claim Reserve prior to resolving all Disputed Claims. Nevertheless, NorthWestern chose not to build such a mechanism into its Plan and instead chose to propose and confirm a plan that provides for Disputed Claimants to receive stock, and only stock.

Tellingly, when NorthWestern wanted to include in the Plan a mechanism to address

future merger or sale transactions, it did so. For example, the warrant agreement governing the warrants issued under the Plan contained an entire negotiated section entitled "Reclassification, Consolidation, Purchase, Combination, Sale or Conveyance." See App. Exh. 98, Exh. Q, pp. 9-10. That section provides for, among other things, that upon a merger or sale of the company, NorthWestern may elect to pay each holder of the warrants cash in lieu of the stock to which such holders would be entitled. NorthWestern could have included a similar provision in the Plan for the New Common Stock in the Disputed Claims Reserve, but elected not to do so. Therefore, to the extent that not including a provision for the cashing-out of shares in the Disputed Claims Reserve was an omission in the Plan, it is an intentional omission that the Bankruptcy Court should not have on legal or equitable grounds corrected by granting the relief requested by NorthWestern.

D. The Bankruptcy Court erred in relying on Rule 3020(d) of the Federal Rules of Bankruptcy Procedure as the basis for entering the Cash-Out Order.

In light of the Bankruptcy Court's acknowledgement that neither 1142(b) nor any other statute under the Bankruptcy Code provided the Bankruptcy Court with authority to enter the Cash-Out Order, as a matter of law, Rule 3020(d) could not provide the authority that was not actually authorized by a statute. Therefore, the Bankruptcy Court's reliance on Rule 3020(d) is reversible error.

At the hearing on the Cash-Out Motion, the Bankruptcy Court correctly found that section 1142(b), which provides that the bankruptcy court may direct any necessary party to perform any act necessary for the consummation of the plan of reorganization (11 U.S.C. § 1142(b)) was not applicable, recognizing that it was "too broad of a reading" of the statute. See App. Exh. 112, p. 43, (line 20). However, the Bankruptcy Court improperly relied on Bankruptcy Rule 3020(d), finding that Rule 3020(d) "provides sufficient authority" to grant the

Cash-Out Motion. See App. Exh. 112, p. 43, (lines 21-22). Any reliance on Rule 3020, however, was misplaced because it ignores well-established and necessary limitations that are placed on the bankruptcy courts' broad equitable powers granted under that (and similar) provision(s).

Section 28 U.S.C §2075 of the Rules Enabling Act provides the Supreme Court with the power to prescribe general rules under title 11. Importantly, 28 U.S.C §2075 provides that "such rules shall not abridge, enlarge, or modify any substantive right." See 28 U.S.C §2075. Congress has made it clear that the purpose of the Bankruptcy Rules is to implement the Bankruptcy Code by providing procedures rather than providing substantive rights. Moreover, when read in conjunction with Bankruptcy Rule 9030, which provides that the Bankruptcy Rules "shall not be construed to extend or limit the jurisdiction of the courts ..." see Bankruptcy Rule 9030, it is evident that if the Bankruptcy Code does not provide for a substantive right, the Bankruptcy Rules cannot do so on their own accord.

Rule 3020(d) provides that "[n]othwithstanding the entry of the order of confirmation, the court may issue any other order necessary to administer the estate." Fed. R. Bankr. P. 3020(d). Notwithstanding the broad language of Rule 3020, as Congress intended, a bankruptcy court's equitable power under the Federal Rules is superseded by substantive rights under the Bankruptcy Code, a creature of federal statutory law. See Branchburg Plaza Assocs., L.P. v. Fesq (In re Fesq), 153 F.3d 113, 116 (3d Cir. 1998) (finding that "when Congress accorded the Supreme Court authority to promulgate the Bankruptcy Rules, it stated 'such rules shall not abridge, enlarge, or modify any substantive right.'") (quoting 28 U.S.C. § 2075)).

The Third Circuit addressed precisely this interplay between the Bankruptcy Code and Bankruptcy Rules in In re Fesq. There, a judgment creditor sought revocation of an order



120087.01600/40167947v.1

confirming a chapter 13 plan based on a computer error. 153 F.3d at 115. Even though section 1330(a) of the Bankruptcy Code limits revocation only to cases of fraud, the creditor attempted to argue that confirmation could be revoked under Bankruptcy Rule 9024, which makes Civil Rule 60(b) generally applicable to bankruptcy cases, because it allows for relief from a final judgment in number of other circumstances. 153 F.3d at 116. In dismissing such an argument outright, the Third Circuit explained that "as a general matter, the Code defines the creation, alteration or elimination of substantive rights but the Bankruptcy Rules define the process by which these privileges may be effected." 153 F.3d at 116 (internal quotations omitted). The Third Circuit emphatically stated that " ... Rule 9024 cannot validly provide [the creditor] with a substantive remedy that would be foreclosed by Section 1330(a) ...". Id. In sum, the Third Circuit made clear that the Bankruptcy Rules could not validly provide the creditor with a substantive remedy that would be foreclosed by a provision of the Bankruptcy Code. See id. See also Term Loan Holder Comm. v. Ozer Group, LLC (In re Caldor Corp.), 303 F.3d 161, 171 (2d Cir. 2002) (recognizing that the Rules Enabling Act places "the rules in a subsidiary position to the Code"); see also In re Wolfberg, 255 B.R. 879, 884 (B.A.P. 9th Cir. 2000), aff'd 37 Fed. Appx. 891 (9th Cir. 2002) ("'Any conflict between the Bankruptcy Code and the Bankruptcy Rules must be settled in favor of the Code'" ) (quoting United States v. Towers (In re Pac. Atl. Trading Co.), 33 F.3d 1064, 1066 (9th Cir. 1994)).

Thus, if the Bankruptcy Code does not grant a party the substantive right to engage in a certain course of action, the Bankruptcy Rules cannot create such substantive right. Similarly here, the Bankruptcy Court erred by relying on Rule 3020(d) to enter the Cash-Out Order because it provides NorthWestern with a substantive remedy to modify a substantially consummated chapter 11 plan, which is otherwise prohibited by section 1142(b) of the

Bankruptcy Code.[6]

Section 1142(b) is explicit that there can be no modification of a chapter 11 plan after substantial consummation. As discussed above, NorthWestern's chapter 11 Plan does not provide for the cashing-out of shares in the Disputed Claims Reserve. By its Cash-Out Order, directing the Transfer Agent on how to proceed upon a cash-out when a cash-out itself is not permitted, the Bankruptcy Court has in effect relied on a bankruptcy rule to abridge an explicit substantive right of the Code, in direct contravention of 28 U.S. C. § 2075.

Furthermore, to the extent that the Bankruptcy Court could have relied on section 105 of the Bankruptcy Code (argued by NorthWestern but not specifically addressed by the Bankruptcy Court), which provides that the bankruptcy court may "issue any order . . . that is necessary to or appropriate to carry out the provisions" of Title 11, 11 U.S.C. § 105(a), such reliance would have been similarly misplaced. Section 105(a), although giving Bankruptcy Courts general equitable powers to issue orders necessary and appropriate to carry out the provisions of the Code, must be exercised in a manner consistent with the Code and does not give bankruptcy courts power to create rights that would otherwise be unavailable under the Code. See MFS Telecom, Inc. v. Motorola, Inc. (In re Conxus Commc'ns, Inc.), 262 B.R. 893, 899 (D. Del. 2001) (holding that "[w]hile Section 105(a) gives a bankruptcy court general equitable powers, those powers are limited by the provisions of the Bankruptcy Code") (citing In re Morristown & Erie R.R.Co., 885 F.2d 98, 100 (3d Cir. 1989) (recognizing that Section 105(a) must be "applied in a manner consistent with the Code."). See also Southern Ry. Co. v. Johnson Bronze Co., 758 F.2d 137, 141 (3d Cir. 1985) (holding that Section 105(a) does not give a bankruptcy court the power to create substantive rights that would otherwise be unavailable under the Code); Henthorn v.

6 It is particularly puzzling that the Bankruptcy Court relied on Rule 3020(d) because the broad language Rule 3020(d) is similar to that in section 1142(b), which the Court recognized was not applicable to the relief sought in the Cash-Out Motion as it would be too broad of a reading of that statute.

GMAC Mortgage Corp. (In re Henthorn), 299 B.R. 351, 355 (E.D. Pa. 2003), aff'd 127 Fed. Appx. 15 (3d Cir. 2005) ("Although Section 105(a) of the Bankruptcy Code supplements courts' specifically enumerated bankruptcy powers by authorizing orders necessary or appropriate to carry out provisions of the Bankruptcy Code, it has a limited scope") (internal citations omitted).

Now that the Plan has been substantially consummated, section 1127(b), a substantive provision of the Bankruptcy Code, prohibits any subsequent modification of the Plan. By permitting NorthWestern to effectuate a cash-out of the stock in the Disputed Claims Reserve, the Bankruptcy Court has created a substantive right for NorthWestern to which it would not otherwise be entitled. Such use of the Court's equitable powers is clearly erroneous and therefore, should be reversed.

E. The Bankruptcy Code trumps Delaware State law and any conflict between the terms of the Plan and Delaware State law is self-inflicted by NorthWestern

NorthWestern's featured claim, and one marginally addressed by the Bankruptcy Court, is the notion that the tendering of shares of New Common Stock in exchange for cash is not a modification of the Plan but is permitted by operation of Delaware corporate law. The Cash-Out Motion states that "NorthWestern is not seeking permission to effect the merger with Babcock & Brown – the merger will become effective pursuant to controlling Delaware law following applicable approvals." See App. Exh. 86, ¶ 2. The Bankruptcy Court adopted NorthWestern's point by stating that "there's nothing in the plan that precludes the debtor from pursuing a merger . . . ." While the Bankruptcy Court appropriately recognized that before it could determine whether the relief sought in the Cash-Out Motion was appropriate it first needed to make the determination that the merger was permitted under the Plan, the analysis and resulting conclusion reached by the Bankruptcy Court were erroneous. The Bankruptcy Court failed to address the question of whether the purported effect of the merger, i.e., the conversion of the New Common

Stock in the Disputed Claims Reserve into cash upon consummation of the merger pursuant to the procedural rules of Delaware corporate law, can be accomplished without an amendment to the Plan. The answer to that is clearly "no."

The point specifically ignored by the Bankruptcy Court is that NorthWestern created its own quandary. NorthWestern's purported need under Delaware corporate law to cash-out the shares in the Disputed Claims Reserve is the result of a voluntary transaction (as opposed to a statutory mandate) entered into by NorthWestern and BBI. There is no controlling state statute that requires NorthWestern to merge with BBI. As previously noted, although NorthWestern is a debtor that has emerged from bankruptcy and is entitled to carry on its business, it is still nonetheless bound by the express terms of its chapter 11 Plan and cannot voluntarily enter into transactions where the result would be inconsistent with or would necessarily amend the Plan or the Plan's intent and purpose. See In re Armstrong World Indus., Inc. 348 B.R. 136, 171 (D. Del. 2006) (finding that the reorganized debtor may operate its business and is "free of restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order"); see also United States v. Lincoln Sav. Bank (In re Commercial Millwright Serv. Corp., 245 B.R. at 606 ("The reorganized debtor operates as a new entity, free of its preconfirmation obligations except as provided in the plan") (citations omitted); see also In re Chicago, Milwaukee, St. Paul and Pac. R.R. Co., 891 F.2d 159, 161 (7th Cir. 1989) ("When the order of confirmation is entered, it binds the debtor and all creditors to the terms of the plan of reorganization.").

NorthWestern negotiated the terms of the BBI Transaction and could have avoided this precise predicament in a number of ways.[7] Indeed, since the transaction was first announced,

[7] It is worth noting that the amount of time necessary to resolve all Disputed Claims has been, and continues to be, solely within NorthWestern's control. The fact that Appellants' claims have not yet been resolved is largely due to

Appellants have repeatedly informed NorthWestern that the stock cannot be cashed-out under the Plan. See Declaration of Dale R. Dubé [docket no. 7, Exh. AA and BB]. It is disingenuous for NorthWestern who was first bound by the terms of its chapter 11 Plan (which does not provide for the cashing-out of shares), to subsequently enter into a transaction that results in the cashing-out of shares and then, in essence, remove itself from the equation by arguing that the cashing-out is pursuant to controlling state law. Any apparent conflict between Delaware law and the Bankruptcy Code and the Plan is self-inflicted and the terms of the Plan would nonetheless control.

The Third Circuit has noted that "if a provision of the [p]lan, a creature of federal law, conflicts with the law of a state and the state law 'frustrates the full effectiveness of federal law, [the state law], is rendered invalid by the Supremacy Clause.'" Jones v. Keene Corp., 933 F.2d 209, 214 (3d. Cir. 1991) (internal quotations omitted). See also Consumers Realty & Dev. Co. v. Goetze (In re Consumers Realty & Dev. Co.), 238 B.R. 418, 426 (B.A.P. 8th Cir. 1999) (finding that the provisions of a confirmed plan will govern if contrary to state law); Ocasek v. Manville Corp. Asbestos Disease Comp. Fund, 956 F.2d 152, 154 (7th Cir. 1992) (holding that because the provisions of a plan bind all parties, the terms of the plan will govern and appellant cannot rest on contradictory Illinois state law for an award of interest).

Similarly here, the treatment of creditors under NorthWestern's Plan, confirmed by the Bankruptcy Court and substantially consummated, cannot be altered by virtue of a state corporate law that provides for different treatment to holders of those claims. See In re Roach, 824 F.2d 1370, 1373 (3d. Cir. 1987) ("any state legislation that frustrates the full effectiveness of

---

NorthWestern's delay tactics in the fraudulent conveyance litigations through the filing of a meritless motion for protective order that halted discovery for almost nine months and necessarily delayed the date for trial in the action. Thus, any conflict between the Plan and the merger agreement, and any resulting delay in closing the transaction, is a result of NorthWestern's own delay devices in the litigation relating to Appellants' Class 9 Claims.

federal law is rendered invalid by the Supremacy Clause …"); Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of Del., Inc. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co. of Del.), 274 B.R. 71, 95-97 (D. Del. 2002) (stating that state law may be preempted when it conflicts or stands as an obstacle to the implementation of specific provisions of the Bankruptcy Code). In BFP v. Resolution Trust Corp., 511 U.S. 531 (1994), the Supreme Court noted that "when the meaning of the Bankruptcy Code's text is itself clear . . . its operation is unimpeded by contrary state law or prior practice" and that "the Bankruptcy Code can of course override by implication when the implication is unambiguous." Id. at 546. See also In re Roach, 824 F.2d at 1373 ("Under Article I, § 8 of the Constitution, Congress has the power to establish uniform bankruptcy laws in the United States and "where Congress has chosen to exercise its authority, contrary provisions of state law must accordingly give way"); First Union Nat'l Bank v. Gibbons (In re Princeton-New York Investors, Inc.), 219 B.R. 55, 59 (D.N.J. 1998) (noting that where Congress chose to exercise its authority, contrary provisions of state law must give way). With respect to the BBI Transaction, enforcing a provision of Delaware corporate law that permits a cash-out of the shares in the Disputed Claims Reserve frustrates the Bankruptcy Code's very purpose and intent in prohibiting a modification of a substantially consummated plan. Allowing Delaware corporate law to override the express terms of the Plan and the provisions of the Bankruptcy Code obstructs the operation of federal law thereby violating the Supremacy Clause.

Simply put, the Bankruptcy Court did not have any authority or discretion (under the Bankruptcy Rules, Bankruptcy Code or Delaware corporate law) to enter the Cash-Out Order, which necessarily violates substantive provisions of the Bankruptcy Code and impermissibly deprives Appellants of their contractual right to receive the form of relief expressly provided for under the Plan.

## II. THE BANKRUPTCY COURT ERRED IN FAILING TO CONCLUDE THAT NORTHWESTERN WAS JUDICIALLY ESTOPPED FROM ARGUING THAT CASH IN LIEU OF STOCK MAY BE PLACED IN THE DISPUTED CLAIMS RESERVE

Under the doctrine of judicial estoppel, a party is precluded from assuming a position in a legal proceeding that is inconsistent with one previously asserted. See Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 358 (3d. Cir. 1996) ("[t]he basic principal [of judicial estoppel] ... is that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory"); Official Comm. of Unsecured Creditors v. Aust (In re Network Access Solutions Corp.), 330 B.R. 67, 77 (Bankr. D. Del. 2005) (noting that judicial estoppel prevents a party from obtaining relief under one theory from later taking a contrary position).

For the doctrine of judicial estoppel to apply, a three-part inquiry must be undertaken: (1) has the party to be estopped taken two positions that are irreconcilably inconsistent; (2) has that party changed his or her position in bad faith, (i.e., with intent to play fast and loose with the court); and (3) is there no lesser sanction available under either statute or the applicable federal rules of procedure that would adequately remedy the damage done by the litigant's misconduct. See Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp., 337 F.3d 314, 319 (3d. Cir. 2003), cert. denied, 541 U.S. 1043 (2004); Montrose Med. Group Participating Sav. Plan v. Bulger, 243 F.3d 773, 779-80 (3d Cir. 2001); Official Comm. Of Unsecured Creditors v. DVI Bus. Credit (In re DVI, Inc.), 326 B.R. 301, 308 (Bankr. D. Del. 2005).[8] All three prongs of this test are met here.

---

8 "The application of judicial estoppel does not turn on whether the estopped party actually benefited from its attempt to play fast and loose with the court." Krystal Cadillac, 337 F.3d at 324; see also T. Copeland and Sons v. SML Int'l, Inc. (In re SLM Int'l, Inc.), 248 B.R. 240, 248 (D. Del. 2000). Instead, any such benefit is only a factor in determining whether the evidence would support a conclusion of bad faith under the second prong of the inquiry. Id. (quoting Ryan, 81 F.3d at 361).

The Bankruptcy Court, in its ruling, failed to consider or evaluate the overwhelming evidence that NorthWestern was judicially estopped from arguing that cash in lieu of stock may be placed in the Disputed Claims Reserve to satisfy the claims of Magten and the Non-Accepting QUIPS. In proceedings before this Court and the Bankruptcy Court, NorthWestern knowingly and willfully has taken an irreconcilable and wholly inconsistent position from its previous assertion that the claims of Magten and the Non-Accepting QUIPS can only be satisfied with shares of NorthWestern's New Common Stock absent a Plan amendment. First, as previously noted, in connection with the failed Settlement Agreement, NorthWestern ardently took the position that Magten and the Non-Accepting QUIPS Holders could not receive any consideration other than stock in satisfaction of their claims without first amending the Plan, which was substantially consummated. See App. Exh. 46, ¶ 65. In direct opposition to this previous position, which both the Bankruptcy Court and this Court accepted and relied upon, NorthWestern now seeks to provide Magten and the Non-Accepting QUIPS Holders with cash in lieu of the shares they are entitled to under the terms of the Plan. NorthWestern's positions regarding this issue are clearly inconsistent – either the Plan provides for an exchange of the Disputed Claims Reserve for cash or it does not.

Second, there can be no question that NorthWestern changed its position in bad faith with the intent to further its own agenda. By asserting the position that Magten and Law Debenture's claims could not be satisfied by a cash payout, NorthWestern clearly sought to gain an advantage in the prior litigation, in which it was successful. Notwithstanding its previous position with the Bankruptcy Court[9], NorthWestern still managed to persuade the Court to adopt a theory that

9 It's worth noting that the Bankruptcy Court's decision that is the subject of this Appeal takes the same previous inconsistent position as NorthWestern prior to granting the relief requested in the Cash-Out Motion. At the hearing to consider Claimants' 9019 Motion, the Bankruptcy Court noted that "there is not going to be any cash paid. That's not even contemplated by the agreement." See App. Exh. 56, p. 41 (lines

directly controverts the theory previously espoused in order to facilitate the contemplated merger transaction. NorthWestern should not be permitted to gain an advantage by asserting one theory in the earlier litigation and prevail to then turn around and assert a completely contrary theory to advance their self-serving interests.

Finally, there is no lesser sanction available under either statute or the applicable federal rules of procedure that would adequately remedy the damage done by NorthWestern's conduct. Judicial estoppel is an equitable remedy, which will apply when there is a "sense of fundamental unfairness." Pickett v. Integrated Health Servs., Inc. (In re Integrated Health Servs., Inc.), 304 B.R. 101, 110 (Bankr. D. Del. 2004). It is clear in this instance that the doctrine of judicial estoppel is tailored to address the harm suffered by Claimants as a result of NorthWestern asserting contrary positions in these litigations. Specifically, Magten and Law Debenture are incurring additional fees and expenses in litigating their motions before the Bankruptcy Court and this Court that is predicated on the precise opposite position taken by NorthWestern in the 9019 Motion. There is no lesser sanction available to alleviate this harm other than to prevent NorthWestern from asserting this contrary position.

Accordingly, the Bankruptcy Court erred by not applying the doctrine of judicial estoppel to protect the integrity of the judicial process by prohibiting NorthWestern from changing positions to suit its purposes.

## CONCLUSION

For the foregoing reasons, Appellants respectfully request this Court summarily reverse the Cash-Out Order and grant such other relief as it deems appropriate.

12-13). By entering the Cash-Out Order, however, the Bankruptcy Court is now permitting cash to be paid out that is not contemplated by the Plan.

Dated: Wilmington, Delaware
March 23, 2007

BLANK ROME LLP

Dale R. Dubé

Dale R. Dubé (DE No. 2863)
Bonnie G. Fatell (DE No.3809)
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 425-6400
Facsimile: (302) 425-6464

- and -

FRIED, FRANK, HARRIS,
SHRIVER & JACOBSON LLP
Bonnie Steingart
Gary L. Kaplan
John W. Brewer
One New York Plaza
New York, NY 10004
Telephone: (212) 859-8000
Facsimile: (212) 859-4000
Counsel for Magten Asset
Management Corporation

- and -

SMITH, KATZENSTEIN & FURLOW, LLP

/s/ Kathleen Miller

Kathleen M. Miller (DE No. 2898)
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 652-8400
Facsimile: (302) 652-8405

- and -

NIXON PEABODY LLP
John V. Snellings
Amanda Darwin
100 Summer Street
Boston, MA 02110
Telephone: (617) 345-1000
Facsimile: (866) 947-1732

Counsel for Law Debenture Trust Company

**CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of March, 2007, I served by hand delivery and electronic filing the OPENING BRIEF OF APPELLANTS using CM/ECF which will send notification of such filing(s) to the following:

Victoria Watson Counihan, Esquire
Dennis A. Meloro, Esquire
Greenberg Traurig LLP
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801

Neil B. Glassman, Esquire
Charlene D. Davis, Esquire
Eric M. Sutty, Esquire
THE BAYARD FIRM
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899

I also certify that, on this 23rd day of March, 2007, I served the aforementioned document, by e-mail and Federal Express, upon the following participants:

Alan W. Kornberg, Esquire
Margaret A. Phillips, Esquire
Ephraim I. Diamond, Esquire
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019

Steven J. Reisman, Esquire
Joseph D. Pizzurro, Esquire
Nancy E. Delaney, Esquire
Miriam K. Harwood, Esquire
Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue
New York, New York 10178-0061

Dale R. Dubé
Dale R. Dubé (I.D. No. 2863)

# UNREPORTED CASE

LEXSEE 2004 U.S. DIST. LEXIS 20822



Positive
As of: Mar 23, 2007

**IN RE: INACOM CORP., et al., Debtors, PRO-TEC SERVICES, LLC, Appellants, v. INACOM CORP., et al., Appellees.**

**Chapter 11, Case No. 00-2426 (PJW), Civil Action No. 04-390-GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

***2004 U.S. Dist. LEXIS 20822***

**October 4, 2004, Decided**
**October 4, 2004, Filed**

**DISPOSITION:** Bankruptcy court's decision reversed and remanded.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant creditor challenged a decision of the United States Bankruptcy Court for the District of Delaware that denied the creditor's motion to reconsider the allowance of its claims against appellee debtor.

**OVERVIEW:** The creditor and a corporation were parties to a computer repair services agreement. The debtor purchased the corporation and the creditor continued to provide services under the agreement. When the debtor filed Chapter 11, the creditor filed a claim and the debtor objected. The bankruptcy disallowed the claims because the creditor's counsel did not respond to the objection. The creditor sought relief under *Fed. R. Civ. P. 60(b)*. The court reversed the ruling of the bankruptcy court, holding that considering the O'Brien factors, the debtor would not be prejudiced in that (1) the debtor was fully aware of the creditor's claim and thus would not be surprised; (2) because the debtor was still negotiating with other creditors, the value of many unsecured claims was unknown and thus any disputed claim was paid without regard to what other claims existed; (3) there was no evidence as to whether payment of the claim would jeopardize the success of the debtor's reorganization or that allowing the claim would cause a "flood" of motions. In view of the agreement of the parties, the court found that the creditor and its counsel acted in good faith.

**OUTCOME:** The court reversed the decision of the bankruptcy court.

**LexisNexis(R) Headnotes**

***Bankruptcy Law > Practice & Proceedings > Appeals > Standards of Review > Abuse of Discretion***
***Bankruptcy Law > Practice & Proceedings > Appeals > Standards of Review > Clear Error Review***
***Bankruptcy Law > Practice & Proceedings > Appeals > Standards of Review > De Novo Review***

[HN1] In reviewing a case on appeal, the district court reviews the bankruptcy court's legal determinations de novo, its factual findings for clear error, and its exercise of discretion for abuse. A bankruptcy court abuses its discretion when its ruling is founded on an error of law or misapplication of law to the facts. In determining whether an error exists, the bankruptcy court's application of the law to the facts is reviewed de novo.

***Bankruptcy Law > Claims > Reconsideration***
***Civil Procedure > Judgments > Relief From Judgment > Motions to Alter & Amend***
[HN2] See *11 U.S.C.S. § 502(j).*

***Bankruptcy Law > Claims > Reconsideration***
***Civil Procedure > Judgments > Relief From Judgment > Excusable Neglect & Mistakes > Excusable Neglect***
***Civil Procedure > Judgments > Relief From Judgment > Motions to Alter & Amend***
[HN3] See *Fed. R. Civ. P. 60(b).*

***Bankruptcy Law > Claims > Reconsideration***
***Governments > Legislation > Statutes of Limitations > Time Limitations***
[HN4] The determination of what type of neglect would be considered "excusable" when a creditor fails to respond to a debtor's objection to a claim is an equitable one taking account of all relevant circumstances surrounding the party's omission. There are four factors to consider in making the excusable neglect determination: the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.

***Bankruptcy Law > Claims > Reconsideration***
[HN5] Regarding a bankruptcy court's reconsideration of a denied claim, prejudice is not an imagined or hypothetical harm; a finding of prejudice should be a conclusion based on facts in evidence. Under Third Circuit case law, a detailed analysis of more than whether the plan set aside money to pay the claim at issue is required. Thus, the relevant factors for analysis of prejudice under O'Brien include: whether the debtor was surprised or caught unaware by the assertion of a claim that it had not anticipated; whether the payment of the claim would force the return of amounts already paid out under the confirmed plan or affect the distribution to creditors; whether payment of the claim would jeopardize the success of the debtor's reorganization; whether allowance of the claim would adversely impact the debt or actually or legally; and whether allowance of the claim would open the floodgates to other future claims.

***Civil Procedure > Pretrial Judgments > Default > Default Judgments***
***Civil Procedure > Pretrial Judgments > Default > Relief From Default***
***Civil Procedure > Judgments > General Overview***
[HN6] The cost of enforcing a judgment later vacated and the delay in realizing satisfaction on a claim rarely serves to establish the degree of prejudice sufficient to prevent the opening of a default judgment. Prejudice is not merely the loss of an advantageous position, but must be something more closely tied to the merits of the issue.

***Civil Procedure > Judgments > Relief From Judgment > Excusable Neglect & Mistakes > General Overview***
[HN7] The concept of excusable neglect clearly anticipates neglect on the part of the party seeking to be excused.

**COUNSEL:** [*1] For Inacom Corp., Debtor: Christopher James Lhulier, Pachulski Stang Ziehl Young & Jones PC, Wilmington, DE, Duane David Werb, Werb & Sullivan, Wilmington, DE, E Lyle Kinley, Jr, Omaha, NE, Jean R Robertson, McDonald, Hopkins, Burke & Haber Co. LPA, Cleveland, OH, Kathleen Marshall DePhillips, Pachulski Stang Ziehl Young & Jones PC, Wilmington, DE, Laura Davis Jones, Pachulski Stang Ziehl Young & Jones, Wilmington, DE, Rosalie L. Spelman, Pachulski Stang Ziehl Young Jones, Wilmington, DE, Rosalie L. Spelman, Potter Anderson & Corroon LLP, Wilmington, DE, Sandra G McLamb, Pachulski Stang Ziehl Young Jones, Wilmington, DE.

For Tantara Transportation Group, Inc., Defendant: Daniel J. Anker, Wilmington, DE.

AQUA SYSTEMS USA, INC., Defendant, Pro Se.

For Sun MicroSystems, Inc., Defendant: Regina A. Iorii, Ashby & Geddes, Wilmington, DE.

For Ingram Micro, Inc., Defendant: James E. Huggett, Flaster Greenberg, Wilmington, DE, USA.

For Kingston Technology Company, Inc., Defendant: Rachel B. Mersky, Monzack & Monaco, P. A., Wilmington, DE, USA.

For The Computer Merchant, Ltd., Avantegarde Computer Services, Inc., Defendant: Charles J. Brown, Elzufon Austin Reardon [*2] Tarlov & Mondell,

Wilmington, DE.

Joseph J. McMahon Jr., Office of the U.S. Trustee, U.S. Trustee.

For Blank Rome Comisky & McCauley, LLP, Creditor Committee: Bonnie Glantz Fatell, Blank Rome LLP, Wilmington, DE, Deborah Cirilla Sellis, Esq, Akin & Herron, PA, Wilmington, DE.

For Official Committee of Unsecured Creditors, Creditor Committee: William J. Burnett, Blank Rome LLP, Wilmington, DE.

For Statutory Committee of Unsecured Creditors, Creditor Committee: William J. Burnett, Blank Rome LLP, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION:**

**MEMORANDUM**

**I. INTRODUCTION**

On June 16, 2000 (the "Petition Date"), Inacom Corp., *et al.* ("Inacom") filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code. Pro-Tec Services, LLC ("Pro-Tec") filed a timely Proof of Claim on November 2, 2000. On June 13, 2001, Inacom filed its Fifth Omnibus Objection to Claims -- Objections to Claims filed Against Inacom, Inc. or Its Affiliates (the "Objection"). On July 13, 2001, the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") entered an order disallowing [*3] Pro-Tec's claim pursuant to Inacom's Objection. Inacom's plan of liquidation was confirmed on May 23, 2003.

On April 2, 2004, Pro-Tec filed a motion to reconsider its claim. The motion was denied at a hearing before the Bankruptcy Court on April 20, 2004. Because the court agrees that Pro-Tec has made a satisfactory showing of excusable neglect, its motion to reconsider the allowance of its claims should have been granted by the Bankruptcy Court. Further, because the court disagrees with the Bankruptcy Court's analysis of *Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership, 507 U.S. 380, 123 L. Ed. 2d 74, 113 S. Ct. 1489 (1993)*, as it applies to the facts of this case, the court will reverse the ruling of the Bankruptcy Court and remand the matter for further proceedings consistent with this opinion.

**II. STANDARD OF REVIEW**

[HN1] In reviewing a case on appeal, the district court reviews the Bankruptcy Court's legal determinations *de novo*, its factual findings for clear error, and its exercise of discretion for abuse. *Manus Corp. v. NRG Energy, Inc. (In re O'Brien Envtl. Energy, Inc.) 188 F.3d 116, 122 (3d Cir. 1999)*. A bankruptcy court abuses its discretion when its ruling is founded on [*4] an error of law or misapplication of law to the facts. *Id.* In determining whether an error exists, the bankruptcy court's application of the law to the facts is reviewed *de novo*. *Id.*

**III. BACKGROUND**

The basic facts pertinent to Pro-Tec's motion to reconsider the allowance of its claims are not in dispute. On September 18, 1997, Pro-Tec and Vanstar Corporation ("Vanstar") were parties to a computer and communication repair services agreement (the "Agreement"). Subsequent to the execution of the Agreement, Inacom purchased Vanstar, and Pro-Tec continued to provide services to Inacom under the Agreement. From February 1999 to June 2000, Inacom incurred charges for services rendered by Pro-Tec under the Agreement. On June 16, 2000, Inacom filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the District of Delaware. On August 1, 2000, Inacom filed its Schedules of Assets and Liabilities (the "Schedules"). Pro-Tec was listed on Exhibit F-3 of Inacom's Schedules as a creditor holding unsecured non-priority claims in the amount of $ 195,823.20.

On November 2, 2000, Pro-Tec's counsel timely filed a Proof of Claim (the "Claim"), in the amount [*5] of $ 330,115.61, with Bankruptcy Services, Inc. ("B.S.I."), Inacom's claims agent. On November 6, 2000, B.S.I. stamped the Claim as received, timely, and numbered the Claim 6647. On June 13, 2001, Inacom filed its Objection. The Objection contests approximately 412 claims spread over 96 pages of exhibits. The exhibits are lettered A through H, with some exhibits containing multiple alphabetical listings of objections. Pro-Tec was

listed on the first alphabetical list of Exhibit E to the Objection. The Objection contained a Proof of Service, indicating that it was served on Pro-Tec's counsel, William Sullivan, at his office address. Pro-Tec's counsel did not respond to the Objection. On July 13, 2001, the Bankruptcy Court entered an Order Disallowing Claims, Expunging Claims, Altering the Status of Claims, or Allowing the Claims in a Reduced Amount (the "Order").

On July 22, 2002, Inacom filed the Notice of Debtors Twenty-Ninth Amendment of Schedules (the "Twenty-Ninth Amendment"), seeking to amend the Claim from $ 195,823.20 to $ 0.00. On May 23, 2003, Inacom's Joint Plan of Liquidation (the "Plan") was confirmed. In February 2004, after Pro-Tec did not receive a distribution under [*6] the Plan (which was expected on or about January 30, 2004), Pro-Tec's counsel inquired into the status of distributions. After contacting B.S.I., Pro-Tec was advised of the July 13, 2001 Order disallowing the Claim. Accordingly, Pro-Tec filed its Motion for Reconsideration on April 2, 2004. A hearing on Pro-Tec's motion was held before the Bankruptcy Court on April 20, 2004. The Bankruptcy Court denied Pro-Tec's motion. On April 30, 2004, Pro-Tec appealed the decision.

**IV. DISCUSSION**

As a result of the Bankcruptcy Court's July 13, 2001 Order, Pro-Tec's Claim in connection with the Agreement was disallowed. It is undisputed that Pro-Tec received the Objection but failed to respond prior to the July 13, 2001 Order, or prior to the May 23, 2003 confirmation of the Plan. Pro-Tec filed a motion for reconsideration pursuant to *11 U.S.C. 502(j)* and *Fed. R. Bankr. P. 3008. Section 502(j)* provides that [HN2] "a claim that has been allowed or disallowed may be reconsidered for cause." Pro-Tec asserts that a motion for reconsideration based on a claim disallowed as a result of the claimant's failure to appear or to produce evidence is usually decided based on whether [*7] the claimant is able to show "excusable neglect." Pro-Tec, therefore, seeks relief from the July 13, 2001 Order under *Federal Rule of Civil Procedure Rule 60(b)*, made applicable to bankruptcy cases by *Bankruptcy Rule 9024. Rule 60(b)* states, in pertinent part, [HN3] "on motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for mistake, inadvertence, or excusable neglect." The factors a court must consider when determining whether a party has failed to appear or to produce evidence because of excusable neglect were articulated by the Supreme Court in *Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership, 507 U.S. 380, 123 L. Ed. 2d 74, 113 S. Ct. 1489 (1993).* The *Pioneer* factors were adopted and applied by the Third Circuit in *In re O'Brien Envtl. Energy, Inc., 188 F.3d 116, 125 (3d Cir. 1999).* Pro-Tec asserts that its failure to respond to the Objection was the result of excusable neglect, and that the Bankruptcy Court made an inadequate excusable neglect analysis under *Pioneer.* As previously noted, the basic facts pertinent to Pro-Tec's motion are not in dispute. [*8] Thus, the court must review *de novo* whether the Bankruptcy Court engaged in a proper analysis under *Pioneer* to make its excusable neglect determination, and whether the Bankruptcy Court abused its discretion in determining that there was no excusable neglect warranting reconsideration of Pro-Tec's claim.

**A. Did the Bankruptcy Court Engage in a Proper *Pioneer* Analysis?**

Pro-Tec first argues that the Bankruptcy Court failed to review the totality of the circumstances surrounding Pro-Tec's failure to respond to the Objection and, therefore, failed to adequately apply *Pioneer's* standards for excusable neglect. The court will start with a brief review of *Pioneer* and the excusable neglect factors articulated in that case. In *Pioneer,* the Supreme Court determined that a Chapter 11 creditor was entitled to file its proof of claim after the bar date deadline because its failure to timely reply was the result of excusable neglect, within the meaning of *Bankruptcy Rule 9006(b)(1)*. The Court held that [HN4] the determination of what type of neglect would be considered "excusable" was an equitable one "tak[ing] account of all relevant circumstances surrounding the party's [*9] omission." *Pioneer, 507 U.S. at 395.* The Court listed four factors to consider in making the excusable neglect determination: "the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Id.* Under the facts of *Pioneer,* the Court held that the creditor's failure to timely file was inadvertent, and in good faith. There was no danger of prejudice to the debtor because the untimely claim was accounted for in the reorganization plan and was filed prior to the plan's effective date. Lastly, the

court noted that notice of the bar date "was outside the ordinary course" because of its "inconspicuous placement" -- a single sentence in a document regarding a creditors' meeting -- which was not accompanied by a statement of significance and "left a 'dramatic ambiguity' in the notification." *Id. at 398*.

Pro-Tec argues that, while the Bankruptcy Court considered the reason for the delay, including whether it was within the reasonable control of Pro-Tec, and the potential [*10] prejudice to Inacom, it did not consider the other *Pioneer* factors. After reviewing the transcript from the April 20, 2004 hearing, the court cannot agree. In making its determination, the Bankruptcy Court made the following findings of fact: (1) overturning the Order would prejudice Inacom because allowing the claims would "open the floodgates to hundreds of these [reconsideration] applications being filed;" (2) allowing the delayed claim "would be a mistake at this very late stage of this case;" and (3) Pro-Tec's counsel was fully responsible for the delay in failing to file a response to the Objection. n1 Tr. at 35-36. Thus, the Bankruptcy Court considered the prejudice to the debtor, the length of the delay and its effect on judicial proceedings, and whether the reason for the delay was in the reasonable control of the movant. The only *Pioneer* factor that the Bankruptcy Court did not consider was the good faith of Pro-Tec's counsel. Inacom, however, acknowledged Pro-Tec's good faith at the April 20, 2004 hearing, which meant that the Bankruptcy Court did not have to consider this factor. For the foregoing reasons, the court finds that the Bankruptcy Court engaged in a [*11] proper *Pioneer* analysis. n2

n1 The Bankruptcy Court noted that Pro-Tec's "client's name and your [Pro-Tec's counsel's] name and address with the law firm is [the] first item on Page 11, it's the first Exhibit E in the batch. And I don't see how you could miss it." Tr. at 35:6-9.

n2 In this section of its brief, Pro-Tec argues its counsel's diligence upon receiving omnibus objections to its other clients' claims. Pro-Tec also argues that the Bankruptcy Court's Local Rule 3007-1, implemented in September 2002, addresses the difficulties created by the large omnibus claim objections by limiting them to 150, but does not ameliorate the difficulties posed by omnibus objections filed before September 1, 2002 (Inacom's Objection was filed before September 1, 2002). The court will not address these arguments because they are not material to whether the Bankruptcy Court engaged in a proper *Pioneer* analysis.

**B. Did the Bankruptcy Court Abuse Its Discretion When It Determined There Was No Excusable Neglect?** [*12]

Pro-Tec next argues that the Bankruptcy Court abused its discretion in failing to find excusable neglect. In addressing this contention, the court will analyze each of the *Pioneer* factors in turn.

**1. Danger of Prejudice to the Debtor**

The Supreme Court in *Pioneer* noted that lack of any prejudice to the debtor weighs strongly in favor of permitting a tardy claim, but provided little guidance as to what prejudice actually is in the bankruptcy context. The United States Court of Appeals for the Third Circuit has recognized that [HN5] "prejudice is not an imagined or hypothetical harm; a finding of prejudice should be a conclusion based on facts in evidence." *In re O'Brien Envtl. Energy, Inc., 188 F.3d 116, 127 (3d Cir. 1999)*. Under Third Circuit case law, *Pioneer* requires a detailed analysis of more than "whether the Plan set aside money to pay the claim at issue." *Id. at 126*. Thus, the relevant factors for analysis of prejudice under *O'Brien* include: whether the debtor was surprised or caught unaware by the assertion of a claim that it had not anticipated; whether the payment of the claim would force the return of amounts already [*13] paid out under the confirmed Plan or affect the distribution to creditors; whether payment of the claim would jeopardize the success of the debtor's reorganization; whether allowance of the claim would adversely impact the debt or actually or legally; and whether allowance of the claim would open the floodgates to other future claims. *Id. at 126-28*. Pro-Tec argues that none of the prejudice factors articulated in *O'Brien* serve as potential prejudice to Inacom.

With regard to the first *O'Brien* factor, the court cannot conclude that Inacom was surprised or caught unaware by the assertion of a claim that it had not anticipated. Inacom listed Pro-Tec as a creditor holding unsecured non-priority claims in the amount of $ 195,823.20 in the Schedules. Pro-Tec timely filed the Claim, which was stamped as received and numbered by

Inacom's claims agent. The Claim remained scheduled for more than one year after it was disallowed by default, on July 13, 2001. In fact, the Claim remained scheduled by Inacom until it filed the Twenty-Ninth Amendment on July 22, 2002, which sought to amend Pro-Tec's scheduled Claim from $ 195,823.00 to $ 0.00. Clearly then, Inacom was aware [*14] of the assertion of the Claim.

The second *O'Brien* factor requires the court to consider whether the payment of the claim would force the return of amounts already paid out under the confirmed Plan or affect the distribution to creditors. Pro-Tec argues that the resolution of the Claim does not impact the recovery being paid to unsecured creditors because Inacom is still litigating the value of many of the unsecured claims. Pro-Tec alleges that unsecured creditors were advised in the Plan that their recovery was uncertain, and, based on the Plan, reconsideration of its Claim will not prejudice other creditors because no creditor will have to return any distribution it may have already received and the ultimate distribution to creditors under the Plan will vary. Inacom notes that the Plan states that "each holder of a Class 4(a) Allowed General Unsecured Claim shall receive such Holder's Pro Rata Share of Available Cash," (Plan at 13, D.I. 4757). However, as Pro-Tec points out, the Plan also states that the recovery of unsecured creditors is uncertain and may vary. Because every creditor is receiving its pro rata share of available amounts, allowing another claim will affect the [*15] distribution to each creditor holding an allowed claim. Pro-Tec argues, however, that Inacom is still litigating the value of many of the unsecured claims and does not know at this time which unsecured creditors will recover or what amount each creditor will recover.

Pro-Tec's argument is persuasive. It is not clear how many creditors will ultimately hold an allowed claim. In addition, the final distributions to creditors will vary based on the results of litigation and the claims resolution process. Moreover, Inacom was not required to allocate funds for each disputed claim under the Plan. n3 Thus, any disputed claim that is allowed is paid without regard to what other claims exist. Lastly, absent from the record is any evidence that Inacom will have to return amounts already paid out under the Plan. Based on these facts, the court finds that payment of the claim will not affect the distribution to creditors.

n3 Pro-Tec urges that whether the plan set aside money to pay the claim at issue is a factor that the Third Circuit held should not be considered in evaluating potential prejudice. The court disagrees. The court in *O'Brien* stated that "*Pioneer* requires a more detailed analysis of prejudice which would account for more than whether the Plan set aside money to pay the claim at issue." *O'Brien, 188 F.3d at 126*. The Third Circuit, however, did not state that an analysis of prejudice should not include whether the Plan set aside money to pay the claim at issue as one of the factors to consider. Rather, the Third Circuit stated that it should not be the only factor that the Bankruptcy Court considers in determining whether there is potential prejudice to the debtor. The Third Circuit stated "the Bankruptcy Court's prejudice analysis seemed to hinge *solely* on the fact that by virtue of Manus's failure to respond to the Application, its claim was not accounted for in the funding of the plan. We believe that *Pioneer* requires a more detailed analysis which would account for more than whether the Plan set aside money to pay the claim at issue." *Id.* (emphasis added).

[*16]

The third *O'Brien* factor is whether payment of the claim would jeopardize the success of the debtor's reorganization. There is no evidence on the record as to whether payment of the claim would jeopardize the success of Inacom's reorganization. In addition, Pro-Tec and Inacom have not made arguments, nor has the Bankruptcy Court made any findings concerning this factor. Thus, the court will treat this consideration as a neutral factor in its analysis.

The fourth *O'Brien* factor is whether allowance of the claim would adversely impact the debtor actually or legally. Pro-Tec argues that there is no prejudice to Inacom created by the delay in litigating the disallowed Claim because the inquiry to be performed in a reconsideration of the Claim is straightforward. Pro-Tec further argues that Inacom is currently reconsidering other creditors' claims. Finally, Pro-Tec asserts that Inacom scheduled its Claim at the outset of the case, a claim that remained scheduled for more than a year after the Bankruptcy Court entered the Order disallowing the Claim. Inacom could not explain why Pro-Tec was listed on the Twenty-Ninth Amendment when Pro-Tec's claim

was disallowed a year earlier, [*17] negating the need to amend the schedule with respect to Pro-Tec. Tr. at 32:10-20. Because Pro-Tec was still listed on the Twenty-Ninth Amendment, Pro-Tec contends that Inacom ascribed some validity to its claim. n4 While this may be true, this fact is not relevant to the court's analysis of whether allowance of the claim would adversely impact the debtor actually or legally. Regardless, the court finds that Inacom has not alleged that payment of the Claim would adversely impact it. Rather, Inacom alleges only that one of the policies underlying the *Pioneer* analysis is the value of finality in judicial proceedings.

> n4 At the hearing in the Bankruptcy Court, Inacom argued that it was irrelevant that Pro-Tec was listed on its Twenty-Ninth Amendment. The Bankruptcy Court agreed, acknowledging that "the debtors' 29th amendment is confusing. But, quite frankly, that was a year "after the disallowance of this claim and I think it's essentially irrelevant to the issue of excusable neglect."

The Third Circuit has [*18] addressed Inacom's argument in contexts other than a bankruptcy proceeding. In *Feliciano v. Reliant Tooling Co., 691 F.2d 653 (3d Cir. 1982)*, the court held that [HN6] "the cost of enforcing a judgment later vacated and the delay in realizing satisfaction on a claim 'rarely serves to establish the degree of prejudice sufficient to prevent the opening of a default judgment.'" *Id. at 656-57*. In *O'Brien*, the court highlighted, with approval, its decision in *Feliciano*, stating that "prejudice is not merely the loss of an advantageous position, but must be something more closely tied to the merits of the issue." *O'Brien, 188 F.3d at 127*. Thus, the court finds that the value of finality in judicial proceedings is not sufficient for a finding of prejudice. In addition, there is no evidence in the record showing that payment of Pro-Tec's Claim would adversely impact Inacom or affect the finality of Inacom's judicial proceedings. To the contrary, as previously noted, Inacom is still litigating disputed claims. However, even were there such a showing, the court cannot discern a reason why the rationale of the Court of Appeals would be inapposite [*19] merely because the scene has shifted to the bankruptcy court. Under the circumstances of this case, the court concludes that allowing the Claim would not adversely impact Inacom.

The final *O'Brien* Factor is whether allowance of the claim would open the floodgates to other future claims. The Bankruptcy Court determined that allowing Pro-Tec's Claim might subject Inacom to a large number of additional claims:

> I will observe that given the massive number of claims filed in this case and the equally massive number of objections that were filed with numerous exhibits attached to the objection, I really think that to allow this claim would potentially open the floodgates to hundreds of these applications being filed. And I think that would be a mistake at this very late stage of this case.

Tr. at 35:22-36:3. The court cannot agree. There is no evidence in the record that allowing the Claim would cause a "flood" of motions. Although Inacom argues that it is inconceivable that at least a fraction of the creditors would not file motions for reconsideration if the appeal was granted, Inacom has not asserted that any other creditor whose claim was eliminated by default has [*20] filed a motion for reconsideration.

Considering all of the *O'Brien* factors, the court determines that Inacom would not be prejudiced by reconsidering Pro-Tec's Claim. Inacom was not surprised by, or unaware of, the Claim. Inacom is still litigating the value of many of its claims, and still litigating claims objections. Moreover, Inacom has not shown through evidence in the record that it will be adversely impacted if Pro-Tec's claim is reconsidered. Finally, Inacom has not alleged that any other creditor whose motion was denied by default has filed a motion for reconsideration. The court, therefore, finds that there is no prejudice to Inacom.

**2. Length of Delay and Potential Impact on Judicial Proceedings**

The court next considers the length of the delay and its impact on the judicial proceedings. The Bankruptcy Court found that "it would be a mistake" to allow the Claim because the case was at "a very late stage." While the Bankruptcy Court considered the delay's effect on the

judicial proceedings, it did not "consider the length of the delay in absolute terms." *O'Brien, 188 F.3d at 130*. In the present case, Inacom filed the Objection on June 13, 2001. Pro-Tec [*21] did not respond. The Order disallowing the Claim issued on July 13, 2001. Pro-Tec still had not responded, Inacom's Twenty-Ninth Amendment was filed on July 22, 2002. Pro-Tec did not respond. n5 Inacom's Plan was confirmed on May 23, 2003, and, as of that time, there was still no response from Pro-Tec. Pro-Tec did not respond until February 2004, after it did not receive its expected distribution under the Plan. On April 2, 2004, Pro-Tec then filed its motion for reconsideration. Pro-Tec's motion was filed almost two years and ten months after the Objection, almost two years and nine months after the Order was served, and nine months after the Plan was confirmed. Pro-Tec argues that the length of the delay has no impact on the implementation of the Plan. Specifically, Pro-Tec asserts that Inacom is still litigating claims subject to the Objection and that creditors have been advised that distributions under the Plan are dependent on the claims resolution process. Pro-Tec also asserts that distributions to unsecured creditors are expected to occur between June 2003 and June 2008, and will be adjusted depending on Inacom's progress in resolving the claims. Lastly, Pro-Tec argues that [*22] Inacom is partly responsible for the delay because of the time it took for Inacom to move through the confirmation process. Inacom's Plan was confirmed almost three years after Inacom filed its petitions.

n5 Pro-Tec alleges that the Twenty-Ninth Amendment was not served on its counsel.

Inacom argues that Pro-Tec's counsel's failure to respond, in and of itself, weighs in favor of denying the appeal. Inacom further argues that Pro-Tec's failure to respond after the Order warrants denying the appeal. In addition, Inacom argues that Pro-Tec should have attempted to contact Inacom to inquire about the Claim. Lastly, Inacom contends that the fact that it is still litigating and negotiating claims indicates that reconsidering Pro-Tec's Claim will delay closure of the case. The court agrees with Pro-Tec and finds Inacom's arguments unpersuasive. Nowhere in *Pioneer* or *O'Brien*, do the Supreme Court or the Third Circuit find that failure to respond, in and of itself, weighs in favor of denying the Claim. Additionally, [*23] there is no finding that the creditor must attempt to make contact with the debtor. When considering the delay's effect on the judicial proceedings in absolute terms, as *O'Brien* instructs, the court concludes that this *Pioneer* factor weighs in favor of Pro-Tec because Inacom is still litigating disputed claims and distributions to creditors are based on Inacom's progress in resolving the claims.

**C. The Reason for the Delay**

The Bankruptcy Court determined that the cause of the delay was in Pro-Tec's control, because it is undisputed that Pro-Tec's counsel received the Objection and read it, but missed the objection to Pro-Tec's Claim. The Bankruptcy Court found that Pro-Tec's neglect did not fall within the *Pioneer* standard for excusable neglect:

> In looking at this document, I think it would probably take maybe 15 or 20 minutes for an informed person to review the document to find out if any of its clients were affected by the objection. And as I pointed out, your client's name and your name and address with the law firm is first item on Page 11, it's the first Exhibit E in the batch. And I don't see how you could miss it. But apparently you did miss it - I don't [*24] say you, someone in your office did, or they didn't even look at the document. And so I don't think that that falls within the *Pioneer* standard for excusable neglect. Presumably it is neglect. Indeed, there's no basis for knowing what the young associate did, including the possibility that he lost the document before he ever looked at it or he just put it in a circular file and didn't look at it. Or that he was otherwise plain remiss in performing his duties.

Tr. at 35:3-17. It is clear in this case, that the delay was due to Pro-Tec's lack of care. However, [HN7] the concept of excusable neglect clearly anticipates neglect on the part of the party seeking to be excused. *See Pioneer, 507 U.S. at 388*; *O'Brien, 188 F.3d at 128*. The court, therefore, must decide whether Pro-Tec's delay was excusable.

Pro-Tec urges the court to follow *Pioneer* and

*O'Brien,* in which the Supreme Court and the Third Circuit held that the debtors' inadequate notice contributed to the creditors' delay. Pro-Tec argues that its delay in responding to the Objection was due in part to inadequate notice provided by Inacom. Pro-Tec asserts that Inacom's Objection contested [*25] approximately 412 claims spread over 96 pages plus exhibits A through H. Pro-Tec further asserts that the exhibits contained multiple lists, some of which were not in alphabetical order. Pro-Tec argues that this type of notice is ambiguous and that even though its counsel failed to find the objection to its Claim, Inacom is partly responsible, like the debtors in *Pioneer* and *O'Brien.* Inacom argues that Pro-Tec's comparison of the present case to the facts in *Pioneer* and *O'Brien* "misses the mark." The Bankruptcy Court recognized that there are multiple schedules within the various exhibits attached to the Objection, some of which were not in alphabetical order, but determined that Inacom's notice was adequate, noting that "your ['Pro-Tec's counsel's] client's name and your name and address with the law firm is [the] first item on page 11, it is the first Exhibit E in the batch. And I don't see how you could miss it." Tr. at 35:6-9. The court agrees with the Bankruptcy Court and Inacom.

The notice that Inacom provided Pro-Tec is distinguishable from the notice provided by the debtors in both *Pioneer* and *O'Brien.* In *Pioneer,* the Supreme Court held that [*26] the debtor's notice was inadequate because the bar date was placed in a notice regarding a creditors' meeting "without any indication of the significance of the bar date." *Pioneer, 507 U.S. at 398.* In *O'Brien,* the debtor gave notice in an application that was twelve pages long, consisting of twenty-four paragraphs. The three important paragraphs, which would provide notice to the contracting parties, were buried in the middle of the document and did not list the relevant contracting parties' names or claims. *O'Brien, 188 F.3d at 129.* The present case is distinguishable from *Pioneer* and *O'Brien* because Inacom's notice was not inconspicuous. Inacom provided notice in its Fifth Omnibus Objection to Claims. Unlike *Pioneer,* in which the bar date appeared in a notice of a creditors' meeting, the title of Inacom's document, which included the word "objection," should have alerted Pro-Tec that its Claim may be affected. Furthermore, unlike *O'Brien,* in which the contracting parties' names and claims were not provided in the relevant document, Pro-Tec's name and address and its counsel's name and address is the first item on Page 11 of the [*27] first Exhibit E. The court agrees with the Bankruptcy Court that "it would probably take maybe 15 or 20 minutes for an informed person to review the document to find out if any of its clients were affected by the objection." n6 Tr. at 35:4-6. The court finds that this *Pioneer* factor weighs in favor of Inacom.

> n6 The court is not in accord, however, with the Bankruptcy Court's view that if the notice of objection to Pro-Tec's Claim had been on the second or third Exhibit E list, instead of the first, then it "might be excusable." Tr. at 26:3-6. This seems to suggest that Pro-Tec would have less responsibility for the delay if it had been in the middle of Exhibit E. However, as the Bankruptcy Court noted, "it would probably take maybe 15 to 20 minutes for an informed person to review the document to find out if any of its clients were affected by the objection." Tr. at 35:4-6. Thus, the court cannot see how Pro-Tec's inadvertence would be any more excusable if the notice had been on the second or third Exhibit E list.

[*28]

**4. Good Faith**

The Bankruptcy court did not make any determination on the issue of whether Pro-Tec acted in good faith because Inacom acknowledged Pro-Tec's good faith at the April 20, 2004 hearing. In view of the agreement of the parties, the court finds that Pro-Tec and its counsel acted in good faith.

## V. CONCLUSION

In the present case, the court cannot say that the Bankruptcy Court failed to apply the *Pioneer* factors. In light of the Bankruptcy Court's consideration and weighing of the facts, the court concludes that the Bankruptcy Court engaged in a proper analysis under *Pioneer.* However, considering the *Pioneer* factors, the facts of the this case, and the equitable nature of excusable neglect, the court concludes that the Bankruptcy Court abused its discretion when it determined that Pro-Tec was not entitled to reconsideration of its Claim based upon excusable neglect. As the court in *Pioneer* observed, "the lack of any prejudice to the debtor or to the interests of efficient judicial administration, combined with . . . good faith . . . [of the appellant and its counsel], weigh strongly in favor

of permitting the tardy claim." *Pioneer, 507 U.S. at 398.* [*29] In the present case, Pro-Tec has shown that there will be no prejudice to Inacom if its Claim is reconsidered, the delay's effect on judicial proceedings in absolute terms will not prejudice Inacom, and Pro-Tec has acted in good faith. The only *Pioneer* factor that weighs against Pro-Tec is the reason for the delay, for which Pro-Tec was fully responsible.

The court, therefore, will reverse the Bankruptcy Court's ruling denying Pro-Tec reconsideration of its Claim and remand this case to the Bankruptcy Court for proceedings consistent with this opinion.

Dated: October 4, 2004

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

**ORDER**

For the reasons stated in the court's Memorandum Opinion of this same date, IT IS HEREBY ORDERED that:

1. The April 20, 2004 decision of the Bankruptcy Court for the District of Delaware is REVERSED and REMANDED.

Dated: October 4, 2004

Gregory M. Sleet
UNITED STATES DISTRICT JUDGE