IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| NORTHWESTERN CORPORATION, | : | Bankruptcy Case No. 03-12872 (KJC) |
| | : | |
| Reorganized Debtor. | : | |
| | : | |
| | : | |
| MAGTEN ASSET MANAGEMENT | : | |
| CORPORATION and LAW DEBENTURE | : | |
| TRUST COMPANY OF NEW YORK, | : | |
| | : | |
| Appellants, | : | Appeal No. 07-114-JJF |
| | : | |
| v. | : | |
| | : | |
| NORTHWESTERN CORPORATION, | : | |
| | : | |
| Appellee. | : | |
| | : | |

## BRIEF OF APPELLEE NORTHWESTERN CORPORATION

**CURTIS, MALLET-PREVOST,**
**COLT & MOSLE LLP**
Joseph D. Pizzurro
Steven J. Reisman
Nancy E. Delaney
Miriam K. Harwood
101 Park Avenue
New York, New York 10178
Telephone:  (212) 696-6000

**GREENBERG TRAURIG, LLP**
Victoria Watson Counihan (No. 3488)
Dennis A. Meloro (No. 4435)
The Nemours Building
1007 North Orange Street
Suite 1200
Wilmington, Delaware 19801
Telephone:  (302) 661-7000

*Co-Counsel for NorthWestern Corporation*

Dated:  April 9, 2007
Wilmington, Delaware

# TABLE OF CONTENTS

**Page #**

PRELIMINARY STATEMENT ....................................................................................... 1

COUNTER-STATEMENT OF ISSUE PRESENTED ON APPEAL.......................................... 4

STANDARD OF APPELLATE REVIEW................................................................................ 4

STATEMENT OF THE CASE................................................................................................. 5

ARGUMENT

    I.     THE BANKRUPTCY COURT PROPERLY AUTHORIZED THE INVESTMENT OF THE CASH PROCEEDS OF SHARES IN THE DISPUTED CLAIMS RESERVE WHICH WILL BE RECEIVED UPON CONSUMMATION OF THE BBI MERGER ................................................... 15

    II.    APPELLANTS' ARGUMENT THAT THEIR CLAIMS CANNOT BE PAID IN CASH,  BUT MUST BE PAID IN SHARES OF NORTHWESTERN COMMON STOCK, WHILE NOT PROPERLY PRESENTED ON APPEAL, MUST ALSO BE REJECTED............................ 17

    III.   APPELLANTS ARE JUDICIALLY ESTOPPED FROM  ASSERTING THAT A CASH PAYMENT ON THEIR CLAIMS FROM THE DISPUTED CLAIMS RESERVE IS NOT PERMISSIBLE ............................... 23

CONCLUSION...................................................................................................................... 27

i

# TABLE OF AUTHORITIES

## CASES

*Binder v. PriceWaterhouse & Co. LLP (In re Resorts Int'l, Inc.)*,
372 F.3d 154 (3d Cir. 2004) ................................................................ 21

*Gruen Marketing Corp. v. Asia Commercial Co.* (*In re Jewelcor Inc.)*,
150 B.R. 580 (M.D. Penn. 1992) ........................................................ 21

*In re AOV Industries, Inc.*, 792 F.2d 1140 (D.D.C. 1986) ........................... 19

*In re Chateaugay Corp.*,  201 B.R. 48 (Bankr. S.D.N.Y. 1996) ...................... 16

*In re Dow Corning Corp.*, 255 B.R. 445 (E.D. Mich. 2000) ........................... 19

*In re Orthopedic Bone Screw Prods. Liab. Litig.*, 193 F.3d 781 (3d Cir. 1999) .......... 5

*In re Resorts Int'l, Inc.*, 199 B.R. 113 (Bankr. D.N.J. 1996) ........................ 16

*In re Resorts Int'l Inc.*, 145 B.R. 412 (Bankr. D.N.J.  1990) ...................... 19

*In re Terracor*, 86 B.R. 671 (D. Utah 1988) ........................................ 16

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*,
337 F.3d 314 (3rd Cir. 2003) .............................................................. 24

*Pettibone Corp. v. Easley*, 935 F.2d 120 (7th Cir. 1991) ......................... 21

*Prince v. Clare*, 67 B.R. 270 (N.D. Ill. 1986) ..................................... 21

*Williams v. Giant Eagle Markets, Inc.*, 883 F.2d 1184 (3d Cir. 1989) .............. 5

## STATUTES

11 U.S.C. § 105(a) ....................................................................... 16

11 U.S.C. §1142(b) ...................................................................... 16

11 U.S.C. § 1123(a)(4) ............................................................ 18, 19

Fed. R. Bankr. P. 3020(d) .......................................................... 16, 20

## PRELIMINARY STATEMENT

NorthWestern Corporation ("NorthWestern") respectfully submits this brief in opposition to the appeal filed by Magten Asset Management Corporation ("Magten") and Law Debenture Trust Company of New York ("Law Debenture," and collectively with Magten, the "Appellants"), seeking to overturn the Order of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), dated February 1, 2007 (the "Order"), which granted *Reorganized NorthWestern's Motion Pursuant to 11 U.S.C. §§ 105(a) and 1142(b), and Rule 3020(d) of the Bankruptcy Rules, Seeking Entry of an Order in Aid of Execution of Confirmed Plan of Reorganization* (the "Aid of Execution Motion").

In the Aid of Execution Motion, NorthWestern sought narrow relief from the Bankruptcy Court on one specific issue:  whether, and on what conditions, La Salle Bank, N.A. ("LaSalle") as transfer agent for the shares of NorthWestern New Common Stock held in the Disputed Claims Reserve, could invest the cash proceeds received upon tendering those shares to Babcock & Brown Infrastructure Limited ("BBI") in connection with the anticipated merger between NorthWestern and BBI (the "BBI Merger").   The Bankruptcy Court's Order granting the Aid of Execution Motion was similarly limited in scope, and simply directed La Salle to invest such cash proceeds in "interest-bearing money-market accounts with federally-regulated depository institutions in the United States" and relieved La Salle from any requirement to post a bond in connection therewith.

From the beginning, Appellants have tried to use the Aid in Execution Motion, and this appeal, as an opportunity to attack and obstruct the BBI Merger itself, and to shift the focus away from the narrow issue presented herein.   Thus, in their two "emergency" stay motions -- both denied -- Appellants expressly asked first the Bankruptcy Court and then this

Court to enjoin NorthWestern from consummating the BBI merger and from tendering and converting the shares in the Disputed Claims Reserve to cash, even though those issues were not presented to the Bankruptcy Court in the underlying Aid of Execution Motion nor are they matters within that Court's jurisdiction.  The Bankruptcy Court was not asked to rule, and did not rule, on the approval of the merger nor on the conversion of the Disputed Claims Reserve shares to cash, and those issues are not presented in this appeal.[1]  However, the brazen relief requested by Appellants in their two stay motions illustrates the true motive behind this appeal:  namely, to threaten the successful consummation of the BBI Merger in order to gain leverage to force a settlement of their contingent, disputed claims against NorthWestern's bankruptcy estate.

Undaunted by the Bankruptcy Court's unequivocal rejection of their opposition to the Aid in Execution Motion, and the swift denial of their two "emergency" stay motions by both the Bankruptcy Court and this Court, Appellants nevertheless persist in their efforts to argue issues that were not the subject of the motion in the Bankruptcy Court and the resulting Order presented for appellate review.  Indeed, Appellants do not take issue with the Bankruptcy Court's determination of the sole issue raised in the Aid of Execution Motion – that is, whether investment of the cash proceeds would be permitted.  Rather, Appellants take issue with the prospect that their outstanding claims against NorthWestern's bankruptcy estate would be paid in cash rather than shares of New Common Stock.

In addition to the fact that this issue is not properly presented in this appeal, the absurdity of Appellants' position defies belief.   Should Appellants ever succeed in obtaining an Allowed Claim against NorthWestern's bankruptcy estate, after the merger they will receive a

---

[1]  See Transcript of February 20, 2007 Hearing, pp. 42-43, attached as Exhibit L to the Affidavit of Joseph D. Pizzurro, dated April 9, 2007 ("Pizzurro Aff."), submitted contemporaneously herewith.

distribution of cash from the Disputed Claims Reserve equal to the value of shares of New Common Stock they would have otherwise received from the Disputed Claims Reserve under the terms of the Plan.   As both the Bankruptcy Court and this Court have recognized, Appellants have not demonstrated, and cannot demonstrate, that payment in shares offers any "enhanced" value over payment in cash.  (Pizzurro Aff. Ex. J, p. 43; Pizzurro Aff. Ex. P, pp. 5-6.)   Indeed, upon consummation of the merger, every holder of NorthWestern common stock will be required to tender their shares to BBI in exchange for $37 cash.  All those creditors of NorthWestern's bankruptcy estate who have already received distributions from the Disputed Claims Reserve, who still hold the shares, will have their shares converted into cash.  Appellants stand in no different position.

Contrary to Appellants' arguments, the Bankruptcy Court's Order did not effectively "modify" the Plan.  The Bankruptcy Court expressly determined that the Plan did not give some right in "perpetuity" to a distribution in the form of shares of New Common Stock, and that a distribution in cash that is equivalent to the value of the shares they would have otherwise received in no way "impairs or devalues" a potential recovery on Appellant's claims. (Pizzurro Aff. Ex. J, p. 43.)

Moreover, while Appellants now argue that their claims must be paid in "stock, and only stock," the record betrays this sudden change of heart.  On numerous occasions throughout NorthWestern's bankruptcy case, Appellants have taken the exact opposite position -- in their own words:  "It can be cash, it can be stock, it can be any currency whatsoever." (Pizzurro Aff. Ex. A, p. 10.)  The inescapable fact that Appellants have long accepted and indeed lobbied for payment of their claims in cash was observed by this Court, which noted that

Appellants have "repeatedly expressed a willingness to accept cash in lieu of NorthWestern common stock in satisfaction of their Disputed Claims." (Pizzurro Aff. Ex. P, p. 5).

Once again defying credulity and ignoring their own inconsistent position, Appellants argue to this Court that NorthWestern should be "judicially estopped" from asserting that Appellants' claims may be paid by cash proceeds of the Disputed Claims Reserve shares. Quite the opposite is true: it is Appellants who are judicially estopped from arguing that a cash payment, which they have vehemently sought in the past, is now suddenly unacceptable or prohibited by the Plan. This sudden and convenient change in position from Appellants' long-standing view underscores the complete lack of good faith exhibited by Appellants in opposing the Aid of Execution Motion and in pursuing this appeal.

Under the applicable law and the facts and circumstances presented herein, NorthWestern respectfully submits that this appeal should be dismissed.

## COUNTER-STATEMENT OF ISSUE PRESENTED ON APPEAL

Whether the Bankruptcy Court correctly ruled that the transfer agent holding shares of NorthWestern New Common Stock set aside in the Disputed Claims Reserve under NorthWestern's Chapter 11 Plan is permitted to invest the cash proceeds received in exchange for such shares pursuant to the BBI-NorthWestern merger, plus any dividends paid on such stock prior to the effective date of the Merger Agreement, in interest-bearing accounts with federally regulated depository institutions in the United States, until such time as all distributions to creditors from the Disputed Claims Reserve pursuant to the Plan have been completed.

## STANDARD OF APPELLATE REVIEW

In reviewing an order of the Bankruptcy Court on appeal, the district court reviews findings of fact under the "clearly erroneous" standard, while legal conclusions are

reviewed *de novo*. *See Williams v. Giant Eagle Markets, Inc.*, 883 F.2d 1184, 1190 (3d Cir.

1989). The Bankruptcy Court's exercise of discretion is reviewed for abuse, which occurs

"when the court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of

law or an improper application of law to fact." *In re Orthopedic Bone Screw Prods. Liab. Litig.*,

193 F.3d 781, 795 (3d Cir. 1999).

## STATEMENT OF THE CASE

### The Parties

NorthWestern is a publicly-traded corporation organized under the laws of

Delaware, which serves as one of the largest providers of electricity and natural gas to more than

600,000 customers in the upper Midwest and Northwest regions of the United States. On

September 14, 2003, NorthWestern filed a petition for relief under Chapter 11 of the Bankruptcy

Code. The Bankruptcy Court confirmed NorthWestern's Second Amended and Restated Plan of

Reorganization Under Chapter 11 of the Bankruptcy Code (the "Plan") by Order dated October

19, 2004 (the "Confirmation Order"). The Plan became effective on November 1, 2004 (the

"Effective Date") and was substantially consummated as of December 29, 2004.[2] Post-

confirmation, approximately 35 million shares of New Common Stock have been issued by the

Reorganized NorthWestern, which are listed on NASDAQ and publicly traded.

Magten is the holder of certain of NorthWestern's securities known as "QUIPS,"

which were originally issued by the Montana Power Company. Magten, an investor in the

securities of distressed companies, first acquired the QUIPS in 2003, shortly before

---

[2] Capitalized terms not defined herein shall have the same meaning as defined in the Plan (as defined herein).

NorthWestern filed for Chapter 11 bankruptcy protection, and continued to acquire QUIPS after NorthWestern's bankruptcy case commenced.

Law Debenture is a limited purpose trust company organized under the laws of New York, which has served as Trustee under the Indenture governing the QUIPS, following the commencement of NorthWestern's bankruptcy case.

### The QUIPS Claims

Magten and Law Debenture filed claims against NorthWestern's bankruptcy estate, seeking to recover approximately $50 million based on NorthWestern's acquisition of certain utility assets from the Montana Power Company (the "QUIPS Claims"). To date, the QUIPS Claims have not yet been resolved, and they are the subject of the litigation currently in the discovery stage and pending before this Court, styled *Magten Asset Management Corp. and Law Debenture Trust Co. of New York v. NorthWestern Corp., Civ. Action No. 04-1494-JJF* (the "QUIPS Litigation").

### The Disputed Claims Reserve

Pursuant to Section 7.5 of the Plan, NorthWestern set aside a reserve (the "Disputed Claims Reserve") for the purpose of satisfying outstanding disputed unsecured claims that had been filed against its bankruptcy estate but not yet resolved as of the Effective Date, in the event such claims were later deemed to be "Allowed Claims" payable from the estate. The Disputed Claims Reserve was to be maintained "equal to the aggregate of any distributable amounts of Cash and New Common Stock equal to the relevant percentage of the Distributions to which holders of Disputed Claims would be entitled under this Plan if such Disputed Claims were Allowed Claims in the amount of such Disputed Claim or such lesser amount as required

by a Final Order." (Appellant Ex. 9.)[3]  LaSalle serves as transfer agent with respect to the shares of New Common Stock in the Disputed Claims Reserve, and is charged with making distributions to holders of Allowed Claims upon NorthWestern's direction.

When the Disputed Claims Reserve was established as of November 1, 2004, it was funded with 4,409,100 shares of NorthWestern New Common Stock.[4]  At present, there are 3,144,642 shares remaining in the Disputed Claims Reserve.  At the merger price of $37 per share which is expected to be paid upon consummation of the merger between NorthWestern and BBI, the value of the shares in the Disputed Claims Reserve is approximately $116 million, exclusive of dividends.

If the QUIPS Claims were to be deemed "Allowed Claims" in the total alleged amount of $50 million which is being sought, the distribution on such claims would be approximately 1.6 million shares of New Common Stock, exclusive of attorneys' fees.  Thus, there is a surplus in the Disputed Claims Reserve over and above the amount needed to pay the QUIPS Claims in full.

Any balance which remains in the Disputed Claims Reserve after the resolution of all outstanding claims does not revert to NorthWestern, but must be distributed pro rata as "surplus" distributions to the holders of Allowed Claims in Class 7 and Class 9 under the Plan. The interests of those Class 7 and Class 9 unsecured creditors who have rights to the residual assets of the Disputed Claims Reserve are represented by the Plan Committee.

---

[3] References to "Appellant Ex." are to the exhibits designated in the Joint Designation of Items to be Included in the Record on Appeal and Statement of the Issues to be Presented on Appeal of Appellants, Magten Asset Management Corporation and Law Debenture Trust Company of New York, as Trustee, filed on February 20, 2007.

[4] The Plan estimated the value of the New Common Stock at $20 per share, which is considered "Plan Value." During the last 52 weeks, the lowest price of NorthWestern New Common Stock has been approximately $30, and the highest price has been approximately $36.  (Pizzurro Aff. Ex. O.)

**The Anticipated Merger between NorthWestern and BBI**

On April 25, 2006, NorthWestern's Board of Directors approved and publicly announced a merger agreement (as amended or modified, the "Merger Agreement"), which provides for the acquisition of all of NorthWestern's outstanding and issued common stock by BBI, an Australian public company, through a cash merger (the "BBI Merger"). Under the terms of the Merger Agreement, holders of NorthWestern's common stock must tender their shares, which will be cancelled and converted into the right to receive $37 cash.

The BBI Merger was disclosed in NorthWestern's 8-K, filed on April 26, 2006, which attached a copy of the Merger Agreement. (Pizzurro Aff. Ex. E.).

In response to the numerous public disclosures of the BBI Merger, including independent press reports, Magten wrote letters to counsel for NorthWestern and BBI on two occasions – May 16, 2006 and again on July 14, 2006 – noting that "Magten is supportive of the sale of NorthWestern to BBI," but raising issues with respect to the impact of the merger upon Magten's interests in NorthWestern's bankruptcy estate. (Pizzurro Aff. Exs. F and G.)

On August 2, 2006, in compliance with Delaware law, NorthWestern's shareholders adopted and approved the Merger Agreement at NorthWestern's Annual Shareholders Meeting. (Pizzurro Aff. Ex. H.)

In June 2006, NorthWestern proceeded to file applications for approval of the merger by various regulatory authorities, which are necessary due to its status as a regulated public utility. All such approvals have been obtained except for that of the Montana Public Service Commission ("MPSC"), before which NorthWestern's application is still pending.

Once the remaining regulatory approval by the MPSC is obtained, the BBI Merger will be consummated, pursuant to applicable Delaware law.

**NorthWestern's Aid of Execution Motion**

As a reorganized entity which had already emerged from bankruptcy, NorthWestern was not required to, and did not, seek Bankruptcy Court approval of the BBI Merger.  Under applicable Delaware law, the BBI Merger becomes effective after NorthWestern has obtained shareholder approval (which was obtained on August 2, 2006), and all necessary regulatory approvals (of which the last pending approval is that of MPSC).

However, recognizing that the Plan did not specifically address whether the cash proceeds received in exchange for the Disputed Claims Reserve shares in the BBI merger could be invested by the transfer agent pending completion of distributions to creditors, NorthWestern filed the Aid of Execution Motion in the Bankruptcy Court on December 6, 2006 seeking direction from the Bankruptcy Court on that limited issue.

In the Aid of Execution Motion, NorthWestern sought <u>only</u> the entry of an order directing LaSalle to invest the cash it will receive upon the effectiveness of the BBI Merger in exchange for the tender of the 3,144,642 shares of New Common Stock which are currently in the Disputed Claims Reserve, plus any dividends received prior to the effective date of the merger, into interest-bearing accounts with federally-regulated depository institutions in the United States.  The Aid of Execution Motion <u>did</u> <u>not</u> seek Bankruptcy Court approval to consummate the Merger Agreement, nor did it seek Bankruptcy Court approval to convert the shares of New Common Stock currently in the Disputed Claims Reserve into cash.  Thus, in paragraph 2, on page 2 of the Motion in Aid of Execution, entitled "Relief Requested, " NorthWestern stated:

> NorthWestern seeks an order from the Court providing direction to the Transfer Agent holding the New Common Stock in the Disputed Claims Reserve for investing the funds received which must be tendered for each share of New Common Stock upon the effectiveness

9

of the Merger Agreement, plus any dividends paid on such shares prior
to the effective date of the Merger Agreement between NorthWestern
and Babcock & Brown.  Through this Motion, NorthWestern is not
seeking permission to effect the merger with Babcock & Brown – the
merger will become effective pursuant to controlling Delaware law
following applicable approvals as noted in Paragraphs 6 and 7 below.
(Appellant Ex. 86.)

The Plan Committee, which represents the interests of the Class 7 and Class 9

Allowed Claims holders who have rights to "surplus" distributions from the Disputed Claims

Reserve after disputed claims are resolved, has not opposed the relief requested by NorthWestern

in the Aid of Execution Motion regarding the investment of cash proceeds received in exchange

for the shares in the Disputed Claims Reserve, nor has it objected in any way to the conversion

of those shares to cash in connection with the BBI merger. [5]  (Pizzurro Aff. Ex. J, p. 30.)

Magten and Law Debenture filed a joint objection to the Aid of Execution Motion

and also sought to engage in discovery.  On December 27, 2006, Magten and Law Debenture

served document requests upon NorthWestern, seeking certain documents allegedly relevant to

the Aid of Execution Motion.  The following day, they served a notice of the deposition of

Michael J. Hanson with regard to the Aid of Execution Motion.  Finally, on December 29, 2006,

Magten and Law Debenture issued a subpoena to LaSalle seeking to inspect documents and

depose a representative of LaSalle regarding the treatment of shares in the Disputed Claims

Reserve.  NorthWestern filed a Motion for a Protective Order and also sought to quash the

subpoena served upon LaSalle.

On February 1, 2007, the Bankruptcy Court conducted a hearing on the Aid of

Execution Motion and issued an Order, also dated February 1, 2007, granting that motion (the

---

[5] The Plan Committee's sole reservation of rights in connection with the Aid of Execution Motion concerned the
potential use of interest on proceeds of the shares in the Disputed Claims Reserve to pay for legal fees in connection
with the resolution of disputed claims, to which the Plan Committee objected.  The parties resolved that issue for
purposes of the motion.  (Pizzurro Aff. Ex. J, p. 30.)

"Order").  (Pizzurro Aff. Exs. J, K.)   As stated on the record when it ruled from the bench, the

Bankruptcy Court found that that there is nothing in NorthWestern's Plan that precludes a

merger, and nothing in the Plan that gave Appellants a right in "perpetuity" to receive

distributions on their claims in the form of stock.  The Bankruptcy Court specifically noted that

Appellants had not shown that the stock that had been issued under the Plan and held in the

Disputed Claims Reserve offered them any enhanced or additional value "over that of having

cash" and that the relief requested by NorthWestern would not treat Appellants differently from

other Class 9 claimants, who would not be permitted to hold on to their stock after the merger,

but would also have to tender their shares in exchange for cash.  (Pizzurro Aff. Ex. J, p. 43.)

      In accordance with the narrow relief requested in the Aid of Execution Motion,

the Order directed the following limited relief:  (1) directing the transfer agent, LaSalle, to invest

all proceeds it receives in exchange for the shares of New Common Stock in the Disputed Claims

Reserve pursuant to the BBI Merger in "interest-bearing money-market accounts with federally-

regulated depository institutions in the United States" and (2) relieving La Salle from any

requirement to post a bond in conjunction with the investment of the proceeds invested.

(Pizzurro Aff. Ex. J.)  The Bankruptcy Court also issued a separate Order granting

NorthWestern's request for a Protective Order, denying the discovery requested by Appellants.[6]

(Appellant Ex. 107.)

      On February 9, 2007, the Appellants filed an Emergency Stay Motion in the

Bankruptcy Court (the "First Emergency Stay Motion"), seeking to stay the Order pending their

anticipated appeal of such order in the District Court.  In the First Emergency Stay Motion,

---

[6] In light of the Bankruptcy Court's Order granting NorthWestern's request for a protective order, Magten
voluntarily withdrew the subpoena directed to LaSalle.

Appellants requested not only a stay of the effectiveness of the Order, but also expressly asked the Bankruptcy Court to enjoin consummation of the BBI Merger and to prohibit the surrender and conversion of shares of New Common Stock in the Disputed Claims Reserve to cash – issues which were not before the Bankruptcy Court in the Aid of Execution Motion and over which the Bankruptcy Court does not have jurisdiction.

On February 12, 2007, Appellants filed their Notice of Appeal of the Order to the District Court. In their Statement of Issues presented on this Appeal, filed on February 20, 2007, Appellants erroneously represented that the issues included (1) whether the Order, which purportedly "permits" NorthWestern "to distribute cash to Claimants on account of their claims instead of shares of New Common Stock" was error; and (2) whether NorthWestern was "judicially estopped" from "arguing that cash in lieu of stock" could be used to satisfy the QUIPS claims. Neither of these issues was the subject of the underlying Aid of Execution Motion.

On February 20, 2007, the Bankruptcy Court heard arguments on the First Emergency Stay Motion on an expedited basis. The Bankruptcy Court recognized that the extraordinary relief which Appellants were requesting in the First Emergency Stay Motion – to enjoin consummation of the BBI Merger – was not related to the "narrow" relief requested in NorthWestern's Aid of Execution Motion and the equally narrow scope of the Bankruptcy Court's Order granting such motion, which is the subject of this appeal. Specifically, the Bankruptcy Court noted that "I was not asked to approve the [BBI] merger" and "the relief that's requested [by Appellants] doesn't match the order." (Pizzurro Aff. Ex. L, pp. 43-44.) Nevertheless, the Bankruptcy Court proceeded to consider the relief requested by the Appellants and held that they had failed to satisfy the requisite elements to obtain a stay. Notably, the

Bankruptcy Court stated that it saw "no irreparable harm" to the Appellants, while it did see injury to third parties, stating:  "to hold up a merger…would visit undue harm to the shareholders and the Creditors of the Debtor here."  (Pizzurro Aff. Ex. L, p. 45.)  Moreover, the Bankruptcy Court found that "public policy weighs strongly in favor of denying this relief."  Id.

Accordingly, on February 22, 2007, the Bankruptcy Court entered its Order denying the First Emergency Stay Motion.  (Pizzurro Aff. Ex. M.)

On February 23, 2007, Appellants filed an Emergency Motion in this Court for a stay of the Order pending appeal (the "Second Emergency Stay Motion"), and also sought expedited appeal.

In the Second Emergency Stay Motion, Appellants once again attempted, this time in this Court, to enjoin consummation of the BBI Merger and to prevent NorthWestern from going forward with the regulatory approval process, pending this appeal – notwithstanding the Bankruptcy Court's warning that such relief was not related to the underlying Aid of Execution Motion and the Order presented on appeal.

On March 9, 2007, this Court denied Appellants' Second Emergency Stay Motion, finding that neither a stay nor expedited appeal was warranted.  (Pizzurro Aff. Ex. P.). In its Memorandum Decision, this Court noted that jurisdiction to enjoin the merger through the appeal was "questionable" because in the underlying Aid of Execution Motion, the Bankruptcy Court was not asked to, nor did it, approve the merger or issue any ruling regarding the merits of merger.  (Id., p. 4.).  In addition, this Court held that "Appellants have not demonstrated a strong likelihood of success on the merits of their appeal," noting, in particular, that "Appellants have repeatedly expressed a willingness to accept cash in lieu of NorthWestern new common stock in satisfaction of their Disputed Claims and have not demonstrated that the value they would

13

receive for any Allowed Claims would be different from the value that similarly situated creditors have received." (Id., pp. 5-6.) Finally, the Decision noted that the public interest weighed in favor of allowing the BBI merger to be consummated, which facilitates the goal of NorthWestern's successful emergence from bankruptcy. (Id., p. 6.).

### **Appellants' Efforts to Obstruct Regulatory Approval of the BBI Merger**

On December 20, 2006, approximately two weeks after NorthWestern filed the Aid of Execution Motion, Magten sent a letter to the MPSC describing its pending claims against NorthWestern's bankruptcy estate and raising various other issues, which it urged "the Commission should take into account in considering NorthWestern's application for regulatory approval" of the BBI merger. (Pizzurro Aff. Ex. I.) The MPSC took no action in response to Magten's letter.

On February 23, 2007, the same day that Appellants filed their Second Emergency Stay Motion in this Court, Appellants also filed a Petition for Intervention in the proceedings before the MPSC, in which NorthWestern's application for regulatory approval of the BBI Merger is pending, arguing that approval should be conditioned upon NorthWestern's resolution of the QUIPS Claims, which are the subject of pending litigation before this Court. (Pizzurro Aff. Ex. N.) The MPSC denied Appellant's Petition for Intervention in the regulatory approval proceedings concerning the BBI Merger on March 9, 2007.

# ARGUMENT

## I.

### THE BANKRUPTCY COURT PROPERLY AUTHORIZED THE INVESTMENT OF THE CASH PROCEEDS OF SHARES IN THE DISPUTED CLAIMS RESERVE WHICH WILL BE RECEIVED UPON CONSUMMATION OF THE BBI MERGER

The only issue properly presented in this appeal is whether the Bankruptcy Court was correct in permitting the investment of cash proceeds of the shares in the Disputed Claims Reserve by LaSalle, the transfer agent, upon the tender and conversion of those shares when the BBI Merger is consummated. As NorthWestern explained in its Motion in the Bankruptcy Court, the Plan neither prohibits nor expressly provides for such investment, but is silent on this question. Arguably, NorthWestern did not have to seek permission from the Bankruptcy Court on this issue, but in an abundance of caution, it sought an Order specifically directing the transfer agent as to the permissible terms and conditions for such investment.

The effort to ensure proper investment of the cash proceeds of Disputed Claims Reserve shares was a prudent measure which maximizes the value of the remaining bankruptcy estate assets. Pending final determination on outstanding claims, and the final surplus distributions to creditors, investment of the cash proceeds ensures that interest will be earned on the corpus of the Disputed Claims Reserve assets, consisting of approximately $116 million. This effort directly inures to the benefit of those creditors of NorthWestern's bankruptcy estate who are entitled to receive distributions from the Disputed Claims Reserve. As noted above, any assets in the Disputed Claims Reserve which remain after resolution of outstanding disputed claims against NorthWestern's estate do not revert to NorthWestern. Rather, all remaining assets must be distributed pro rata to those creditors of NorthWestern's bankruptcy estate holding Allowed Claims in Class 7 and Class 9. Interest earned on the assets in the Disputed Claims Reserve increases the amount of the surplus distributions ultimately made to those creditors.

15

It is clear that the Bankruptcy Court had ample authority upon which to grant the requested relief. Section 105 of the Bankruptcy Code provides that the Bankruptcy Court "may issue any order…that is necessary to or appropriate to carry out the provisions" of Title 11. 11 U.S.C. § 105(a). Section 1142 of the Bankruptcy Code provides that the Bankruptcy Court may direct any necessary party to perform any act necessary for the consummation of a plan of reorganization. 11 U.S.C. §1142(b). Further, Bankruptcy Rule 3020(d) provides that, notwithstanding the entry of the confirmation order, the Bankruptcy Court is empowered to issue any other order necessary to administer the debtor's estate. FED. R. BANKR. P. 3020(d). *See In re Resorts Int'l, Inc.,* 199 B.R. 113, 119 (Bankr. D.N.J. 1996); *In re Terracor,* 86 B.R. 671, 676 (D. Utah 1988).

Section 13.1 of the Plan provides that the Bankruptcy Court has exclusive jurisdiction over all matters arising out of and relating to NorthWestern's bankruptcy case, including, *inter alia*, to cure any omission in the Plan and Confirmation Order as may be necessary to carry out its purpose and intent. In addition, the Bankruptcy Court has inherent jurisdiction to interpret and enforce its own Confirmation Order. *See In re Chateaugay Corp.,* 201 B.R. 48, 62 (Bankr. S.D.N.Y. 1996) (noting that bankruptcy courts have inherent or ancillary jurisdiction to interpret and enforce their own orders).

In its ruling on the Aid of Execution Motion, the Bankruptcy Court stated that "Rule 3020(d) provides sufficient authority" for the requested relief (Pizzurro Aff. Ex. J, p. 43), and further stated: "granting the relief, it seems to me, advances the purpose of the [NorthWestern] plan, specifically here and of Chapter 11 generally, which is to get value to the creditors, and it seems to me the relief requested here is entirely consistent with the purpose of it." (Pizzurro Aff. Ex. J, p. 44.) The Bankruptcy Court further held that, while the Plan could

16

have included terms which would have covered "the eventuality of a merger," the fact that it did not do so did not preclude the relief requested by NorthWestern. (Id., p. 43.).

As noted above, Appellants do not in fact take issue with the Bankruptcy Court's determination that investment of cash proceeds received in exchange for the shares in the Disputed Claims Reserve is appropriate, is not prohibited by Plan, and is consistent with its purpose in maximizing assets of the estate and recovery to creditors. This is the only issue properly presented on appeal, and it is clear that the Bankruptcy Court correctly interpreted the terms of the Plan and correctly relied upon applicable law. As such, the Order should be affirmed.

## II.

### APPELLANTS' ARGUMENT THAT THEIR CLAIMS CANNOT BE PAID IN CASH, BUT MUST BE PAID IN SHARES OF NORTHWESTERN COMMON STOCK, WHILE NOT PROPERLY PRESENTED ON APPEAL, MUST ALSO BE REJECTED

In opposing the Aid of Execution Motion, and in this appeal, Appellants have focused their arguments on their assertion that the Bankruptcy Court's Order allowing investment of the cash proceeds of the Disputed Claims Reserve shares should be reversed because it is premised on the conversion of those shares to cash in the first instance, and the payment of the QUIPS Claims from those proceeds in cash rather than in shares of NorthWestern common stock. Appellants assert numerous grounds on which they argue that a cash payment of their pending claims against NorthWestern's bankruptcy estate, should those claims become Allowed Claims, is not permitted by the Plan and not acceptable to them. None of these arguments is persuasive.

It should be noted at the outset that the issue of whether the QUIPS claims may be paid in cash was not the subject of the Aid in Execution Motion, and it was not the subject of the

Bankruptcy Court's Order granting that motion, and thus that issue is not properly presented for review in this appeal.   Nevertheless, a brief review of Appellants' arguments on this issue demonstrate their utter lack of merit.

First, Appellants claim that the Order effectively constitutes a "modification" of NorthWestern's Plan, by allowing "the substitution of cash" for the stock which Appellants argue they must receive if and when they succeed in obtaining an Allowed Claim against NorthWestern's bankruptcy estate.  (App. Br. at p. 16.)[7]  Appellants argue that NorthWestern is bound by the terms of the Plan to provide a recovery on their claims in "stock, and only stock," (Id. at p. 17), and that by entering into the BBI Merger and converting the shares in the Disputed Claims Reserve to cash, NorthWestern has effected a "back-door amendment" to the Plan.  (Id. at p. 17.)

As discussed more fully in Point III, below, Appellants themselves have previously taken the position that a cash payment on their claims -- the "economic equivalent" of a distribution in shares -- would be perfectly acceptable, and they should be judicially estopped from arguing otherwise now.   In any event, the Bankruptcy Court expressly rejected this argument, stating:  "there's nothing in the plan that precludes the debtor from pursuing a merger, and there's nothing in the plan which, it seems to me, gives some right and [sic] perpetuity for distributees of the stock to have it be in that form…"  (Pizzurro Aff. Ex. J,  p. 43.).

Second, Appellants argue that payment of their claims in cash rather than shares of common stock violates Section 1123(a)(4) of the Bankruptcy Code, which provides that a Plan shall provide the "same treatment" for creditors in each class unless the holder agrees to "a less favorable treatment" of its claim.  (App. Br. at p. 18.)  Again, as both the Bankruptcy Court

---

[7] References to "App. Br." Are to the Opening Brief of Appellants, filed in this Appeal on March 23, 2007.

and this Court have found, Appellants have not and cannot demonstrate any basis for arguing that a cash payment on their claims is not equivalent or is "less favorable" than payment in shares. (Pizzurro Aff. Ex. J, p. 43 and Ex. P, pp. 5-6.). *See, e.g., In re Dow Corning Corp.,* 255 B.R. 445, 497 (E.D. Mich. 2000) (Section 1123 should "not be interpreted as requiring precise equality of treatment, but rather, some approximate measure of equality") (*quoting In re Resorts Int'l Inc.,* 145 B.R. 412, 447 (Bankr. D.N.J. 1990);" *see also In re AOV Industries, Inc.,* 792 F.2d 1140, 1154 (D.D.C. 1986) ("[w]e do not hold that all class members must be treated precisely the same in all respects").

Their arguments to the contrary notwithstanding, Appellants could not demonstrate to the Bankruptcy Court that payment in shares offered any "enhanced" value over payment in cash. As the Bankruptcy Court stated:

> "There's no attribute of the stock that was issued under the plan that's been described to me today that shows that it's [sic] value is or would be enhanced over that of having cash. The proposed relief gives the same treatment to the [QUIPS] objectors as to all other Class 9 claimants. It grants them the same rights they'd have under state law, which wouldn't permit them to hold onto the stock." (Pizzurro Aff. Ex. J, p. 43.)

As the Bankruptcy court corrected observed, Appellants are in the same position as other creditors of NorthWestern's bankruptcy estate who have already received distributions of shares from the Disputed Claims Reserve, who will be required to tender their shares in the BBI Merger, and whose shares will converted to cash at the merger price of $37 per share.

Appellants' ability to obtain a recovery on their claims is not at all impaired by the Order and the prospective payment of cash instead of shares. If Appellants obtain Allowed Claims before the effective date of the merger, they would receive their appropriate pro rata allocation of shares of New Common Stock as provided under the Plan, and upon consummation

of the merger, they would have to tender their shares and would receive the merger consideration of $37 per share in cash under the procedures specified in the Merger Agreement. If Appellants obtain a recovery after the Merger Agreement becomes effective, then they will receive cash equal to the product of (a) the number of shares of New Common Stock allocated to their Allowed Claims pursuant to the Plan multiplied by (b) the merger price of $37 per share.

Third, Appellants argue that the "omission" in NorthWestern's Plan concerning the conversion of Disputed Claims Reserve shares to cash was "intentional" and therefore binding on NorthWestern. In support of this argument, Appellants note that NorthWestern had received other merger offers before BBI, and so could have foreseen a merger and somehow specifically provided for it in the Plan. Again, this specious argument was rejected by the Bankruptcy Court, which found the absence of a provision in the Plan concerning "the eventuality of a merger" did not preclude NorthWestern from either entering into a merger or distributing cash payments to creditors rather than shares, and that, in light of subsequent events, "the form of the distribution may change." (Pizzurro Aff. Ex. J, p. 43.)

Fourth, Appellants argue that the Bankruptcy Court impermissibly relied upon Bankruptcy Rule 3020(d) to create a "substantive right" which "modified" the Plan by allowing for the cash-out of the shares in the Disputed Claims Reserve. In fact, the conversion of shares in the Disputed Claims Reserve to cash is not prohibited by the Plan. Under Section 7.5 of the Plan, NorthWestern is to maintain a reserve "equal to the aggregate of any distributable amounts of Cash and New Common Stock equal to the relevant percentage of the Distributions to which holders of Disputed Claims would be entitled under this Plan if such Disputed Claims were Allowed Claims in the amount of such Disputed Claim or such lesser amount as required by a Final Order." (Appellant Ex. 9.) The question of whether shares held in the Disputed Claims

Reserve can be converted to cash is not addressed in the Plan. Under Bankruptcy Rule 3020(d), the bankruptcy court is empowered to issue any order necessary to administer the debtor's estate, and retains jurisdiction for purposes of overseeing implementation of the plan. *See, e.g., Binder v. PriceWaterhouse & Co. LLP (In re Resorts Int'l, Inc*.), 372 F.3d 154, 165 (3d Cir. 2004). The Bankruptcy Court was fully authorized to interpret NorthWestern's Plan on issues as to which the Plan was silent, or to aid in its implementation, and doing so simply does not constitute a "modification" of the Plan.

Finally, Appellants again take issue with the NorthWestern's entering into the BBI Merger itself, arguing that NorthWestern cannot "voluntarily enter into transactions" inconsistent with the "intent and purpose" of the Plan. (App. Br. at p. 27.) It bears repeating that, notwithstanding Appellants' efforts to seek review of the BBI Merger itself in the context of the Aid of Execution Motion and this appeal, approval of the merger was not presented to the Bankruptcy Court, nor is it within the jurisdiction of the Bankruptcy Court. As a reorganized debtor, post-confirmation, NorthWestern is free to entertain and enter into mergers without seeking approval of the Bankruptcy Court. *Prince v. Clare*, 67 B.R. 270, 272 (N.D. Ill. 1986) (reorganized debtor is the "master of his own fate in the commercial world"); *Pettibone Corp. v. Easley*, 935 F.2d 120, 122 (7th Cir. 1991) (post-confirmation debtor may go about its business without further supervision of Bankruptcy Court); *Gruen Marketing Corp. v. Asia Commercial Co.* (*In re Jewelcor Inc.)*, 150 B.R. 580, 583 (M.D. Penn. 1992) (post-confirmation debtor is not in "permanent tutelage" to the Bankruptcy Court subject to supervision and control over all aspects of corporate conduct.)

In fact, various sections of the Plan specifically provide NorthWestern with the freedom to entertain potential mergers. Section 5.14 of the Plan provides that "[a]fter the

21

Effective Date, Reorganized Debtor may operate its business, and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules . . . ." Section 9.1 of the Plan provides that on the Effective Date, the management and control of the Reorganized Debtor becomes the responsibility of the directors of the Reorganized Debtor who are entrusted with the general responsibility for maintaining operations in accordance with applicable law.  (Appellant Ex. 9.).

Far from being inconsistent with the "purpose and intent" of the Plan, the BBI Merger is the final step in NorthWestern's successful reorganization and emergence from bankruptcy.  In accordance with the terms of the Plan, NorthWestern's current management and its Board of Directors have managed reorganized NorthWestern in a manner that has substantially increased the value of NorthWestern's shares, which value has inured to the benefit of all NorthWestern's shareholders, its creditors, as well as Appellants, as claimants with a potential interest in the Disputed Claims Reserve.  This delivery of value to shareholders is manifest in BBI'S $37 per share all-cash merger offer to NorthWestern's shareholders.  Recent market prices for NorthWestern common stock, which have reached the highest levels since it emerged from bankruptcy in 2004, at approximately $35 to $36 per share, undoubtedly reflects the anticipated consummation of the $37 per share BBI Merger.

As this Court noted in its March 9, 2007 Decision denying Appellants' Second Emergency Stay Motion, "NorthWestern is now a Reorganized Debtor trying to complete the reorganization process and finish making distributions to its creditors.  The public interest lies in having NorthWestern emerge from bankruptcy as quickly as possible, and in the Court's view, the merger between NorthWestern and BBI is another step that facilitates that goal."  (Pizzurro Aff. Ex. P, p. 6).

In short, Appellants' complaints concerning the purported negative impact upon their potential recovery from NorthWestern's estate if the Disputed Claims Reserve shares are converted to cash and Appellants receive a cash payment rather than shares of common stock, are lacking in merit and should be rejected in their entirety.

### III.

### APPELLANTS ARE JUDICIALLY ESTOPPED FROM ASSERTING THAT A CASH PAYMENT ON THEIR CLAIMS FROM THE DISPUTED CLAIMS RESERVE IS NOT PERMISSIBLE

Appellants are disingenuous at best when they assert that NorthWestern should be judicially estopped from arguing that their claims may be satisfied by cash proceeds of the New Common Stock which is held in the Disputed Claims Reserve.

Indeed, if any parties are judicially estopped in this case, it is Appellants who are estopped from arguing now that their claims against the bankruptcy estate can only be satisfied by "stock, and only stock."  (App. Br., p. 3.)   Appellants have, on numerous occasions, previously taken the position that their claims against NorthWestern's bankruptcy estate could be satisfied by payment in cash –  in their own words, the "economic equivalent" of the value of shares that would otherwise be distributed on their claims.  Appellants made this argument on at least the following occasions:

(a)  At the October 29, 2004 hearing on Magten's Motion For a Stay of the Confirmation Order Pending Appeal, Magten argued that NorthWestern should set aside a larger reserve for the QUIPS claims, stating:

"It can be cash, it can be stock, it can be any currency whatsoever."

(Pizzurro Aff. Ex. A, p. 10.)

(b)  Again, in their March 4, 2005 brief filed in the Bankruptcy Court in connection with their 9019 motion to enforce a proposed settlement agreement with NorthWestern, Appellants argued:

23

> "If NorthWestern determines not to use the shares in the class 9
> reserve to satisfy its obligations under the Settlement Agreement,"
> it could satisfy the QUIPS Claims through "the economic
> equivalent of the distributions" by various means, including cash.
> "Alternatively, NorthWestern has unrestricted cash in excess of
> 100 million and can easily pay in cash the current market value of
> the 382,732 shares and 710,449 warrants."

(Pizzurro Aff. Ex. B, p. 17.)

 (c)  Likewise, in its June 30, 2005 Brief filed in this Court in its appeal of the Confirmation Order, Magten stated:

> "Specifically, to satisfy Magten's claim, NorthWestern can use its
> available cash on hand, issue new stock or provide the value from
> any other available source."

(Pizzurro Aff. Ex. C, p. 17.)

 (d)  In their June 30, 2005 brief filed in the Bankruptcy Court in their action to Revoke the Confirmation Order under Rule 1144 of the Bankruptcy Code, Appellants again stated:

> "Northwestern can issue New Common Stock to satisfy Plaintiffs'
> [QUIPS] Claims, and/or pay cash to satisfy the full value of these
> claims."

(Pizzurro Aff. Ex. D, p. 2.)

 As noted by the Third Circuit in *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.,* 337 F.3d 314 (3rd Cir. 2003), cited by Appellants, judicial estoppel should be applied in order "to avoid a miscarriage of justice," and is appropriate where:  (1) the party's positions are "irreconcilably inconsistent"; (2) the party changed its position *"in bad faith – i.e. with intent to play fast and loose with the court";* and (3)  the estoppel is tailored to address the harm identified and no lesser sanction would adequately remedy the damage.  Id. at 319 (emphasis added).

 The application of judicial estoppel against Appellants is warranted here.  Clearly, Appellants' current position complaining about a potential a cash payment is "irreconcilably

inconsistent" with their prior positions, outlined above.  As made clear by the record cited above, Appellants have time and again argued that cash would be perfectly acceptable to them as payment for their claims against NorthWestern's bankruptcy estate.

The current flip flop in Appellants' position concerning the adequacy of a cash payment on their claims highlights the lack of good faith in this appeal and reveals Appellants' true motives.  Appellants do not want, and have never wanted, shares in NorthWestern.  What they want is to exert pressure to leverage a settlement of their disputed claims against NorthWestern's bankruptcy estate by creating what they hope will be a threat to the completion of a two billion dollar merger.  Appellants' counsel admitted as much at the February 1 hearing before the Bankruptcy Court, stating that NorthWestern could "set itself free" by settling with Appellants.  (Pizzurro Aff. Ex. J, pp. 24-25.)   The fact that Appellants' position makes no sense from an economic point of view -- particularly where the merger price of $37 per share is above both the originally contemplated "Plan Value" as well as the highest market price reached since NorthWestern emerged from bankruptcy -- makes it clear that Appellants are simply "playing fast and loose," and will take whatever position they deem to be most obstructive to NorthWestern at any point in time.  The doctrine of judicial estoppel is designed to address precisely this type of bad faith tactics.

Appellants' assertion that NorthWestern has previously maintained that the QUIPS claims should be satisfied by stock rather than cash is misleading and taken out of context.  This issue arose in connection with Magten's attempt in March 2005 to enforce a proposed settlement agreement which contained certain terms that the Bankruptcy Court found violated the Plan.  Specifically, the proposed settlement called for payment to Magten and Law Debenture from the reserve set aside in the Disputed Claims Reserve for the litigating QUIPS

holders as well as shares and warrants that, under the Plan, could only be paid to the QUIPS

holders who chose not to litigate.  Upon objection by other creditors, the Bankruptcy Court

agreed that such terms violated the Plan by improperly giving the litigating QUIPS holders the

benefit of both options.  (Appellant Ex. 53.)

As noted above, Magten itself argued at that time that if NorthWestern could not

pay the QUIPS claims out of the New Common Stock held in the Disputed Claims Reserve,

NorthWestern could simply satisfy the QUIPS claims by a "cash payment" from whatever

alternative sources it might have at its disposal, such as "unrestricted cash."  (Pizzurro Aff. Ex.

B, p. 17.).  In response, rather than arguing that cash was *per se* a prohibited mode of payment,

NorthWestern simply argued that forcing NorthWestern to look to assets outside the Disputed

Claims Reserve was inappropriate and would unjustifiably favor the QUIPS holders with assets

which had not been made available to other disputed claims holders.  (Appellant Exs. 46, 56.).  A

cash distribution at that time would have also favored Appellants with a different, more

advantageous treatment than that afforded to NorthWestern's other Class 9 creditors, who had

received stock.  The current situation, in which NorthWestern contemplates paying the QUIPS

holders out of cash proceeds of the shares which have been held for their benefit in the Disputed

Claims Reserve for the last two and a half years, is not inconsistent with NorthWestern's prior

position.  Moreover, it affords the same treatment to Appellants as all of NorthWestern's

creditors who have received shares, who will have to exchange those shares for cash pursuant to

the BBI Merger.

Thus, it is Appellants, not NorthWestern, who have taken an "irreconcilably

inconsistent" position on the issue of cash distributions, and Appellants should be estopped from

arguing at this time that such payment is not an appropriate or acceptable means by which to satisfy their claims.

## **CONCLUSION**

For the reasons set forth above, it is respectfully submitted that Appellants' appeal should be dismissed.

Dated: Wilmington, Delaware
April 9, 2007

Respectfully submitted,

**GREENBERG TRAURIG, LLP**

Victoria Watson Counihan (No. 3488)
Dennis A. Meloro (No. 4435)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801
Telephone: (302) 661-7000

- and -

**CURTIS, MALLET-PREVOST, COLT
& MOSLE LLP**

Joseph D. Pizzurro
Steven J. Reisman
Nancy E. Delaney
Miriam K. Harwood
101 Park Avenue
New York, New York 10178
Telephone: (212) 696-6000

*Co-Counsel for NorthWestern Corporation*

27

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| NORTHWESTERN CORPORATION, | : | Bankruptcy Case No. 03-12872 (KJC) |
| | : | |
|     Reorganized Debtor. | : | |
| | : | |
| MAGTEN ASSET MANAGEMENT | : | |
| CORPORATION and LAW DEBENTURE | : | |
| TRUST COMPANY OF NEW YORK, | : | |
| | : | |
|     Appellants/Movants, | : | Appeal No. 07-00114-JJF |
| | : | |
|     v. | : | |
| | : | |
| NORTHWESTERN CORPORATION, | : | |
| | : | |
|     Appellee/Respondant. | : | |

## **CERTIFICATE OF SERVICE**

I, Dennis A. Meloro, being duly sworn according to law, deposes and says that I am employed by Greenberg Traurig, LLP, which is counsel for Northwestern Corporation and hereby certify that on the 9th day of April 2007, I caused copies of the following to be served upon the parties on Exhibit A, attached hereto via Hand Delivery upon Local Counsel and U.S. Mail upon the remaining parties.

- Brief of Appellee NorthWestern Corporation
- Affidavit of Joseph D. Pizzurro

Dated: April 9, 2007

Dennis A. Meloro (No. 4435)
Greenberg Traurig, LLP
1007 North Orange Street, Suite 1200
The Nemours Building
Wilmington, DE 19801

## EXHIBIT A

Alan W. Kornberg, Esq.
Paul, Weis, Rifkind,
Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019

Neil B. Glassman, Esq.
Charlene D. Davis, Esq.
The Bayard Firm
222 Delaware Avenue
Wilmington, DE 19801

Kathleen M. Miller, Esquire
Smith Katzenstein & Furlow LLP
800 Delaware Avenue, 7th Floor
Wilmington, DE  19801
(Law Debenture)

John V. Snellings, Esq.
Amanda Darwin, Esq.
Nixon & Peabody LLP
100 Summer Street
Boston, Massachusetts  02100
(Law Debenture)

Dale Dube, Esq.
Blank Rome LLP
1201 Market Street
Suite 800
Wilmington DE 19801
(Magten)

Bonnie Steingart, Esq.
John W. Brewer, Esq.
Gary L. Kaplan, Esq.
Fried Frank Harris Shriver & Jacobson LLP
One New York Plaza
New York NY 10004
(Magten)