IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| NORTHWESTERN CORPORATION, | : | Bankruptcy Case No. 03-12872 (KJC) |
| | : | |
| Reorganized Debtor. | : | |
| | : | |
| MAGTEN ASSET MANGEMENT | : | |
| CORPORATION and LAW DEBENTURE | : | |
| TRUST COMPANY OF NEW YORK, | : | |
| | : | |
| Appellants, | : | Appeal No. 07-00114-JJF |
| | : | |
| v. | : | |
| | : | |
| NORTHWESTERN CORPORATION, | : | |
| | : | |
| Appellee | : | |

## AFFIDAVIT OF JOSEPH D. PIZZURRO

State of New York )
                  ) ss:
County of New York )

Joseph D. Pizzurro, Esq., being duly sworn, deposes and says:

1.    I am a member of the firm of Curtis, Mallet-Prevost, Colt & Mosle LLP, counsel for appellee NorthWestern Corporation ("NorthWestern") in the above-captioned appeal (the "Appeal"). I submit this Affidavit in support of the Brief of Appellee NorthWestern Corporation, filed in this Appeal contemporaneously herewith on April 9, 2007.

2.    Attached hereto are true and correct copies of the following documents:

| Exhibit | Description |
|---------|-------------|
| A | October 29, 2004 Transcript of District Court Hearing to Consider Magten Motion to Stay Confirmation Order Pending Appeal [Del. Dist. Ct. Civ. Action No. 04-1389, Dkt. No. 17] [Appellee Ex. 36][1] |
| B | March 4, 2005 Joint Reply of Magten Asset Management Corporation and Law Debenture Trust Company of New York as Indenture Trustee to the Objections of NorthWestern Corporation, the Plan Committee and the Ad Hoc Committee to the Joint Motion for an Order Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure Approving a Settlement Between NorthWestern Corporation, Magten Asset Management Corporation, and Law Debenture Trust Company of New York [Del. Bankr. Case No. 03-12872, Dkt. No. 2880] [Appellant Ex. 50][2] |
| C | June 30, 2005 Memorandum of Law of Magten Asset Management Corporation in Support of Opposition to (I) NorthWestern Corporation's Motion to Dismiss the Consolidated Appeals and (II) Joinder of Plan Committee to NorthWestern Corporation's Motion to Dismiss [Del. Dist. Ct. Civ. Action No. 04-1389, Dkt. No. 59] [Appellee Ex. 37] |
| D | June 30, 2005 Response and Memorandum of Law of Magten Asset Management Corporation and Law Debenture Trust Company of New York to Defendants' Motion to Stay Adversary Proceeding Pending Resolution of the Appeal of Confirmation Order or, in the Alternative, to Dismiss Complaint [Del. Bankr. Adv. Pro. No. 05-50866, Dkt. No. 9] [Appellee Ex. 40] |
| E | NorthWestern Form 8-K, with attached April 25, 2006 Agreement and Plan of Merger among Babcock & Brown Infrastructure Limited, et al. and NorthWestern Corporation [*see* Appellant Ex. 86] |
| F | May 16, 2006 Letter from counsel for Magten to counsel for NorthWestern and BBI [Appellant Ex. 110] |
| G | July 14, 2006 Letter from counsel for Magten to counsel for NorthWestern and BBI [Appellant Ex. 110] |
| H | August 2, 2006 NorthWestern Public Release "NorthWestern Corporation's Stockholders Vote To Adopt Merger Agreement" [Civ. Action No. 07-114-JJF, Dkt. No. 9] |
| I | December 20, 2006 Letter from Magten to Montana Public Service Commission [Appellant Ex. 117] |
| J | February 1, 2007 Transcript of Bankruptcy Court Hearing on Motion in Aid of Execution [Appellant Ex. 112] |

[1] References to "Appellee Ex." are to the exhibits designated in Appellee NorthWestern Corporation's Counter-Designation of Additional Items to be Included in the Record on Appeal and Counter-Statement of Issues Presented on Appeal, filed on March 2, 2007.

[2] References to "Appellant Ex." are to the exhibits designated in the Joint Designation of Items to be Included in the Record on Appeal and Statement of the Issues to be Presented on Appeal of Appellants, Magten Asset Management Corporation and Law Debenture Trust Company of New York, as Trustee, filed on February 20, 2007.

| Exhibit | Description |
|---------|-------------|
| K | February 1, 2007 Order of the Bankruptcy Court, Hon. K. Carey, in Aid of Execution of Plan Directing Transfer Agent to Invest Proceeds Received from Stock Tender Upon Consummation of Merger in Accordance with 11 U.S.C. § 345 [Del. Bankr. Case No. 03-12872, Dkt. No. 3575] [Appellant Ex. 108] |
| L | February 20, 2007 Transcript of Bankruptcy Court Hearing on Emergency Motion of Magten Asset Management Corporation and Law Debenture Trust Company For a Stay Pending Appeal of Order in Aid of Execution of Plan of Reorganization [Del. Bankr. Case No. 03-12872, not yet filed on docket] [Appellant Ex. 120] |
| M | February 22, 2007 Order of the Bankruptcy Court, Hon. K. Carey, Denying Emergency Motion of Magten Asset Management Corporation and Law Debenture Trust Company For a Stay Pending Appeal of Order in Aid of Execution of Plan of Reorganization [Del. Bankr. Case No. 03-12872, Dkt. No. 3602] [Appellant Ex. 119] |
| N | February 27, 2007 Petition For Intervention of Law Debenture Trust Company of New York, as Indenture Trustee and Magten Asset Management Corporation [Civ. Action No. 07-114-JJF, Dkt. No. 9] |
| O | NorthWestern Energy Corporation NASDAQ Stock Quote, as of March 2, 2007 [Civ. Action No. 07-114-JJF, Dkt. No. 9] |
| P | March 9, 2007 Order of the District Court, Hon. J. Farnan, Denying Emergency Motion of Magten Asset Management Corporation and Law Debenture Trust Company For (1) A Stay Pending Appeal of Order in Aid of Execution of Plan of Reorganization and (II) Expedited Appeal [Civ. Action No. 07-114-JJF, Dkt. No. 17] |

Dated: New York, New York
     April 9, 2007

Joseph D. Pizzurro

Subscribed and sworn to before me this 9th day of April, 2007

Lynn M. Mooney
Notary Public, State of New York
My Commission Expires _____

LYNN M. MOONEY
Notary Public, State of New York
No. 41-4841073
Qualified in Queens County
Certificate Filed in New York County
Commission Expires June 30, 20___

1               IN THE UNITED STATES DISTRICT COURT

2               IN AND FOR THE DISTRICT OF DELAWARE

3                          - - -

4    NORTHWESTERN CORPORATION,        :        CIVIL ACTION
                                      :
5               Debtor.               :
     - - - - - - - - - - - - - - - - - -
6    MAGTEN ASSET MANAGEMENT CORP.,   :

7               Appellant,            :
                                      :
8          v                          :
                                      :
9    NORTHWESTERN CORPORATION,        :
                                      :
10              Appellee.             :        NO. 04-1389 (***)

11                         - - -

12                    Wilmington, Delaware
               Friday, October 29, 2004 at 11:00 a.m.
13
                           - - -
14
     BEFORE:        HONORABLE KENT A. JORDAN, U.S.D.C.J.
15
                           - - -
16   APPEARANCES:

17

18             GREENBERG TRAURIG, LLP
               BY:  SCOTT D. COUSINS, ESQ., and
                    WILLIAM E. CHIPMAN, JR., ESQ.
19
20             and

21             PAUL HASTINGS JANOFSKY & WALKER, LLP
               BY:  JESSE H. AUSTIN, ESQ., and
22                  KAROL DENNISTON, ESQ.
                    (Atlanta, Georgia)

23                  Counsel for Debtor and Appellee

24
                              Brian P. Gaffigan
25                            Registered Merit Reporter

```
 1    APPEARANCES: (Continued)

 2
                    BLANK ROME, LLP
 3                  BY:  ELIO BATTISTA, JR., ESQ.

 4                       and

 5                  FRIED FRANK HARRIS SHRIVER & JACOBSON
                    BY:  BONNIE STEINGART, ESQ., and
 6                       GARY L. KAPLAN, ESQ.
                         (New York, New York)
 7
                            Counsel for Appellant
 8

 9                  THE BAYARD FIRM
                    BY:  ERIC MICHAEL SUTTY, ESQ.
10
11                       and

12                  PAUL WEISS RIFKIND WHARTON & GARRISON, LLP
                    BY:  MARGARET A. PHILLIPS, ESQ., and
                         EPHRAIM DIAMOND, ESQ.
13                       (New York, New York)

14                          Counsel for the Official
                            Creditors Committee
15

16                  BIFFERATO BIFFERATO &  GENTILOTTI
                    BY:  JOSEPH KENDALL KOURY, ESQ.
17
18                       and

19                  DEWEY BALLENTINE, LLP
                    BY:  IRENA GOLDSTEIN, ESQ.
20
                            Counsel for Exit Financing Banks
21

22

23

24

25
```

1                              - oOo -

2                       P R O C E E D I N G S

3              (REPORTER'S NOTE:  Proceedings were held in open

4      court, beginning at 11:00 a.m.)

5              THE COURT:  Good morning.  Please be seated.

6              All right.  Why don't we start with some

7      introductions.

8              MR. BATTISTA:  Good morning, your Honor.  Elio

9      Battista from Blank Rome on behalf of Magten Asset Management

10     Corporation.  I have with me here today my colleagues Bonnie

11     Steingart and Gary Kaplan from Fried Frank in New York.

12             Also today we have debtors that are present.

13     On behalf the debtors, we have Mr. Jesse Austin and Karol

14     Denniston from Paul Hastings; their local counsel Mr. Scott

15     Cousins.

16             MR. COUSINS:  Good morning, your Honor.

17             MR. BATTISTA:  And Mr. William Chipman from

18     Greenberg Traurig.

19             MR. CHIPMAN:  Good morning, your Honor.

20             MR. BATTISTA:  On behalf of the Committee, we

21     have Ms. Margaret Phillips from Paul Weiss.

22             THE COURT:  Good morning.

23             MR. BATTISTA:  Mr. Eric Sutty of The Bayard Firm,

24     local counsel, and Mr. Ephraim Diamond of Paul Weiss on

25     behalf of the Committee.

1     Also, we have present Ms. Irene Goldstein --

2     MS. GOLDSTEIN:  Irena Goldstein.

3     MR. BATTISTA:  -- from Dewey Ballentine I believe

4 on behalf of the Exit Financing and their local counsel.

5     MR. KOURY:  Good morning, your Honor.  Joseph

6 Koury.

7     THE COURT:  Welcome.  Thank you for being here.

8     MR. BATTISTA:  Your Honor, as a quick preliminary

9 housekeeping matter, all lead counsel have been admitted pro

10 hac vice in the bankruptcy matter.  However, those motions

11 are being filed today for this matter here before this court

12 and I would just request that your Honor approve their

13 admission pro hac vice to be heard in this case.

14     THE COURT:  All right.  I will accept that

15 omnibus motion for admission pro hac vice.  You are all

16 admitted.

17     MR. BATTISTA:  Thank you, your Honor.

18     THE COURT:  Well, we're here to talk about this

19 motion for a stay pending appeal.  And who is going to be

20 speaking on behalf of the appellant?

21     MS. STEINGART:  I will, your Honor.

22     THE COURT:  All right.  Ms. Steingart, have I got

23 that right?

24     MS. STEINGART:  Yes.

25     THE COURT:  Ma'am, if you would come forward and

1    give me Magten's best pitch.

2             MS. STEINGART:  Good morning, your Honor.  As a

3    threshold matter, I would like to thank the Court for hearing

4    us on such notice and permitting us to attend in person.

5             Magten is appealing a confirmation order that was

6    issued in connection with the NorthWestern bankruptcy.  As

7    this Court is aware from the papers that had been submitted,

8    Bankruptcy Rule 8005 empowers the Court to stay any judgment

9    or order pending appeal.  It further provides that the Court

10   may make any appropriate order during the pendency of an

11   appeal on such terms as will protect the rights of all parties

12   in interest.  All parties mean the debtor, the lenders and

13   Magten as well, your Honor.

14            THE COURT:  Sure.  And you can take it as a given

15   that I've taken a look at the papers and have a feel for the

16   standard.  In fact, I want to give you a chance to say the

17   things that you think are important to you, but I do have

18   several questions so please don't be offended if I interrupt

19   you as I probably will to try to point the discussion where I

20   have specific questions.  So go ahead, please.

21            MS. STEINGART:  Thank you, your Honor.  In

22   determining whether to stay the confirmation order, the Court

23   must consider whether Magten is likely to succeed on the

24   merits, whether Magten will be irreparably harmed if the

25   stay is not issued, whether the issuance of the stay will

1    substantially harm other parties and whether the public

2    interest is affected.  Of course, these are Third Circuit

3    standards that have been articulated in <u>Republic of</u>

4    <u>Philippines</u> and thereafter. No one factor is isolated.

5    Rather, the Court is called upon to balance and weigh all

6    relative and relevant factors.

7              THE COURT:  Okay.  Well, let's look at one of

8    them right now.  And you didn't have the chance, given the

9    shortness of this turnaround, to respond in writing which is

10   one of the reasons I want to get your response to something

11   specific.  I'm going to open up to tab G in the exhibits

12   provided to me by the debtor.  That's a volume labeled docket

13   item 8.  It's the amended affidavit of Brian Byrd.

14             What I need to hear from you is a response to

15   the assertions that begin with paragraph 5 on page 3 of that

16   affidavit in which Mr. Byrd says, hey, judge if you stop this

17   thing, it's going to impair the equity value.  It's going to

18   put us in an unbelievable crunch because the DIP financing

19   expires.  It's going to put the exit financing commitment at

20   serious jeopardy.  And you need to have all that in mind when

21   they tell you there is no substantial harm.  So he teed it up

22   in the affidavit.  That is what I'm interested in hearing you

23   talk about.

24             MS. STEINGART:  Well, your Honor, when we look

25   at substantial harm, I think we have to look at the numbers.

1    Let's look at what we're talking about.  Let's look at the
2    magnitude of the estate.  Let's look at the relief that
3    actually needs to be imposed if we were to preserve the
4    rights of the holders of the QUIPS to have relief based on
5    the fraud that was done.
6            At this point in the proceedings, your Honor, the
7    debtors under the confirmation plan are required to have a
8    disputed claim reserve.  So the status quo, your Honor, as
9    we speak is that the confirmation order requires them to set
10   aside a reserve that would pay to the full extent permitted
11   under Class 9, assuming for the moment that the fraudulent
12   conveyance claim would be treated in Class 9.  If the change
13   went without any change by this Court, the remaining QUIPS,
14   which are $50 million of QUIPS that did not take the
15   proposal, $50 million goes into Class 9.
16           Now, under the plan, Class 9 gets treatment of
17   69 cents on the dollar.  So if we round up, and I don't mean
18   to round up too much but let's say we round up to 70 cents.
19   So 70 percent of $50 million is $35 million.  Under the terms
20   of the plan, as confirmed, the debtors are already required
21   to set aside stock or cash or whatever currency is approp-
22   riate of $35 million of the $50 we think this Court needs to
23   reserve in order to protect the rights of the QUIPS holders.
24           THE COURT:  So what I hear you saying --
25           MS. STEINGART:  So what we're talking about --

1      THE COURT:  At worst, you are at risk $15

2  million.

3      MS. STEINGART:  At worst, we are at risk $15

4  million.  And at worst, the debtors would need to put aside

5  cash or stock of that amount in order for the Magten and the

6  QUIPS claims on appeal not to become moot.

7      THE COURT:  Okay.  Well, when you say "moot," you

8  mean moot to the extent that's $15 million; right?

9      MS. STEINGART:  I mean moot -- yes, your Honor.

10  Exactly.

11      THE COURT:  So not moot altogether.  You wouldn't

12  get 30 of the cents you think you would be entitled to but

13  you would get something.

14      MS. STEINGART:  We would get something.  Exactly

15  right, your Honor.

16      THE COURT:  All right.  Now, balance that for me,

17  the things they say are substantial harm to them.

18      MS. STEINGART:  I think this is a company, your

19  Honor -- and I don't mean to be facetious.  I think $15

20  million is an accounting error.  I think this is a company

21  that has come out of bankruptcy, the low end of the range is

22  $1.4-$1.5 billion.  Their own investment bankers say the

23  company was worth more in the range of $1.7-$1.8 billion.

24  They have 13 percent of the stock being set aside for all

25  kinds of disputed claims anyway.  So when you talk about $15

1    million in the grand scheme of things in terms of substantial

2    harm to the debtors, it's not really substantial harm.  It's

3    really a small number, whereas $15 million is a much bigger

4    number when it comes to the relief that QUIPS are requesting

5    and in terms of preserving the rights to appeal.

6          THE COURT:  Well, I'm having a little bit of a

7    hard time because what I'm trying to find out is you've told

8    me essentially that's not a lot of money to them but the

9    question as I understand it is what is the harm in staying

10   the appeal, not what is the harm in making them make you

11   whole at some point, not what is $15 million to them.

12         The question is if I stay this and in fact their

13   assertions by affidavit are accurate, that that puts their

14   exit financing at risk, what is that harm?  They made a

15   representation of what that harm is.  I need to hear from

16   you a response as to whether that substantial harm or not.

17   They say we lose our exit financing, no guarantee we get it

18   back.  Fluctuation of equity markets might mean we don't get

19   what we've got before in the way of a commitment.  That's

20   the point I'm trying to get you to respond to.  That is what

21   they're saying is substantial harm, not that there is 30

22   cents on the dollars you guys might lose but that we might

23   lose big time in the equity financing market or exit

24   financing.

25         MS. STEINGART:  Your Honor, I don't think they

1    have addressed whether the incremental amount that would

2    be stayed, in addition to the amount that they are already

3    required under the disputed claims reserve to set aside,

4    would have any impact at all.  Their papers talk about

5    whether the Court should require them to put aside $50

6    million.  It can be cash, it can be stock, it can be any

7    currency whatsoever.

8            They talk about what would happen indeed if the

9    entire confirmation were stopped.  But the Court has the

10   flexibility to fashion a remedy and in this case, because of

11   the numbers involved, it actually can fashion a remedy that

12   really will not impact those things.  So when we look at the

13   affidavit, the affidavit I think is addressing numbers other

14   than the numbers that I have been just discussing with the

15   Court, your Honor.

16           THE COURT:  Sure.  I do get a sense that maybe

17   people are speaking past a little bit each other.  I just

18   want people to be speaking head on.  Do I understand you to

19   be telling me that if I were to stay this thing or enter an

20   order that say you can't go forward with confirmation unless

21   you put another $15 million in the kitty -- which is perhaps

22   too much of a informal way of stating it but that's what

23   I hear you saying, make them put another $15 million and

24   stay it until they do it.  That if I were to put an order

25   like that in place, that wouldn't effect the commitment

1   that creditors currently have?  That wouldn't be a basis on

2   which the folks who were anteing up the money for the exit

3   financing could pull out and say no, we're not going forward?

4   Because that's the point I want you to talk to.  You are

5   saying you can fashion something that is less.  And what I

6   need to know is if I did what you said I ought to do, would

7   I, regardless of whether it was 30 cents or stopping the

8   whole thing, would that give those exit financiers a chance

9   to say all bets are off?

10          MS. STEINGART:  As I understand the financing,

11  your Honor, it would not.  And I think what the order would

12  look like is that the confirmation order is only stayed to

13  the extent there should be another $15 million in any form

14  that the debtors propose setting aside to satisfy this

15  judgment if, as and when the appeal and the adversary are

16  successful.  So it's not a matter of staying everything

17  until they put aside $15 million.  It's a matter of saying

18  everything is fine and you only need -- the only aspect of it

19  that is being stayed or is being effected is that another $15

20  in whatever form that the debtor determines is appropriate.

21          If the debtor told us they were going to either

22  hold back $15 million in stock or issue additional stock,

23  that would be satisfactory.  If the debtor wanted to say,

24  your Honor, that --

25          THE COURT:  That takes me right to the merits of

1    the appeal, though, doesn't it?  Maybe I'm wrong but I get

2    this sense that you want me to blow past the stay issue and

3    --

4                MS. STEINGART:  No.

5                THE COURT:  -- and say in effect put the $15

6    million in.

7                MS. STEINGART:  Well, I think that what the

8    stay is, you know, there is the actual adversary that is

9    being pursued but what the stay deals with is whether it's

10   appropriate for the debtor not to have, pending the determ-

11   ination of the adversary proceeding and other issues and the

12   issues that are on appeal, whether it's appropriate for the

13   debtor not to reserve an amount that would be sufficient to

14   pay the QUIPS 100 cents on the dollar in any form.

15               THE COURT:  I thought that was the appeal.  See,

16   I don't know that that -- to me, that is a distinction with a

17   difference.  I take your appeal to be we should have a full

18   amount in that pot in case we win.

19               MS. STEINGART:  Correct, your Honor.

20               THE COURT:  I take your motion for a stay pending

21   appeal to be don't let this plan go forward until you have a

22   chance to consider whether or not the plan should be amended

23   to say all that money needs to be in the pot so we can be

24   made whole if we are successful in our adversary.  So that

25   is why I'm suggesting to you that I have the feeling you are

1   pulling me past the stay when you say all you need to do is

2   make them put another $15 million in, because it feels like

3   you are telling me decide this appeal on the merits right

4   now on this record, and then you don't have to have a stay.

5   Correct me if I'm wrong.

6          MS. STEINGART:   I think if the Court was able

7   to expedite its consideration so that it could conclude,

8   before the plan went effective, whether the money should be

9   set aside on the merits, that would be true.   But assuming

10  that the plan will become effective on Monday, because I

11  think that is not a possibility, then the only stay we're

12  asking for is a stay that would require the debtors, in going

13  effective with the plan, to have available in some form

14  enough so that if the QUIPS prevailed they got 100 percent.

15  And what I'm explaining, and the thing I'm addressing in

16  terms of the $15 million number, your Honor, is that the only

17  difference in the plan as it exists now and the impact that

18  this Court's stay would have, and the impact would only be as

19  long as the appeal were pending, would be for the debtors to

20  have, in one form or another, $15 million available so that

21  if the QUIPS were successful, they could get a full recovery.

22          They already need to reserve $35 million.   So

23  it's a di minimis -- as far as we can understand it, it's a

24  di minimis number.   $15 million in the world of numbers is

25  a lot of money; I don't want to denigrate its importance;

1    but in terms of the size of this debtor, the cash it has on

2    hand, the use of its resources, the time during which this

3    additional $15 million, in any form the debtor wants it to

4    take, because we think when the debtor merges, debtor will

5    be good for it, that it's going to be successful, that it's

6    going to reorganize and if the debtor said we don't want to

7    put money aside but we will put ourselves in a position where

8    if the Court rules on the appeal that the QUIPS, because of

9    the fraudulent conveyance claim and the attributes of that

10    claim, if they prevail, they would be entitled to 100 percent,

11    we will have enough so that if that occurs and they prevail

12    on appeal, they'll be able to be paid in full.  If they made

13    that representation to this Court, that would be sufficient.

14           THE COURT:  Let me make sure.  If they made the

15    representation to the Court that they would be able to pay,

16    you would be satisfied?

17           MS. STEINGART:  I would be satisfied.  I wouldn't

18    even require or ask the Court to require them to create

19    any additional reserve because I think that in terms of the

20    size of the company, the company's business, that that is a

21    representation that is entirely within the realm of.

22           THE COURT:  Then help me out with irreparable

23    harm, because if you think they're good for it -- let's assume

24    you are right.  Let's play this out.  I say no to your stay.

25    The plan goes.  You proceed with your adversary action.  You

1    win.  All $50 million is yours.  They're good for it.  How are

2    you harmed?

3                    MS. STEINGART:  Well, I would have to proceed,

4    your Honor, both with the adversary and with the appeal

5    because I need the appeal so that the appeal tells me how

6    much on the dollar I get in my adversary.  The Bankruptcy

7    Court has already capped me in my adversary at 69 cents on

8    the dollar.

9                    THE COURT:  So no matter what you --

10                   MS. STEINGART:  So I have to proceed with

11   the appeal one way or the other so that the portion of the

12   determination of the Bankruptcy Court that says all I have

13   is a disputed claim and a disputed claim reserve that has

14   been allocated, 69 cents on the dollar.  So the appeal still

15   has to proceed.  That's the first aspect of it.

16                   But the other aspect of it is that in situations

17   where plans go effective and stock is distributed and

18   things happen, debtors have a habit of saying that there is

19   substantial consummation, complete effectuation, any one of a

20   number of phrases.  I think that in the cases like United

21   Merchants -- that was a case very, very much like ours, your

22   Honor, before Judge Farnan.  The appellant there came in and

23   said there is a disputed claim reserve.  The debtors' plan

24   has been confirmed and the debtor said our claim is not going

25   to get paid.  It's disputed.  It's not happening for any one

1  of a number of reasons, and my claim is $28 million.  That is

2  what happened in <u>United Merchants</u>.  And the plan had been

3  confirmed.  And indeed, payments had already been made out of

4  the disputed claim reserve when it came before Judge Farnan.

5  And Judge Farnan said no.  And so debtor said it's been

6  consummated.  Others who are in this pool are getting money.

7  But the judge said, no, that's not true.

8          THE COURT:  Let's take it back to the stay.  You

9  pointed out very accurately that I left a important piece out

10  of the hypothetical I gave you.  You move forward with your

11  appeal, all right?  And you win.  So it's post.  The plan

12  has been moving forward but I say after the plan has been

13  moved forward, you still have to come up with another $15

14  million for that pot.  Now answer my question about how are

15  you harmed?  How are you harmed if I say no to a stay today?

16  If they're good for it two months from now, how are you

17  harmed by a failure to have a stay today?

18          MS. STEINGART:  Well, your Honor, I believe

19  they're good for it but I believe they will take the position

20  that because the plan has been consummated and effectuated,

21  that they can't unscramble eggs.  They can't do things that

22  will enable them to sort of comply and to pay in accordance

23  with the appeal.

24          One of the first arguments they would make in

25  response to the appeal that we would file in this Court

1    is that this Court cannot grant the relief that the QUIPS

2    holders ask, and I would like to get to some of the other

3    claims that I think that we have.  But you can't grant

4    the relief and it would be to you, your Honor, because we

5    consummated the plan.  That money has been dealt with,

6    dispensed with, spent, done, over.

7         Now, if the debtors were to say "that is not a

8    defense that we would have" and "it's not a defense that we

9    would assert, that we believe that it's our position that if

10   your appeal is successful and you're able to show, and the

11   Court holds that indeed there should have been a constructive

12   trust or something amounting to that so you get 100 cents on

13   the dollar in whatever currency we have available at the

14   time," if they say that to the Court, well, that would be a

15   different story, too, your Honor.

16        THE COURT:  Okay.

17        MS. STEINGART:  Okay?  So that is what is on

18   the table.  So 8005 does provide great flexibility in this

19   situation.  I think that a limited stay that would protect

20   the entitlement of the QUIPS is not something that is

21   addressed in Mr. Byrd's affidavit.  I don't think he addresses

22   a delta of $15 million and also a delta that can be in any

23   form of currency, any form of consideration that the debtor

24   determines is appropriate given their other commitments.

25        THE COURT:  That's fine.

1          MS. STEINGART:  I think that gives the debtors'

2    flexibility.

3          THE COURT:  I hear your legal arguments you are

4    asserting to me, if we were to do what you are saying, that

5    would not put the exit financing at risk.

6          MS. STEINGART:  I don't think so, your Honor.

7    No.

8          THE COURT:  Okay.  I have that position.

9          MS. STEINGART:  I think that we have shown --

10   that this discussion has dealt with a factor that says, well,

11   will a stay substantially injure others?  And I don't think

12   that this $15 million delta in a choice of currency of

13   the debtor will provide injury to them.  I think preventing

14   Magten and preventing the QUIPS from getting the full

15   relief, precluding it completely because of the argument of

16   substantial consummation and completion would, I think when

17   we look at the public interest, because the debtor can go

18   forward with its plan, I think the public interest in having

19   a company that admittedly had a financial statement and used

20   a financial statement that was $900 million in error as a

21   basis for this transaction, I think the public interest is

22   served by having the debtors continue to be answerable for

23   the sequela on that.

24         THE COURT:  Well, before we get to factor four,

25   let me take you back to factor one, which is the likelihood

1    of success on the merits; all right?  And first, I want to

2    ask you, your opposing counsel make a point of saying, Law

3    Debenture was with Magten when they're objecting but

4    they're not with them coming in here today.  And that's an

5    important thing for you to note.  What is your take on why

6    the indenture trustee isn't sitting at your table?  And is

7    that something that should make any difference in that?

8             MS. STEINGART:  Your Honor, most respectfully, I

9    think it's irrelevant.  I think that Magten -- that the Law

10   Debenture is pursuing the adversary, is still a party to the

11   adversary.  And I don't think it's of any moment that Law

12   Debenture is not with us today.  I think that everyone has

13   to make choices about how they proceed in litigation, but

14   Law Debenture is still an active part of the fraudulent

15   conveyance litigation, an active objector below to the

16   claims of other bondholders and an active participant in

17   the proceedings as they go forward.  So I think it's of no

18   moment, you know, in terms of probability of success on the

19   merits.

20             THE COURT:  Well, let me have you answer that

21   question in connection with the things Judge Case said

22   because that's what I want you to speak to; all right?  I'm

23   going to be looking at, I'm going to read here in the record

24   something that starts on page 26 of the transcript of the

25   October 8th hearing.  And this is on line 22, starting mid

1  sentence.  It says:

2           "... a primary point of the Magten position and

3  the Law Debenture position is that the Montana utility assets

4  are not property of the estate because they are subject in

5  effect to a constructive trust in favor of Magten as

6  plaintiff in the fraudulent conveyance case."  Going over to

7  the top of page 27.

8           He accurately described your position, right?

9           MS. STEINGART:  Yes, your Honor.

10          THE COURT:  He goes on and says:

11          "Everyone agrees that there has been no action

12  yet actually taken to impose a constructed trust.  At this

13  point, we only have the allegations, which as noted, have

14  narrowly survived a motion to dismiss with a high burden

15  placed on the plaintiff even to stay in the game at this

16  point."

17          Then he goes on, if recollection serves, and

18  notes that your claims about a automatic constructive trust

19  don't hold a lot of water in his view -- don't hold any water

20  in his view, in fact.  He was pretty emphatic in saying "that

21  view would put at risk every transaction that was done until

22  such time as the statute of limitations would run," unquote

23  at page 28.

24          I want you to speak directly to those points,

25  those rulings made by Judge Case when he was weighing the

1    strength of your position.

2              MS. STEINGART:  Well, your Honor, everyone does

3    not agree that no action has been taken.  Both Law Debenture

4    and Magten has taken every action that was available to

5    them. Filed claims that noted the existence of the fraudulent

6    conveyance.  This debtor is in bankruptcy, your Honor.  There

7    was no ability to go pursue the debtor and get a constructive

8    trust out of bankruptcy.  We were limited to the proceedings

9    we could bring within the bankruptcy process.  And within

10   that process, every action that was available was taken.

11             And that's part of the problem.  Because the

12   debtors are so mad about that, there has been no basis for

13   discussion.  But when we filed our claims, we noted the

14   existence of the fraudulent conveyance.  We noted that we

15   believed that the fraudulent conveyance gave rise to a

16   constructive trust.  We requested permission to bring the

17   adversary.  When the judge gave us permission to bring the

18   adversary, within two weeks we filed the complaint.  They

19   made a motion to dismiss the complaint.  We responded.  At

20   the end of August, the judge denied that motion to dismiss

21   the complaint.  The complaint hasn't yet been answered,

22   things haven't proceeded, but it's pending.  So actions

23   had been taken.  In addition to those actions, there have

24   been lawsuits brought in Montana state court against other

25   wrongdoers in connection with this fraud.

1          THE COURT:  Okay.  Let's get to the fraud

2     issue here.  The assertion as I understand it is that you

3     believe, what Judge Case characterized as a piece of an

4     overall transaction, you believe is in itself a fraudulent

5     conveyance, this so-called going flat transaction; right?

6          MS. STEINGART:  Your Honor, it is a separate

7     transaction.  There was not, in terms of the response and the

8     motion to dismiss the adversary, any indication that somehow

9     these transactions in tax language were going to be stepped

10    and merged.  It is one transaction.  There were several

11    disclosures for this transaction, several releases for the

12    transaction, separate consideration for the transaction but

13    we don't have to litigate that here.

14         THE COURT:  No, but you do have to persuade me

15    that if I stay this, you have a reasonable likelihood of

16    succeeding on the ultimate appeal; all right?

17         MS. STEINGART:  Yes.

18         THE COURT:  The ultimate appeal being that,

19    in fairness, $50 million should be in that pot.

20         MS. STEINGART:  Yes, your Honor.

21         THE COURT:  Because you've got a great claim that

22    ought to be addressed; right?

23         MS. STEINGART:  Right.

24         THE COURT:  And I take Judge Case's remarks to be

25    saying you don't have such a great claim.  You are going to

1    be lucky to get past what I still left for you, if I read him

2    right.

3                    MS. STEINGART:  Right.

4                    THE COURT:  And that's what I'm trying to have

5    you address to me specifically when it comes to likelihood of

6    success on the merits.

7                    MS. STEINGART:  Right.  I respectfully disagree

8    with that because, first of all, I don't think the trans-

9    actions will be stepped; and there was no argument that

10   they should be combined at any point before we saw it in the

11   opinion.  That is number one.

12                   Number two, what Judge Case held, when he

13   refused to grant the motion to dismiss, is that what Law

14   Debenture, Magten had to show was fraud and then fraudulent

15   consideration.  Okay?  And as to fraud, your Honor, we have

16   a step up here.  And the step up is that the financials that

17   were given to the trustee, in connection with the going

18   flat transaction, misstated the assets of this debtor by

19   $900 million.  There is no dispute about that.  They have

20   admitted it.  And the SEC has a formal investigation and that

21   investigation is ongoing.

22                   The other thing that we've also provided in the

23   exhibit is that the public statements about the value of the

24   assets and the value of the liabilities assumed at the time

25   of the transaction show that there was a disconnect as to

1    value.  So the value of assets that the debtors got was north

2    of $1 billion and the only thing that they gave in return for

3    those assets was the assumption of less than $700 million in

4    liabilities.  At the time of the transaction, there were

5    shareholders who brought suit and said this is not good.  We

6    believe the transaction should be stopped.  And what the

7    Montana court did for the shareholders at that time was to

8    say, under Montana law, you have stated --

9           MR. AUSTIN:  Your Honor, I'll object.  She has

10    not put any of this type of information into the record on

11    appeal or even put it into the record in support of her

12    objections in confirmation, so she is now arguing facts not

13    in evidence.

14           THE COURT:  Well, you will have your chance to

15    talk about that.

16           MR. AUSTIN:  Thank you, your Honor.

17           THE COURT:  Go ahead, Ms. Steingart.

18           MS. STEINGART:  Indeed, the judge had the

19    McGreevey claimants before him, sustained the McGreevey

20    request for constructive trust in the lawsuit during the

21    bankruptcy.  But going beyond that, under Montana law, the

22    Montana courts recognize that the constructive trust arises

23    by operation of the complaint.  You don't have to prove

24    up the complaint under Montana law before you get the

25    constructive trust.

1          THE COURT:  Isn't that exactly what Judge Case

2   said you were wrong about?

3          MS. STEINGART:  Right.  It's our view, your

4   Honor, is that Judge Case was wrong about that, and the thing

5   that adds to his error is the finding he made with respect to

6   the QUIPS claim.  He held that, well, because you alleged a

7   fraudulent conveyance, it means that there is recision.  And

8   if there is recision, it means they don't have to pay the 14

9   cents on the dollar they paid to TOPRs just like you.  All

10  right?  Because if there is recision, there is no liability

11  whatsoever.  The transaction never happened.  So if he holds

12  that the heart of the claim is recision and the consequences

13  of that --

14         THE COURT:  Actually, I hate to cut you off but I

15  don't know that that is particularly relevant.  Because the

16  point I took him to be making was you made an assertion about

17  Montana law which is critical to your assertion that you have

18  a likelihood of success, and that is that by operation of

19  law, this constructive trust comes into being with the filing

20  of a lawsuit which he rejects out of hand.  And I guess what

21  I'm saying is he is pointed about saying you gave him no

22  case, cited him no authority.  Maybe he is wrong, but that

23  is what he said on the record.  You didn't give me a thing

24  to justify this, he said.  As a matter of public policy, it

25  strikes me as kind of outlandish because of what I quoted

1    earlier.  That would mean every transaction is at risk until

2    the statute of limitations run because somebody could file a

3    lawsuit and by operation of law, constructive trust would

4    reach back and try to unravel the transaction.

5          Now, I may have read him wrong but that is

6    what the words appear to me to be saying.  So he thought

7    about recision, or this or that.  Those are the things I'm

8    interested in hearing you talk about:  his assertion that

9    on this fundamental point of law, you are just wrong.

10          MS. STEINGART:  Right.  We filed in our briefs

11    that we filed objecting to the plan, your Honor, we cited

12    both law and cases that indicates that Judge Case is wrong.

13          THE COURT:  Okay.

14          MS. STEINGART:  And most respectfully, I

15    think that Judge Case found the idea and the fact that the

16    law permitted it in this context to present a difficult

17    situation.  But in fact, it is well within Montana law and we

18    cite numerous cases that hold that such constructive trusts

19    arise in the briefs that we submitted below.

20          THE COURT:  All right.

21          MS. STEINGART:  Not only that, but to the extent,

22    your Honor, I do think that one goes with the other.  Because

23    if you are going to say that the effect of the fraudulent con-

24    veyance is a recision, a recision is a recision.  If people

25    are going back to the status quo ante, what does that mean?

1    It doesn't mean we just have a claim for a postpetition claim.

2    It means that the transaction never came into existence.  So

3    within the Court's own rulings in terms of disposing of the

4    QUIPS, which I think the Court was too eager to do, the Court

5    made a ruling that was internally inconsistent.  So if there

6    is recision and if the transaction never occurred, it means

7    the assets don't belong to this debtor.

8                    THE COURT:  All right.

9                    MS. STEINGART:  We're not saying you have to take

10   all the assets away.  I'm saying it's not unfair.

11                   THE COURT:  Well, let's get back to point four.

12   We covered one, two and three.  You were starting down the

13   road of point four and I heard your argument.  I want you

14   to -- and obviously folks on the other side will speak for

15   themselves but I can imagine an argument something like

16   this:  That purpose of the Bankruptcy Code is to maximize

17   the value of the debtor.  Enormous sums of money and effort,

18   including the judicial effort of a skilled and respected

19   bankruptcy judge have gone into figuring out how to do that.

20   Having gone through that entire process, and having come up

21   short, it's not in the public interest to put the results of

22   all that effort at risk because one participant doesn't like

23   it.

24                   Now, what is the come back to that?

25                   MS. STEINGART:  The come back to that, your Honor,

1    is that the entire results of that process are not at risk.

2    The delta here is very small.  The issues involving the

3    public interest with respect to the fraud and the corporate

4    fraud here are also substantial.  There is no reason why

5    the corporate fraud here should be hidden even partially or

6    obscured even partially behind the Bankruptcy Code.  The

7    Bankruptcy Code does not exist to do that, and especially

8    here where --

9              THE COURT:  Well, speak to how the interest

10   is satisfied.  If you're right in taking people to task,

11   then the public interest, as opposed to the purely private

12   interest that you represent here for Magten, the public

13   interest in having wrongdoers brought to justice and pay

14   the price for their wrongdoing, that is not cut off by

15   whatever happens in this bankruptcy, is it?

16             MS. STEINGART:  Yes, your Honor.  I think it is.

17   Because I think that there are actions, that there are causes

18   of action that create a private right of action for those who

19   are injured by fraud, that serve the public interest in an

20   important way in addition to the SEC.  Yes, the action will

21   vindicate the public interest, but also causes of action for

22   fraudulent conveyance and for corporate false accounting that

23   create the ability for individuals who are injured to recover

24   have importance.

25             THE COURT:  Sure.

1          MS. STEINGART:  So I think we are also

2    vindicating that interest.  And there is no reason why, given

3    the fact you can fashion a stay that will protect the fruits

4    of the bankruptcy and will protect the small delta here and

5    hold the wrongdoers answerable in a reasonable way, there is

6    no reason not to do that because then the Court can satisfy

7    all the public interests that are at stake here.

8          THE COURT:  Okay.  Thanks very much.  I've got to

9    cut you off because we've been going through 40 minutes and I

10   have two other parties to hear, but I thank you for answering

11   the questions I had, and I'm going to go ahead and hear from

12   debtor's counsel.

13         MS. STEINGART:  At some point, if the Court was

14   interested in hearing our presentation on bond?

15         THE COURT:  I definitely will be interested in

16   hearing that.

17         MR. STEINGART:  Thank you.

18         THE COURT:  All right.  For the debtor.

19         MR. AUSTIN:  Yes, your Honor.

20         THE COURT:  Before you get going, let me just

21   tell you, I want you to answer straight up the thing that Ms.

22   Steingart concluded on, and which she started on, I think,

23   too, because of my questioning and that is you're really not

24   at risk here because I can impose a remedy right now that

25   doesn't put at risk the exit financing or raise any of the

1   other parade of horribles that are listed in the affidavit

2   that Mr. Brian Byrd filed.

3                   MR. AUSTIN:   Well, your Honor, I would

4   acknowledge depending on what that remedy is, that maybe the

5   answer to that may be correct but we may not necessarily be

6   at risk.   But the issue that we have, at least until we've

7   got into the courtroom today and heard Ms. Steingart make her

8   presentation, is that in the motion that is brought before

9   the Court, they asked effectively all or nothing.   They asked

10  for a stay of the entire proceeding, the entire effect of

11  the confirmation or they effectively ask for the debtor to

12  post a $50 million cash deposit to cover all their respective

13  claims.

14                  It's an interesting process in the sense that

15  they are the appellants in the case and to a certain extent

16  they're asking the debtor to bond the case off, which I think

17  is kind of turning things on its head.   So depending what the

18  Court said, we may well be able to proceed but I will want to

19  advise the Court that we have $140 million of claims going

20  into this Class 9 claims reserve.   And if you would take Ms.

21  Steingart at face, what she was saying initially, but then

22  you have to parse down under it, if what she is saying is

23  simply saying put more claims into the claim reserve so we

24  end up with say a $40 million claim, that claim is going

25  to be treated.   We will accept that claim is treated as a

1    Class 9 unsecured claim, getting paid 69 cents on the

2    dollar.  That is one thing.

3         But that is not what she has been arguing all

4    along in this case.  And I don't think that is effectively

5    what she is arguing today, because she kept saying, well,

6    it's a currency of some type because what she is effectively

7    arguing is to say we want stock or cash so if we get a $40

8    million claim, we get a $40 million recovery.  And that is

9    treating her claim different than what Judge Case determined

10   in the confirmation order because that is not treating her

11   claim as a Class 9 unsecured claimant that gets paid 69 cents

12   on the dollar.  That is treating that claim as some other

13   type claim that is getting paid 100 cents on the dollar.

14        The problem with that is the creditors that

15   voted for the plan, the creditors with whom we negotiated the

16   plan, the senior unsecured bondholders primarily effectively

17   represented by the committee and the other subordinated

18   creditors on the committee, they basically said we'll do

19   this deal but we know that the senior noteholders are going

20   to get 69 cents on the dollar and we'll end up with 92

21   percent of the stock and the junior subordinators, of which

22   the QUIPS were part of it, there is 8 percent the junior

23   subordinators will get.  So you're effectively trying to

24   fashion a relief that at the end of the day would say Magten

25   gets 100 cents on the dollar of its claim.  That is not what

1  the creditors voted for.  And irrespective of whether it

2  would impact the exit financing, it turns on its head and

3  puts at risk the deal that was negotiated because at that

4  point you are diluting the senior unsecured creditors' 92

5  percent stock position such that they may not have wanted to

6  then give the other 8 percent to the junior creditors so

7  whether or not that plan stays together is exceptionally in

8  jeopardy.

9          THE COURT:  Now explain that to me how does that

10  put -- yes, don't focus on the exit strategy.  My bad for

11  doing that.

12          MR. AUSTIN:  I'm not going do to that.

13          THE COURT:  I hear your opposing counsel say it's

14  not going to hurt this confirmation a bit for them to put

15  that $50 million in.

16          MR. AUSTIN:  Not true.

17          THE COURT:  It's going to roll forward.  Tell me

18  about that.

19          MR. AUSTIN:  It wouldn't, your Honor, if she

20  will stand up and say my appeal is substantively now resolved

21  because I'm willing to accept 69 cents on the dollar.  But

22  she didn't tell you that.  What she has told you is that it's

23  taken care of because then if I win on the adversary case, I

24  can get 100 cents on the dollar.  And the deal, your Honor,

25  is this.

1          If I can go to these charts for one second, I

2    think it will help.

3                THE COURT:  Sure.

4                MR. AUSTIN:  May I stand here for a second, your

5    Honor.

6                THE COURT:  Yes, that's fine.

7                MR. AUSTIN:  Your Honor, this is the debtor's

8    capital structure prior to the way we are today.  Debtor has

9    $913 million in senior secured obligations.  It has roughly

10   $865 million of principle in senior unsecured obligations and

11   it has roughly $366 million in principle of subordinated

12   obligations.

13              The QUIPS, as they're referred to, is this 8.45

14   percent of $65 million of the 366 claims.  The others are

15   other subordinated debts.  You may have referred to the term

16   TOPRs. The debtor's plan initially as it came out when we

17   filed in March still was, the debtor's plan has always been

18   a debtor equity plan.  All the unsecured bond and all the

19   unsubordinated debt would be converted into equity.

20              The first turn of the plan provided that these

21   senior unsecured obligations would receive 98 percent of the

22   stock of the Reorganized NorthWestern.  The subordinated

23   would only get 2 percent.  Through negotiations, we ended

24   up with -- and this is the plan Judge Case confirmed, based

25   on all of the negotiations and perceived value -- we ended

1   up with that these senior unsecured obligations will receive

2   92 percent of the stock of the Reorganized NorthWestern and

3   the subordinated would receive 8 percent of the stock plus

4   warrants convertible into another 13 percent of the Reorgan-

5   ized NorthWestern.  So effectively, from our description, the

6   senior unsecured, because Judge Case made a finding of fact

7   which was uncontroverted by any evidence presented by Magten,

8   that Judge Case made a finding of fact that the debtor's

9   value was only $1.5 billion.  As this Court can easily see,

10  you add up the senior secured and senior unsecured, that

11  weight is in excess of $1.5 billion value, so under the

12  absolute priority rule, the subordinated creditors would

13  otherwise be entitled to nothing.

14          My point is, your Honor, if all of a sudden

15  this Court is saying we've got to fashion a remedy such that

16  $50 million of value, whether it's cash, whether it's stock,

17  whatever, has to be set aside to protect Magten -- and

18  I'll speak to that in a second -- that $50 million of value

19  comes out of this recovery.  It dilutes the recovery to

20  the senior unsecured bondholders, who are already somewhat

21  kicking and screaming, agreed to give 8 percent to the junior

22  subordinated.  If you now dilute the recovery through a remedy

23  that you are now requesting today, which we never heard of

24  before, the problem is, your Honor, is that it looks to dilute

25  the recovery anticipated by the senior unsecured that they

1    voted for, and from that perspective, they may well carve

2    back, and want to carve back the 8 percent that they otherwise

3    had gifted over to the unsecured noteholders.

4                    THE COURT:  All right.

5                    MR. AUSTIN:  Now, Magten is sitting here saying

6    it's $50 million.  And this Court asked the question where is

7    Law Debenture?  Is that important?  We submit that it is, your

8    Honor.  Because Law Debenture, as the indenture trustee for

9    the QUIPS, is the only entity that can pursue remedies on

10   behalf of all of the QUIPS.  Magten does not have standing on

11   this motion for stay pending appeal or on the appeal itself to

12   argue the rights of the other QUIPS holders if Law Debenture

13   has not joined in the appeal.  It can only, as the case law

14   clearly established, Magten can only argue the rights of

15   itself.  And those claims, Magten's claims are only about

16   40 percent of that $65 million, which is roughly $26 million.

17   We submit, your Honor, that if Magten's claim is indeed

18   ultimately treated as a Class 9 unsecured claim, there is

19   more than enough reserve being set aside in the Class 9

20   reserve pool for Class 9 unsecured claims.

21                    We would also like to point out, your Honor,

22   that in connection with their constructive trust argument

23   that they've claimed that they did everything necessary,

24   which we believe Judge Case obviously made the correct

25   ruling, that the transaction of which they are complaining is

1    indeed, in part, in great part, one transaction.    In February

2    2002, NorthWestern Corporation required the transmission

3    distribution of the old Montana Power Company.    Because of

4    regulatory issues of getting approval both in the Montana

5    Public Service Commission and the Federal Energy Regulatory

6    Commission, those assets had to state a subsidiary and you

7    could complete actually giving the assets to NorthWestern

8    until November 2002, but we were filing papers at the FERC

9    and the SEC to indicate that is what we were going to be

10    doing.

11              What is important, your Honor, is this, because

12    this goes to their burden that they have to show a likelihood

13    of success on their ultimate claim:  Magten didn't own these

14    debt obligations.  They didn't own three QUIPS until just

15    before we filed bankruptcy in 2003.  And they acquired most

16    of their position during the bankruptcy.  The point is we

17    don't believe we can defraud someone -- and we do not admit a

18    fraud in the first instance, but we certainly don't believe

19    you can defraud someone that was not a creditor of your

20    estate at the time a transaction of which they complained

21    occurred.

22              THE COURT:  All right.  Is there anything you

23    want to tell me about your position?

24              MR. AUSTIN:  Your Honor, we just don't believe

25    they satisfied any of the four standards.  We think we have

1   put in substantially.  And I think this is important.  I

2   would ask the Court to focus on this point.  The allegations

3   of the lawsuit are simply that -- they're allegations.  The

4   answer has not been filed.  We joined issue.  And her point

5   of where there was an asset write-down, you know, an asset

6   write-down, in and of itself, does not lead to fraud.

7            With respect to her argument that the public

8   policy is going to be thwarted if this case is going to

9   be confirmed, goes forward, I'd note two things:  First

10  off, confirmation of the plan doesn't do anything to the

11  SEC investigation.  That is going to be ongoing.  What Ms.

12  Steingart also fails to note for the Court, though, is

13  NorthWestern was a defendant and its directors were defendants

14  in a securities class action lawsuit brought by private

15  plaintiffs who acquired securities as a result of this asset

16  write-down that occurred in April 2003, which, by the way,

17  Magten bought its claim after -- April 2003, after the

18  write-down occurred.  The point of that, your Honor, is that

19  the plan also incorporates a settlement of the class action

20  lawsuit.  So to the extent there is a concern about public

21  policy being covered by somebody pursuing this asserted fraud,

22  it has happened.

23            THE COURT:  I hear you.  I understand.

24            MR. AUSTIN:  Thank you.

25            THE COURT:  Thanks.  Who is going to be speaking

1   on behalf of the Committee?

2              MR. AUSTIN:  And obviously for the record, we do

3   not believe a stay in whole or part should be granted.  If

4   one is granted, a substantial bond should be posted.

5              THE COURT:  Actually, hold up just a moment

6   because I will hear from Ms. Steingart about the bond in

7   a moment but I'm not going to have time to have you get up

8   again.  So tell me what the bond is you think would satisfy

9   you.  Assume I was going to do something here in the way of

10  a stay.  What is the kind of bond that would satisfy you?

11             MR. AUSTIN:  I'm going to throw a number out,

12  your Honor, we're quite serious about given the circumstances

13  of this case.  We put it in our papers.  We believe an

14  appropriate bond should be about $1.8 billion, and that is

15  because that is the enterprise value.  That is a combination

16  of a number of things.  It's a combination of the enterprise

17  value that was clearly established at confirmation.  That

18  adds on the administrative cost of this case.  That adds on

19  the fact that the debtor will not have a working capital line

20  of credit.

21             The DIP loan expires in December.  And if there

22  is a stay, we don't have the financing.  If you don't believe

23  us, obviously the exit banks filed their own very short

24  and succinct pleading and said we're not there.  We'll have

25  ongoing costs.  We have working capital needs because as a

1   regulated utility -- and this is, I'll be succinct here, your

2   Honor.  NorthWestern is not a power producer of any great

3   amount.  It is a transmission distribution company.  It has

4   to buy power under the standards considered in the energy

5   business.  If it's buying power and they don't believe it's

6   either investment grade or financial worthy, NorthWestern has

7   to post letters of credit for deposit.  We have $50 million

8   deposited.  If we don't go on and exit, we believe we'll have

9   to post more, your Honor.

10                  THE COURT:  All right.  Thanks.

11                  I'll hear from the Committee's counsel.

12                  MS. PHILLIPS:  Good afternoon, your Honor.

13  Margaret Phillips of Paul Weiss Rifkind Wharton & Garrison

14  on behalf of the Official Committee of Unsecured Creditors.

15  A couple points we want to point out.

16                  In general, we concur with the debtor's argument

17  in denying the request for stay by Magten here specifically

18  because they failed to meet any of the requirements in order

19  to impose a stay.  One thing we want to point out:  That not

20  only is what they're asking unfair to the creditors of this

21  estate but that also includes the QUIPS holders who voted

22  in favor of this plan.  The vast majority of QUIPS holders

23  voted in favor of the plan and they're going to harmed by any

24  negative impact in the equity value.

25                  THE COURT:  That is what I want to you to speak

1    to.  And that is not whether the appeal is going to be some-

2    thing that other people like or don't like if I ultimately

3    decide that's a good appeal but whether the stay itself is

4    going to cause real damage to people.  I've heard debtor's

5    counsel say it puts the whole bankruptcy at risk.  I've heard

6    Ms. Steingart say it doesn't put anything a risk.  I want you

7    to tell me what you think and why.

8            MS. PHILLIPS:  I think the creditors would

9    certainly disagree with Ms. Steingart's position that this

10   does not put the bankruptcy, the plan at risk.

11           THE COURT:  Why?

12           MS. PHILLIPS:  This was a heavily negotiated

13   plan.  And as the judge found at trial, by the valuation

14   evidence, this was a so-called gift plan where that the value

15   of the assets here was such that creditors that were junior

16   creditors to Class 7 were not going to get anything unless

17   Class 7 gave them something, and in this instance they did

18   in order to get this plan, a plan in place.

19           THE COURT:  And what would happen if I said,

20   well, I think more money ought to be there?  What happens to

21   the plan?  What will the behavior be of the parties in the

22   real world if I were to give Ms. Steingart the remedy that

23   she is looking for on behalf of Magten?

24           MS. PHILLIPS:  Well, our understanding is based

25   on the representations in the affidavit filed by the exit

1  lenders is that it will impact the timing on the implement-

2  ation of the plan, if it gets implemented at all.  And that

3  is obviously going to impair the value of these creditors'

4  recovery that voted overwhelmingly in support of the plan.

5  And that is simply unfair, especially when you have a sit-

6  uation here where Magten came to the table here well after

7  the purported fraud in connection with the going flat

8  transaction.  They purchased three QUIPS at deep discount

9  and here they are today holding up everyone else and no one

10  else can receive their recovery if the stay is put in place

11  and that is substantial harm.

12          THE COURT:  All right.  And what do you think

13  about a bond?

14          MS. PHILLIPS:  We agree with the debtor's number

15  and we certainly think that in this situation, there has to

16  be a bond posted by Magten.

17          THE COURT:  Okay.  Thanks very much.

18          MS. PHILLIPS:  Thank you.

19          THE COURT:  Ms. Steingart, I'll give you a chance,

20  just a couple minutes to hit whatever rebuttal points -- oh,

21  I'm sorry.

22          MS. GOLDSTEIN:  That's okay.

23          THE COURT:  My bad.

24          MS. GOLDSTEIN:  I filed the skinniest papers.

25          THE COURT:  Skinny papers sometimes are good.

1          MS. GOLDSTEIN:  Irena Goldstein on behalf of the

2    bank exit financing.  Am I admitted?

3          MR. KOURY:  Your Honor, I apologize for the

4    inconvenience.  Ms. Goldstein was not admitted in the main

5    case.

6          THE COURT:  All right.

7          MR. KOURY:  I do have a motion.

8          THE COURT:  That's great.  If you will hand it up

9    and we'll just go ahead and proceed, I'll grant the motion

10   orally right now.

11         MR. KOURY:  Again, my apologies.

12         THE COURT:  That's fine.  I appreciate your

13   taking care of it here today.

14         All right.  If you would please, Ms. Goldstein.

15         MS. GOLDSTEIN:  Basically, Magten's counsel

16   asserts that a limited stay would not harm the exit financing

17   facility, would not prevent the exit financing banks from

18   closing, and I don't know how she can possibly say that.

19   The condition precedent to closing is that the confirmation

20   order is in full force and effect.  There is a question as

21   to whether or not this would be material change.  There is a

22   question as to whether an opinion could be issued.  This has

23   already gone to market.  We planned to close on Monday and

24   this is a significant development.

25         THE COURT:  If I hear you saying that as a matter

1   of contractual law, you folks are not bound unless this

2   thing closes on Monday as described in the papers, have I

3   understood you correctly?

4               MS. GOLDSTEIN:  That's correct.  And there was

5   also in the papers a comment that if it doesn't close, don't

6   worry about it because they are good.  They'll get financing

7   elsewhere.  Well, they probably won't get this financing

8   which is very favorable to the debtor, and they will, the

9   debtor and its creditors will bear completely the market

10  risk.  And, obviously, anything that requires the debtor to

11  segregate assets not currently contemplated is going to be

12  a bad factor in both their ability to get financing and the

13  rate that they'll would get if it is available.

14              THE COURT:  All right.  Thanks very much.

15              MS. GOLDSTEIN:  Thank you.

16              THE COURT:  Now is your chance for rebuttal, Ms.

17  Steingart.  And talk about bond.

18              MS. STEINGART:  You know it's not a gift plan

19  because those who didn't take the settlement didn't get the

20  gift.  So this is a very nice chart, and they did a gift

21  down, but what the choice that they had was to take the 14

22  cents on the dollar, take the gift, or pursue the litigation.

23  So now I don't think that it's appropriate to say if they

24  pursue the litigation and they win, and they get what they

25  told everybody all the time they always wanted -- okay? --

1   in their objections to the plan, in their claim, in their

2   appeal, that now the whole house of cards will fall down.

3   That is just not true.

4           THE COURT:  Well, when you say it's just not

5   true, let's take this in two bites.  We may just be spinning

6   our wheels here but I really am interested in hearing you

7   respond to the assertion made by counsel for the exit financ-

8   ing people who are sitting in the courtroom, representing

9   and saying we don't know what she is talking about.  We have

10   papers that says we can't close on Monday unless the plan is

11   in place.  So I'm trying to get you to meet that head on.

12   You say I don't think it will matter.  They are telling me

13   as a matter of law, it does matter.  As a matter of fact, it

14   will matter.

15           MS. STEINGART:  If that were the case, your

16   Honor, no one could ever get a stay pending appeal.  The

17   debtor could also sign an agreement the day after the

18   confirmation order with some exit finance person that said

19   even the most de minimis amount.  We have an admission it's

20   $1.5 billion.  We're talking about a delta.  And what Mr.

21   Austin says, your Honor, is that, listen, even if Magten

22   wins, you know, we may have claims but now all the other

23   QUIPS holders can't get 100 cents on the dollar, just

24   Magten, so what Mr. Austin is saying is that the delta is

25   even smaller.

1          THE COURT:  So if I understand you now, you are

2    saying regardless of whether this financing craters, that

3    can't be the determinative factor for you, judge, because

4    otherwise that sets up a precedent which no appellant could

5    ever get past on a stay.

6          MS. STEINGART:  I think there are two points

7    here, your Honor.  One is given the flexibility that all the

8    parties here have and the Court has to fashion a remedy that

9    will address the delta, given the fact that Mr. Austin does

10   not dispute he already has to reserve 69 cents on those X

11   number of dollars, I don't think that anyone in a transaction

12   that is $1.5 to $1.8 billion is going to sort of pull the

13   plug because the exit lenders and the banks and everyone

14   else, they're making fees.  They're making money.

15         THE COURT:  So you don't believe it.

16         MS. STEINGART:  I don't believe it and I don't

17   believe it's -- we're talking less than $15 million, less

18   than .10 of 1 percent of the value of the company.  And would

19   we create a situation where courts could also be hamstrung

20   and never be able to do a stay pending appeal when there is

21   a way to fashion something that could protect the interest

22   of all parties?

23         As to the bond.  I think that Judge Farnan's

24   decision in United Merchants, you know, hits just the right

25   note here, your Honor.  As to costs of appeal, we get to

1   appeal this whether the Court stays it or not.  You know,

2   as to whether the debtor wants to argue on appeal that our

3   appeal is moot, the debtor has not suggested to this Court

4   that it would not argue that our appeal is moot, not try to

5   diminish the claim in any way that it could.  And that is

6   an option that the debtor has as well.  So given all the

7   choices that the debtor has, I think that the parade of

8   horribles is an overstatement that is meant to prevent the

9   Court from doing that which it has the discretion to do.

10          THE COURT:  Okay.

11          MS. STEINGART:  Thank you, your Honor.

12          THE COURT:  Thank you.  I'm giving you a ruling

13   right now.

14          I have to say that I can certainly appreciate

15   the vigor with which Magten's position has been presented.

16   I don't share your disbelief about the damage that would be

17   done to all the other players in this drama if I were to say

18   we'll stop this boat right now.  On the contrary, it's my

19   finding that Magten hasn't satisfied any of the four factors

20   on the showing of the likelihood of success on the merits.

21          My exposure to this is very, very minimal.  But I

22   have tried to read with care the arguments that the parties

23   have made to me about what the underlying merits are and what

24   Judge Case had to say about it and I can't say there is a

25   likelihood of success given that minimal exposure.

1    Nor am I in a position to say that the movant

2    will suffer irreparable harm.  Because in order to say that,

3    I would have to assume that not only would Magten win but it

4    would win in the amount it says it would win.  And again, I'm

5    just not in a position to say, well, yes, I think that is

6    going to be the outcome here and, therefore, if they're short

7    31 cents on the dollar, they're irreparably injured.

8    Third and fourth are perhaps things which are the

9    most overwhelming to me here.  It occurs to me, after having

10   heard the arguments and read the things that I've read, that

11   the risk here of harm to many, many stakeholders is very

12   substantial, exceedingly so.  And that the assertion -- I

13   mean the phrase which counsel for Magten used in wrapping

14   up.  Given the flexibility here, I think goes right to the

15   heart of it.  Whether they were artful in the way they put

16   it all together and therefore maneuvered it in a way that is

17   artificial or not, I don't know, but I believe them when they

18   say we have the legal right to pull out and we will.  And

19   when the exit finance folks say that, that's a meaningful

20   statement.

21   When counsel for the debtor points out that this

22   is carefully negotiated and that all of the interests in play

23   here worked hard and negotiated hard to get to where they

24   were, the fact that one interest holder is unhappy doesn't

25   make it anything less than substantial harm to everybody

1  else to hold the boat up.  And so, again, I find there is

2  substantial harm that would be inflicted on nonmovants to

3  grant the stay.

4          Finally, as to the public interest, Magten

5  counsel's assertion that private rights of action do effect

6  public good is absolutely true.  But you haven't lost the

7  right of action.  You've got it.  And you are pursuing it

8  right now in your adversary proceeding.  The SEC is pursuing

9  an investigation.  And as was pointed out by counsel for the

10  debtor, this plan also addressed the shareholders' suit.  So

11  those public interests issues with respect to the alleged

12  fraud, if in fact it's proven to be fraud, appear to me on

13  balance to be adequately protected.  And a highly important

14  public interest would be seriously damaged if a stay were

15  granted, and that is effectuating the purpose of the Bank-

16  ruptcy Code and all the money and effort that has gone in to

17  bringing the plan to this point.

18          So I'm not stopping this thing from being

19  effective.  The motion to stay is denied.  You will get a very

20  succinct order from me that says for the reasons stated in

21  open court, the motion is denied, and that will be forthcoming

22  today.  I thank everybody for their time and attendance

23  today.  We're in recess.

24          (Proceedings adjourned at 12:11 p.m.)

25

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------------- x
                                           :
In re:                                     :    Chapter 11
                                           :
NORTHWESTERN CORPORATION,                  :    Case No. 03-12872 (JLP)
                                           :
                          Debtor.          :
                                           :    Hearing Date: March 8, 2005
                                           :
                                           :
------------------------------------------------------------------- x
```

**JOINT REPLY OF MAGTEN ASSET MANAGEMENT CORPORATION
AND LAW DEBENTURE TRUST COMPANY OF NEW YORK AS
INDENTURE TRUSTEE TO THE OBJECTIONS OF NORTHWESTERN
CORPORATION, THE PLAN COMMITTEE AND THE AD HOC
COMMITTEE TO THE JOINT MOTION FOR AN ORDER PURSUANT TO
RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE
APPROVING A SETTLEMENT BETWEEN NORTHWESTERN
CORPORATION, MAGTEN ASSET MANAGEMENT CORPORATION,
AND LAW DEBENTURE TRUST COMPANY OF NEW YORK**

Magten Asset Management Corporation ("Magten") and Law Debenture Trust

Company of New York as Indenture Trustee and Guarantee Trustee (the "Indenture Trustee"

and together with Magten, the "Movants"), by and through their undersigned counsel,

respectfully submit this reply (the "Reply") to the objections of NorthWestern Corporation

("NorthWestern"), the Plan Committee and the Ad Hoc Committee of Class 7 Debtholders (the

"Ad Hoc Committee") in further support of their joint motion (the "Motion") for entry of an

order pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure approving the

settlement (the "Settlement Agreement") among NorthWestern, Magten and the Indenture

Trustee (collectively the "Parties") regarding the compromise and settlement of all pending and

threatened claims, causes of actions, appeals and disputes among the Parties.  In support of

their Reply, the Movants respectfully state as follows:

# INTRODUCTION

By their Motion, the Movants are seeking approval of a Settlement Agreement that fully and finally resolves approximately ten complex litigations, objections and appeals and that the Debtor believes is in the best interest of NorthWestern, its estate and its creditors. Although NorthWestern now objects to entry of the settlement, NorthWestern continues to believe that the "settlement is in the best interest of the Debtor" and that the proposed settlement would "greatly facilitate NorthWestern's business goals." See Objection of NorthWestern Corporation to Motion, Dkt No. 2868, at p. 15.

After NorthWestern executed a binding contract that it believes is reasonable and in NorthWestern's best interest, Northwestern has sought to repudiate that contract because its largest shareholder – Harbert Distressed Investment Master Fund Ltd. ("Harbert") – is unhappy about the settlement and has created a new "ad hoc" Committee and Plan Committee to oppose the settlement.[1] The Settlement Agreement is now opposed primarily on the grounds that it cannot be effectuated absent an amendment to the Plan.   This position is belied by NorthWestern's representations to this Court that no Plan amendment is necessary and the provisions of the Plan itself, and, thus, is simply an attempt to pacify Harbert, rather than proceeding with a settlement that is in the best interests of all of NorthWestern's constituencies.[2]

---

[1]      During the course of NorthWestern's chapter 11 case, Harbert was a significant holders of the TOPrS. Harbert and Wilmington Trust Company ("Wilmington Trust") were active creditors in pursuing the rights and interests of the TOPrS.  Magten understands that at or around the time NorthWestern's Plan was confirmed, Harbert purchased a significant amount of Class 7 claims from certain members of the Official Committee of Unsecured Creditors (the "Creditors' Committee").  As a result of Harbert's substantial holding of Class 7 claims, Harbert is NorthWestern's largest shareholder.

[2]      As described more fully infra (i) until last week, the Plan Committee consisted of only one member, Wilmington Trust, the indenture trustee for the TOPrS notes held by Harbert, and (ii) several days ago, the

2

As the drafter of the Plan, it strains credulity for NorthWestern to claim that it was unaware of the terms of the Plan, particularly when its counsel, Paul Hastings Janofsky & Walker LLP ("Paul Hastings"), billed in excess of 7500 hours and charged NorthWestern in excess of $2,262,000 for its Plan and Disclosure Statement related efforts. Having drafted both the Plan and the Settlement Agreement, and having entered into the Settlement Agreement knowing full well the terms of the Plan, NorthWestern cannot simply "walk away" from the settlement and claim that it is now unable to meet the terms of the agreement. The purported defect in the settlement is easily remedied by providing the holders of the QUIPS with the economic equivalent of the recovery bargained for in the Settlement. In lieu of the 382,732 shares of stock and the 710,449 warrants to be distributed under the terms of the Settlement Agreement that parties allege require a Plan amendment, NorthWestern can, consistent with the terms of the Plan, provide the non-accepting QUIPS holders with stock from the Class 9 disputed claims reserve, issue new stock, or pay cash. None of these options would prejudice any other creditors and none require a Plan amendment. While NorthWestern can select whichever option it desires (so long as it provides the economic equivalent to the current market value of stock and warrants at issue), it cannot execute an agreement, present the agreement to the Court, tout the agreement to the marketplace and then simply discard the agreement.

When NorthWestern executed the Settlement Agreement it was no longer a debtor in possession and could therefore execute contracts without the constraints of section 363(b) of the Bankruptcy Code. The Settlement Agreement, by its terms, is "binding upon the

---

Plan Committee belatedly made self serving amendments to amend its By-Laws to place greater restrictions on NorthWestern's ability to settle claims.

3

parties" and was not conditioned upon this Court's approval. <u>See</u> Declaration of Gary L. Kaplan filed contemporaneously herewith (the "Kaplan Decl.") Exh. A, p. 4.   Since section 363(b) no longer acts to preclude NorthWestern from being bound by a contract, NorthWestern is bound by the Settlement Agreement and must perform its obligations or pay damages for breach of contract.

Moreover, the objections of the Plan Committee and the Ad Hoc Committee do not serve as a valid ground for repudiation and were not a surprise to NorthWestern.  During the February 10, 2005 omnibus hearing, during which counsel for NorthWestern advised this Court of the Settlement Agreement and its terms, NorthWestern also represented to this Court "we are well aware that certain Class 7 holders...are, to say the least not happy with this settlement and we anticipate we may receive some objections to the settlement..." <u>See</u> Kaplan Decl. Exh. B, p. 12.  All of the objections to the settlement and NorthWestern's reluctance to pursue the settlement are the result of one simple fact – certain of NorthWestern's senior bondholders who have already received 100 cents on the dollar on account of their claims want NorthWestern to continue litigation with the QUIPS[3] rather than pursue a reasonable settlement alternative.  None of these parties sought to intervene in any of the litigations or actions commenced by Magten and/or the Indenture Trustee and they do not have to bear the cost in any of the litigations, disputes and appeals being resolved pursuant to the Settlement Agreement.  In addition, all of the objectors are shareholders that can sell their stock at any time and do not have to live with the ongoing costs, expenses and distractions of the litigations. As a result, unlike NorthWestn and the parties to the litigation being settled, these shareholders have already received a recovery of approximately 100% on the dollar, these parties have little

---

[3]    Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion.

4

downside if NorthWestern ultimately loses the litigations but have a significant upside if NorthWestern wins.

NorthWestern entered into an enforceable contract that it drafted and negotiated – a contract that by its own terms is binding upon the parties and that NorthWestern believes is in the best interest of its estate, its creditors and its shareholders. As such, this Court should grant the Motion.

## I.    The Movants Have Standing To Bring The Motion

In opposing the settlement, the Plan Committee asserts that Magten and the Indenture Trustee lack standing under Bankruptcy Rule 9019 to seek approval of the Settlement Agreement. That objection, however, wholly ignores the facts surrounding the filing of the Motion. After NorthWestern informed Magten of its stated intention to breach the Settlement Agreement, Magten sought guidance from the Bankruptcy Court with respect to how to proceed to enforce the Settlement Agreement. In response, the Bankruptcy Court directed Magten and the Indenture Trustee to file a 9019 motion to approve the Settlement Agreement and set the matter to be heard at the next omnibus hearing scheduled for March 8, 2005. In accordance with the Court's direction, Magten filed a proposed scheduling order with the Court that provided, among other things, that Magten and the Indenture Trustee "may file a motion (the '9019 Motion') pursuant to Federal Rule of Bankruptcy Procedure 9019 seeking this Court's approval of the settlement agreement." See Kaplan Decl. Exh. C. In its response to the Court regarding the proposed order, NorthWestern specifically stated that its only objection to the proposed order was the provision requiring NorthWestern to pay the costs and expenses incurred in providing notice of the Motion, and "[o]therwise, we have no objection to

5

the Proposed Scheduling Order." <u>See</u> Kaplan Decl. Exh. D. Thereafter, on February 23, 2005, the Court entered the order as proposed (the "Order"), thereby granting Magten and the Indenture Trustee permission to file the Motion for approval of the Settlement Agreement. <u>See</u> Kaplan Decl. Exh. C.

Given the Court's explicit direction for Magten to file a 9019 motion and the Order there is no basis to challenge the Movants' right to file the Motion. In fact, the cases relied upon by the Plan Committee in their objection demonstrate that a Court may grant permission to a party other than the Debtor to bring a motion for approval of the settlement agreement. For instance, the Plan Committee relies upon <u>In re Walnut Equip. Leasing Co. Inc.</u>, which permitted creditors to pursue a settlement under Bankruptcy Rule 9019 because the settlement being advanced was authorized and supported by the debtor. 1999 WL 288651, at *3, n.7 (Bankr. E.D. Pa. 1999). In this case, not only is there an express order by the Court permitting the Movants to file the Motion, but NorthWestern – the Reorganized Debtor – initiated the settlement, drafted the agreement, continues to believe that the settlement is in the best interest of its estate, and did not oppose the order permitting the Movants to file the motion.

## II.    <u>The Parties Are Bound By The Settlement Agreement</u>

It is well settled in the Third Circuit that "an agreement to settle a law suit, voluntarily entered into, is binding upon the parties, whether or not made in the presence of the court, and even in the absence of a writing." <u>Green v. John H. Lewis & Co.</u>, 436 F.2d 389, 390 (3d Cir. 1970). A settlement agreement is treated as any other contract. <u>See</u> <u>Loppert v. Windsortech, Inc.</u>, 2004 WL 1439768 at *2 (Del. Ch. Ct. June 25, 2004) ("A settlement

6

agreement is enforceable as a contract."); <u>Rowe v. Rowe</u>, 2002 WL 1271679 at *3 (Del. Ch. Ct. May 28, 2002) ("A settlement agreement is construed using the principles of contract interpretation."). Delaware law is clear that "a contract 'comes into existence if a reasonable person would conclude, based on the objective manifestations of assent and the surrounding circumstances, that the parties intended to be bound by their agreement on all essential terms.'" <u>Leonard v. University of Delaware</u>, 204 F.Supp.2d 784, 787 (D. Del. May 24, 2002) (citing <u>Intellisource Group, Inc. v. Williams</u>, 1999 U.S. Dist. LEXIS 12446 (D. Del., 1999) (citations omitted)). Where the intent of the parties "can be cleanly extracted from the clear and unambiguous words that the parties have used, it is equally conventional wisdom that they are held to those words contained in the contract." <u>Compass Tech. v. Tseng Lab.</u>, 71 F.3d 1125, 1131 (3d Cir. 1995). Those who reach a settlement "are bound by its terms and may not challenge it, pending notice to others and subsequent court approval." <u>In re Nelson</u>, 117 B.R. 813, 820 n. 19 (Bankr. E.D. Pa. 1996). <u>See</u> <u>In re Stroud Ford</u>, 205 B.R. 722, 725 (Bankr. M.D. Pa. 1996) ("Court approval under [Bankruptcy Rule] 9019 is, thus, implied in law and does not detract from the conclusion that the agreement is binding as between the parties.").

The Settlement Agreement, which was drafted by counsel to NorthWestern is clear on its face that "the Settlement outlined herein shall be binding upon and inure to the benefit of the respective successors and assigns of each of the parties hereto." <u>See</u> Kaplan Decl. Exh. A, p. 4. By executing the agreement expressly containing that language, the parties indicated their intent and their consent to be bound by the terms of the agreement.

NorthWestern argues that the Settlement Agreement was not binding upon execution because court approval is a condition precedent to its effectiveness. In support of this, NorthWestern provides a long discussion regarding the limitations on the authority of a

7

debtor in possession to execute non-ordinary contracts under section 363 of the Bankruptcy Code. NorthWestern, however, ignores one essential fact -- a reorganized debtor is free to conduct business and enter into outside the ordinary course of business without the court approval. When a debtor in possession executes a contract that is not in the ordinary course, under section 363 of the Bankruptcy Code that contract will not be enforced absent court approval. Here, however, NorthWestern is no longer a debtor in possession and the constraints of section 363(b) of the Bankruptcy Code do not apply. "Section 363(b) speaks of the trustee's right to sell property of the estate. Once a plan has been confirmed, there is no longer a trustee and no longer an estate." In re W.R.M.J. Johnson Fruit Farm, Inc. 107 B.R. 18, 19 (Bankr. W.D.N.Y. 1989). NorthWestern entered into a binding contract, free from the limitations of section 363, with no conditions limiting the enforceability of the agreement. Consistent with this, NorthWestern's Plan provides that:

> After the Effective Date, Reorganized Debtor may operate its businesses, and my use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, but subject to the continuing jurisdiction of the Bankruptcy Court as set forth in Article XIII hereof.

See Kaplan Decl. Exh. E, section 5.14.

Likewise, the Confirmation Order provides that:

> On or after the Effective Date, the Reorganized Debtor shall be authorized to use, acquire and dispose of property... without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than restrictions expressly imposed by the Plan or this Order

See Kaplan Decl. Exh. F, p. 89.

8

Moreover, the Plan provides that the "Reorganized Debtor shall have the exclusive authority to compromise, settle, otherwise resolve or withdraw any objections filed by Reorganized Debtor." See Kaplan Decl. Exh. E, section 7.4   NorthWestern's exclusive right to compromise and settle claims is unaffected by the Plan Committee, as the Plan Committee's only right is to object to NorthWestern's agreements concerning the allowance of claims.   See Kaplan Decl. Exh. E, section 7.9.   The Plan Committee By-Laws in effect at the time the settlement was executed simply provide a structure for the Plan Committee to communicate its views to NorthWestern with respect to any settlements. See Kaplan Decl. Exh. G, section 1.10.1.1.   Several weeks after the Settlement Agreement was executed, and at some point after the Plan Committee filed their objection to the Motion, the Plan Committee concocted self-serving and bad faith amendments to the Plan Committee By-Laws to provide, inter alia, that all settlements must be "expressly subject to Bankruptcy Court approval and shall not be binding ... until [an] order is obtained and entered by the Bankruptcy Court."[4] See Kaplan Decl. Exh. G, section 1.10.1.1(adopted March 3, 2005) and Kaplan Decl. Exh. H.   In essence, these ill conceived efforts to amend the Plan Committee By-Laws are nothing more than an admission that the Plan Committee has no authority to do anything more than object to the settlement.   Finally, these belated amendments to the Plan Committee By-Laws (i) do not have any retroactive application, (ii) are ineffective to the extent that they contradict the express provisions in the Plan that give NorthWestern the exclusive right to enter into binding

---

[4]        It is ironic that NorthWestern and the Plan Committee claim that they cannot amend the Plan, and yet, by amending the Plan Committee By-Laws they are amending a Plan document which seeks to effectuate a material amendment to the Plan.

9

settlements, and (iii) given the manner and timing of their adoption, should not be countenanced by the Court.[5]

Because NorthWestern is no longer a debtor in possession and may enter into contracts without the constraints of section 363(b) of the Bankruptcy Code, there is no basis to hold that an agreement executed by NorthWestern is not binding absent court approval. See e.g., Northview Motors, Inc. v. Chrysler Motors Corp. 186 F3d 346, 351 (3d Cir. 1999) ("Relying on Section 363, we have held that a contract providing for the use or sale of estate property outside the regular course of business is unenforceable absent court approval").

Rule 9019 is only a procedural rule and it cannot alter the substantive rights of the parties. See 28 U.S.C. §2075 ("The Supreme Court shall have the power to prescribe by general rules, the forms of process, writs, pleadings, and motions, and the practice and procedure in cases under Title 11.  Such rules shall not abridge, enlarge or modify any substantive right.").  As the Third Circuit has noted,

> As a matter of law, Bankruptcy Rule 9019(a), a rule of procedure, cannot, by itself, create a substantive requirement of judicial approval of the Trustee's settlement of the [the debtors'] claims against Chrysler.  However, we adhere to our ruling in Martin, that Section 363 of the Code is the substantive provision requiring court approval.

Northview Motors, Inc.v. Chrysler Motors Corp. 186 F3d 346, 351, n.4 (3d Cir. 1999) (emphasis added) (internal citation omitted).

Thus, since section 363 is no longer applicable, Rule 9019 by itself cannot alter substantive contract rights.  The provision in the settlement agreement providing that the

---

5    The Plan Committee also included the following in its amendments to the By-Laws: (i) the payment by NorthWestern of legal fees of members of the Plan Committee, and (ii) an expanded indemnity by NorthWestern of each of the Plan Committee members. The Plan Committee members are clearly concerned, as they should be, that they can be held accountable for tortiously interfering with NorthWestern's performance of the Settlement Agreement. See Kaplan Decl. Exh. G, section 1.10.1.1.

10

settlement would be implemented pursuant to a motion under Bankruptcy Rule 9019 is merely a procedural mechanism for implementation of the settlement. Because section 363 is not applicable and Bankruptcy Rule 9019 is only a procedural mechanism, the Settlement Agreement is a legal and binding contract, the terms of which must be satisfied. NorthWestern and the Plan Committee's contention that the Settlement Agreement is not binding upon the parties until approved by this Court is contrary to the terms of the settlement, the explicit provisions of the Plan and applicable law.

NorthWestern's reliance on the Third Circuit's decision in Meyers v. Martin (In re Martin), 91 F.3d 389 (3d Cir. 1989) is similarly misplaced. In Martin, the trustee executed a settlement with a creditor, and due to the fact that subsequent events dramatically impacted the value of the litigation being settled, the trustee determined that the settlement was no longer in the best interest of the debtor's estate. As a result, the trustee did not oppose the objection that was interposed to the settlement. The Third Circuit held that due to the "unique facts of this case" the court would not conclude that the stipulation of settlement was binding upon the parties and that the trustee breached the settlement. In reaching this conclusion, the Third Circuit specifically highlighted that "the trustee did not flout or breach any term of the stipulation. Nor did she withdraw the motion to approve the stipulation. Rather, at the hearing, the trustee simply elected not to argue in favor of her motion." Martin, 91 F.3d at 394. Moreover, the Third Circuit premised its decision on the fact that the trustee had a fiduciary duty to the creditor body and would have violated that duty by actively championing a

11

settlement that she believed was no longer in the debtor's best interests.[6]  Most important, the

Court's decision was firmly grounded in the fact that section 363 of the Bankruptcy Code

restricts the trustee's ability to use assets in the absence of court approval.  Id. at 395.

None of the facts in Martin are present in this case.  First, NorthWestern is a

reorganized debtor that does not have duties to the creditor body and is not subject to the

restrictions under section 363 of the Bankruptcy Code.  Additionally, while the trustee in

Martin concluded that intervening facts rendered the settlement no longer in the debtor's best

interest, here, no intervening facts have occurred that could have altered NorthWestern's

position and NorthWestern continues to believe that the Settlement Agreement is in the best

interest of its estate.  Indeed, the only facts that have changed since the execution of the

Settlement Agreement is that Magten's litigation position has improved in light of the district

court's denial of the summary judgment motion filed by the officers of Clark Fork in the

litigation brought by Magten relating to their role in the fraudulent conveyance.  Lastly, unlike

in Martin where the trustee "did not flout or breach any term of the stipulation," NorthWestern

has openly opposed the settlement, has encouraged other parties to oppose the settlement (See

Kaplan Decl. Exh. I), and distributed the stock and cancelled warrants that were to be

distributed pursuant to the settlement.

### III.    The Settlement Agreement Can Be Implemented Without A Plan Amendment

Despite NorthWestern's previous representations to this Court, NorthWestern and

the Plan Committee now assert that the Settlement Agreement cannot be approved because it

---

6        The Third Circuit noted that once a debtor in possession agrees to a settlement, "Rule 9019(a) demonstrates the legislature's intent to place th[e] responsibility [of evaluating the reasonableness of a settlement] with the bankruptcy court."  Id.

12

cannot be implemented absent a Plan amendment, and NorthWestern cannot propose a Plan amendment because the Plan has been substantially consummated. This does not, however, render it impossible to enforce the Settlement Agreement.

As a preliminary matter, the only portions of the settlement that the objectors assert requires a Plan amendment is the distribution of the 382,732 shares of stock and 710,449 warrants that would have gone to the holders of the QUIPS had they accepted the Plan. [7] The remaining 870,000 shares to be distributed pursuant to the settlement come from the Class 9 reserve, and there is no argument that the distribution of such shares requires a Plan amendment.

At the February 10, 2005 omnibus hearing, NorthWestern's counsel advised this Court that the parties had entered into a settlement and described the terms of that settlement to the Court. See Kaplan Decl. Exh. B, pp. 5-15. During the course of that discussion, the Court specifically asked counsel to NorthWestern whether a Plan amendment would be necessary to implement the settlement. See Kaplan Decl. Exh. B, p. 13. Counsel for NorthWestern responded as follows:

> We're not making an amendment to the plan per se, Your Honor. Because we have a pending adversary proceeding, we think we can do this under a 9019 settlement. We don't think it relates to a plan amendment because we had actually under the plan reserved a significant amount of stock for the Class 9 potential claimants as contingent unliquidated claims in connection with going effective. So that matter had ultimately been disclosed relative to the potential for settling claims.

---

[7]     In addition, NorthWestern's current belief that the proposed allocation of stock and warrants in the Distribution Letter is inconsistent with the Plan is belied by the fact that NorthWestern was fully aware of the terms of the Distribution Letter prior to presenting the terms of the settlement to the Court on February 10, 2005 (See Kaplan Decl. Exh. J) and the Settlement Agreement expressly allows Magten and the Indenture Trustee to determine how it wishes to distribute the stock and warrants it receives pursuant to the settlement. See Kaplan Decl. Exh. A, p. 2.

13

See Kaplan Decl. Exh. B, p. 13.[8]

From the time the Plan was confirmed, NorthWestern and the Indenture Trustee had discussions regarding permitting those QUIPS holders that chose "Option 2" under the Plan (the litigation option) with the opportunity to elect to receive the "Option 1" distribution, thereby granting such holders that had rejected the Plan stock and warrants in the reorganized debtor – without the need for a Plan amendment or additional solicitations. See Kaplan Decl. Exh. L. As the drafter of the Plan, and given that its counsel spent 7500 hours working on the Plan, NorthWestern cannot simply contend that it was unaware of the requirements of the Plan.[9]

There has been no change of circumstances since the execution of the Settlement Agreement. Because NorthWestern can comply with the terms of the Settlement Agreement by providing the economic equivalent of the stock and warrants called for by the agreement from the disputed claims reserve that NorthWestern has established there is no reason or basis not to approve the settlement. See Newark v. NVF Co., 1980 WL 6367 at *4 (Del. Ch. Jan. 10, 1980) ("mere inability to perform a contract will not alone relieve the defaulting party … the

---

[8]    It is well-settled law in this district that "an attorney of record in a pending action acknowledges that a compromise has been reached, he or she is presumed to have the lawful authority to do so." Rowe v. Rowe, 2002 WL 1271679 at *3 (Del. Ch. Ct. May 28, 2002). This apparent authority is not altered by the fact that the client is a corporation, especially where there is evidence that the corporation was aware of the terms of the settlement. See Loppert v. Windsortech, Inc., 2004 WL 1439768 at *4 (Del. Ch. Ct. June 25, 2004). Here, public statements by NorthWestern's CEO that the settlement was "is in the best interest of [NorthWestern] and its shareholders," (See Kaplan Decl. Exh. K) demonstrate NorthWestern's awareness and acceptance of the Settlement Agreement.

[9]    As the drafter of the Plan, NorthWestern is the party with the most detailed knowledge of the contents of the Plan and what, if any, steps would be necessary thereunder as a condition precedent to the effectiveness of a settlement. See In re NVF Co., 309 B.R. 698, 704 (Bankr. D. Del. 2004) ("ambiguous provisions are construed against the drafter [and] where the Plan is considered an enforceable contract the interpretation of the ambiguous provisions will be construed against. . .the Plan proponent.").

14

impossibility of performance or frustration of purpose which will discharge a contractual obligation must be created by a fortuitous event and not by the voluntary act of the promisor.") (citations omitted); Bell Atlantic Directory Services, Inc. v. Delaware Law Center, Inc., 2000 WL 33654061at *1 (Del. Com. Pl. 2000); (citing 17 Am.Jur. 2nd, "Contracts" § 673) ("To avail itself of th[e] defense [of impossibility of performance and frustration of purpose], the [defendant] must carry the burden of proving by affirmative evidence that its performance under the contract is rendered impossible by an act of God, law or the other party); Martin v. Star Pub. Co ., 126 A.2d 238 (Del. Supr. 1956) (to be released, the party must demonstrate that the obligation under the contract cannot be performed by any means).

The Plan gives the non-accepting QUIPS holders a disputed Class 9 claim of at least $50 million and required NorthWestern to establish a disputed claims reserve with sufficient stock to ensure that holders of disputed claims would receive the same recovery as those whose claims were allowed.  In creating the reserve, NorthWestern estimated certain claims for the sole purpose of calculating the amount necessary to be placed in the reserve.  In that regard, NorthWestern and the Indenture Trustee entered into a stipulation estimating the non-accepting QUIPS claims at $25 million for the sole purpose of establishing the reserve. By its terms, the stipulation did not limit the Indenture Trustee to a $25 million claim and specifically provided that "[t]o the extent that the Allowed QUIPS Litigation Claims ultimately exceed $25 million, the holders of such claims shall have any deficiency satisfied out of the general Disputed Claims Reserve (as such is described in the Plan and the Confirmation Order)." See Kaplan Decl. Exh. M, p. 3.  Further, in agreeing to the stipulation, the Indenture Trustee and NorthWestern discussed the amount of disputed claims and Northwestern assured the Indenture Trustee that the disputed claims reserve contained sufficient stock to pay the

15

QUIPS holders' claims in full when allowed. Indeed, the Plan would not have been confirmable unless sufficient stock was placed in the reserve to ensure that all holders of class 9 claims received equal distributions. See 11 U.S.C. §1129(b)(2).

Counsel for NorthWestern has represented to this Court that NorthWestern "had actually under the plan reserved a significant amount of stock for the Class 9 potential claimants as contingent unliquidated claims in connection with going effective." See Kaplan Decl. Exh. B, p. 13. If the QUIPS were to ultimately establish their liability in the Fraudulent Conveyance Proceeding, they would receive an allowed claim in the amount of $50 million and would be entitled to receive $34.2 million of stock at Plan value (or approximately $47.5 million of stock at today's market value). As such, there is no basis for NorthWestern to assert that it cannot pay $28 million of stock (at Plan value) out of the reserve to consummate the settlement. Additionally, if the reserve has insufficient stock to pay a judgment in full when only 2 disputed claims have been settled, there is likely sufficient grounds for Magten and the Indenture Trustee to move this Court revoke the Confirmation Order pursuant to Section 1144 of the Bankruptcy Code.

Moreover, while the Plan Committee and the Ad Hoc Committee both object to the use of the Class 9 disputed claims reserve to fund the settlement, it is important to note that none of the members of either the Plan Committee or the Ad Hoc Committee hold Class 9 claims. As class 7 creditors, they are only entitled to any remaining stock in the disputed claims reserve after the allowance and disallowance of all claims in Class 9. In receiving their pro rata distributions, and for purposes of satisfying the fair and equitable test, the Plan did not account for claimants in Class 7 to receive the stock reserved for Class 9. As these Creditors have already received 100 cents on the dollar and since they had no expectation that they

16

would receive any stock from the class 9 reserve, these class 7 creditors suffer no harm if the Movants recovery reduces the class 9 reserve.

If NorthWestern determines not to use the shares in the Class 9 reserve to satisfy its obligations under the Settlement Agreement, NorthWestern can provide the QUIPS with the value of the remaining 382,732 shares and 710,449 warrants by issuing authorized but unissued stock or by cash payment. Pursuant to the Plan, NorthWestern was authorized to issue 200 million shares, and to date, NorthWestern has only issued approximately 40 million shares. See Kaplan Decl. Exh. N, p. 64. Therefore, NorthWestern has more than an adequate number of shares to satisfy its obligations under the Settlement Agreement.[10]   Alternatively, NorthWestern has unrestricted cash in excess of 100 million and can easily pay in cash the current market value of the 382,732 shares and 710,449 warrants. See Kaplan Decl. Exh. P, p. 6. The bottom line is that, even without a Plan amendment, the economic equivalent of the distributions contemplated under Settlement Agreement can be readily provided by NorthWestern pursuant to the settlement. In light of the fact that NorthWestern believes that the settlement is the best interest of NorthWestern's estate, its creditors and its shareholders, and in light of that fact that NorthWestern signed a binding Settlement Agreement, NorthWestern must be required, one way or another, to comply with its obligations under the Settlement Agreement.

---

[10]    NorthWestern and its board has located sufficient stock to provide stock incentives to 50 key employees. See Kaplan Decl. Exh. O. Notably, Mr. Drook, who once publicly praised the Settlement Agreement will receive stock worth almost $2.9 million. See Kaplan Decl. Exh. O.

17

IV.    **The Settlement Agreement Meets The Standard For Approval Under Bankruptcy Rule 9019**

Both the Plan Committee and the Ad Hoc Committee challenge the appropriateness of the settlement and assert that, in their view, the settlement is unreasonable. The overwhelming weight of the facts, however, show that the settlement more than satisfies the minimal level of reasonableness threshold applied in approving a settlement pursuant to Bankruptcy Rule 9019.[11]    As set forth more fully in the 9019 Motion, settlements are generally favored because they expedite the bankruptcy process and the settlement of claims. See Motion at ¶¶ 26-27. See also In re Coram Healthcare Corp., 315 B.R. 321, 329 (Bankr. D. Del. 2004) ("The consensual resolution of claims minimizes litigation and expedites the administration of a bankruptcy estate."). Moreover, when examining a settlement, the Court "is not to determine that the settlement is the best that can be achieved by the debtor [nor is it] 'to decide the numerous questions of law and facts raised. . .'" In re Integrated Health Services, Inc., 2001 Bankr. LEXIS 100, *6-7 (Bankr. D. Del. January 3, 2001) (quoting Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1993)).    Rather, the Court should "review the issues, without deciding them do determine whether the settlement falls "below the lowest point in the range of reasonableness.'" In re Integrated Health Services, Inc., 2001 Bankr. LEXIS 100, *6-7 (Bankr. D. Del. January 3, 2001) (quoting Newman v. Stein, 464 F.2d 689, 693 (2d Cir. 1972).

In determining whether or not to approve the Settlement Agreement this Court should not delve into the merits of the underlying claims and litigations.    Instead, the Court

---

[11]    Significantly, under the facts presented in this case, Bankruptcy Rule 9019 cannot operate to alter the substantive rights of the parties.    As discussed above, in light of the fact that section 363(b) is not applicable and the Plan does not require that agreements be approved pursuant to Bankruptcy Rule 9019, that procedural rule cannot be used to allow NorthWestern to "walk away" from the settlement.

18

must only determine whether the terms of the Settlement Agreement satisfy a minimal threshold of reasonableness. See Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1993) (the responsibility of the bankruptcy judge is not to decide the numerous questions of law and fact "but rather to canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness'"); see also In re Teltronics Servs., Inc., 762 F.2d 185, 189 (2d Cir. 1985) (a settlement should be approved unless it "fall[s] below the lowest point in the range of reasonableness").

### A.    The Settlement Agreement is Fair and Reasonable

When examined in light of the applicable legal framework, the settlement plainly satisfies the standard of reasonableness.  The various litigations that would be dismissed pursuant to the Settlement Agreement currently put NorthWestern and certain of its officers and advisors at risk of substantial liability, put NorthWestern at risk that its plan of reorganization may be unwound, and will inevitably lead to months and even years of expensive and time consuming litigation.  The continued prosecution of these litigations will result in millions of dollars in legal fees and expert fees, and months, if not years, of constant and ongoing litigation.  NorthWestern's President and CEO has recognized the value of this settlement, "as it removes the uncertainty associated with these protracted legal dispute that if continued would have resulted in significant cost to [NorthWestern]."  See Kaplan Decl. Exh. K.  Moreover, NorthWestern continues to believe that "[r]esolution of the extensive litigation involving the Parties would significantly reduce NorthWestern's legal fees and costs and the drain on senior management's time, permitting NorthWestern's senior management and its Board of Directors to focus on continuing to improve NorthWestern's business operations and

19

efficient management thereof." See Objection of NorthWestern Corporation to Motion, Dkt No. 2868, at p. 15.

The settlement fairly compromises the litigation risk facing all of the parties, by providing a recovery to the holders of the QUIPS that is significantly less than the QUIPS holders would receive if they succeed in some, let alone all of the litigation instituted on their behalf. Specifically, under the Settlement Agreement, the holders of the QUIPS will receive 1,252,732 shares of common stock at the reorganization plan value of $20 per share and (i.e., shares worth approximately $25 million at Plan Value) and (b) 710,449 warrants to purchase additional shares of common stock (at current market rates, the warrants are worth approximately $3.26 million). Absent the Settlement, if Magten and the Indenture Trustee are successful in their litigation, the QUIPS could receive from NorthWestern substantially in excess of $50 million in cash plus the fees and expenses incurred by the Indenture Trustee, as well as the possibility of additional relief from Magten's other litigations. The costs incurred in litigating the various claims and objections will undoubtedly cost NorthWestern millions of dollars more. Based upon NorthWestern's forecasts, a $50 million or more cash judgment could have devastating consequences to NorthWestern.[12] While the objecting parties argue that Magten and the holders of the QUIPS are receiving a recovery in excess of $38 million of value, this calculation is based on the current stock price of approximately $28 per share, as opposed to the Plan value of $20 a share. Magten's Class 9 claim entitles it to receive payment in stock at the Plan value. Likewise, although the recovery to Class 7 under the Plan value was purported to be approximately 70 cents on the dollar, due to the increase in the stock price,

---

[12]    Moreover, although NorthWestern is not a named party to certain pending litigations that the settlement will resolve, it would still incur significant fees and expenses in connection with the litigation, since, among other things, it would be subject to discovery.

20

holders of Class 7 claims (including Harbert), have received a recovery of approximately 100 cents on the dollar. Therefore, when considered in light of the fact that creditors in Class 7 received a full recovery and that the holders of the QUIPS are receiving substantially less than they would receive if they are successful in their litigation, the Plan Committee's argument that the recovery to Magten and the holders of the QUIPS is unfair is specious.

In questioning the reasonableness of the Settlement Agreement, the Ad Hoc Committee now argues that NorthWestern's senior management and its counsel have a conflict of interest that contributed to NorthWestern's support for the Settlement Agreement. The Ad Hoc Committee, however, is estopped from making these arguments. The members of the Ad Hoc Committee did not raise the conflict issue with respect to the release and settlement of other claims that have involved or could have involved NorthWestern's senior management or its counsel (e.g., the settlement with the McGreevy Class Action Plaintiffs and the settlement of the Securities Class Action Litigation). In fact, when Magten brought a motion seeking to disqualify Paul Hastings as counsel to NorthWestern due to a conflict of interest, many of the parties now members of the Ad Hoc Committee, through Paul Weiss as their counsel, stated that no conflict existed. Specifically, Avenue Capital was a member of the Creditors' Committee, which filed an objection to Magten's motion and specifically argued that Paul Hastings was disinterested and that Paul Hastings' pre-petition representation of NorthWestern in the going flat transaction did not render Paul Hastings disinterested. See Objection of NorthWestern Corporation to Motion, Dkt No. 2868, at p. 8. This Court can take judicial notice of the fact that a company's management often negotiates settlements where both the company and members of its management are defendants. For Harbert and Avenue Capital to

21

now raise the "conflict issue" to challenge the settlement is simply not credible and is a red herring that should be disregarded by the Court.

NorthWestern continues to believe that the settlement is in the best interest of the reorganized debtor, its estate and its creditors. The Indenture Trustee for the holders of the QUIPS believes that the settlement is in the best interest of the holders of the QUIPS. The only real opposition to the settlement is from Harbert, who is responsible for the objection of both the Plan Committee and the Ad Hoc Committee. Until last week, (which was two weeks after the settlement was executed and presented to the Court), the Plan Committee consisted of only one member: Wilmington Trust – the indenture trustee for the TOPrS notes held by Harbert throughout the chapter 11 case and the party that joined with Harbert in all litigation efforts during the chapter 11 case. Moreover, the Ad Hoc Committee, like the Plan Committee, is also the voice of Harbert and was formed merely a week ago for the sole purpose of objecting to the Settlement Agreement. Counsel to the Ad Hoc Committee, Kramer, Levin, Naftalis & Frankel ("Kramer Levin"), acted as counsel to Wilmington Trust and took the lead in discovery on behalf of Wilmington Trust and Harbert in connection with confirmation of the Plan.[13] Harbert is using its membership on both the Plan Committee and the Ad Hoc Committee to artificially increase the amount of objections to the settlement in an effort to try to recover significantly more than 100 cents on the dollar on account of its claims.

> B.    The Movants' Claims Are Not Meritless

---

[13]    Although Kramer Levin now purports to represent the Ad Hoc Committee in addition to Wilmington Trust, Kramer Levin has failed to file a statement pursuant to Bankruptcy Rule 2019 disclosing its dual representation of both Wilmington Trust and the Ad Hoc Committee and disclosing details with respect to its representation of the Ad Hoc Committee. Accordingly, in light of Kramer Levin's failure to make such disclosures, the Court should dismiss the objection of the Ad Hoc Committee. See Bankruptcy Rule 2019(b).

22

The Plan Committee also challenges the settlement by arguing that the claims of the holders of the QUIPS lack merit. The Plan Committee only raises this argument because Harbert, by its own opinion, had placed a "low likelihood of recovery" on the litigations and would instead prefer that it receive more stock than it is entitled to. See Kaplan Decl. Exh. Q, pg. 5. Harbert's opinion, however, is not shared by NorthWestern which has disclosed in its filings with the Securities and Exchange Commission that the "[fraudulent conveyance] litigation could adversely affect [NorthWestern's] business, results of operations and financial condition and [its] ability to continue normal operations." See Kaplan Decl. Exh. P, p. 52. Nor is Harbert's opinion shared by Paul Weiss, who acted as counsel for the Creditors Committee and now as counsel for the Plan Committee. Paul Weiss represented to this Court that the Fraudulent Conveyance Proceeding was an important issue "at the heart of this case." See Kaplan Decl. Exh. B, p. 81. Moreover, when undertaking an independent analysis of that litigation, Paul Weiss concluded that if a court found that the holders of the QUIPS had standing to pursue a cause of action against NorthWetern, such holders "may have a colorable claim under a fraudulent transfer theory. . ." See Kaplan Decl. Exh. R at p. 2). Paul Weiss' conclusion was based on the analysis of Houlihan Lokey, the Creditors' Committee financial advisor, who determined that there was a significant disparity between the value of the assets transferred from Clark Fork to NorthWestern and the consideration received by Clark Fork. See Kaplan Decl. Exh. S, p. 2.

Most important, the Fraudulent Conveyance Proceeding survived a motion to dismiss and Judge Case determined there was a sufficient merit to the claim so as to allow it to proceed to trial. Based on the fact that NorthWestern used admittedly false financial statements to effectuate the going flat transaction (NorthWestern publicly admitted that it

23

financials were overstated by $880 million, See Kaplan Decl. Exh. T ), Magten and the Indenture Trustee were confident that they would prevail on their claims. Likewise, Magten's claim against the officers and directors of Clark Fork filed in Montana district court survived a motion for summary judgment. In light of the decisions in those actions, the Plan Committee's view as to whether the claims have any merit is wholly irrelevant.

In addition, Harbert, under the guise of the Plan Committee, attempts to dismiss as meritless the PUHCA allegations set forth in the Movant's complaint in the Fraudulent Conveyance Proceeding. One of the grounds upon which it dismisses these claims is its assertion that the statute of limitations for the PUHCA claims ran prior to the commencement of the chapter 11 case. Throughout NorthWestern's chapter 11 case, however, Harbert and Wilmington Trust continuously alleged that NorthWestern violated PUHCA and sought to lift the automatic stay to pursue NorthWestern's PUHCA violations. Taken at face value, the assertions by the Plan Committee with respect to the merits of the PUHCA claims suggest that Harbert and Wilmington Trust are conceding that they pursued claims in bad faith. It is simply not credible for Harbert and Wilmington Trust to take the position claiming that the PUHCA claims are meritless, when they championed such claims throughout the chapter 11 process. See e.g, Motion to Lift Automatic Stay, Dkt. No.1172; Objection to Claims of HSBC, Dkt. No. 1640; and Objection to Plan, Dkt. No. 1790.

C.   The Movants Will Be Prejudiced if the Settlement Agreement is Not Approved

NorthWestern and the Plan Committee further contend that Magten and the Indenture Trustee will suffer no prejudice if the Settlement Agreement is not approved. Contrary to NorthWestern's contention, as a result of the highly publicized terms of the

24

settlement, Magten and the Indenture Trustee will suffer extreme prejudice and cannot be returned to the "status quo" if the Settlement Agreement is not approved.  Instead of merely announcing that a settlement had been reached among the parties, NorthWestern in its press release and on the record before the Court broadcasted in great detail the terms of the settlement and the distributions being made to the holder of the QUIPS pursuant to the agreement.  Magten and the Indenture Trustee reluctantly agreed to settle the outstanding claims and objections for substantially less than what they could receive if they prevail on their claims.  However, because the terms of the settlement have now been widely publicized, Magten and the holders of the QUIPS will suffer substantial prejudice if they are required to continue litigation.  Moreover, the Movants spent significant time and money negotiating the settlement and presenting the settlement which cannot be recovered or recouped.

25

## CONCLUSION

For the reasons set forth above, and for the reasons set forth in the Motion, Magten and the Indenture Trustee respectfully request the Court grant the Motion approving the Settlement Agreement, direct NorthWestern to pay the costs and expenses incurred in enforcing the terms of the settlement and grant such other and further relief as is just and proper.

Dated: Wilmington, Delaware
      March 4, 2005

**BLANK ROME LLP**

Mark J. Packel (DE No. 4048)
Elio Battista, Jr. (DE No. 3814)
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone:  (302) 425-6400
Facsimile:  (302) 425-6464

- and -

**FRIED, FRANK, HARRIS, SHRIVER &**
      **JACOBSON LLP**
Bonnie Steingart
Gary Kaplan
One New York Plaza
New York, NY 10004
Telephone:  (212) 859-8000
Facsimile:  (212) 859-4000

Counsel for Magten Asset Management
      Corporation

- and -

26

**SMITH, KATZENSTEIN & FURLOW, LLP**

_/s/ Kathleen M. Miller_
Kathleen M. Miller (I.D. No. 2898)
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE  19899
Courier 19801
Telephone: (302) 652-8400
Facsimile:  (302) 652-8405

- and -

**NIXON PEABODY LLP**
Amanda D. Darwin, BBO No. 547654
John V. Snellings, BBO No. 548791
Lee Harrington (DE No. 4046)
100 Summer Street
Boston, MA  02110
Telephone: (617) 345-1000
Facsimile:  (617) 345-1300

Attorneys for Law Debenture Trust Company of
New York

490772

27

# EXHIBIT C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| NORTHWESTERN CORPORATION, | : | |
| | : | Case No. 03-12872 (JLP) |
| Debtor. | : | |
| | : | |
| | : | |
| MAGTEN ASSET MANAGEMENT CORP. | : | |
| | : | |
| Appellant, | : | |
| v. | : | CA NO. 04-1389 (JJF) |
| | : | |
| NORTHWESTERN CORPORATION, | : | |
| | : | |
| Appellee. | : | |

---

**MEMORANDUM OF LAW OF MAGTEN ASSET MANAGEMENT
CORPORATION IN SUPPORT OF OPPOSITION TO (I)
NORTHWESTERN CORPORATION'S MOTION TO DISMISS THE
CONSOLIDATED APPEALS AND (II) JOINDER OF PLAN COMMITTEE
TO NORTHWESTERN CORPORATION'S MOTION TO DISMISS**

---

**FRIED, FRANK, HARRIS, SHRIVER
    & JACOBSON LLP**
Bonnie Steingart
Gary L. Kaplan                    -and-
One New York Plaza
New York, NY 10004
Telephone:  (212) 859-8000

**BLANK ROME LLP**
Mark J. Packel (DE No. 4048)
Elio Battista, Jr. (DE No. 3814)
1201 Market Street, Suite 800
Wilmington, DE 19801
 Telephone: (302) 425-6400

Counsel for Magten Asset Management Corporation

Dated: June 30, 2005
Wilmington, Delaware

# TABLE OF CONTENTS

Table of Authorities ................................................................................................. ii

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF THE CASE ................................................................................ 4

    A. Chapter 11 Proceeding ................................................................................ 4

    B. Recovery to QUIPS Holders Under the Plan ........................................... 8

    C. The Fraudulent Conveyance Proceeding .................................................. 9

ARGUMENT ........................................................................................................... 11

    I.  The Appeals Are Not Equitably Moot ........................................................ 11

        A. Substantial Consummation Does Not Moot the Appeals ......................... 12

        B. Failure to Obtain a Stay is Not Dispositive .............................................. 14

        C. The Court Can Fashion Effective Relief Without Affecting the Success
           of the Plan .................................................................................................. 16

        D. The Court Can Fashion Effective Relief Without Affecting the Rights of
           Third Parties .............................................................................................. 17

        E. Public Policy Supports the Conclusion that the Appeals are Not Moot ...... 18

    II.  The Plan Committee Does Not Have Standing to Join in the Appeals ............ 19

CONCLUSION ........................................................................................................ 21

i

## TABLE OF AUTHORITIES

### FEDERAL CASES

In re 183 Lorraine St. Associate,
198 B.R. 16 (E.D.N.Y. 1996) ............................................................................ 17

In re ANC Rental Corp.,
57 Fed. Appx. 912, (3d Cir. 2003) .................................................................. 19

In re AOV Industrial Inc.,
792 F.2d 1140 (D.C. Cir. 1986) ............................................... 12, 13, 14, 18

Bartel v. Bar Harbor Airways,
196 B.R. 268 (S.D.N.Y. 1995) ...................................................................... 20

In re Best Products,
68 F.3d 26 (2d Cir. 1995) ............................................................................. 14

In re Block Shim Development Company-Irving,
113 B.R. 256 (N. D. Tex. 1990) .................................................................... 18

Central States v. Central Transport, Inc.,
841 F.2d 92 (4th Cir. 1988) ........................................................................ 13

In re Chateaugay,
167 B.R. 776 (S.D.N.Y. 1994) ................................................................. 14, 17

Chateaugay Corp. v. LTV Steel Co. (In re Chateaugay Corp.),
10 F.3d 944 (2d Cir. 1993) ................................................................. passim

City of Covington v. Covington Landing Ltd.,
71 F.3d 1221 (6th Cir. 1995) ...................................................................... 15

In re Club Associate,
956 F.2d 1065 (11th Cir. 1992) .................................................................. 15

In re Cont'l Airlines,
91 F.3d 553 (3d Cir. 1996) ................................................................. passim

In re Cosmopolitan Aviation Corp.,
763 F. 2d 507 (2d Cir. 1985) ...................................................................... 20

In re Dykes,
10 F.3d 184 (3d Cir. 1993) .................................................................... 19, 20

ii

In re Fondiller,
    707 F.2d 441, 443 (9th Cir., 1983)) ................................................................ 20

Gillman v. Continental,
    203 F.3d 211 (3d. Cir. 2000) ........................................................... 13, 18

In re Ionosphere Clubs, Inc.,
    184 B.R. 648 (S.D.N.Y. 1995) ............................................................ 13

Nordhoff Investments v. Zenith Electrics Corp. (In re Zenith Electrics Corp.),
    250 B.R. 207 (D. Del. 2000) ...................................................... 11, 15, 18

In re O'Brien Environmental Energy, Inc.,
    181 F.3d 527 (3d Cir. 1999) ............................................................... 20

In re PWS Holding Corp.,
    228 F.3d at 224 (3d Cir. 2000) ................................................ 14, 19, 20, 21

In re Lafayette Hotel Partnership,
    No.96-7476, 1997 WL 599386 (S.D.N.Y. Sept. 29, 1997) ................................. 15, 17, 18

RTC v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.),
    16 F.3d 552, 560 (3d Cir. 1994) ........................................................ 16

In re Sun Valley Ranches, Inc.,
    823 F.2d 1373 (9th Cir. 1987) ........................................................... 15

Travelers Insurance Co. v. H.K. Porter Co.,
    45 F.3d 737 (3d Cir. 1995) .............................................................. 19

In re UNR Industrial Inc.,
    20 F.3d 766 (7th Cir. 1994) .......................................................... 11, 15

In re Zenith Electrics Corp.,
    329 F.3d 338 (3d Cir. 2003) ................................................. 11, 13, 17, 18

**Statutes and Rules**

11 U.S.C. § 11 ............................................................................... 6

11 U.S.C. § 1109(b) ..................................................................... 20, 21

iii

Appellant Magten Asset Management Corporation ("Magten"), by and through its undersigned counsel, hereby submits this opposition and memorandum of law (the "Opposition") to (i) the motion (the "Motion to Dismiss") filed by NorthWestern Corporation ("NorthWestern"), to dismiss the consolidated appeals (the "Appeals"), and (ii) the joinder (the "Joinder") of the Plan Committee to the Motion to Dismiss. In support of this Opposition, Magten respectfully states as follows:[1]

## PRELIMINARY STATEMENT

Since August 2002, NorthWestern sought to deprive the creditors of its wholly-owned subsidiary, Clark Fork & Blackfoot LLC ("Clark Fork"), of any remedy for the fraudulent conveyance of the utility assets of Clark Fork to NorthWestern (the "Transfer"). At the time of the Transfer, NorthWestern hid its financial condition by using fraudulent financial statements (which it subsequently restated). Following the Transfer, NorthWestern filed for chapter 11 and tried to use the chapter 11 process to prevent the creditors of Clark Fork from obtaining an appropriate remedy. NorthWestern's Motion to Dismiss, which was filed while briefing was stayed pending a court ordered mediation, is simply the latest attempt by NorthWestern to deprive creditors of Clark Fork of their right to a full recovery.

By way of background, in August 2002, only 13 months before commencing its chapter 11 case, NorthWestern, as the sole member of Clark Fork, caused Clark Fork to transfer its utility assets (valued at between $1.15 billion and $1.4 billion) (the "Montana Utility Assets") to NorthWestern for no cash and only approximately $700 million of liabilities. At the time of the Transfer, NorthWestern's public financial statements overstated NorthWestern's revenue by

---

[1]    Pursuant to the Court's order dated June 6, 2005, the parties will be briefing the Motion to Dismiss and the merits of the Appeals separately. As such, in accordance with this Court's order, Magten, in this Opposition, does not address the merits of the Appeals. Magten will be submitting a separate brief with respect to the merits of the Appeals on or before July 15, 2005, in accordance with the stipulation and briefing schedule agreed to by the parties and approved by the Court.

$878 million and NorthWestern was not financially capable of performing its obligations under the indenture governing the QUIPS notes. The public, however, was not apprised of NorthWestern's true financial condition until eight months after the Transfer when NorthWestern publicly admitted that (i) the financials used in connection with the transfer were materially misleading[2] and (ii) NorthWestern was insolvent. Thus, holders of the Series A 8.45% Quarterly Income Preferred Securities (the "QUIPS") went from being creditors of a solvent entity to being creditors of an overleveraged insolvent entity. Due to NorthWestern's insolvency and false financials, holders of the QUIPS were denied their right to seek a full recovery against the transferred assets.

Throughout NorthWestern's chapter 11 case, Magten, on behalf of the trust holding the QUIPS, has sought to avoid the fraudulent conveyance of the Montana Utility Assets, and Magten and Law Debenture Trust Company of New York ("Law Debenture"), as Indenture Trustee for the Indenture governing the QUIPS, filed a complaint (the "Complaint") seeking to avoid the fraudulent transfer of the Montana Utility Assets (the "Fraudulent Conveyance Proceeding"). The Complaint survived a motion to dismiss and the bankruptcy court acknowledged that the claims in the Complaint "may have legs." Magten Ex. 231, p.9.

The Motion to Dismiss devotes nearly 50 pages to why this Court should dismiss the Appeals as equitably moot and attempts to characterize NorthWestern's Second Amended and Restated Plan of Reorganization (the "Plan") as a complicated series of transactions all of which

---

[2]    On April 16, 2003, NorthWestern issued a press release concerning the $878 million in negative charges. Magten Ex. 227, Ex. 4. Shortly thereafter, NorthWestern announced that the SEC has begun an ongoing investigation into these issues.
References to items identified in Magten's Amended Designation of Items to be Included in the Record on Appeal and Statement of Issues to be Presented on Appeal from the Order Confirming Debtor's Second Amended and Restated Plan of Reorganization under Chapter 11 of the Bankruptcy Code Entered on October 19, 2004 [Bankr. Docket No. 2335], are referred to as *"Magten Ex. __"*. References to items identified in NorthWestern's Designation of Additional Documents for the Record and Objection to Statement of Issues on Appeal [Bankr. Docket No. 2365], are referred to as *"NorthWestern Ex. __"*.

2

would have to be unwound to fashion relief in the Appeals. Although Magten does not dispute that the Plan has been substantially consummated, NorthWestern can feasibly provide Magten with a recovery on the full value of its claim – a $50 million allowed claim on account of the fraudulent conveyance – without unwinding the Plan. Magten and the holders of the QUIPS that chose to pursue the Fraudulent Conveyance Proceeding hold a disputed Class 9 Claim such that, if successful in the Fraudulent Conveyance Proceeding, the maximum recovery Magten can receive is $31.5 million (a $.63 recovery). Since NorthWestern has an enterprise value of nearly $1.8 billion, the additional $18.5 million ($.37 recovery) required to make Magten "whole" is negligible and can easily be satisfied by other sources of value without upsetting the Plan. NorthWestern can provide Magten with stock from the Class 9 disputed claims reserve (the "Disputed Claims Reserve"), issue new stock, and/or pay cash to satisfy the full value of Magten's claim. None of these options would prejudice any other creditors and none require the unraveling of the Plan. In light of the feasibility with which this Court can grant Magten relief, Magten should not be denied its appellate rights to pursue the merits of the Appeals.

Lastly, the Plan Committee has filed a Joinder to the Motion to Dismiss, however, the Plan Committee is not a "party aggrieved" by the Appeals and thus lacks standing to appear in this matter.

3

## STATEMENT OF THE CASE

A. Chapter 11 Proceeding

NorthWestern is a publicly traded Delaware corporation that was incorporated in 1923. NorthWestern, together with its direct and indirect non-debtor subsidiaries, comprise one of the largest providers of electricity and natural gas in the upper Midwest and Northwest regions of the United States, serving approximately 608,000 customers throughout Montana, South Dakota and Nebraska.

Magten holds in excess of 40% of the QUIPS issued by Montana Capital I (the "Trust"). The Trust is a business trust established pursuant to the Delaware Business Trust Act. The Trust was established by The Montana Power Company ("Montana Power"), predecessor in interest to Clark Fork (f/k/a NorthWestern Energy, LLC), as a financing vehicle. The only assets of the Trust are the 8.45% Junior Subordinated Debentures due 2036 issued by Montana Power.

On September 29, 2000, Montana Power entered into a unit purchase agreement with NorthWestern pursuant to which NorthWestern agreed to purchase the Montana Utility Assets. In order to facilitate the assets sale to NorthWestern, Montana Power created a subsidiary, Montana Power Company LLC.

On November 15, 2002, NorthWestern orchestrated the transfer of substantially all of the utility assets of its directly owned subsidiary, Clark Fork to NorthWestern for inadequate consideration. Though the Clark Fork assets had a value well in excess of $1 billion, the total consideration received for the Transfer was the assumption of approximately $700 million of liabilities by NorthWestern. As a result of this Transfer, Clark Fork was rendered insolvent.

At the time of the Transfer, NorthWestern's public filings contained misleading statements with respect to, among other things, loans totaling approximately $200 million made by NorthWestern to its non-utility subsidiary, Expanets Inc. ("Expanets"). Magten Ex. 227, Ex.

4

4. Although a portion of these loans were made as early as December 31, 2001, NorthWestern did not disclose these loans until September 2002, when it restated its financials for the fiscal year of 2001 and the first and second quarters of 2002.  In October of 2002, despite knowing that it should have written down the value of its loans to Expanets, NorthWestern completed a common stock offering and failed to disclose this information in its prospectus in connection with its securities offerings.

NorthWestern's failure to appropriately disclose the loans is made worse by the fact that both NorthWestern and its counsel signed its 10K for 2001 and 10Q's for the first three quarters of 2002 under certification that the financials fully complied with the Sarbanes Oxley Act.  On April 16, 2003, NorthWestern reported its financial results for the fiscal year ended ("FYE") 2002 – the year in which the Transfer occurred – and finally restated its previously unaudited quarterly results for the first three quarters of FYE 2002.  Appx. Ex. A (NorthWestern's 10K for the fiscal year ended Dec. 31, 2002).[3]  NorthWestern's restated financials indicated an additional $878.5 million in previously unreported "negative charges." Magten Ex. 227, Ex. 4, and Appx. Ex. A .  Specifically, NorthWestern publicly admitted that it was aware that its non-utility businesses, including its investment in Expanets, had for some time been underperforming, thereby resulting in the write down of the $205.7 million in loans to Expanets.  Appx. Ex. A. Immediately thereafter, the United States Securities and Exchange Commission (the "SEC") launched an informal investigation into NorthWestern's financial restatements.  This investigation became a formal investigation in December 2003, and is continuing.  Magten Ex. 164, p. 47.

---

[3]    Magten has contacted counsel to NorthWestern regarding the filing of a joint motion to designate additional items cited in the Motion to Dismiss and the Opposition that may not have originally been included in the record of the Appeals.  All references to items not specifically listed in Magten's or NorthWestern's designation of record, are included in the appendix and referred to as *"Appx. Ex __".*

On September 14, 2003, NorthWestern filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

In January 2004, Magten timely filed a proof of claim asserting, among other things, claims against NorthWestern for damages resulting from the fraudulent transfer of certain Montana utility assets to NorthWestern. Magten Ex. 219.

On March 11, 2004, NorthWestern filed its initial plan of reorganization and disclosure statement with the Bankruptcy Court, as well as its motion in support of the Disclosure Statement. Magten Exs. 13 and 14, respectively.

On May 14, 2004, NorthWestern filed its First Amended Plan and Disclosure Statement with the Bankruptcy Court (Magten Exs. 49 and 50, respectively), and on May 25, 2004, NorthWestern filed its revised First Amended Plan and Disclosure Statement. Magten Exs. 57 and 58, respectively. On May 26, 2004, the Bankruptcy Court approved the revised First Amended Disclosure Statement. Magten Ex. 59.

On August 9, 2004, Magten filed an objection to NorthWestern's First Amended Plan of Reorganization. Magten Ex. 110.

On August 19, 2004, four business days before the scheduled confirmation hearing, NorthWestern filed its Second Amended Plan and Disclosure Statement. Magten Exs. 128 and 129, respectively. On August 25, 2004, Magten filed an objection to the Second Amended Plan and Disclosure Statement. Magten Ex. 158. Due to this eleventh hour filing, which included substantive changes including the re-classification of the claims of the QUIPS – Magten sought and was granted an extension of time to object to the Plan. That same day, over the objections of Magten and Law Debenture, the Bankruptcy Court held a hearing with respect to NorthWestern's disclosure statement and began the confirmation hearing.

6

On August 31, 2004, NorthWestern filed its revised Plan and revised Second Amended and Restated Disclosure Statement (Magten Exs. 163 and 164, respectively), and on September 2, 2004, the Bankruptcy Court entered an order approving the Second Amended and Restated Disclosure Statement. Magten Ex. 167.

On September 21, 2004, Magten filed an objection to the Plan (Magten Ex. 180), and on October 6, 2004, the Bankruptcy Court continued the confirmation hearing with respect to the Plan. Magten Ex. 202. Subsequently, on October 8, 2004, the Bankruptcy Court held a teleconference during which the Bankruptcy Court confirmed the Plan over Magten and Law Debenture's objections. Magten Ex. 213.

On October 19, 2004, the Bankruptcy Court entered the Confirmation Order. Magten Ex. 203. Upon entry of the Confirmation Order, on October 22, 2004, Magten filed with the Bankruptcy Court an emergency motion for a stay pending appeal of the Confirmation Order to prevent the Plan from becoming effective. Magten Ex. 205. On October 25, 2004, the Bankruptcy Court held a hearing on the Emergency Motion and denied Magten's Emergency Motion. Magten Ex. 218. On October 25, 2004, Magten filed a notice of appeal of the Confirmation Order with the Bankruptcy Court. Magten Ex. 209.

Immediately thereafter, on October 26, 2004, Magten filed with this Court a motion to be heard on an emergency basis seeking to stay the Confirmation Order. Appx. Ex. B (Emergency Motion for Stay Pending Appeal of the Order Confirming the Debtor' `s Second Amended and Restated Plan of Reorganization, filed Oct. 26, 2004). On October 29, 2004, after oral argument, this Court denied Magten's motion for a stay.

On November 1, 2004, NorthWestern's Plan became effective (Magten Ex. 217), and on December 29, 2004, NorthWestern filed a Notice of Substantial Consummation of the Debtor's

7

Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy

Code. Appx. Ex. C (Notice of Substantial Consummation, Bankr. Dkt. No. 2519).

    B.  <u>Recovery to QUIPS Holders Under the Plan</u>

        Under the Plan, holders of the QUIPS did not receive the same recovery as the holders of

NorthWestern's other junior subordinated debt, but instead were required to choose between (i) a

recovery on account of their QUIPS holdings and forego any claim or right with respect to the

Fraudulent Conveyance Proceeding ("Option 1"), or (ii) a recovery in the Fraudulent

Conveyance Proceeding and receive no distribution on account of their QUIPS holdings

("Option 2"). Although the right to recover in the Fraudulent Conveyance Proceeding is separate

and apart from the right to be compensated in bankruptcy on account of the QUIPS claims,

NorthWestern forced the QUIPS holders to choose between two recoveries to which they are

rightfully entitled. This was a choice other similarly situated creditors were not required to

make.

        Magten elected Option 2 and received a Class 9 general unsecured claim and a pro rata

share of recoveries, if any, upon resolution of the Fraudulent Conveyance Proceeding. Pursuant

to Section 7.5 of the Plan, the QUIPS holders electing Option 2 received the benefit of the Class

9 Reserve established for disputed claims established.[4] In order to provide a mechanism to

protect the holders of disputed claims and to ensure that such holders were not prejudiced by

confirmation of the Plan prior to the final resolution of all disputed claims, NorthWestern was

---

[4]      On or about November 3, 2004, the Bankruptcy Court entered an order approving the Stipulation and Order Establishing a Disputed Claims Reserve (the "Stipulation") between NorthWestern and Law Debenture which provided that the Reorganized Debtor shall set aside a portion of its initial reserve of 13.5% of New Common Stock solely to satisfy in full a $25 million Class 9 claim of the QUIPS litigation claims holders. NorthWestern Ex. 6. Any claim by a QUIPS litigation claimant is to be afforded the treatment accorded Class 9 General Unsecured Claims, as set forth in the Plan. By its express terms, the Stipulation did not cap the recovery on account of the QUIPS Litigation Claim at $25 million claim. The Stipulation provided that an Allowed Claim in excess of $25 million would be satisfied from the Disputed Claims Reserve. NorthWestern Ex. 6.

required to assume (unless otherwise agreed or estimated by this Court) that the full amount of a disputed claim would become an allowed claim. Specifically, to accomplish this, the Plan required that NorthWestern set aside sufficient new common stock to ensure that once disputed claims are allowed, they would receive the same distribution as claims that were allowed at the time of confirmation.

Upon confirmation of the Plan, NorthWestern determined to set aside 13.5% of new common stock in the Disputed Claims Reserve to satisfy the requirements of the Plan.[5] Magten Ex. 210.

C. The Fraudulent Conveyance Proceeding

After NorthWestern filed its chapter 11 petition, the extent of the harm to the creditors of Clark Fork became clear. Instead of receiving a full recovery on account of their claim as they would have had the Transfer never occurred, it became clear that holders of the QUIPS would receive a minimal recovery under NorthWestern's Plan.

On March 17, 2004, Magten filed its motion for relief from the automatic stay to commence an adversary proceeding seeking to avoid the fraudulent transfer. Magten Ex. 17. On April 8, 2004, the Bankruptcy Court granted Magten's motion, thereby allowing Magten and Law Debenture to commence this adversary proceeding against NorthWestern. Magten Ex. 56,

---

[5]        As this Court is aware, the parties attempted to settle all outstanding litigation, however, NorthWestern rescinded the settlement agreement. Magten and Law Debenture filed a motion with the bankruptcy court seeking approval of the settlement agreement and the bankruptcy court ultimately determined not to approve the settlement, in part, because the Disputed Claims Reserve did not contain sufficient stock to pay Magten the full amount contemplated by the settlement agreement. NorthWestern's failure to adequately fund the Disputed Claims Reserve has led to further litigation in the bankruptcy court. Appx. Ex. D (Complaint to Revoke Order of Confirmation Pursuant to Section 1144 of the Bankruptcy Code and Rule 7001(5) of the Federal Rules of Bankruptcy Procedure and for Breach of Fiduciary Duty, Bankr. Case No. 05-50866, Docket No. 1). NorthWestern, in an effort to defend itself, has now stated that "the total amount in the Disputed Claims Reserve is sufficient to cover all disputed claims which are currently pending against the estate." Appx. Ex. E, p. 34 (Defendants' Motion to Stay Adversary Proceeding Pending Resolution of Appeal of Confirmation Order or, in the Alternative, to Dismiss Complaint, Bankr. Case No. 05-50866, Docket No. 7).

9

pp. 85-87.

On April 16, 2004, after this Court granted Magten and the Indenture Trustee relief from the automatic stay, Magten, together with the Indenture Trustee, filed a complaint against NorthWestern in the Bankruptcy Court on behalf of the holders of the QUIPS seeking to set aside the fraudulent conveyance of the Montana utility assets. Magten Ex. 224. The Fraudulent Conveyance Proceeding contends that Northwestern wrongfully appropriated certain assets of a subsidiary and that the holders of the QUIPS (as direct creditors of that subsidiary as well as NorthWestern) had the right to have their claims paid in full before those assets could be made available to satisfy the claims of NorthWestern's other creditors.

On May 14, 2004, NorthWestern filed a motion to dismiss the Complaint (Magten Ex. 225), and on June 16, Magten and Law Debenture submitted an objection to that motion and a memorandum of law in support of its objection. Magten Ex. 227. On June 28, 2004, NorthWestern filed a reply in further support of its motion to dismiss the Complaint. Magten Ex. 228.

On August 20, 2004, the Bankruptcy Court entered a decision denying in part the motion to dismiss on the ground that Magten and Law Debenture have standing as creditors of Clark Fork if Magten and Law Debenture can prove under applicable law that the release provided in Section 1102 of the Indenture was obtained through actual fraud or as part of a fraudulent scheme. Magten Ex. 231.

On October 4, 2004, Magten filed an amended complaint in the Fraudulent Conveyance Proceeding. Magten Ex. 232. Then, on November 17, 2004, Magten filed a motion with this Court seeking to withdraw the reference with respect to the Fraudulent Conveyance Proceeding (the "Withdrawal Motion"). The Withdrawal Motion is currently pending in this Court and the

10

bankruptcy court has stayed the Fraudulent Conveyance Proceeding because it determined that it had been divested of jurisdiction as a result of the filing of the Appeals. As such, at the time the Plan was filed (and later confirmed), the Fraudulent Conveyance Proceeding had not been resolved and, as a result, the QUIPS litigation claim was treated as a disputed claim.

## ARGUMENT

### I. The Appeals Are Not Equitably Moot

NorthWestern argues that the Appeals should be dismissed on grounds of equitable mootness, asserting that implementation of Magten's requested relief "would be wholly inequitable." Motion to Dismiss, p. 23. The equitable mootness doctrine, which NorthWestern is seeking to invoke, should not be invoked lightly but rather should be "limited in scope" and must be "cautiously applied." In re Cont'l Airlines, 91 F.3d 553, 559 (3d Cir. 1996) ("Continental I"). As the Third Circuit has explicitly noted, "the equitable mootness doctrine is to be applied only in order to 'prevent[] a court from unscrambling complex bankruptcy reorganizations when the appealing party should have acted before the plan became extremely difficult to retract.'" In re Zenith Elecs. Corp., 329 F.3d 338, 340 (3d Cir. 2003) (quoting Nordhoff Invs. v. Zenith Elecs. Corp. 258 F.3d 180, 185 (3d Cir. 2001)). In turn, courts have mandated that equitable mootness should be applied sparingly and, specifically, in circumstances where prudential reasons dictate that the court cannot provide some means of effective relief for the appealing party. See generally, Zenith Elecs. Corp. 329 F.3d at 340; Continental I, 91 F.3d at 559; In re UNR Indus. Inc., 20 F.3d 766, 769 (7th Cir. 1994).

Moreover, "a claimant should not be out of court on grounds of mootness solely because its injury is too great for the debtor to satisfy in full." Chateaugay Corp. v. LTV Steel Co. (In re Chateaugay Corp.), 10 F.3d 944, 954 (2d Cir. 1993) ("Chateaugay II"). Although courts "recognize the value of finality in bankruptcy proceedings and the need to afford reorganized

11

120087.01600/40154918v1

[debtors] a 'fresh start,' those considerations are not sufficient to moot this issue on appeal." Id. "In exercising its discretionary power to dismiss an appeal on mootness grounds, a court cannot avoid its obligation to scrutinize each individual claim, testing the feasibility of granting the relief against its potential impact on the reorganization scheme as a whole." In re AOV Indus. Inc., 792 F.2d 1140, 1148 (D.C. Cir. 1986). In that regard, courts are reluctant to dismiss an appeal on grounds of equitable mootness when a remedy can be fashioned. Because this Court can "equitably" provide Magten with effective relief without upsetting the Plan, the distributions made to creditors and NorthWestern's successful emergence as a reorganized entity, the equitable mootness doctrine is wholly inapplicable in this case.

In applying the doctrine of equitable mootness, the Third Circuit has enumerated five factors for determining whether the merits of a bankruptcy appeal should be considered. Continental I, 91 F.3d 553 at 560. These factors include:

> (1) whether the reorganization plan has been substantially consummated; (2) whether a stay has been obtained; (3) whether the relief requested would affect the rights of parties not before the court; (4) whether the relief requested would affect the success of the plan; and (5) the public policy of affording finality of bankruptcy judgments.

Id.

A review of these factors makes clear that these Appeals should not be dismissed as equitably moot.

A.    Substantial Consummation Does Not Moot the Appeals

While Magten does not dispute that NorthWestern has taken actions to complete distributions to holders of allowed claims under the Plan and thus has substantially consummated the Plan, this factor does not automatically render the Appeals moot nor does it preclude the Court from fashioning appropriate relief. Courts recognize that "substantial consummation of a

12

reorganization plan is a momentous event, but it does not necessarily make it impossible or inequitable for an appellate court to grant effective relief." Chateaugay II, 10 F.3d at 952. See also AOV Indus. 792 F.2d at 1148 (substantial consummation is "not a blanket discharge" of "judicial duty to examine carefully each request for relief"); In re Ionosphere Clubs, Inc., 184 B.R. 648, 651 (S.D.N.Y. 1995) ("substantial consummation of a plan does not necessarily make it impossible or inequitable for a reviewing court to grant relief."). "Orders confirming plans of reorganization do not become immune from appellate review upon their partial, or even substantial, implementation." Cent. States v. Cent. Transp., Inc., 841 F.2d 92, 96 (4th Cir. 1988)(citing In re AOV Indus., Inc. 792 F.2d at 1148-50).

Although NorthWestern heavily relies on Continental I to support its argument that relief cannot be granted in light of the substantial consummation of the Plan, NorthWestern's ignores the fact that in Continental I, the court recognized

> More significant to the Court's determination that the appeal was equitably moot, however, was the fact that 'a reversal of the order confirming the Plan likely would put Continental back into bankruptcy.' The Court's decision in that case, therefore, was based not merely on the fact that the plan had been substantially consummated in a definitional sense, but rather on the probability that granting the appeal would unravel the plan, upon which numerous parties were at that point in reliance.

In re Zenith Elecs. Corp., 329 F.3d at 344 (quoting Continental I, 91 F.3d at 561).[6]

Where relief can be granted without "unraveling" the plan, substantial consummation does not render an appeal moot. For example, in Chateaugay II, the Second Circuit found that despite the fact that the debtor's plan had been substantially consummated, the court could

---

[6]    Although the Court in Continental I determined that it could not fashion a limited remedy for the appellants, in Gillman v. Cont'l Airlines, 203 F.3d 203 (3d Cir. 2000) ("Continental II"), the court examined the merits of the appeal after determining that limited relief could be granted as it would not necessitate the reversal or unraveling of the entire plan of reorganization. In fact, in Continental II, the Court acknowledged that "even if successful, Plaintiffs' appeal should not threaten the entire reorganization."

13

"fashion effective relief … to the extent that can be done manageably and without imperiling

[the debtor's] fresh start." Chateaugay II, 10 F.3d at 953.  The Second Circuit went on to explain

that although full relief may no longer be available after substantial consummation, "we are

convinced that at least some effective relief could be granted." Id. at 954.  Similarly, in In re

PWS Holding Corp., 228 F.3d 224, 236 (3d Cir. 2000) (quoting In re Chateaugay Corp., 167

B.R. 776, 780 (S.D.N.Y. 1994)), despite affirming the confirmation order on the merits, the

Third Circuit determined that because a successful appeal would not "'knock the props out from

under the authorization for every transaction that has taken place,'" and there were "intermediate

options" short of undoing the entire plan, it declined to dismiss the appeal as equitably moot.

     Here, the Court can fashion relief that does not require unraveling the Plan.  As discussed

above, Magten currently holds a Class 9 Claim, which entitles Magten to a $.63 recovery on

account of its claim.  The delta between the $.63 recovery Magten is due to receive as a Class 9

claimant and the full recovery it would receive on account of the fraudulent conveyance is

merely $.37 – a total of $18.5 million.  Since emerging from chapter 11, NorthWestern has

settled some of its largest claims and has approximately $77 million of cash on hand.  In

addition, pursuant to the Plan, NorthWestern is authorized to issue 200 million shares of stock of

which, to date, it has issued less than 40 million shares. Magten Ex. 163, p. 46.  NorthWestern

can readily provide Magten with the value of its claim through a variety of available sources of

value.

    B.    Failure to Obtain a Stay is Not Dispositive

     The second Continental I factor – whether a stay has been obtained – does not preclude

the Court from granting relief.  It is widely recognized that even when a plan has been

substantially consummated, failure to obtain a stay does not automatically render any subsequent

appeal moot.  In re Best Prods., 68 F.3d 26, 29-30 (2d Cir. 1995); See, e.g., In re AOV Indus.

<center>14</center>

Inc., 792 F.2d at 1147 ("It is equally evident . . . that failure to secure a stay is not per se dispositive of all the issues before us."); City of Covington v. Covington Landing Ltd., 71 F.3d 1221, 1225-26 (6th Cir. 1995) ("The failure to seek a stay . . . is not necessarily fatal to the appellant's ability to proceed."); In re UNR Indus., 20 F.3d at 769-70 (the failure to seek a stay is not "a censurable event to be punished by refusal to adjudicate the merits"), cert. denied, 130 L. Ed. 2d 416, 115 S. Ct. 509 (1994); In re Club Assoc., 956 F.2d 1065, 1070 (11th Cir. 1992) ("the absence of a stay does not compel a finding of mootness in all cases."); In re Sun Valley Ranches, Inc., 823 F.2d 1373, 1375 (9th Cir. 1987) ("a debtor's failure to obtain a stay . . . followed by the sale of debtor's property, did not moot the debtor's subsequent appeal because the creditor-purchaser was before the court").

While Magten was unable to obtain a stay of the Confirmation Order, it is both significant and important to note that Magten *did seek* to stay the Confirmation Order both through emergency motions before the bankruptcy court and this Court. Courts have recognized that this Continental I factor "merely requires that the appellant seek a stay, not that she secure one." In re Lafayette Hotel Partnership, No.96-7476, 1997 WL 599386, at *5 (S.D.N.Y. Sept. 29, 1997). See also Chateaugay II, 10 F.3d at 954; Nordhoff Invs. v. Zenith Elecs. Corp. (In re Zenith Elecs. Corp.), 250 B.R. 207, 215 (D. Del. 2000) ("[a]s an 'equitable' factor . . . the failure to even seek a stay would seem to have significance beyond the mere failure to obtain a stay"). Accordingly, although Magten did not prevail in securing a stay, the "result certainly cannot be attributed to any lack of initiative." Chateaugay II, 10 F.3d at 954.

Furthermore, since, as discussed above, this Court can easily fashion appropriate relief for Magten without unraveling the Plan, Magten's failure to obtain the stay that it sought has not created an inequitable situation.

15

C.    The Court Can Fashion Effective Relief Without Affecting the Success of the Plan

As explained above, the doctrine of equitable mootness is narrowly tailored to apply in limited circumstances where it would be inequitable to fashion *any* kind of relief. Continental I, 91 F.3d at 559. An appeal is not moot "merely because a court cannot restore the parties to the status quo ante. Rather, when a court can fashion 'some form of meaningful relief,' even if it only partially redresses the grievances of the prevailing party, the appeal is not moot." Continental I, 91 F.3d at 558 (quoting RTC v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.), 16 F.3d 552, 560 (3d Cir. 1994) (in banc)). In that regard, the fourth Continental I factor weighs in favor of the Appeals not being equitably mooted because the Court can provide appropriate relief without affecting the success of the Plan.

NorthWestern is a $1.8 billion dollar enterprise with approximately $77 million of cash on hand. As previously noted, pursuant to the Plan, NorthWestern is authorized to issue 200 million shares of common stock and has issued less than 40 million shares to date. Magten Ex. 163, p.46. Thus, NorthWestern has more than an adequate number of shares to satisfy its obligations to Magten. Moreover, since consummation of the Plan, NorthWestern has used cash to pay down its debt, issued additional stock to its senior management under an employee incentive plan, and declared and issued dividends for its common stock – all without affecting the rights of third parties. Accordingly, while the Disputed Claims Reserve should have sufficient stock to provide Magten with a $31.5 million recovery on account of its $50 million claim, the remaining $18.5 million can be satisfied, with minimal consequence, through the issuance of a *de minimus* amount of stock, cash or any other available sources of value.

As the Second Circuit in Chateaugay II noted:

> It is difficult to conceive how a potential liability of, at most,
> several million dollars could unravel the Debtors' reorganization,

16

which involved the transfer of billions of dollars, and which has resulted in the revival of Debtors into a multibillion dollar operation with $200 million in working capital . . . appellees have made no showing that it would 'knock the props out from under the authorization for every transaction that has taken place and create an unmanageable uncontrollable situation for the Bankruptcy Court.'

In re Chateaugay, 167 B.R. 776, 780 (S.D.N.Y. 1994) (citing Chateaugay II 10 F.3d at 953). See also In re Zenith Elecs. Corp., 329 F.3d 338 (3d Cir. 2003) (finding that the amount of relief sought was "tiny" in the context of a reorganization of a company valued at $300 million, and thus the relief sought could be granted without unraveling the Plan). Similarly, in this case, it is clear that the Court can render effective relief without unraveling the entire Plan and creating an unmanageable and uncontrollable situation.

### D.   The Court Can Fashion Effective Relief Without Affecting the Rights of Third Parties

While courts must consider the effects of any relief on third parties, the dollar amount needed to satisfy Magten's claim is immaterial in the context of NorthWestern's reorganization. In that regard, in accordance with the third Continental I factor, and as explained in detail above, Magten can be afforded relief without any effect on parties not before the Court.[7]  Specifically, to satisfy Magten's claim, NorthWestern can use its available cash on hand, issue new stock or provide the value from any other available source.  In light of NorthWestern's financially sound condition, the Court has no reason to believe that the additional $18.5 million needed to make Magten "whole" will have any impact on the rights of third parties that may have relied on the Confirmation Order.  Hence, as demonstrated above, the Court can easily fashion relief for Magten without unraveling intricate transactions or disrupting the distributions already made.

---

[7]     Where all relevant parties are before the court and have had the opportunity to be heard on the issues, courts have held the fourth Chateaugay II factor to be satisfied. See Lafayette Hotel 1997 WL 599386 at *4; In re 183 Lorraine St. Assoc., 198 B.R. 16, 25 (E.D.N.Y. 1996).

17

E.    Public Policy Supports the Conclusion that the Appeals are Not Moot

"While courts should always be conscious of the impact their rulings will have on the development of the law, the Court's role is to decide the matters before it, based on the record before it." Lafayette Hotel, 1997 WL 599386 at *5.   NorthWestern, in asserting that public policy favors finality of bankruptcy orders, once again heavily relies on Continental I and Zenith – two cases in which the facts and circumstances made it impossible for the Court to fashion effective relief without unwinding the Plan.  However, when a form of effective relief can be fashioned, as is the case here, such relief should be granted rather than have an appellant "suffer the mootness of its appeal as a whole." Chateaugay II, 10 F.3d at 954 (citations omitted). Essentially, when relief is possible without unraveling the entire plan, plaintiffs or appellants, who have "never had their day in court" should not be "forced to forfeit their claims against non-debtors with no consideration." Continental II, 203 F.3d 211 ("In balancing the policy favoring finality of bankruptcy court judgments – particularly reorganization plans – against other considerations, we note as well that the equities here would not dictate dismissal."). See also In re Block Shim Dev. Company-Irving, 113 B.R. 256, 258 (N. D. Tex. 1990) ("The mootness doctrine is not to be applied in an uncritical manner, sweeping aside all claims on the basis of some that may be incapable of prompting effective appellate relief").

Because a holding in which this Court grants Magten the relief it is entitled to will be limited to the facts of this case, it is highly unlikely that such decision will "contribute to the gradual erosion of reliance on Bankruptcy Court orders." Lafayette 1997 WL 599386 at *5. Rather, "[i]n exercising its discretionary power to dismiss an appeal on mootness grounds, a court cannot avoid its obligation to scrutinize each individual claim, testing the feasibility of granting the relief against its potential impact on the reorganization scheme as a whole." In re AOV Indus., 792 F.2d at 1148.

18

II.     **The Plan Committee Does Not Have Standing to Join in the Appeals**

On June 10, 2005, the Plan Committee filed a Joinder to NorthWestern's Motion to Dismiss Appeals. The Plan Committee lacks standing to be heard and its Joinder should be disregarded.

Section 7.9 of NorthWestern's Plan creates the Plan Committee for "the purpose of overseeing the remaining Claims reconciliation and settlement process." Unlike the Official Committee of Unsecured Creditors that is a statutorily created body to protect the interests of creditors appointed by the United States Trustee, the Plan Committee is merely created by the Plan and is not vested with statutory duties to protect the rights and interests of creditors. Section 7.9 of the Plan specifically grants rights to the Plan Committee *only* with respect to the settlement process and does not grant the Plan Committee such a broad sweeping role in the administration of NorthWestern's estate. The Plan Committee's role is limited by section 7.9 of the Plan and it has no right to be heard in these appeals.

Even if the role of the Plan Committee fell within the scope of protecting the interests of creditors, the Third Circuit has established that appellate standing is generally limited to parties that are "aggrieved" by a bankruptcy court's decision. With the intentions of limiting third party standing for appeals in bankruptcy cases, the Third Circuit stated that

> We consider a person to be aggrieved only if the bankruptcy court's order "diminishes their property, increases their burdens, or impairs their rights." Thus, only those "whose rights or interests are directly and adversely affected pecuniarily" by an order of the bankruptcy court may bring an appeal.

In re PWS Holding Corp, 228 F.3d at 249 (quoting In re Dykes, 10 F.3d 184, 187 (3d Cir. 1993)) (internal citations omitted). See also In re ANC Rental Corp., 57 Fed. Appx. 912, 914 (3d Cir. 2003) ("appellate standing in bankruptcy cases is limited to 'persons aggrieved'"); Travelers Ins.

19

Co. v. H.K. Porter Co., 45 F.3d 737, 741 (3d Cir. 1995) ("'Efficient judicial administration requires that appellate review be limited to those persons whose interests are directly affected.'") (quoting In re Fondiller, 707 F.2d 441, 443 (9th Cir., 1983)); In re Dykes, 10 F.3d 184, 188 (3d Cir. 1993) ("we are satisfied that an appellant must qualify as a person aggrieved to be eligible for appellate review of a bankruptcy court order .... To appeal from an order of a bankruptcy court one must show that the order diminishes one's property, increases one's burdens or impairs one's rights."); Bartel v. Bar Harbor Airways, 196 B.R. 268, 271 (S.D.N.Y. 1995) ("To be a 'person aggrieved', the appellant must be 'directly and adversely affected pecuniarily by the challenged order'") (quoting In re Cosmopolitan Aviation Corp., 763 F. 2d 507, 513 (2d Cir. 1985), cert. denied 474 U. S. 1032 (1985)). The Third Circuit further noted that when considering appellant standing, "the 'person aggrieved' standard is more stringent than the constitutional test for standing." In re PWS Holding Corp., 228 F. 3d at 249. See also, In re O'Brien Envtl. Energy, Inc., 181 F. 3d 527, 530 (3d Cir. 1999).

The Plan Committee is not a "party aggrieved" such that its rights and interests are directly and adversely affected by the relief that can be afforded Magten in the Appeals. As previously noted, the Plan Committee is not an individual creditor nor is it a fiduciary for a creditor constituency.

Furthermore, the Plan Committee incorrectly asserts its right to submit the Joinder as a "party in interest" pursuant to section 1109(b) of the Bankruptcy Code.[8] Magten does not believe that the Plan Committee, with the very limited role it has been granted under the Plan, was intended to be a "party in interest" within the meaning in section 1109(b), with the right to raise,

---

[8]    Section 1109(b) of the Bankruptcy Code provides, in relevant part:

> [a] party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity securities holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter.

appear and be heard on any issue in NorthWestern's chapter 11 case. Nonetheless, even if the

Plan Committee is a "party in interest," as noted above, only a "party aggrieved" is conferred

standing in an appeal, not a mere "party in interest." As the Third Circuit has made clear,

although "[t]itle 11 U.S.C § 1109(b) . . . confers broad standing at the trial level . . . courts do not

extend that provision to appellate standing." In re PWS Holding Corp., 228 F.3d at 248-249. For

this reason, the Plan Committee's reliance on section 1109(b) is improper and the Plan Committee

does not have a right to be heard in the Appeals.

## CONCLUSION

As set forth in this Response, the Appeals are not equitably moot as this Court can

fashion effective relief without unwinding the Plan. Therefore, for the reasons stated herein,

Magten respectfully requests that the Motion to Dismiss be denied.

Dated: Wilmington, Delaware
       June 30, 2005

BLANK ROME LLP

Mark J. Packel (DE No. 4048)
Elio Battista, Jr. (DE No. 3814)
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone:  (302) 425-6400

-and –

FRIED, FRANK, HARRIS, SHRIVER &
     JACOBSON LLP
Bonnie Steingart, Esq.
Gary L. Kaplan, Esq.
One New York Plaza
New York, NY 10004
Telephone:  (212) 859-8000

Counsel for Magten Asset Management
     Corporation

21

# ATTACHMENT "1"

Westlaw.

Not Reported in F.Supp.

1997 WL 599386 (S.D.N.Y.)

(Cite as: 1997 WL 599386 (S.D.N.Y.))

Page 1

▷

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
In re: LAFAYETTE HOTEL PARTNERSHIP,
Debtor.
WHBA Real Estate Limited Partnership, Appellant,
v.
Lafayette Hotel Partnership, Debtor-Appellee.
Nos. 96 Civ. 7476 HB, 95 B 40682 BRL.

Sept. 29, 1997.
Harvey A. Strickon, Paul, Hastings, Janofsky &
Walker, LLP, New York City, for appellant.

Martin F. Brecker, Anderson, Kill & Olick, P.C.,
New York City, for debtor-appellee.

**OPINION AND ORDER**

BAER, J.

*1 WHBA Real Estate Limited Partnership
("WHBA") appeals from an Order of the
bankruptcy court, Lifland, B.J., confirming
Debtor-Appellee Lafayette Hotel Partnership's
("Debtor") reorganization plan. Debtor has moved
to dismiss the appeal as moot. Oral argument on
the motion to dismiss was held on July 11, 1997.
For the reasons discussed below, the motion to
dismiss is **DENIED**.

**BACKGROUND**

On February 16, 1995, the Debtor filed a petition
for reorganization under Chapter 11 of the
Bankruptcy Code. Debtor owned a Ramada hotel,
an adjacent restaurant and some vacant land. Until
it filed for bankruptcy, Debtor leased the hotel to

API and ran the restaurant under a franchise
agreement with Damon's Management ("Damon's").
WHBA had a $3.3 million claim against Debtor,
secured by two mortgages on Debtor's property.
WHBA had commenced a foreclosure action
against Debtor before Debtor filed for bankruptcy
protection.

The Bankruptcy Court made a factual finding that
Debtor's property was worth $2.4 million and
therefore determined that WHBA had a $2.4 million
secured claim against Debtor, and a $900,000
unsecured deficiency claim. On July 31, 1996, the
Bankruptcy Court entered an order ("Confirmation
Order") confirming the Debtor's First Amended
Plan ("Plan"), based upon the above findings
regarding WHBA's claims and over WHBA's
objection. The Plan called for: (i) a balloon
payment of the principal of WHBA's $2.43 million
secured claim in seven years, with interest payments
due over the seven year period; (ii) payment of *pro
rata* shares of $65,000 to all unsecured claimants,
the largest of which is WHBA, in each of the seven
years following confirmation; (iii) present payment
of administrative fees, priority claims, and
convenience creditors; (iv) payment of priority tax
claims plus interest over a six-year period; and (v)
execution of a new lease agreement between Debtor
and API for seven years, increasing API's rental
payments from their pre-petition levels. The Plan
also called for Debtor to lease to API both the hotel
and the restaurant, whereas only the hotel had been
leased previously. The substantive appeal by
WHBA relates to whether the Bankruptcy Court
properly classified various creditors in determining
whether the "cramdown" plan could be approved.

The Debtor and API entered into the seven-year
lease contemplated by the Plan. The parties disagree
as to whether this lease was entered into prior or
subsequent to the entry of the Confirmation Order.
Subsequently (on an unspecified date), the Debtor
and API jointly settled claims with Damon's.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

1997 WL 599386 (S.D.N.Y.)

(Cite as: 1997 WL 599386 (S.D.N.Y.))

Pursuant to this settlement, Damon's dropped its objections to the Plan, Debtor rejected its existing franchise agreement with Damon's, and API and Damon's entered into a franchise agreement which provided for API to pay Debtor's pre-petition defaults under the old franchise agreements.

Since Confirmation, the Debtor has also commenced interest payments on WHBA's secured claim (totalling $178,200 as of oral argument) and made other payments due under the Plan (convenience creditors, taxes, unsecured claims and attorneys' fees) totalling over $150,000. Furthermore, API has taken possession of the hotel and restaurant, made rental payments to the Debtor, spent in excess of $138,000 to finance improvements to the restaurant and approximately $146,000 in renovating the hotel (as of December 1996) and paid Damon's pursuant to the franchise agreement.

*2 On August 9, 1996, nine days after the Confirmation Order was entered by Judge Lifland, WHBA appealed from the Confirmation Order. WHBA, however, neither sought nor obtained a stay of enforcement of the Confirmation Order pending an appeal from either the Bankruptcy Court or this Court. On December 11, 1996, the Debtor moved to dismiss the appeal as moot and API, a party to the bankruptcy proceeding and this appeal, has joined in the motion.

*DISCUSSION*

The mootness doctrine in bankruptcy involves both constitutional and equitable concerns. *In re Best Products,* 68 F.3d 26, 29 (2d Cir.1995). The constitutional requirement of a "case or controversy" requires that an appeal be dismissed as moot when post-confirmation events makes it impossible to grant effective relief. *In re Chateaugay Corporation,* 988 F.2d 322, 325 (2d Cir.1993) ("Chateaugay I"). Equitable considerations, by contrast, require that an appeal be dismissed as moot when 'even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable.' " *Id.* (citations omitted). Thus, an appeal must be

dismissed as moot if effective relief is impossible to grant or if effective relief, though possible, would be inequitable. Most cases holding an appeal moot involve significantly more transactions than those at issue here or the distribution of assets to numerous non-parties. *See Chateaugay I,* 988 F.2d at 326 (appeal moot where funds distributed to pension plan beneficiaries; *Bartel v. Bar Harbor Airways,* 196 B.R. 268, 273 (appeal moot where assets liquidated and distributed); *In Re Best Products,* 177 B.R. 791, 805 (S.D.N.Y.1995) (appeal moot where debtor entered into thousands of transactions with third parties), *aff'd on other grounds,* 68 F.2d 26 (2d Cir.1995); *In Re Revere Copper and Brass, Inc.,* 78 B.R. 17, 21 (S.D.N.Y.1987) (appeal moot where debtor issued millions of shares of stock). Debtor does not contend that the appeal is constitutionally moot. Rather, the issue before the Court relates to equitable considerations only.

**A.** *Substantial Consummation*

The Debtor contends that the appeal from the Confirmation Order is moot because the Plan has been "substantially consummated." Substantial consummation is defined in the Bankruptcy Code as:
    (A) transfer of all or substantially all the property proposed by the plan to be transferred;
    (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; *and*
    (C) commencement of distribution under the plan.
11 U.S.C. § 1101(2) (emphasis added).

Whether a plan has been substantially consummated is a question of fact. 7 *Collier on Bankruptcy* at 1101-7 to 1101-8 (15th ed. revised 1997). Contrary to Debtor's contention, substantial consummation requires that all three § 1101(2) criteria be satisfied. *Id.* at ¶ 1102.02[2], at 1101-7. Here, the second and third criteria for substantial consummation are clearly met. API has assumed the management of the hotel and restaurant--the only property owned by the Debtor--and the Debtor has begun distributions under the Plan as described above.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I, *Elio Battista, Jr.*, certify that I am not less than 18 years of age, and that on June 30, 2005, I caused service of the attached *Memorandum of Law of Magten Asset Management Corporation in Support of Opposition to (I) Northwestern Corporation's Motion to Dismiss the Consolidated Appeals and (II) Joinder of Plan Committee to Northwestern Corporation's Motion to Dismiss* to be made on the parties listed below in the manner indicated.

Under penalty of perjury, I declare that the foregoing is true and correct.

Elio Battista, Jr

### BY HAND DELIVERY

Scott D. Cousins, Esquire
William E. Chipman, Jr., Esquire
Greenberg Traurig LLP
1000 West Street, Suite 1540
Wilmington, DE 19801

Kathleen M. Miller, Esquire
Smith, Katzenstein & Furlow LLP
800 Delaware Avenue, 7th Floor
Wilmington, DE 19801

Neil B. Glassman, Esquire
Charlene D. Davis, Esquire
The Bayard Firm
222 Delaware Avenue, 9th Floor
Wilmington, DE 19801

David L. Finger, Esquire
Finger & Slanina, P.A.
1201 Market Street, Suite 725
Wilmington, DE 19801

Office of the United States Trustee
844 King Street, Room 2313
Wilmington, DE 19801

### BY FIRST CLASS MAIL

Jesse H. Austin, III, Esquire
Karol K. Denniston, Esquire
Paul, Hastings, Janofsky & Walker LLP
600 Peachtreet Street, Suite 2400
Atlanta, GA 30308

Amanda Darwin, Esquire
John V. Snellings, Esquire
Nixon Peabody LLP
100 Summer Street
Boston, MA 02110

Alan W. Kornberg, Esquire
Margaret A. Phillips, Esquire
Paul, Weiss, Rifkind, Wharton &
   Garrison LLP
1285 Avenue of the Americas
New York, NY 10019

# EXHIBIT D

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 03-12872 (JLP) |
| NORTHWESTERN CORPORATION, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| MAGTEN ASSET MANAGEMENT CORPORATION | ) | |
| AND LAW DEBENTURE TRUST COMPANY | ) | |
| OF NEW YORK, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Adv. No. 05-50866(JLP) |
| NORTHWESTERN CORPORATION, GARY G. | ) | |
| DROOK, MICHAEL J. HANSON, BRIAN B. BIRD, | ) | |
| THOMAS J. KNAPP and ROGER P. SCHRUM. | ) | |
| | ) | |
| Defendants. | ) | |

**RESPONSE AND MEMORANDUM OF LAW OF MAGTEN ASSET MANAGEMENT CORPORATION AND LAW DEBENTURE TRUST COMPANY OF NEW YORK TO DEFENDANTS' MOTION TO STAY ADVERSARY PROCEEDING PENDING RESOLUTION OF THE APPEAL OF CONFIRMATION ORDER OR, IN THE ALTERNATIVE, TO DISMISS COMPLAINT**

FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP
One New York Plaza
New York, NY 10004
Telephone:  (212) 859-8000
Facsimile:  (212) 859-4000

-and-

BLANK ROME LLP
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone:    (302) 425-6400
Facsimile:    (302) 425-6464

Counsel for Magten Asset Management
Corporation

NIXON PEABODY LLP
100 Summer Street
Boston, MA 02110
Telephone: (617) 345-1000
Facsimile:  (617) 345-1300

-and-

SMITH, KATZENSTEIN & FURLOW, LLP
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 652-8400
Facsimile:  (302) 652-8405

Counsel for Law Debenture Trust Company of
New York

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ......................................................................................... 1

THE PARTIES TO THE 1144 ADVERSARY PROCEEDING ....................................... 4

BACKGROUND ................................................................................................................ 5

      A.    The Fraudulent Conveyance Proceeding ...................................................... 5

      B.    The Plan and the Disputed Claims Reserve ................................................. 6

      C.    Magten's Appeal of the Confirmation Order and the Effective Date of the
           Plan ............................................................................................................... 8

      D.    The Amended Fraudulent Transfer Complaint ............................................. 9

      E.    The Disclosure of the Fraud ...................................................................... 10

II.    THE MATTERS RAISED IN THE 1144 COMPLAINT ARE NOT RELATED
       TO THE MATTERS THAT ARE THE SUBJECT OF MAGTEN'S APPEAL OF
       THE CONFIRMATION ORDER ........................................................................ 13

III.   THE 1144 ADVERSARY PROCEEDING IS NOT EQUITABLY MOOT ......... 17

      A.    Application of the Equitable Mootness Doctrine to 1144 Proceedings is
           Contrary to the Plain Meaning of the Statute and Congressional Intent ..... 17

      B.    Even if the Doctrine of Equitably Mootness is Applicable to 1144
           Proceedings, Defendants have failed to demonstrate that this proceeding is
           equitably moot ............................................................................................ 20

IV.   PLAINTIFFS HAVE MET THEIR BURDEN OF PLEADING AND THE
       MOTION TO DISMISS SHOULD BE DENIED ................................................. 26

      A.    Plaintiffs have satisfied the motion to dismiss standard .............................. 26

      B.    Plaintiffs Have Stated a Sustainable Cause of Action Under Section 1144 of
           the Bankruptcy Code ................................................................................. 28

V.    NO WAIVER OF CLAIMS ................................................................................. 33

VI.   PLAINTIFFS HAVE SUFFICIENTLY STATED A CLAIM FOR BREACH OF
       DUTY AGAINST INDIVIDUAL DEFENDANTS ............................................. 34

VII.  DEFENDANTS HAVE NOT MOVED TO DISMISS DECLARATORY
       JUDGMENT ACTION.......................................................................................... 36

i

VIII.  CONCLUSION ...................................................................................................... 37

# TABLE OF AUTHORITIES

AOV Industrial, Inc., 792 F.2d 1140 (D.C. Cir. 1986) ..................................... 22, 24

Almeroth v. Innovative Clinical, Ltd., 302 B.R. 136 (Bankr. D. Del. 2003)... 20, 26

In re Armstrong World Industrial, Inc., No. 00-4471 2005 U.S. Dist.
    LEXIS 2810 (D. Del. Feb. 23, 2005) .................................................. 18

In re Best Products Co., 68 F.3d 26 (2d Cir. 1995) ................................ 24

Central States v. Central Trans., Inc., 841 F.2d 92 (4th Cir. 1988) ...................... 22

Chateaugay Corp. v. LTV Steel Co. (In re Chateaugay Corp.), 10 F.3d 944
    (2d Cir. 1993) ........................................................................ 22, 23,
                                                                                          25

In re Circle K Corp., 171 B.R. 666 (Bankr. D. Ariz. 1994) ........................... 20, 26

City of Covington v. Covington Landing Ltd., 71 F.3d 1221 (6th Cir. 1995) ....... 24

In re Club Associates, 956 F.2d 1065 (11th Cir. 1992) .......................... 24

Conley v. Gibson, 355 U.S. 41 (1957) ................................................. 29

In re Cont'l Airlines, 91 F.3d 553 (3d Cir. 1996) ........................... 18, 21

In re Cont'l Airlines, Inc., 148 B.R. 207 (D. Del 1992) ........................... 18

Gann v. Del. State Hospital, 543 F. Supp. 268 (D. Del. 1982) ...................... 29

Gillman v. Cont'l Airlines, ., 203 F.3d 203 (3d Cir. 2000) ..................... 22

Griffin v. Oceanic Contractors, Inc., 458 U.S. 564 (1982) ..................... 19

Griggs v. Provident Consumer Discount Co., 459 U.S. 56 (1982))
    (emphasis added .......................................................................... 14

Hishon v. King & Spalding, 467 U.S. 69 (1984) ................................... 28

In re Ionosphere Clubs, Inc., 184 B.R. 648 (S.D.N.Y. 1995) ................ 22

Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc., 677
   F.2d 1045 (5th Cir. 1982) ................................................................................. 29

In re Keene Corp., 166 B.R. 31 (Bankr. S.D.N.Y. 1994)........................................ 14

Mary Ann Pensiero, Inc. v. Lingle, 847 F.2d 90 (3d Cir. 1988) ............................ 14

In re Mazzocone, No. 94-5068, 1995 U.S. Dist. LEXIS 3218 (E.D. Pa.
   Mar. 15, 1995).................................................................................................. 16

Manufacturers Finance Co. v. McKey, 294 U.S. 442 (1935) ................................. 26

Montclair v. Ramsdell, 107 U.S. 147 (1883) ......................................................... 19

In re NII Holdings, Inc., 288 B.R. 356 (Bankr. D. Del. 2002)............................... 30

In re NVF Co., 309 B.R. 698 (Bankr. D. Del. 2004) ............................................. 31

Nordhoff Investments, Inc. v. Zenith Electrics Corp. (In re Zenith Electrics
   Corp.), 250 B.R. 207 (D. Del. 2000) ................................................................ 25

Official Committee of Hechinger Investment Co. of Del. v. Fleet Retain
   Finance Group, 274 B.R. 71 (D. Del. 2002)..................................................... 35

Seminole Tribe of Fla. v. Florida, 517 U.S. 44 (1996) .......................................... 14

In re Servico, Inc., 161 B.R.  297 (S.D. Fla. 1993)................................................. 20

In re St. Clair, 251 B.R. 660 (Bankr. D.N.J. 2002) ................................................ 14

In re Sun Valley Ranches, Inc., 823 F.2d 1373 (9th Cir. 1987).............................. 24

TRW Inc. v. Andrews, 534 U.S. 19 (2001).............................................................. 19

Tenn-Fla Partners v. First Union National Bank of Fla., 226 F.3d 746 (6th
   Cir. 2000) .......................................................................................................... 30

Trivits v. Wilmington Institute, 383 F. Supp. 457 (D. Del. 1974) ......................... 29

In re UNR Industrial, Inc., 20 F.3d 766 (7th Cir. 1994) .................................. 18, 24

United States v. America Trucking Associations, 310 U.S. 534 (1940)................. 19

iv

United States v. Cooper, 396 F.3d 308 (3d Cir. 2005).............................. 19

United States v. Locke, 471 U.S. 84 (1985)......................................... 20

United States v. Menasche, 348 U.S. 528 (1955).................................. 19

United States v. Ron Pair Enterprises, Inc., 489 U.S. 235 (1989) ......................... 18

In re Zenith Electrics Corp., 329 F.3d 338 (3d Cir. 2003) .............................. 18, 21, 22

## STATE CASES

Geyer v. Ingersoll Publ'ns Co., 621 A.2d 784 (Del. Ch. 1992).............................. 35

In re Lafayette Hotel Partnership, No. 96-7476, 1997 WL. 599386 (S.D.N.Y. Sept. 29, 1997)...................................... 25

Prod. Resources Group, L.L.C. v. NCT Group, Inc., 863 A.2d 772 (Del. Ch. 2004)................................................ 35

Production Resources Group, 863 A.2d 800........................................ 36

## FEDERAL STATUTES

11 U.S.C. § 1101(2)............................................................... 20

11 U.S.C. § 1123(a)(4) ........................................................... 30

11 U.S.C. § 1129(a)(1) ........................................................... 30

11 U.S.C. § 1129(a)(3) ........................................................... 31

11 U.S.C. § 1144 ................................................................ 18

11 U.S.C. § 1144(1).............................................................. 19

Fed. R. Civ. P. 12(b)(6) .......................................................... 29

## MISCELLANEOUS

Collier on Bankruptcy § 1123.01 (15th ed. rev'd 2005)............................ 31

v

Court. <u>Kaplan Decl. Ex. 10</u> at ¶66 .......................................................................... 12

The Public Utility Holding Company Act of 1935 ................................................ 15

Wright and Miller, <u>Fed. Practice and Procedure</u>: Civil 2d § 357, at 321
    (1990) ................................................................................................................ 27

Magten Asset Management Corporation ("Magten") and Law Debenture Trust Company of New York, as Indenture Trustee ("Law Debenture" and together with Magten, "Plaintiffs") hereby submit this response and memorandum of law (the "Response") to the motion (the "Motion to Stay/Dismiss") filed by NorthWestern Corporation ("NorthWestern"), Gary G. Drook, Michael J. Hanson, Brian B. Bird, Thomas J. Knapp and Roger P. Schrum (collectively, the "Individual Defendants" and together with NorthWestern, the "Defendants") to stay the above captioned adversary proceeding (the "1144 Adversary Proceeding") pending resolution of Magten's appeal of the Order Confirming NorthWestern's Second Amended and Restated Plan of Reorganization (the "Confirmation Order") or in the alternative dismissing the 1144 Adversary Proceeding, with prejudice. In support of this Response, Plaintiffs respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The gravamen of the complaint underlying the 1144 Adversary Proceeding (the "1144 Complaint") is that by underfunding the Disputed Claims Reserve,[1] NorthWestern procured the Confirmation Order by fraud, with the aid and complicity of certain of the senior management of NorthWestern. Nowhere in their Motion to Stay/Dismiss do the Defendants claim that the Disputed Claims Reserve was funded in accordance with the requirements of the Plan and the Confirmation Order. Rather, Defendants argue that Magten's appeal of the Confirmation Order has divested this Court of jurisdiction to consider "any matters relating to the Confirmation Order," including the 1144 Complaint. Motion to Stay/Dismiss at p. 3.

2.      Defendants' argument fails because it proves too much. Magten appealed the Confirmation Order on various grounds, none of which even remotely relate to the Disputed Claims Reserve or the allegations of fraud in the 1144 Complaint. See Declaration of Gary L. Kaplan Exhibit 1 at pp. 13-14 (hereinafter "Kaplan Decl. Ex. ___"). Indeed, the issues raised by

---

[1]      All capitalized terms not expressly defined herein have the meaning ascribed to them in NorthWestern's Second Amended and Restated Plan of Reorganization (the "Plan"). A copy of the Plan is attached to the Motion to Stay/Dismiss as Exhibit D. Hereinafter, all references to exhibits attached to the Motion to Stay/Dismiss are referred to as ("Defendants' Ex. ___").

the 1144 Complaint did not even come to light until [five] months after the entry of the
Confirmation Order.[2]  To hold that the appeal of a confirmation order deprives this Court
jurisdiction to consider any matters relating to the Confirmation Order, means that this Court is
deprived of jurisdiction to settle claims disputes, or permit distributions from the Disputed
Claims Reserve established by the Confirmation Order.  Defendants' argument regarding
deprivation of jurisdiction should be seen for what it really is – an attempt to delay having the
merits of the 1144 Complaint heard, so that NorthWestern can later argue that the passage of
time and intervening event, have rendered the complaint moot.

       3.      Similarly, so as to avoid scrutiny into NorthWestern's funding of the Disputed
Claims Reserve, Defendants argue that the 1144 Complaint cannot be heard because it is
equitably moot.  <u>Motion to Stay/Dismiss</u> at pp. 22-28.  Defendants' argument, however, ignores
the plain language of the section 1144 of the Bankruptcy Code which includes a protection for
third parties that have relied upon a confirmation order.  Thus, the potential concerns that result
in the application of the equitable mootness doctrine are inapplicable.  Moreover, as set forth in
greater detail below, this Court can readily fashion a remedy for Plaintiffs that will satisfy both
Section 1144 of the Bankruptcy Code and the doctrine of equitable mootness.  Since
NorthWestern has an enterprise value of nearly $1.8 billion, the additional recovery required to
make Plaintiffs "whole" is negligible and can easily be satisfied by other sources of value
without upsetting the Plan.  NorthWestern can feasibly provide Plaintiffs with a recovery on the
full value of its claim – a $50 million Allowed Claim – without unwinding the Plan.
NorthWestern can issue New Common Stock to satisfy Plaintiffs' claims, and/or pay cash to
satisfy the full value of these claims.  None of these options would prejudice any other creditors
and none require the unraveling of the Plan.

---

[2]      Prior to this revelation, NorthWestern contended that the holders of Disputed Claims were protected
because "there is more than enough reserve being set aside in the Class 9 reserve pool for Class 9
unsecured claims."  <u>Kaplan Dec. Ex. 2</u> at p. 35.

4.    The 1144 Complaint states that despite the clear requirements set forth in the Plan and the Confirmation Order regarding the establishment and funding of the Disputed Claims Reserve – requirements suggested by NorthWestern and ultimately adopted by this Court – the Defendants ignored those requirements and intentionally underfunded the Disputed Claims Reserve with the aid and complicity of the Individual Defendants, several of whom are seeking to have their own claims satisfied from that very reserve. NorthWestern's non-compliance with the exact terms of the Plan and Disclosure Statement is undisputed. Nowhere in its Motion to Stay/Dismiss does NorthWestern claim to have complied with the terms thereof or set forth the procedures that were undertaken to comply. Instead, NorthWestern seeks to make excuses for its noncompliance and cites the fast pace with which items were developing on the eve of Confirmation and claims that any underfunding was merely a mistake. Motion to Stay/Dismiss at pp. 32, 34. NorthWestern's argument adds insult to injury. Since NorthWestern set the schedule for confirmation, it is disingenuous for NorthWestern to argue that the "fast-paced, constantly evolving circumstances" surrounding the confirmation effected its ability to adequately fund the Disputed Claims Reserve. Motion to Stay/Dismiss at p. 34.

5.    More, importantly, NorthWestern's excuses for failing to comply with the requirements of the Plan are not defenses and do not satisfy the Defendants' heavy burden in a motion to dismiss. The establishment of the reserve was not complicated and NorthWestern, working with the claims agent, knew the maximum claim amount under the Plan. When NorthWestern elected to underfund the Disputed Claims Reserve, without advising the Court or its creditors, NorthWestern knowingly defrauded the Court and its creditors.[3] Had NorthWestern advised the Court that it would not be funding the Plan as required, this court would not have entered the Confirmation Order.

---

[3]    The Creditors' Committee and its advisors, which had a duty to ensure that the Disputed Claims Reserve was funded in accordance with the terms of the Plan, were incentivized to have a smaller reserve than required by the Plan. The Creditors' Committee was largely comprised of holders of Class 7 Claims – Allowed Unsecured Note Claims – which were Allowed on the Effective Date. If NorthWestern had established and funded the Disputed Claims Reserve in accordance with the terms of the Plan, many or the members if the Creditors' Committee would have received a smaller recovery at the outset.

6.      Similarly, the Individual Defendants owed Plaintiffs a fiduciary duty to ensure that NorthWestern complied with the terms of the Plan and the Confirmation Order. Not only did they obviously fail to do so, but they are now also engaging in self-dealing by seeking to have their own claims satisfied from the Disputed Claims Reserve after this Court determined that it would be "imprudent" to satisfy Plaintiffs' claim in full by virtue of the underfunding of the Disputed Claims Reserve. Defendants' Ex. P at p. 6. On its face, the 1144 Complaint states sufficient wrongdoing on the part of the Individual Defendants to proceed with discovery. In addition, because Defendants have raised no objection to the Third Cause of Action in the 1144 Complaint, for a declaratory judgment, that cause of action must proceed.

## THE PARTIES TO THE 1144 ADVERSARY PROCEEDING

7.      Magten is a corporation validly organized and doing business under the laws of the State of Delaware. Magten holds in excess of 33% of the Series A 8.45% Quarterly Income Preferred Securities (the "QUIPS").

8.      Law Debenture is a limited purpose trust company duly organized under the laws of the State of New York. Law Debenture is the Indenture Trustee, the Property Trustee and the Guaranty Trustee for the Indenture Underlying the QUIPS.

9.      On September 14, 2003, NorthWestern filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. NorthWestern is a corporation validly organized under the laws of the State of Delaware, with its headquarters and principal place of business in South Dakota. NorthWestern owns and operates utility companies in the United States. NorthWestern and its direct and indirect non-debtor energy subsidiaries comprise one of the largest providers of electricity and natural gas in the upper Midwest and Northwest regions of the United States, serving approximately 600,000 customers throughout Montana, South Dakota and Nebraska.

10.     Gary G. Drook ("Drook") was Chief Executive Officer of NorthWestern from January 2003 until March 2005. Drook was also the President of NorthWestern from August 2003 until March 2005.

4

11.    Michael J. Hanson ("Hanson") was the Chief Operating Officer of NorthWestern from August 2003 until March 2004. Beginning in March 2004, Hanson became President of NorthWestern.

12.    Brian B. Bird ("Bird") has been the Chief Financial Officer of NorthWestern since December 2003.

13.    Thomas J. Knapp ("Knapp") has been General Counsel of NorthWestern since November 2004.

14.    Roger P. Schrum ("Schrum") has been NorthWestern's Vice-President of Human Resources and Communications since December 2003.

## BACKGROUND

### A.    The Fraudulent Conveyance Proceeding

15.    In January 2004, Plaintiffs each timely filed proofs of claim asserting, among other things, claims against NorthWestern for damages resulting from the fraudulent transfer of certain Montana utility assets to NorthWestern. 1144 Complaint at ¶22; Motion to Stay/Dismiss at ¶13.

16.    On April 16, 2004, after this Court granted Plaintiffs relief from the automatic stay, they filed a complaint (the "Fraudulent Conveyance Complaint") against NorthWestern in the Bankruptcy Court on behalf of the holders of the QUIPS seeking to set aside the fraudulent conveyance of the Montana utility assets to NorthWestern (the "Fraudulent Conveyance Proceeding"). 1144 Complaint at ¶23; Motion to Stay/Dismiss at ¶14.

17.    On May 14, 2004, NorthWestern filed a motion to dismiss the Fraudulent Conveyance Proceeding. Following completion of briefing, on August 20, 2004, the Court denied NorthWestern's motion to dismiss. At the time the Plan was filed (and later confirmed), the Fraudulent Conveyance Proceeding had not been resolved and, as a result, the QUIPS Litigation Claim was treated as a Disputed Claim under the Plan. 1144 Complaint at ¶24; Motion to Stay/Dismiss at ¶¶16, 18.

5

B.    **The Plan and the Disputed Claims Reserve**

18.    NorthWestern filed a revised plan on August 18, 2004, on the eve of the Confirmation Hearing, which was scheduled to begin on August 25, 2004.[4] Due to this eleventh hour filing, which included substantive changes including the re-classification of the claims of the QUIPS – Plaintiffs sought and were granted an extension of time to object to the Plan.

19.    The Plan required the holders of the QUIPS choose between (i) a 14.3% recovery and forfeit their right to pursue the Fraudulent Conveyance Proceeding or (ii) pursuing the Fraudulent Conveyance Proceeding, which, if successful, would result in those holders receiving an Allowed Class 9 Claim to be satisfied from the Disputed Claims Reserve. Defendants' Ex. D, at § 4.8(b)(ii);  1144 Complaint at ¶25; Motion to Stay/Dismiss at ¶23.

20.    Section 7.5 of the Plan, entitled "Establishment and Maintenance of Reserve for Disputed Claims" required NorthWestern to "maintain the Disputed Claims Reserve equal to the aggregate of any distributable amount of Cash and New Common Stock equal to the relevant percentage of Distributions to which holders of Disputed Claims would be entitled under this Plan if such Disputed Claims were Allowed Claims in the amount of such Disputed Claim or such lesser amount as required by Final Order." The Plan further provided that the only method by which an amount less than the full amount of a Disputed Claim could be reserved by NorthWestern was if either the Bankruptcy Court estimated the amount of such Disputed Claim or NorthWestern and the holder of a Disputed Claim agreed in writing. Defendants' Ex. D at § 7.5; 1144 Complaint at ¶26; Motion to Stay/Dismiss at ¶22.

21.    In papers filed with this Court, NorthWestern specifically represented that the Plan met the requirements of the Bankruptcy Code and did not unfairly discriminate against those holders of the QUIPS that chose to pursue the Fraudulent Conveyance Proceeding. See Kaplan Decl. Ex. 3 at p. 13; 1144 Complaint at ¶27. For a plan of reorganization not to discriminate against a dissenting class, the members of the dissenting class must be provided with the value provided to all other similarly situated classes. Thus, the holders of the QUIPS

---

[4]    This plan was subsequently amended and a revised version was filed on August 31, 2004.

that chose to pursue the Fraudulent Conveyance Proceeding hold a Disputed Class 9 Claim such that, if successful in the Fraudulent Conveyance Proceeding, the holders of the QUIPS Litigation Claims must be provided with the same value as the other holders of Allowed Class 9 Claims. 1144 Complaint at ¶27.

22.    On September 21, 2004, Magten and Law Debenture filed separate objections to the Plan.

23.    The Confirmation Hearing continued on October 6, 2004. During the confirmation hearing on October 6, 2004, counsel for NorthWestern represented to this Court that consistent with its obligation under the Plan, it would "put into the Class 9 reserve an amount for the claim that would hold back a certain level of the stock for the eventuality that the litigation may well result in a favorable judgment for those QUIP holders that are pursuing the litigation." Kaplan Decl. Ex. 4 at pp. 233-234; 1144 Complaint at ¶28.

24.    In its oral ruling confirming the Plan held on October 8, 2004 (the "Oral Ruling"), this Court found that the QUIPS Litigation Claim was a disputed unsecured claim that was entitled to a reserve consistent with Section 7.5 of the Plan, such that if the Fraudulent Conveyance Proceeding is successful, holders of the QUIPS Litigation Claim will receive the distribution provided to holders of Allowed Class 9 Claims. See Kaplan Decl. Ex. 5 at pp. 30, 39; 1144 Complaint at ¶29.

25.    On October 13, 2004, counsel for NorthWestern submitted a certification of counsel and draft confirmation order to this court (the "Draft Confirmation Order"). This Draft Confirmation Order required NorthWestern to "establish an initial reserve of 13.5% of New Common Stock allocated to Class 7 and Class 9 for the Disputed Claims Reserve. . .pursuant to Section 7.5 of the Plan." Kaplan Decl. Ex. 6 at ¶27; 1144 Complaint at ¶30. At all times during the confirmation hearing and the confirmation process, the information regarding the methodology for establishing the reserve and the sufficiency of the reserve was solely in NorthWestern's possession and control. 1144 Complaint at ¶30.

<div align="center">7</div>

26.     The 13.5% reserve proposed by NorthWestern in the Draft Confirmation Order was predicated on representation that 13.5% of the stock was an amount equal to the relevant percentage of Distributions to which the holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims in the amount of such Disputed Claim or such lesser amount as required by Final Order, as required by Section 7.5 of the Plan. 1144 Complaint at ¶31.

27.     On October 19, 2004, this Court entered the Confirmation Order, which like the Draft Confirmation Order suggested by NorthWestern, required NorthWestern to "establish an initial reserve of 13.5% of New Common Stock allocated to Class 7 and Class 9 for the Disputed Claims Reserve. . .pursuant to Section 7.5 of the Plan." Defendants' Ex. C at ¶27; 1144 Complaint at ¶32.

### C.     Magten's Appeal of the Confirmation Order and the Effective Date of the Plan

28.     On October 22, 2004, Magten requested that this Court stay the effectiveness of the Confirmation Order pending Magten's appeal thereof (the "Confirmation Appeal"). On October 25, 2004 this Court held a hearing on that motion and declined to issue a stay. In denying Magten's motion for a stay pending appeal, this Court again found that "just like any other Creditor of claimant of an unsecured nature in class 9, that [the QUIPS Litigation Claims holders] would be entitled to have a disputed claim reserve amount determined, either by stipulation or by the Court in accordance with Section 7.5 of the Plan." Kaplan Decl. Ex. 7 at p. 28; 1144 Complaint at ¶34. This Court also went on to find that because the holders of the QUIPS Litigation Claims were being protected by being included in the Disputed Claims Reserve, Magten and the other holders of the QUIPS were being treated fairly and "for that reason there is – there has been an inadequate showing of irreparable harm…" Kaplan Decl. Ex. 7 at p. 29; 1144 Complaint at ¶35.

29.     On October 26, 2004, Magten filed a motion with the United States District Court for the District of Delaware (the "District Court") seeking to stay the effectiveness of the

8

Confirmation Order pending the resolution of Magten's appeal therefrom. The District Court held a hearing on the motion on October 29, 2004 and denied Magten's request for a stay.[5] At that hearing, counsel for NorthWestern expressly represented to the District Court that "there is more than enough reserve being set aside in the Class 9 reserve pool for Class 9 unsecured claims." See Kaplan Decl. Ex. 2 at p. 35; 1144 Complaint at ¶37.

30.     Also, on October 29, 2004, NorthWestern and Law Debenture entered into a stipulation (the "Stipulation"), whereby NorthWestern agreed to set aside a portion of the Disputed Claims Reserve "solely to satisfy in full a $25 million Class 9 claim of the QUIPS Litigation Claims holders (the "QUIPS Claims Reserve")" and set forth the rights of the QUIPS Litigation Claims holders to recover on account of an Allowed Claim in excess of that amount. Defendants' Ex. M at p. 2 ¶1; 1144 Complaint at ¶38; Motion to Stay/Dismiss at ¶35. By its express terms, the Stipulation did not cap the recovery on account of the QUIPS Litigation Claim at $25 million claim. The Stipulation provided that an Allowed Claim in excess of $25 million would be satisfied from the Disputed Claims Reserve. Defendants' Ex. M at p. 3 ¶¶1,3; 1144 Complaint at ¶38; Motion to Stay/Dismiss at ¶36.

31.     The Plan became effective on November 1, 2004. 1144 Complaint at ¶40; Motion to Stay/Dismiss at ¶39.

### D.     The Amended Fraudulent Transfer Complaint

32.     On October 4, 2004, Plaintiffs filed an Amended Complaint in the Fraudulent Conveyance Adversary Proceeding (the "Amended Fraudulent Transfer Complaint").

33.     On November 3, 2004, NorthWestern filed a Motion to Dismiss the Amended Fraudulent Transfer Complaint (the "Second Motion to Dismiss"). In their opposition to the

---

[5]     On January 3, 2005, Magten's appeal of the Confirmation Order was referred to mediation pursuant to that certain standing order of the District Court Establishing Procedures to Govern Mediation of Appeals from Bankruptcy Court dated as of July 23, 2004 (the "Standing Order"). Kaplan Decl. Exs. 8, 9. As a result of the entry of the Referral Order, the briefing of Magten's appeal of the Confirmation Order was stayed. On March 10, 2005, in violation of the Standing Order and Referral Order, NorthWestern filed a Motion to Dismiss Magten's Appeal of the Confirmation Order. Subsequently, the parties to the various pending appeals agreed to a comprehensive briefing schedule of all District Court appeals.

Second Motion to Dismiss, Plaintiffs argued that this Court was divested of jurisdiction to consider certain issues, to the extent that such issues may be the same issues raised by the appeal of the Confirmation Order.

34.    On December 7, 2004, this Court issued an order staying its decision on the Second Motion to Dismiss until Magten's appeal of the Confirmation Order had been resolved and holding that under applicable authority, this Court was divested of its control of those aspects of the Fraudulent Transfer Proceeding involved in the appeal. Defendants' Ex. B at p. 3.

### E.    The Disclosure of the Fraud

35.    On December 29, 2004, NorthWestern filed a Notice of Substantial Consummation of the Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Substantial Consummation Notice"). In Section 4(b) of the Substantial Consummation Notice, NorthWestern claims to have reserved 4,409,100 shares of New Common Stock in accordance with Section 7.5 of the Plan. Defendants' Ex. M at § 4(b); 1144 Complaint at ¶41.

36.    On January 27, 2005, Magten, Law Debenture as Indenture Trustee for the QUIPS and NorthWestern executed a settlement agreement whereby the Fraudulent Conveyance Proceeding and all other litigation between the parties would come to an end (the "Settlement Agreement"). 1144 Complaint at ¶42; Motion to Stay/Dismiss at ¶45. Pursuant to the terms of the Settlement Agreement, the holders of the QUIPS were to receive (i) 382,732 shares of common stock at the reorganization plan value of $20.00 per share ("Plan Value") and the 710,449 warrants and (ii) the shares segregated as the QUIPS Claims Reserve plus an additional $300,000 of common stock of reorganized NorthWestern at Plan Value. The Settlement Agreement provided the holders of the QUIPS with an amount less than they would be entitled to recover if the Fraudulent Conveyance Proceeding is successful. 1144 Complaint at ¶42; Motion to Stay/Dismiss at ¶46.

37.     Based on the terms of the Settlement Agreement, if approved, the holders of the QUIPS Litigation Claims would have received a total of 1,252,732 shares of New Common Stock (excluding warrants), with a Plan Value of $25,054,640.  This amount represents a 50.1% recovery on account of the QUIPS Litigation Claim, significantly below the 63% recovery that the holders of such claims would recover if their Disputed Claims were Allowed in full.[6]  The Settlement Agreement not only provided the holders with the QUIPS with a recovery significantly less than the full $50 million Allowed Claim to which they would have been entitled if the Fraudulent Conveyance Proceeding was successful, but also settled nine other outstanding litigations between NorthWestern, Plaintiffs, and related parties.  1144 Complaint at ¶43; Motion to Stay/Dismiss at ¶46.

38.     After NorthWestern disavowed the Settlement Agreement, Plaintiffs filed a joint motion seeking this Court's approval of the Settlement Agreement pursuant to Bankruptcy Rule 9019 (the "9019 Motion"), in order to enforce the terms of the Settlement Agreement.  1144 Complaint at ¶44; Motion to Stay/Dismiss at ¶¶49-50.

39.     On March 8, 2005, this Court held a hearing on the 9019 Motion (the "9019 Hearing") wherein the Debtor acknowledged that it has approximately 200 claims that are seeking recovery from the Disputed Claims Reserve such that the 382,732 shares of common stock that were the primary subject of NorthWestern's 9019 Objection could not be allocated to the holders of the QUIPS from the Disputed Claims Reserve.  Defendants' Ex. O at p. 44; 1144 Complaint at ¶44.

40.     Based upon NorthWestern's objection to the 9019 Motion (the "9019 Objection") and the arguments presented at the hearing, it became apparent that in establishing and funding the Disputed Claims Reserve, NorthWestern failed to reserve the maximum claim amount asserted by holders of Disputed Claims, as required by the Plan.  Specifically, NorthWestern

---

[6]     Although the Disclosure Statement in support of the Plan (the "Disclosure Statement") estimated that holders of Allowed Claims would likely receive a 68% recovery on account of those claims, ultimately, holders of Allowed Claims actually received an approximately 63% recovery on account of those claims.

11

acknowledged at the hearing that there were over 200 Disputed Claims awaiting resolution. As of the Confirmation Date, 2 holders of Claims had agreed to estimate their Claims at approximately 50% for the purposes of setting up the reserve, resulting in segregated disputed claims reserves within the total $140 million Disputed Claims Reserve of $25 million and $70 million, respectively. Other significant Claims against NorthWestern included Mr. Hylland's $30 million Claim and rejected pension plans Claims of approximately $15 million. Thus, for those 4 claims alone, the disputed claims Reserve should have held $140 million. That does not account for the 196 or so remaining Disputed claims.[7] 1144 Complaint at ¶46.

41.    Thus, without accounting for the more than 190 other Disputed Claims, on the Effective Date, the Disputed Claims Reserve should have contained sufficient New Common Stock to satisfy $295 million of Disputed Claims. Instead, upon information and belief, the Disputed Claims Reserve contained only enough New Common Stock to satisfy $140 million of Disputed Claims. Thus, it appears that in blatant violation of the Plan, NorthWestern fraudulently "estimated all contingent, unliquidated claims. . . at 50% of the face amount of the stated claim" and only placed enough New Common Stock sufficient to satisfy half of the Allowed Claims in the Disputed Claims Reserve, not the 100% promised by the Plan and in open Court. Kaplan Decl. Ex. 10 at ¶66; 1144 Complaint at ¶47.

42.    The inadequacy of the Disputed Claims Reserve led to counsel for the ad hoc committee of Class 7 Claimants to state that it was apparent that "there just isn't enough stock in Class 9." Defendants' Ex. O at p. 74; 1144 Complaint at ¶48.

43.    On March 10, 2004 this Court denied the 9019 Motion, in part, because the Disputed Claims Reserve, as established by NorthWestern, did not contain enough stock to

---

[7]    In addition, on the Effective Date of the Plan, Cornerstone Propane, L.P. ("Cornerstone") held a Disputed Claim in the amount of $130 million. Although NorthWestern had filed a motion to approve a settlement between NorthWestern and Cornerstone whereby Cornerstone would receive an Allowed Claim of $19.5 million, this settlement was not approved until after the Effective Date. As a result, because Section 7.5 of the Plan permits NorthWestern to reserve an amount less than the full amount of a Disputed Claim only by Order of this Court or by written agreement of the parties, on the Effective Date, the Disputed Claims Reserve should have contained sufficient New Common Stock to satisfy Cornerstone's asserted Claim of $130 million.

12

distribute any stock in excess of a $25 million claim to the holders of the QUIPS, despite the clear language of the Plan and the Confirmation Order, resulting in a "financial dilemma" that led to the failure of the Settlement Agreement. Defendants' Ex. P at p. 6; 1144 Complaint at ¶49.

44.    Specifically, this Court found that the Stipulation recognized the $50 million QUIPS Litigation Claim and reserved 50% of that claim, or a $25 million claim of Class 9 reserved shares. This Court further found that pursuant to the Stipulation, "to the extent that the [QUIPS] litigation claim exceeded $25 million, 'the holders of such claims shall have any deficiency satisfied out of the general Disputed Claims Reserve' described in the Plan." Defendants' Ex. P at p. 4-5 (citing Defendants' Ex. M); 1144 Complaint at ¶50.

45.    On April 15, 2005, in light of NorthWestern's admissions that it had not complied with the terms of the Plan and the Confirmation Order when funding the Disputed Claims ·Reserve, Plaintiffs brought the 1144 Complaint, seeking among other things, revocation of the Confirmation Order for fraud, damages for breach of fiduciary duty and a declaratory judgment that in the absence of actual fraud, the underfunding of the Disputed Claims Reserve could not have occurred absent negligence or willful misconduct.

## II.    THE MATTERS RAISED IN THE 1144 COMPLAINT ARE NOT RELATED TO THE MATTERS THAT ARE THE SUBJECT OF MAGTEN'S APPEAL OF THE CONFIRMATION ORDER

46.    The issues raised in Magten's Confirmation Appeal are completely different from the issues raised by this proceeding. The 1144 Complaint states that despite the requirements of the Plan for establishing and funding the Disputed Claims Reserve, which requirements were subsequently echoed in the Confirmation Order entered by this Court, and despite NorthWestern's numerous representations that it had complied with the terms thereof, NorthWestern did not fund the Disputed Claims Reserve in accordance with those documents. See 1144 Complaint at ¶¶59,60,65,71. In stark contrast, the Confirmation Appeal raises a number of issues regarding whether the Plan, as confirmed, violated the requirements of the

13

Bankruptcy Code and, thus, should never have been confirmed. See Kaplan Decl. Ex. 1 at pp.

13-15. The only similarities between the two proceedings are that they both seek a similar

remedy – to overturn the Confirmation Order. Because the underlying issues are entirely

different, however, there is no risk of inconsistent judgment and no reason that this proceeding

should be stayed.

47.     The United States Supreme Court has determined that, "the filing of a notice of

appeal is an event of jurisdictional significance – it confers jurisdiction on the court of appeals

and divests the district court of its control over those issues of the case involved in the appeal."

Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 114 n.10 (1996) (quoting Griggs v. Provident

Consumer Discount Co., 459 U.S. 56, 58 (1982)) (emphasis added).  This rule is limited, such

that a court is not divested of jurisdiction over "matters that are 'uniquely separable' and

collateral from the merits of the appeal."  In re St. Clair, 251 B.R. 660, 669 (Bankr. D.N.J. 2002)

(citing Mary Ann Pensiero, Inc. v. Lingle, 847 F.2d 90, 97 (3d Cir. 1988)).

48.     Moreover, as numerous courts have recognized, this is a judge-made rule "that is

founded on prudential considerations."  Mary Ann Pensiero, Inc. v. Lingle, 847 F.2d 90, 97 (3d

Cir. 1988).  See also In re Keene Corp., 166 B.R. 31, 33 (Bankr. S.D.N.Y. 1994) ("rule 'designed

to avoid the confusion and waste that might flow from putting the same issues before two courts

at the same time.'" (citing Moore's Fed. Practice 3-45-46 § 203.11 (2d ed. 1993)).  As such, the

rule should not be applied blindly.  See Pensiero, 847 F.2d at 97 ("As a prudential doctrine, the

rule should not be applied when to do so would defeat its purpose of achieving judicial

economy.").  In arguing that this Court has been divested of jurisdiction to consider the merits of

the 1144 Adversary Proceeding while the Confirmation Appeal is pending, NorthWestern

completely ignores not only the limited circumstances under which the rule is to be applied, but

also misconstrues the issues raised by the Confirmation Appeal.

49.     At the time it raised its objections to confirmation of the Plan, Magten and the

Court assumed that NorthWestern would take the necessary steps to determine how to properly

fund the Disputed Claims Reserve and would fund the Disputed Claims Reserve accordingly.

14

Because the information relevant to the amount and number of Disputed Claims was at all time under NorthWestern's sole control, Plaintiffs presumed that NorthWestern would use the information at its disposal to comply with the terms of the Plan and the Confirmation Order and that the Committee and its professionals would oversee the process to ensure that all creditors – even the ones with Disputed Claims – would not be prejudiced by the Plan becoming effective. In connection with confirmation, Plaintiffs raised several objections to the Plan and the treatment afforded the holders of the QUIPS in their respective confirmation objections, but neither Magten nor Law Debenture ever asserted that the Disputed Claims Reserve was not sufficiently funded – because NorthWestern did not admit to having done so until March 2005, more than four months after the entry of the Confirmation Order. Thus, the Confirmation Appeal has as its factual predicate the issues underlying Magten's arguments that the Plan was patently unconfirmable – arguments that in no way relate to the 1144 Complaints allegations that the Disputed Claims Reserve was underfunded.

50.    Because the issues in the Confirmation Appeal and the 1144 Complaint are different, there is no risk that if the Court considers the 1144 Complaint it will reach a result that is inconsistent with a decision that may be reached by the District Court. In the Confirmation Appeal, the District Court is deciding whether it was proper to overrule Magten's objections to confirmation regarding, among other things, whether a constructive trust had been imposed or whether NorthWestern violated The Public Utility Holding Company Act of 1935 ("PUHCA"). Kaplan Decl. Ex. 1 at pp. 13-15. In contrast, in the 1144 Adversary Proceeding, this Court is considering whether it was defrauded by NorthWestern in entering the Confirmation Order because NorthWestern promised to establish the Disputed Claims Reserve in accordance with the terms of the Plan, and failed to do so. 1144 Complaint at ¶59-60.

51.    Under NorthWestern's broad reading of the divestiture of jurisdiction rule, this Court would not have jurisdiction to authorize any distribution from the Disputed Claims Reserve to settle claims, to interpret the Confirmation Order or to otherwise administer this

case.[8]  Such a nebulous interpretation would particularly hamper the ability of a Bankruptcy Court to manage its caseload and see to the efficient administration of its docket.  See In re Mazzocone, No. 94-5068, 1995 U.S. Dist. LEXIS 3218, at *12-13 (E.D. Pa. Mar. 15, 1995).

52.     NorthWestern is mistaken when it argues that this Court is divested of jurisdiction to consider the 1144 Complaint because it has already determined in a previous order that it was divested of jurisdiction to consider the issues raised in NorthWestern's Motion to Dismiss the Amended Fraudulent Conveyance Complaint.  Motion to Stay/Dismiss at p. 21.  The Amended Fraudulent Transfer Complaint states, among other things, that a constructive trust was an available remedy to Plaintiffs and that NorthWestern violated PUHCA, thereby rendering certain contracts relating to the QUIPS void.  After the Confirmation Order was entered, NorthWestern moved to dismiss the Amended Complaint based on collateral estoppel grounds – that certain of the allegations in the Amended Complaint (including those relating to PUHCA and the constructive trust) had already been decided by this Court in connection with confirmation of the Plan.  After examining the Amended Complaint and the Confirmation Order, this Court determined that, "since [the] issues on appeal are now also presented for decision to this Court, and indeed, the pending litigation encompasses those issues, this Court is without jurisdiction to try [the Fraudulent Conveyance Proceeding]."  Defendants' Ex. B at pp. 3-4.  Thus, because the 1144 Complaint does not "encompass the issues" raised in the Confirmation Appeal, this Court has not been deprived of jurisdiction.

53.     Lastly, NorthWestern's argument that the 1144 Adversary Proceeding should be stayed is a transparent attempt to delay these proceedings and prejudice the Plaintiffs. NorthWestern has already argued that because the Plan has been substantially consummated, this

---

[8]     Simultaneously herewith, Magten filed an omnibus objection to certain of NorthWestern's motions pursuant to Bankruptcy Rule 9019 to approve various settlement agreements.  Magten does not believe that this Court should authorize any distribution from the Disputed Claims Reserve until the 1144 Complaint has been fully and finally resolved.  In addition, although Magten does not believe that this Court has been divested of jurisdiction to hear all issues related to the resolution of Disputed Claims and the Disputed Claims Reserve, to the extent that this Court holds that is does not have jurisdiction over the 1144 Complaint, Magten believes that this Court would also be unable to grant the relief sought in NorthWestern's motions.

proceeding is equitably moot. Although Plaintiffs disagree with this contention (see below), to the extent that this proceeding is stayed pending the full and final adjudication of the Confirmation Appeal, the proceeding may well be equitably moot when that appeal is resolved. Recent news articles indicate that various towns and cities have been in discussions with NorthWestern and its advisors concerning the possible sale of NorthWestern to those localities. Kaplan Decl. Ex. 11. In fact, on the date hereof, Montana Public Power Incorporated disclosed a letter it sent to NorthWestern's board of directors offering to purchase NorthWestern's utility business for $32.50 per share (in cash). Kaplan Decl. Ex. 12. Plaintiffs believe that NorthWestern may be attempting to delay this proceeding until such sale is consummated. Plaintiffs should not have to wait to resolve these issues on NorthWestern's timetable.

## III.    THE 1144 ADVERSARY PROCEEDING IS NOT EQUITABLY MOOT

54.    NorthWestern contends that the 1144 Adversary Proceeding should be dismissed because the Plan has been substantially consummated, thereby rendering those claims that seek revocation of the Confirmation Order equitably moot. Motion to Stay/Dismiss at pp. 22-28. However, Defendants' assertions must fail for two reasons. First, the application of the equitable mootness doctrine to section 1144 of the Bankruptcy Code ignores the plain language of the statute that already protects third parties that have relied on the Confirmation Order (the stated purpose of the doctrine) and renders Congressional intent a nullity. Second, even if this Court is compelled by precedent to conclude generally that the doctrine of equitable mootness could apply to section 1144 proceedings, NorthWestern is unable to demonstrate that it has satisfied the doctrine in this proceeding.

### A.    Application of the Equitable Mootness Doctrine to 1144 Proceedings is Contrary to the Plain Meaning of the Statute and Congressional Intent

55.    Section 1144 of the Bankruptcy Code provides:

> On request of a party in interest at any time before 180 days after the date of the entry of the order of confirmation, and after notice and a hearing, the court may revoke such order if and only if such

17

order was procured by fraud. An order under this section revoking a confirmation order shall –

(1)    contain such provisions as are necessary to protect any entity acquiring rights in good faith reliance on the order of confirmation; and

(2)    revoke the discharge of the debtor.

11 U.S.C. § 1144. Similarly, the doctrine of equitable mootness is one that courts use only where prudential reasons dictate that a court cannot provide some means of effective relief. See generally In re Zenith Elecs. Corp., 329 F.3d 338, 340 (3d Cir. 2003); In re Cont'l Airlines, 91 F.3d 553, 559 (3d Cir. 1996) ("Continental I"); In re UNR Indus., Inc., 20 F.3d 766, 769 (7th Cir. 1994). In keeping with this theory, courts are generally reluctant to dismiss a matter on grounds of equitable mootness when a remedy can be fashioned.

56.    The doctrine of equitable mootness takes into account the reliance of third parties on the entry of an order and bars relief if a court cannot fashion a remedy that adequately protects these parties. Similarly, in section 1144 of the Bankruptcy Code, Congress has explicitly provided that in fashioning relief for a confirmation order procured by fraud, the court must fashion a remedy that adequately protects third parties that have relied on the Confirmation Order. Application of the doctrine of equitable mootness in the context of section 1144 of the Bankruptcy Code is inappropriate insofar as the statute itself requires a court to consider those same issues when fashioning a remedy. Applying the doctrine of equitable mootness makes a portion of section 1144 meaningless.

57.    The first rule of statutory interpretation is to determine whether a statute is unambiguous – if it is, a court should enforce it. See In re Armstrong World Indus., Inc., No. 00-4471 2005 U.S. Dist., LEXIS 2810 at *30 (D. Del. Feb. 23, 2005) (citations omitted). This is especially true where the Bankruptcy Code is concerned. See United States v. Ron Pair Enters., Inc., 489 U.S. 235, 240-241 (1989) ("Congress worked on the formulation of the Code for nearly a decade…as long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute."); see also In re Cont'l Airlines, Inc., 148 B.R. 207, 211 (D. Del 1992) ("The United States Supreme Court has specifically

18

addressed the need for adhering to the 'plain meaning' of the statute as the controlling principle of construction for the Bankruptcy Code.").

58.     In addition, when reviewing a statute, the Court must attempt to give meaning to every word in the statute. The Supreme Court has recognized, "there is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes." Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571 (1982) (quoting United States v. Am. Trucking Assns., 310 U.S. 534, 543 (1940)). It is the duty of a Court "to give effect, if possible, to every clause and word of a statute." United States v. Menasche, 348 U.S. 528, 538-539 (1955) (quoting Montclair v. Ramsdell, 107 U.S. 147, 152 (1883)). Relying on similar authority, the Third Circuit Court of Appeals has noted, that when construing a statute, "no clause, sentence, or word shall be superfluous, void, or insignificant." United States v. Cooper, 396 F.3d 308, 312 (3d Cir. 2005) (quoting TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001)). If the doctrine of equitable mootness were to apply, section 1141(1), which requires that an order revoking confirmation "contain such provisions as are necessary to protect any entity acquiring rights in good faith reliance on the order of confirmation," would be meaningless. 11 U.S.C. § 1144(1).

59.     Defendants also urge this court to hold that despite the plain meaning of the statute giving Plaintiffs 180 days to file a complaint pursuant to section 1144 of the Bankruptcy Code, and despite the fact that the 1144 Complaint was timely filed, the doctrine of equitable mootness actually requires that any such complaint be filed before substantial consummation of a debtor's plan – in this case, less than 60 days from the date of the entry of the Confirmation Order. This reading of Section 1144 is directly contrary to Congressional authority insofar as it has the effect of restricting a filing date enacted by Congress. As the Supreme Court has recognized,

> with respect to filing deadlines a literal reading of Congress' words is
> generally the only proper reading of those words. To attempt to decide
> whether some date other than the one set out in the statute is the date
> actually "intended" by Congress is to set sail on an aimless journey, for

19

the purpose of a filing deadline would be just as well served by nearly any date a court might choose as by the date Congress has in fact set out in the statute.

United States v. Locke, 471 U.S. 84, 93 (1985).

60.    Congress has established a specific time frame within which a complaint to revoke a confirmation order pursuant to section 1144 of the Bankruptcy Code may be brought – 180 days from the entry of the confirmation order.  To adopt the rule urged by Defendants is to read into section 1144 an additional restriction that was created by judicial fiat – that a complaint to revoke the confirmation order pursuant to Section 1144 of the Bankruptcy Code must be brought within 180 days of the entry of the confirmation order or before the plan is substantially consummated (as such term is defined in Section 1101(2) of the Bankruptcy Code), whichever comes first.[9]  Surely, if Congress had wanted to insert this requirement into the Bankruptcy Code, it was capable of doing so.  Such an interpretation is not only contrary to the plain meaning of the Bankruptcy Code, but it has the practical effect of encouraging debtors to risk misrepresenting material issues to the Court and their creditors – so long as a plan can be substantially consummated before the fraud is discovered.

**B.    Even if the Doctrine of Equitably Mootness is Applicable to 1144 Proceedings, Defendants have failed to demonstrate that this proceeding is equitably moot**

61.    Plaintiffs acknowledge that despite the plain meaning of section 1144, courts in this district have held (on very different facts) that the doctrine of equitable mootness can be applicable to proceedings to revoke the confirmation order pursuant to Section 1144 of the Bankruptcy Code. See Almeroth v. Innovative Clinical, Ltd., 302 B.R. 136 (Bankr. D. Del. 2003); In re Circle K Corp., 171 B.R. 666 (Bankr. D. Ariz. 1994); In re Servico, Inc., 161 B.R.

---

[9]    Section 1101(2) of the Bankruptcy Code defines substantial consummation as:
   (A)  transfer of all or substantially all of the property proposed by the plan to be transferred;
   (B)  assumption by the debtor or the successor to the debtor under the plan of the business or the management of all or substantially all of the property dealt with by the plan; and
   (C)  commencement of distribution under the plan.
11 U.S.C. § 1101(2).

297 (S.D. Fla. 1993). However, it is clear, based on the facts here, that this proceeding is not equitably moot.

62.    Despite Defendants' efforts to make the application of the doctrine of equitable mootness seem to be a common, everyday occurrence, in reality, the equitable mootness doctrine should not be invoked lightly but rather it should be "limited in scope" and must be "cautiously applied." Continental I, 91 F.3d at 559. As the Third Circuit has explicitly noted, "the equitable mootness doctrine is to be applied only in order to 'prevent a court from unscrambling complex bankruptcy reorganizations when the appealing party should have acted before the plan became extremely difficult to retract.'" Zenith Elecs. Corp., 329 F.3d at 340 (quoting Nordhoff Invs. v. Zenith Elecs. Corp., 258 F.3d 180, 185 (3d Cir. 2001)).

63.    In determining whether a proceeding is equitably moot, the Third Circuit has enumerated the following five factors:

> (1) whether the reorganization plan has been substantially consummated; (2) whether a stay has been obtained; (3) whether the relief requested would affect the rights of parties not before the court; (4) whether the relief requested would affect the success of the plan; and (5) the public policy of affording finality of bankruptcy judgments.

Continental I, 91 F.3d at 560.

64.    A review of these factors makes it clear that the 1144 Adversary Proceeding should not be dismissed as equitably moot. As explained above, when applied, the doctrine of equitable mootness is narrowly tailored to apply in limited circumstances where it would be inequitable to fashion *any* kind of relief. Continental I, 91 F.3d at 559. An appeal is not moot "merely because a court cannot restore the parties to the status quo ante. Rather, when a court can fashion 'some form of meaningful relief,' even if it only partially redresses the grievances of the prevailing party, the appeal is not moot." Continental I, 91 F.3d at 558 (quoting RTC v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.), 16 F.3d 552, 560 (3d Cir. 1994) (en banc)).

21

65.    NorthWestern principally argues that because the Plan has been substantially consummated, Plaintiffs cannot be granted relief.  Motion to Stay/Dismiss at pp. 22-23, 26. While Plaintiffs do not dispute that NorthWestern has taken actions to complete distributions to holders of allowed claims under the Plan and thus has substantially consummated the Plan, NorthWestern erroneously relies on this factor to support its contention that the Appeals are equitably mooted.  Courts recognize that "substantial consummation of a reorganization plan is a momentous event, but it does not necessarily make it impossible or inequitable for an appellate court to grant effective relief." Chateaugay Corp. v. LTV Steel Co. (In re Chateaugay Corp.), 10 F.3d 944, 952 (2d Cir. 1993) ("Chateaugay II").  See also AOV Indus., Inc.,792 F.2d 1140, 1148 (D.C. Cir. 1986) (substantial consummation is "not a blanket discharge" of "judicial duty to examine carefully each request for relief"); In re Ionosphere Clubs, Inc., 184 B.R. 648, 651 (S.D.N.Y. 1995) ("substantial consummation of a plan does not necessarily make it impossible or inequitable for a reviewing court to grant relief.").  Obviously, "orders confirming plans of reorganization do not become immune from appellate review upon their partial, or even substantial, implementation." Cent. States v. Cent. Trans., Inc., 841 F.2d 92, 95 (4th Cir. 1988) (citing In re AOV Indus., Inc. 792 F.2d at 1148-50).

66.    Although NorthWestern heavily relies on Continental I to support its argument that relief cannot be granted in light of the fact that the Plan has been substantially consummated, NorthWestern's argument fails because

> more significant to the [Continental] Court's determination that the appeal was equitably moot, however, was the fact that 'a reversal of the order confirming the Plan likely would put Continental back into bankruptcy.'  The Court's decision in that case, therefore, was based not merely on the fact that the plan had been substantially consummated in a definitional sense, but rather on the probability that granting the appeal would unravel the plan, upon which numerous parties were at that point in reliance.

Zenith Elecs. Corp., 329 F.3d at 344 (quoting Continental I, 91 F.3d at 561).[10]

---

[10]    Although the Court in Continental I determined that it could not fashion a limited remedy for the appellants, in Gillman v. Cont'l Airlines, . 203 F.3d 203 (3d Cir. 2000) ("Continental II"), the court

22

67.     Unlike <u>Continental I,</u> where the court determined that it would have been impossible to fashion any relief without "unraveling" the plan, in <u>Chateaugay II</u>, 10 F.3d at 954, the Second Circuit found that despite the fact that the debtor's plan had been substantially consummated, the court could "fashion effective relief ... to the extent that it can be done manageably and without imperiling [the debtor's] fresh start." <u>Chateaugay II</u>, 10 F.3d at 953. The Second Circuit went on to explain that although full relief may no longer be available after substantial consummation, "we are convinced that at least some effective relief could be granted." <u>Chateaugay II</u>, 10 F.3d at 954.

68.     The second <u>Continental I</u> factor – whether a stay has been obtained – does not preclude the Court from granting relief.  It is widely recognized that even when a plan has been substantially consummated, failure to obtain a stay does not automatically render any subsequent appeal moot.  <u>In re Best Prods. Co.</u>, 68 F.3d 26, 29-30 (2d Cir. 1995); <u>See, e.g.</u>, <u>In re AOV Indus., Inc.</u>, 792 F.2d at 1147 ("failure to secure a stay is not <u>per se</u> dispositive of <u>all</u> the issues before us.") (emphasis in original); <u>City of Covington v. Covington Landing Ltd.</u>, 71 F.3d 1221, 1225-26 (6th Cir. 1995) ("The failure to seek a stay . . . is not necessarily fatal to the appellant's ability to proceed."); <u>In re UNR Indus.</u>, 20 F.3d at 769 (the failure to seek a stay is not "a censurable event to be punished by refusal to adjudicate the merits"), <u>cert. denied</u>, 130 L. Ed. 2d 416, 115 S. Ct. 509 (1994); <u>In re Club Assocs.</u>, 956 F.2d 1065 (11th Cir. 1992) ("the absence of a stay does not <u>compel</u> a finding of mootness in <u>all</u> cases.") (emphasis in original); <u>In re Sun Valley Ranches, Inc.</u>, 823 F.2d 1373, 1375 (9th Cir. 1987) ("a debtor's failure to obtain a stay . . . followed by the sale of the debtor's property, did not moot the debtor's subsequent appeal because the creditor-purchaser was before the court").

69.     While Magten was unable to obtain a stay of the Confirmation Order, it is both significant and important to note that Magten did seek to stay the Confirmation Order both

---

examined the merits of the appeal after determining that limited relief could be granted as it would not necessitate the reversal or unraveling of the entire plan of reorganization.  In fact, in <u>Continental II</u>, the Court acknowledged that "even if successful, Plaintiffs' appeal should not threaten the entire reorganization."

through emergency motions before the bankruptcy court and this Court. Courts have recognized that this <u>Continental I</u> factor "merely requires that the appellant seek a stay, not that she secure one." <u>In re Lafayette Hotel P'ship</u>, No. 96-7476, 1997 WL 599386 at *5 (S.D.N.Y. Sept. 29, 1997); <u>Nordhoff Invs., Inc. v. Zenith Elecs. Corp. (In re Zenith Elecs. Corp.)</u>, 250 B.R. 207, 215 (D. Del. 2000) ("[a]s an 'equitable' factor . . . the failure to even seek a stay would seem to have significance beyond the mere failure to obtain a stay"). Therefore, although Magten did not prevail in securing a stay, the "result certainly cannot be attributed to any lack of initiative." <u>Chateaugay II</u>, 10 F.3d at 954.

70.    The third factor, the effect of relief on third parties, weighs in favor of Plaintiffs. NorthWestern has a variety of remedies at its disposal that do not effect third parties that have already received their distribution, including requiring NorthWestern to establish and fund the Disputed Claims Reserve as it should have been established on November 1, 2004. Similarly this Court can require that Plaintiffs be paid 100% of the face amount of their claim because the Settlement Agreement failed in part because of NorthWestern's failure to properly fund the reserve. This result would similarly not effect those parties that have received their distribution and would have the added putative effect of discouraging fraud on the Court. Thus, because the Court can fashion meaningful relief that does not impact the distribution received by third parties, the third factor weighs in favor of Plaintiffs.

71.    Similarly, the fourth factor, whether granting relief will effect the success of the Plan, weighs in favor of Plaintiffs. As this Court has recognized, despite the continued self serving statements of NorthWestern, its management and its advisors, concerning the success of the Plan much work remains to be done and many claims and litigations need to be resolved, "which are hardly consistent with [a] glowing description..." <u>Kaplan Decl. Ex. 13</u> at p. 14. In this regard, NorthWestern is a $1.8 billion dollar enterprise with approximately $77 million of cash on hand. As previously noted, pursuant to the Plan, NorthWestern is authorized to issue 200 million shares of common stock and, to date, NorthWestern has only issued approximately

less than 40 million shares. Thus, NorthWestern has more than an adequate number of shares to satisfy its obligations to Plaintiffs without disturbing the 'success' of the Plan.

72.     The fifth factor, the public policy of finality in bankruptcy cases, also weighs in favor of Plaintiffs. NorthWestern's business operations have been shrouded in allegations of fraud and government investigations for the better part of three years. Now NorthWestern is faced with the revocation of its Confirmation Order for failure to comply with the terms of its own Plan – an allegation it has not denied. It has long been observed that 'he who seeks equity must do equity.' See Mfrs. Fin. Co. v. McKey, 294 U.S. 442 (1935). NorthWestern cannot argue that it has a right to rely on the public policy of finality – when that finality will assist NorthWestern in covering up its fraud in procuring this Court's approval of the Confirmation Order.

73.     Defendants heavily rely on Innovative Clinical and Circle K for the proposition that this action should be dismissed as equitably moot. Motion to Stay/Dismiss at pp. 23-24. Defendants' reliance on those cases is misplaced. First, in Innovative Clinical, the Bankruptcy Court was adjudicating an adversary proceeding more than three years after the effective date of the plan. Innovative Clinical 302 B.R. at 140. Second, in Innovative Clinical, the Court was particularly troubled by the fact that in the time since the entry of the confirmation order the debtor had essentially sold all of its businesses, replaced members of senior management and ceased its operations. Id. at 141, 143 ("I conclude that [the] Plan consummation transactions and the post Effective Date business transactions are so persuasive that it is not feasible to [revoke the confirmation order]."). In the case at bar, however, as discussed above, NorthWestern's Plan has only been effective for eight months, and NorthWestern has adequate cash and stock on hand to fashion an appropriate remedy and continue to operate its business.

74.     Moreover, in both Innovative Clinical and Circle K, the primary reason that the Court dismissed the complaint was because it could not fashion an equitable remedy that would protect the interests of those that had relied in good faith on the Confirmation Order, as required by Section 1144 of the Bankruptcy Code. Innovative Clinical 302 B.R. at 143-144; Circle K

25

Corp., 171 B.R. at 670.  As discussed in greater detail above, this Court is not faced with this

dilemma.  In fashioning a remedy, this Court can revoke the Confirmation Order with respect to

the Disputed Claims Reserve only or can direct NorthWestern to comply with the terms of

Section 7.5 of the Plan and fund the Disputed Claims Reserve as it should have been funded on

November 1, 2004, the Effective Date of the Plan.  Similarly, because of the abundance of cash

and stock NorthWestern has at its disposal, this Court can require NorthWestern to pay Plaintiffs

100% on account of their Claim because when Plaintiffs looked to the Disputed Claims Reserve

to satisfy their Claim they were turned away from the well and informed that "there just isn't

enough stock in Class 9."  Defendants' Ex. O at p. 74; 1144 Complaint at ¶48.[11]

75.    In that regard, because this Court can "equitably" provide Plaintiffs with effective

relief without upsetting the Plan the distributions made to creditors or NorthWestern's successful

emergency as a reorganized entity (and because as discussed in greater detail below that is not

the only remedy sought by Plaintiffs in the 1144 Adversary Proceeding), the equitable mootness

doctrine is inapplicable to this proceeding and the Motion to Stay/Dismiss should be denied in its

entirety.

## IV.    PLAINTIFFS HAVE MET THEIR BURDEN OF PLEADING AND THE MOTION TO DISMISS SHOULD BE DENIED

### A.    Plaintiffs have satisfied the motion to dismiss standard

76.    NorthWestern has made its Motion to Dismiss under Federal Rule of Civil

Procedure 12(b)(6), failure to state a claim upon which relief can be granted, which is made

applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7012.  Motion

to Stay/Dismiss at p. 1.  In considering whether to grant a motion to dismiss, a court should

accept the allegations in the complaint as true.  Hishon v. King & Spalding, 467 U.S. 69, 73

---

[11]    Moreover, Plaintiffs believed that if NorthWestern's failure to comply with the terms of the Plan and the Confirmation Order had been apparent prior to the entry of the Confirmation Order, Magten may have obtained a stay of the effectiveness of that order.  Specifically, in denying Magten's motion for a stay pending appeal, this Court found that because the holders of the QUIPS Litigation Claims were being protected by being included in the Disputed Claims Reserve, they were being treated fairly and had made "an inadequate showing of irreparable harm…"  Kaplan Decl. Ex. 7 at p. 29; 1144 Complaint at ¶35.

(1984); Gann v. Del. State Hosp., 543 F. Supp. 268, 269 (D. Del. 1982). In addition, while deciding whether a complaint adequately sets forth a basis for relief, a court must give the plaintiff the benefit of the doubt. See Trivits v. Wilmington Inst., 383 F. Supp. 457, 459 (D. Del. 1974) ("the complaint must be liberally construed with all inferences drawn and all ambiguities resolved in favor of the nonmovant . . .").

77.    Because of the deference given to the complaint and the allegations therein, "a complaint should not be dismissed for failure to state a claim unless it appears *beyond doubt* that the plaintiff can prove *no set of facts* in support of his claim that would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957) (emphasis added). It is precisely for this reason that motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) are rarely granted and looked upon with disfavor. *Wright and Miller*, Fed. Practice and Procedure: Civil 2d § 357, at 321 (1990); see also Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc., 677 F.2d 1045, 1050 (5th Cir. 1982) ("dismissal of a claim on the basis of barebones pleadings is a 'precarious disposition with a high mortality rate'").

78.    Despite the fact that NorthWestern claims that Plaintiffs have failed to state a claim upon which relief can be granted, NorthWestern never denies that it failed to fund the Disputed Claims Reserve in accordance with the terms of the Plan. As set forth below, the 1144 Complaint states sufficient facts to demonstrate that NorthWestern represented to the Court and its creditors both in the Plan and in hearings held before this Court that the Disputed Claims Reserve would be funded in accordance with the terms of the Plan. Subsequent events (and NorthWestern's own admissions and omissions) demonstrate that it did not comply with these requirements. These developments, together with the denial of the Settlement Agreement and this Court's determination that NorthWestern faced a "financial dilemma" regarding the Disputed Claims Reserve gave rise to the allegations of the 1144 Complaint. Defendants' Ex. P at p. 6; 1144 Complaint at ¶49. Based on these undisputed facts, the Complaint is facially sufficient and the Debtor has failed to meet its substantial burden in proving otherwise.

27

**B.** **Plaintiffs Have Stated a Sustainable Cause of Action Under Section 1144 of the Bankruptcy Code**

79.    One of the primary allegations raised in the 1144 Complaint is that the Confirmation Order should be revoked because it was procured by fraud. 1144 Complaint at ¶¶51-60. Although NorthWestern claims it "did not defraud the Bankruptcy Court in procuring the Confirmation Order by fraud" Motion to Stay/Dismiss at p. 29, it dances around the issue of whether the Disputed Claims Reserve was funded in accordance with the terms of the Plan. Nowhere in its papers does NorthWestern set forth the steps it took to fund the Disputed Claims Reserve or to determine the amount of Disputed Claims. In fact, NorthWestern admits its noncompliance when it states that "it attempted to estimate the likely amount of the disputed claims on which the estate might be required to make distributions." Motion to Stay/Dismiss at p. 11. Moreover, NorthWestern claims that the 1144 Complaint at best alleges that NorthWestern made a mistake after confirmation or miscalculated, but that to claim the Confirmation Order was procured by fraud because of that "requires an inference of malfeasance that is wholly unjustified." Motion to Stay/Dismiss at p. 32.

80.    While NorthWestern is entitled to make these arguments at trial – that underfunding the reserve was an innocent mistake that caused no harm - Plaintiffs are entitled to conduct discovery to prove their allegations. Based on the previous findings of this Court, NorthWestern's admissions, and NorthWestern's failure to deny that the reserve was improperly funded, Plaintiffs have established a prima facie case that the Confirmation Order was procured by fraud. The information concerning what analysis, if any, was conducted in connection with the establishing of the Disputed Claims Reserve is solely within the knowledge of NorthWestern and its agents "and will only be confirmed and proven upon further discovery…" – a position NorthWestern has argued before this Court in related actions. Kaplan Decl. Ex. 14 at p. 12.

81.    NorthWestern acknowledges that to prove actual fraud with respect to the procurement of the Confirmation Order, Plaintiffs have to satisfy the five-part test established by

28

the United States Court of Appeals for the Sixth Circuit in <u>Tenn-Fla Partners v. First Union Nat'l Bank of Fla.</u>, 226 F.3d 746 (6th Cir. 2000). <u>Motion to Stay/Dismiss</u> at p. 30. These factors are:

(1)     that the debtor make a representation regarding compliance with Code § 1129 which was materially false;

(2)     that the representation was either known by the debtor to be false, or was made without belief in its truth, or was made with reckless disregard for the truth;

(3)     that the representation was made to induce the court to rely on it;

(4)     that the court did rely on it; and

(5)     that as a consequence of such reliance, the court entered the confirmation order.

<u>Id</u>. at 750. In considering these factors, although a party seeking to revoke a confirmation order for fraud pursuant to Section 1144 of the Bankruptcy Code must prove actual fraud, circumstantial evidence may be used to establish such intent. <u>Id</u>. Thus, as set forth below, based on the undisputed evidence thus far – before discovery is even conducted – a review of each factors shows that Plaintiffs have sufficient circumstantial evidence to establish actual fraudulent intent.

82.     With respect to the first criteria – NorthWestern made a false representation regarding its compliance with Section 1129 the Bankruptcy Code. Section 1129(a)(1) requires that in order to be confirmed, a Plan must comply "with the applicable provisions of this title." 11 U.S.C. § 1129(a)(1). This means that in order to be confirmed, among other things, a plan must satisfy section 1123 of the Bankruptcy Code. <u>See</u> <u>In re NII Holdings, Inc.</u>, 288 B.R. 356, 359 (Bankr. D. Del. 2002) (finding the requirements of Section 1129 were met where a plan complied with Section 1123). In turn, Section 1123(a)(4) provides that a plan shall, "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). Because NorthWestern underfunded the Disputed Claims Reserve, holders of Disputed Claims in Class 9 will receive a lesser recovery on account of their claims than

29

holders of Allowed Class 9 Claims received on account of their claims. This disparate treatment between members of the same class is a violation of Section 1123 of the Bankruptcy Code. See Collier on Bankruptcy § 1123.01 (15th ed. rev'd 2005) ("[section 1123(a)(4) of the Bankruptcy Code] certainly prohibits different percentage settlements to members of the same class."). Therefore, because the Plan violated section 1123(a)(4) of the Bankruptcy Code, NorthWestern's representations to this Court that the Plan complied with section 1129 were false.

83.    Similarly, under section 1129 of the Bankruptcy Code, in order to be confirmed, a Plan must be proposed in good faith. 11 U.S.C. § 1129(a)(3). Plaintiffs believe - and believe they can prove after conducting discovery - that NorthWestern never had any intention of reserving sufficient New Common Stock in the Disputed Claims Reserve. Instead, Plaintiffs believe that rather than complying with section 7.5 of the Plan and setting aside an amount of New Common Stock "equal to the aggregate of any distributable amount of Cash and New Common Stock equal to the relevant percentage of Distributions to which holders of Disputed Claims would be entitled under this Plan if such Disputed Claims were Allowed Claims in the amount of such Disputed Claim or such lesser amount as required by Final Order," NorthWestern set aside New Common Stock based on its own guess-timation of what holders of Disputed Claims would recover, taking into account which Claims may settle and which claims may be disallowed - assumptions NorthWestern was not permitted to make.

84.    The second factor, that the representation was either known by the debtor to be false, or was made without belief in its truth, or was made with reckless disregard for the truth is borne out by the fact that NorthWestern controlled all of the documents in this case. See In re NVF Co., 309 B.R. 698, 704 (Bankr. D. Del. 2004) ("ambiguous provisions are construed against the drafter [and] where the Plan is considered an enforceable contract the interpretation of the ambiguous provisions will be construed against. . .the Plan proponent."). NorthWestern represented that to comply with the requirement of the Plan, it set aside "an initial reserve of 13.5% of New Common Stock allocated to Class 7 and Class 9 for the Disputed Claims Reserve. . .pursuant to Section 7.5 of the Plan." Defendants' Ex. C; 1144 Complaint at ¶ 32.

30

Subsequently, it became apparent to many parties – and even to this Court – that NorthWestern did not comply with its own Plan. Defendants' Ex. P. Indeed, its non-compliance is something NorthWestern does not even deny in its Motion to Stay/Dismiss. Given these undisputed facts, it is easy to infer that NorthWestern's vow to fund the Disputed Claims Reserve in accordance with Section 7.5 of the Plan was either made without regard for whether or not NorthWestern would comply or without belief that it would.

85.    The remaining factors are equally easy to demonstrate – even before discovery based on the undisputed evidence before this Court. Without the guarantee that holders of Disputed Claims would receive the same recovery as those holders of Allowed Claims in the same class, the Plan would not have been confirmable under the Bankruptcy Code. In fact, at the second day of the confirmation hearing, counsel for NorthWestern represented to this Court that consistent with its obligation under the Plan, NorthWestern would "put into the Class 9 reserve an amount for the claim that would hold back a certain level of the stock for the eventuality that the litigation may well result in a favorable judgment for those QUIP holders that are pursuing the litigation." Kaplan Decl. Ex. 4 at pp. 233-234; 1144 Complaint at ¶28. Thus, the representation that NorthWestern would adequately fund the reserve was made in order that the Bankruptcy Court would rely on it and confirm the Plan.

86.    The Bankruptcy Court specifically relied on NorthWestern's numerous representations, when it found that the QUIPS Litigation Claim was a disputed unsecured claim that was entitled to a reserve consistent with Section 7.5 of the Plan, such that if the Fraudulent Conveyance Proceeding is successful, holders of the QUIPS Litigation Claim will receive the distribution provided to holders Allowed Class 9 Claims. See Kaplan Decl. Ex. 5 at pp. 30, 39; 1144 Complaint at ¶29. Thereafter, the Confirmation Order was entered on October 19, 2004. 1144 Complaint at ¶22; Motion to Stay/Dismiss at ¶21.

87.    Moreover, both the Bankruptcy Court and the District Court further relied on the alleged "protection" NorthWestern afforded holders of Disputed Claims when they denied Magten's motion for a stay pending its appeal of the Confirmation Order. Specifically, in

31

denying the stay, this Court found that because the holders of the QUIPS Litigation Claims were being protected by being included in the Disputed Claims Reserve, Magten and the other holders of the QUIPS were being treated fairly and "for that reason there is – there has been an inadequate showing of irreparable harm..." Kaplan Decl. Ex. 7 at p. 29; 1144 Complaint at ¶35. Similarly, when Magten sought a stay from the District Court, counsel for NorthWestern expressly represented to the District Court that "there is more than enough reserve being set aside in the Class 9 reserve pool for Class 9 unsecured claims." Kaplan Decl. Ex. 2 at p. 35; 1144 Complaint at ¶37. Because NorthWestern had once again represented that the Plaintiffs and other holders of Disputed Claims were adequately protected, Magten's motion for a stay was denied by the District Court. Approximately four months later it became publicly known for the first time that NorthWestern had not honored its obligations under the Plan and had misrepresented its intentions to both this Court and the District Court.

88.    Despite this Court's findings and the statements made by parties in interest at the 9019 Hearing regarding the inadequacy of the Disputed Claims Reserve, NorthWestern claims that its non-compliance was an honest mistake, resulting from "fast-paced, constantly-evolving circumstances." Motion to Stay/Dismiss at p. 34. This argument is nonsensical in light of the fact that NorthWestern controlled the timing of the Confirmation Hearing, the setting of the Disputed Claims Reserve and the timing of the distributions. NorthWestern's hasty decision to proceed with confirmation without being able to comply with the terms of the Plan does not form the basis of a valid defense to the 1144 Complaint.

89.    Moreover, NorthWestern has the audacity to contend that "no claims holder has been denied a distribution to which it was entitled." Id. As discussed herein, this is patently false, as Plaintiffs were denied the claim agreed to under the Settlement Agreement in part because this Court found, based on NorthWestern's statements and the statements of other parties in interest, that there was not a sufficient amount of New Common Stock in the Disputed Claims Reserve to satisfy the Settlement Agreement -- an amount that was substantially less than the full amount of Plaintiffs' claim.

32

90.     As if to further tout the results of its fraud, NorthWestern asserts that because it
has been so successful in resolving claims, there has been a "decrease in the total amount [of
claims] asserted against the estate (as the Debtor expected); and the total amount of the Disputed
Claims Reserve is sufficient to cover all disputed claims which are currently pending against the
estate." Motion to Stay/Dismiss at p. 34.  The brazenness of this statement is unparalleled.  First,
NorthWestern essentially admits that it did not comply with the terms of the Plan and
Confirmation Order when establishing the Disputed Claims Reserve because it apparently
thought that the actual amount of asserted claims would be lower.  On its face, this is an
admission of the allegations in the Complaint.  Second, NorthWestern seeks to excuse its fraud
by arguing that it got lucky insofar as there is now enough stock.  This does not change the fact
that harm has already been done – the Settlement Agreement was denied and the Court has been
defrauded.  The fact that NorthWestern believes it may all work out in the end is immaterial to
the allegations of the 1144 Complaint – which as demonstrated above are generally undisputed
and more than sufficient to withstand the Defendants' Motion to Stay/Dismiss.

## V.     NO WAIVER OF CLAIMS

91.     NorthWestern's arguments that Plaintiffs are estopped from alleging fraud or the
inadequacy of the Disputed Claims Reserve is nonsensical, especially when considered in light
of the fact Plaintiffs were denied an Allowed Claim significantly less than the total amount of
their claim because the Disputed Claims Reserve did not contain enough stock to make a
distribution on account of even that reduced claim.  The Stipulation establishing the QUIPS
Claim Reserve specifically provided – and this Court has recognized – that to the extent the
QUIPS Litigation Claim exceeded the $25 million reserve, the "'holders of such claims shall
have any deficiency satisfied out of the Disputed Claims Reserve' described in the Plan."
Defendants' Ex. P at p. 5 (quoting Defendants' Ex. M at ¶1 p. 3).  NorthWestern has admitted
this fact, as it must in light of this Court's holding.  Motion to Stay/Dismiss at p. 35.  The Court
then went on to hold that because of the "financial dilemma" NorthWestern creased by

33

improperly funding the Disputed Claims Reserve, it would be "imprudent" to distribute to Plaintiffs any recovery in excess of the $25 million QUIPS Litigation Reserve. <u>Defendants' Ex. P</u> at p. 6; <u>1144 Complaint</u> at ¶¶49-50.

92.    Despite the clear language of the Stipulation, NorthWestern argues that because it had no duty to replenish the Disputed Claims Reserve, and because Magten did not object to that or any other provision of the Stipulation that Magten has waived any right to object to the adequacy of the Disputed Claims Reserve – a proposition for which NorthWestern has cited no authority. <u>Motion to Stay/Dismiss</u> at pp. 35-36.  While Plaintiffs concede that NorthWestern did not have a duty to add more stock to the Disputed Claims Reserve, NorthWestern had a duty to fund the reserve properly in the first place.  Had NorthWestern properly funded the Disputed Claims Reserve, then it would not have been "imprudent" to distribute to Plaintiffs any recovery in excess of the $25 million QUIPS Litigation Reserve.

## VI.    PLAINTIFFS HAVE SUFFICIENTLY STATED A CLAIM FOR BREACH OF DUTY AGAINST INDIVIDUAL DEFENDANTS

93.    As discussed in greater detail above, Plaintiffs have satisfied pleading requirements of Federal Rule of Civil Procedure 12(b)(6).  As such, the 1144 Complaint cannot be dismissed unless it "appears with reasonable certainty that [Plaintiffs will] not be entitled to the relief sought under any set of facts which could be proven to support the action." <u>Geyer v. Ingersoll Publ'ns Co.</u>, 621 A.2d 784, 790 (Del. Ch. 1992).  As Defendants' authority reveals, it is well settled that in Delaware, once a company is insolvent (as NorthWestern was when the Plan was filed and the Confirmation Order was entered), that directors owe fiduciary duties to creditors. <u>See Id.</u> at 787-788 (noting an examination of Delaware caselaw reveals the existence of a duty to creditors exists from the moment of insolvency whether or not a bankruptcy proceeding has been commenced); <u>Official Comm. of Hechinger Inv. Co. of Del. v. Fleet Retain Fin. Group</u>, 274 B.R. 71, 89 (D. Del. 2002); <u>see also Prod. Res. Group, L.L.C. v. NCT Group, Inc.</u>, 863 A.2d 772, 790-791 (Del. Ch. 2004) ("when a firm has reached the point of insolvency,

34

it is settled that under Delaware law the firm's directors are said to owe fiduciary duties to the company's creditors.").

94.    The complaint states that the Individual Defendants as members of senior management, owed fiduciary duties to Plaintiffs. 1144 Complaint at ¶¶61-65. At the time the Plan was filed and the Confirmation Order was entered, both setting forth the requirements for funding the Disputed Claims Reserve, NorthWestern was insolvent because the debt-for-equity swap contemplated by the Plan had not yet occurred. As a result, the Individual Defendants owed Plaintiffs and all of their creditors fiduciary duties to comply with the terms of the Plan and the Confirmation Order. As this Court has already determined, NorthWestern did not comply with those terms. See Defendants' Ex. P at p. 6. As a result, Plaintiffs have stated sufficient facts to withstand Defendants' Motion to Stay/Dismiss and begin conducting discovery.

95.    NorthWestern argues that directors are free to favor one group of similarly situated creditors over another. Motion to Stay/Dismiss at p. 38. However, while that may be true, that is not the situation presented in the case at bar. Here the Defendants concealed their intent to favor certain creditors from this Court and its creditor body at large. This is the nexus of the 1144 Complaint – that the Defendants represented that holders of Disputed Claims would receive the same treatment as their Allowed Claim counterparts and then underfunded the Disputed Claims Reserve so that the equal treatment was impossible to achieve. Such conduct goes far beyond favoritism and crosses the line into fraud and breach of fiduciary duty. See Production Resources Group, 863 A.2d 800 (noting that a complaint for breach of fiduciary duty to creditors is properly pleaded where one creditor or group of creditors is favored and there is no basis for the favoritism).

96.    Lastly, NorthWestern argues that Plaintiffs fail to state a claim against the Individual Defendants because Plaintiffs have not alleged self-dealing by the Individual Defendants. Motion to Stay/Dismiss at p. 38. Interestingly, on June 10, 2005, NorthWestern filed several motions pursuant to Bankruptcy Rule 9019 seeking Court approval of several settlement agreements. Included in these were NorthWestern's motion to enter into settlement

35

agreements with (i) Certain Members of the NorthWestern Corporation Supplemental Income Security Plan, the NorthWestern Public Service Company Deferred Compensation Plan for Non-Employee Directors, and the NorthWestern Public Service Company Directors' Retirement Plan; and (ii) Certain Members of the NorthWestern Corporation Cash Balance Supplemental Executive Retirement Plan and the NorthWestern Energy Long-Term Incentive Plan. Among others, these motions seek to settle the claims of Michael Hanson and Gary Drook – two of the Individual Defendants – and to pay the claims of those Individual Defendants from the Disputed Claims Reserve. Thus, while this Court determined that it was "imprudent" to grant the Plaintiffs an Allowed Claim in excess of the $25 million QUIPS Litigation Reserve, because of the underfunding of the reserve, NorthWestern now seeks to allow the claims of its senior management. Defendants' Ex. P at p. 6.

97.    Thus, because the Individual Defendants had a fiduciary duty to Plaintiffs and all of their creditors to fund the Disputed Claims Reserve in accordance with the terms of the Plan and the Disclosure Statement and because such terms were not complied with, Plaintiffs have set forth sufficient facts to conduct discovery and pursue this cause of action. Similarly, in light of the recent self-dealing by certain of the Individual Defendants, the relief sought in the Motion to Stay/Dismiss should be denied in its entirety.

## VII.    DEFENDANTS HAVE NOT MOVED TO DISMISS DECLARATORY JUDGMENT ACTION

98.    As a final matter, Plaintiffs note that Defendants have not moved to dismiss the third count of the 1144 Complaint wherein Plaintiffs seek a declaratory judgment that the Exculpated Parties are not entitled to exculpation with respect to the underfunding of the Disputed Claims Reserve. 1144 Complaint at ¶¶68-71. Pursuant to Section 10.1 of the Plan "none of the [Exculpated Parties] shall have to incur any liability to any holder of the Claim or Equity Interest for any act or omission in connection with, related to, or arising out of, the Chapter 11 Case, the preparation or formulation of the Plan, the pursuit of confirmation of this Plan, the consummation of this Plan or the administration of this Plan or the property to be

36

distributed under this Plan, except for willful misconduct or gross negligence…" Defendants' Ex. D at § 10.01 (emphasis added); 1144 Complaint at ¶67. The actions and omissions detailed in the 1144 Complaint and described in greater detail herein could only have occurred because of Defendants' willful misconduct or gross negligence in either failing to adequately fund the Disputed Claims or failing to adequately supervise the establishment of the Disputed Claims Reserve. 1144 Complaint at ¶68. Therefore, because Plaintiffs have sufficiently stated this cause of action and because Defendants have not moved to dismiss it or otherwise objected to it, this cause of action should proceed.

## VIII.  **CONCLUSION**

99.    It is undisputed that Defendants did not comply with the terms of the Plan or the Confirmation Order when establishing and funding the Disputed Claims Reserve. NorthWestern does not deny this fact, but attempts to couch its deliberate non-compliance with the defense that its non-compliance was a "mistake" or the result of its best-estimate because the Plan was moving forward quickly and was in a state of flux. Motion to Stay/Dismiss at pp. 30, 32, 34. These excuses do not remedy NorthWestern's non-compliance or provide a basis to dismiss the 1144 Complaint. Likewise, there is no basis to conclude that this Court has been divested of jurisdiction to consider the 1144 Complaint or that the 1144 Complaint is equitably moot. Rather, NorthWestern's motion to dismiss should be denied and Plaintiffs should be permitted to conduct discovery and to prove the allegations in the 1144 Complaint.

37

WHEREFORE, for all of the reasons set forth here, the Motion to Stay/Dismiss should be denied in its entirety.

Dated:  Wilmington, Delaware
       June 30, 2005

**BLANK ROME LLP**

Mark J. Packel (DE No. 4048)
Elio Battista, Jr. (DE No. 3814)
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone:  (302) 425-6400
Facsimile:    (302) 425-6464

– and –

**FRIED, FRANK, HARRIS, SHRIVER &**
    **JACOBSON LLP**
Bonnie Steingart
Gary Kaplan
One New York Plaza
New York, NY 10004
Telephone:  (212) 859-8000
Facsimile:    (212) 859-4000

Counsel for Magten Asset Management
    Corporation

**SMITH, KATZENSTEIN & FURLOW, LLP**

_s/ Kathleen M. Miller_
Kathleen M. Miller (I.D. No. 2898)
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE  19899
Courier 19801
Telephone: (302) 652-8400
Facsimile:  (302) 652-8405
– and –

**NIXON PEABODY LLP**
Amanda D. Darwin
John V. Snellings
Lee Harrington
100 Summer Street
Boston, MA  02110
Telephone: (617) 345-1000
Facsimile:  (617) 345-1300

Counsel for Law Debenture Trust Company of
    New York

120087.01600/40154921v1

# ATTACHMENT "1"

LEXSEE 1995 US DIST LEXIS 3218

In Re: CARL M. MAZZOCONE, Debtor. JUDITH ANN KATES, Appellant, v. FOX, ROTHSCHILD, O'BRIEN & FRANKEL, Appellee. LEWIS KATES, et al., Appellant, v. FOX, ROTHSCHILD, O'BRIEN &, FRANKEL, Appellee.

CIVIL ACTION No. 94-5068, CIVIL ACTION No. 94-5201

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*1995 U.S. Dist. LEXIS 3218*

March 15, 1995, Decided
March 16, 1995, FILED, ENTERED

**PRIOR HISTORY:** [*1] BANKRUPTCY No. 93-12296S

**COUNSEL:** For IN RE: CARL MAZZOCONE, DEBTOR: PAUL J. BRENMAN, FOX, ROTHSCHILD, O'BRIEN & FRANKEL, PHILA, PA. ARMANDO A. PANDOLA, JR., ARAMDO A. PANDOLA, ATTY AT LAW, PHILA, PA.

For JUDITH ANN KATES, APPELLANT: MELVIN LASHNER, LASHNER & LASHNER, PHILA, PA.

DAVID T. SYKES, ESQ., INTERESTED PARTY, PRO SE , DUANE, MORRIS HECKSCHER, PHILADELPHIA, PA.

FREDERIC J. BAKER, ESQ., TRUSTEE, PRO SE , ASST. UNITED STATES TRUSTEE, THE CURTIS CENTER, PHILADELPHIA, PA.

**JUDGES:** Assigned to: JUDGE LOWELL A. REED, JR.

**OPINIONBY:** LOWELL A. REED, JR.

**OPINION:**

### MEMORANDUM

**Reed, J.**

**March 15, 1995**

The instant appeal arises out of the Chapter 11 bankruptcy proceedings of Carl M. Mazzocone, debtor.

Currently before this Court is the appeal of Judith Ann Kates from an Order of the United States Bankruptcy Court for the Eastern District of Pennsylvania dated July 20, 1994 distributing the funds obtained from the sale of property jointly owned by appellant and debtor. (Civil Action No. 94-5068) Also currently before this Court is the appeal of Lewis Kates, the law partnerships of Kates, Livesey, & Mazzocone and Kates & Mazzocone, and the real partnerships of Kates, [*2] Livesey & Mazzocone and Kates & Mazzocone n1 from that same Order. (Civil Action No. 94-5201) This Court has jurisdiction over these appeals pursuant to *28 U.S.C. § 158*(a). For the following reasons, the Order will be vacated with regard to the distributions to Fox, Rothschild, O'Brien & Frankel and to Armando A. Pandola, Jr., Esquire and the case will be remanded to the bankruptcy court for reconsideration of the fee applications of these attorneys and the objections of the Kates Parties to those applications. In all other respects, the Order will be affirmed.

n1 Mr. Kates and these four partnerships will be referred to collectively as the "Kates Parties."

### I. BACKGROUND

Appellant Judith Ann Kates and debtor each owned a one-half interest in certain real property located at 108 West 75th Street in New York City ("New York Property"). n2 In April 1993, debtor filed for Chapter 11 bankruptcy protection. At the time that debtor filed for bankruptcy, an agreement had been made to sell the New

York Property [*3] to the 108 West 75th Street Corporation ("Buyer"), but the sale had not yet been consummated. During the pendency of the bankruptcy proceedings, debtor moved the bankruptcy court to approve the sale of this property to the Buyer on basically the same terms as provided for in the original sales agreement. This motion was granted, despite various objections by appellant Judith Ann Kates, in an Order dated August 5, 1993 ("First Sale Order"). Mrs. Kates promptly appealed that Order ("First Appeal"). The First Sale Order set the closing date for the sale as September 20, 1993, but the closing failed to occur on that date. Debtor then made another motion for approval of the sale of the property to the Buyer on essentially the same terms but with a later closing date. The bankruptcy court granted that motion, again over the objections of Mrs. Kates, in an Order dated October 27, 1993 ("Second Sale Order"). Mrs. Kates again promptly appealed ("Second Appeal"). Mrs. Kates also sought a stay of the sale pending appeal, but her motion to stay was denied

by an Order of the bankruptcy court dated December 8, 1993. Shortly thereafter, the sale was consummated.

> n2 This Court is not making any finding at this time regarding the specifics of the ownership arrangement between appellant and debtor, except to note that the parties do not dispute that debtor and appellant each had a one-half interest in the property at issue.

[*4]

The proceeds from the sale, $ 800,000, were distributed in the following manner. Mrs. Kates received $ 350,000 immediately on account of her interest in the property. The remaining proceeds were deposited into the Registry of the District Court. In an Order dated April 29, 1994, the bankruptcy court adopted the court-appointed examiner's findings relating to the distribution of the funds held in the Registry. This distribution was to be as follows:

| | |
|---|---|
| To the real estate brokers: | $ 43,050.00 |
| To the City of New York: | 62,000.00 |
| To [Judith Ann] Kates: | 7,659.20 |
| To Mazzocone: | 332,659.20 |
| Leaving for resolution of certain matters on appeal: | 4,950.00 |

Examiner's Fifth Report at 25. n3 The amounts for Mrs. Kates and debtor were calculated so that Mrs. Kates would receive $ 25,000 more than debtor when the $ 350,000 already received by Mrs. Kates was considered. This $ 25,000 came from the fact that debtor, with the court's approval, had agreed to cover a $ 25,000 credit given to the Buyer in order to facilitate the sale. See Second Sale Order at 3. The examiner recommended that $ 4,950 be left in the Registry because he found that its disposition rested on the result of the First and Second Appeals that were still pending. For reasons that are unclear, the only portion of this distribution which apparently took place was the $ 43,050 to the real estate [*5] brokers; the remainder of the funds were not paid out of the Registry at this time.

> n3 The record on appeal does not reveal why the total amount of this recommended distribution exceeds $ 450,000.

On June 1, 1994, the bankruptcy court granted a motion to dismiss the bankruptcy case. An Order to that effect, dated June 2, 1994 and including various conditions, was subsequently filed ("Dismissal Order"). Included in these conditions were requirements that the liens of the City of New York on the property be satisfied in full within the proceeds of the sale of the New York Property, that the distribution of those proceeds be completed, and that parties wishing to submit claims on the proceeds should file claims and objections within a certain time frame. Lewis Kates appealed the Dismissal Order, but Mrs. Kates did not.

Various administrative claims were made to the bankruptcy court, both during the pendency of the bankruptcy proceedings and in response to the invitation for such claims made by the bankruptcy court [*6] in the Dismissal Order. Debtor's counsel, appellee Fox, Rothschild, O'Brien & Frankel, filed an application for interim compensation and reimbursement of expenses on February 8, 1994 for $ 198,694.23 and a second application for compensation and reimbursement of expenses on July 11, 1994 for $ 190,918.53, creating a

total administrative claim of $ 389,612.76. Debtor's special counsel, Armando A. Pandola, Jr., Esquire, filed an application for interim compensation on May 17, 1994 for $ 26,160. n4 And finally, the examiner, David Sykes, Esquire, filed an application for compensation on May 27, 1994 for $ 94,716.37.

> n4 The special counsel filed a second application for compensation on July 8, 1994, but the record on appeal does not include this second application. Therefore, it will not be considered by this Court.

Objections to these various claims were filed by creditor Joseph Livesey, Mrs. Kates, and the Kates Parties. At the July 20, 1994 hearing on these claims, debtor and the claimants presented the court [*7] with a settlement of the administrative claims; Mr. Livesey, Mrs. Kates, and the Kates Parties were not parties to this settlement. The court issued an Order on that day which provided for the following distribution of funds from the Registry:

| | |
|---|---|
| David T. Sykes, Esquire | $ 79,541.87 |
| Fox Rothschild O'Brien & Frankel | 225,000.00 |
| Armando A. Pandola, Jr., Esquire | 25,845.60 |
| City of New York | 66,225.05 |
| Judith Kates | 5,387.47 |

Order Setting Distribution of Proceeds Held in the Registry of the United States District Court of 7/20/94 ("Distribution Order"). The payments to Sykes, the firm of Fox, Rothschild, O'Brien & Frankel, and Pandola were in accordance with the settlement presented to the court. The balance of the funds in the Registry was ordered held pending resolution of the First and Second Appeals. Mrs. Kates and the Kates Parties then filed the instant appeals of the Distribution Order. Mrs. Kates also moved for a stay of the Distribution Order pending appeal. That stay was denied by this Court on July 22, 1994.

On February 15, 1995, this Court dismissed the First Appeal as moot. On February 21, 1995, this Court dismissed the Second Appeal as moot. On March 6, 1995, acting on the appeal by Mr. Kates, this Court vacated the Dismissal Order and remanded the case to the bankruptcy court for further proceedings.

## II. APPEAL [*8] OF JUDITH ANN KATES

Appellant Judith Ann Kates raises four issues on appeal. First, she questions whether the bankruptcy court had jurisdiction to distribute the proceeds from the sale of the New York Property when the orders approving that sale were on appeal. Second, she questions the amount ultimately paid to the City of New York. Third, she questions whether the bankruptcy court had jurisdiction to distribute the proceeds when the underlying bankruptcy case had been dismissed. And fourth, she questions whether the bankruptcy court had jurisdiction to pay the administrative claims when the ownership of the assets used to pay those claims was still

being contested and when the administrative claims were never determined to be reasonable, appropriate, and proper.

### A. Issues Properly Presented on Appeal

Appellee Fox, Rothschild, O'Brien & Frankel n5 claims that Mrs. Kates has waived all but the first issue she sought to raise on appeal because she has failed to argue the other issues. It is true that when a party fails to properly brief an issue on appeal, that party is considered to have waived that issue. See, e.g., *Moore v. FDIC, 993 F.2d 106 (5th Cir. 1993)*; [*9] *Greenbrier, Ltd. v. City of Alabaster, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989)*; *Jusino v. Zayas, 875 F.2d 986, 993 n.9 (1st Cir. 1989)*; *Community Bank v. Boone (In re Boone), 164 Bankr. 167, 169-70 n.1 (S.D. Fla. 1994)*. In the instant case, Mrs. Kates listed all four issues in her brief. She then proceeded, however, to argue only two of the issues in the remainder of the brief. See brief of appellant at 9-14. In addition, while she included one section in her brief relating to the divestiture of jurisdiction by the appeals issue and another section relating to the validity of the administrative claims issue, the argument in the second section merely restated the argument in the first section. See id. at 13-14. Thus the only issue for which Mrs. Kates has provided any legal argument or authority is the effect of the pending appeals on the jurisdiction of the bankruptcy court. Therefore, Mrs. Kates has waived the other issues she sought to raise on appeal.

n5 Fox, Rothschild, O'Brien & Frankel is the only party besides Mrs. Kates that filed a brief in this appeal.

[*10]

Normally this waiver would limit the matters on appeal to the single issue of whether the pendency of the First and Second Appeals divested the bankruptcy court of jurisdiction to distribute the funds realized from the sale of the New York Property. But as the issue of whether the dismissal of the bankruptcy case divested the bankruptcy court of jurisdiction to distribute the proceeds goes to the subject matter jurisdiction of the bankruptcy court, this Court will also consider that issue despite appellant's waiver of it. See *Fed. R. Civ. P. 12(h)(3)*; *Packard v. Provident Nat'l Bank, 994 F.2d 1039, 1049 (3d Cir. 1993)* (holding that federal courts are "under a continuing duty to satisfy themselves of their jurisdiction before proceeding to the merits of any case"), cert. denied sub nom. *Upp v. Mellon Bank, N.A., ___ U.S. ___, 114 S. Ct. 440 (1993)*.

## B. Divestiture of Jurisdiction by Pending Appeals

It is well established that the filing of a notice of appeal divests the lower court "of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58 (1982)*. The purpose of this judge-made rule is [*11] "to prevent the confusion and inefficiency that would result if both the district court and the court of appeals were adjudicating the same issues simultaneously." *Mary Ann Pensiero, Inc. v. Lingle, 847 F.2d 90, 97 (3d Cir. 1988)*. Since this rule is prudential, it "should not be applied when to do so would defeat its purpose of achieving judicial economy." Id.. This rule is equally applicable to an appeal from a bankruptcy court decision as to an appeal from a district court decision. See, e.g., *Bialac v. Harsh Inv. Corp. (In re Bialac), 694 F.2d 625, 627 (9th Cir. 1982); In re Neuman, 67 Bankr. 99, 101 (S.D.N.Y. 1986); In re de Kleinman, 150 Bankr. 524, 526 (Bankr. S.D.N.Y. 1992)*.

In the bankruptcy context, some general principles have emerged regarding the exact boundaries of divestiture of jurisdiction by pending appeals. Courts have consistently held that a bankruptcy court lacks jurisdiction to vacate or modify an order which is the subject of a pending appeal. See, e.g., *Bennett v. Gemmill (In re Combined Metals Reduction Co.), 557 F.2d 179, 201 (5th Cir. 1977); In re Eddis, 37 Bankr. 217, 218 (E.D. Pa. 1984); de Kleinman, 150 Bankr. at [*12] 527*. Courts have also consistently held that if an issue is raised on appeal, a bankruptcy court cannot reconsider that issue even in the context of another Order. See, e.g., *Bialac, 694 F.2d at 627; Bryant v. Smith (In re Bryant),*

*175 Bankr. 9, 12 (W.D. Va. 1994); In re Maddox, 84 Bankr. 251, 255 (Bankr. N.D. Ga. 1987); In re Wonder Corp. of America, 81 Bankr. 221, 225 (Bankr. D. Conn. 1988)*. But most courts have also held that bankruptcy courts retain jurisdiction to enforce, implement, and otherwise treat as valid judgments and orders that are the subject of pending appeals, as long as that enforcement and implementation does not require redeciding issues that are on appeal. See, e.g., *Dicola v. American Steamship Owners Mut. Protection and Indemnity Ass'n (In re Prudential Lines), 170 Bankr. 222, 243-45 (S.D.N.Y. 1994); C.H. Sanders Co. v. BHAP Housing Dev. Fund Co., 750 F. Supp. 67, 69 (E.D.N.Y. 1990); In re Commodore Corp., 86 Bankr. 564, 568 (N.D. Ind. 1988)*. But see *In re Madill, 65 Bankr. 729, 733 (D. Mont. 1986)* (district court held that bankruptcy court lacked jurisdiction to lift stay because order rejecting Chapter 13 plan was on [*13] appeal); *Keck v. Nat'l Farmers Org. (In re Sandy Lake Transfer, Inc.), 49 Bankr. 504 (Bankr. W.D. Pa. 1985)* (bankruptcy court held that it lacked jurisdiction to approve the sale of property when the order establishing title for the same property was on appeal). This distinction is especially important in the bankruptcy context, where there are often "myriad issues, many totally unrelated and unconnected with the issues involved in any given appeal taken by a litigant in the course of the administration of a case." *Urban Dev. Ltd. v. Hernando New York Assoc. (In re Urban Dev. Ltd.), 42 Bankr. 741, 744 (Bankr. M.D. Fla. 1984)*. Adopting a broader divestiture of jurisdiction rule in the bankruptcy context would "severely hamper the bankruptcy court's ability to administer its cases in a timely manner." *Sullivan Central Plaza I, Ltd. v. Bancboston Real Estate Capital Corp. (In re Sullivan Central Plaza I, Ltd.), 935 F.2d 723, 727 (5th Cir. 1991)* (declining to adopt a rule that a bankruptcy court lacks jurisdiction over "any request which either directly or indirectly touches upon the issues involved in a pending appeal and may not do anything which has any impact on the order [*14] on appeal"). Based on this case law, at least one court has specifically held that bankruptcy courts retain jurisdiction to distribute the proceeds from a sale of property even when the order approving that sale is on appeal. *In re Bencker, 122 Bankr. 506, 509 (Bankr. W.D. Mich. 1990)*.

In the First Appeal, appellant challenged various provisions of the August 5, 1993 Order which she alleged violated an agreement between the parties. Specifically she challenged that Order's failure:

> 1. to provide for immediate distribution of the undisputed portion of appellant's share of the proceeds;

2. to assign the $ 25,000 credit solely to debtor's share of the proceeds;

3. to bar deductions for real estate commissions at the settlement;

4. to reserve for later determination the portion of taxes, fines, interests, and penalties incurred after November 23, 1992 that should be borne by the buyer and/or debtor;

5. to order the buyer to place the initial deposit in the Registry of the District Court;

6. to afford appellant her right to purchase the New York Property upon the partition of that property;

7. to protect her legal rights relating to the New York [*15] Property; and

8. to issue an order consistent with the agreement that the parties had reached regarding the sale.

In the Second Appeal, appellant challenged:

1. the bankruptcy court's jurisdiction to approve the sale of the New York Property when the First Appeal was pending;

2. the bankruptcy court's finding that the sale was made in good faith;

3. the bankruptcy court's approval of the sale agreement with which the buyer had failed to comply under the First Sale Order;

4. the bankruptcy court's apparent application of an allegedly forfeited deposit to the purchase price resulting in a sale below fair market value; and

5. the bankruptcy court's alleged penalization of appellant and debtor for the delay occasioned solely by the breach of the Buyer by directing that all adjustments be made as of the new date of closing.

In making the distribution of the proceeds from the sale of the New York Property, the bankruptcy court made decisions regarding the share of the proceeds that should go to appellant, debtor, and the City of New York. The bankruptcy court did not resolve the issue of how much should be paid to the real estate brokers, [*16] as the parties agreed that the amount necessary to resolve that claim should be kept in the Registry pending resolution of the matters on appeal. n6 Hearing Before the Honorable David A. Scholl, United States Bankruptcy Judge, 7/20/94 ("Hearing, 7/20/94"), at 3-4. The bankruptcy court then used debtor's share to pay the administrative claims that had been made against debtor. The bankruptcy court also determined that when the remaining claim of the real estate brokers was resolved, the interest accumulated in the Registry should be distributed pro-rata to the various payees.

n6 The first payment to the real estate brokers of $ 43,050 was apparently uncontested and, under any conditions, was not the subject of the Distribution Order. The remaining $ 4,950 claimed by the brokers was contested, however, as appellant claimed that the brokers were owed their 6% commission only on $ 717,500, since the remainder of the proceeds from the sale came from the initial deposit which appellant claims was forfeited and so could not be used as a basis for the real estate brokers' commission.

[*17]

Since the facts underlying this divestiture of jurisdiction issue are undisputed, my review of the bankruptcy court's conclusion that it was not divested of jurisdiction by the pending appeals is plenary. *Brown v. Pennsylvania State Employees Credit Union, 851 F.2d 81, 84 (3d Cir. 1988)*. A comparison of the issues on appeal and the issues addressed in the Distribution Order does not reveal any overlap between these issues. The closest possible intersection is between the last issue raised in the Second Appeal, regarding the allocation of "adjustments" to the appellant and debtor, and the Distribution Order issue of how much of the proceeds should be distributed to the City of New York. The record on appeal is, however, completely unclear on the details of what those "adjustments" were, and if they related to the claims of the City of New York. Since appellant bears the burden of providing a complete record on appeal, appellant must bear the consequences of this lack of clarity. See, e.g., *In re Abijoe Realty Corp., 943 F.2d 121, 123 n.1 (1st Cir. 1991)* ("responsibility for voids in the appellate record must reside with the party whose claim of error depends for support [*18] upon any portion of the record of the

proceedings below which was omitted from the designation of the record on appeal"). Therefore, the issues resolved by the bankruptcy court in the Distribution Order were not the subject of the First and Second Appeals. As a result, the bankruptcy court was not divested of jurisdiction to issue the Distribution Order by the pendency of the First and Second Appeals.

## C. Divestiture of Jurisdiction by Dismissal of Bankruptcy Case

When a bankruptcy court dismisses a bankruptcy case, it may exercise its discretion to retain jurisdiction over various matters if factors such as judicial economy, fairness and convenience to the litigants and the degree of difficulty of the legal issues involved would support such retention. *Smith v. Commercial Banking Corp. (In re Smith), 866 F.2d 576, 580 (3d Cir. 1989)*. Retention of jurisdiction over the distribution of property is especially appropriate when the bankruptcy court has actually or constructive custody of the property. E.g., *Cline v. Kaplan, 323 U.S. 97, 98 (1944); Makoroff v. Sorry Charlie's (In re Sorry Charlie's), 100 Bankr. 258, 262 (Bankr. W.D. Pa. 1989); In re Cuascut [*19] , 91 Bankr. 13, 15 (Bankr. E.D. Pa. 1988); Wallace Med. Ctr. v. Wallace (In re Wallace), 46 Bankr. 807, 808-09 (Bankr. W.D. Mo. 1984)*. Since the decision to retain jurisdiction is discretionary, it is reviewed for abuse of discretion. *Smith, 866 F.2d at 580*.

In the instant case, the bankruptcy court stated in the Dismissal Order that the case would "remain open" for the purpose of completing the distribution of the proceeds from the sale of the New York Property and, specifically, that the liens of the City of New York would be satisfied. Dismissal Order P 4. While not invoking the magic word "jurisdiction," the bankruptcy court clearly intended to retain jurisdiction over the distribution of those proceeds. Such retention was just as clearly a proper exercise of discretion. The issues surrounding the distribution of those proceeds had already been argued extensively before the bankruptcy court, and had been the subject of careful scrutiny by the court-appointed examiner. All of the parties present at the hearing relating to the motion to dismiss expressed a willingness to have the court proceed with the distribution subsequent to the dismissal, including Mrs. Kates. Hearing [*20] Before the Honorable David A. Scholl, United States Bankruptcy Judge, 6/1/94, at 26, 30-43. It would have served no purpose to require, at this late stage, the parties that had a claim to the proceeds to go to some other forum in order to resolve their claims. Therefore, the dismissal of the bankruptcy case did not deprive the bankruptcy court of jurisdiction to distribute the proceeds from the sale of the New York property

given that the court specifically retained jurisdiction over this matter and was well within its discretion in doing so.

## III. APPEAL OF THE KATES PARTIES

The Kates Parties challenge the bankruptcy court's awarding of administrative fees and expenses to debtor's counsel and special counsel. n7 Specifically, they argue that the bankruptcy court erred by: (1) failing to conduct an evidentiary hearing on the administrative claims; (2) failing to consider the nature, extent and value of services, the benefit of such services to the estate, and the results achieved; (3) failing to make findings of fact and to assure that the administrative claim petitions complied with applicable legal standards; and (4) awarding compensation and reimbursement of expenses [*21] to the special counsel for matters outside the scope of the bankruptcy court's appointment. n8

> n7 The Kates Parties do not challenge the amount paid to the examiner, and made it clear during the July 20, 1994 that they had no objections to the examiner's claim. Hearing, 7/20/94, at 26.

> n8 The Kates Parties also challenge the Distribution Order as a whole on the same jurisdictional grounds as those asserted by Mrs. Kates; as discussed previously, this Court rejects those grounds. The Kates Parties also appear to argue that even if the bankruptcy court had jurisdiction to issue the Distribution Order, it lacked jurisdiction to actually implement that Order because of the pendency of Mrs. Kates appeal of the Distribution Order. As already discussed, bankruptcy courts retain jurisdiction to implement Orders even if those Orders are on appeal. The proper course of action to stop the distribution was to seek a stay of that distribution. This was the course pursued by Mrs. Kates, albeit unsuccessfully.

### A. [*22] Record on Appeal

Preliminarily, the argument of the Kates Parties that the materials listed by appellee Fox, Rothschild, O'Brien & Frankel n9 in its designation of additional items to be included in the record on appeal should not be considered by this Court needs to be addressed. The Kates Parties argue that some of these items were never part of the bankruptcy record, that others were insufficiently described so as to determine if they were presented to the bankruptcy court, and that the remaining items were not part of the record for the fee application.

n9 Fox, Rothschild, O'Brien & Frankel is the only party besides the Kates Parties that filed a brief in this appeal.

A review of the items designated by appellee to be included in the record on appeal reveals that while most of the items listed were filed in the bankruptcy court and included in its docket and so are properly before this Court, n10 nine items may not be properly before this Court. Three of these items came into existence after the July [*23] 20, 1994 Distribution Order: the motion of Mrs. Kates for a stay of the July 20, 1994 Order, the transcript of the hearing on that motion, and this Court's Order denying that motion. n11 Two items were apparently filed only in this Court and so were not before the bankruptcy court: the appellee brief in Civil Action No. 93-6231 and the request for distribution of proceeds. And four other items appear not to have ever been made part of the bankruptcy court's docket or this Court's docket: letter of the Honorable David A. Scholl of June 17, 1994, letter of David Sykes of July 5, 1994, letter of David Sykes of July 15, 1994, and the proposed order of the City of New York. Since none of these items are necessary for this Court's resolution of the issues presented by the Kates Parties, I will assume without deciding that these items are not properly before this Court and will not consider them while reviewing the Distribution Order. n12

n10 The Kates Parties imply that even if some items were on the bankruptcy court's docket, they were not properly part of the record with regard to considering the fee applications. None of the cases cited by the Kates Parties, however, support such a segregation of the bankruptcy court's record, nor has this Court been able to find any other support for such a segregation. Therefore, the items that were on the bankruptcy court's docket prior to the issuance of the Distribution Order and which have been included in the record on appeal are properly before this Court. [*24]

n11 This is not to say that these items are not necessarily relevant to the procedural history of the case, but they could not, of course, have had any bearing on the bankruptcy court's decision to issue the Distribution Order.

n12 Since these materials were also not necessary for the resolution of the jurisdictional issues raised by both the Kates Parties and by

Mrs. Kates, I also did not consider these materials in resolving the jurisdictional issues discussed in the previous section addressing Mrs. Kates' appeal.

**B. Evidentiary Hearing**

The section of the bankruptcy code dealing with fee applications requires that a notice and a hearing be given before such applications are granted or denied. *11 U.S.C. § 330*(a). A bankruptcy court is not required, however, to conduct a full blown evidentiary hearing before approving fee applications. See, e.g., *In re Heck's Properties, Inc., 151 Bankr. 739, 748 (S.D.W. Va. 1992)*; cf. *Industrial Ins. Serv. v. Zick (In re Zick), 931 F.2d 1124, 1129 (6th Cir. 1991)* (the dismissal of a Chapter 7 bankruptcy case does not require a "the [*25] formalities of a full-blown evidentiary hearing" when an adequate opportunity was provided for the parties to support their positions). The Bankruptcy Code defines the phrase "after notice and a hearing" to mean "after such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances," thereby leaving the exact scope of hearing to the discretion of the bankruptcy court. *11 U.S.C. § 102*(1)(A). In the instant case, while the Kates Parties raised numerous objections, they failed to identify any evidence, either in their written objections or at the hearing, that they desired to present to the bankruptcy court; n13 they appeared to rely solely on the billing statements that accompanied the applications. Therefore, there was no reason for the bankruptcy court to seek evidence beyond that already submitted to the court with the applications, and so the bankruptcy court's failure to hold a more extensive hearing was not an abuse of discretion.

n13 The only reference to such evidence was a comment by debtor's counsel that counsel for the Kates Parties "wants to go through testimony, whoever he wants to call." Hearing, 7/20/94, at 29. No other person present, including counsel for the Kates Parties, followed up on this statement. This statement, which was not even made by the counsel for the Kates Parties, is insufficient to constitute a request for an expanded hearing.

[*26]

**C. Other Alleged Failures**

The Bankruptcy Code provides:

1995 U.S. Dist. LEXIS 3218, *

After notice to any parties in interest and to the United States trustee and a hearing . . . the court may award to a trustee, to an examiner, to a professional person . . ., or to the debtor's attorney --

(1) reasonable compensation for actual necessary services rendered by such trustee, examiner, professional person, or attorney, as the case may be, and by any paraprofessional persons employed by such trustee, professional person, or attorney, as the case may be, based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a cause under this title; and

(2) reimbursement for actual, necessary expenses.

*11 U.S.C. § 330(a).* The case law that has developed around this statute is relatively straight forward. The person applying for compensation and reimbursement of expenses bears the burden of persuasion. See, e.g., *In re Kenneth Leventhal & Co., 19 F.3d 1174, 1177, 1178 (7th Cir. 1994); Continental Illinois Nat'l Bank & Trust Co. v. Charles N. Wooten, Ltd. (In re Evangeline Ref. Co.), 890 F.2d* [*27] *1312, 1326 (5th Cir. 1989); In re Metro Transp. Co., 107 Bankr. 50, 53 (E.D. Pa. 1989).* In addition to demonstrating that the fees sought are reasonable as required by the statute, a growing number of courts have held that the applicant must also convince the bankruptcy court that the fees sought were incurred for the benefit of the estate. See, e.g., *In re Reed, 890 F.2d 104, 105 (8th Cir. 1989); Trustees of the Amalgamated Ins. Fund v. McFarlin's, Inc., 789 F.2d 98, 101 (2d Cir. 1986); Mayer, Glassman & Gaines v. Washam (In re Hanson), 172 Bankr. 67, 70-73 (Bankr. 9th Cir. 1994); In re Kingsbury, 146 Bankr. 581, 585 (Bankr. D. Me. 1992)* (collecting cases); *In re Sounds Distrib. Corp., 122 Bankr. 952, 955 (Bankr. W.D. Pa. 1991).* The applicant must provide detailed records identifying the professionals involved, the specific tasks they performed, the amount of time spent on each task, and the applicable billing rate, as well as an explanation of the expenses. Fed. R. Bankr. P. 2016; L.B.R. 2002.2(a); *In re Chiapetta, 159 Bankr. 152, 157 (Bankr. E.D. Pa. 1993).* Some courts have held that once this information is provided, the applicant has created a prima [*28] facie case, and any objector to the application bears a burden of production with regard to evidence that would justify reducing the fees sought. *In re Blackwood Associates, L.P., 165 Bankr. 108, 111-12 (Bankr. E.D.N.Y. 1994); In re Hunt's Health Care, Inc.,*

*161 Bankr. 971, 981 (Bankr. N.D. Ind. 1993); In re Ralph Marcantoni & Sons, 62 Bankr. 245, 247 (D. Md. 1986);* see also *In re Meade Land & Dev. Co., 527 F.2d 280, 284 (3d Cir. 1975)* (holding that a fee application colorably showing that attorney's services were legal in nature creates *prima facie* case which can only be rebutted by production of contrary evidence). The decision of whether to award fees and reimbursement of expenses is within the discretion of the bankruptcy court and is reviewed for abuse of discretion. *Kenneth Leventhal & Co., 19 F.3d at 1177; Evangeline Ref. Co., 890 F.2d at 1325; Southwestern Media v. Rau, 708 F.2d 419, 422 (9th Cir. 1983); In re Rheam of Indiana, Inc., 142 Bankr. 698, 700 (E.D. Pa. 1992).* Any factual findings relied upon by the bankruptcy court in exercising its discretion are reviewed under a clearly erroneous standard and any legal conclusions relied [*29] upon by the bankruptcy court are subject to plenary review. *Brown, 851 F.2d at 84; Meade Land & Dev. Co., 527 F.2d at 282-83.* The bankruptcy court is required to review fee applications, notwithstanding the absence of any objections from interested parties. *In re Busy Beaver Bldg. Centers, Inc., 19 F.3d 833, 841 (3d Cir. 1994).* And, if there are objections, the bankruptcy court is required to make appropriate findings of fact and conclusions of law. *Fed. R. Bankr. P. 7052* (making *Fed. R. Civ. P. 52* relating to findings of fact and conclusions of law applicable to bankruptcy cases), 9014 (making *Fed. R. Bank. P. 7052* applicable to all contested matters); *FDIC v. Grimm (In re Grimm), 156 Bankr. 958, 962 n.8 (E.D. Va. 1993).*

An examination of the record on appeal reveals that the bankruptcy court failed to conduct even a cursory review of at least some if not all of the fee applications. The following hearing exchange occurred during the July 20, 1994 hearing on the applications:

THE COURT: Okay, well let me see what we have left here. We still have, I suppose -- well, that's -- maybe there are some new issues, but the last time I was here, I issued an Order and [*30] you were going to -- all these administrative claims were going to be made by July 11th and there were three applications filed. Actually, I think Mr. Pandola filed two, so maybe there were four. You had one that was around from before, but you filed --

MR. BRENMAN [debtor's counsel]: Yes.

THE COURT: -- a new one.

MR BRENMAN: We filed a new one.

1995 U.S. Dist. LEXIS 3218, *

**THE COURT**: Mr. Sykes filed one. There were objections. I have not looked at those applications.

Hearing, 7/20/94, at 5. As the context reveals, the phrase "I have not looked at those applications" refers to, at a minimum, the second application by debtor's counsel and the application by the examiner; it is possible that the phrase refers to all of the applications. Since the Distribution Order was actually signed by the bankruptcy judge during this hearing, the bankruptcy court apparently never looked at some if not all of the applications before signing that Order. Id. at 32. Nor does the record on appeal reveal any explicit findings of fact by the bankruptcy court that would support its granting of the contested applications, and, since the bankruptcy court did not review at least [*31] some of the applications, no implicit findings of fact can be assumed. The failure of the bankruptcy court both to review the applications and to make appropriate findings of fact constitutes an abuse of discretion. See *Busy Beaver Bldg. Centers, 19 F.3d at 841*. While this Court is not unaware of the burdens that fee applications can place on the bankruptcy courts, a failure to even look at some or all of the applications, especially when objections have been raised to them, cannot be overlooked.

**D. Harmless Error**

Appellee Fox, Rothschild, O'Brien & Frankel argues that even if the bankruptcy court erred by not making specific findings of fact, that error was harmless. It notes that its original claim of $ 389,612.76 was reduced to $ 225,000, so that even if a significant portion of the applied for fees had been denied, it still would have received at least the amount that it did receive.

It is true that the doctrine of harmless error applies to appellate review of bankruptcy court decisions. *Gianakas v. Gianakas (In re Gianakas), 917 F.2d 759, 761 (3d Cir. 1990)*. It has also been applied specifically to the fee application process. *In re Spillane, 884 F.2d* [*32] *642, 647 (1st Cir. 1989)*. In the instant case, however, the bankruptcy court did not review some if not all of the applications before signing the Distribution Order and made no findings of fact with regard to the applications. Therefore, in order to confirm that this failure was indeed harmless, this Court would have to in the first instance review the applications and make the findings that the bankruptcy failed to make. Such tasks are better left to the bankruptcy court, given its greater expertise in these matters. Therefore, this Court will decline appellee's invitation to perform these tasks and will instead vacate the Distribution Order with regard to the distributions to debtor's counsel and special counsel

and will remand this case to the bankruptcy court for reconsideration of the fee applications of these attorneys.

**IV. CONCLUSION**

For the foregoing reasons, the Order of the United States Bankruptcy Court for the Eastern District of Pennsylvania dated July 20, 1994 distributing the funds obtained from the sale of property jointly owned by appellant and debtor will be vacated with regard to the distributions to debtor's counsel, Fox, Rothschild, O'Brien & Frankel, [*33] and to debtor's special counsel, Armando A. Pandola, Jr., Esquire, and the case will be remanded to the bankruptcy court with instructions to reconsider the fee applications of these attorneys and the objections to those applications raised by the Kates Parties. In all other respects, the July 20, 1994 Order will be affirmed.

An appropriate Order follows.

**ORDER**

**AND NOW**, this 15th day of March, 1995, upon consideration of the appeal of Judith Ann Kates from the "Order Setting Distribution of Proceeds Held in the Registry of the United States District Court" of the United States Bankruptcy Court for the Eastern District of Pennsylvania dated July 20, 1994, having considered the brief of appellant, the brief of appellee Fox, Rothschild, O'Brien & Frankel, and the record on appeal, and also upon consideration of the appeal of Lewis Kates, the law partnerships of Kates, Livesey & Mazzocone and Kates & Mazzocone, and the real estate partnerships of Kates, Livesey & Mazzocone and Kates & Mazzocone ("Kates Parties") from the same Order, having considered the brief of appellants, the brief of appellee Carl M. Mazzocone, the reply brief of appellants, and the record on appeal, [*34] it is hereby **ORDERED**, for the reasons set forth in the foregoing memorandum, that the "Order Setting Distribution of Proceeds Held in the Registry of the United States District Court" of the United States Bankruptcy Court for the Eastern District of Pennsylvania dated July 20, 1994 is hereby **VACATED** only with regard to the payment of $ 225,000.00 to Fox, Rothschild, O'Brien & Frankel and with regard to the payment of $ 25,845.60 to Armando A. Pandola, Jr., Esquire. **IT IS FURTHER ORDERED** the July 20, 1994 Order of the Bankruptcy Court is **AFFIRMED** in all other respects. **IT IS FURTHER ORDERED** that this case is **REMANDED** to the Bankruptcy Court for reconsideration of the applications by Fox, Rothschild, O'Brien & Frankel and Armando A. Pandola, Jr., Esquire for compensation and reimbursement of expenses and the objections of the Kates Parties to those applications.

**LOWELL A. REED, JR., J.**

# EXHIBIT E

CLOSE WINDOW

PRINT PAGE

NORTHWESTERN CORP filed this 8-K on 04/26/2006.

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

### WASHINGTON, D.C. 20549

# FORM 8-K

### CURRENT REPORT

### Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): **April 25, 2006**

# NorthWestern Corporation
(Exact name of registrant as specified in its charter)

| | | |
|---|---|---|
| **Delaware** | **0-692** | **46-0172280** |
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**125 South Dakota Avenue**
**Sioux Falls, South Dakota**                                          **57104**
(Address of principal executive offices)                          (Zip Code)

**(605) 978-2908**
(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☒ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 1.01 Entry into a Material Definitive Agreement.**

Northwestern Corporation (the "Company"), a Delaware corporation, announced that it has entered into an Agreement and Plan of Merger, dated as of April 25, 2006 (the "Merger Agreement"), with Babcock & Brown Infrastructure Limited, an Australian public company ("Parent"), BBI US Holdings Pty Ltd., an Australian company and a direct wholly-owned subsidiary of Parent ("Holding Company"), BBI US Holdings II Corp., a Delaware corporation and direct wholly-owned direct subsidiary of Holding Company ("Holdings"), BBI Glacier Corp., a Delaware corporation and direct wholly-owned subsidiary of Holdings ("Sub"), pursuant to which Sub will merge with and into the Company (the "Merger"), with the Company continuing as the surviving corporation.

Pursuant to the Merger Agreement, at the effective time of the Merger, each outstanding share of common stock, par value $.01 per share, of the Company (the "Shares"), other than any Shares owned by the Company, Parent, Holding Company, Holdings or Sub or any of their respective subsidiaries, or by any stockholders who are entitled to and who properly exercise appraisal rights under Delaware law, shall be canceled and shall be converted automatically into the right to receive $37.00 in cash, without interest.

The consummation of the Merger is subject to the satisfaction or waiver of closing conditions applicable to both Parent and the Company, including the termination or expiration of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, the receipt of required regulatory approvals and the approval of the transaction by the stockholders of the Company. The Merger Agreement also contains customary representations, warranties and covenants of both Parent and the Company.

Immediately prior to the execution of the Merger Agreement, the Company and LaSalle Bank National Association, a national banking association, as rights agent (the "Rights Agent"), entered into an amendment (the "Rights Agreement Amendment") to the Rights Agreement, dated as of December 5, 2005 (the "Rights Agreement"), which provides that neither the execution of the Merger Agreement nor the consummation of the Merger will trigger the provisions of the Rights Agreement. The Rights Agreement Amendment is further described in Item 3.03 below.

The foregoing descriptions of the Merger Agreement and Rights Agreement Amendment do not purport to be complete and are qualified in their entirety by reference to the Merger Agreement and the Rights Agreement Amendment, which are filed as exhibits hereto, and are incorporated herein by reference.

**Item 3.03 Material Modification to Rights of Security Holders**

Immediately prior to the execution of the Merger Agreement, the Company and the Rights Agent entered into the Rights Agreement Amendment, which provides that neither the execution of the Merger Agreement nor the consummation of the Merger will trigger the provisions of the Rights Agreement.

In particular, the Rights Agreement Amendment provides the following: (i) neither Parent, Holding Company, Holdings, Sub, nor any of their respective affiliates or associates, shall be deemed to be an "Acquiring Person," (ii) neither a Flip-In Event, an event described in clauses (a) (i), (ii), or (iii) of Section 13 of the Rights Agreement, a Distribution Date, nor a Stock Acquisition Date shall be deemed to have occurred and (iii) no holder of any Rights shall be entitled to exercise such Rights under, or be entitled to any rights pursuant to, Sections 3(a), 7(a), 11(a) or 13 of the Rights Agreement, in each of (i), (ii) and (iii) above, by reason of the approval, execution or delivery of the Merger Agreement or any amendments thereof or the commencement or, prior to termination of the Merger Agreement, the consummation, of any of the transactions contemplated by the Merger Agreement, including the Merger. The Rights Agreement Amendment also redefines "Expiration Date" to include the time immediately prior to the effective time of the Merger.

The foregoing description of the Rights Agreement Amendment does not purport to be complete and is qualified in its entirety by reference to the Rights Agreement Amendment, which is filed as an exhibit hereto, and is incorporated herein by reference.

**Item 8.01 Other Events**

On April 25, 2006, the Company issued a press release announcing the execution of the Merger Agreement, which is filed as an exhibit hereto and is incorporated herein by reference.

**Item 9.01 Financial Statements and Exhibits.**

(c) Exhibits

2.1     Agreement and Plan of Merger, dated as of April 25, 2006, among Babcock & Brown Infrastructure Limited, BBI US Holdings Pty Ltd., BBI US Holdings II Corp., BBI Glacier Corp. and Northwestern Corporation.

4.1     Amendment No.1, dated as of April 25, 2006, to the Rights Agreement, dated as of December 5, 2005, between Northwestern Corporation and LaSalle National Bank.

99.1    Press Release, dated April 25, 2006, of Northwestern Corporation, announcing the Agreement and Plan of Merger.

3

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

NorthWestern Corporation

By:    /s/
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
Thomas J. Knapp
Vice President, General Counsel
  and Corporate Secretary

Date: April 26, 2006

4

<u>Index to Exhibits</u>

| EXHIBIT NO. | DESCRIPTION OF DOCUMENT |
|---|---|
| 2.1 | Agreement and Plan of Merger, dated as of April 25, 2006, among Babcock & Brown Infrastructure Limited, BBI US Holdings Pty Ltd., BBI US Holdings II Corp., BBI Glacier Corp. and Northwestern Corporation. |
| 4.1 | Amendment No.1, dated as of April 25, 2006, to the Rights Agreement, dated as of December 5, 2005, between Northwestern Corporation and LaSalle National Bank. |
| 99.1 | Press Release, dated April 25, 2006, of Northwestern Corporation, announcing the Agreement and Plan of Merger. |

5

**Exhibit 2.1**

**EXECUTION COPY**

AGREEMENT AND PLAN OF MERGER

among

BABCOCK & BROWN INFRASTRUCTURE LIMITED,

BBI US HOLDINGS PTY LTD.,

BBI US HOLDINGS II CORP.,

BBI GLACIER CORP.

and

NORTHWESTERN CORPORATION

Dated as of April 25, 2006

# TABLE OF CONTENTS

| | | | Page |
|---|---|---|---|
| **ARTICLE I** | THE MERGER | | 1 |
| | SECTION 1.01 | Certain Definitions | 1 |
| | SECTION 1.02 | The Merger | 8 |
| | SECTION 1.03 | Closing | 9 |
| | SECTION 1.04 | Effective Time | 9 |
| | SECTION 1.05 | Effects of the Merger | 9 |
| | SECTION 1.06 | Certificate of Incorporation and Bylaws | 9 |
| | SECTION 1.07 | Directors | 10 |
| | SECTION 1.08 | Officers | 10 |
| **ARTICLE II** | EFFECT OF THE MERGER ON THE CAPITAL STOCK OF THE CONSTITUENT CORPORATIONS; EXCHANGE OF CERTIFICATES | | 10 |
| | SECTION 2.01 | Effect on Capital Stock | 10 |
| | SECTION 2.02 | Exchange of Certificates | 12 |
| | SECTION 2.03 | Disputed Claims Reserve | 14 |
| **ARTICLE III** | REPRESENTATIONS AND WARRANTIES | | 15 |
| | SECTION 3.01 | Representations and Warranties of the Company | 15 |
| | SECTION 3.02 | Representations and Warranties of Parent Group | 26 |
| **ARTICLE IV** | COVENANTS | | 30 |
| | SECTION 4.01 | Conduct of Business of the Company | 30 |
| | SECTION 4.02 | Control of Other Party's Business | 33 |
| **ARTICLE V** | ADDITIONAL AGREEMENTS | | 34 |
| | SECTION 5.01 | Preparation of Proxy Statement; Stockholders' Meeting | 34 |
| | SECTION 5.02 | No Solicitation | 35 |
| | SECTION 5.03 | Access to Information; Confidentiality | 37 |
| | SECTION 5.04 | Regulatory Matters; Reasonable Best Efforts | 37 |
| | SECTION 5.05 | Fees and Expenses | 39 |
| | SECTION 5.06 | Indemnification; Directors' and Officers' Insurance | 39 |
| | SECTION 5.07 | Public Announcements | 41 |
| | SECTION 5.08 | Transfer Taxes | 41 |

SECTION 5.09        State Takeover Laws                                              41

i

|  |  |  | **Page** |
|---|---|---|---|
| SECTION 5.10 | Notification of Certain Matters | | 41 |
| SECTION 5.11 | Employees | | 41 |
| SECTION 5.12 | Delisting | | 43 |
| SECTION 5.13 | Rule 16b-3 | | 43 |
| SECTION 5.14 | Financing | | 43 |
| SECTION 5.15 | No Agreements with Company Stockholders | | 44 |
| SECTION 5.16 | Letter of Credit | | 45 |
| **ARTICLE VI** | **CONDITIONS** | | 46 |
| SECTION 6.01 | Conditions to Each Party's Obligation to Effect the Merger | | 46 |
| SECTION 6.02 | Additional Conditions to Obligations of Parent Group | | 46 |
| SECTION 6.03 | Additional Conditions to Obligations of the Company | | 47 |
| **ARTICLE VII** | **TERMINATION, AMENDMENT AND WAIVER** | | 47 |
| SECTION 7.01 | Termination | | 47 |
| SECTION 7.02 | Effect of Termination | | 49 |
| SECTION 7.03 | Amendment | | 51 |
| SECTION 7.04 | Extension; Waiver | | 51 |
| **ARTICLE VIII** | **GENERAL PROVISIONS** | | 51 |
| SECTION 8.01 | Nonsurvival of Representations and Warranties | | 51 |
| SECTION 8.02 | Notices | | 51 |
| SECTION 8.03 | Interpretation | | 53 |
| SECTION 8.04 | Counterparts | | 53 |
| SECTION 8.05 | Entire Agreement; Third Party Beneficiaries | | 53 |
| SECTION 8.06 | Governing Law | | 54 |
| SECTION 8.07 | Severability | | 54 |
| SECTION 8.08 | Assignment | | 54 |
| SECTION 8.09 | Submission To Jurisdiction; Waivers | | 54 |
| SECTION 8.10 | Enforcement | | 55 |
| Exhibit A | Letter of Credit | | |

Case 1:07-cv-00114-JJF     Document 21-6     Filed 04/09/2007     Page 10 of 74

THIS AGREEMENT AND PLAN OF MERGER (this "Agreement"), dated as of April 25, 2006, is among Babcock & Brown Infrastructure Limited, an Australian public company with company number ACN 100 364 234 ("Parent"), BBI US Holdings Pty Ltd., an Australian Company with company number ACN 119 325 950 and a direct wholly-owned subsidiary of Parent ("Holding Company"), BBI US Holdings II Corp., a Delaware corporation and direct wholly-owned subsidiary of Holding Company ("Holdings"), BBI Glacier Corp., a Delaware corporation and direct wholly-owned subsidiary of Holdings ("Sub"), and Glacier Corporation, a Delaware corporation (the "Company").

WHEREAS, the respective boards of directors of each of Parent, Holding Company, Holdings, Sub and the Company have (i) approved and declared advisable this Agreement, the merger of Sub with and into the Company on the terms and subject to the conditions set forth in this Agreement (the "Merger") and the other transactions contemplated hereby and (ii) determined that the Merger and the other transactions contemplated by this Agreement are fair to, and in the best interest of, their respective corporations and stockholders.

WHEREAS, each of Parent, Holding Company, Holdings, Sub and the Company desire to make certain representations, warranties, covenants and agreements in connection with the Merger and also to prescribe various conditions to the Merger.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth in this Agreement, and intending to be legally bound hereby, Parent, Holding Company, Holdings, Sub and the Company hereby agree as follows:

<div align="center">

**ARTICLE I**

**THE MERGER**

</div>

SECTION 1.01     Certain Definitions. As used in this Agreement, the following terms shall have the meanings indicated below.

(a)     "1935 Act" means the Public Utility Holding Company Act of 1935, as amended, including the rules and regulations promulgated thereunder.

(b)     "affiliate" of any person means another person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such first person. For purposes of this definition, "control" when used with respect to any specified person means the power to direct the management and policies of such person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

(c)     "Affiliate Group" means any affiliated group with the meaning of Section 1504(a) of the Code filing a consolidated federal income tax Return, or any similar group filing a consolidated, combined, or unitary tax Return under a comparable provision of state, local or foreign law.

(d)      "<u>BEA</u>" means the Bureau of Economic Analysis of the U.S. Department of Commerce.

(e)      "<u>beneficial ownership</u>" or "<u>beneficially own</u>" shall have the meaning under Section 13(d) of the Exchange Act.

(f)      "<u>Benefit Plans</u>" means, with respect to any person, each material employee benefit plan, program, arrangement and contract (including, without limitation, any "<u>employee benefit plan</u>," as defined in Section 3(3) of <u>ERISA</u> and any bonus, deferred compensation, stock bonus, stock purchase, restricted stock, stock option, employment, termination, stay agreement or bonus, retiree medical or life insurance, change-in-control and severance plan, program, policy, arrangement and contract (whether written or unwritten) in effect on the date of this Agreement to which such person or its Subsidiary is a party, which is maintained or contributed to by such person, or with respect to which such person could incur material liability under Section 4069, 4201 or 4212(c) of ERISA or otherwise.

(g)      "<u>Blackstone</u>" means The Blackstone Group L.P.

(h)      "<u>Business</u>" means the businesses of the Company or its Subsidiaries.

(i)      "<u>Business Day</u>" means any day on which banks are not required or authorized to close in the City of New York.

(j)      "<u>Charter Documents</u>" means the Company's certificate of incorporation and bylaws, as such may be amended from time to time.

(k)      "<u>COBRA</u>" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

(l)      "<u>Code</u>" means the Internal Revenue Service Code of 1986, as amended.

(m)      "<u>Company Board</u>" means the board of directors of the Company and any committees thereof.

(n)      "<u>Company Common Stock</u>" means the common stock, par value US$.01 per share, of the Company, together with the associated Company Rights.

(o)      "<u>Company Credit Facility</u>" means the Company's unsecured senior revolving credit facility in an aggregate principal amount of US$200 million pursuant to the Amended and Restated Credit Agreement, dated June 30, 2005, between the Company and the several lenders from time to time parties thereto.

(p)      "<u>Company Preferred Stock</u>" means the preferred stock, par value US$.01 per share, of the Company.

(q)      "<u>Company Rate Review</u>" means the requirement set forth in the Consent Order and Section 4(a) of the Settlement Agreement, pursuant to which not later than September

2

30, 2006, based on a 2005 test year, the Company shall file complete documents complying with the minimum electric and gas rate filing standards provided in ARM 38.5.106 through 38.5.195.

(r)        "Company Rights" means the rights distributed to the holders of Company Common Stock pursuant to the Company Rights Agreement.

(s)        "Company Rights Agreement" means the Rights Agreement, dated as of December 5, 2005, between the Company and LaSalle Bank National Association, as Rights Agent.

(t)        "Company Stockholders" means the holders of the outstanding shares of Company Common Stock.

(u)        "Company Stockholder Approval" means the affirmative vote of the holders of a majority of the outstanding shares of Company Common Stock required to adopt this Agreement.

(v)        "Confidentiality Agreement" means the letter agreement, dated December 16, 2005 between Parent and the Company.

(w)        "Credit Suisse" means Credit Suisse Securities (USA) LLC.

(x)        "Deferred Director Plan" means the Company's 2005 Deferred Compensation Plan for Non-Employee Directors.

(y)        "DGCL" means the Delaware General Corporation Law.

(z)        "Disputed Claims Reserve" has the meaning assigned to such term in the Reorganization Plan. Such Disputed Claim Reserve is held by LaSalle Bank National Association.

(aa)        "Disputed Claims Reserve Shares" means, collectively, shares of Company Common Stock held immediately prior to the Effect Time in the Disputed Claims Reserve.

(bb)        "Dissenting Shares" means any shares of Company Common Stock that are outstanding immediately prior to the Effective Time, the holders of which shall have properly delivered a written demand for payment of the fair cash value of such shares of Company Common Stock in accordance with Section 262 of the DGCL.

(cc)        "DSUs" means deferred stock units entitling the holder thereof to shares of Company Common Stock.

(dd)        "Electronic Data Room" means the electronic data room maintained on IntraLinks as of 4:30 P.M. EST on April 24, 2006. An index of the contents of such Electronic Data Room is disclosed in Section 1.01(dd) of the Company Disclosure Letter.

3

(ee)    "Employee Restricted Stock Plan" means the Company's 2005 Employee Restricted Stock Grant Plan.

(ff)    "Environmental Laws" means all Laws as in effect on or prior to the date hereof relating to the protection of human health, safety, or welfare or the environment, including any emission, discharge, generation, storage, treatment, disposal, abatement, Release, threatened Release, reporting, licensing, permitting, investigation, cleanup, mitigation, remediation, transportation, or other handling of any Hazardous Materials, including the following federal Laws as amended and their state counterparts: (i) the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601, et seq.; the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901, et seq.; the Clean Water Act, 33 U.S.C. §§ 1251, et seq.; the Clean Air Act, 42 U.S.C. §§ 7401, et seq.; and the Toxic Substances Control Act, 15 U.S.C. §§ 2601, et. seq.; and (ii) all other requirements pertaining to protection of air, surface water, groundwater or land and subsurface, natural resources, and related human health, safety, or welfare.

(gg)    "Environmental Liabilities and Costs" means all damages, natural resource damages, claims, losses, expenses, costs, obligations, and liabilities (collectively, "Environmental Losses") imposed by, under or pursuant to Environmental Laws, including all Environmental Losses related to Remedial Actions, and all fees, compliance costs, disbursements, penalties, fines and expenditures necessary to cause property, the Company, any Significant Subsidiary or the Business to be in compliance with the requirements of Environmental Laws.

(hh)    "Environmental Permits" means any federal, state or local permit, license, registration, consent, order, administrative consent order, certificate, approval, waiver or other authorization necessary for the conduct of the Business as currently conducted under any applicable Environmental Law.

(ii)    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

(jj)    "Exchange Act" means the Securities Exchange Act of 1934, as amended, including the rules and regulations promulgated thereunder.

(kk)    "Expenses" means all out-of-pocket expenses (including, without limitation, all fees and expenses of counsel, accountants, investment bankers, experts and consultants to a party hereto and its affiliates) incurred by a party or on its behalf in connection with or related to the authorization, preparation, negotiation, execution and performance of this Agreement and the transactions contemplated hereby, including (i) the preparation, printing, filing and mailing of the Proxy Statement and the solicitation of the Company Stockholder Approval, (ii) the preparation and filing of all applications, notices, registrations, declarations, petitions and filings with any Governmental Entity in connection with the Required Statutory Approvals and (iii) all other matters related to the transactions contemplated hereby.

(ll)    "FERC" means the Federal Energy Regulatory Commission.

4

(mm)    "Final Order" means any action by a relevant Governmental Entity that has not been reversed, stayed, enjoined, set aside, annulled or suspended, with respect to which any waiting period (a "Final Order Waiting Period") prescribed by Law before the transactions contemplated hereby may be consummated has expired, and as to which all conditions to the consummation of such transactions prescribed by Law have been satisfied.

(nn)    "GAAP" means generally accepted accounting principles of the United States.

(oo)    "Governmental Entity" means any national, state, municipal, local or foreign government, any instrumentality, subdivision, court, administrative agency or commission or other authority thereof, or any quasi-governmental or private body exercising any regulatory, taxing, importing or other governmental or quasi-governmental authority.

(pp)    "Hazardous Materials" means any substance that (a) is defined, listed, identified or otherwise regulated under any Law, as in effect on or prior to the date hereof, relating to the protection of the environment (including "hazardous" and "toxic" substances and wastes, radioactive substances including radon gas, polychlorinated-biphenyls, asbestos and petroleum), or (b) requires investigation, remediation, or other protective measures under such Law.

(qq)    "HSR Act" means the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended, and the rules and regulations promulgated thereunder.

(rr)    "IISA" means the International Investment Survey Act of 1976, now known as the International Investment and Trade Services Survey Act.

(ss)    "Intellectual Property Right" means any trademark, service mark, trade name, copyright, patent, software license, other database, invention, trade secret, know-how (including any registrations or applications for registration of any of the foregoing) or any other similar type of proprietary intellectual property right.

(tt)    "IRS" means the Internal Revenue Service.

(uu)    "known," "knowingly" or "Knowledge" means, with respect to the Company, the actual knowledge of the persons listed on Schedule 1.01(uu).

(vv)    "known," "knowingly" or "Knowledge" means, with respect to Parent Group, the actual knowledge of the following persons:  Steven Boulton, Jeffrey Kendrew, Michael Ryan and Michael Garland.

(ww)    "Laws" mean all (A) statutes, laws, rules, regulations, ordinances or codes of any Governmental Entity and (B) orders, decisions, injunctions, judgments, awards and decrees of any Governmental Entity.

(xx)    "Liens" means all mortgages, liens, pledges, encumbrances, charges and security interests.

5

(yy)    "<u>Material Adverse Effect</u>" means, with respect to the Company, an effect, event, development or change (i) which is materially adverse to the business, assets, properties, financial condition, or results of operations of the Company and its Subsidiaries, taken as a whole, other than any effect, event, development or change arising out of or resulting from (A) changes or conditions in the U.S. or global economy or capital or financial markets generally, including changes in interest or exchange rates, (B) general changes to or developments in the industries in which the Company and its Subsidiaries operate (except to the extent that such changes or developments have had a disproportionate effect on the Company and its Subsidiaries, taken as a whole, as compared to other persons in the industries in which the Companies and its Subsidiaries operate), (C) changes in general legal, tax, regulatory, political or economic conditions affecting companies in general, (D) changes in GAAP (or any interpretation thereof) or Regulation S-X of the SEC, (E) the execution, announcement or performance of, or compliance with, this Agreement or the consummation of the transactions contemplated herein, including the impact thereof on relationships, contractual or otherwise, with Governmental Entities, customers, suppliers, licensors, distributors, partners or employees, (F) the commencement, occurrence, continuation or intensification of any war, sabotage, armed hostilities or acts of terrorism that does not directly affect the assets or properties of, or the communities served by, the Company and its Subsidiaries, taken as a whole, (G) any change in the Company's stock price or trading volume on the NASDAQ National Market or (H) any matter disclosed in (x) the Company SEC Documents prior to the date of this Agreement, (y) the Company Disclosure Letter, including in each case, any adverse effect or adverse event, development or change that occurs after the date of this Agreement but that arises out of or results from any such matter or (z) the Electronic Data Room (*provided*, that in the case of (x), (y) and (z), the extent that the magnitude and significance of such adverse effect or adverse event, development or change was reasonably discernable to Parent prior to the date hereof based on the disclosure made to Parent in the Company SEC Documents, the Company Disclosure Letter or the Electronic Data Room, as the case may be), or (ii) that prevents or materially delays (to a date beyond the Final Date) the consummation of the Merger and the other transactions contemplated hereby, or prevents or materially delays (to a date beyond the Final Date) the ability of the Company to perform its obligations hereunder.

(zz)    "<u>MPSC</u>" means the Montana Public Service Commission.

(aaa)    "<u>NASDAQ</u>" means the National Association of Securities Dealers Automated Quotations.

(bbb)    "<u>NLRB</u>" means the National Labor Relations Board.

(ccc)    "<u>NPSC</u>" means the Nebraska Public Service Commission.

(ddd)    "<u>other party</u>" means, with respect to the Company, Parent Group, and with respect to Parent Group, the Company, unless the context otherwise requires.

(eee)    "<u>Parent Group</u>"  means collectively Parent, Holding Company, Holdings and Sub.

6

(fff)    "Parent Material Adverse Effect"  means an effect, event, development or change which prevents or materially delays (to a date beyond the Final Date) the consummation of the Merger and the other transactions contemplated hereby or prevents or materially delays the ability of Parent Group to perform their respective obligations hereunder.

(ggg)    "person" means an individual, corporation, limited liability company, partnership, association, trust, unincorporated organization, other entity or group (as defined in the Exchange Act).

(hhh)    "Proxy Statement" means, collectively, the preliminary and definitive proxy statements (as amended or supplemented from time to time) relating to the Company Stockholder Approval.

(iii)    "Release" means any releasing, spilling, disposing or other discharging of Hazardous Materials into the environment (including air, soil, subsurface, surface water and groundwater).

(jjj)    "Remedial Action" means all actions required by any Governmental Entity pursuant to the Environmental Laws to investigate, monitor, clean up, remove, treat or in any other way remediate any Release.

(kkk)    "Reorganization Plan" means the Company's Second Amended and Restated Plan of Reorganization under Chapter 11 of the Bankruptcy Code, dated August 18, 2004, affirmed by the United States Bankruptcy Court for the District of Delaware on October 19, 2004.

(lll)    "Representatives" means with respect to any party, any director, officer or employee of, or any investment banker, attorney or other advisor or representative of such party.

(mmm)    "Restricted Shares" means each share of Company Common Stock that is subject to restrictions on ownership, transferability, or vesting or other lapse restrictions pursuant to the Special Recognition Plan or the Employee Restricted Stock Plan.

(nnn)    "Returns" means all federal, state, local and foreign returns, estimates, information statements and reports relating to Taxes.

(ooo)    "SDPUC" means the South Dakota Public Utilities Commission.

(ppp)    "SEC" means the Securities and Exchange Commission.

(qqq)    "Securities Act" means the Securities Act of 1933, as amended, including the rules and regulations promulgated thereunder.

(rrr)    "Senior Notes" means the Senior Secured Notes, 5.875% Series A due 2014, limited in aggregate principal amount of US$225 million and the Senior Secured Notes, 5.875% Exchange Series A due 2014, limited in aggregate principal amount of US$225 million, issued pursuant to the Senior Note Indenture, dated as of November 1, 2004, between the

7

Company and U.S. National Bank Association, as trustee, as supplemented and amended by Supplemental Indenture No. 1 dated as of November 1, 2004.

(sss)    "Settlement Agreement" means that certain Stipulation and Settlement Agreement, dated as of July 8, 2004, by and among the Company, the MPSC and the Montana Consumer Counsel.

(ttt)    "Special Recognition Plan" means the Company's 2004 Special Recognition Grant Restricted Stock Plan.

(uuu)    "Statement of Factors" means that certain Statement of Factors for Evaluating Proposals to Acquire Northwestern Energy issued by the MPSC as of October 18, 2004.

(vvv)    "Stockholders' Meeting" means a meeting of Company Stockholders (which may be the regular annual meeting) for the purposes of obtaining the Company Stockholder Approval.

(www)    "Subsidiary," when used with respect to any party, means any corporation or other organization, whether incorporated or unincorporated, (i) of which such party or any other Subsidiary of such party is a general partner (excluding partnerships, the general partnership interests of which held by such party or any Subsidiary of such party do not have a majority of the voting interests in such partnership) or (ii) at least a majority of the securities or other interests of which, having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation or other organization, is directly or indirectly owned or controlled by such party or by any one or more of its Subsidiaries, or by such party and one or more of its Subsidiaries.

(xxx)    "Supplemental Dividend" means an amount in cash equal to the product of:  (A) the total number of days between the eighteen (18) month anniversary of the date of this Agreement and the date on which such dividend is declared by the Company Board and (B) the product of (i) $1,369,324,350 and (ii) the quotient of 3.50% and 360.

(yyy)    "Taxes" means any and all federal, state, local and foreign taxes, including, without limitation, gross receipts, income, profits, sales, use, occupation, value added, ad valorem, transfer, franchise, withholding, payroll, recapture, employment, excise and property taxes, assessments, governmental charges and duties together with all interest, penalties and additions imposed with respect to any such amounts.

(zzz)    "Transfer Taxes" means all stock transfer, real estate transfer, property, documentary, stamp, recording and other similar Taxes incurred in connection with the transactions contemplated by this Agreement.

Other capitalized terms defined elsewhere in this Agreement and not defined in this Section 1.01 shall have the meanings assigned to such terms in this Agreement.

SECTION 1.02    The Merger. Upon the terms and subject to the conditions set forth in this Agreement, and in accordance with the DGCL, Sub shall be merged with and

8

into the Company at the Effective Time (as defined below). Following the Effective Time, the separate corporate existence of Sub shall cease and the Company shall continue as the surviving corporation (the "Surviving Corporation") and shall continue its corporate existence under the laws of the State of Delaware and shall succeed to and assume all of the rights and obligations of the Company and Sub in accordance with the DGCL. As a result of the Merger, the Surviving Corporation shall become a wholly-owned indirect subsidiary of Parent. The effects and consequences of the Merger shall be as set forth in Section 1.05.

SECTION 1.03    Closing. The closing of the Merger (the "Closing") shall take place at 8:00 a.m. local time on a date to be specified by the parties hereto, which shall be no later than the second Business Day after satisfaction or, to the extent permitted by this Agreement and applicable Law, waiver of the conditions set forth in Article VI of this Agreement (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or, to the extent permitted by this Agreement and applicable Law, waiver of those conditions), at the offices of LeBoeuf, Lamb, Greene & MacRae LLP, 125 West 55th Street, New York, NY 10019, unless another time, date or place is agreed to in writing by Parent and the Company. The date on which the Closing occurs is referred to in this Agreement as the "Closing Date."

SECTION 1.04    Effective Time. Subject to the provisions of this Agreement, the parties shall prepare, and on the Closing Date the parties shall file with the Delaware Secretary of State, a certificate of merger or other appropriate documents as provided in Section 251 of the DGCL (in any such case, the "Certificate of Merger") executed in accordance with the relevant provisions of the DGCL and shall make all other filings or recordings required under the DGCL to effectuate the Merger. The Merger shall become effective at such time as the Certificate of Merger is duly filed with the Delaware Secretary of State, or at such later time as the parties hereto may agree and specify in the Certificate of Merger (the time and date the Merger becomes effective being hereinafter referred to as the "Effective Time").

SECTION 1.05    Effects of the Merger. The Merger shall have the effects set forth in this Agreement and the applicable provisions of the DGCL. Without limiting the generality of the foregoing, and subject thereto, at the Effective Time, all the property, rights, privileges, immunities, powers, franchises and authority of the Company and Sub will be vested in the Surviving Corporation, and all debts, liabilities and duties of the Company and Sub will become the debts, liabilities and duties of the Surviving Corporation.

SECTION 1.06    Certificate of Incorporation and Bylaws.

(a)    Subject to Section 5.06, the certificate of incorporation of Sub, as in effect immediately prior to the Effective Time, shall be the certificate of incorporation of the Surviving Corporation until thereafter changed or amended as provided therein or by applicable Law.

(b)    Subject to Section 5.06, the bylaws of Sub as in effect immediately prior to the Effective Time shall be the bylaws of the Surviving Corporation, until thereafter changed or amended as provided therein or by applicable Law.

9

SECTION 1.07    Directors. From and after the Effective Time, the directors of Sub shall become the directors of the Surviving Corporation and shall serve on the Surviving Corporation's board of directors until the earlier of their resignation or removal or until their respective successors are duly elected and qualified.

SECTION 1.08    Officers. The officers of the Company immediately prior to the Effective Time shall be the officers of the Surviving Corporation, until the earlier of their resignation or removal or until their respective successors are duly elected or appointed or qualified.

## ARTICLE II

## EFFECT OF THE MERGER ON THE CAPITAL STOCK OF THE CONSTITUENT CORPORATIONS; EXCHANGE OF CERTIFICATES

SECTION 2.01    Effect on Capital Stock. As of the Effective Time, by virtue of the Merger and without any action on the part of the Company, Parent Group or the holders of any of the following securities:

(a)    Capital Stock of Sub. Each issued and outstanding share of capital stock of Sub shall be converted into and become one fully paid and nonassessable share of common stock, par value US$.01 per share, of the Surviving Corporation.

(b)    Cancellation of Treasury Stock and Parent Owned Stock. Each share of Company Common Stock that is owned by the Company as treasury stock and each share of Company Common Stock that is owned by Parent, Holding Company, Holdings or Sub, or any other Subsidiary of Parent, Holding Company or Holdings (collectively, the "Canceled Shares") shall automatically be canceled and retired and shall cease to exist, and no consideration shall be delivered in exchange therefor.

(c)    Conversion of Company Common Stock. Each share of Company Common Stock issued and outstanding (other than the Canceled Shares, Dissenting Shares (except as provided in paragraph (d) below), Disputed Claims Reserve Shares and Restricted Shares) shall be converted into the right to receive US$37.00 in cash, without interest (the "Merger Consideration"), less any required withholding taxes. As of the Effective Time, all such shares of Company Common Stock shall no longer be outstanding and shall automatically be canceled and retired and shall cease to exist, and each holder of a certificate representing any such shares of Company Common Stock shall cease to have any rights with respect thereto, except the right to receive the Merger Consideration and declared but unpaid dividends, without interest, upon surrender of such certificate in accordance with, or as otherwise contemplated by, Section 2.02 of this Agreement.

(d)    Dissenting Shares. Notwithstanding anything in this Agreement to the contrary, Dissenting Shares shall not be converted into or represent the right to receive the Merger Consideration as provided in this Section 2.01. As of the Effective Time, the Dissenting Shares shall no longer be outstanding and shall automatically be canceled and retired and shall cease to exist, and each holder of any Dissenting Shares shall be entitled only to such rights as

10

are granted under Section 262 of the DGCL, except that all Dissenting Shares held by persons who fail to perfect or who effectively waive, withdraw or lose their rights as a dissenting shareholder in respect of such shares of Company Common Stock under Section 262 of the DGCL shall thereupon be deemed converted as of the Effective Time into the right to receive the Merger Consideration as provided in this Article II.

(e)    <u>Warrants</u>. Each holder (each, a "<u>Warrantholder</u>") of a warrant (each, a "<u>Warrant</u>") to purchase Company Common Stock shall be entitled to receive an amount (the "<u>Warrant Consideration</u>") in cash, without interest, equal to the product obtained by multiplying (x) the total number of shares of Company Common Stock issuable upon the exercise in full of such Warrant held by such Warrantholder by (y) the excess, if any, of the amount of the Merger Consideration over the exercise price per share of Company Common Stock under such Warrant (with the aggregate amount of such payment round up to the nearest cent), less any required withholding taxes. As of the Effective Time, all such Warrants shall no longer be outstanding and shall automatically be canceled and retired and shall expire and cease to exist and each Warrantholder shall cease to have any rights with respect thereto, except the right to receive the Warrant Consideration, without interest, upon the surrender of an original copy of the Warrant to the Paying Agent in accordance with Section 2.02(j).

(f)    <u>Restricted Stock</u>. Each Restricted Share that is issued and outstanding immediately prior to the Effective Time shall vest in full, become free of restrictions and shall be converted into the right to receive the Merger Consideration, less any required withholding taxes. As of the Effective Time, all such Restricted Shares shall no longer be outstanding and shall automatically be canceled and retired and shall cease to exist, and each holder of a certificate representing any such Restricted Shares shall cease to have any rights with respect thereto, except the right to receive the Merger Consideration, without interest, upon surrender of such certificate in accordance with, or as otherwise contemplated by, Section 2.02 of this Agreement.

(g)    <u>Deferred Stock Units</u>. Each DSU which is outstanding immediately prior to the Effective Time shall automatically be converted into the right to receive from the Company or the Surviving Corporation (as applicable), at the time previously selected by the holder thereof pursuant to the terms of any deferral election made with respect to such DSU, an amount in cash equal to the product of (i) the number of shares of Company Common Stock subject to such DSU (including, without limitation, those shares corresponding to previously declared and paid dividends that resulted in an increase in the number of shares of Company Common Stock subject to DSUs) and (ii) the Merger Consideration, less any required withholding taxes, subject to the terms and conditions set forth in the Deferred Director Plan, including the terms and conditions with respect to distributions and timing of payment thereunder and in compliance with Section 409A of the Code.

(h)    <u>Deferred Director Plan</u>. All account balances under the Deferred Director Plan will be paid out in cash, less any required withholding taxes, by the Company or the Surviving Corporation (as applicable) to participants therein, at the time previously selected by the holder thereof pursuant to the terms of any deferral election made with respect to such account balance, subject to the terms and conditions set forth in the Deferred Director Plan, including the terms and conditions with respect to distributions and timing of payment thereunder and in compliance with Section 409A of the Code.

11

(i)    Disputed Claim Reserve Shares. Each Disputed Claims Reserve Share shall be converted into the right to receive the Merger Consideration (the aggregate amount of such consideration, the "Disputed Claims Merger Consideration"). As of the Effective Time, all Disputed Claims Reserve Shares shall no longer be outstanding and shall automatically be canceled and retired and shall cease to exist, and all persons that, pursuant to the Reorganization Plan, would have been entitled to receive distribution of any Disputed Claims Reserve Shares shall instead be entitled to receive, from the Disputed Claims Reserve, the Merger Consideration therefore.

SECTION 2.02    Exchange of Certificates.

(a)    Paying Agent. Prior to the Effective Time, Parent Group shall designate a federally insured bank or trust company, reasonably acceptable to the Company, to act as paying agent in the Merger (the "Paying Agent") and, prior to the Effective Time, Parent Group shall enter into an agreement with Paying Agent, which agreement shall provide that Parent Group shall deposit with the Paying Agent, prior to the Effective Time, for the benefit of the holders of shares of Company Common Stock (other than the Disputed Claims Reserve Shares) and the Warrantholders, immediately available funds in an aggregate amount necessary for the payment of (i) the Merger Consideration (excluding the Disputed Claims Merger Consideration), (ii) the aggregate amount of cash dividends, if any, that (A) were declared after the date hereof and are expressly permitted hereunder to have been so declared, (B) have a record date prior to the Effective Time and (C) are unpaid at the Effective Time (such dividends, the "Outstanding Dividends") and (iii) the Warrant Consideration, upon surrender of certificates representing shares of Company Common Stock or an original copy of a Warrant, as the case may be, pursuant to this Section 2.02 (it being understood that any and all interest earned on funds made available to the Paying Agent pursuant to this Agreement shall be turned over to Parent). Any cash deposited with the Paying Agent shall hereinafter be referred to as the "Exchange Fund." The agreement with the Paying Agent shall identify specific time limits by when the transmittal materials and cash are to be mailed to holders of Certificates (as defined below) as specified in paragraph (b) of this Section 2.02.

(b)    Exchange Procedures for Certificates. As of or promptly following the Effective Time, Parent, Holding Company and Holdings shall cause the Paying Agent to mail to each holder of record of a certificate or certificates which immediately prior to the Effective Time represented shares of Company Common Stock (the "Certificates") whose shares were converted into the right to receive the Merger Consideration pursuant to Section 2.01, (i) a letter of transmittal in a form mutually agreed upon by Parent Group and the Company, which shall specify that delivery shall be effected, and risk of loss and title to the Certificates shall pass, only upon delivery of the Certificates to the Paying Agent and (ii) instructions for effecting the surrender of the Certificates in exchange for the Merger Consideration. Upon surrender of a Certificate for cancellation to the Paying Agent, together with such letter of transmittal, duly executed, and such other documents as may reasonably be required by the Paying Agent, Parent, Holding Company, Holdings and the Surviving Corporation shall cause the Paying Agent to promptly pay, to the holder of such Certificate in exchange therefor the amount of cash into which the shares of Company Common Stock theretofore represented by such Certificate shall have been converted pursuant to Section 2.01 and the amount of Outstanding Dividends due thereon, and the Certificate so surrendered shall forthwith be canceled. In the event of a transfer

12

of ownership of shares of Company Common Stock that is not registered in the transfer records of the Company, payment may be made to a person other than the person in whose name the Certificate so surrendered is registered, if such Certificate shall be properly endorsed or otherwise be in proper form for transfer. Until surrendered as contemplated by this Section 2.02, each Certificate shall be deemed at any time after the Effective Time to represent only the right to receive upon such surrender the amount of cash, without interest, into which the shares of Company Common Stock theretofore represented by such Certificate shall have been converted pursuant to Section 2.01 and the amount of Outstanding Dividends due thereon. No interest will be paid or will accrue on the cash payable upon the surrender of any Certificate.

(c)    No Further Ownership Rights in Company Common Stock. All cash paid upon the surrender of Certificates in accordance with the terms of this Section 2.02 shall be deemed to have been paid in full satisfaction of all rights pertaining to the shares of Company Common Stock theretofore represented by such Certificates. At the Effective Time, the stock transfer books of the Company shall be closed, and there shall be no further registration of transfers on the stock transfer books of the Surviving Corporation of the shares of Company Common Stock that were outstanding immediately prior to the Effective Time. If, after the Effective Time, Certificates are presented to the Surviving Corporation or the Paying Agent for any reason, they shall be canceled and exchanged as provided in this Article II.

(d)    Termination of Exchange Fund. Any portion of the Exchange Fund which remains undistributed to holders of Certificates for twelve (12) months after the Effective Time shall be delivered to Parent, and any holders of Certificates who have not theretofore complied with this Article II shall thereafter look only to Parent for the Merger Consideration and Outstanding Dividends with respect to such Certificates.

(e)    Investment of the Exchange Fund. The Paying Agent may invest any cash included in the Exchange Fund, as directed by Parent or the Surviving Corporation. Any interest and other income resulting from such investments shall be paid to Parent or the Surviving Corporation. To the extent that there are losses with respect to such investments, or the Exchange Fund diminishes for other reasons below the level required to make prompt payments of the Merger Consideration, Outstanding Dividends and Warrant Consideration as contemplated hereby, Parent, Holding Company, Holding shall cause the Surviving Corporation to, and the Surviving Corporation shall, promptly replace or restore the portion of the Exchange Fund lost through investments or other events so as to ensure that the Exchange Fund is, at all times, maintained at a level sufficient to make such payments.

(f)    No Liability. None of Parent Group, the Company, the Surviving Corporation or the Paying Agent or any of their respective directors, officers, employees and agents shall be liable to any person with respect to any Merger Consideration from the Exchange Fund delivered to a public official pursuant to any applicable abandoned property, escheat or similar Law. If any Certificate shall not have been surrendered prior to five (5) years after the Effective Time (or immediately prior to such earlier date on which any cash in respect of such Certificate would otherwise escheat to or become the property of any Governmental Entity), any such cash in respect of such Certificate shall, to the extent permitted by applicable Law, become the property of Parent, free and clear of all claims or interest of any person previously entitled thereto.

13

(g)     Lost Certificates. If any Certificate shall have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the person claiming such Certificate to be lost, stolen or destroyed and, if required by Parent, the posting by such person of a bond in such reasonable amount as Parent may direct as indemnity against any claim that may be made against it with respect to such Certificate, the Paying Agent shall deliver, in exchange for such lost, stolen or destroyed Certificate, the applicable Merger Consideration and Outstanding Dividends with respect thereto.

(h)     Withholding Tax. Parent and the Surviving Corporation shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement to any holder of shares of Company Common Stock outstanding immediately prior to the Effective Time such amounts as may be required to be deducted and withheld with respect to the making of such payment under the applicable Tax Law, and shall promptly remit all withheld amounts to the applicable taxing authority. To the extent that amounts are so withheld, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the holder of the shares of Company Common Stock outstanding immediately prior to the Effective Time in respect of which such deduction and withholding was made.

(i)     Certain Adjustments. If, between the date of this Agreement and the Effective Time, the outstanding Company Common Stock shall have been changed into a different number of shares or different class by reason of any reclassification, recapitalization, stock split, split-up, combination or exchange of shares or a stock dividend or dividend payable in any other securities shall be declared with a record date within such period, or any similar event shall have occurred, the Merger Consideration shall be equitably adjusted to eliminate the effects of such event.

(j)     Exchange Procedure for Warrants. Upon the surrender to the Paying Agent of an original copy of a Warrant, the Paying Agent shall pay to such Warrantholder the Warrant Consideration. The procedures and other provisions set forth in this Section 2.02 shall apply to any surrender of a Warrant.

SECTION 2.03     Disputed Claims Reserve. Prior to the Effective Time, Parent Group shall enter into an agreement (the "LaSalle Agreement") with LaSalle Bank National Association, a national banking association ("LaSalle"), which agreement shall provide that Parent Group shall deposit with LaSalle, prior to the Effective Time, immediately available funds in an aggregate amount equal to the sum of (a) the Disputed Claims Merger Consideration and (b) the aggregate amount of Outstanding Dividends due with respect to the Disputed Claims Reserve Shares ((a) and (b) collectively, the "Disputed Claims Consideration"). Any distributions of the Disputed Claims Consideration shall be made in accordance with the terms of this Agreement and the Reorganization Plan. Such terms shall be explicitly set forth in an "instruction letter," which shall be set forth as an exhibit to the LaSalle Agreement.

14

# ARTICLE III

## REPRESENTATIONS AND WARRANTIES

SECTION 3.01    Representations and Warranties of the Company. The Company represents and warrants to Parent Group, except as set forth in: (i) the Company SEC Documents filed prior to the date hereof; (ii) the disclosure letter delivered by the Company to Parent on April 25, 2006 (with specific reference to the representations and warranties in this Section 3.01 to which the information in such letter relates) (the "Company Disclosure Letter") or (iii) the Electronic Data Room, in connection with the transactions contemplated by this Agreement:

(a)    Organization.

(i)    The Company is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware, and has all requisite power and authority to conduct its business as it is now being conducted, except where the failure to have such power and authority would not have a Material Adverse Effect. The Company is duly qualified or licensed to do business and is in good standing in each jurisdiction in which the property owned, leased or operated by it or the nature of the business conducted by it makes such qualification or licensing necessary, except in such jurisdictions where the failure to be so duly qualified or licensed and in good standing would not have a Material Adverse Effect. The copies of the Charter Documents, which were previously furnished or made available to Parent, are true, complete and correct copies of such documents as in effect on the date of this Agreement.

(ii)    Each Significant Subsidiary (as defined in Rule 1-02 of Regulation S-X of the SEC) of the Company is an entity duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization (to the extent such concept is recognized in such jurisdictions) and has all necessary powers required to carry on its business as it is now being conducted, except where the failure to have such power and authority would not have a Material Adverse Effect.

(b)    Capitalization. As of the date of this Agreement, the authorized capital stock of the Company consists of (A) 200,000,000 shares of Company Common Stock and (B) 50,000,000 shares of Company Preferred Stock, of which 100,000 shares have been designated Series A Junior Participating Preferred Shares which may be issued upon the exercise of the Company Rights. As of the date of this Agreement, (A) 35,493,141 shares of Company Common Stock were issued and outstanding, of which 3,144,642 were Claims Reserve Shares, (B) 313,547 shares of Company Common Stock were held in the treasury of the Company, (C) no shares of Company Preferred Stock were outstanding, (D) 35,164 were Restricted Shares issued and outstanding under the Special Recognition Plan and (E) no Restricted Shares were outstanding under the Employee Restricted Stock Plan. All issued and outstanding shares of the capital stock of the Company are duly authorized, validly issued, fully paid and non-assessable, and no class of capital stock is entitled to preemptive rights. There are no bonds, debentures, notes or other indebtedness of the Company having the right to vote (or convertible into, or exchangeable for, securities having the right to vote) on any matters on which Company

15

Stockholders may vote. As of the date of this Agreement, there are no options, warrants, preemptive or other outstanding rights, stock appreciation rights, conversion rights, redemption rights, repurchase rights, agreements, arrangements or commitments of any kind to which the Company or its Significant Subsidiaries is a party, or by which the Company or its Significant Subsidiaries are bound, obligating the Company or its Significant Subsidiaries to issue, deliver or sell, or cause to be issued, delivered or sold, any shares of capital stock or other securities of the Company or its Significant Subsidiaries or any securities or obligations convertible or exchangeable into or exercisable for, or giving any person a right to subscribe for or acquire, any securities of the Company or its Significant Subsidiaries, and no securities or obligations evidencing such rights are authorized, issued or outstanding other than (x) Company Rights, (y) Warrants representing the right to purchase 4,839,018 shares of Company Common Stock, and (z) 35,190 DSUs issued and outstanding under the Deferred Director Plan.

(c)  <u>Authority</u>. The Company has the requisite corporate power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby, subject, in the case of the consummation of the Merger, to obtaining the Company Stockholder Approval. The execution, delivery and performance of this Agreement and the consummation by the Company of the Merger and of the other transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of the Company and no other corporate action on the part of the Company is necessary to authorize the execution, delivery and performance of this Agreement by the Company or to consummate the transactions so contemplated, in each case, subject to, with respect to the Merger, the Company Stockholder Approval. This Agreement has been duly executed and delivered by the Company and, assuming this Agreement constitutes a valid and binding obligation of Parent Group, constitutes a valid and binding obligation of the Company enforceable against the Company in accordance with its terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws of general application affecting enforcement of creditors' rights generally and (ii) as limited by Laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

(d)  <u>No Conflicts; Consents and Approvals</u>.

(i)  The execution, delivery or performance of this Agreement by the Company does not or will not, as the case may be, and the consummation by the Company of the transactions contemplated hereby, including the Merger, does not or will not (x) conflict with or result in a violation pursuant to any provision of the Charter Documents or any provision of the organizational documents of any Significant Subsidiary, in each case, as amended to the date of this Agreement, (y) subject to obtaining or making the consents, approvals, notices, orders, authorizations, registrations, declarations and filings referred to in paragraph (ii) below, contravene any Law or any order, writ, judgment, injunction, decree, determination or award currently in effect, or (z) conflict with or result in a breach of, or default under, any loan or credit agreement, note, bond, mortgage, indenture, lease, license, benefit plan, contract, agreement or other instrument, permit, concession, or obligation applicable to the Company, any Significant Subsidiary or their respective properties or assets, except, with respect to clauses (y) and (z) above, for any such contraventions, conflicts, breaches, defaults or other occurrences which would not have, individually or in the aggregate, a Material Adverse Effect.

16

(ii)    Except for (A) compliance with, and filings under, the HSR Act; (B) the filing with the SEC of (i) the Proxy Statement and (ii) such reports under the Exchange Act as may be required in connection with this Agreement and the transactions contemplated by this Agreement; (C) the filing of the Certificate of Merger and other appropriate merger documents required by the DGCL with the Secretary of State of the State of Delaware and appropriate documents with the relevant authorities of other states in which the Company or its Significant Subsidiaries is qualified to do business; (D) any filings and approvals pursuant to the rules and regulations of the NASDAQ; (E) applicable requirements, if any, of state securities or "blue sky" Laws; (F) application to, and the consent and approval of, the FERC, or an order from the FERC disclaiming jurisdiction over the transactions contemplated hereby; (G) to the extent required, notice to and approval of, (i) the SDPUC, (ii) the MPSC, and (iii) the NPSC; (H) required pre-approvals of license transfers with the Federal Communications Commission; (I) to the extent applicable, consents, approvals and actions of, filings with, and notices to, any Governmental Entity pursuant to the Exon-Florio Act (such items set forth above in clauses (A) through (I) collectively, the "Required Statutory Approvals"); and (J) the filing of a report with the BEA pursuant to the IISA, no consent, approval, notice, order or authorization of, or registration, declaration or filing with, any Governmental Entity, is necessary or required to be obtained or made in connection with the execution and delivery of this Agreement by the Company, the performance by the Company of its obligations hereunder or the consummation of the Merger and the other transactions contemplated hereby, other than such items that the failure to make or obtain, as the case may be, would not have a Material Adverse Effect.

(e)    SEC Reports, Financial Statements and Utility Reports.

(i)    The Company has filed with the SEC all forms, reports, schedules, statements and other documents required to be filed by it since December 31, 2005, pursuant to the Exchange Act or the Securities Act (such forms, reports, schedules, statements and other documents, including any financial statements or schedules included therein, are collectively referred to herein as the "Company SEC Documents"). The Company SEC Documents, as of their respective dates of filing (giving effect to any amendments or supplements thereto), (x) did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading and (y) complied as to form in all material respects with the applicable requirements of the Exchange Act and the Securities Act, as the case may be, and, to the extent applicable, the Sarbanes-Oxley Act of 2002 (it being understood that the foregoing does not cover future events resulting from public announcement of the Merger). The audited consolidated financial statements and the unaudited quarterly financial statements of the Company included in the Company SEC Documents comply as to form in all material respects with the published rules and regulations of the SEC with respect thereto in effect on the date of filing, have been prepared in accordance with GAAP, except as may be indicated in the notes thereto or, in the case of such unaudited statements, as permitted by Form 10-Q and Form 8-K of the SEC, and fairly present (subject, in the case of the unaudited statements, to normal, recurring audit adjustments), in all material respects, the consolidated financial position of the Company and its

17

consolidated Subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods then ended.

(ii)    All filings (other than immaterial filings) required to be made by the Company or its Subsidiaries since January 1, 2005 under the 1935 Act, the Federal Power Act, as amended, the Communications Act of 1934, as amended by the Telecommunications Act of 1996, and applicable state Laws have been filed with the SEC, the FERC, the Federal Communications Commission, the Department of Energy, the MPSC, the NPSC or the SDPUC, as the case may be, including all forms, statements, reports, agreements (oral or written) and all documents, exhibits, amendments and supplements appertaining thereto, including all rates, tariffs, franchises, service agreements and related documents and all such filings complied, as of their respective dates, with all applicable requirements of the applicable statute and the rules and regulations thereunder, except for filings the failure of which to make or the failure of which to make in compliance with all requirements of the applicable statute and the rules and regulations thereunder, individually or in the aggregate, would not have a Material Adverse Effect.

(iii)    Neither the Company nor any of its Subsidiaries is a party to, or has any commitment to become a party to, any joint venture, off-balance sheet partnership or similar contract or arrangement (including any contract relating to any transaction or relationship between or among the Company and any of its Subsidiaries, on the one hand, any unconsolidated affiliate, including any structured finance, special purpose or limited purpose entity or person, on the other hand, or any "off-balance sheet arrangements" (as such term is defined in Item 303(a) of Regulation S-K of the SEC)), where the result, purpose or effect of such contract is to avoid disclosure of any material transaction involving, or material liabilities of, the Company or any of its Subsidiaries, in the Company's audited consolidated financial statements or other Company SEC Documents.

(f)    No Undisclosed Liabilities. Except as reflected, reserved against or otherwise disclosed in the consolidated financial statements of the Company (including the notes thereto and related management discussion and analysis) included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2005, to the Knowledge of the Company, neither the Company nor any of its Subsidiaries has any liabilities or obligations (whether absolute, accrued, fixed, contingent or otherwise) required to be set forth in the Company's consolidated balance sheet under GAAP, other than liabilities (i) incurred in the ordinary course of business since December 31, 2005, (ii) incurred pursuant to the transactions contemplated by this Agreement, (iii) discharged or paid in full prior to the date of this Agreement in the ordinary course of business or (iv) which would not have, individually or in the aggregate, a Material Adverse Effect.

(g)    Sarbanes-Oxley.

(i)    The management of the Company has (x) designed and implemented disclosure controls and procedures (as defined in Rule 13a-15(e) of the Exchange Act), or caused such disclosure controls and procedures to be designed and

18

implemented under their supervision, to ensure that material information relating to the Company, including its consolidated Subsidiaries, is made known to the management of the Company by others within those entities and (y) has disclosed, based on its most recent evaluation of internal control over financial reporting (as defined in Rule 13a-15(f) of the Exchange Act), to the Company's outside auditors and the audit committee of the Company Board (A) any significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which could reasonably be expected to adversely affect the Company's ability to record, process, summarize and report financial information and (B) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting. Since December 31, 2005, any material change in internal control over financial reporting required to be disclosed in any Company SEC Document has been so disclosed.

(ii)     Since December 31, 2005, (A) neither the Company nor any of its Subsidiaries nor, to the Knowledge of the Company, any Representative of the Company or any of its Subsidiaries has received or otherwise obtained knowledge of any material complaint, allegation, assertion or claim, whether written or oral, regarding the accounting or auditing practices, procedures, methodologies or methods of the Company or any of its Subsidiaries or their respective internal accounting controls relating to periods after December 31, 2005, including any material complaint, allegation, assertion or claim that the Company or any of its Subsidiaries has engaged in questionable accounting or auditing practices (except for any of the foregoing received after the date of this Agreement which have no reasonable basis), and (B) to the Knowledge of the Company, no attorney representing the Company or any of its Subsidiaries, whether or not employed by the Company or any of its Subsidiaries, has reported evidence of a material violation of securities Laws, breach of fiduciary duty or similar violation, relating to periods after December 31, 2005, by the Company or any of its officers, directors, employees or agents to the Company Board or any committee thereof or to any director or executive officer of the Company.

(h)     Absence of Certain Changes or Events. Since December 31, 2005, (i) through the date of this Agreement, each of the Company and its Subsidiaries has conducted its business only in the ordinary course consistent with past practice, and (ii) there has not been any event or occurrence that would reasonably be expected to have a Material Adverse Effect.

(i)     Information Supplied. None of the information supplied or to be supplied by or on behalf of the Company for inclusion or incorporation by reference in (i) the Proxy Statement or (ii) any other document filed or to be filed with the SEC in connection with the transactions contemplated by this Agreement (the "Other Filings") will, on each relevant filing date and in the case of the Proxy Statement, on the date of mailing to the Company Stockholders and at the time of the Stockholders' Meeting, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading. The Proxy Statement and the Other Filings will comply as to form in all material respects with the provisions of the Exchange Act. Notwithstanding the foregoing, the Company makes no

19

representation or warranty with respect to any information supplied by Parent Group that is contained in the Proxy Statement.

      (j)    <u>Employee Benefit Plans</u>.

      (i)    Section 3.01(j)(i) of the Company Disclosure Letter sets forth all Benefit Plans maintained or contributed to by the Company and any of its Subsidiaries, or for which the Company or any of its Subsidiaries could incur any liability, true, complete and correct copies of which have been provided or otherwise made available to Parent. The Company has also provided or otherwise made available to Parent with respect to each Benefit Plan (to the extent applicable) copies of: the trust agreement, the most recently filed annual report on IRS Form 5500 (including all schedules and audited financial statements), the most recently received IRS determination letter, the most recently prepared actuarial report and financial statement, the most recent summary plan description, any summaries of material modification, any employee handbooks, and any material written communications by the Company or its Subsidiaries to any current or former employees, consultants or directors of the Company or any of its Subsidiaries concerning the extent of the benefits provided under a Benefit Plan.

      (ii)    Except where failure to comply would not have a Material Adverse Effect, each Benefit Plan maintained by the Company and any Subsidiary of the Company has been operated and administered in compliance with its terms and applicable Law. Each Benefit Plan that is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter from the IRS that the Benefit Plan is so qualified, and, to the Knowledge of the Company, no fact or circumstances exists that would result in the revocation of such letter. Neither the Company nor any of its Subsidiaries has incurred or reasonably expects to incur, either directly or indirectly (including as a result of an indemnification obligation), any liability under Title I or IV of ERISA or the penalty, excise tax or joint and several liability provisions of the Code or any regulations relating to employee benefit plans (including, without limitation, Sections 406, 409, 502(i), 502(1), 4069 or 4212(c) of ERISA, or Sections 4971, 4975 or 4976 of the Code). Neither the Company nor any of its Subsidiaries nor any "party in interest" or "disqualified person" in respect of the Benefit Plans has engaged in a "prohibited transaction" (within the meaning of Section 4975 or Section 406 of ERISA) that would reasonably be expected to have a Material Adverse Effect.

      (iii)    Except for the continuation coverage requirements of COBRA, neither the Company nor any Subsidiary of the Company has any liability or potential liability for benefits to any employees following termination of employment or retirement under any of the Benefit Plans that are employee welfare benefit plans.

      (iv)    The execution of this Agreement and the consummation of the Merger will not constitute an event under any Benefit Plan maintained by the Company or any Subsidiary of the Company that will or may result in any payment, acceleration, termination, forgiveness of indebtedness, vesting, distribution, increase in compensation or benefits or obligation to fund benefits with respect to any employee of the Company or any Subsidiary of the Company which would reasonably be expected to have a Material

20

Adverse Effect. The execution of this Agreement and the consummation of the Merger will not give rise to any excise tax under Section 4999 of the Code or a loss of deduction under Section 280G of the Code. Except as would not have a Material Adverse Effect, all contributions and other payments required to be made by the Company or its Subsidiaries by Law or by the terms of any Benefit Plan with respect to any period ending before the Closing Date have been timely made to any funds or trusts established thereunder or in connection therewith, or reserves adequate for such contributions or other payments have been or will be set aside therefor and have been or will be reflected in financial statements, and no accumulated funding deficiencies exist in any of such plans subject to Section 412 of the Code.

(v)    Except as would not have a Material Adverse Effect, there are no existing (or, to the Knowledge of the Company, threatened) lawsuits, claims or other controversies, other than claims for information or benefits in the normal course, with respect to any Benefit Plan maintained by the Company or any Subsidiary of the Company. Neither the Company nor any Subsidiary of the Company has incurred, nor reasonably expects to incur, any liability under Title IV of ERISA (other than liability for premium payments to the Pension Benefit Guaranty Corporation arising in the ordinary course) other than those liabilities which would not result in a Material Adverse Effect.

(k)    <u>Litigation</u>. There is no suit, claim, action, proceeding (at law or in equity) or any investigation, arbitration, administrative or other proceeding by or before any Governmental Entity or, to the Knowledge of the Company, threatened against or affecting the Company or any Subsidiary of the Company or any of their respective properties or assets or any of their respective officers, employees or directors in their capacity as such, except for any such suit, claim, action, proceeding or investigation as would not have a Material Adverse Effect. As of the date of this Agreement, neither the Company nor its Subsidiaries is subject to any outstanding order, writ, judgment, injunction, decree, rule or order of any Governmental Entity that would reasonably be expected to have a Material Adverse Effect.

(l)    <u>Permits</u>. Other than with respect to Environmental Laws, which are governed by Section 3.01(o), each of the Company and its Significant Subsidiaries holds all permits, licenses, authorizations, certificates, rights, variances, exemptions, orders and approvals of all Governmental Entities that are required pursuant to any Laws and necessary for the lawful conduct of its business as of the date of this Agreement (the "<u>Company Permits</u>"), except for failures to hold such Company Permits that would not have a Material Adverse Effect. Each of the Company and its Significant Subsidiaries is in compliance with the terms of the Company Permits, except where the failure to so comply, individually or in the aggregate, would not have a Material Adverse Effect.

(m)    <u>Tax Matters</u>.

(i)    Each of the Company and its Subsidiaries has timely filed all Returns required to be filed by it with any Tax authority prior to the date hereof either separately or as a member of an Affiliated Group, pursuant to applicable Law except for such Returns that would not have a Material Adverse Effect. As of the time of filing, all such Returns were true, correct and complete in all material respects. Each of the

21

Company and its Subsidiaries has paid all amounts in respect of Taxes shown to be due and payable on such Returns and all such amounts required to be paid to any Governmental Entity or other person on or before the date hereof.

(ii)    All material Taxes that each of the Company and its Subsidiaries is or was required by Law to withhold or collect have been duly withheld or collected, and have been timely paid over to the proper Governmental Entity or other person to the extent due and payable.

(iii)    Each of the Company and its Subsidiaries is not delinquent in the payment of any material Tax nor is there any material Tax deficiency outstanding, proposed or assessed against the Company or its Subsidiaries, nor has the Company or its Subsidiaries executed any unexpired waiver of any statute of limitations on or extending the period for the assessment or collection of any Tax.

(iv)    To the Knowledge of the Company, no audit or other examination of any Return of the Company or its Subsidiaries by any Tax authority is presently in progress. Neither the Company nor its Subsidiaries has been notified of any request for such an audit or other examination.

(v)    No material adjustment to the Tax liability of the Company relating to any Return filed by the Company or its Subsidiaries has been proposed in writing, formally or informally, by any Tax authority to the Company, its Subsidiaries or any representative thereof.

(vi)    Neither the Company nor its Subsidiaries has any liability for any unpaid Taxes which have not been accrued for or reserved on the Company's most recent balance sheet included in the Company SEC Documents, whether asserted or unasserted, contingent or otherwise, other than any liability for unpaid Taxes that may have accrued since the end of the most recent fiscal period covered by such balance sheet in connection with the operation of the Business in the ordinary course of business.

(n)    <u>Labor Relations and Employment.</u>

(i)    Except where failure to comply would not have a Material Adverse Effect, the Company and each Subsidiary is in compliance with all applicable Laws respecting employment and employment practices, terms and conditions of employment and wages and hours, including, without limitation, the Immigration Reform and Control Act, the WARN Act, any Laws respecting employment discrimination, sexual harassment, disability rights or benefits, equal opportunity, plant closure issues, affirmative action, workers' compensation, labor relations, wage and hour standards, occupational safety and health requirements and unemployment insurance, and is not engaged in any unfair labor practices.

(ii)    Neither the Company nor any of its Subsidiaries is a party to any collective bargaining agreement or other labor union agreement applicable to individuals employed by the Company or any of its Subsidiaries, nor are there any formal activities or proceedings of any labor union to organize any such employees.

22

(iii)    Except as would not have a Material Adverse Effect, there are no complaints, charges or claims against the Company or any of its Subsidiaries pending, or to the Knowledge of the Company, threatened to be brought or filed with the NLRB or any Governmental Entity based on, or arising out of, in connection with, or otherwise relating to the employment (including unfair labor practice complaints, grievances or charges) or termination of employment of any individual by the Company or any of its Subsidiaries.

(o)    Environmental Matters. Except as provided in this Section 3.01(o), the Company makes no representation or warranty, express or implied, as to any environmental matters, including Environmental Laws and Environmental Permits.

(i)    Each of the Company and its Subsidiaries is in compliance with all applicable Environmental Laws, except for such violations and defaults as would not have a Material Adverse Effect.

(ii)    Except as would not have a Material Adverse Effect, the Company and its Subsidiaries have obtained or applied in a timely manner for all Environmental Permits necessary for the conduct of their operations as of the date of this Agreement, as applicable, and all such Environmental Permits are in full force and effect or, where applicable, a renewal application has been timely filed and is pending agency approval. There are no pending or, to the Knowledge of the Company, threatened proceedings to revoke or enforce such Environmental Permits and each of the Company and its Subsidiaries is in compliance with all terms and conditions thereof, except where the failure to possess or comply with such Environmental Permits or the failure for such Environmental Permits to be in full force and effect would not have a Material Adverse Effect.

(iii)    Except for matters that would not have a Material Adverse Effect, neither the Company nor its Subsidiaries has received any written notification that the Company or any such Subsidiary, any property currently owned, leased or operated, any property formerly owned, leased or operated, is the subject of any proceeding, investigation, claim, lawsuit or order by any Governmental Entity or other person seeking (i) any Remedial Action or (ii) to impose any Environmental Liabilities and Costs on the Company or any such Subsidiary.

(iv)    Except as would not have a Material Adverse Effect, neither the Company nor its Subsidiaries is required to (i) implement or pay for any Remedial Action, (ii) reimburse costs incurred by third parties with respect to any Remedial Action, or (iii) incur Environmental Liabilities and Costs.

(v)    With respect to any property currently owned, leased or operated by the Company or any of its Subsidiaries or, to the Knowledge of the Company, with respect to any property formerly owned, leased or operated by the Company or any of its Subsidiaries, there has not been any Release that would reasonably be expected to result in any Environmental Liabilities and Costs that would have a Material Adverse Effect.

23

(p)     Material Contracts.

(i)     As of the date hereof, except for this Agreement, neither the Company nor its Subsidiaries is a party to, and none of their respective properties or other assets is subject to, any contract:

(A)     that would be required to be filed by the Company as a "material contract" pursuant to Item 601 (b)(10) of Regulation S-K of the SEC; or

(B)     that contain a minimum annual purchase requirement of US$1,000,000 or more which has a term of more than one (1) year and that cannot be canceled on less than ninety (90) days notice.

Each such Contract described in clauses (A) and (B) is referred to herein as a "Material Contract."

(ii)     All Material Contracts are valid, binding and in full force and effect, except to the extent they have previously expired in accordance with their terms or to the extent the failure to be in full force and effect would not have a Material Adverse Effect. The Company is not, and has not received any written notice or has any Knowledge that any other party is, in default in any respect under any such Material Contract, except for those defaults which would not have a Material Adverse Effect, and there has not occurred any event that, with the lapse of time or the giving of notice or both, would constitute such a material default.

(q)     Property. All properties and assets of the Company and its Subsidiaries, real and personal, material to the conduct of its business are, except for changes in the ordinary course of business consistent with past practice since December 31, 2005, reflected in the most recent balance sheet of the Company included in the Company SEC Documents, and each of the Company and its Subsidiaries has legal title to, or a leasehold interest, license or easement in, its real and personal property reflected on such balance sheet or acquired by it since the date of such balance sheet, free and clear of all Liens other than those Liens which are of record as of the date hereof and those Liens which would not result in a Material Adverse Effect.

(r)     Intellectual Property. The Company owns or possesses adequate licenses or other rights to use all Intellectual Property Rights necessary to conduct the business of the Company and its Subsidiaries as currently conducted, except where failure to own or possess such licenses or rights would not have a Material Adverse Effect. To the Knowledge of the Company, the Intellectual Property Rights of the Company do not conflict with or infringe upon any Intellectual Property Rights of others to the extent that, if sustained, such conflict or infringement would reasonably be expected to have a Material Adverse Effect.

(s)     Insurance. All material insurance policies (the "Insurance Policies") carried by or covering the Company and its Subsidiaries with respect to their business, assets and properties are in full force and effect, and no notice of cancellation, or threatened cancellation, has been received by the Company or its Subsidiaries with respect to any Insurance Policy which has not been cured by the payment of premiums that are due, except where such failure to cure would not have a Material Adverse Effect. All premiums due on the Insurance Policies have

24

been paid in a timely manner and the Company and its Subsidiaries have complied in all material respects with the terms and provisions of the Insurance Policies.

(t)    No Ownership of Nuclear Power Plants. Neither the Company nor its Subsidiaries owns, directly or indirectly, any interest in any nuclear generation station or manages or operates any nuclear generation station.

(u)    State Takeover Statutes. Assuming the accuracy of Parent's representation in Section 3.02(g), no "moratorium," "control share," "fair price," "business combination" or other anti-takeover Laws are applicable to the Merger or any of the other transactions contemplated by this Agreement.

(v)    Brokers. No broker, investment banker, financial advisor or other person, other than Credit Suisse and Blackstone the fees and expenses of which will be paid by the Company, is entitled to any broker's, finder's, financial advisor's or other similar fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Company.

(w)    Opinion of the Company's Financial Advisors. The Company Board has received an opinion from each of Credit Suisse (the "CS Fairness Opinion") and Blackstone (the "Blackstone Fairness Opinion"), to the effect that, as of the date of this Agreement, the Merger Consideration to be received by the holders of Company Common Stock pursuant to the Merger is fair from a financial point of view to such holders.

(x)    Board Approval. At a meeting duly called and held, the Company Board (i) determined that this Agreement and the transactions contemplated hereby, including the Merger, are fair to and in the best interests of the Company and the Company Stockholders, (ii) approved, authorized and adopted this Agreement and approved and authorized the transactions contemplated hereby, including the Merger, (iii) resolved to recommend that this Agreement be submitted for consideration by the Company Stockholders at the Stockholders' Meeting and (iv) resolved to recommend adoption by the Company Stockholders of this Agreement.

(y)    Vote required. Assuming the accuracy of Parent's representation in Section 3.02(g), the Company Stockholder Approval is the only vote of the holders of any class or series of the Company capital stock necessary to adopt this Agreement and approve the Merger and the other transactions contemplated hereby.

(z)    Company Rights Agreement. The Company has amended the Company Rights Agreement in accordance with its terms to render it inapplicable to this Agreement, the Merger and other transactions contemplated by this Agreement.

(aa)    Completion of Transaction. As of the date of this Agreement, the Company has no Knowledge of any fact or circumstances relating to or affecting the Company that it reasonably believes would prevent the Company from fulfilling its material obligations under this Agreement and completing the transactions contemplated hereby or that would, without the incurrence of undue expense or time, prevent the Company from obtaining all Required Statutory Approvals.

25

(bb)    No Other Representations and Warranties. Except for the representations and warranties contained in this Section 3.01, none of the Company, any affiliate of the Company or any other person makes any representations or warranties, and the Company hereby disclaims any other representations or warranties, whether made by the Company, any affiliate of the Company, or any of their respective officers, directors, employees, agents or representatives, with respect to the negotiation, execution and delivery of this Agreement or the transactions contemplated hereby, notwithstanding the delivery or disclosure, in writing or orally, to the Parent, Sub or any of their officers, directors, employees, agents or representatives of any documentation or other information.

SECTION 3.02    Representations and Warranties of Parent Group. Each constituent of Parent Group jointly and severally represent and warrant to the Company as follows:

(a)    Organization.

(i)    Each of Parent and Holding Company is a legal entity duly organized, validly existing and in good standing under the laws of Australia and has all requisite power and authority to carry on its business as now being conducted and to enter into and carry out its obligations under this Agreement, except where the failure to have such power and authority would not have a Parent Material Adverse Effect.

(ii)    Each of Holdings and Sub is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite corporate power and authority to carry on its business as now being conducted and to enter into and carry out its obligations under this Agreement, except where the failure to have such power and authority would not have a Parent Material Adverse Effect.

(b)    Authority. Each constituent of Parent Group has the requisite power and authority (corporate or otherwise) to execute and deliver this Agreement and to consummate the transactions contemplated hereby. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary action (corporate or otherwise) on the part of each constituent of Parent Group and no other proceedings (corporate or otherwise, including any shareholder action) on the part of Parent, Holding Company, Holdings or Sub are necessary to authorize this Agreement or to consummate such transactions. This Agreement has been duly executed and delivered by each constituent of Parent Group and, assuming this Agreement constitutes a valid and binding obligation of the Company, constitutes a valid and binding obligation of each constituent of Parent Group enforceable against them in accordance with its terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws of general application affecting enforcement of creditors' rights generally and (ii) as limited by Laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

26

     (c)     <u>No Conflicts; Consents and Approvals</u>.

     (i)     The execution, delivery or performance of this Agreement by each constituent of Parent Group does not or will not, as the case may be, and the consummation by each constituent of Parent Group of the transactions contemplated hereby, including the Merger, does not or will not (x) conflict with or result in a violation pursuant to any provision of the organizational documents of Parent, Holding Company, Holdings or Sub, in each case, as amended to the date of this Agreement, (y) subject to obtaining or making the consents, approvals, notices, orders, authorizations, registrations, declarations and filings referred to in paragraph (ii) below, contravene any Law or any order, writ, judgment, injunction, decree, determination or award currently in effect, or (z) conflict with or result in a breach of, or default under, any loan or credit agreement, note, bond, mortgage, indenture, lease, license, benefit plan, contract, agreement or other instrument, permit, concession, or obligation applicable to Parent, Holding Company, Holdings or Sub or their respective properties or assets, except, with respect to clauses (y) and (z) above, for any such contraventions, conflicts, breaches, defaults or other occurrences which would not have, individually or in the aggregate, a Parent Material Adverse Effect.

     (ii)     Other than the Required Statutory Approvals and the filing of a report with the BEA pursuant to the IISA, no consent, approval, order or authorization of, or registration, declaration or filing with, any Governmental Entity is required by or with respect to Parent, Holding Company, Holdings or Sub in connection with the execution and delivery of this Agreement by Parent, Holding Company, Holdings or Sub or the consummation of the Merger and the other transactions contemplated hereby, other than such consents, approvals, orders, authorizations, registrations, declarations or filings that the failure to obtain or make would not have a Parent Material Adverse Effect.

     (d)     <u>Litigation</u>. No legal action, suit or proceeding or judicial, administrative or governmental investigation is pending, or to the Knowledge of Parent, threatened against Parent, Holding Company, Holdings or Sub that (i) questions the validity of this Agreement or the transactions contemplated hereby, including, but not limited to, the Merger, or any actions taken or to be taken by Parent, Holding Company, Holdings or Sub pursuant hereto or seeks to enjoin or otherwise restrain the transactions contemplated hereby or (ii) would have a Parent Material Adverse Effect. As of the date of this Agreement, neither Parent, Holding Company, Holdings nor Sub is subject to any outstanding order, writ, judgment, injunction, decree, rule or order of any Governmental Entity that would have a Parent Material Adverse Effect.

     (e)     <u>Information Supplied</u>. None of the information supplied or to be supplied by or on behalf of Parent Group for inclusion in (i) the Proxy Statement and (ii) Other Filings will, on each relevant filing date, and in the case of the Proxy Statement, on the date of mailing to the Company Stockholders and at the time of the Stockholders' Meeting, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading. Notwithstanding the foregoing, Parent Group makes no representation or warranty with respect to any information supplied by the Company which is contained in the Proxy Statement.

27

(f)      <u>Interim Operations of Holding Company, Holdings and Sub</u>.   Each of Holding Company, Holdings and Sub was formed solely for the purpose of engaging in the transactions contemplated hereby and, except for activities incidental to its organization and maintenance of corporate existence, has engaged in no other business activities and has conducted its operations only as contemplated hereby.

(g)      <u>No Ownership Interest</u>.   Neither Parent, Holding Company, Holdings, Sub, nor any of their respective affiliates owns, beneficially or of record, any shares of capital stock of the Company.

(h)      <u>Financing Arrangements</u>.

(i)      Parent Group has delivered to the Company true and correct copies of financing letters with respect to debt financing of US$505,000,000 (the "<u>Financing Commitments</u>").

(ii)      None of the Financing Commitments has been amended or modified prior to the date of this Agreement, and the respective financing commitments contained in the Financing Commitments have not been withdrawn or rescinded in any respect. The Financing Commitments are in full force and effect. There are no conditions precedent or other contingencies related to the funding of the full amount of the financing contained in the Financing Commitments, other than as set forth in, or contemplated by, the Financing Commitments.

(iii)      As of the date of this Agreement, no event (including, without limitation, the failure to pay any and all commitment fees and other fees required by the Financial Commitments) has occurred which, with or without notice, lapse of time or both, would constitute a default or breach on the part of Parent, Holding Company, Holdings or Sub under any term or condition of the Financing Commitments.

(iv)      The aggregate proceeds contemplated by the Financing Commitments, together with (x) cash currently on hand and available to Parent Group and (y) cash Parent Group reasonably believes is available to it from other sources of debt and equity financing ((x) and (y) in the aggregate, the "<u>Available Cash</u>"), are sufficient (A) to pay (or provide the funds for the Surviving Corporation to pay) the aggregate Merger Consideration, the aggregate Warrant Consideration and Outstanding Dividends, (B) to pay (or provide the funds for the Surviving Corporation to pay) all amounts contemplated by Sections 2.01(g), (h) and (i) when due, (C) to refinance any indebtedness or other obligation of the Company which may become due, and to finance any "change of control" offer that may be required under any indebtedness of the Company, in each case, as a result of this Agreement, the Merger, or any of the transactions contemplated hereby, and (D) to pay all related fees and expenses, arising solely out of the Merger when due.

(v)      As of the date of this Agreement, Parent Group does not have any reason to believe that any of the terms of or conditions to the Financing Commitments will not be satisfied on a timely basis or that the full amount of the financing contained in

28

the Financing Commitments and the Available Cash will not be available to the Parent Group on the Closing Date.

(i)    Letter of Credit.  The Letter of Credit (as defined in Section 5.16 below) is in full force and effect. There are no conditions precedent or other contingencies related to the funding of the full amount of the Letter Credit, other than as set forth in, or contemplated by, the Letter of Credit. No event has occurred which, with or without notice, lapse of time or both, would constitute a default or breach on the part of Parent, Holding Company, Holdings or Sub with respect to any term or condition of the Letter of Credit.

(j)    Completion of Transaction.  As of the date of this Agreement, Parent Group has no Knowledge of any fact or circumstances relating to or affecting Parent, Holding Company, Holdings or Sub that it reasonably believes would prevent Parent, Holding Company, Holdings or Sub from fulfilling their material obligations under this Agreement and completing the transactions contemplated hereby or that would, without the incurrence of undue expense or time, prevent Parent, Holding Company, Holdings or Sub from obtaining all Required Statutory Approvals.

(k)    Certain Issues Relating to the MPSC.

(i)    Parent Group acknowledge and agree that they have been provided by the Company, and have reviewed and analyzed, the Settlement Agreement, including the Consent Order (as defined in the Settlement Agreement), and the Statement of Factors.

(ii)    Parent Group acknowledge the agreements, covenants and obligations of the Company contained in the Settlement Agreement and the Consent Order, and will exercise reasonable best efforts to address such agreements, covenants and obligations of the Company and the concerns of the MPSC, as reflected in such documents.

(iii)    Parent Group have no Knowledge of any fact or circumstances relating to or affecting Parent Group or any of their respective Subsidiaries, this Agreement, the Merger or the consummation of the other transactions contemplated by this Agreement that it reasonably believes would prevent Parent Group or the Surviving Corporation and its Subsidiaries from having a preponderance of the elements and characteristics of an acquirer as outlined by the MPSC in the Statement of Factors.

(l)    Fairness Opinions.  Parent Group acknowledge and agree that they may not rely on the CS Fairness Opinion or the Blackstone Fairness Opinion.

(m)    No Agreements with Company Stockholders.  As of the date of this Agreement, neither Parent, Holding Company, Holdings nor Sub nor any of their respective Representatives or affiliates has entered into any agreement, arrangement or understanding (in each case, whether oral or written), or authorized, committed or agreed to enter into any agreement, arrangement or understanding (in each case, whether oral or written), pursuant to which any Company Stockholder would be entitled to receive consideration of a different

29

amount or nature than the Merger Consideration or pursuant to which a Company Stockholder agrees to vote to adopt this Agreement or agrees to vote against any Superior Proposal.

(n)      No Other Representations and Warranties.   Except for the representations and warranties contained in this Section 3.02, none of Parent, Holding Company, Holdings, Sub, any affiliate of Parent, Holding Company, Holdings or Sub or any other person makes any representations or warranties, and Parent Group hereby disclaim any other representations or warranties, whether made by Parent, Holding Company, Holding Company, Holdings, Sub, any affiliate of Parent, Holding Company, Holdings, Sub or any of their respective officers, directors, employees, agents or representatives, with respect to the negotiation, execution and delivery of this Agreement or the transactions contemplated hereby, notwithstanding the delivery or disclosure, in writing or orally, to the Company or any of its officers, directors, employees, agents or representatives of any documentation or other information.

## ARTICLE IV

## COVENANTS

SECTION 4.01      Conduct of Business of the Company.   Except as set forth in Section 4.01 of the Company Disclosure Letter (with specific reference to the covenants in this Section 4.01 to which the information in such letter relates), contemplated or permitted by this Agreement, required by a Governmental Entity of competent jurisdiction or as expressly agreed to in writing by Parent (which consent shall not be unreasonably withheld or delayed), the Company will, and will cause its Subsidiaries to, conduct its operations in all material respects according to its ordinary course of business consistent with past practice and use its commercially reasonable efforts to preserve intact its current business organization, to keep available the services of its current officers and employees and to preserve its relationships with customers, suppliers, licensors, licensees, advertisers, distributors and others having business dealings with it. In this Section 4.01, "ordinary course of business consistent with past practice" shall include actions (the "Plan Actions") that are specifically provided for in, or undertaken pursuant to, the Reorganization Plan; *provided*, *however*, that "ordinary course of business consistent with past practice" shall not include actions that are substantially similar to Plan Actions, but are not specifically provided for in, or undertaken pursuant to, the Reorganization Plan. Without limiting the generality of the foregoing, except as set forth in Section 4.01 of the Company Disclosure Letter (with specific reference to the covenants in this Section 4.01 to which the information in such letter relates) and, except as (x) contemplated or permitted by this Agreement or (y) required by Law, the Company will not and will cause its Subsidiaries not to, without the consent of Parent, which consent shall not be unreasonably withheld or delayed:

(i)      except with respect to bonuses or other incentive compensation made in the ordinary course of business consistent with past practice (including, without limitation, an annual bonus or compensation plan adopted for fiscal year 2007 consistent with annual plans for prior years), adopt or amend in any material respect, any bonus, profit sharing, compensation, severance, change-in-control, termination, stock option, restricted stock, stock purchase, stock appreciation right, pension, retirement, employment or other employee benefit agreement, trust, plan or other arrangement for the benefit or welfare of any director, officer or employee of the Company or its Subsidiaries

30

or increase in any manner the compensation or fringe benefits of any director, officer or employee of the Company or its Subsidiaries (except, in each case, for annual increases and cost of living increases for the benefit of officers and employees of the Company or its Subsidiaries which, in the aggregate, are consistent with past practice);

(ii)         sell, lease, license, mortgage or otherwise encumber or subject to any Lien or otherwise dispose of any of its properties or assets other than immaterial properties or assets (or immaterial portions of properties or assets), except in the ordinary course of business, and other than Liens (A) arising as a matter of Law, (B) granted in connection with the incurrence, assumption or guaranteed of any indebtedness permitted under clause (ix) below and (C) as required by after acquired property covenants in contracts evidencing indebtedness of the Company or its Subsidiaries and Liens created in connection with the refinancing of indebtedness of the Company or its Subsidiaries that are no less favorable to the Company and its Subsidiaries than those Liens that were created in connection with the indebtedness that is being refinanced;

(iii)        (x) declare, set aside or pay any dividends on, or make any other distributions in respect of, any of its capital stock, (y) split, combine or reclassify any of its capital stock or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for shares of its capital stock or (z) purchase, redeem or otherwise acquire any shares of capital stock of the Company or its Subsidiaries or any other securities thereof or any rights or warrants to acquire any such shares or other securities, except that (A) the Company may continue the declaration and payment of regular cash dividends per share of Company Common Stock, not to exceed $0.31 per quarter up to and including the third quarter of 2006 and, thereafter, not to exceed $0.34 per quarter, in each case, with usual record and payment dates for such dividends in accordance with past dividend practice, (B) the Company may declare and pay a Supplemental Dividend on Company Common Stock on a quarterly basis for the period commencing on the eighteen (18) month anniversary of the date hereof through the Effective Time, (C) the Company may declare and pay a special cash dividend on Company Common Stock with a record date in the fiscal quarter in which the Effective Time occurs in a per share amount up to the amount of the regular cash dividend declared per share by the Company in the immediately preceding fiscal quarter multiplied by a fraction, the numerator of which is the number of days elapsed in the then current fiscal quarter over the total number of days in the then current fiscal quarter, (D) any Subsidiary of the Company may pay dividends to the Company (and any intermediate holding company) and (E) the Company may purchase Company Common Stock for the purpose of funding or providing benefits under employee benefit plans, stock option and other incentive compensation plans, directors plans and stock purchase and dividend reinvestment plans in accordance with past practice or as may be permitted by Section 4.01(i) or 4.01 (iv);

(iv)        authorize for issuance, issue, deliver, sell or agree or commit to issue, sell or deliver (whether through the issuance or granting of options, warrants, commitments, subscriptions, rights to purchase or otherwise), pledge or otherwise encumber any shares of its capital stock, any other voting securities or any securities convertible into, or any rights, warrants or options to acquire, any such shares, voting

31

securities or convertible securities or any other securities or equity equivalents (including, without limitation, stock appreciation rights) other than issuances upon exercise of Warrants or Company Rights or in connection with stock-based awards outstanding as of the date hereof or granted after the date hereof in accordance with the terms of any Benefit Plan (including the grant of Restricted Shares pursuant to the Employee Restricted Stock Plan or the issuance of DSUs pursuant to the Deferred Director Plan) or as permitted under Section 4.01(i);

(v)      amend its Charter Documents;

(vi)      acquire (x) by merging or consolidating with, or by purchasing a substantial portion of the assets of, or by any other manner, any business or any corporation, partnership, joint venture, association or other business organization or division thereof or (y) any assets, including real estate, except (A) acquisitions of assets (other than capital expenditures) in the ordinary course of business; and (B) the making of capital expenditures (1) in accordance with, and in an amount not materially greater than, the Company's capital expenditures plan set forth in Section 4.01(vi) of the Company Disclosure Letter, (2) in connection with the repair or replacement of facilities destroyed or damaged due to casualty or accident (whether or not covered by insurance) or (3) otherwise, in an aggregate amount for all such capital expenditures made pursuant to this clause (3) not to exceed US$20 million;

(vii)      pay, discharge, settle or satisfy any claims, liabilities, obligations or litigation (absolute, accrued, asserted or unasserted, contingent or otherwise), other than the payment, discharge, settlement or satisfaction, in the ordinary course of business or in accordance with their terms;

(viii)      make or rescind any Tax elections that, individually or in the aggregate, could be reasonably likely to adversely affect in any material respect the Tax liability or Tax attributes of the Company or its Significant Subsidiaries, settle or compromise any material income tax liability or, except as required by applicable Law, materially change any method of accounting for Tax purposes or prepare or file any Return in a manner inconsistent with past practice;

(ix)      incur, assume or guarantee any indebtedness for borrowed money or enter into any "keep well" or other agreement to maintain any financial condition of another person or enter into any arrangement having the economic effect of any of the foregoing (including any capital leases, "synthetic" leases or conditional sale or other title retention agreements), other than (1) in the ordinary course of business consistent with past practice (including, without limitation, under the Credit Agreement), (2) borrowings made to finance capital expenditures and other acquisitions permitted pursuant to clause (vi) above, (3) borrowings made in connection with the refinancing of any indebtedness existing on the date hereof (including, without limitation, the Senior Notes and the Company Credit Facility) or permitted to be incurred hereunder and that will result in "investment-grade" style covenants (including with respect to restrictions on dividend payments and "change of control" provisions), (4) borrowings in an amount not

32

materially greater than as set forth in Section 4.01(ix) of the Company Disclosure Letter and (5) other borrowings in an aggregate amount not to exceed US$20 million;

(x)      other than in the ordinary course of business consistent with past practice and on terms not materially adverse to the Company and its Subsidiaries, taken as whole, enter into, modify or terminate any Material Contract or waive, release or assign any rights or claims or exercise any options thereunder;

(xi)      not make or implement any changes to the Company's or its Subsidiaries rates or charges, standards of service or execute any agreement with respect thereto except (1) in the ordinary course of business consistent with past practice, (2) as required under the Settlement Agreement or the Consent Order or (3) as required by a Governmental Entity of competent jurisdiction. The Company shall, and shall cause its Subsidiaries to, deliver to Parent a copy of each such filing or agreement at least four (4) Business Days prior to the filing or execution thereof;

(xii)      make any material changes in its accounting methods, except (i) as required by changes in GAAP (or any interpretation thereof) or Regulation S-X of the SEC, in each case as required by the Company's independent public accountants, (ii) as may be required by a change in applicable Law, (iii) as disclosed in the Company SEC Documents filed prior to the date hereof, (iv) or as required by a Governmental Entity (including the FASB or other similar organization);

(xiii)      amend, modify or waive any material provision of the Company's risk management program as currently in effect;

(xiv)      other than as contemplated by this Agreement in connection with the Merger or as required pursuant to a decree, temporary restraining order, preliminary or permanent injunction or other order issued by any Governmental Entity of competent jurisdiction terminate, amend, modify or waive any provision of (1) any confidentiality or standstill agreement in respect of the Company and its Subsidiaries to which it is a party or (2) the Company's Rights Agreement;

(xv)      fail to maintain in full force and effect or fail to use commercially reasonable efforts to, replace with financial responsible insurers, or renew, the Insurance Policies existing as of the date hereof;

(xvi)      enter into any agreements that limit or otherwise restrict the Company or any of its Subsidiaries or any successor thereto from engaging or competing, in any material respect, in any line of business or in any geographic area; or

(xvii)      authorize, or commit or agree to take, any of the foregoing actions.

SECTION 4.02      Control of Other Party's Business.   Nothing contained in this Agreement shall give the Company, directly or indirectly, the right to control or direct Parent's operations prior to the Effective Time. Nothing contained in this Agreement shall give Parent, directly or indirectly, the right to control or direct the Company's operations prior to the Effective Time. Prior to the Effective Time, each of the Company and Parent shall exercise,

33

consistent with the terms and conditions of this Agreement, complete control and supervision over its respective operations.

<div align="center">

## ARTICLE V

### ADDITIONAL AGREEMENTS

</div>

SECTION 5.01    Preparation of Proxy Statement; Stockholders' Meeting.

(a)    As soon as reasonably practicable following the date of this Agreement, but in no event later than forty-five (45) days after the date hereof, the Company shall prepare and file with the SEC the Proxy Statement, and the Company shall use all commercially reasonable efforts to respond as promptly as practicable to any comments of the SEC with respect thereto and to cause the Proxy Statement to be mailed to the Company Stockholders as promptly as practicable following the date of this Agreement. The Company shall promptly notify Parent upon the receipt of any comments from the SEC or the staff of the SEC or any request from the SEC or the staff of the SEC for amendments or supplements to the Proxy Statement and shall provide Parent with copies of all correspondence between the Company and its Representatives, on the one hand, and the SEC and the staff of the SEC, on the other hand, relating to the Proxy Statement. Notwithstanding the foregoing, prior to filing or mailing the Proxy Statement or responding to any comments of the SEC or the staff of the SEC with respect thereto, the Company (i) shall provide Parent a reasonable opportunity to review and comment on such document or response and (ii) shall include in such document or response all comments reasonably proposed by Parent. Whenever any event occurs which is required to be set forth in an amendment or supplement to the Proxy Statement, the Company or Parent, as the case may be, will promptly inform the other of such occurrence and cooperate in filing with the SEC and/or mailing to Company Stockholders such amendment or supplement.

(b)    The Company shall, as soon as reasonably practicable following the date of this Agreement, establish a record date for, duly call, give notice of, convene and hold the Stockholders' Meeting. Subject to Section 5.02, the Company shall, through the Company Board, recommend that the Company Stockholders vote in favor of the adoption of this Agreement and shall include such recommendation in the Proxy Statement. Subject to Section 5.02, the Company will use all reasonable efforts to solicit from Company Stockholders proxies in favor of the adoption of this Agreement. Notwithstanding anything to the contrary contained in this Agreement, the Company may adjourn or postpone the Stockholders' Meeting to the extent necessary to ensure that any necessary supplement or amendment to the Proxy Statement is provided to Company Stockholders in advance of a vote on the adoption of this Agreement or, if as of the time for which the Stockholders' Meeting is originally scheduled (as set forth in the Proxy Statement) there are insufficient shares of Company Common Stock represented (either in person or by proxy) to constitute a quorum necessary to conduct the business of such Stockholders' Meeting; *provided*, *however*, that any Stockholders' Meeting so adjourned or postponed shall be held as promptly as permitted by the Charter Documents and applicable Law.

<div align="center">34</div>

SECTION 5.02    No Solicitation.

(a)    Subject to the remainder of this Section 5.02, from the date of this Agreement until the earlier of the Effective Time and the termination of this Agreement pursuant to Article VII, the Company shall not, and shall use its reasonable best efforts not to permit any Representative of the Company or its Subsidiaries to, (i)  solicit, initiate or knowingly encourage, directly or indirectly, the submission of any Acquisition Proposal (as defined below), (ii) enter into any agreement with respect to any Acquisition Proposal, or (iii) participate in any discussions or negotiations regarding, or furnish to any person any non-public information with respect to, or knowingly take any other action to, directly or indirectly, facilitate any inquiries or the making of any proposal that constitutes, or may reasonably be expected to lead to, any Acquisition Proposal.

(b)    Notwithstanding anything to the contrary in this Agreement, the Company may, in response to an Acquisition Proposal that was not the result of any actions prohibited in paragraph (a) above and that was received at any time prior to the receipt of the Company Stockholder Approval, and which the Company Board determines, in good faith, after consultation with its outside legal counsel and financial advisor, may reasonably be expected to lead to a Superior Proposal (as defined below) and the following actions are required for the Company Board to act in a manner consistent with its fiduciary duties to the Company Stockholders under applicable Law, (x) enter into a customary confidentiality agreement with the person making such Acquisition Proposal having terms and conditions not in the aggregate materially more favorable to such person than the terms of the Confidentiality Agreement are to Parent, (y) furnish, and authorize and permit its Representatives to furnish, information with respect to the Company and its Subsidiaries to the person making such Acquisition Proposal and its Representatives pursuant to such customary confidentiality agreement and (z) participate in discussions or negotiations with such person and its Representatives regarding any Acquisition Proposal; *provided, however*, that the Company shall promptly provide to Parent any non-public information concerning the Company or any Subsidiary that is provided to the person making such Acquisition Proposal or its Representatives which was not previously provided to Parent; *provided further, however*, that the Company shall also promptly (and in any event within 48 hours) notify Parent of the receipt of each Acquisition Proposal, set forth in reasonable detail the material terms and conditions of the Acquisition Proposal (including, without limitation, information relating to the financing) and, to the extent not prohibited by any confidentiality agreement or other similar agreement in existence as of the date of this Agreement, identify the party submitting the Acquisition Proposal, and thereafter shall keep Parent reasonably informed of the status and material terms and conditions of such Acquisition Proposal.

(c)    Neither the Company Board nor any committee thereof shall (i) withdraw (or modify in a manner adverse to Parent), or publicly propose to withdraw (or modify in a manner adverse to Parent), the recommendation of this Agreement by the Company Board or any such committee, (ii) approve or recommend, or publicly propose to approve or recommend, the approval or adoption of any Acquisition Proposal, or resolve or agree to take any such action, or (iii) cause or permit the Company or any of its Subsidiaries to execute or enter into, any letter of intent, memorandum of understanding, agreement in principle, merger agreement, acquisition agreement, option agreement, joint venture agreement, partnership agreement or other similar agreement constituting or related to, or that is intended to or may reasonably be expected to lead

35

to, any Acquisition Proposal, other than any confidentiality agreement referred to in Section 5.02(b).

(d)        Notwithstanding the foregoing, at any time prior to the time when the Company Stockholder Approval has been obtained:

(i)        upon having received an Acquisition Proposal that the Company Board concludes constitutes a Superior Proposal, the Company Board may withhold, withdraw or modify its recommendation of this Agreement and the Merger, approve or recommend the Superior Proposal or terminate this Agreement pursuant to Section 7.01(c) and shall promptly notify Parent in writing of any such determination.

(ii)        In circumstances other than as provided in Section 5.02(d)(i) above, the Company Board may, if it determines in good faith, after consulting with outside legal counsel, that the failure to take such action could result in a breach of the Company Board's fiduciary obligations under applicable Law, withhold, withdraw or modify, or propose publicly to withhold, withdraw or modify, the recommendation by the Company Board or any committee thereof of this Agreement and the Merger, but only after (A) the Company has notified Parent in writing that the Company Board is prepared to make the determination set forth in this clause (ii), (B) for a period of five (5) Business Days following Parent's receipt of the notice set forth in clause (A) of this sentence, the Company negotiates with Parent in good faith to make such adjustments to the terms and conditions of this Agreement as would enable the Company Board to proceed with its recommendation of this Agreement and the Merger and (C) at the end of such five (5) Business Day period the Company Board maintains its determination described in this clause (ii) (after taking in account such adjustments to the terms and conditions of this Agreement).

(e)        Nothing contained in this Section 5.02 shall prohibit the Company from taking and disclosing to the Company Stockholders a position contemplated by Rule 14d-9 or Rule 14e-2(a) promulgated under the Exchange Act or from making any required disclosure to the Company Stockholders if, in the good faith judgment of the Company Board, after consultation with outside legal counsel, failure so to disclose would be inconsistent with its fiduciary obligations under applicable Law.

For purposes of this Agreement, "Acquisition Proposal" means any inquiry, proposal or offer from any person (other than Parent Group) relating to (i) any direct or indirect acquisition or purchase of more than 20% of the outstanding shares of Company Common Stock; (ii) any tender offer or exchange offer that, if consummated, would result in any person beneficially owning more than 20% of the outstanding shares of Company Common Stock; (iii) the acquisition of assets of the Company or its Subsidiaries representing more than 20% of the consolidated assets of the Company; and (iv) a merger, consolidation, business combination, recapitalization, liquidation, dissolution or other similar transaction involving the Company or any Significant Subsidiary, in each case other than the transactions contemplated by this Agreement.

For purposes of this Agreement, "Superior Proposal" means an Acquisition

36

Proposal for more than 50% of the equity interest in, or more than 50% of the consolidated assets, of the Company or that provides for a merger between the Company and another person as a result of which holders of equity interests of such person would own more than 50% of the equity interests of the entity surviving or resulting from such merger, and that the Company Board determines in its good faith judgment, after consideration of all relevant material terms of such proposal with its outside legal counsel and financial advisor, is (x) reasonably capable of being completed, taking into account all legal, financial, regulatory and other aspects of the Acquisition Proposal and the person submitting such proposal and (y) more favorable to the Company Stockholders from a financial point of view than the Merger and the other transactions contemplated by this Agreement.

SECTION 5.03    Access to Information; Confidentiality.    To the extent permitted by applicable Law, the Company agrees that upon reasonable notice it shall (and shall cause its Significant Subsidiaries to) afford Parent Group's Representatives reasonable access, during normal business hours throughout the period prior to the Effective Time, to such information regarding the Company and its Subsidiaries as may reasonably be requested by Parent and shall cause its executive officers to be reasonably available to Parent Group to respond to reasonable questions regarding such information and, if requested, the Company agrees to assist Parent and its Representatives in developing a transition or integration plan to be utilized by Parent and its Representatives following the consummation of the Merger and the other transactions contemplated by this Agreement; *provided, however*, that the Company may restrict the foregoing access and assistance to the extent that, in the reasonable judgment of the Company, (A) any applicable Law requires the Company or its Subsidiaries to restrict or prohibit access to any such properties or information, (B) the information is subject to confidentiality obligations to a third party (*provided*, that the Company shall use its best efforts to obtain a waiver of such confidentiality obligations to permit Parent Group to have access) or (C) disclosure of any such information or document could result in the loss of attorney-client privilege; *provided further, however*, that with respect to this clause (C), if requested by Parent, the Company will enter into joint defense agreements or other arrangements with Parent to allow such disclosure, but only if the Company determines, with the advice of its outside legal counsel, but in its sole discretion, that so doing will fully preserve the attorney-client privilege; *provided further*, *however*, that any information provided to Parent Group pursuant to this Section 5.03 shall be subject to the Confidentiality Agreement, the terms of which shall continue to apply, except as otherwise agreed by the Company, notwithstanding termination of this Agreement. In the event of any conflict between the terms of this Section 5.03 (other than clause (C) above) and the terms of the Confidentiality Agreement, the terms of the Confidentiality Agreement shall control. No review of information pursuant to this Agreement will affect any of the representations or warranties of the parties hereto contained in this Agreement or the conditions hereunder to the obligations of the parties hereto.

SECTION 5.04    Regulatory Matters; Reasonable Best Efforts. (a)    Each party hereto shall cooperate and promptly prepare and file all necessary documentation to effect all necessary applications, notices, petitions and filings, and shall use reasonable best efforts to take or cause to be taken all actions, and do or cause to be done all things, in order to obtain all approvals and authorizations of all Governmental Entities, necessary or advisable to consummate and make effective, in the most expeditious manner reasonably practicable, the Merger and the other transactions contemplated by this Agreement, including the Required Statutory Approvals

37

and the filing of a report with the BEA pursuant to the IISA. The Company shall have the right to review and approve in advance all characterizations of the information relating to the Company, and Parent shall have the right to review and approve in advance all characterizations of the information relating to Parent Group, in either case, that appear in any application, notice, petition or filing made in connection with the Merger or the other transactions contemplated by this Agreement, it being understood and agreed that neither party shall unreasonably withhold or delay its approval. Parent Group and the Company agree that they will (i) consult and cooperate with each other with respect to the obtaining of all such necessary approvals and authorizations of Governmental Entities and in connection with any investigation or other inquiry, including any proceedings initiated by a third party, (ii) promptly inform the other party of any communication received by such party from, or given by such party to, any Governmental Entity regarding any of the transactions contemplated hereby, (iii) permit the other party, or the other party's legal counsel, to review any communication given by it to, and consult with each other in advance of any meeting or conference with any Governmental Entity and (iv) to the extent agreed or not objected to by the relevant Governmental Entity, give the other party the opportunity to attend and participate in such meetings and conferences.

(b)        Upon the terms and subject to the conditions set forth in this Agreement, each of the parties agrees to use its reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other parties in doing, all things reasonably necessary or advisable to consummate and make effective, in the most expeditious manner reasonably practicable, the Merger and the other transactions contemplated by this Agreement, including (i) the defending of any lawsuits or other legal proceedings, whether judicial or administrative, challenging this Agreement or the consummation of the transactions contemplated by this Agreement, including seeking to have any stay or temporary restraining order entered by any court or other Governmental Entity vacated or reversed, and (ii) the execution and delivery of any additional instruments necessary to consummate the transactions contemplated by this Agreement. Notwithstanding the foregoing, as used in this Section 5.04, "reasonable best efforts" shall not include nor require any party to (A) sell, or agree to sell, hold or agree to hold separate, or otherwise dispose or agree to dispose of any asset, in each case if such sale, separation or disposition or agreement with respect thereto would reasonably be expected to have a Material Adverse Effect or Parent Material Adverse Effect (as applicable), or (B) conduct or agree to conduct its business in any particular manner if such conduct or agreement with respect thereto would reasonably be expected to have a Material Adverse Effect or Parent Material Adverse Effect (as applicable).

(c)        Parent Group shall not, and shall cause their respective Subsidiaries not to, enter into, engage in or agree to engage in any transaction or series of transactions that would present a significant risk of making it more difficult for Parent Group or the Company to obtain any approval or authorization required in connection with the Merger or otherwise prevent or materially delay the consummation of the Merger and the other transactions contemplated hereby.

(d)        Parent Group shall not, and shall cause their respective Subsidiaries not to, enter into, engage in or agree to engage in any transaction or series of transactions that would prevent Parent Group and the Surviving Corporation from complying with the Settlement Agreement, including the Consent Order, and the Statement of Factors.

38

SECTION 5.05    <u>Fees and Expenses</u>.  Subject to Section 7.02, whether or not the Merger is consummated, all Expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such Expenses; *provided*, *however*, that each of Parent Group and the Company shall bear and pay one-half of the costs incurred in connection with the filing fees with respect to the pre-merger notification and report forms under the HSR Act; *provided further*, *however*, that Parent shall pay all Expenses incurred in connection with the preparation and filing of all applications, notices, registrations, declarations, petitions and filings with any Governmental Entity in connection with the Required Statutory Approvals.

SECTION 5.06    <u>Indemnification; Directors' and Officers' Insurance</u>.

(a)    Following the Effective Time, Parent, Holding Company and Holdings shall cause the Surviving Corporation to, and the Surviving Corporation shall, to the fullest extent permitted by Law, indemnify and hold harmless, and provide advancement of expenses to, all past and present directors, officers, employees and agents of the Company and its Subsidiaries and all other persons who may presently serve or have served at the request of the Company or any of its Subsidiaries as a director, officer, employee or agent of another person, including as a fiduciary with respect to an employee benefit plan (the "<u>Indemnified Parties</u>"), in each case, for acts or failures to act in such capacity, against any costs or expenses (including reasonable attorney's fees), judgments, amounts paid in settlement, fines, losses, claims, damages or liabilities incurred in connection with any claim, action, suit, proceeding or investigation, whether civil or criminal, administrative or investigative, arising out of or pertaining to matters existing or occurring at or prior to the Effective Time (including for acts or omissions occurring in connection with the approval of this Agreement and the consummation of the Merger and the other transactions contemplated hereby), whether asserted or claimed prior to, at or after the Effective Time, to the same extent such individuals are indemnified or have the right to advancement of expenses as of the date of this Agreement by the Company or such Subsidiary pursuant to its Charter Documents, or similar organizational documents, as applicable, and the indemnification agreements identified in Section 5.06(a) of the Company Disclosure Letter.

(b)    Any Indemnified Party wishing to claim indemnification under paragraph (a) of this Section 5.06, upon receiving written notification of any such claim, action, suit, proceeding or investigation, shall promptly notify Parent or the Surviving Corporation thereof, but the failure to so notify shall not relieve the Surviving Corporation of any liability it may have to such Indemnified Party except if, and only to the extent that, such failure materially and irreversibly prejudices Parent. In the event of any such claim, action, suit, proceeding or investigation, (i) Parent, Holding Company and Holdings shall cause the Surviving Corporation to, and the Surviving Corporation shall, pay the fees and expenses of counsel selected by the Indemnified Party, promptly after statements therefor are received, and otherwise advance to such Indemnified Party upon request reimbursement of documented expenses reasonably incurred, and (ii) Parent, Holding Company and Holdings shall cause the Surviving Corporation to, and the Surviving Corporation shall, cooperate in the defense of any such matter.

(c)    Parent, Holding Company and Holdings shall cause the Surviving Corporation to, and the Surviving Corporation shall, maintain a policy or policies of officers' and directors' liability insurance and fiduciary liability insurance for acts and omissions occurring

39

prior to the Effective Time ("D&O Insurance") from an insurance carrier with the same or better credit rating as the Company's current insurance carrier with coverage in amount and scope at least as favorable as the Company's existing directors' and officers' liability insurance and fiduciary liability insurance coverage for the period ending on the later of (i) six (6) years and one (1) month after the Effective Time and (ii) the applicable statute of limitations for such acts and omissions; *provided*, *however*, that in lieu of such coverage, the Surviving Corporation may substitute a prepaid "tail" policy for such coverage, which it may cause the Company to obtain prior to the Closing.

(d)    In determining whether an Indemnified Party is entitled to indemnification under Section 5.06(a), if requested by such Indemnified Party, such determination shall be made in a written opinion by independent counsel mutually acceptable to Parent and the Indemnified Party, which counsel shall not have, at the time of such determination, otherwise performed services for the Surviving Corporation or Parent or their respective Subsidiaries or affiliates during the preceding three (3) years.

(e)    If Parent, Holding Company, Holdings or the Surviving Corporation or any of their respective successors or assigns shall (i) consolidate with or merge into any other person and shall not be the continuing or surviving corporation or entity of such consolidation or merger or (ii) transfers all or substantially all of its properties and assets to any person, then, and in each such case, proper provisions shall be made so that the successors and assigns of Parent, Holding Company, Holdings or the Surviving Corporation, as the case may be, shall assume all of the obligations of Parent, Holding Company, Holdings and the Surviving Corporation set forth in this Section 5.06.

(f)    The rights of each Indemnified Party under this Section 5.06 shall be in addition to any right such person might have under the Charter Documents of the Company or the similar organizational documents of any of its Subsidiaries, or under applicable Law (including the DGCL), or under any agreement of any Indemnified Party with the Company or its Subsidiaries. The provisions of this Section 5.06 are intended to be for the benefit of, and shall be enforceable by, each of the Indemnified Parties, their respective heirs and representatives.

(g)    The obligations of Parent, Holding Company, Holdings and the Surviving Corporation under this Section 5.06 shall not be terminated or modified in such a manner as to adversely affect any indemnitee to whom this Section 5.06 applies without the written consent of such affected indemnitee (it being expressly agreed that the indemnitees to whom this Section 5.06 applies shall be third-party beneficiaries of this Section 5.06).

(h)    The Company (or, after the Effective Time, the Surviving Corporation) shall indemnify any Indemnified Party against all reasonable costs and expenses (including reasonable attorneys' fees and expenses), such amounts to be payable in advance upon request as provided in this Section 5.06, relating to the enforcement of such Indemnified Party's rights under this Section 5.06 or under the Charter Documents or existing indemnification agreements. Any amounts due pursuant to the preceding sentence shall be payable upon request by the Indemnified Party.

SECTION 5.07   <u>Public Announcements</u>.   Parent Group and the Company shall use commercially reasonable efforts to develop a joint communications plan and each party shall use commercially reasonable efforts to ensure that all press releases and other public statements with respect to the transactions contemplated hereby shall be consistent with such joint communications plan. Unless otherwise required by applicable Law or by obligations pursuant to any listing agreement with or rules of any securities exchange, and except for any matters referred to in Section 5.02(c) or 5.02(d), (x) prior to the issuance by the Company of any press release or other public statement or disclosure concerning this Agreement or the transactions contemplated hereby, the Company shall obtain the consent of Parent, which consent shall not be unreasonably withheld or delayed, and (y) prior to the issuance by Parent Group of any press release or other public statement or disclosure concerning this Agreement or the transactions contemplated hereby, Parent Group shall obtain the consent of the Company, which consent shall not be unreasonably withheld or delayed. In addition to the foregoing, except to the extent disclosed in or consistent with the Proxy Statement in accordance with the provisions of Section 5.01, or unless otherwise required by applicable Law or by obligations pursuant to any listing agreement with or rules of any securities exchange or NASDAQ, neither Parent Group nor the Company shall issue any press release or otherwise make any public statement or disclosure concerning the other party or the other party's business, financial condition or results of operations without the consent of the other party, which consent shall not be unreasonably withheld or delayed.

SECTION 5.08   <u>Transfer Taxes</u>.  All Transfer Taxes shall be paid by either Sub or the Surviving Corporation, and the Company shall cooperate with Parent Group in preparing, executing and timely filing any Returns with respect to such Transfer Taxes.

SECTION 5.09   <u>State Takeover Laws</u>.   If any "fair price," "business combination" or "control share acquisition" statute or other similar statute or regulation is or may become applicable to the transactions contemplated hereby, the Company and Parent Group shall each take such actions as are necessary so that the transactions contemplated hereby may be consummated as promptly as practicable on the terms contemplated hereby and otherwise act to eliminate or minimize the effects of any such statute or regulation on the transactions contemplated hereby.

SECTION 5.10   <u>Notification of Certain Matters</u>.  The Company shall give prompt notice to Parent, and Parent shall give prompt notice to the Company, of the occurrence, or non-occurrence, of any event the occurrence, or non-occurrence, of which is likely to result in any failure of such party at Closing to comply with or satisfy any condition to be satisfied hereunder; *provided, however*, that the delivery of any notice pursuant to this Section 5.10 shall not limit or otherwise affect the remedies available hereunder to any of the parties sending or receiving such notice.

SECTION 5.11   <u>Employees</u>.

(a)     For the period commencing at the Effective Time and ending no earlier than the third (3rd) anniversary thereof, Parent, Holding Company and Holdings shall cause the Surviving Corporation and its Subsidiaries to maintain, and the Surviving Corporation and its Subsidiaries shall maintain, compensation, employee benefit plans and arrangements and

41

severance pay and benefits (the "<u>Comparable Benefits</u>") for employees of the Company and its Subsidiaries ("<u>Affected Employees</u>") that are, in the aggregate, no less favorable than as provided under the compensation arrangements, Benefit Plans, severance plans and current policies or practices of the Company and its Subsidiaries as in effect on the date hereof; *provided*, *however*, that, subject to obligations under applicable Law and applicable collective bargaining agreements, commencing on the second (2nd) anniversary of the Effective Time, the Surviving Corporation and its Subsidiaries shall not have to maintain Comparable Benefits if a Governmental Entity of competent jurisdiction determines that such Comparable Benefits are unreasonably high and, as result, the Surviving Corporation determines in its good faith judgment (after consultation with such Governmental Entity) that the Comparable Benefits would have a negative impact on a rate review or similar proceeding.

(b)        Parent, Holding Company and Holdings shall cause the Surviving Corporation and its Subsidiaries to honor, and the Surviving Corporation and its Subsidiaries shall honor, all Benefit Plans (including any obligations with respect to deferral elections previously made pursuant to such Benefit Plan that are not terminated and settled as of the Effective Time) and other contractual commitments, including, without limitation, severance and change-in-control agreements, in effect immediately prior to the Effective Time between the Company and Affected Employees, retirees or former employees of the Company, as set forth on Section 5.11(b) of the Company Disclosure Letter. In addition to and without limiting the generality of the foregoing, Parent, Holding Company and Holdings shall cause the Surviving Corporation and its Subsidiaries to, and the Surviving Corporation and its Subsidiaries shall, (i) pay all annual bonuses that are payable to the Affected Employees, retirees and former employees of the Company and its Subsidiaries with respect to the fiscal year in which the Effective Time occurs, including bonuses accrued on the consolidated financial statements of the Company (whether or not then earned by or vested in Affected Employees) under the Company's 2006 Employee Incentive Plan (and any successor to such plan for subsequent years), (ii) continue the Deferred Director Plan until such time as all outstanding obligations thereunder are satisfied in accordance with their terms and (iii) honor all vacation, holiday, sickness and personal days accrued by Affected Employees and, to the extent applicable, former employees of the Company or any Subsidiary as of the Effective Time.

(c)        Subject to its obligations under applicable Law and applicable collective bargaining agreements, Parent, Holding Company and Holdings shall cause the Surviving Corporation and its Subsidiaries to give, and the Surviving Corporation and its Subsidiaries shall give, all Affected Employees full credit for purposes of benefit accrual, eligibility and vesting under any employee benefit plan arrangement maintained by Parent, Holding Company, Holdings or the Surviving Corporation or any Subsidiary thereof for such Affected Employees' service with the Company or any Subsidiary (or any prior employer) to the same extent recognized by the Company or any Subsidiary or any Benefit Plan immediately prior to the Effective Time; *provided*, *however*, that such crediting of service shall not result in any duplication of benefits.

(d)        Subject to its obligations under applicable Law and applicable collective bargaining agreements, Parent, Holding Company and Holdings shall cause the Surviving Corporation and its Subsidiaries to, and the Surviving Corporation and its Subsidiaries shall, (i) with respect to any life, health or long-term disability insurance plan, waive all limitations as to

42

preexisting conditions, exclusions and waiting periods with respect to participation and coverage requirements under any welfare benefit plan established to replace any Benefit Plan in which such Affected Employees may be eligible to participate after the Effective Time, other than limitations or waiting periods that are already in effect with respect to such Affected Employee and that have not been satisfied as of the Effective Time under any plan maintained for the Affected Employee immediately prior to the Effective Time, (ii) with respect to any health insurance plan, provide each Affected Employee with credit for any co-payments and deductibles paid prior to the Effective Time in satisfying any applicable deductible or out-of-pocket requirements under any such plan that such Affected Employees are eligible to participate in after the Effective Time and (iii) with respect to any life or long-term disability plan, waive any medical certification otherwise required in order to assure the continuation of coverage at a level not less than that in effect immediately prior to the implementation of such plan (but subject to any overall limit on the maximum amount of coverage under such plans).

(e)     For the period commencing at the Effective Time and ending no earlier than the second (2nd) anniversary thereof, (i) Parent, Holding Company and Holdings shall cause the Surviving Corporation and its Subsidiaries to employ, and the Surviving Corporation and its Subsidiaries shall employ, in the aggregate, approximately the same number of employees as employed by the Company immediately prior to the Effective Time, including substantially all of the Affected Employees, and (ii) Parent, Holding Company and Holdings shall not permit the Surviving Corporation to effect, and the Surviving Corporation shall not effect, any material reductions in employee work force of the Surviving Corporation and its Subsidiaries. Notwithstanding sub-clauses (i) and (ii) above, the Surviving Corporation and its Subsidiaries may terminate an Affected Employee for breach of employment terms, fraud, theft and misconduct.

SECTION 5.12     Delisting.  Each of the parties agrees to cooperate with each other in taking, or causing to be taken, all actions necessary to delist the Company Common Stock from NASDAQ and to terminate registration under the Exchange Act; *provided*, *however*, that such delisting and termination shall not be effective until after the Effective Time.

SECTION 5.13     Rule 16b-3.  Prior to the Effective Time, the Company may approve, in accordance with the procedures set forth in Rule 16b-3 promulgated under the Exchange Act and certain SEC No-Action Letters, any dispositions of equity securities of the Company (including derivative securities with respect to equity securities of the Company) resulting from the transactions contemplated by this Agreement by each officer or director of the Company who is subject to Section 16 of the Exchange Act with respect to equity securities of the Company.

SECTION 5.14     Financing.

(a)     Parent and Holding Company shall cause Holdings and Sub to use its reasonable best efforts to obtain the full amount of the financing contained in the Financing Commitments consistent with the terms specified and described in the Financing Commitments delivered to the Company by Parent Group; *provided*, *however*, it is expressly understood and agreed that Parent Group's obligations to consummate the Merger on the terms and conditions specified herein are not subject to a financing condition or the results of Parent Group's efforts to

43

obtain the full amount of the financing required to effect the Closing pursuant to Section 1.03 hereof and to satisfy their obligations under Article II hereof, including, depositing (or causing to be deposited) with the Paying Agent and LaSalle sufficient funds to make all payments pursuant to Article II hereof.

(b)     Parent Group will keep the Company reasonably informed of the status of the Financing Commitments and the Available Cash and any material developments with respect thereto.

(c)     The Company shall provide, and will cause its officers and employees to provide, all necessary cooperation and information in connection with the arrangement and obtaining of the financing contained in the Financing Commitment as may be reasonably requested by Parent, including, without limitation, facilitating customary due diligence and arranging senior officers, as selected by Parent, to meet with prospective lenders and investors in customary presentations (including "road show" presentations and sessions with rating agencies), cooperation in the preparation and filing of any offering documents, the issuance of any comfort letter, the receipt of any auditors' consents, certifications of the chief financial officer with respect to solvency matters, the delivery of consolidated pro forma financial information and the use of commercially reasonable efforts to cause each independent auditor to so cooperate or otherwise. Parent shall not amend, supplement, modify or terminate (whether unilaterally or by mutual consent), in a manner either materially adverse to the Company or to the consummation of the Merger, any Financing Commitment, or waive any rights thereunder, prior to the termination of this Agreement, without the written consent of the Company.

(d)     The Company acknowledges that, prior to the Effective Time, Parent may, and Parent may request that the Company and its Subsidiaries, take actions with respect to (i) prepaying, redeeming and/or obtaining the consent of the holders of the Company's outstanding Senior Notes in accordance with the terms of the indenture pursuant to which such notes were issued or (ii) restructuring the Company Credit Facility. The Company agrees to cooperate with such efforts and provide such information or take such actions as may be reasonably requested by Parent Group with respect thereto, including call for prepayment or redemption, or to renegotiate, as the case may be, the Senior Notes; *provided*, that (i) no such prepayment or redemption shall actually be made until substantially contemporaneous with or after, or, in the case of the call for prepayment, immediately prior to or contemporaneous with, the Effective Time and (ii) no such call for prepayment or redemption shall be required prior to the Effective Time unless the Company is permitted to condition such call for prepayment or redemption on the occurrence of the Effective Time or to withdraw such call for prepayment or redemption if the Effective Time shall not have occurred on or prior to the applicable scheduled prepayment or redemption date; and *provided*, *further*, that the Company shall not be required to enter into any bank commitment that will become effective prior to the Effective Time. .

SECTION 5.15     No Agreements with Company Stockholders.     Neither Parent, Holding Company, Holdings nor Sub will, nor will they authorize or permit any of their affiliates or Representatives to, enter into any agreement, arrangement or understanding (in each case, whether oral or written), or to authorize, commit or agree to enter into any agreement, arrangement or understanding (in each case, whether oral or written), pursuant to which any Company Stockholder would be entitled to receive consideration of a different amount or nature

44

than the Merger Consideration or pursuant to which a Company Stockholder agrees to vote to adopt this Agreement or agrees to vote against any Superior Proposal.

SECTION 5.16    Letter of Credit.

(a)    In consideration for the Company entering into, and as an inducement and condition to the willingness of the Company to enter into, this Agreement, Parent Group has delivered to the Company an irrevocable letter of credit duly issued by Australia and New Zealand Banking Group Limited, New York Branch in an amount equal to US$70,000,000 with a termination date of April 25, 2007 in the form of Exhibit A hereto (the "Letter of Credit").

(b)    No later than 5:00 P.M. New York City time on January 25, 2007 (the "LC Date"), Parent Group shall deliver, or caused to be delivered, to the Company an irrevocable substitute letter of credit duly issued by Australia and New Zealand Banking Group Limited, New York Branch, or another financial institution reasonably acceptable to the Company, in a form exactly the same as Exhibit A hereto, except that such substitute letter of credit shall have a termination date that is thirty (30) Business Days following the Final Date (the "Substitute Letter of Credit"). The Substitute Letter of Credit shall be in full force and effect. There shall be no conditions precedent or other contingencies related to the funding of the full amount of the Substitute Letter of Credit, other than as set forth in, or contemplated by, the Substitute Letter of Credit. As of the date of delivery of the Substitute Letter of Credit, no event shall have occurred which, with or without notice, lapse of time or both, shall constitute a default or breach on the part of Parent, Holding Company, Holdings or Sub with respect to any term or condition of the Substitute Letter of Credit. If the Substitute Letter of Credit is delivered to the Company prior to an LC Default Draw (as defined below), the Company will promptly return the Letter of Credit to Parent Group.

(c)    The Company and Parent Group agree that if Parent Group fails to deliver, or fails to cause to be delivered, the Substitute Letter of Credit on or before the LC Date (an "LC Default"), then unless and until Parent Group delivers the Substitute Letter of Credit to the Company, the Company shall have the right to immediately draw (without any further action on the part of Parent Group) upon the Letter of Credit in an amount equal to the Business Interruption Fee (such actual draw by the Company, the "LC Default Draw"); provided, however, that in no event shall a LC Default be considered an event of termination pursuant to Section 7.01 hereof; provided further, however, that a LC Default Draw shall be deemed to be payment of a Business Interruption Fee within the meaning of Section 7.02(c)(i). The LC Default Draw funds shall be held by the Company in a separate interest bearing account, segregated from all other funds of the Company (such account, the "Separate Account"). All LC Default Draw funds, together with all interest thereon (collectively, the "Funds"), shall be held by the Company until the earliest of (i) delivery of a Substitute Letter of Credit, (ii) a Return Event or (iii) a termination of this Agreement as described in Section 7.02(c) hereof. If Parent Group shall deliver the Substitute Letter of Credit to the Company after a LC Default Draw, or there shall have occurred a Return Event, the Company shall within two (2) Business Days return the Funds to Parent Group. In no event shall such return affect the right of the Company to draw upon the Substitute Letter of Credit thereafter in accordance with this Agreement. If a termination of this Agreement as described in Section 7.02(c) hereof shall have occurred, the Company shall have the right to withdraw the Funds from the Separate Account and retain an

45

amount of such Funds equal to the Business Interruption Fee. The Company shall promptly return any excess to the Parent.

(d)        The Letter of Credit or the Substitute Letter of Credit, as the case may be, shall serve as a source of funds for Parent Group's obligations under Section 7.02(c) hereof. The Company agrees to return the Letter of Credit or the Substitute Letter of Credit, as the case may be, to Parent Group (or its designee), upon the earlier to occur of (i) the receipt of the Merger Consideration, Outstanding Dividends and Warrant Consideration by the Paying Agent and the receipt of the Disputed Claims Consideration by LaSalle or, if later, the Effective Time or (ii) the termination of this Agreement under circumstances where the Company is not entitled to the Business Interruption Fee pursuant to Section 7.02 (a "Return Event").

## ARTICLE VI

## CONDITIONS

SECTION 6.01        Conditions to Each Party's Obligation to Effect the Merger.  The respective obligation of each party to effect the Merger shall be subject to the satisfaction or waiver at or prior to the Closing Date of each of the following conditions:

(a)        Stockholder Approval.   The Company Stockholder Approval shall be obtained.

(b)        No Injunctions or Restraints.    No material statute, rule, regulation, executive order, decree, temporary restraining order, preliminary or permanent injunction or other order issued by any court of competent jurisdiction or other Governmental Entity or other legal restraint or prohibition (collectively, the "Restraints") shall be in effect (i) having the effect of making the Merger illegal or (ii) otherwise preventing or prohibiting the consummation of the Merger.

(c)        HSR Approval.   The applicable waiting periods (and any extension thereof) under the HSR Act shall have expired or been terminated.

(d)        Governmental and Regulatory Approvals.  Other than the filing provided for under Section 1.04 and filings pursuant to the HSR Act, all consents, approvals and actions of, filings with and notices to any Governmental Entity required of Parent Group, the Company or any of their respective Subsidiaries, including, without limitation, Final Orders with respect to the Required Statutory Approvals, to consummate the Merger and the other transactions contemplated hereby, the failure of which to be obtained or taken would reasonably likely to have a Material Adverse Effect, shall have been obtained and such Final Orders shall not contain any condition, limitation or restriction that would reasonably be likely to result in a Material Adverse Effect, a Parent Material Adverse Effect or a material adverse effect on the financial condition of Parent Group.

SECTION 6.02        Additional Conditions to Obligations of Parent Group.  The obligations of Parent Group to effect the Merger shall be subject to the satisfaction (or waiver by Parent) at or prior to the Effective Time of each of the following additional conditions:

46

(a)    <u>Representations and Warranties</u>.    Each of the representations and warranties of the Company set forth in this Agreement shall have been true and correct as of the date hereof and shall be true and correct as of the Closing Date (except as to any such representation or warranty which speaks as of a specific date, which must only be true and correct as of such specific date), except where the failure to be so true and correct (without giving effect to any limitation as to "materiality" or "material adverse effect" or similar terms or phrases in any such representation or warranty) would not, individually or in the aggregate with all such failures, constitute a Material Adverse Effect.

(b)    <u>Performance of Obligations of the Company</u>.    The Company shall have performed or complied in all material respects with all material agreements and covenants required to be performed by it under this Agreement at or prior to the Closing Date.

(c)    <u>Officer's Certificate</u>.    Parent Group shall have received a certificate signed by an executive officer of the Company, dated the Closing Date, to the effect that the conditions set forth in Sections 6.02(a) and 6.02(b) have been satisfied or waived.

SECTION 6.03    <u>Additional Conditions to Obligations of the Company</u>.    The obligations of the Company to effect the Merger shall be subject to the satisfaction (or waiver by the Company) at or prior to the Effective Time of each of the following additional conditions:

(a)    <u>Representations and Warranties</u>.    Each of the representations and warranties of Parent Group set forth in this Agreement shall have been true and correct as of the date hereof and shall be true and correct as of the Closing Date (except as to any such representation or warranty which speaks as of a specific date, which must only be true and correct as of such specific date), except where the failure to be so true and correct (without giving effect to any limitation as to "materiality" or "material adverse effect" or similar terms or phrases in any such representation or warranty) would not, individually or in the aggregate with all such failures, constitute a Parent Material Adverse Effect.

(b)    <u>Performance of Obligations of Parent Group</u>.    Each constituent of Parent Group shall have performed or complied in all material respects with all material agreements and covenants required to be performed by it under this Agreement at or prior to the Closing Date.

(c)    <u>Officer's Certificate</u>.    The Company shall have received certificates signed by an executive officer of each of Parent, Holding Company, Holdings and Sub, dated the Closing Date, to the effect that the conditions set forth in Sections 6.03(a) and 6.03(b) have been satisfied or waived.

## ARTICLE VII

### TERMINATION, AMENDMENT AND WAIVER

SECTION 7.01    <u>Termination</u>.    This Agreement may be terminated at any time prior to the Effective Time, whether before or after the Company Stockholder Approval shall have been obtained:

47

(a)    by mutual written consent of Parent and the Company, if the Board of Directors of each party so determines by a vote of a majority of the members of its entire Board;

(b)    by either the Company or Parent, if:

(i)    the Company Stockholder Approval shall not have been obtained at a meeting duly convened therefor or at any adjournment or postponement thereof; or

(ii)    any Restraint having any of the effects set forth in Section 6.01(b) shall be in effect and have become final and nonappealable; *provided, however*, that the party seeking to terminate this Agreement shall have used its reasonable best efforts to remove or lift such Restraint; or

(iii)    the Merger shall not have been consummated on or before the date that is twelve (12) months after the date of this Agreement (the "Outside Date"); *provided*, that if on the Outside Date the conditions to Closing set forth in Sections 6.01 (c) or 6.01(d) shall not have been fulfilled but all other conditions to the Closing shall have been fulfilled or shall be capable of being fulfilled (including in the case of Parent Group, the ability to effect the Closing pursuant to Section 1.03 hereof and to satisfy their obligations under Article II hereof, including depositing (or causing to be deposited) with the Paying Agent and LaSalle sufficient funds to make all payments pursuant to Article II hereof), then either party may (on one or more occasions) extend the Outside Date for up to six (6) months (the "Extended Outside Date"); *provided*, *further*, that, if the Outside Date (as it may be extended to an Extended Outside Date) shall occur during any Final Order Waiting Period, the Outside Date or Extended Outside Date, as the case may be, shall be extended until the third (3rd) Business Day after the expiration of such Final Order Waiting Period; *provided*, *further*, that either party may terminate this Agreement if the Merger shall not have been consummated on or before the date that is twenty-four (24) months after the date of this Agreement (the "Final Date"); and *provided*, *further*, that the right to terminate this Agreement pursuant to this Section 7.01(b)(iii) shall not be available to any party whose failure to perform any of its obligations under this Agreement results in the failure of the Merger to be consummated by the Outside Date, the Extended Outside Date or the Final Date.

(c)    by the Company prior to when Company Stockholder Approval has been obtained, if the Company Board determines in good faith (after consultation with its outside legal and financial advisors), in the exercise of its fiduciary duties, that an Acquisition Proposal constitutes a Superior Proposal; *provided*, *however*, that the Company may not terminate this Agreement pursuant to this clause (c) until after the fifth (5th) Business Day following Parent's receipt of a written notice (a "Notice of Superior Proposal") from the Company advising Parent that the Company intends to take such action and specifying the reason thereof, including the material terms and conditions of such Superior Proposal and, to the extent not prohibited by any confidentiality agreement or other similar agreement in existence as of the date of this Agreement, identifying the person making such Superior Proposal (it being understood and agreed that in determining whether an Acquisition Proposal constitutes a Superior Proposal, the Company Board shall take into account any changes to the terms and conditions of this Agreement proposed by Parent in response to a Notice of Superior Proposal); *provided further*,

48

*however*, that the Company's ability to terminate this Agreement pursuant to this clause (c) is conditioned upon the payment by the Company to Parent of any amounts owed by it pursuant to Section 7.02(b).

       (d)     by Parent, if, prior to when Company Stockholder Approval has been obtained, the Company Board shall have (i) withheld, withdrawn or materially modified in a manner adverse to Parent, its recommendation of the Merger or this Agreement, (ii) approved or recommended any Acquisition Proposal, (iii)  publicly proposed to approve or recommend any Acquisition Proposal or (iv) resolved to effect any of the foregoing;

       (e)     by Parent, if the Company breaches or fails to perform any of its representations, warranties or covenants contained in this Agreement, which breach or failure to perform (i) would give rise to the failure of a condition set forth in Section 6.02(a) or 6.02(b) and (ii) cannot be cured by the Outside Date, (*provided*, that neither Parent nor Sub is then in material breach of any representation, warranty or covenant contained in this Agreement); or

       (f)     by the Company, if Parent, Holding Company, Holdings or Sub breaches or fails to perform any of its representations, warranties or covenants contained in this Agreement, which breach or failure to perform (i) would give rise to the failure of a condition set forth in Section 6.03(a) or 6.03(b) and (ii) cannot be cured by the Outside Date (*provided*, that the Company is not then in material breach of any representation, warranty or covenant contained in this Agreement).

       SECTION 7.02    Effect of Termination.

       (a)     In the event of a termination of this Agreement pursuant to Section 7.01, this Agreement shall forthwith become null and void and there shall be no liability or obligation on the part of Parent Group or the Company or their respective officers or directors, except with respect to the last proviso of the first sentence of Section 5.03 (Confidentiality), Section 5.05 (Fees and Expenses), this Section 7.02 (Effect of Termination) and Article VIII (General Provisions), which provisions shall survive such termination.

       (b)     *Termination Fee*.

       (i)     In the event that (x) this Agreement is validly terminated pursuant to Section 7.01(c) or (d) or (y) (A) prior to the obtaining of the Company Stockholder approval, an Acquisition Proposal has been publicly proposed and not publicly withdrawn by any person (other than Parent Group or any of their respective affiliates), (B) thereafter this Agreement is terminated by either Parent or the Company pursuant to Section 7.01(b)(iii) (but only if the Stockholders' Meeting has not been held prior to such time) or Section 7.01(b)(i) and (C) any person (other than Parent Group or any of their respective affiliates) shall enter into a definitive agreement to consummate, or consummate, an Acquisition Proposal with the Company within twelve (12) months following the termination of this Agreement, then the Company shall pay to Parent, by wire transfer of same day funds, a termination fee of US$50,000,000 (the "Termination Fee") on the date such person and the Company enter into such definitive agreement or, if earlier, consummate an Acquisition Proposal, as applicable; *provided*, *however*, that,

49

subject to Section 7.02(b)(ii) below, the Company shall have no liability under this Agreement in the event that the Company pays Parent the Termination Fee; *provided further*, *however*, that for the purpose of this Section 7.02(b)(i)(y)(C), the term "Acquisition Proposal" shall have the meaning assigned to such term in Section 5.02, except that references to "more than 20%" shall be deemed to be references to "more than 50%."

(ii)    The Company acknowledges that the agreements contained in this Section 7.02 are an integral part of the transactions contemplated by this Agreement, that the damages resulting from the termination of this Agreement under circumstances where a Termination Fee is payable are uncertain and incapable of accurate calculation and that the amounts payable pursuant to Section 7.02(b)(i) are reasonable forecasts of the actual damages which may be incurred and constitute liquidated damages and not a penalty, and that, without these agreements, Parent Group would not enter into this Agreement; accordingly, if the Company fails to promptly pay the Termination Fee, and, in order to obtain such payments Parent Group commences a suit which results in a judgment against the Company for the Termination Fee, the Company shall pay to Parent Group its costs and expenses (including reasonable attorney's fees) in connection with such suit.

(c)    *Business Interruption Fee.*

(i)    In the event that this Agreement is validly terminated by the Company pursuant to Section 7.01(f) (including, without limitation, as a result of Parent Group breaching their obligation to effect the Closing pursuant to Section 1.03 hereof or failing to satisfy their obligations under Article II hereof including, depositing (or causing to be deposited) with the Paying Agent and LaSalle sufficient funds to make all payments pursuant to Article II hereof), then Parent Group shall pay US$70,000,000 (the "Business Interruption Fee") to the Company. Contemporaneously with such termination, the Company shall be entitled to immediately draw (without any further action on the part of Parent Group) upon the Letter of Credit or the Substitute Letter of Credit, as the case may be, in an amount equal to the Business Interruption Fee. Such amount shall be credited to the payment of the Business Interruption Fee by Parent Group to the Company. If, for any reason, the funds available under the Letter of Credit or the Substitute Letter of Credit, as the case may be, are insufficient to satisfy Parent Group's obligation to pay the Business Interruption Fee, then Parent Group shall pay the balance of the Business Interruption Fee owing to the Company by wire transfer in immediately available funds to an account specified by the Company in writing to Parent as promptly as reasonably practicable (and, in any event, within two (2) Business Days following such termination; *provided*, *however*, that, subject to Section 7.02(c)(ii) below, Parent Group shall have no liability under this Agreement in the event that Parent pays the Company the Business Interruption Fee.

(ii)    Parent Group acknowledge that the agreements contained in this Section 7.02 are an integral part of the transactions contemplated by this Agreement, that the damages resulting from the termination of this Agreement under circumstances where a Business Interruption Fee is payable are uncertain and incapable of accurate calculation and that the amounts payable pursuant to Section 7.02(c)(i) are reasonable forecasts of

50

the actual damages which may be incurred and constitute liquidated damages and not a penalty, and that, without these agreements, the Company would not enter into this Agreement; accordingly, if Parent Group fails to promptly pay the Business Interruption Fee, and, in order to obtain such payments the Company commences a suit which results in a judgment against Parent Group for the Business Interruption Fee, Parent shall pay to the Company its costs and expenses (including reasonable attorney's fees) in connection with such suit.

SECTION 7.03    Amendment.    This Agreement may be amended by the parties hereto, by action taken or authorized by their respective boards of directors, at any time before or after approval of the matters presented in connection with the Merger by the Company Stockholders, *provided, however,* that after any such approval, no amendment shall be made which by Law requires further approval by such Company Stockholders without obtaining such further approval of such Company Stockholders. This Agreement may not be amended except by an instrument in writing signed on behalf of each of the parties hereto.

SECTION 7.04    Extension; Waiver.    At any time prior to the Effective Time, each party hereto, by action taken or authorized by its board of directors, may, to the extent legally allowed, (i) extend the time for the performance of any of the obligations or other acts of the other party hereto, (ii) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto or (iii) waive compliance with the agreements or conditions for the benefit of such party contained herein. Any agreement on the part of a party hereto to any such extension or waiver shall be valid only if set forth in a written instrument signed on behalf of such party. The failure of any party hereto to assert any of its rights hereunder or otherwise shall not constitute a waiver of those rights.

## ARTICLE VIII

## GENERAL PROVISIONS

SECTION 8.01    Nonsurvival of Representations and Warranties.    None of the representations, warranties, covenants and other agreements in this Agreement or in any instrument delivered pursuant to this Agreement, including any rights arising out of any breach of such representations, warranties, covenants and other agreements, shall survive the Effective Time, except for those covenants and agreements contained herein and therein (including Section 5.06) that by their terms apply or are to be performed in whole or in part after the Effective Time; *provided*, *however*, that Parent shall have no direct liability with respect to Sections 5.06 and 5.11 after the Effective Time other than in its capacity as the direct or indirect shareholder of Holding Company, Holdings and the Surviving Corporation and then only to the extent of its rights as such shareholder.

SECTION 8.02    Notices.    All notices and other communications hereunder shall be in writing and shall be deemed duly given (a) on the date of delivery if delivered personally, or by telecopy or facsimile, upon confirmation of receipt, (b) on the first Business Day following the date of dispatch if delivered by a recognized next-day courier service, or (c) on the tenth Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid. All notices hereunder shall be delivered as set

51

forth below, or pursuant to such other instructions as may be designated in writing by the party to receive such notice:

(a)    if to Parent Group to:

BBI US Holdings II Corp.
BBI Glacier Corp.
c/o Babcock & Brown LP
2 Harrison Street
San Francisco, CA 94105
Telephone: (415) 512-1515
Facsimile:  (415) 512-1515
Attention: Michael M. Garland

with copies (which shall not constitute notice) to:

Babcock & Brown Infrastructure Limited
The Chifley Tower, Level 39
2 Chifley Square
Sydney NSW 2000
Australia
Telephone: 61-2-9229-1800
Facsimile:  61-2-9231-5619
Attention: Michael Ryan

and

LeBoeuf, Lamb, Greene & MacRae LLP
125 West 55th Street
New York, NY 10019-5389
Telephone: (212) 424-8072
Facsimile:  (212) 424-8500
Attention: Sheri E. Bloomberg, Esq.

and

(b)    if to the Company, to:

NorthWestern Corporation
125 South Dakota Avenue 57104-6403
Telephone: (605) 978-2903
Facsimile:  (605) 351-1112
Attention: Michael Hanson, President and CEO

with copies to (which shall not constitute notice):

52

Manatt, Phelps & Phillips, LLP
11355 West Olympic Blvd.
Los Angeles, California
Telephone: (310) 312-4000
Facsimile:  (310) 312-4224
Attention: Gordon M. Bava, Esq.

SECTION 8.03    Interpretation.  When a reference is made in this Agreement to Sections, Exhibits or Schedules, such reference shall be to a Section of, or an Exhibit to, or Schedule to, this Agreement unless otherwise indicated. The table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. All terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neutral genders of such terms. Any agreement, instrument or statute defined or referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein. References to a person are also to its permitted successors and assigns. All parties will be considered drafters of this Agreement and accordingly any ambiguity shall not be construed against any particular party.

SECTION 8.04    Counterparts.  This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties, including delivery by facsimile, it being understood that all parties need not sign the same counterpart.

SECTION 8.05    Entire Agreement; Third Party Beneficiaries.

(a)    This Agreement (including the documents and instruments referred to herein and the Company Disclosure Letter) and the Confidentiality Agreement constitute the entire agreement, and supersede all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof.

(b)    This Agreement shall be binding upon and inure solely to the benefit of each party hereto, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other person any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement, other than Section 5.06 (which is intended to be for the benefit of the persons covered thereby and may be enforced by such persons).

53

SECTION 8.06    <u>Governing Law</u>.    This Agreement shall be governed by, and construed in accordance with, the Laws of the State of Delaware (without giving effect to choice of Law principles thereof).

SECTION 8.07    <u>Severability</u>.    If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible to the fullest extent permitted by applicable law in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

SECTION 8.08    <u>Assignment</u>.    Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties, in whole or in part (whether by operation of Law or otherwise), without the prior written consent of the other party, which consent may be withheld for any reason by such other party in its sole discretion, and any attempt to make any such assignment without such consent shall be null and void and of no effect whatsoever. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and assigns.

SECTION 8.09    <u>Submission To Jurisdiction; Waivers</u>.    Each of the parties irrevocably agrees that any legal action or proceeding with respect to this Agreement or for recognition and enforcement of any judgment in respect hereof brought by the other party hereto or its successors or assigns shall be brought and determined exclusively in the Delaware Court of Chancery (and if the Delaware Court of Chancery shall be unavailable, any court of the State of Delaware or the federal court of the United States of America sitting in the Sate of Delaware), and each of the parties hereby irrevocably submits with regard to any such action or proceeding for itself and in respect to its property, generally and unconditionally, to the exclusive jurisdiction of the aforesaid courts. Each of the parties hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, counterclaim or otherwise, in any action or proceeding with respect to this Agreement, (a) any claim that it is not personally subject to the jurisdiction of the above-named courts for any reason other than the failure to lawfully serve process, (b) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in any such court (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise), and (c) to the fullest extent permitted by applicable Law, that (i) the suit, action or proceeding in any such court is brought in an inconvenient forum, (ii) the venue of such suit, action or proceeding is improper and (iii) this Agreement, or the subject matter hereof, may not be enforced in or by any such court. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of the above-named courts. Without limiting the foregoing, each party agrees that service of process on such party as provided in Section 8.02 shall be deemed effective service of process on such party.

<div align="center">54</div>

SECTION 8.10    <u>Enforcement</u>.    The parties agree that irreparable damage would occur and the parties would not have any adequate remedy at law in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to (i) an injunction or injunctions to prevent breaches of this Agreement and to (ii) specific performance of the terms hereof, this being in addition to any other remedy to which they are entitled at Law or in equity.

<div align="center">55</div>

IN WITNESS WHEREOF, Parent, Holding Company, Holdings, Sub and the Company have caused this Agreement to be signed by their respective officers thereunto duly authorized as of the date first written above.

BABCOCK & BROWN
   INFRASTRUCTURE LIMITED

By:     /s/ Jeffrey Kendrew
         Name: Jeffrey Kendrew
         Title: COO, Energy


BBI US HOLDINGS PTY LTD.

By:     /s/ Jeffrey Kendrew
         Name: Jeffrey Kendrew
         Title: Director


BBI US HOLDINGS II CORP.

By:     /s/ Michael M. Garland
         Name: Michael M. Garland
         Title: President


BBI GLACIER CORP.

By:     /s/ Michael M. Garland
         Name: Michael M. Garland
         Title: President


NORTHWESTERN
   CORPORATION

By:     /s/ Michael J. Hanson
         Name: Michael J. Hanson
         Title: President and Chief
                Executive Officer

56

Exhibit 4.1

## AMENDMENT NO. 1 TO RIGHTS AGREEMENT

This Amendment No. 1 to Rights Agreement (this "**Amendment**") is entered into as of April 25, 2006 (to become effective on the date set forth in Section 5.0 of this Amendment), between Northwestern Corporation, a Delaware corporation (the "**Company**"), and LaSalle Bank National Association, a national banking association, as Rights Agent (the "**Rights Agent**"), and amends the Rights Agreement dated as of December 5, 2005, between the Company and the Rights Agent (the "**Rights Agreement**").

WHEREAS, the Company desires to amend the Rights Agreement to prevent certain Persons acting with the approval of the Board of Directors of the Company to acquire all of the equity interests in the Company from becoming Acquiring Persons; and

WHEREAS, this Amendment is entered into pursuant to Section 27 of the Rights Agreement prior to the time that any Person, to the knowledge of the Company, has become an Acquiring Person.

NOW, THEREFORE, in consideration of the premises and the mutual agreements herein set forth, the parties hereto agree as follows:

**1.0  Defined Terms**. Terms defined in the Rights Agreement and used and not otherwise defined herein shall have the meanings given to them in the Rights Agreement.

**2.0  Additional Definitions**. Section 1 of the Rights Agreement is hereby amended to add the following definitions, which shall be inserted into Section 1 in alphabetical order:

"**Merger Agreement**" shall mean the Agreement and Plan of Merger made and entered into as of April 25, 2006, by and among Parent, Holding Company, Holdings, Sub and the Company.

"**Parent**" shall mean Babcock & Brown Infrastructure Limited, an Australian public company.

"**Holding Company**" shall mean BBI US Holdings Pty Ltd. Company, an Australian Company and direct wholly-owned subsidiary of Parent.

"**Holdings**" shall mean BBI US Holdings II Corp., a Delaware corporation and direct wholly-owned subsidiary of Holding Company.

"**Sub**" shall mean BBI Glacier Corp., a Delaware corporation and direct wholly-owned subsidiary of Holdings.

1

**3.0  Amendment of Section 7**. Paragraph (a) of Section 7 of the Rights Agreement is amended by:

    **3.1**    deleting the word "or" immediately preceding clause (iii) thereof and by adding a "," immediately preceding clause (iii) thereof; and

    **3.2**    by adding the following new phrase immediately following clause (iii) thereof: "or (iv) immediately prior to the Effective Time (as defined in the Merger Agreement). "

**4.0  Addition of a New Section 35.** The Rights Agreement is amended by adding a Section 35 thereof which shall read as follows:

    "Section 35. Exception For Merger Agreement. Notwithstanding any provision of this Agreement to the contrary, neither a Flip-In Event, an event described in clauses (a)(i), (ii), or (iii) of Section 13, a Distribution Date, nor a Stock Acquisition Date shall be deemed to have occurred, none of Parent, Holding Company, Holdings, Sub nor any of their Affiliates or Associates shall be deemed to have become an Acquiring Person, and no holder of any Rights shall be entitled to exercise such Rights under, or be entitled to any rights pursuant to, any of Sections 3(a), 7(a), 11(a) or 13 of this Agreement, in any such case by reason of (a) the approval, execution or delivery of the Merger Agreement or any amendments thereof, or (b) the commencement or, prior to termination of the Merger Agreement, the consummation of any of the transactions contemplated by the Merger Agreement, including the Merger (as defined in the Merger Agreement)."

**5.0 Effectiveness**. This Amendment shall be deemed effective as of the time immediately prior to the signing of the Merger Agreement. Except as amended hereby, the Rights Agreement shall remain in full force and effect and shall be otherwise unaffected hereby.

**6.0 Miscellaneous**. This Amendment shall be deemed to be a contract made under the laws of the State of Delaware and for all purposes shall be governed by and construed in accordance with the laws of such state. This Amendment may be executed in any number of counterparts, each of such counterparts shall for all purposes be deemed an original and all such counterparts shall together constitute but one and the same instrument. If any term, provision, covenant or restriction of this Amendment is held by a court of competent jurisdiction or other authority to be invalid, illegal, or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Amendment shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

<div align="center">2</div>

IN WITNESS WHEREOF, the parties hereto have caused this Amendment No. 1 to the Rights Agreement to be duly executed as of the day and year first above written.

NORTHWESTERN CORPORATION

By: /s/ Michael J. Hanson

Name: Michael J. Hanson
Title: President and Chief Executive Officer

LASALLE BANK NATIONAL ASSOCIATION,
solely as Rights Agent herein under and not within its individual capacity,

By: /s/ Joseph Pellicore

Name: Joseph Pellicore
Title: Assistant Vice President

S-1

---

**Exhibit 99.1**



NorthWestern Corporation
d/b/a NorthWestern Energy
125 S. Dakota Ave.
Sioux Falls, SD 57104
www.northwesternenergy.com

**News Release**

**NASDAQ: NWEC**

**Media Relations Contact:**
Claudia Rapkoch
(406) 497-2841
claudia.rapkoch@northwestern.com
*or*
Stan Neve, Brunswick Group
(212) 333-3810

**Investor Relations Contact:**
Dan Rausch
(605) 978-2902
dan.rausch@northwestern.com

**Babcok & Brown Infrastructure**
Tristan B. Peniston-Bird, Gavin Anderson & Company
(212) 515-1933

### NORTHWESTERN CORPORATION REACHES DEFINITIVE AGREEMENT TO SELL COMPANY TO BABCOCK & BROWN INFRASTRUCTURE

**Consideration is $37 Per Share in Cash**

**Acquirer is a Long-Term Investor Committed to Stability**

**No Impact from Transaction on Cost, Reliability or Quality of Customer Service**

**SIOUX FALLS, S.D.** – April 25, 2006 – The Board of Directors of NorthWestern Corporation d/b/a NorthWestern Energy (NASDAQ: NWEC) today announced that the Company has reached a definitive agreement with Babcock & Brown Infrastructure ("BBI") under which BBI will acquire NorthWestern in an all-cash transaction at $37 per share, valuing the Company at $2.2 billion. The transaction is subject to

regulatory and shareholder approvals.

BBI is a utility infrastructure company based in Sydney, Australia and listed on the Australian Stock Exchange (ASX: BBI). It owns and manages on a long-term basis, utility and infrastructure companies and assets around the world. BBI owns companies in electricity transmission and distribution, gas transmission and distribution, and transport infrastructure, and has ownership interests in thermal and renewable power generation. BBI's energy sector management are utility executives with an average of more than 25 years experience in the electric and gas transmission and distribution business.

BBI has committed to maintaining existing employee and customer service levels. Additionally, NorthWestern will have access to BBI's capital base and experience with the development of new transmission, wind power and coal projects. The transaction will not increase NorthWestern's debt.

– More –

Steven Boulton, Chief Executive Officer of Babcock & Brown Infrastructure said: "BBI is extremely pleased to have the opportunity to team with this well run, locally based utility and to further expand BBI's involvement in the United States. There are many parallels between the NorthWestern business and BBI's complementary businesses in Australia, New Zealand and Europe. Each of the businesses operates distribution and transmission assets in locally regulated environments with geographically large service territories. We look forward to meeting with the regulators and other state and local public officials to share details of our plans to ensure that NorthWestern will continue to improve service, stabilize rates and provide exceptional customer care in Montana, South Dakota and Nebraska."

E. Linn Draper, Chairman of the Board of NorthWestern, said: "We are pleased that our strategic review process has yielded an extremely positive outcome for all our stakeholders – one that is far superior to the unsolicited proposals received during 2005, and which represents the best value for stockholders of the proposals we received as part of the process. In its review of the proposals, the Board recognizes that BBI provides the experience and stability that the local community demanded, while offering the highest value for stockholders. Additionally, the transaction will not increase NorthWestern's debt and includes adequate protections for NorthWestern's stockholders."

Michael J. Hanson, NorthWestern's President and Chief Executive Officer, said:  "Throughout this process, the Board and senior management have been working to balance the interests of all of NorthWestern's stakeholders — customers, employees, regulators and stockholders. NorthWestern has focused in particular on ensuring that a sale of the Company has no impact on the cost, reliability or quality of our customer service."

Hanson added:  "We strongly believe that a sale to BBI represents the best outcome for all of NorthWestern's stakeholders. BBI is a long-term owner of energy, transmission and power generation businesses with a well earned and proven track record."

BBI and NorthWestern are committed to maintaining strong relationships with the communities and the regulators in Montana, South Dakota and Nebraska. BBI has indicated an intention to ensure local management accountability with a focus on a continuation of excellent customer service.

The transaction is subject to the approval of NorthWestern's shareholders and customary regulatory approvals, and is expected to be completed in 2007. Upon closing NorthWestern will cease to be a publicly traded company and will become a locally managed subsidiary of BBI.

**Sale Process**

In mid-2005, following its emergence from a successful reorganization under Chapter 11 and several quarters of improving financial performance, NorthWestern received several informal proposals from parties who were interested in buying the Company.

In keeping with its fiduciary duties, NorthWestern's Board of Directors in November 2005 directed senior management and its financial advisor to commence an evaluation of all strategic alternatives to maximize value for all stockholders. In connection with the review, NorthWestern identified and invited interested parties, including Montana Public Power (MPPI) and Black Hills Corporation, to submit formal proposals to acquire NorthWestern. All interested parties were invited to perform due diligence, and the Board's financial advisor and senior management actively engaged with the bidders as they considered their final offers.

– More –

2

The Board established an M&A Committee of independent directors to oversee the process. After a thorough review and analysis of the final proposals, the Board determined that a sale of the Company was the best means of maximizing stockholder value. The Board reviewed the most attractive proposals, and in early April had its advisors engage with the interested parties in an effort to obtain the best possible outcome for the Company and its stakeholders.

The agreed upon acquisition price represents a 15.3% premium to NorthWestern's share price of $32.09 upon market close April 25, 2006. The transaction will be fully taxable to NWEC shareholders.

NorthWestern was advised by Credit Suisse and Manatt, Phelps & Phillips LLP. The Blackstone Group, as financial advisor, rendered a fairness opinion in connection with the transaction to the Board of Directors of NorthWestern.

**Investor Conference Call**

NorthWestern will host an investor conference call on Wednesday, April 26, 2006, at 11:00 a.m. Eastern Time (10:00 a.m. Central Time) to discuss today's announcement.

The conference call will be webcast live on the Internet at http://www.northwesternenergy.com under the "Investor Information" heading. To listen, please go to the site at least 10 minutes in advance of the call to register. An archived webcast will be available shortly after the call.

A telephonic replay of the call will be available beginning at 2:30 p.m. ET on April 26, 2006, through May 26, 2006, at (800) 475-6701, access code 827377.

**About NorthWestern Energy**

NorthWestern Energy is one of the largest providers of electricity and natural gas in the Upper Midwest and Northwest, serving more than 628,500 customers in Montana, South Dakota and Nebraska. More information on NorthWestern Energy is available on the Company's Web site at www.northwesternenergy.com.

**About Babcock & Brown Infrastructure**

Babcock & Brown Infrastructure (ASX: BBI) is a utility investment company that provides investors access to a diversified portfolio of quality infrastructure assets. BBI's strategy focuses on identifying, acquiring and operating quality utility and infrastructure investments worldwide.

Its investments include:

- Powerco – the second largest electricity and gas distribution business in New Zealand;
- IEG – a natural gas and LPG distribution and supply business in the United Kingdom, Channel Islands, Isle of Man and Portugal;
- Cross Sound Cable - a high voltage direct current transmission cable which links the electricity grids of New York and Connecticut;
- Dalrymple Bay Coal Terminal - one of the worlds largest coal export facilities, located in Queensland, Australia;

3

- PD Ports – the second largest port operator and the owner of the largest port in the industrial north-east of the United Kingdom;
- Ecogen – a 50% equity stake in gas-fired electricity generation plants in Victoria, Australia;
- Redbank – a 50% equity stake in a coal tailings-fired electricity generation plant in New South Wales, Australia; and
- B&B Wind Partners – a 16.5% equity stake in a portfolio of 15 wind energy farms in the US, Spain, Germany, and Australia.

BBI has a current enterprise value of approximately $4.5 billion.

For further information please visit BBI's Web site: www.bbinfrastructure.com

### Special Note Regarding Forward-Looking Statements

This press release contains forward-looking statements within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995.  Forward-looking statements often address our expected future business and financial performance, and often contain words such as "expects," "anticipates," "intends," "plans," "believes," "seeks," or "will."  These statements are based upon our current expectations and speak only as of the date hereof.  Our actual future business and financial performance may differ materially and adversely from those expressed in any forward-looking statements as a result of various factors and uncertainties, including, but not limited to:

- our ability to maintain normal terms with vendors and service providers;

- our ability to fund and execute our business plan;

- our ability to avoid or mitigate adverse rulings or judgments against us in our pending litigation arising from our bankruptcy proceeding, litigation related to our acquisition of the electric and natural gas transmission and distribution business formerly held by The Montana Power Company, and the formal investigation being conducted by the Securities and Exchange Commission;

- unscheduled generation outages, maintenance or repairs which may reduce revenues and increase cost of sales or may require additional capital expenditures or other increased operating costs;

- unanticipated changes in availability of trade credit, usage, commodity prices, fuel supply costs or availability due to higher demand, shortages, weather conditions, transportation problems or other developments, may reduce revenues or may increase operating costs, each of which would adversely affect our liquidity;

- adverse changes in general economic and competitive conditions in our service territories; and

- potential additional adverse federal, state, or local legislation or regulation or adverse determinations by regulators could have a material adverse affect on our liquidity, results of operations and financial condition.

4

In addition, we may not be able to complete the proposed transaction on the terms summarized above or other acceptable terms, or at all, due to a number of factors, including the failure to obtain approval of our stockholders, regulatory approvals or to satisfy other customary closing conditions. Our Annual Report on Form 10-K, recent and forthcoming Quarterly Reports on Form 10-Q, recent Current Reports on Form 8-K and other Securities and Exchange Commission filings discuss some of the important risk factors that may affect our business, results of operations and financial condition. We undertake no obligation to revise or publicly update any forward-looking statements for any reason.

**Important Legal Information**

In connection with the proposed transaction, Northwestern Corporation will file a proxy statement with the Securities and Exchange Commission. Before making any voting or investment decision, investors and security holders of Northwestern Corporation are urged to carefully read the entire proxy statement, when it becomes available, and any other relevant documents filed with the Securities and Exchange Commission, as well as any amendments or supplements to those documents, because they will contain important information about the proposed transaction. Investors and security holders may obtain a free copy of the proxy statement (when available) and other documents filed by Northwestern Corporation at the Securities and Exchange Commission's Web site at http://www.sec.gov. The proxy statement and such other documents may also be obtained for free from Northwestern Corporation by directing such request to Northwestern Corporation, 125 South Dakota Avenue. Sioux Falls, SD 57104, Attention: Dan Rausch, Director of Investor Relations, telephone: (605) 978-2902.

Northwestern Corporation, its directors, executive officers and other members of its management, employees, and certain other persons may be deemed to be participants in the solicitation of proxies from Northwestern Corporation stockholders in connection with the proposed transaction. Information about the interests of Northwestern Corporation's participants in the solicitation is set forth in Northwestern Corporation's proxy statements and Annual Reports on Form 10-K, previously filed with the Securities and Exchange Commission, and in the proxy statement relating to the transaction when it becomes available.

*# # #*

# EXHIBIT F

# FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

One New York Plaza
New York, NY 10004-1980
Tel: 212.859.8000
Fax: 212.859.4000
www.friedfrank.com

Direct Line: 212.859.8019
Fax: 212.859.8583
schelbr@ffhsj.com

May 16, 2006

Manatt, Phelps & Phillips LLP
11355 West Olympic Boulevard
Los Angeles, California 90064
Attn: Gordon Bava, Esq.
        David Huard, Esq.

LeBoeuf, Lamb, Greene & MacRae LLP
125 West 55th Street
New York, NY 10019
Attn: Sheri Bloomberg

Richards Layton & Finger PA
One Rodney Square
920 North King Street
Wilmington, DE 19801
Attn: Don Bussard, Esq.

Re:    Magten Asset Management Corporation ("Magten");
       NorthWestern Corporation ("NorthWestern"), and together
       with any and all of its subsidiaries and affiliates, including all
       predecessors and successors and any and all of their respective
       present and former officers, directors, agents, advisors, and
       representatives (the "NorthWestern Entities")

Dear Ms. Bloomberg and Messrs. Bava, Huard and Bussard:

Together with Storch Amini & Munves, P.C., we are counsel for Magten in
connection with Magten's claims and rights relating to the NorthWestern Entities,
including all adversary proceedings, contested matters, appeals and other actions.

Based upon the Form 8-K issued by NorthWestern on April 26, 2006, we
understand that NorthWestern has signed a definitive agreement (the "Merger
Agreement") to be acquired by Babcock & Brown Infrastructure Ltd. ("BBI") for $37
per share of common stock in an all cash transaction that values NorthWestern at
approximately $2.2 billion (the "Merger").

As you may be aware, Magten holds in excess of 40% of the 8.45% Quarterly
Income Preferred Securities (the "QUIPS") originally issued by Montana Power
Capital I and purportedly assumed by NorthWestern. As the largest holder of the

New York • Washington • London • Paris • Frankfurt

A Delaware Limited Liability Partnership

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

May 16, 2006
Page 2

QUIPS, Magten has a substantial interest in the value of NorthWestern.  As you also may know, Magten and Law Debenture Trust Company of New York, the QUIPS' Indenture Trustee (the "Indenture Trustee"), have asserted a myriad of claims and causes of action arising from and in connection with the fraudulent transfer by Clark Fork and Blackfoot LLC ("Clark Fork"), a subsidiary of NorthWestern, of utility assets valued at between $1.15 billion and $1.4 billion (the "Montana Utility Assets") to NorthWestern for no cash and the assumption of only approximately $700 million of liabilities.

Rather than belabor this letter with a detailed summary of the numerous claims, actions and appeals to which Magten, the Indenture Trustee and NorthWestern are a party, attached as Exhibit A is a brief summary of such claims, causes of actions and appeals.  In addition, we have established a data room containing all information concerning the claims and litigation of Magten and the Indenture Trustee, including all adversary proceedings, contested matters, appeals, and other actions, related to, arising from and in connection with the NorthWestern Entities, and you are welcome to visit the data room to conduct due diligence.

By way of background only, following the commencement of NorthWestern's chapter 11 case, Magten and the Indenture Trustee initiated an adversary proceeding seeking, among other things, the imposition of a constructive trust on the Montana Utility Assets (the "Fraudulent Conveyance Proceeding").  The Fraudulent Conveyance Proceeding spawned numerous claims and litigations, including an appeal of the Bankruptcy Court's order confirming NorthWestern's chapter 11 plan which, if successful, could unravel NorthWestern's chapter 11 plan and return the Montana Utility Assets to Clark Fork.  Magten and the Indenture Trustee have pursued the Fraudulent Conveyance Proceeding and other claims on behalf of approximately $55 million in QUIPS (including accrued interest through the effective date of NorthWestern's chapter 11 plan).  Had such holders received the full amount of their claims as they were entitled, they would have received 2.75 million shares of common stock at a value of $20 per share.  At the Merger price, the total value of the claims represented by Magten and the Indenture Trustee are approximately $102 million, or approximately 4.6% of the total cash consideration under the Merger.  Magten and the Indenture Trustee are the only remaining entities with a primary claim to the shares in the Disputed Claims Reserve.

Given that the order confirming NorthWestern's chapter 11 plan remains the subject of a pending appeal and given that the Fraudulent Conveyance Proceeding is in the early stages of discovery, we trust that NorthWestern made known to you the risks posed by the litigations and appeals.

We are not writing this letter to engage in debate.  Rather, we are writing to ensure that BBI is aware of the claims and interests of Magten and the Indenture Trustee and to preserve, protect and maximize value for all parties.  Putting aside all of the existing claims and appeals and the ramifications of such claims and appeals,

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

May 16, 2006
Page 3

Magten is supportive of the sale of NorthWestern to BBI.  Nevertheless, we have
reason to believe that the current structure of the Merger Agreement may impair the
rights of Magten and the Indenture Trustee.  Pursuant to section 2.01(i) of the Merger
Agreement, each share of common stock in the Disputed Claims Reserve will be
converted into $37 in cash – the value of the merger consideration.  While we
understand BBI's desire to cash out all shares, it is not clear that a cash out of the shares
in the Disputed Claims Reserve is permitted under the terms of NorthWestern's chapter
11 plan.

To the extent that BBI desires to explore alternatives to permit the cashing out
of the shares in the Disputed Claims Reserve or to better understand Magten and the
Indenture Trustee's claims and appeals, we would be happy to meet with BBI and its
advisors and would welcome and encourage the participation of NorthWestern's
management and advisors in all meetings with BBI.

Very truly yours,

Brad Eric Scheler

cc:    Magten Asset Management Corporation
       Bijan Amini, Esq. (special litigation counsel for Magten)
       John Snellings, Esq.  (counsel for Law Debenture, the Indenture Trustee)
       Patrick Healy (Law Debenture)
       Thomas J. Knapp, Esq. (General Counsel, NorthWestern)
       Michael Ryan, Esq. (Corporate Counsel, BBI)

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

**For Settlement Purposes Only**

## EXHIBIT A

All of the actions and litigations discussed below have as their root the transfer of the Montana Utility Assets by Clark Fork to NorthWestern for inadequate consideration. By way of background, in August 2002, only 13 months before commencing its chapter 11 case, NorthWestern, as the sole equity holder of Clark Fork, caused Clark Fork to transfer the Montana Utility Assets to NorthWestern at a time when NorthWestern was hopelessly insolvent (the "Transfer"). However, despite its insolvency, at the time of the Transfer, NorthWestern's public financial statements overstated NorthWestern's revenue by $878 million. Eight months after the Transfer, NorthWestern admitted that (i) the financial statements used in connection with the Transfer were materially misleading[1] and (ii) NorthWestern was insolvent. Thus, holders of the QUIPS went from being creditors of a solvent entity to being creditors of an overleveraged insolvent entity.[2]

### The Litigations and Appeals

I.    The Fraudulent Conveyance Proceeding

There can be no doubt not only that the Fraudulent Conveyance Proceeding has merit – but also that it is and was at the heart of NorthWestern's Chapter 11 case. The time entries of the professionals during NorthWestern's bankruptcy show that a significant amount of time was expended investigating the issues surrounding the Transfer. Counsel to NorthWestern has recognized that the Fraudulent Conveyance Proceeding is the "penultimate piece of litigation" and counsel to the Official Committee of Unsecured Creditors (the "Committee"), and now counsel to the Plan Committee, likewise recognized that it is "at the heart of this case."

The Bankruptcy Court denied NorthWestern's motion to dismiss the Fraudulent Conveyance Proceeding and found Magten's arguments to have merit. Subsequently, the Bankruptcy Court stayed the Fraudulent Conveyance Proceeding pending the outcome of Magten's Confirmation Appeal. On September 22, 2005, the United States District Court for the District of Delaware (the "District Court") granted the joint motion of Magten and the Indenture Trustee to withdraw the reference from the Bankruptcy Court. The Fraudulent Conveyance Proceeding is in the early stages of the discovery process before the District Court. If Magten and the Indenture Trustee prevail, there exists the risk that the District Court may find that the Montana Utility Assets, which comprise a substantial portion of NorthWestern's assets, are being held in constructive trust for the creditors of Clark Fork.

---

[1]    On April 16, 2003, NorthWestern issued a press release concerning the $878 million in negative charges. Shortly thereafter, NorthWestern announced an ongoing SEC investigation into these issues.

[2]    This summary does not include the following actions brought by Storch Amini & Munves, PC, as special litigation counsel for Magten: (i) a complaint filed against Paul Hastings Janofsky & Walker LLP ("Paul Hastings") alleging aiding and abetting the breach of fiduciary duties owed to creditors in the zone of insolvency, aiding and abetting the Transfer, conspiracy to effect the Transfer and malpractice in its representation of Clark Fork; and (ii) a motion to disqualify Paul Hastings as counsel in NorthWestern's chapter 11 case due to material misrepresentations regarding its lack of disinterestedness. Any questions with respect to these actions should be directed to Storch Amini & Munves, PC.

II.    The Montana Litigation

One of the litigations closely related to the Fraudulent Conveyance Proceeding is the Montana Litigation against the officers of Clark Fork (the "Clark Fork Defendants"). The crux of this litigation is that because Clark Fork was in the zone on insolvency at the time of the fraudulent transfer of the Montana Utility Assets, the officers of Clark Fork owed fiduciary duties to Clark Fork's creditors not to engage in any transaction that would render Clark Fork insolvent and unable to perform its objections with respect to the QUIPS.

The Clark Fork Defendants made a motion to dismiss the Montana Litigation pursuant to Federal Rule of Civil Procedure 12(b)(6). While that motion was still pending, the Clark Fork Defendants made a motion for summary judgment. As with the denial of NorthWestern's motion to dismiss the Fraudulent Conveyance Proceeding, both of these motions were denied by the Montana District Court. The Montana Litigation has been transferred to Delaware and is in the early stages of the discovery process before the District Court.

III.    The Confirmation Appeal

A.    The Appeal From the Confirmation Order

On October 19, 2004, the Bankruptcy Court confirmed NorthWestern's Second Amended and Restated Plan of Reorganization (the "Plan"), which order has been appealed by Magten.[3] Under the Plan, holders of the QUIPS did not receive the same recovery as the holders of NorthWestern's other junior subordinated debt, but instead were required to choose between (i) a recovery on account of their QUIPS holdings – thereby foregoing any claim or right with respect to the Fraudulent Conveyance Proceeding, or (ii) a recovery in the Fraudulent Conveyance Proceeding – thereby forgoing any distribution on account of their QUIPS holdings. This was a choice other, similarly situated creditors were not required to make.

B.    The Appeal from the Memorandum of Understanding

The issues surrounding Magten's objection to the MOU are directly related, not only to the Fraudulent Conveyance Proceeding, but also to the appeal of the Confirmation Order. The MOU purported to settle certain outstanding class action litigations (the "Securities Litigations") brought by former equity holders of the Montana Power

---

[3]    This appeal has been consolidated with Magten's appeal of the order approving the Memorandum of Understanding (the "MOU") providing for settlement and dismissal of the Securities Litigation. The basis of Magten's objection to the MOU was procedural because NorthWestern was attempting to circumvent the plan process by seeking separate approval of the MOU, which purported to distribute estate assets. Thereafter, the substantive portions of Magten's objection were raised in its objection to the confirmation order, which is now embodied in the Confirmation Appeal. Magten's overarching objection to the distributions afforded by the MOU was that it settled litigation claims brought by equity holders, whose interests were subordinated to that of the QUIPS.

2

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

Company, NorthWestern's predecessor-in-interest.

Although the claims on account of the Securities Litigations are subordinated under section 510(b) of the Bankruptcy Code, the Plan/MOU provided for the holders of such claims to receive more than $37 million in distributions of estate property, thereby violating the doctrine of absolute priority under the Bankruptcy Code. Despite the fact that the holders of the QUIPS did not receive a full (or in most cases any) recovery on account of the QUIPS, the parties to the MOU received a distribution of estate property at the expense of more senior creditors.

IV.    The 9019 Appeal

After over two years of litigation over numerous issues, all stemming from the Fraudulent Conveyance Proceeding, on January 27, 2005, Magten, the Indenture Trustee and NorthWestern reached an agreement in principle to settle all outstanding litigations (the "Settlement"). The terms of the Settlement were reduced to writing in the settlement agreement dated as of January 27, 2005 (the "Settlement Agreement") and executed by the Parties on February 9, 2005. The Settlement Agreement, which was drafted by counsel to NorthWestern made it clear that "the Settlement outlined herein shall be binding upon and inure to the benefit of the respective successors and assigns of each of the parties hereto." On February 9, 2005, NorthWestern issued a press release in which NorthWestern's President and CEO stated "[w]e believe this settlement is in the best interest of the Company and its shareholders as it removes the uncertainty associated with this protracted legal dispute that, if continued, would have resulted in significant cost to the Company." Thereafter, on February 10, 2005, NorthWestern disclosed the terms of the Settlement to the Bankruptcy Court.

On February 16, 2005, less than one week after NorthWestern issued its press release touting the benefits of the Settlement, NorthWestern repudiated the Settlement – a Settlement that it had initiated and consistently pursued, supported and endorsed. There can be no doubt that a binding contract was executed by each of the Parties containing all of the material terms of the Settlement. In fact, NorthWestern publicly acknowledged that its reason for failing to move forward with the Settlement Agreement was the objection asserted by Harbinger Capital Partners Offshore Manager, L.L.C. (f/k/a/ Harbert Distressed Investment Master Fund, Ltd.). However, the objections of third parties to the Settlement did not give NorthWestern the right to release itself from its obligations under the Settlement Agreement.

Despite the binding nature of the Settlement Agreement, the Bankruptcy Court did not approve the Settlement because representatives of NorthWestern and the Plan Committee represented to the Court that there was insufficient stock in the Disputed Claims Reserve to honor the terms of the Settlement. This fact was admitted at the hearing on the 9019 motion by counsel for the Plan Committee and counsel for the ad hoc committee of noteholders. In its order denying the 9019 Motion, the insufficiency of the reserve was addressed by the Court, which found that NorthWestern faced a "financial dilemma" because of its failure to comply with the terms of the Plan regarding the establishment of a reserve.

3

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

As a result of NorthWestern's breach of the Settlement Agreement and its admitted conduct in improperly funding the Disputed Claims Reserve, Magten and the Indenture Trustee filed a complaint seeking to revoke the confirmation order for fraud in establishing the Disputed Claims Reserve.

## V.     The Magten Fee Appeal

NorthWestern filed an adversary proceeding (the "NOR Adversary") against Magten alleging that Magten and Mr. Embry had improperly traded QUIPS while a member of the Committee, without any evidence and without investigating the underlying claims. After NorthWestern repudiated the Settlement and on the eve of an expedited trial in the NOR Adversary, NorthWestern dismissed the complaint with prejudice and acknowledged that there were insufficient facts to support the allegations pled in its complaint.

Thereafter, given the frivolous nature of the actions, Magten made a motion for reimbursement of fees and expenses incurred in connection with defending the baseless allegations raised in the NOR Adversary. The Bankruptcy Court denied this motion and Magten appealed that denial (the "Magten Fee Appeal"). The Magten Fee Appeal is currently pending in Delaware before the District Court.

* * * * *

4

# EXHIBIT G

# FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

One New York Plaza
New York, NY 10004-1980
Tel: 212.859.8000
Fax: 212.859.4000
www.friedfrank.com

Direct Line: 212.859.8019
Fax: 212.859.8583
schelbr@ffhsj.com

July 14, 2006

Manatt, Phelps & Phillips LLP
11355 West Olympic Boulevard
Los Angeles, California 90064
Attn: Gordon Bava, Esq.
    David Huard, Esq.

LeBoeuf, Lamb, Greene & MacRae LLP
125 West 55th Street
New York, NY 10019
Attn: Sheri Bloomberg

Richards Layton & Finger PA
One Rodney Square
920 North King Street
Wilmington, DE 19801
Attn: Don Bussard, Esq.

Re:    Magten Asset Management Corporation ("Magten");
NorthWestern Corporation ("NorthWestern"), and together
with any and all of its subsidiaries and affiliates, including all
predecessors and successors and any and all of their respective
present and former officers, directors, agents, advisors, and
representatives (the "NorthWestern Entities")

Dear Ms. Bloomberg and Messrs. Bava, Huard and Bussard:

As you are aware, together with Storch Amini & Munves, P.C., we are
counsel for Magten in connection with Magten's claims and rights relating to the
NorthWestern Entities, including all adversary proceedings, contested matters, appeals
and other actions.

Based upon the Notice of Annual Meeting and Proxy Statement issued by
NorthWestern on June 9, 2006, we understand that NorthWestern will be holding its
annual meeting of stockholders on August 2, 2006, at which time NorthWestern's
stockholders of record will be asked, among other things, to adopt the merger
agreement (the "Merger Agreement") providing for the acquisition of NorthWestern by
Babcock & Brown Infrastructure Ltd. ("BBI") for $37 per share of common stock in an
all cash transaction (the "Merger").

New York ● Washington ● London ● Paris ● Frankfurt
A Delaware Limited Liability Partnership

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

July 14, 2006
Page 2

As noted in our prior letter dated May 16, 2006 ("May 16 Letter"), we believe
that the current structure of the Merger Agreement may impair the rights of Magten and
Law Debenture Trust Company of New York, in its capacity as Indenture Trustee for
the QUIPS. Pursuant to section 2.01(i) of the Merger Agreement, each share of
common stock in the Disputed Claims Reserve will be converted into $37 in cash – the
value of the merger consideration. As we explained in our May 16 Letter, we believe
that a cash out of the shares in the Disputed Claims Reserve is not permitted under the
terms of NorthWestern's chapter 11 plan.

As you may be aware, Section 251 of the Delaware General Corporation Law
governs the merger or consolidation of domestic corporations. Specifically, Section
251(d) provides, in relevant part:

> Any agreement of merger or consolidation may contain a
> provision that the boards of directors of the constituent
> corporations may amend the agreement at any time prior to the
> time that the agreement (or a certificate in lieu thereof) filed
> with the Secretary of State becomes effective in accordance
> with § 103 of this title, provided that an amendment made
> subsequent to the adoption of the agreement by the stockholders
> of any constituent corporation shall not (1) alter or change the
> amount or kind of shares, securities, cash, property and/or rights
> to be received in exchange for or on conversion of all or any of
> the shares of any class or series thereof of such constituent
> corporation.

8 Del. C. §251(d) (2006).

Pursuant to this provision, once the Merger Agreement is adopted by
NorthWestern's shareholders, the Merger Agreement may not be amended to "alter or
change the amount or kind of shares . . . to be received in exchange for or conversion of
all or any of the shares" of NorthWestern. Therefore, to the extent that, after the
adoption of the Merger Agreement, a court finds that the terms of section 2.01(i) of the
Merger Agreement violate the terms of the Plan, NorthWestern and BBI cannot amend
the Merger Agreement to adjust the provision that provides for the cashing out of the
Disputed Claims Reserve. Rather, NorthWestern's only option would be to terminate
the Merger Agreement or for NorthWestern to convene another shareholder meeting –
at significant expense and time – to adopt an amended form of the Merger Agreement.

Accordingly, it is premature for NorthWestern to incur the considerable expense
of holding its shareholder meeting unless and until NorthWestern and BBI make the
appropriate amendment to section 2.01(i). Should NorthWestern proceed with its
shareholder meeting as planned, NorthWestern's officers and directors face the risk that
they may be subject to claims and causes of action stemming from their pursuit of a

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

July 14, 2006
Page 3

shareholder meeting to adopt an invalid Merger Agreement.

Please share this letter with each member of the Board of Directors of your respective clients and confirm in writing that you have done so.

We look forward to hearing from you in the near term.

Sincerely,

Brad Eric Scheler

cc:    Magten Asset Management Corporation
       Bijan Amini, Esq. (special litigation counsel for Magten)
       John Snellings, Esq.  (counsel for Law Debenture, the Indenture Trustee)
       Patrick Healy (Law Debenture)
       Thomas J. Knapp, Esq. (General Counsel, NorthWestern)
       Michael Ryan, Esq. (Corporate Counsel, BBI)
       Jesse H. Austin, III, Esq. (counsel to NorthWestern)
       Steven Reisman, Esq. (counsel to NorthWestern)

# EXHIBIT H

# NorthWestern Corporation's Stockholders Vote To Adopt Merger Agreement

### *Seven Directors Re-elected to Board*
### *Board Approves Common Stock Dividend of 31 Cents Per Share*

**SIOUX FALLS, S.D. – Aug. 2, 2006 –** NorthWestern Corporation d/b/a NorthWestern Energy (NASDAQ-GS: NWEC) today reported that, at its 2006 Annual Meeting of Stockholders held today in Sioux Falls, S.D, NorthWestern's stockholders approved the adoption of the merger agreement providing for the acquisition of NorthWestern by Babcock & Brown Infrastructure Limited (BBI). Under the terms of the merger agreement, NorthWestern stockholders will be entitled to receive $37 per share in cash. The transaction is expected to be completed by mid 2007, subject to the satisfaction or waiver of closing conditions.

"The stockholders' approval of the merger agreement is the first of several steps for NorthWestern and BBI to complete the transaction. The transaction with BBI presented the best result for our stockholders, customers, employees and the communities we serve. This approval by our stockholders clearly demonstrates the recognition of the benefits of this merger." said Mike Hanson President and CEO. "We look forward to continuing our approval process with the various regulato authorities." In addition, NorthWestern's stockholders re-elected E. Linn Draper, Jr., Stephen P. Adi Jon S. Fossel, Michael J. Hanson, Julia L. Johnson, Philip L. Maslowe and D. Louis Peoples to a one-year term on the Board. Stockholders also ratified Deloitte & Touche, LLP as the company's independent registered public accounting firm for the year ending Dec. 31, 2006.

## Board Approves Dividend of 31 Cents Per Share

NorthWestern's Board today announced that it approved a quarterly common stock dividend of 31 cents per share. The dividend is payable on Sept. 30, 2006, to common stockholders of record as of Sept. 15, 2006.

## Board Adopts New Policy on Electing Board Members

NorthWestern's Board also announced today that it has adopted a policy for majority voting in noncontested elections of nominated directors. The policy provides that to be elected, in a noncontested election, a director nominee must receive a majority of the votes cast such that the number of votes "for" the nominee exceeds the summation of the number of votes "against" and "withheld" related to the nominee. If the incumbent director fails to be elected, he or she will promptly tender his or her resignation following certification of the shareholder vote.

A plurality vote standard will be retained for the election of directors only in the event of a contested election. The policy of majority voting shall take effect for the next shareholder vote.

## About NorthWestern Energy

NorthWestern Energy is one of the largest providers of electricity and natural gas in the Upper Midwest and Northwest, serving more than 628,500 customers in Montana, South Dakota and Nebraska. More information on NorthWestern Energy is available on the Company's Web site at www.northwesternenergy.com.

## Special Note Regarding Forward-Looking Statements

This press release contains forward-looking statements within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995. Forward-looking statements often address our expected future business and financial performance, and often contain words such as "expects," "anticipates," "intends," "plans," "believes," "seeks," or "will." These statements

are based upon our current expectations and speak only as of the date hereof.  Our actual future business and financial performance may differ materially and adversely from those expressed in any forward-looking statements as a result of various factors and uncertainties, including, but not limited to:

- the effect of the definitive agreement to sell NorthWestern to Babcock & Brown Infrastructure Limited (BBI), including the consummation of the transaction or the termination of the definitive agreement due to a number of factors, including the failure to obtain regulatory approvals or to satisfy other customary closing conditions;

- our ability to avoid or mitigate adverse rulings or judgments against us in our pending litigation;

- unanticipated changes in availability of trade credit, usage, commodity prices, fuel supply costs or availability due to higher demand, shortages, weather conditions, transportation problems or other developments, may reduce revenues or may increase operating costs, each of which would adversely affect our liquidity;

- unscheduled generation outages or forced reductions in output, maintenance or repairs which may reduce revenues and increase cost of sales or may require additional capital expenditures or other increased operating costs;

- adverse changes in general economic and competitive conditions in our service territories; and

- potential additional adverse federal, state, or local legislation or regulation or adverse determinations by regulators could have a material adverse effect on our liquidity, results of operations and financial condition.

Our Annual Report on Form 10-K, recent and forthcoming Quarterly Reports on Form 10-Q, recent Current Reports on Form 8-K and other Securities and Exchange Commission filings discuss some of the important risk factors that may affect our business, results of operations and financial condition.  We undertake no obligation to revise or publicly update any forward-looking statements for any reason.

# # #

**Media Contact:**
Claudia Rapkoch
(866) 622-8081
claudia.rapkoch@northwestern.com

**Investor Relations Contact:**
Dan Rausch
(605) 978-2902
daniel.rausch@northwestern.com

For Customers | For Investors | Community Relations | About NorthWestern
Privacy Policy |  Legal Terms & Conditions |  Site Map |  Webmaster | RSS
Copyright © 2007 NorthWestern Energy Corporation. All rights reserved.

# EXHIBIT I

**Fried, Frank, Harris, Shriver & Jacobson LLP**

One New York Plaza
New York, New York 10004-1980
Tel: +1.212.859.8000
Fax: +1.212.859.4000
www.friedfrank.com



Direct Line: 212.859.8004
Fax: 212.859.8583
steinbo@ffhsj.com

December 20, 2006

State of Montana
Public Service Commission
1701 Prospect Avenue
P.O. Box 202601
Helena, MT 59620-2601

      RE:    Docket No. D2006.6.82
               NorthWestern Corporation ("NorthWestern")

Dear Chairman Jergeson and Members of the Commission:

      I write on behalf of my law firm's client Magten Asset Management Corporation ("Magten") to bring to the Commission's attention factors which we believe the Commission should take into account in considering NorthWestern's application for regulatory approval of its purchase by affiliates of Babcock & Brown Infrastructure Ltd. ("BBI"). Magten is a substantial holder of certain securities issued by an affiliate of the former Montana Power Company, and is currently pursuing litigation against NorthWestern and others in the U.S. District Court for the District of Delaware.

      As the Commission is well aware, NorthWestern acquired the regulated utility assets of Montana Power Company in 2002 only to default on its obligations and descend into chapter 11 bankruptcy the following year, causing considerable uncertainty and prejudice for the Montana customers the Commission is charged with protecting. NorthWestern then manipulated the bankruptcy process to block any meaningful recovery for Montana Power creditors such as Magten, even though the Montana Power assets were the primary source of value for the reorganized company. What is clear in hindsight is that NorthWestern did not suddenly encounter unexpected financial difficulties immediately after acquiring the Montana Power assets. Rather, NorthWestern affirmatively and fraudulently concealed the catastrophic failure of its non-utility business ventures until just after it had completed the transfer of the Montana Power assets to itself. Magten believes that this Commission and the

Fried, Frank, Harris, Shriver & Jacobson LLP

December 20, 2006
Page 2

Consumer Counsel, as well as creditors, investors, and customers, were victims of that fraud.

Earlier this month, the U.S. Securities and Exchange Commission commenced a lawsuit against certain current and former NorthWestern employees, charging them with causing NorthWestern to release materially false financial statements with respect to the fourth quarter of 2001 and the first and second quarters of 2002 – the very time period during which NorthWestern was obtaining approval from this Commission for its acquisition of the Montana Power assets.  One of the defendants in this litigation, Bart Thielbar, apparently remains a Vice President and senior member of NorthWestern's management team despite the SEC's pending charges that he violated the federal securities laws by causing NorthWestern's public financial statements to be inflated and his refusal (unlike his co-defendants) to accept responsibility by settling with the SEC. We attach a copy of the SEC's press release announcing the litigation for your reference.

The SEC's investigation is apparently ongoing, and more charges may be brought.  According to NorthWestern's own public statements, a number of additional "Wells notices" indicating proposed enforcement actions targeting affiliated individuals were issued this past summer.  In addition to the specific misconduct at one of NorthWestern's subsidiaries targeted by the recently-filed action, we understand that the SEC's investigation more generally encompasses NorthWestern's subsequent restatement of its 2002 quarterly financial statements after admitting that those statements had been false and misleading when issued, the timing of NorthWestern's announcement of the almost billion dollars of extraordinary losses and write-downs it admitted to in connection with its financial statements for the end of 2002, and the misstatement of the financial condition of other subsidiaries and affiliates.

We believe that had the truth about NorthWestern's financial condition and prospects been disclosed to the Commission at the time, the 2002 transaction would never have been approved, or at a minimum any approval would have been conditioned on structural provisions appropriately insulating the former Montana Power business and its customers and creditors from the catastrophic failure of NorthWestern's other, unregulated businesses.

As the Commission recognized with regret in its January 24, 2003 Final Order in Docket no. D2002.12.159, after the Commission approved NorthWestern's purchase of the Montana Power assets, the company's reported "financial condition . . . spiraled down due to non-utility activities." In particular, on November 15, 2002, NorthWestern caused the former Montana Power entity it had acquired 100% ownership of (renamed at the time NorthWestern Energy, L.L.C.) to transfer the Montana Power assets without adequate consideration up to NorthWestern itself, where they could be commingled

Fried, Frank, Harris, Shriver & Jacobson LLP

December 20, 2006
Page 3

with its other, money-losing businesses and be made directly available to cover the losses of those other businesses. Within weeks after completing this transfer, NorthWestern suddenly announced that substantial losses associated with its non-utility businesses were anticipated – losses that ultimately resulted in the near-billion-dollar write-down of asset values mentioned above. This announcement was rapidly followed by the cascade of ratings agency downgrades of NorthWestern debt described in the January 24, 2003 order and the chapter 11 filing later that year.

The settlement stipulation dated as of July 8, 2004 that the Commission and Consumer Counsel reached with NorthWestern in its bankruptcy case expressly recognizes the need for structural "ring fencing" measures which would separate and insulate the former Montana Power assets from the risks and liabilities of other, unregulated businesses NorthWestern might engage in going forward. The damage done in the bankruptcy to the customers and creditors of the former Montana Power was almost entirely the result of NorthWestern's exploitation of the fact that explicit "ring fencing" provisions were not in place as of November 2002. As stated above, we are confident that the Commission and Consumer Counsel would have insisted on such measures at the time of NorthWestern's purchase of the Montana Power assets had it not been for the fraudulent concealment of NorthWestern's true financial condition.

Thus, while the Commission's primary focus will no doubt appropriately be on the potential risks or benefits of the currently-proposed BBI transaction to Montana customers, we believe that it should also give due consideration to the disturbing fact that NorthWestern has not yet accepted full responsibility for its misconduct in connection with the prior transaction, in which it took advantage of the fact that "ring fencing" was not in place. Nor has NorthWestern compensated those who were injured by that misconduct to the best of its ability, even given the constraints imposed by the bankruptcy. By contrast, those who benefited from that transaction at the expense of Montana Power's customers and creditors now stand to receive a windfall if the BBI transaction is consummated.

Indeed, just last month NorthWestern's board awarded itself and members of management over 190,000 shares of new NorthWestern stock pursuant to a so-called "Long-Term Incentive Plan" – shares which will immediately vest and entitle these insiders to pocket over $5 million in additional cash from BBI if the proposed transaction is consummated. The purported purpose of this award – incentivizing management to take a long-term perspective toward the business from now through the end of 2011 – is an obvious sham, since management hopes and expects to cash in the stock by the middle of next year, rather than over the five-year period officially contemplated. The Commission may recall that in its January 24, 2003 order it expressed serious concerns about NorthWestern's prior "incentive" arrangements for senior management, which had improperly enriched insiders prior to the revelation of

Fried, Frank, Harris, Shriver & Jacobson LLP

December 20, 2006
Page 4

NorthWestern's financial distress, and which had not been disclosed to the Commission until after its approval of NorthWestern's acquisition of the Montana Power assets.

As a result of this latest round of self-dealing and self-enrichment (as well as prior such awards subsequent to the bankruptcy case) Michael Hanson, now NorthWestern's CEO, stands to receive personally several million dollars from the transaction. As of November 2002, Mr. Hanson was the CEO of the former Montana Power entity who permitted the Montana Power assets to be transferred to NorthWestern, exploiting the lack of explicit "ring fencing" protections in place at the time. Magten is currently suing Mr. Hanson for violating his fiduciary duties to the former Montana Power creditors in connection with that transfer.

Obviously, the final resolution of Magten's claims against NorthWestern, Mr. Hanson, and other defendants in related litigation is not directly within this Commission's jurisdiction. We believe, however, that several factors related to the litigation should be of interest and concern to the Commission. The first relates to the general issue, as noted above, of whether NorthWestern's current board and management team have genuinely put the problems of the past behind them. Any claim that the company is now being managed by new faces who were not involved in the prior misconduct must be subject to consideration not only of the continuing role of certain individuals who were involved in that misconduct, notably Messrs. Hanson and Thielbar, but also of the actions of more recently-arrived officers and directors when it comes to accepting appropriate responsibility for the past. In this regard, the Commission may wish to examine NorthWestern's conduct in reneging on a signed settlement agreement with Magten which it had then further confirmed in a court filing was in NorthWestern's own best interests. This change of heart apparently resulted from pressure from a third party which had already been made more than whole in the chapter 11 case – pressure so strong as to lead to the abrupt departure from the company of Mr. Hanson's predecessor as CEO, Gary Drook. This same third party that forced NorthWestern to retract the settlement with Magten had actually petitioned for, and was granted, an exemption from the Public Utility Holding Company Act of 1935 by promising not to exert influence over NorthWestern. NorthWestern nonetheless let itself be influenced by the pressure brought to bear by violations of these securities laws.

Second, the Commission should know that NorthWestern and Mr. Hanson have been assiduously resisting discovery in Magten's litigation against them. Indeed, we have recently been forced to file a motion to compel in order to receive a substantial response to requests for documents that were served this past January. While foot-dragging and stone-walling are unfortunately not unknown in civil litigation, here the Commission should be aware of the possibility that the continued delay results from an attempt by NorthWestern to continue concealing the evidence Magten is seeking until

Fried, Frank, Harris, Shriver & Jacobson LLP

December 20, 2006
Page 5

after it has received the required regulatory approvals for its proposed transaction with BBI. Such a strategy necessarily implies fear that the evidence Magten is seeking to uncover would be viewed by the Commission and other regulators as both relevant and damaging to NorthWestern's application for approval of the proposed transaction.

As our investigation continues, with or without NorthWestern's compliance with its discovery obligations, we anticipate providing the Commission with additional factual details we believe might be helpful in your consideration of the proposed transaction. If you would like further information on any of the issues discussed above, we would be more than happy to provide it.

We appreciate your consideration of these matters as you continue to carry out your important responsibilities with respect to consideration of the proposed transaction.

Sincerely,

Bonnie Steingart /KB

Bonnie Steingart

cc:    Robert A. Nelson, Consumer Counsel
       John L. Alke (Montana regulatory counsel to NorthWestern)
       Gordon Bava  (transaction counsel to NorthWestern)
       Don Bussard (transaction counsel to NorthWestern)
       Sheri Bloomberg  (transaction counsel to BBI)

# EXHIBIT J

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          . Case No. 03-12872(KJC)
                                .
                                .
  NORTHWESTERN CORPORATION,     .
                                . 824 Market Street
                                . Wilmington, DE  19801
      Reorganized Debtors.      .
                                . February 1, 2007
. . . . . . . . . . . . . . . . 1:30 p.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Reorganized Debtors:  Greenberg Traurig, LLP
                              By:  DENNIS A. MELORO, ESQ.
                              The Brandywine Building
                              1000 West Street
                              Suite 1540
                              Wilmington, DE  19801

                              Paul, Hastings, Janofsky & Walker
                               LLP
                              By:  JESSE H. AUSTIN III, ESQ.
                              600 Peachtree Street, N.E.
                              Atlanta, GA  30308

Audio Operator:               Jason Smith

 Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-Mail:  jjcourt@optonline.net**

**(609) 586-2311  Fax No.  (609) 587-3599**

2

```
APPEARANCES (Cont'd.):

For the Reorganized Debtors:  Curtis, Mallet-Prevost, Colt &
                               Mosle LLP
                              By:  CURTIS J. REISMAN, ESQ.
                              101 Park Avenue
                              New York, NY  10178-0061

For Law Debenture Trust Co.:  Nixon Peabody, LLP
                              By:  JOHN V. SNELLINGS, ESQ.
                              437 Madison Avenue
                              New York, NY   10022


                              Smith, Katzenstein & Furlow LLP
                              By:  ETTA R. WOLFE, ESQ.
                              The Corporate Plaza
                              800 Delaware Avenue
                              P.O. Box 410
                              Wilmington, DE  19899

For Magten:                   Blank Rome, LLP
                              By:  BONNIE GLANTZ FATELL, ESQ.
                              Chase Manhattan Centre
                              1201 Market Street
                              Suite 800
                              Wilmington, DE 19801


                              Fried, Frank, Harris, Shriver
                               & Jacobson, LLP
                              By:  BONNIE STEINGART, ESQ.
                                   GARY KAPLAN, ESQ.
                                   JORDANA NIDRITCH, ESQ.
                              One New York Plaza
                              New York, NY  10004

For the Plan Committee:       Paul, Weiss, Rifkind, Wharton
                               & Garrison LLP
                              By:  MARGARET PHILLIPS, ESQ.
                              1285 Avenue of the Americas
                              New York, NY 10019


                              The Bayard Firm
                              By:  ERIC M. SUTTY, ESQ.
                              222 Delaware Avenue
                              Suite 900
                              P.O. Box 25130
                              Wilmington, DE  19899
```

APPEARANCES (Cont'd.):

For the Non-Managing Trustee: Pachulski, Stang, Ziehl, Young,
                               Jones & Weintraub, P.C.
                              By:  BRUCE GROHSGAL, ESQ.
                              10100 Santa Monica Boulevard
                              11th Floor
                              Los Angeles, CA 90067

TELEPHONE APPEARANCES:

For the Managing Trustee:     Morrison & Foerster LLP
                              By:  JOHN HEMPILL, ESQ.
                                   RENEE FREIMUTH, ESQ.
                                   NORM ROSENBAUM, ESQ.
                              1290 Avenue of the Americas
                              New York, NY  10104-0050

4

1          THE COURT:  Good afternoon, all.

2          ALL:  Good afternoon, Your Honor.

3          MR. AUSTIN:  Good afternoon, Your Honor.  For the

4   record, I am Jess Austin with the firm of Paul, Hastings,

5   Janofsky, and Walker, along with Dennis Meloro here from the

6   Greenberg Traurig firm.  We are counsel to Northwestern

7   Corporation.  In addition to ourselves today, we also have Tom

8   Knapp, who is General Counsel to Northwestern or reorganized

9   Northwestern, and Mr. Steven Reisman from the Curtis Mallet

10  firm in New York, who is counsel for Northwestern on certain

11  other pending litigation matters which are not before the Court

12  today.

13          Today's agenda really contains two matters.  There is

14  an uncontested matter, and then there's a couple of contested

15  matters.  The uncontested matter deals with a joint motion by

16  Northwestern Corporation and the Managing Trustee for the

17  Northwestern Corporation D&O Trust that was formed in

18  connection with the confirmed reorganization plan.  Mr. Bruce

19  Grohsgal here, as counsel for that Trustee, will present.  That

20  matter is not opposed, and I believe they filed a certificate

21  of no objection, but he needs to make a few comments for the

22  record.

23          The other two matters that are on the calendar which

24  are contested and will be going forward is (1) reorganized

25  Northwestern's motion pursuant to Sections 105 and 1142(b) and

1  Rule 3020(d) of the bankruptcy rules seeking an order in aid of

2  execution of the confirmed plan, plus a motion for protective

3  order relating to discovery that was filed by both Magten and

4  Law Debenture Trust.  What I would propose to do, Your Honor,

5  before going into that matter -- those two matters is have Mr.

6  Grohsgal present on the uncontested matter, if that is okay.

7           THE COURT:  Very well.

8           MR. GROHSGAL:  Afternoon, Your Honor.  Bruce Grohsgal

9  with Pachulski Stang for Walker Truesdell in its capacity as

10  the Managing Trustee of the Northwestern D&O Trust.  Your

11  Honor, as was correctly stated, pending before the Court is a

12  motion that has two parts.  Well, this part wasn't stated on

13  the record, but the motion consists of two parts.  The first

14  part is what's before the Court today, which is the parties'

15  request for approval of the noticing procedures with respect to

16  the substantive part of the motion which will be heard on a

17  later day.  We noticed the hearing today only on the

18  procedures.  We received no objections, and we filed a

19  certificate of no objection yesterday with the proposed order

20  attached.

21           With me on the phone are my co-counsel, Misters

22  Hempill and Rosenbaum as well as Ms. Freimuth of the Morrison

23  and Foerster firm.  And we would ask that this order be

24  entered.  We're prepared to answer any questions that the Court

25  might have.  Before the Court enters the order, however, we

6

1  need to provide certain dates in the order that was attached to

2  the CNO yesterday.  So I don't know if the Court has any

3  questions, but we'd be happy to answer them if you do.

4         THE COURT:  I do not.  We need to fill in the blanks.

5         MR. GROHSGAL:  Okay.  Very good.

6         THE COURT:  I'm interested, even though I did see the

7  CNO, is anyone else present or on the phone who cares to be

8  heard on this matter?

9                    (No verbal response)

10        THE COURT:  I hear no response.

11        MR. GROHSGAL:  Okay.

12        THE COURT:  Okay.  Let's fill in the blanks.

13        MR. GROHSGAL:  Thank you, Your Honor.  Your Honor, if

14 it's acceptable to the Court, because of the timing of the

15 publication and of the service on this, we've asked the Court

16 to give us a hearing date, if it's convenient, of the 12th,

17 13th, or 14th of March, preferably the 13th or the 14th.  And

18 we've asked that objections be due ten days before that date.

19 We think the parties will have an ample amount of time to

20 respond, and that will give us time to deal with any objections

21 that come in.

22        THE COURT:  How about March 13th at 3:30?

23        MR. GROHSGAL:  That would be excellent, Your Honor.

24 Thank you.  And then I'll -- that will be the Tuesday, so

25 perhaps we could have the objections due the Friday that's -- I

7

1  think it's 11 days before that.  Or would it be -- no, that's

2  right, Friday, the 2nd of March?

3          THE COURT:  It would be the 2nd.  Yes.

4          MR. GROHSGAL:  Okay.  Thank you.  The order that was

5  attached has blanks.  There are several of them.  I don't know

6  if Your Honor wants to fill those in now or have me go back to

7  my office and fill them in and send a second order over under

8  certification.  It's your call.

9          THE COURT:  No, I'll fill in the blanks.

10          MR. GROHSGAL:  That would be great.  Thank you very

11  much.  And if I may note, there is a -- there's one last date

12  on page 2 before we conclude, which is just the -- today's date

13  for the date of the hearing.

14          THE COURT:  I filled that in.

15          MR. GROHSGAL:  Great.  Thank you.

16          THE COURT:  All right.  That order has been signed.

17          MR. GROHSGAL:  Thank you, Your Honor.

18          MR. AUSTIN:  Thank you, Your Honor.  Again for the

19  record, I am Jess Austin on behalf of Northwestern Corporation.

20  The next two matters on the calendar are I think somewhat

21  intertwined.  The first matter, which generated today's hearing

22  scheduling, is Northwestern's motion seeking an order in aid of

23  execution of confirmed plan of reorganization.  The relief

24  which Northwestern seeks is the right or -- excuse me -- is for

25  the indentured -- the Trustee or the Transfer Agent under the

1  company's current stock plan, which currently is holding the

2  remaining shares and claim reserve, to be able to invest those

3  dollars in accordance with the bankruptcy rules and procedures,

4  Section 545, and not have to post a bond upon completion of a

5  merger agreement between Northwestern and Babcock and Brown.

6          In connection with that motion, Your Honor, we

7  received a limited objection from the Plan Committee.  I can

8  report to the Court that based on some modification to the

9  proposed order we'll add language to that order, which would

10 resolve the plan Committee's objection, and we obviously will

11 note for the record that the Plan Committee reserves all rights

12 relative to alternate distributions out of the disputed claims

13 reserve at a later date.

14         We've also received a joint objection on behalf of

15 Magten Asset Management Corporation and Law Debenture Trust

16 Company of New York to the motion to which we filed a reply,

17 and in connection with the objections Magten and Law Debenture

18 sought to undertake certain discovery with respect to the

19 motion which first off that discovery was document discovery

20 related to Northwestern, request for a deposition of

21 Northwestern's President Mike Hanson, and also serving of a

22 third party subpoena upon LaSalle Bank, the Transfer Agent.

23         Northwestern moved to quash the subpoena, and

24 Northwestern also filed a motion for protective order as to the

25 requests, the discovery of it, and its President on the grounds

9

1  that we believe there's absolutely nothing that can be

2  discovered that has any relevance to the limited relief which

3  Northwestern is requesting here today.  And we think, Your

4  Honor, that to appropriately consider the motions for a

5  protective order, that this Court would necessarily need to

6  understand the underlying motion itself, and we think that we

7  will proceed in that regard.

8          THE COURT:  Well, let's -- let's stop a minute, and

9  before we get in too deep, let me -- I have reviewed the

10 submissions -- raise a couple issues.  And I guess in the way

11 of order of proceeding the joint objectors here have said we

12 need more discovery, so we shouldn't hear the underlying motion

13 yet until we have the discovery.  So it seems to me that while

14 you might be right, I need to understand the underlying issue

15 before I can decide the discovery issue.  There's a threshold I

16 guess that procedurally may have to be determined first.

17         But within that I have another issue, and that is

18 while the parties have agreed to have this Court resolve the

19 motion to quash, I don't know that this is the Court that under

20 the rules is the one to be deciding that.

21         MR. AUSTIN:  And I can address both those, Your

22 Honor, right now.

23         THE COURT:  Okay.

24         MR. AUSTIN:  I'll address the last one first.  I

25 think procedurally you're probably correct as it relates to the

1  motion to quash, which is why Northwestern, when it moved to

2  quash, did not file the motion to quash here.  It filed a

3  motion to quash in Illinois.  We came back and filed the

4  notice, because, certainly, the underlying discovery, the

5  overall dispute, is tied into the motion for a protective

6  order.

7           Our own belief is that, to extent this Court would

8  consider it, fine, but our own belief also is that to the

9  extent this Court at least can hear the motion for a protective

10 order, which you certainly have jurisdiction to do, and to the

11 extent this Court was going to grant our motion for a

12 protective order, I would like to think at that point it either

13 moots out -- and I can file a similar order in Illinois, or at

14 that point, if there's no discovery going forward relative to

15 Northwestern, I would hope at that point Magten and/or Law

16 Debenture would reasonably consider to withdraw that request

17 for a subpoena.

18          With respect to the motion for a protective order --

19 and I believe that -- as I'll get into this, Your Honor, very

20 clearly -- succinctly here -- there's no need to take any

21 discovery in the motion for order of execution.  As I noted,

22 the discovery request of Northwestern and its President Mike

23 Hanson and our subpoena to LaSalle are focused on, which they

24 say even in their own pleadings, are for limited purposes.  And

25 I think the most telling piece of that, Your Honor, is in

11

1  response to our motion for protective order at paragraph four

2  on page three where they specifically note that, "The

3  claimants' limited discovery request seek documents and

4  testimony from Mr. Hanson and the Transfer Agent in an effort

5  to understand (1) the circumstances surrounding the creation

6  and maintenance of the disputed claim reserve under the plan,

7  and (2) as well as Northwestern's knowledge during, prior to,

8  immediately after the plan of confirmation process of the

9  potential sale or merger of the company."  Two limited points.

10 They say they want discovery.

11         Our response to that, Your Honor, is that first off

12 those two issues are totally irrelevant relative to the fact

13 that this is a cash out merger that shareholders and regulators

14 have approved, and as soon as Northwestern obtains the approval

15 of the one last regulator, the Montana Public Service

16 Commission, and then assuming that approval comes in, this

17 merger will be completed.  It was not prohibited under the

18 plan, and we'll circle back and come into that on a subsequent

19 basis.

20         But more important, Your Honor, as to the two things

21 that they say they want discovery on, all of these facts have

22 already been disclosed to Magten and Law Debenture, and if they

23 look, they can determine all of this, and it's all in the

24 public record.  Plus those facts do not impair or impinge on

25 the limited issue which we are raising on our motion in aid of

12

1  execution.

2         The first issue, creation and maintenance of the

3  disputed claim reserve.  This reserve, the disputed claim

4  reserve, which was initially set up with 4,409,100 shares of

5  Northwestern's -- reorganized Northwestern's new common stock

6  was established prior to the effective date of Northwestern's

7  plan.  By way of general background, Your Honor, Northwestern

8  filed Chapter 11 on September 13th, 2003.  We obtained a

9  confirmation order on October 19th, 2004.  On December --

10  excuse me -- on November 1, 2004 Northwestern confirmed -- a

11  reorganization plan went effective.

12         Your Honor, on October 25 docket number 2270, which I

13  have a copy if the Court would like to see, Northwestern

14  actually filed a notice of establishment of the claim reserve

15  pursuant to Section 7.5 of the debtor's plan wherein we

16  specifically noted that we were establishing a reserve of 13.5

17  percent of the new common stock allocated to Class 7 and Class

18  9 for the disputed claim reserves.  A simple mathematical

19  calculation at that point would have determined -- anyone could

20  determine, and indeed the Creditors Committee clearly quickly

21  determined that we were setting aside 4,409,100 shares of stock

22  in the disputed claim reserve.  We received no objections to

23  doing that.

24         Subsequent to that, Your Honor, every time -- every

25  time Northwestern didn't resolve a Class 9 claim -- and Class 9

1  is a class that the Magten claims currently reside, and the

2  claims of the non-accepting quips currently reside.  Every time

3  that we resolved a claim that would come out of the disputed

4  claim reserve Northwestern filed a notice of the settlement

5  which identified the claimant, identified the allowed claim

6  amount, and identified the number of shares, and we filed this

7  on the docket.  And, Your Honor, I have a summary of everyone

8  that we filed with the docket numbers which I can deliver to

9  the Court for its review and am prepared to give to everyone

10 else.

11         But the point of this, Your Honor, is that if they

12 want to know what happened to the disputed claim reserve, all

13 they got to do is start with the first notice and then look at

14 everyone that we then distributed thereafter.  And what it

15 boils down to, Your Honor, we started out with 4,409,100

16 shares, and we now have remaining in the disputed claim reserve

17 3,144,642 shares.  Now, with respect to dividends which have

18 been paid, Northwestern has been -- and taking those dividends

19 on account of those shares that weren't distributed have been

20 investing those dollars and are prepared once the merger is

21 complete to deliver all the cash then as to the transferee.

22 There's nothing magical or questionable and no factual dispute

23 as to what's happened to the shares in the disputed claim

24 reserve, because we certainly can't invest them.  They are

25 Northwestern shares.  You can't go out and start playing the

14

1  market with those.

2         As for the prospects of the merger or sale, anything

3  that happened pre-confirmation was fully disclosed in the

4  disclosure statement and/or at the confirmation hearing.

5  Magten and Law Debenture know all about that.  Subsequent to

6  the confirmation hearing, subsequent to the effective date of

7  the plan, any relevant, any important, any material facts

8  relative to a disclosure of any entity that had interest in

9  acquiring the company's assets or the company has been

10 disclosed to the company's SEC filings.  Again, there are no

11 secrets in this regard.  There is nothing to be gained by

12 taking depositions or seeking paper discovery on these issues.

13        And the real key here, Your Honor, is that once the

14 Babcock and Brown merger proposal was announced, which was

15 announced in April of 2005, no other party has stepped forth to

16 top the $37 per share proposal.  The point is, Your Honor,

17 there is no better deal out there.  Management in its exercise

18 of its judgment, the board in the exercise of its judgment, and

19 indeed majority of the company shareholders have approved this

20 merger.

21        THE COURT:  Wait a minute.  I'm not here to decide

22 today --

23        MR. AUSTIN:  I understand that.

24        THE COURT:  -- whether a better deal could be had.

25 Am I?

1              MR. AUSTIN:  No, Your Honor.  You're not, Your Honor.

2   But the point on this -- but at no time since April of 2006

3   when the merger agreement was signed has anyone stepped forward

4   to present a better deal.  The point is, Your Honor, there's no

5   point to then take discovery on what anybody else wanted to do

6   regarding the purchase of the company's assets.  So the two

7   issues that they say they need discovery on we submit, Your

8   Honor, is irrelevant.  There's nothing important to discover

9   that's going to impact the issue that is before the Court,

10  which is simply the question of when the merger is completed,

11  when Babcock and Brown makes it all cash tender for all the

12  company's shares, and LaSalle Bank receives approximately $116

13  million, can LaSalle Bank take that money and invest it in

14  accordance with provisions of the Bankruptcy Code without in

15  any way having to post the bond.

16              We submit, Your Honor, that is is nothing that is

17  subject to a dispute.  There are no facts that will impact

18  whether or not this can occur, and that the issue before the

19  Court is simply a legal determination whether and to what

20  extent the Court will allow the motion in aid of execution.

21  Thus, Your Honor, we ask the Court to grant our motion for a

22  protective order and, to the extent possible, quash the

23  subpoena against LaSalle.

24              THE COURT:  I take it that the debtor at this point

25  is not disputing that the plan has been substantially

**J&J COURT TRANSCRIBERS, INC.**

16

1  consummated.

2         MR. AUSTIN:  The debtor does not dispute that, and,

3  frankly, no one else disputes that, Your Honor.  In fact, we

4  filed a notice in late December of '04 giving notice of

5  substantial consummation, and to further confirm that, Your

6  Honor, even the Magten appeal of the confirmation order, Judge

7  Farnan in the last few months has dismissed that appeal on the

8  grounds of equitable mootness, which obviously is based on the

9  fact that the plan has been consummated, and Magten has not

10 appealed that decision to the Third Circuit.  So from that

11 standpoint, Your Honor, the confirmation order is a final --

12 truly final order at this point.

13        THE COURT:  All right.  And so the essence of not the

14 discovery dispute but the underlying dispute is whether the

15 relief that's being sought here is, in fact, simply a request

16 to the Court to aid in the plan's implementation.  The

17 objectors say, nah, it's a purported improper amendment to the

18 plan.

19        MR. AUSTIN:  That is their position, Your Honor.

20 Certainly, it's not our position.

21        THE COURT:  Okay.

22        MR. AUSTIN:  Your Honor, may I approach with a copy

23 of these --

24        THE COURT:  You may.

25        MR. AUSTIN:  -- the schedule and the prior notice?

1          THE COURT:  You may.  Thank you.  Other counsel have

2  them as well?

3          MR. AUSTIN:  Yes.

4          THE COURT:  All right.

5                    (Pause)

6          MR. AUSTIN:  And, Your Honor, I might say that --

7  also that at this point everyone understands how many shares

8  were put into the disputed claim reserve from the very

9  beginning, because there's been a lot of negotiations,

10  discussions, conversations, even pleadings relative to all

11  those shares that went in at the very beginning.  So that to my

12  knowledge there's no dispute that at this point we didn't --

13  about five -- we did put 4,409,100 shares in that reserve.

14          THE COURT:  All right.  Thank you.

15          MR. AUSTIN:  Thank you.

16          THE COURT:  Let me hear from the objectors.

17          MS. FATELL:  Good afternoon, Your Honor.  Bonnie

18  Fatell from Blank Rome for Magten.  I just wanted to introduce

19  my co-counsel, Bonnie Steingart and Gary Kaplan and Jordana

20  Nidritch from the Fried Frank firm and also -- for Magten --

21  excuse me -- and also John Snellings from Nixon Peabody for Law

22  Debenture.

23          THE COURT:  Okay.

24          MS. STEINGART:  Good afternoon, Your Honor.

25          THE COURT:  Good afternoon.  Now, after having said

18

1  that I'd like to address the discovery issue first as a

2  threshold matter, I'm going to ask you a question with respect

3  to the substance of your objection.  I'm going to start by

4  noting I guess a circumstance that I would consider to be quite

5  unusual in a bankruptcy proceeding, and that is a party saying

6  I'd rather have the stock than the cash.  It's almost always

7  the other way around.  What's happening here?

8        MS. STEINGART:  Well, what's happened here is that we

9  have a motion where, first of all, the debtor has cited two

10 provisions of the Code which really don't apply to what they're

11 doing, and we'll get to that.  But what the Northwestern plan

12 of reorganization did was to provide something called the new

13 common stock as the plan currency.  Indeed all holders of

14 claims and interests other than those that received cash as

15 administrative claims receive new common stock, and the new

16 common stock had a number of attributes.  Many of those

17 attributes were described in the plan in Section 5.3 and 5.4.

18 And, in addition, there was a registration rights agreement

19 which described additional attributes of that stock.

20       What the debtors now propose to do is to say the plan

21 currency, which has a lot of stuff are pertinent to it that

22 cash does not, is something that we want to extinguish at a

23 point in time when we have not completed making our

24 distributions under the plan.  And, Your Honor, I do not think

25 that the Code permits that.  Indeed I think that there is no

**J&J COURT TRANSCRIBERS, INC.**

19

1  case where under 1142(b) or under 105 a court has changed the

2  nature of the consideration that was given to holders of claims

3  and interests after a plan has been substantially consummated.

4         THE COURT:  Well, let me ask it this way.  What are

5  these attributes that make holding of the stock so much more

6  valuable?  And I have to assume that that would be the impetus

7  for such an objection than cash.

8         MS. STEINGART:  Well, you know --

9         THE COURT:  Else why would you care?

10        MS. STEINGART:  Right.  Value is in the eyes of the

11  beholder, and what the plan provides and what the plan is a

12  contract to do on the part of the debtor is to distribute the

13  new common stock.  Once the debtor has sort of closed its case,

14  once the consideration that is provided for in the plan is

15  fully distributed, the fact that that stock may undergo changes

16  in what it represents or being cashed out is another story.

17  But at this point what the Court is -- what the debtor is

18  asking the Court to do is to modify the plan.

19        One might argue that most people would rather have

20  cash than stock, but even if that's the case, that really

21  doesn't matter.  What matters here is that the request is a

22  modification and not merely a motion in aid.  If we look at the

23  words of 1142(b), what 1142(b) says is that, "The Court may

24  direct the debtor and any other necessary party to execute or

25  deliver or to join in the execution or delivery of any

1  instrument required to affect a transfer of property dealt with

2  by a confirmed plan and to perform any other act including

3  satisfaction of any lien that is necessary for the consummation

4  of the plan." Eleven 42(b) permits the Court to order acts to

5  be taken that are necessary for consummation of the plan.

6  Conversion of the new common stock into cash is not necessary

7  for the consummation of the plan. Indeed what was necessary

8  for the consummation of the plan was the issuance and the

9  distribution of that new common stock. So 1142 does not apply.

10      THE COURT: Well, let me ask what is it that you

11  think you need to know in order to prepare the appropriate

12  opposition to the debtor's motion here in the way of discovery?

13      MS. STEINGART: Well, the issues here, to the extent

14  that as a matter of law the debtor cannot convert these shares

15  to cash, is to establish to the Court's satisfaction that the

16  debtor indeed had every option and opportunity and motivation

17  to provide directly in the plan disclosure statement and

18  provisions of the disputed claims reserve that in the event

19  that there was transactions that converted the nature of the

20  currency being distributed to claims in interest, that that --

21  that the currency in the disputed claims reserve would be

22  adjusted accordingly. That given the tenor of the discussions

23  and the number of the discussions that were occurring prior,

24  during, post, every period of time, that that was something

25  that the debtor would have been obliged to do in order to get

21

1  the relief that it wants today.  And I think with all due

2  respect --

3           THE COURT:  Well, are you suggesting that the debtor

4  here had some motive in constructing the plan the way it did?

5           MS. STEINGART:  I do.  I think it did, Your Honor.

6           THE COURT:  And what evidence do you have of that?

7           MS. STEINGART:  Well, that's why I would like to --

8  that's what I'd like to discover.  With all due respect to Mr.

9  Austin, Your Honor, I think that there were substantial

10 discussions that were occurring not only in connection with the

11 plan and disclosure statement but in the period that

12 immediately followed confirmation and during that period where

13 there were substantial discussions with lots of people.  I know

14 that Mr. Austin says everything's disclosed, but that's what

15 discovery's about, Your Honor.  I think that we get to test

16 that.

17           I think that the other thing we get to test are the

18 kinds of things that we talked about in connection with the

19 plan and disclosure statement in terms of why the provisions of

20 the disputed claims reserve are what they are, why there

21 weren't further provisions included with respect to merger.

22 There was --

23           THE COURT:  But what -- let me ask you this.  What --

24 understanding how things are developing, what is it you think

25 should've been -- let me ask the question in two parts.  The

22

1  debtor says all we're asking for is a remedy which has the

2  effect of treating every Class 9 claimant identically.  So if

3  that's true, and you can tell me if you think it's not -- what

4  is it that could've been or should've been put in the plan

5  which would've made the result any different?

6          MS. STEINGART:  Well, I don't think all they're

7  asking for is for every Class 9 claimant to be treated

8  identically, because there are Class 9 claimants who have new

9  common stock.

10          THE COURT:  But apparently not for long.

11          MS. STEINGART:  Well, possibly not for long.  I think

12  that to the extent that the debtor cannot alter the terms and

13  the rights and the privileges that are pertinent to the new

14  common stock in Class 9, those rights may last a little bit

15  longer.  Okay?  That's number one.

16          Just because the debtor says it's a conclusion that

17  everyone is getting the same thing if they change what the plan

18  provides that people get.  So it's sort of saying after the

19  fact that if I say your white dress is red, well, then you've

20  always had that red dress.  That's the nature of changing

21  something.  Just because everyone -- that things in everyone's

22  hands are getting changed does not mean it's not being changed,

23  and I don't think that given the structure of the Code and the

24  structure of the plan that there is a whole lot of discretion

25  about that.

1          THE COURT:  So your position --

2          MS. STEINGART:  Once the Court --

3          THE COURT:  It seems to me the result of your

4  position is either that the debtor can't complete a merger, or

5  there's a period of time, which could be unlimited, during

6  which it may not complete a merger until the claims dispute in

7  which you are now embroiled is resolved.  Is that -- I mean it

8  seems to me one of those two has to result from the position

9  that you're taking.

10          MS. STEINGART:  I think it does, Your Honor.

11          THE COURT:  And does that make sense?

12          MS. STEINGART:  And I think it does make sense.

13          THE COURT:  Tell me why.

14          MS. STEINGART:  And I think it makes sense, because

15  the debtor really, to the extent that the implication of the

16  Court's question is is the debtor being put in jail, is the

17  debtor being restrained from having the kind of use of its

18  assets that it should have after the plan is confirmed.  Any

19  use of the debtor's assets after confirmation of the plan is

20  impacted by the plan itself and the agreements and the

21  structure of the plan.  That's number one

22          Number two.  The debtor has always had the ability

23  with respect to disputed claims and disputed claims reserves to

24  set itself free.  The debtor had the ability to structure the

25  plan and the provisions of the disputed claims reserve in the

24

1  way that it chose.  The debtor had the ability to structure the

2  merger agreement and the continuation of the attributes of the

3  stock in the disputed claims reserve in the way it chose to do

4  it.  The debtor had the opportunity to settle the disputed

5  claim with Law Debenture and Magten in the way that it chose to

6  do it.

7          Indeed when we had the hearing on our 9019, one of

8  the -- and I'm not going to say the only, but one of the

9  reasons why the debtor said we can't effectuate this agreement

10  that we negotiated over a number of months and told the world

11  was a great agreement was, because we don't know how much stock

12  we have in the computed -- in the disputed claims reserve.

13  Even though we settled with Magten and Law Debenture for an

14  amount that's less than their Class 9 claim, we can't pay that

15  amount, because there may be other disputed claims that have a

16  right to that stock, and there may not be enough there.  Even

17  when the debtor got to the point where it's got such a surplus

18  because of everything else that was settled in that disputed

19  claim reserve that the Plan Committee said, hey, how about a

20  surplus distribution.  Even when the debtor got to that point

21  where it had a settlement that it had already said was in the

22  best interest that was less than the Class 9 claim, it still

23  didn't settle the claim and set itself free.

24          So we have four different junctions here where the

25  debtor can have what it wants, do what it wants, set the terms

**J&J COURT TRANSCRIBERS, INC.**

1 and conditions of all of these things as it wants, and it has

2 determined not to do that.  So, Your Honor, it does make sense.

3 It does make sense, because the debtor has painted the box.  It

4 has painted the cover.  It has tied itself in, and it does have

5 the ability to get itself out.

6          THE COURT:  And how would that be, by settling with

7 you?

8          MS. STEINGART:  Yea, I think that's right.  And I

9 think that that is part of the pressure that's always on a

10 debtor in the context of a bankruptcy proceeding.  I think that

11 you have to decide what you're going to fight, what you're

12 going to not fight, what it's going to cost you, what

13 limitations it will place on your range of activities

14 afterwards.  Again, the plan and the terms of the disputed

15 claims reserve were always in control of the debtor.  It

16 decided what it would say.  We didn't decide what it would say.

17 We asked on more than one occasion that the right to have stock

18 maybe should be thought about as currency of some kind and

19 could be monetized.  They fought against it, they convinced

20 Judge Peterson against it, and now they come with the complete

21 opposite position.

22          I think that the terms of the plan preclude the

23 relief that the debtor is asking for here.  I think that the

24 cases are explicit on this.  If the Court looks at the U.S.

25 Brass case, we have a situation here -- and that was a Fifth

1 Circuit case, Your Honor, we cited in our brief where like this

2 a debtor came to the Court and said I just need a motion in

3 aid.  I need a motion in aid, so the Court can approve this

4 settlement, and the Court said it's very nice for you to call

5 this a motion in aid, but it's not a motion in aid.  You want

6 to change the recovery that the insurer is getting when the

7 insurer has negotiated to have you litigate and settle before a

8 judge.  The fact that you want to litigate and have a binding

9 file decision by an arbitrator changes --

10              THE COURT:  How --

11              MS. STEINGART:  -- what the insurer is getting?

12              THE COURT:  Does what the debtor requests here change

13 your recovery?

14              MS. STEINGART:  It changes the recovery, because the

15 new common stock is nothing like cash.  The new common stock

16 can go up.  The new common stock can go down.  The new common

17 stock has voting rights.  The new common stock is publicly

18 traded.  The debtor cannot go into a transaction that changes

19 that new common stock to something that is not described in the

20 plan and disclosure statement.

21              THE COURT:  But absent the bankruptcy overlay here,

22 in a cash out merger the relief that's requested here is

23 something that would happen as a consequence of the operation

24 of such a merger.  There may be rights that you could assert

25 having to do with valuation or perhaps other things, but the

27

1  debtor here has alleged it's received sufficient votes for the

2  merger.

3          MS. STEINGART:  But that's only, Your Honor -- that's

4  a very big assumption, and the big assumption is that it can

5  change the rights that the plan -- that the confirmation plan

6  permits it to change the rights that are pertinent to the

7  stock, and there's nothing in the plan that permits it to do

8  that.

9          THE COURT:  Almost every bankruptcy case and

10 accommodations that are made in proposing plans or plans that

11 are confirmed over objections are almost always about the

12 money.  I guess there might be some that you could point to and

13 say, well, there was something else involved, either instead or

14 in addition to, but it's usually all about the money, and I

15 don't see why this 11 is any different.

16         MS. STEINGART:  Well, it's not that -- it's -- Your

17 Honor, the question today is not whether it's about the money.

18 The question today is whether the terms of the plan restrict

19 the activity that the debtor proposes to undertake.

20         THE COURT:  And I think that you framed the question

21 correctly, but to answer the question I have to examine what

22 the substance of the relief that's being requested is, and it's

23 to take something -- it's to take two things of equal value and

24 exchange them, and there's nothing that you've said to me that

25 tells me that there's some reason why they're not of equal

28

1  value.

2      MS. STEINGART:  I don't think that's -- that can be

3  the question, Your Honor.  I think the question, Your Honor,

4  here is more limited and not subject to that kind of

5  rationalization.  I think the question is what does the Code

6  say you can do to get the debtor out of this box, and I don't

7  think the Code says that you can decide in a abstract way that

8  the value of the stock and the value of the money for these

9  purposes are equal.  There's no case where a court has said

10  that the currency that the plan has identified as the currency

11  for claims and interest can be changed under this rubric.

12  None.  And the cases are legion that say that even though the

13  debtor can do what it want with its property, it can't do

14  things that are contrary to the provisions of the plan once you

15  have substantial consummation.

16      And so this is not in aid of consummation.  It's not

17  under 142(b).  There's no authority or basis for it to be under

18  105, so there's no power to do this.  The debtor has power to

19  help make this happen.  The debtor has means to help make this

20  happen, or the debtor can wait.  The debtor can wait until

21  these claims are litigated, until they're decided, and then it

22  can go ahead -- if it wins, then it can do with the disputed

23  claim what it will.

24      THE COURT:  What's the present procedural posture of

25  the litigation?

1          MS. STEINGART:  Well, the present procedural posture

2  of the litigation is that the debtor has talked about

3  stipulating to the fact that there was uneven value given.

4          MR. AUSTIN:  Your Honor, I'd have to interpose an

5  objection here --

6          MS. STEINGART:  Okay.

7          MR. AUSTIN:  -- because I think some of the

8  discussions that she's now getting into may impart on

9  discussions between -- and some settlement reports and non-

10 public information which Mr. Reisman can report on.  That

11 doesn't go to the posture of the litigation.

12         THE COURT:  Yes, I'm just interested --

13         MS. STEINGART:  I'm sorry.  It's not non-public.

14 We've done it before a magistrate, Your Honor.

15         THE COURT:  I'm just interested in learning --

16         MS. STEINGART:  It's not -- and a special master.

17 It's not non-public.

18         THE COURT:  Counsel, I'm just interested in learning

19 where the litigation stands procedurally.

20         MS. STEINGART:  The litigation stage is that we are

21 doing discovery.

22         THE COURT:  Okay.  Thank you.

23         MS. STEINGART:  And that we have a scheduling order

24 that contemplates a trial that will start I think in the spring

25 -- the late spring of this year.

1          MR. AUSTIN:  December.

2          MS. STEINGART:  Of December?

3          MR. AUSTIN:  December.

4          MS. STEINGART:  That's not my recollection.  Okay.

5          THE COURT:  All right.

6          MS. STEINGART:  Thank you, Your Honor.

7          THE COURT:  Okay.  Is that it from the objectors'

8 side?

9          MR. SNELLINGS:  Your Honor, John Snellings from Law

10 Debenture.  I join in Ms. Steingart's arguments, but I don't

11 need to add anything.

12          THE COURT:  All right.  Anyone who I haven't heard

13 from care to be heard on this?

14          MS. PHILLIPS:  Good afternoon, Margaret Phillips of

15 Paul, Weiss, Rifkind, Wharton, and Garrison on behalf of the

16 Plan Committee.  We filed a limited objection which essentially

17 has been resolved with our reservation of rights and also with

18 respect to the proposed order.

19          We don't object to the motion in aid that's before

20 the Court that's been filed by Northwestern.  And, in fact, you

21 know, as a representative of creditors who have a contingent

22 interest in the disputed claims reserve, you know, we would

23 welcome if the merger actually happens maximizing the value of

24 what's going to ultimately be distributed from the disputed

25 claims reserve.  That's all.

**J&J COURT TRANSCRIBERS, INC.**

31

1          THE COURT:  Thank you.

2          MR. AUSTIN:  I think, Your Honor, there's one -- as

3   you get into the arguments, you see ultimately -- on the

4   discovery you see that you can get into some of the issues

5   relative to the substance of the pending motion.  I think an

6   initial point of the rebuttal -- and it's something that is

7   very, very telling -- is that Ms. Stein -- excuse me --

8   response reinforces the point that this is just another effort

9   throughout this long bankruptcy proceeding by Magten and Law

10  Debenture to attempt to leverage and bring pressure to the

11  debtor to settle the litigation which is currently defending

12  before Judge Farnan.  We submit this Court should see that

13  objection for what it is and effectively overrule it, because

14  they're not the only one that has an interest -- as Ms.

15  Phillips noted, has an interest in the disputed claim reserve.

16  Under the terms of the plan, to the extent that there is stock

17  left in the disputed claim reserve, or ultimately now going to

18  be cash, that corpus then gets distributed pro rata to all

19  other previously Class 8 -- 7, 8, and 9 claims.

20          And just to put it in perspective, Your Honor, the

21  face amount of their remaining claims is approximately $50

22  million.  If you use the formula, which is the allowed claim

23  divided by $140 million of claims, which was the claims and the

24  disputed claims, multiplied by 4,409,100 shares, Magten, if

25  they got -- and Law Debenture -- 100 percent of their claim --

 1 face amount of the claims, would get approximately 1.8 million

 2 shares.  Well, that means there still would be approximately

 3 1.2 million shares left over that then gets re-circulated or

 4 redistributed to basically the constituents represented by the

 5 Plan Committee.  That's how the plan operates.  And indeed even

 6 Magten and Law Debenture, who then have an allowed claim, would

 7 share in a little bit additional distribution associated with

 8 that.

 9          In this instance the argument was that the Code

10 doesn't allow this.  Well, it does, because the Code says the

11 goal of Chapter 11 is to reorganize.  The goal of Chapter 11 is

12 then rehabilitate and go out on the back side and have your

13 assets re-vest and operate your business as if the Chapter 11

14 didn't happen.  And that is indeed what happened.  And in this

15 instance not only has Northwestern achieved a remarkable

16 reorganization, because it did reorganize, it's plan was

17 overwhelmingly confirmed by its creditors.  It received and

18 distributed stock, and this stock has been distributed.  It has

19 gone to the transfer agent.  The difference here is Magten and

20 Law Debenture don't have it in their hands.  But that stock's

21 been distributed, and that stock had a value -- a plan value,

22 as we call it, at approximately $20 a share.  This company has

23 now operated 26 months post-confirmation and has achieved by

24 paying dividends and has also now achieved a merger, which

25 nobody is objecting to, of $37 a share.

**J&J COURT TRANSCRIBERS, INC.**

1          Now, they're sitting here saying what are we going to

2  do.  Well, if you follow their logic, their point would be that

3  any Chapter 11 case that distributed stock, if one shareholder

4  came up and says, you know, I rather have, for example, the

5  dividends.  I don't want the cash, because I can't necessarily

6  reinvest that.  You can't do the merger, unless the plan

7  specifically says that.  That's not what the law says, Your

8  Honor.  The law says post-confirmation you operate your

9  business in accordance with applicable law.  Here we're

10 operating in accordance with applicable law.  That law is the

11 law of the State of Delaware.  Delaware -- we've gone through

12 the merger.  We've gone through the shareholder vote.  We've

13 gone through the regulatory approval, and all along it's been

14 approved.  And at no time -- and this is an important thing I

15 think, Your Honor.

16         Under the terms of the merger agreement, when this

17 merger agreement went out for shareholder vote, the shares that

18 were in the disputed claim reserve were deemed to count as a no

19 vote for the merger.  As a result of that, Your Honor, those no

20 votes had descending share rights.  But to the extent that

21 Magten and Law Debenture really wanted to contest the value of

22 the merger, they needed to have then interjected or use their

23 descending share rights.  They did not do so, and nowhere along

24 the line have they attempted to interpose an objection to this

25 merger, seek an injunction at state law, or what have you.

34

1            We're simply here today, Your Honor, to say, look,

2    we're going to get money.  Now, they argue, well, you told us

3    you're going to give us a white dress.  Now you're going to

4    give us a red dress.  Well, you still get a dress, and that

5    dress has -- is worth $37, and that's not changing, because

6    even if they had the shares today, even if we could reach an

7    agreement, or could reach an agreement previously -- and we

8    still have disputed claims.  Even if they voted against the

9    merger, the merger would still go forward, because the

10   shareholders have approved it.  They would have no choice but

11   to tender that share on the completion of the merger.

12           THE COURT:  One thing that the objectors say is that,

13   look, you knew that merger was one of the possibilities before

14   the time of confirmation of this plan, but you didn't include

15   that eventuality in the plan.  Why not?

16           MR. AUSTIN:  Well, Your Honor, we did not explicitly

17   say there could be a merger.  And, frankly, to the extent it

18   should have been explicitly stated, I would submit, standing

19   here as counsel that had a major role in drafting, it's

20   probably an oversight, an oversight of my part, oversight of

21   the Creditors Committee's counsel, oversight of management of

22   the debtors, frankly, an oversight even of Magten and Law

23   Debenture.  They didn't say anything.

24           But the point of the plan is this.  The plan is a

25   contract, which they have pointed out, but the contract says

1  deliver me value.  Go out -- here's a share, take it, but now

2  I'm going to be a shareholder.  Deliver me value.  And to the

3  extent there were not explicit provisions, there certainly are

4  implicit provisions where when you read the terms of the plan,

5  the determination of a contract is to enforce the contract in

6  accordance with the intent.

7          At Section 5.7 the plan specifically re-vest the

8  assets in the reorganized debtor.  At Section 5.14 it

9  specifically provides that, "The reorganized debtor may operate

10 its business and may use, acquire, and dispose of property free

11 of any restrictions of the Bankruptcy Code."

12         At Section 9.1 it specifically provided that, "On the

13 effective date the management, control, and operation of

14 reorganized debtor shall become the general responsibility of

15 the board, which shall thereafter have responsibility for

16 management, control, and operation of the reorganized debtor in

17 accordance with applicable law."

18         And even in Section 7.6, which deals with the

19 distributions of allowance of the disputed claims, it

20 specifically provides that, "To the extent there is a claim

21 that's been allowed and it gets a distribution out of a

22 disputed claim reserve, it gets the allowed claim plus any

23 interest, dividends, or other distributions earned thereof."

24         We submit, Your Honor, that while it may have been an

25 oversight not to explicitly say this debtor can go forth and do

36

1  a merger, and in a merger you are bound by law, we submit that

2  under the terms of the plan it is effectively provided for, we

3  didn't need to have to do that, and the law -- the case law

4  that has construed these things have clearly said that once

5  you've gone -- you've been confirmed, once the plan has been

6  substantially consummated, the tutelage of the Bankruptcy Court

7  is supposed to end except for limited jurisdictional points.

8  And those limited jurisdictional points are, in this case,

9  resolved disputed claims.

10        In this particular case we have one -- we have a few

11 disputed claims left.  The primary ones are with Magten and Law

12 Debenture.  And but for that, Your Honor, we would be closing

13 these cases.  We could bring this to quick resolution.  We,

14 unfortunately, are not there, but we do think, Your Honor, that

15 the merger can go forward, and we are not here asking for the

16 Court's approval for that.  If Magten and Law Debenture want to

17 effectively stop the merger, it's not in this forum.  They need

18 to go down to State Court here in Delaware to seek an

19 injunction for that merger.

20        Even if this Court thought it had jurisdiction or

21 they thought this Court had jurisdiction, the forum -- the

22 procedure to do that is not the objection to the motion in aid

23 of execution, but it would be seeking an injunction under the

24 article -- the Section 7 rules of the adversary proceedings.

25 It's not for this simple order.

1          Here today, Your Honor, the only issue we really have

2     before the Court is can LaSalle take the cash it's going to

3     receive, invest it in accordance with the Bankruptcy Code, and

4     not have to post a bond.  So that at that point until all the

5     litigation is resolved, that those -- that cash will earn some

6     interest for increasing the distributions to creditors when we

7     can make a final distribution from the estate.  And at this

8     point -- and from that standpoint, Your Honor, Magten and Law

9     Debenture are in no different position than if we have a group

10    of shareholders that receive stock in accordance with the plan

11    and has held on to that stock through the debtor -- the merger

12    agreement.  Those shareholders -- just like what's happening

13    here, those shareholders would have to tender that stock and

14    receive $37.  Thank you, Your Honor.

15          THE COURT:  Thank you.

16          MR. AUSTIN:  And to be clear from the record, we

17    certainly ask the Court to grant our motion in aid of execution

18    and also to grant the motion to -- for a protective order

19    relative to the discovery.

20          THE COURT:  All right.  Briefly.

21          MS. STEINGART:  Thank you, Your Honor.  I'll be very

22    brief.  Judge, this is -- you know, it's the same thing.  It's

23    head I win, tails you lose.  Always with the debtor, heads I

24    win, tails you lose.  I could've.  I should've.  I would've.  I

25    could've put it in the plan, but I didn't.

1          They have a Section 13.1 that they laud in their

2    brief as something that permits them to do that.  Their Section

3    13.1 says that they can do what's necessary to carry out the

4    purpose and intent of the plan or confirmation.  The merger has

5    nothing to do with the plan or confirmation.  We sent -- we

6    provided the debtor two letters, one immediately when they

7    announced the merger agreement, one before the shareholder vote

8    saying you can't convert these shares.  The plan prevents you

9    from doing it.  Under the plan you can only have in the

10   disputed claims reserve new common stock.  And, Your Honor, I

11   will tender to the Court those letters.  I will tender them

12   also to Mr. Austin, who has I'm sure seen them ad nauseam

13   already.  If I may approach?

14          THE COURT:  Yes.  Thank you.

15          MS. STEINGART:  And the heads I win, tails I lose of

16   it is if we had gone somewhere else, he would've said they're

17   not even shareholders.  So we took the remedy that we thought

18   was available to us.  We wrote to them.  We said this is not

19   going to work.  This is what you need to do, and we were

20   ignored.

21          I don't think that we can save Mr. Austin and

22   Northwest from the plan that it proposed from the plan that it

23   wrote.  As we pointed out to the Court, if you look at the

24   provisions of the warrants, the provisions of the warrants

25   issued in connection with the plan have specific language about

1  what will happen if there is a sale or other disposition of the

2  stock in the company, or if there is some other limitation on

3  the ability to turn the warrants into new common stock.

4  There's no such provision here.

5          Section 7.6 has language that goes to dividends as

6  well as interest, because there are some claims that were

7  payable in cash.  To the extent that the disputed claims

8  reserve refers to claims that are payable in stock, there is no

9  reference to interest.  There are only reference to dividends.

10 And if you look at the distributions that are referred to in

11 Class 9, there are no reference to cash or interest of any

12 kind.

13         You know, I would just bring the Court's attention to

14 a case called Tilliston (phonetic), which we cited.  And I'm

15 just looking for the -- excuse me.

16                      (Pause)

17         MS. STEINGART:  It's a 2001 case, and it was a case

18 where somebody asked where a debtor, because of a parade of

19 horribles that had occurred, was asking for a second

20 reorganization.  And indeed if the debtor had some to this

21 Court and said we need to do a merger because of change in

22 circumstances, and we need a second plan to effectuate the

23 merger, this Court would look at what was foreseeable at the

24 time the first plan was proposed.  And if a merger was

25 foreseeable, and there were provisions in the plan that didn't

1  deal with it, and that indeed made the currency of the plan

2  such that the merger would extinguish it, the Court would say

3  you can't do another plan.  You're bound by the first plan.

4  Why should the debtor be able to do something here which it

5  could not even do if it was proposing to have a second plan of

6  reorganization because of the limitations imposed by the

7  contract it entered into, it designed, it drafted in its own

8  amended plan of reorganization?

9         The words that the Court used in <u>Tilliston</u> is that

10  "The genuine need for a second is established by extraordinary

11  change of circumstances after substantial consummation.

12  Because the debtor should generally be bound by the terms of

13  the confirmation plan and live by the benefits and burdens of

14  its bargain, only changes that are unanticipated and not

15  reasonably foreseeable at the time of confirmation or

16  substantial consummation can justify the filing of a new

17  organization plan."

18         This could not provide a basis for filing a new

19  reorganization plan, and it could not, because it was clearly

20  foreseeable, clearly anticipated.  Indeed the major shareholder

21  that was the driver of the Plan Committee after the

22  reorganization effectuated a change in management of the debtor

23  to drive it towards this merger.  And discovery and presenting

24  evidence before this Court, Your Honor, would show that all of

25  the debtor's efforts in terms of achieving value post-

41

1  confirmation were involved in negotiating and weighing and

2  valuing various merger alternatives.  It was front and center

3  on this debtor's plate, and the debtor chose not to deal with

4  it in this aspect of its plan.  Given all the control and all

5  the debtor's choices here, the Court should not be in a

6  position of extending 1142(b) or the general terms of the plan

7  about continuing jurisdiction and consideration in some sort of

8  expansive way to save the debtor from itself.  That would

9  certainly, Your Honor, not be an equitable result.

10                         (Pause)

11         MS. STEINGART:  And I think that's my queue.  That

12  would not be an equitable result --

13         THE COURT:  Okay.

14         MS. STEINGART:  -- given the circumstances.

15         THE COURT:  Thank you.

16         MS. STEINGART:  Thank you.

17         THE COURT:  I'm going to take a short break.  When

18  the phone issue is straightened out, I'll come back.  Five

19  minutes.

20                         (Recess)

21         THE CLERK:  All rise.

22         THE COURT:  Okay.  Apparently, it was the phone

23  participants who decided they wanted to exit.  Maybe it was

24  something we said.  I don't know.  I'm prepared to give my

25  ruling.

42

1            First of all, with respect to the motion for

2    protective order, I'm going to grant it.  I've heard nothing

3    here today which tells me that any information not already

4    available is needed by the objectors here in being able to

5    mount the appropriate opposition to -- an informed opposition

6    to the motion in aid of the execution of the plan that has been

7    filed by the debtor here.  I find that, at least as I read

8    bankruptcy rule 9016, which incorporates Rule 45, that it's the

9    Court who issues the subpoena that has to determine a motion to

10   quash.  I don't -- I think for me to try to take that even with

11   the agreement of the parties would involve this Court reaching

12   too far.

13            MS. STEINGART:  In light of the Court's ruling, Your

14   Honor, we will withdraw that subpoena.

15            THE COURT:  All right.  With respect to the debtor's

16   motion for substantive relief here, you know, on one level it

17   raises lots of questions, including the ones the objectors here

18   have raised, and that is if a plan's a contract, you know, how

19   firm is the contract.  Bankruptcy Court, I've often said, is a

20   place where -- I don't know how else to say it other than it's

21   a place where insolvent entities bring lots of their problems,

22   most of which get resolved, here.  Sometimes bankruptcy courts

23   are criticized for trying to fix too much.  We are, after all,

24   courts of limited jurisdiction.  So I take very seriously a

25   challenge to the scope of relief that's being requested by

43

1  anyone, including the debtor.

2          That having been said, I am going to grant the

3  debtor's motion and here's why.  There's nothing in the plan --

4  while it could be argued, and has been, that the eventuality of

5  a merger should have been covered in the plan, it was not.  But

6  there's nothing in the plan that precludes the debtor from

7  pursuing a merger, and there's nothing in the plan which, it

8  seems to me, gives some right and perpetuity for distributees

9  of the stock to have it be in that form, which is I think one

10  of the things that has to underlie the objectors' argument

11  here.

12          There's no attribute of the stock that was issued

13  under the plan that's been described to me today that shows

14  that it's value is or would be enhanced over that of having

15  cash.  The proposed relief gives the same treatment to the

16  objectors as to all other Class 9 claimants.  It grants them

17  the same rights they'd have under state law, which wouldn't

18  permit them to hold onto the stock.  I wonder whether the

19  debtor's argument that 1142(b) applies might not call for too

20  broad a reading of this specific and explicit language of that

21  statute, but I think Rule 3020(d) provides sufficient

22  authority.  This is, after all, a request to aid in the

23  implementation of the plan which at its heart involves

24  distributions to creditors, and because of how events have

25  developed, the form of the distribution may change.  But I've

**J&J COURT TRANSCRIBERS, INC.**

44

1  heard nothing that tells me that it in any way impairs or

2  devalues that which might ultimately distributed to the

3  objectors here.

4           If I step away from that and then look to the overall

5  purpose of what the 11 is for, I see no purpose to denying the

6  motion which would have the effect either of precluding or

7  hindering the merger or putting undue -- putting the debtor in

8  a position where there might be undue pressure on it to settle

9  rather than pursue litigation with the objectors here.

10          On the other hand, granting the relief, it seems to

11 me, advances the purpose of the plan, specifically here and of

12 Chapter 11 generally, which is to get value to the creditors,

13 and it seems to me the relief requested here is entirely

14 consistent with the purpose of it.  So for all of these

15 reasons, I am going to grant that relief.  Now, do you have a

16 revised form of order --

17          MR. AUSTIN:  Yes, Your Honor.

18          THE COURT:  -- based upon your arrangement with the

19 Committee?

20          MR. AUSTIN:  I have a revised --

21          THE COURT:  Okay.

22          MR. AUSTIN:  -- form of order, which I've shared a

23 black lined with the objecting parties.  And, if I may, Your

24 Honor, I can present the clean version as well as the black

25 lined to you.

45

1          THE COURT:  All right.  Does anyone have any comments

2    on the form of revised order being presented?

3                    (No verbal response)

4          THE COURT:  I hear no response.

5          MR. AUSTIN:  And, Your Honor, I also have a form of

6    order -- simple form which grants the motion for a protective

7    order.  I have given a copy to the objecting parties.  It

8    simply says that the motion is granted, that there is a

9    response from Northwestern is required for production of the

10   documents, and they're prohibited from proceeding with the

11   deposition of Mr. Hanson, and that this order takes effect

12   immediately, which I'd like to present to the Court.

13         THE COURT:  All right.  One moment.

14                    (Pause)

15         THE COURT:  I am making a handwritten addition to the

16   proposed form of order that was just handed up, and it's to add

17   a phrase that simply says, "After due deliberation and for good

18   and sufficient cause, therefore, and for the reasons stated on

19   the record --"

20         MR. AUSTIN:  Thank you, Your Honor.

21         THE COURT:  "-- it is hereby ordered," and with that

22   I've signed that order.

23                    (Pause)

24         THE COURT:  All right.  Any comments on this form of

25   order?

**J&J COURT TRANSCRIBERS, INC.**

46

1          MR. KAPLAN:  Your Honor, for Magten, Gary Kaplan from

2  Fried Frank.  The only comment is paragraph 2 we think is

3  unnecessary.  The first ordered paragraph is that the motion is

4  granted.  Having a prohibition on proceeding with depositions,

5  motion for a protective order is granted.  It's granted.  I

6  don't think we need an order that prohibits us from doing

7  anything.  I don't think there was an injunction or otherwise

8  that was brought.

9          MR. AUSTIN:  If the Court wants to strike, and they

10 understand that we're not obviously responding to any documents

11 or producing depositions, we're fine with that, Your Honor.

12         THE COURT:  So your request is that I strike out

13 paragraph 2?

14         MR. AUSTIN:  I think they request to strike the whole

15 paragraph 2.

16         MR. KAPLAN:  Yes, we -- the motion has been granted.

17 I think that's sufficient.

18         THE COURT:  I've struck that paragraph out, and with

19 that I've signed the order.  Anything further for today?

20         MR. AUSTIN:  Nothing further today, Your Honor.  We

21 thank you for your time.

22         THE COURT:  All right.  Thank you.  This hearing is

23 concluded.  Court is adjourned.

24                         *  *  *  *  *

25

## **CERTIFICATION**

I, PATRICIA C. REPKO, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter to the best of my ability.


/s/ Patricia C. Repko          Date:  February 8, 2007
PATRICIA C. REPKO
J&J COURT TRANSCRIBERS, INC.

# EXHIBIT K

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

In re:                                          :
                                                :     Chapter 11
NORTHWESTERN CORPORATION,                       :
                                                :     Case No. 03-12872 (KJC)
            Reorganized Debtor.                 :
                                                :
                                                :

**ORDER IN AID OF EXECUTION OF PLAN DIRECTING TRANSFER AGENT TO
INVEST PROCEEDS RECEIVED FROM STOCK TENDER UPON CONSUMMATION
OF MERGER IN ACCORDANCE WITH 11 U.S.C. § 345**

Upon consideration of *Reorganized NorthWestern's Motion Pursuant to 11 U.S.C. §§
105(a) and 1142(b), and Rule 3020(d) of the Bankruptcy Rules Seeking Entry of an Order in Aid
of Execution of Confirmed Plan of Reorganization* (the "Motion"), with due notice having been
given and all interested parties having been given an opportunity to be heard, and based upon the
record in this Chapter 11 case and after considering the arguments, presentations and evidence
presented at the hearing to consider the Motion, and it appearing that the relief requested is in the
best interests of Reorganized NorthWestern's remaining Chapter 11 estate and its creditors, and
after due deliberation and for good and sufficient cause therefore, it is hereby ORDERED as
follows:   *and for the reasons stated on the record*

1.  The Motion is GRANTED and any objections thereto are overruled.

2.  The Transfer Agent[1] holding the shares of New Common Stock in the Reorganized
NorthWestern that are allocated to the Disputed Claims Reserve shall invest all cash proceeds it
receives from Babcock & Brown Infrastructure Limited in connection with the Merger
Agreement with respect to the New Common Stock held in the Disputed Claims Reserve, plus

---

[1] All capitalized terms not otherwise defined have the meaning ascribed to them in the Motion.

any dividends paid on such stock prior to the effective date of the Merger Agreement (collectively the "Proceeds"), in one or more interest-bearing money market accounts with federally-regulated depository institutions in the United States in accordance with 11 U.S.C. § 345. Such Proceeds and all interest earned thereon after the effective date of the Merger Agreement shall be distributed in accordance with the Plan.

3. The Transfer Agent is relieved from any requirement that it be required to post any bond in conjunction with the investment of the Proceeds as might otherwise be required under 11 U.S.C. § 345 or otherwise.

4. This order shall take effect immediately upon entry.

5. The Court retains jurisdiction to hear and determine all matters arising from implementation of this order.

Dated: February ⌊, 2007

HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT L

1

2                UNITED STATES BANKRUPTCY COURT
                      DISTRICT OF DELAWARE
3

4    IN RE:                    .        Chapter 11
                               .
5    NorthWestern Corporation, .
                               .
6        Reorganized Debtor(s). .    Bankruptcy #03-12872 (KJC)
     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
7
                            Wilmington, DE
8                          February 20, 2007
                             11:00 a.m.
9
                    TRANSCRIPT OF MOTIONS HEARING
10         BEFORE THE HONORABLE KEVIN J. CAREY
               UNITED STATES BANKRUPTCY JUDGE
11

12   APPEARANCES:

13   For Reorganized Debtor(s):    Victoria Watson Counihan, Esq.
                                   Greenberg Traurig, LLP
14                                 The Nemours Building
                                   1007 North Orange Street
15                                 Wilmington, DE 19801

16                                 Joseph Pizzurro, Esq.
                                   Curtis, Mallet-Prevost, Colt
17                                 & Mosle, LLP
                                   101 Park Avenue
18                                 New York, NY 10178

19   For Magten:                   Gary L. Kaplan, Esq.
                                   Fried, Frank, Harris, Shriver
20                                 & Jacobson, LLP
                                   One New York Plaza
21                                 New York, NY 10004

22                                 Jodanna L. Nadritch, Esq.
                                   Fried, Frank, Harris, Shriver
23                                 & Jacobson, LLP
                                   One New York Plaza
24                                 New York, NY 10004

25

2

```
1                                    David W. Carickhoff, Esq.
                                     Blank Rome, LLP
2                                    Chase Manhattan Centre
                                     1201 Market St.-Ste. 800
3                                    Wilmington, DE 19801

4     For The Plan Committee:        Margaret A. Phillips, Esq.
                                     Paul, Weiss, Rifkind, Wharton
5                                    & Garrison, LLP
                                     1285 Avenue of the Americas
6                                    New York, NY 10019

7                                    Eric M. Sutty, Esq.
                                     The Bayard Firm
8                                    222 Delaware Ave.-Ste. 900
                                     Wilmington, DE 19899
9
      For Law Debenture:            Kathleen Miller, ESq.
10                                   Smith Katzenstein Furlow, LLP
                                     The Corporate Plaza
11                                   800 Delaware Ave.
                                     Wilmington, DE 19899
12
      Audio Operator:               Ken Brown
13
      Transcribing Firm:            Writer's Cramp, Inc.
14                                   6 Norton Rd.
                                     Monmouth Jct., NJ 08852
15                                   732-329-0191

16   Proceedings recorded by electronic sound recording, transcript
     produced by transcription service.
17

18

19

20

21

22

23

24

25
```

3

1          THE CLERK:  All rise.  Be seated please.

2          THE COURT:  Good morning.

3          MR. KAPLIN:  Good morning.

4          MS. COUNIHAN:  Good morning, Your Honor, Victoria,

5    Counihan from Greenberg Traurig on behalf of the Reorganized

6    Debtor, NorthWestern Corporation.  I have here with me today

7    Joseph Pizzurro from the Curtis Mallet firm who will be arguing

8    on behalf of NorthWestern.  I believe Mr. Pizzurro was pro

9    haced in the adversary proceedings that are pending in front of

10   Judge Farnan, but I'm not sure if we ever submitted pro hac

11   papers for him in the Bankruptcy Court.  So I would move his

12   admission pro hac vice today.  And we'll follow up with papers

13   to the extent that they haven't been filed in the Bankruptcy

14   Court.

15         THE COURT:  Very well.

16         MS. COUNIHAN:  Thank you.

17         MR. KAPLAN:  Morning, Your Honor, Gary Kaplan from

18   Fried Frank here on behalf of Magten.  We're here today, Your

19   Honor, on Magten's motion pursuant to Rule 8005 for a stay

20   pending appeal from this Court's February 1st, 2006 Order that

21   was entitled The Order in Aid of Execution of the Plan, but

22   which, as we argued before Your Honor several weeks ago, we

23   believe that the order did a lot more than that.  And actually

24   sought a modification of the plan.

25         Your Honor, the stay is necessary to permit Magten and Law

4

1   Debenture to have appellate rights and not run into the risk

2   that we're going to find ourselves mooted out.

3           THE COURT:  Well, let me ask you this.

4           MR. KAPLAN:  Sure.

5           THE COURT:  I think the Debtor here has a number of

6   good arguments which indicate the relief that you seek should

7   not be granted.  But the threshold one is you're trying to fit

8   a square peg in a round hole.  The relief you request has

9   nothing to do with the order that I entered.

10          MR. KAPLAN:  Your Honor, respectfully, I disagree.

11  NorthWestern is trying to have it both ways.  What they came to

12  Your Honor with -- they said, well, we don't need to do this,

13  and we're not asking you to find that this doesn't violate the

14  plan.  But in order for them to get the relief that they're

15  seeking Your Honor did address, and had to address, whether or

16  not they could ultimately cash out the stock that's in the

17  reserves.

18          There's really two parts to the relief that they were

19  seeking.  The second part, and what the order addresses,

20  presupposed an answer to the first one.  And Your Honor

21  recognized that, and that's why in Your Honor's decision Your

22  Honor went through whether or not the plan contemplated a

23  merger, whether this was appropriate or not.  Because you

24  cannot get to what do we do with the cash, unless you answer

25  the fundamental question that is, can we actually get the cash?

5

1  And that is --

2      THE COURT: Well, focus most narrowly. The earlier

3  reading -- ruling should be read this way. A plan fiduciary

4  came to the Court seeking guidance on what it should do with

5  funds which were to come into its possession. And the order

6  granted the guidance that it asked for, that is, investment

7  advice. And I don't know how -- well, obviously the issues are

8  related. It's not like there's no relation between them. But

9  in terms of the specific relief that was granted, all that was

10  granted was permission to invest the funds to be received as a

11  result of the merger in a specific way.

12      MR. KAPLAN: It -- but -- and as Your Honor said,

13  they're so related and intertwined, you can't say, let's have

14  an order that addresses how we're going to invest the cash

15  received in the merger without dealing with the fact that we

16  have a plan with which Your Honor has jurisdiction to enforce

17  that says that we're not supposed to get cash, that we're

18  supposed to get stock. And what's gonna happen to us, as

19  Magten all of a sudden our Claimants allowed in six months a

20  year. We show up and say, okay, give us the stock. And

21  they're gonna say, no, no, no. You got cash. And we say,

22  wait, the plan says very clearly in section 4.9 and in 7.1 we

23  are supposed to get a pro rata share of new common stock. And

24  7.1 says that when we get that distribution, when we ultimately

25  have an allowed claim, we get the distribution as if our claim

6

1   was allowed on the effective date.  On the effective date, no

2   dispute, we get stock.

3       We show up at their door and say, this is the plain terms

4   of the plan, give us our stock.  And they say, what are you

5   talking about?  The Judge said we can cash this out into cash,

6   you have no other relief because we cashed you out.  And in

7   fact, the Judge actually found in his decision that the plan

8   didn't address a merger, didn't preclude a merger, and that

9   this does not violate the terms of the plan.

10      So -- and I think Your Honor's discussion about whether

11  1142 permitted this went straight to the issue of whether the

12  plan permits this or not.

13          THE COURT:  But what about the Debtor's argument that

14  you haven't directly challenged the merger in any form?  The

15  proposed merger, in any form.

16          MR. KAPLAN:  Well, what we do in or forum, Your Honor

17  -- well, two things on that.  First, I have no doubt that if we

18  did we would be hauled into Court for interfering with the

19  transaction.  They would say whether it be discharge injunction

20  or some other thing, they're gonna say, the plan is being

21  enforced, how can you be out there doing it?  And they'll

22  choose whichever forum they think is most favorable.

23          THE COURT:  Well, one thing that impresses me is that

24  your client would be unafraid to take an aggressive position in

25  this or in any other forum.  So I wonder whether there's really

1  any reluctance (indiscern.).

2        MR. KAPLAN:  Well, Your Honor, while they are

3  unafraid there are limitations, #1.  Number 2, we don't want to

4  spend the money in chasing things to end up and have them say

5  -- well, two things, let me step back.  First thing is, our

6  primary argument is, and I think it's clear, is that this does

7  not -- that this violates the terms of the plan.  If we go into

8  District Court or Delaware State Court and say, Judge, look at

9  4.9 of the plan, look at 7.1, they're gonna look at us and say,

10  that's what the Bankruptcy Judge is for.  Go talk to him.  And

11  so -- and then we found ourselves -- so we had that.  And I

12  think the Court would frankly be right.  And would I want a

13  Delaware State Court Judge interpreting a plan?  Probably not.

14  And I think that Your Honor would say under the plan and the

15  retention of jurisdiction provision that should come back here.

16  So that's #1.

17        Number 2, we had what -- I won't call it an anomaly,

18  because I think it was intensional, was that the Debtors came

19  to this Court asking for permission.  So we didn't have to go

20  through the stage of saying, do we file injunction papers?

21  Because they came to this Court, and even though they couched

22  it very carefully, they were asking for permission.  They could

23  have said, knowing our position on this, since we sent them

24  letters many, many months ago saying this is problem attic and

25  all that, they could have waited until the merger closed and

8

1    come right in and say, gee, Judge, we have a file of cash, what

2    do we do with it?

3         They could have done that.  And frankly, we submit they

4    would have done that, but they were looking for a Comfort

5    Order.  They were saying, we have something telling us this

6    isn't permitted.  I done know whether the Buyer is nervous or

7    anything else.  I don't know what's going on with that, and

8    we're precluded from discovery to find out what led to this.

9    But they come in for a Comfort Order and say, Your Honor, the

10   merger's not happened yet -- remember, they filed this back in

11   November or December.  Months ago.  And they say, well, tell us

12   what we can do with this cash.  We need to know how to invest

13   this cash.  And Your Honor, frankly, the reason that they were

14   doing it was because they wanted Your Honor to look at it and

15   say, there is no conflict with the plan, this is okay under the

16   plan, and now were we to try to challenge this transfer and any

17   other place they'll say, look, we already had the Bankruptcy

18   Court interpreted the plan and said that this was okay.  And we

19   were frankly getting whip sawed.  They asked for Your Honor's

20   guidance on this.  They get it.  And then we're told, well, you

21   know, that guidance doesn't mean anything and you're not

22   entitled to a stake because it's beyond relief.

23         THE COURT:  Well, but see here's the -- you know, and

24   I don't know, maybe both sides are being too clever by half

25   here, but the Debtor's argument that your request for a stay

1  pending appeal is in substance an injunction against

2  consummation of the merger.  And that resonates with me.

3            MR. KAPLAN:  Well, Your Honor, I think it only is --

4            THE COURT:  Because --

5            MR. KAPLAN:  -- based -- well, I'm sorry.

6            THE COURT:  -- it does, doesn't it?  And isn't that

7  exactly what you want?

8            MR. KAPLAN:  Well, let me say it this way.  It only

9  is because of what they view their order as doing.  I

10 understand that all we're entitle to ask for today under Rule

11 8005 is a stay of the order that Your Honor entered.  The

12 consequences of that -- and if they think well that precludes

13 them from going forward with the merger, then it precludes them

14 for it.  But they can't have it both ways.  I understand I

15 can't stand here on 8005 and say, give me a broad injunction

16 that precludes them from doing anything.  The only thing that

17 8005 gives me is the right to stand here and say, we

18 respectfully disagree with the order that Your Honor entered.

19 We would like to have our appellate rights of the order, and

20 they can proceed, and that order is stayed.

21      If they interpret that, which I think they do, as

22 precluding the merger, whether it be in law or in fact, because

23 whether it be the transfer agent, the Buyer, or something else

24 says, gee, with their being uncertainty I don't want to go

25 forward, that is precisely the problem that we're fazing.

1    They're trying to do so much with this order that they have

2    created a circumstance, or what they tell you out of one side

3    of their mouth is simply a procedural administrative function

4    about what we do with the cash.  And then they're saying, but

5    if you hold that up that's the equivalent of enjoining the

6    merger.

7         THE COURT:  All right.  Have you -- you've provided

8    -- okay.  I look at your proposed Form of Order, okay?  And

9    paragraph 2 says, "NorthWestern shall be prohibited from

10   consummating the BBI transaction" -- which is the merger

11   -- "and surrendering and converting shares to new common

12   stock."  See, technically it seems to me that if relief were

13   warranted the only relief that I would give in the nature of a

14   stay pending appeal is I would stay the affect of the order

15   authorizing investment of cash.  So it seems to me the result

16   would be -- or one result could be, that the plan fiduciary

17   takes the cash and either chooses not to invest it or makes a

18   judgment about how it should best be invested and hope that

19   someone doesn't say that it wasn't properly invested.  I mean,

20   and then the merger goes forward anyway.

21        Now, I guess, as you're arguing, the plan Trustee could

22   say, "All right, I'll hold up on the merger."  I would tend to

23   doubt it.  But that's just speculation.

24        MR. KAPLAN:  Your Honor, what I would say is they

25   knew before they filed the motion what they were getting into.

1    And they've known from day one.  And they could have easily, as

2    I suggested before, said, "You know what, we don't need to deal

3    with this and take up the Court's time on this.  Let's close

4    the merger, come back, and then there's no argument on this."

5    But they don't want that.  They want Your Honor's blessing.

6    They love the transcript of last ruling where Your Honor said

7    in essence there's no conflict with the plan.  That's what this

8    motion was about.  And that's what they got from Your Honor,

9    and that's precisely why they're going forward today.

10         So again, the consequences from it, and that's -- we'll

11   only see depending on what happens with the stay, but they had

12   a reason for doing this.  They had to sit there and say there

13   are discovery fights, as Your Honor recalls, there's Protective

14   Orders, one filed in Chicago.  This was a whole to do where if

15   they thought this was a whole to do about nothing, and all

16   we're talking about was, you know, a week of interest.  Because

17   I have no doubt if the merger had closed and they then came in

18   on an emergency basis and said, "Judge, the merger's closed,

19   we're sitting on a pot of cash.  Shorten notice because we need

20   some -- we need relief on how we can invest this."  They could

21   have done that.  And why wouldn't they do that?  And why

22   wouldn't they avoid all the time and effort of going through

23   this?  And because they want the approval.  And they got the

24   approval.  And now we're getting it both ways, which is they

25   got the approval through in essence a back-door approval, and

1 now we're being told, well, but the order is very limited.  But

2 it's not limited.

3      And just turning -- and I do think that some of the merits

4 -- issues, while I've been arguing them, I think there are a

5 couple of fundamental points on the merits that while -- that

6 were addressed in the decision, or at least that were sort of

7 addressed in the argument below but then didn't make its way

8 into the decision that frankly are why this order does a lot

9 more than they say it does.

10      THE COURT:  Well, then wouldn't the proper remedy

11 have been for you to file a Motion for Reconsideration?  If you

12 think I missed something.

13      MR. KAPLAN:  Well, I think you -- well, respectfully,

14 I think the issues were briefed and argued, and I don't think

15 that the decision covered it.  And I don't want -- I don't

16 think if we had filed reconsideration I know that the comeback

17 would have undoubtedly been, look, you argued it.  The Judge

18 obviously didn't agree with you on those points, and

19 therefore --

20      THE COURT:  But that's always the response to a

21 Motion for Reconsideration.

22      MR. KAPLAN:  I understand.  So -- but so we're stuck

23 in -- I think from our perspective we looked at it as a

24 judgment call that said, look, you know, Your Honor did spend

25 however long it was, an hour, two hours on argument.  That we

13

1   did have -- briefing was completed on this.  And for standard

2   for reconsideration that frankly the fact that the decision --

3   that there were points in the decision that presumably Your

4   Honor considered but rejected, that that wasn't appropriate to

5   come for reconsideration.  That the next move, if you will, was

6   to take it to an Appellate Court.

7          THE COURT:  Again, you know, your client doesn't

8   strike me as being that shy about telling me I might have been

9   mistaken.  Which is in essence in part an argument, in part,

10  that you make in support of the Motion for Stay Pending Appeal.

11  All right.  Well, why don't you tell me what else you'd like to

12  tell me.

13         MR. KAPLAN:  Okay, well, just going to the merits for

14  -- you know, very briefly, and I will not reargue the entire

15  motion, as was argued a couple weeks ago.  I do think that

16  fundamentally this goes to a plan modification.  And it's the

17  point that I made before, which is, by Your Honor giving your

18  blessing to the merger, or saying what Your Honor said in the

19  decision, that is, the merger can go forward and that the

20  merger's not precluded by the plan, Your Honor did not address

21  sections 4.9 and 7.1 of the plan, which -- and 7.6 of the plan,

22  which very clearly say, we're entitled to common stock and when

23  our claim becomes allowed, whenever that is, we get the same

24  distribution we would have gotten on the effective date.  And

25  Your Honor's decision, respectfully, didn't address that.

1      Your Honor looked at the policies of Chapter 11 and said,

2  well, you know, this is reorganization, and it's to help, and

3  this is a good thing for the company.  But it didn't -- Your

4  Honor did not address the fact that we have a plan, and the

5  language of the plan is very clear.

6      And I think -- you know, if there's one decision that I

7  think is very, very telling on this it's the U.S. Brass Corp.

8  decision, 5th Circuit, which we cite in our papers.  There the

9  issue was arguably even more straightforward than this.  Which

10  was, the plan provided for certain claims to be either

11  litigated to the end or settled.  That was the provision of the

12  plan.

13      They came in with a -- also a Motion in Aid, in the

14  vinacular.  People trying to do too much with the motion.  And

15  they came in and said, "We want to go to binding arbitration.

16  We've agreed with the other side we're going to binding

17  arbitration."  And the 5th Circuit looked at that and said,

18  "The plan says litigate to a conclusion or settle.  It doesn't

19  say arbitrate.  And I don't care about whether there's harm to

20  anybody or anything else.  The plan is the plan, and those are

21  the terms that need to be enforced.  And your Motion in Aid

22  can't get you that relief.

23      And respectfully, when Your Honor looked at this Your

24  Honor looked and said, well, what's the difference between cash

25  and stock?  Is there really any difference?  How are you

*Writer's Cramp, Inc.*

Certified Court Transcribers

732-329-0191

1  harmed?  But in our view, the plan is the plan.  The same way

2  the 5th Circuit held in U.S. Brass.  The plan says litigation.

3  It doesn't say arbitration, even though there's all this policy

4  in favor of alternate dispute resolution.  The plan is what it

5  is.  And respectfully, the plan was just altered on us by an

6  order that, while the Debtors now say was very limited in

7  scope, it was a lot more than that.  The plan now provides that

8  as to us, when our claim is ultimately allowed, we're gonna get

9  cash, and not the stock.

10      I think other points that I want to make just briefly --

11           THE COURT:  And how, to go to a -- one of the

12  elements of the standard that you need to meet for entitlement

13  to the relief that you've requested is irreparable harm.  Tell

14  me how you would be irreparably harmed by having to accept cash

15  rather than stock in this case.

16           MR. KAPLAN:  I think, and I know there was a lot of

17  discussion about this during the hearing, and Your Honor is

18  frankly -- I understand I have an uphill climb on this one,

19  but, Your Honor --

20           THE COURT:  Well, actually, I'm waiting --

21           MR. KAPLAN:  Okay.

22           THE COURT:  -- for just a single reason, not that it

23  would change my mind --

24           MR. KAPLAN:  A single --

25           THE COURT:  -- but I didn't hear a single reason why

16

1    it made a difference.

2        MR. KAPLAN:  It makes a difference because what was

3    negotiated for under the plan after a contentious process, and

4    what was voted upon by Creditors, and what our contractual

5    rights entitle us to, is common stock.  Common stock has rights

6    attended to it.  It has upside.  It has risk.  Any person can

7    sit there on any given day and say, do I want to have cash and

8    put it in a bank, or do I want to buy stock and have the upside

9    and everything else that's attendant to it?  And saying that to

10   somebody you're losing the upside opportunity, you're losing

11   the stock that you are entitled to is damage.  I don't think

12   that it's fair to say, you know what, if the stock today is

13   worth $37, then $37 in cash is the equivalent.  Well then

14   saying the same thing, I can back up a truck of pennies and

15   give you that, but it's different.

16       THE COURT:  Well, here's the rub.  And I acknowledge

17   that in theory that there's a difference in the character of

18   each type of property, stock and cash.  And I acknowledge that

19   there could be attributes that would make a cash out

20   inappropriate.  But I heard nothing specific.  For example --

21   I'm just picking an illustration out of the air.  If someone at

22   the hearing where I granted the relief that's been appealed

23   from, that said, you know, Your Honor, this stock is like

24   Berkshire Hathaway.  It's gonna grow beyond -- in value beyond

25   the wildest imagination.  And here's a couple reasons why we

17

1    think that will happen.  Maybe that would have been a good

2    enough reason.  But I heard nothing.  Specific.

3            MR. KAPLAN:  Well, Your Honor, to that point, I think

4    we can look at the history of this stock, and look at -- I

5    mean, let's look at what Creditors were expecting under the

6    plan.  There was a contested valuation hearing at confirmation,

7    and Judge Case at the time -- I believe it was Judge Case.

8    We've gone through a lot of Judges in this case.

9            THE COURT:  I think it was Judge Case.

10           MR. KAPLAN:  He found a value that equated to

11   approximately $20 per share.  By the time of the effective

12   date, when this plan -- when the stock was actually listed,

13   which was about 10, 15 days later, it started trading at $28 a

14   share.  We wouldn't be having this fight if the stock under the

15   plan -- if at the time of confirmation the valuation was

16   actually set right, this fight wouldn't be there.  Because we

17   have securities to which we're entitled to a distribution.  We

18   would be -- we are so far in the money at $37 a share that the

19   whole fraudulent conveyance claim is irrelevant.  The only

20   reason we have a fraudulent conveyance claim is because at $20

21   a share we were arguably out of the money, if you believe, and

22   so --

23           THE COURT:  Look, you point out what might perhaps be

24   one of the drawbacks of, you know, the confirmation snapshot.

25   But you know, there needs to be some finality.  I -- in the

18

1    most hotly contested valuation hearing I had I picked a number

2    at which the stock traded for a little bit and then the Debtors

3    reminded me ever since that it's gone down.  So you know, it

4    can go either way.

5            MR. KAPLAN:  And I wasn't criticizing Judge Case --

6            THE COURT:  No.

7            MR. KAPLAN:  -- but what I was noting though was the

8    fact that this whole dispute, that in terms of the stock value,

9    I mean, they could have said on day one, well, what's the

10   difference $20 a share, we can give you $20 in cash.  Well we

11   have seen since that time the huge upside.  I don't believe

12   that BBI is coming from Australia buying this.  And buying the

13   asset if they think it's overvalued at 37.  People usually --

14   they're usually -- pretty smart, pretty sophisticated people,

15   probably still see some value in it.  My client undoubtedly

16   does, which is why he's fighting for this stock.  And he's

17   entitled to that stock, and that's what was promised to him

18   under the plan.

19       And I think -- moving onto the topic, but I think it's

20   very closely related to this, and that's the judicial estoppel

21   argument, which again, we argued, but respectfully I don't

22   think was really covered by Your Honor.  When we were here

23   before a different Judge on the 9019 settlement one of the

24   issues that was discussed, they said if the plan is specific on

25   the currency, and one of the arguments at the time being made

1  was that the disputed claims reserve had been underfunded and

2  that there was insufficient stock to actually give us the

3  settlement, and Judge Peterson in his decision talked about the

4  dilemma of not having enough.  One of the issues, and one of

5  the things that was raised was, well, you know what?  It's

6  fungible.  And you may get cash.  In NorthWestern the Plan

7  Committee, and Judge Peterson who made comments said, you

8  can't.  It says stock, and you have to get stock.

9      Well, now we're finding ourselves whipsawed while the same

10 party who argued vehemently before and who the Bankruptcy Court

11 agreed with and the District Court agreed with that said stock

12 means stock, you can't substitute that for cash are here now

13 saying, you know what?  Stock and cash, there's no difference.

14 Well, that's what judicial estoppel was intended to prevent.

15 We are in a position of being whipsawed, which is one day we're

16 fighting one fight, the other day it's another fight.  And

17 frankly, the Court is being played with --

18      THE COURT:  Let me go back, let me go back to an

19 argument that was made, and a discussion that was had at the

20 hearing.  And that is, had the stock been in your hands the

21 result would have been no different.

22      MR. KAPLAN:  I agree with that.  But the stock is not

23 yet in our hands.  And today we have a provision in the plan

24 that can't be ignored, which is again 7.6 tells me the day my

25 claim is allowed I show up at the Debtor and say, "Under 7.6

1    I'm entitled to this distribution." They can't argue and say,

2    "Well, some time between the effective date and later on things

3    could happen, therefore I don't have to give you the

4    distribution." That's not what it says. And the terms of

5    their plan, what they are doing, and what Your Honor's order

6    did was change the terms of the plan. Whether it can --

7    whether things can happen after our claim is allowed is

8    entirely different. Once we get the stock we know what

9    happens. And you know what? Once we get the stock they

10   wouldn't be able to come to Your Honor for an order. Because

11   that would be it. They'd close the case and Your Honor

12   wouldn't have continuing jurisdiction.

13       So they use the hook of one disputed claim, because that's

14   all we're talking about is Magten and Law Debenture's claim is

15   it. That's the entire pot is sitting there solely for our

16   claim. And that's why the case is still open, solely for our

17   claim. That's the hook to get into this Court for

18   jurisdiction. And until the day that we get what the plan

19   promises us they're stuck by the terms of the plan.

20       And in terms of timing, and there was a lot of discussion

21   last time about the timing and the Debtors make a lot about

22   this that this is a last ditch effort, we're just trying to

23   hold up the merger, the reason why we're here today is because

24   of all of the tactics that the Debtors have employed over the

25   last several years to delay having a Court decide our case on

21

1  the merits.

2      When Judge Farnan was ready to go and ready to start

3  discovery, at this point I think it's probably like two years

4  ago, after this was -- after a failed mediation, this was after

5  we had a settlement that subsequently we reneged, all of a

6  sudden the Debtor jumped up and said, "Judge, Judge, we want

7  mediation, please." And we said, "Your Honor, we've been

8  there, done that. This is ridiculous." And even Judge Farnan

9  commented and said, "I can understand why the other side thinks

10  this is gamesmanship, but you know what? You're telling me in

11  good faith you're gonna mediate in good faith, I'm not gonna

12  hold that up. We'll mediate and then we'll get started."

13      We went to mediation, we spent a month and a half picking

14  a senior bankruptcy partner in New York, agreeable mediator.

15  We had nothing. There was no proposal. There was nothing. By

16  the time brunch time came around everybody said, what are we

17  doing mediating? Those are the delays -- and that delayed

18  everything. Judge Farnan said, "I'm not starting discovery.

19  I'm not starting to review any of the appellate beliefs. Let's

20  see what happens in the mediation." We had that stall tactic.

21  Once Judge Farnan says, "Okay now mediation is done let's start

22  discovery," we get a Motion for Protective Order that Judge

23  Farnan took a while to decide but rejected it outright. But

24  the District Court rules provide when a Protective Order Motion

25  is filed no discovery.

1    So we're sitting here now at this point not because we

2  wanted to.  We want a distribution.  We wanted our distribution

3  years ago.  We're here because NorthWestern keeps delaying,

4  delaying, delaying.  And now they turned it on us and say,

5  well, you're just here at a last minute trying to force

6  something.  We're not trying to force anything.  We want to get

7  to the merits, which we've been delayed at every turn, and we

8  want to get the distribution to which we're entitled under the

9  plan.

10    Just a couple of other points, Your Honor, also in the

11  decision.  You know, Your Honor I think found that 1142 didn't

12  grant Your Honor the authority to enter the order.  But instead

13  Your Honor said, "Well, Rule 3020 does."  And frankly I think

14  that there's reversible error there that the Court does not

15  have -- the Court cannot say the statute doesn't give me the

16  right, but I can -- I get that right under the rules.

17              THE COURT:  Well, by what right are you here?

18              MR. KAPLAN:  Under Rule 8005.

19              THE COURT:  Exactly.

20              MR. KAPLAN:  But there's no -- but the difference,

21  Your Honor, is that there's no statutory equivalent that deals

22  with it.  1142, which was again the basis for their relief,

23  they said this statutory section gives us it.  And Your Honor

24  looked and said, "Well, I'm looking at the statute.  It doesn't

25  do it."  That's a very different situation than we have.

23

1    Because there you have a statute addresses it but it doesn't go

2    far enough, and it didn't give Your Honor authority.  And so

3    then what Your Honor had to said was, "Okay, the statute

4    doesn't do it, but I can take a rule and the rule does it."

5        And I think there, frankly, if you look at the 3rd Circuit's

6    decision in <u>Branchburg Plaza Associates</u> it was a similar -- it

7    was somewhat of a similar case.  There a Creditor was arguing

8    that a plan could be -- confirmation could be revoked under

9    9024 when 1330 was more limiting than 9024.  And they said,

10   well, 60(b) is more expansive.  So the fact that 1330 has some

11   limitations and that it doesn't work, I'd still like to go

12   9024.  And the 3rd Circuit outright and flatly rejected it.

13   And said, you can't.  If there's a statute that deals with

14   something and that you don't have the right to go under the

15   statute you then -- (microphone noise) sorry -- you then can't

16   look at a rule that's more expansive and say, well, the rule

17   gives me broader rights.  If the -- if there's a statutory

18   provision dealing with something, which here there is, but it's

19   limited in its scope and its terms, you can't use the rule to

20   broaden it.

21          THE COURT:  All right.  Let's move off of merits and

22   -- we've talked about irreparable harm.  Let's talk about the

23   other elements.

24          MR. KAPLAN:  Okay.  With respect to the harm to the

25   other parties, frankly, and I know we're gonna hear a parade of

24

1    horribles, I don't think there is any harm to the other

2    parties.  This was a merger that was never contemplated by the

3    plan and which we view -- and the plan provisions do not

4    contemplate in any way, shape or form that there would be a

5    merger.

6        I talked already about the value of the stock.  What

7    Creditors were entitled to expect to receive under the plan was

8    $20 a share.  Whether the merger goes forward or not it's

9    substantially, substantially, substantially higher than that.

10   And we're not talking about a lengthy delay.  We are willing to

11   -- and we will expedite the appeal in as many ways as we

12   possibly can.  And we expect to go to the extent that Your

13   Honor grants us the stay we expect to be before the District

14   Court immediately asking for an expedited briefing schedule so

15   that we can get this done as soon as possible.

16       I don't know the exact stage of the regulatory approval.

17   But my understanding is we may be able to get the -- may or may

18   not be able to get the appeal done before they finish with the

19   regulatory approval.  But I don't know.  And they certainly

20   won't stipulate to that.  But we are willing to move as fast as

21   we can to get an appeal done before they have the ability to

22   moot us out.

23       And the harm to them is, there is none.  They're saying,

24   "Well, you know, we really like this merger and want it to

25   happen on our time line."  Let's say it happens a week later,

25

1    two weeks later.  I mean, are they saying to the regulator

2    hurry up?  You're causing us harm and delay in each day.  No,

3    it's one of the issues that they have to go through is

4    regulatory approvals and any other approvals that are

5    necessary.  And if one approval is delayed a little bit, if

6    this appeal delays them a week or two weeks, what is the harm

7    to them?  The harm that they're not getting for their stock

8    that's worth 37 they're not getting cash?  Is that their harm

9    when we're being told that stock and cash are the same?  I

10   frankly don't think that they're being harmed.  And that ties a

11   little bit to the bond issue, which we'll get to later.

12       You know, they throw in a number, I don't know, $1.4

13   billion, figure it sounds high enough to scare anyone.  But

14   they have nothing, zero discussion as to how they get to that

15   number, what the harm is.

16       There's a couple of generic senses about, oh, lost

17   interest and lost harm.  Zero itemization in any way, shape or

18   form of what is the harm.  And I think frankly, the reason is

19   because they can't quantify it.  There is no harm.

20       And then I think that takes us to the next problem, which

21   is public policy.  There are a lot of cases and a lot of

22   decisions, probably more than I can count about the importance

23   of finality in bankruptcy and the importance of finality

24   particularly of Chapter 11 plans.  Now -- and enforcing those

25   plans as written.  And what they are doing, Your Honor, what

1    they are seeking to do, is turn the plan on its head with

2    respect to our claim.  And solely our claims.  And that is, the

3    plan provided very specific treatment for us, and what they are

4    saying is, "Well, you know what?  The plan's just sort of a

5    frame work.  As long as we give you something close, no harm,

6    no foul."  And the public policy is very strong that says you

7    can't disturb the plan.  And they are seeking to turn it on its

8    head.  And frankly, the public policy, I believe, strongly

9    weighs in favor of us.  And I think the policy -- related

10   policy, although it flows into a couple of different prongs is

11   the risk of mootness.

12       Now 2nd Circuit in its _Gucci_ decision, which we cite in

13   our papers, you know, noted the extreme harm that happens when

14   parties don't have the opportunity to get appellate review.

15   Now they said it doesn't mean that you get a stay in every

16   case.  But they did write to alert Judges that said there is

17   harm in having things closed immediately and not having

18   appellate rights.

19       We just saw this frankly, in the _Adelphia_ Chapter 11 case

20   where the District Court granted a stay subject to a bond,

21   because the District Court said, how can it be that the

22   Bankruptcy Court is the only Court in America where there is no

23   appellate review?  I get reviewed every time -- every time I

24   issue a decision I know people are going upstairs.  How is it

25   that the Bankruptcy Court has a free pass that people can go to

27

1   the Bankruptcy Court, get an order, and then it's a race

2   against the clock and as long as they get -- as long as they

3   can beat any Appellate Court Judge decision it's moot and

4   there's no review.  And I think that, while it goes to

5   reparable harm, it also goes to public policy that there has to

6   be a -- there cannot be a public policy that says the

7   Bankruptcy Court is the only Court that has absolutely no

8   appellate review, and as long as the Debtor can pull the

9   trigger fast enough, if Creditors are aggrieved, so be it.

10            THE COURT:  You know, I've been on the bench a little

11  over six years and I've always felt like there's appellate

12  review, and a lot of it, to boot.  I don't know.  Maybe there

13  are other people who feel differently.

14            MR. KAPLAN:  I think, Your Honor, in certain

15  circumstances I would agree, but I think Your Honor would agree

16  that when it comes to Confirmation Orders that the general view

17  of bankruptcy practitioners is don't worry about an appeal

18  because it will become equitably moot.

19            THE COURT:  Well, unless you get a stay in this

20  circuit you may be right.

21            MR. KAPLAN:  Right.  And on 363 sales -- I mean,

22  there are certain orders, and I think this falls into that

23  gamut.  I would agree with Your Honor.  A settlement in the

24  middle of the case, there are a lot of things of which there is

25  appellate review.  But on a lot of issues of great import, of

1  which this is since it's enforcing the terms of a plan, that

2  will be mooted.  We already got mooted out on our confirmation

3  appeal.  On that same valuation issue I talked about.  Well we

4  got mooted out on that because, you know, stay was denied, and

5  oh, well, now the stock's at 37 and we would have avoided the

6  last three years of fighting had the valuation not turned out

7  that way.

8         And with respect to this issue, we should not find

9  ourselves once again having a plan that is being -- you know,

10 with the rug being pulled out from under us and no appellate

11 review.

12         THE COURT:  Thank you.

13         MR. KAPLAN:  Thank you, Your Honor.

14         MR. PIZZURRO:  Morning, Your Honor, Joseph Pizzurro,

15 Curtis, Mallet-Prevost, Colt & Mosle for the Reorganized

16 Debtor, NorthWestern Corporation.  Very interesting Your Honor.

17 When Your Honor pointed out the problem with the relief sought

18 in the context of the order granted below I heard Mr. Kaplan

19 said, "We're not really looking to enjoin the merger.  They may

20 -- NorthWestern may construe it that way.  But we're really not

21 seeking to enjoin the merger."  Now aside from the fact that

22 their order, proposed order says enjoin the merger --

23         THE COURT:  Clearly.

24         MR. PIZZURRO:  -- aside from the fact that every

25 single argument, every one of their arguments, on the merits,

1    on irreparable injury, on the public interest, on lack of

2    injury to NorthWestern or anyone else, all has to do with the

3    predicate relief of enjoining the merger, right?

4        Let's say we take them at their word. Let's say that

5    that's all they want. Where's the irreparable injury if the

6    Court denies the injunctive relief? How are they injured if

7    the transfer agent has to sit on the cash for some period of

8    time until they can get the District Court to review this

9    Court's determination? They're not. They simply are not.

10   None.

11       Now is there any irreparable injury to any other party?

12   Well, possibly. There is possibly liability on the part of the

13   transfer agent. $116 million of cash? How is that to be

14   invested, how is that to be, you know, put to use? What

15   possible liability could there be to the beneficiaries of those

16   funds? Yes, there is injury to others.

17       So if we take them at their word they are clearly not

18   entitled under any set of tests to the relief that they seek.

19   But let's forget what Mr. Kaplan said this morning and let's

20   focus on what they've argued up until Mr. Kaplan made that

21   point.

22       They argue they have to have an emergency injunction to

23   prevent this merger from going forward because otherwise these

24   poor folks are gonna end up with cash instead of stock. First

25   point on this, Your Honor, before I get to the tests is,

1   they're seeking equity from this Court.  They're seeking a

2   stay.  They're seeking an injunction.  And one of the old

3   equitable maxims is, equity aids the vigilant, and it will not

4   aid those who sleep on their rights.  Have they slept on their

5   rights?  Let's take a look.

6        April 26, 2006, AK is issued by NorthWestern which says

7   we're gonna do a cash-out merger.  A little over two weeks on

8   May 16 Counsel -- and this is all in their papers, Counsel

9   writes a letter to Counsel, Counsel for Magten and Law

10  Debenture write a letter to the Board of Directors of

11  NorthWestern saying, "Hey, there may be a problem here.  We

12  think that a cash-out merger is gonna violate terms of the

13  plan.  We're entitled to stock.  You better talk to us.  You

14  better settle with us or there might be problems."

15       Now, that letter is effectively ignored.  Did they bring a

16  lawsuit?  Did they bring a lawsuit -- let's take Mr. Kaplan at

17  his word they were afraid or concerned if they went to the

18  District Court, if they went to the Montana Public Service

19  Commission, if they went to the Chancery Court, what were they

20  not doing here where they're now claiming this Court has the

21  ability to grant the relief?  Did they come here and seek an

22  injunction?  No.  They did nothing.

23       July 14, 2006, two months later.  They write another

24  letter to the Board of Directors, Counsel for the Board of

25  Directors of NorthWestern saying, "We understand there's going

1   to be a shareholders meeting on the 2nd of August to approve

2   this merger.  That is going to result potentially in a

3   violation of the plan.  We might have claims against members of

4   the Board of Directors.  You might have -- you will to have

5   terminate the merger agreement, because -- and you're gonna go

6   through the expense of having a shareholders meeting?  You

7   better not do it.  You better come and talk to us.  You better

8   buy us off."  That letter an effectively ignored.  Do they

9   bring an action in this Court seeking an injunction?  They do

10  nothing.

11      August 2nd, 2006, shareholder's meeting.  95% of the value

12  of the shares vote in favor of this merger, the shares which

13  are in the disputed claims reserve representing approximately

14  5% do not vote.  That's taken as a negative vote.  The merger

15  obviously is overwhelmingly approved.  Did they bring an action

16  here?  They do nothing.  They sit on their rights for 10

17  months.

18      And now, in the guise of seeking an emergency stay of this

19  Court's order permitting the investment of the funds by the

20  transfer agent, they say, they're entitled to an injunction.

21  There's no Court of which we are aware, whether it's in

22  Delaware in the Bankruptcy Court or anywhere else who would

23  permit Plaintiffs to sit on their rights, to threaten and

24  articulate the very claims that are the basis for this relief,

25  for 10 months do nothing, and on what they claim is the eve of

1  closing a billion dollar merger agreement come in and say, "Oh,

2  please grant us this emergency relief.  We're going to suffer

3  irreparable injury.  We're gonna have to take cash, shares

4  valued at $37 a share if you don't do this."

5      That in and of itself is a basis for denying this relief.

6  But let's look now at the traditional tests.  Mr. Kaplan says

7  that his client wants stock, they have a right to stock.  And

8  that's what he's fighting for here is stock.  What they're

9  fighting for here, Your Honor, is to hold up the company and

10 get a settlement.

11     Let's look at -- this dovetails very nicely with their

12 judicial estoppel argument.  Who's judicially estopped?  On the

13 9019 motion they argued when the objection to a settlement was

14 there aren't sufficient shares available to fund the entire

15 settlement, it was Magten that said, just give us cash.  Cash

16 is fine.  We like cash.  Please, give us cash.  And the

17 argument there that was made by NorthWestern and by the Plan

18 Committee was you can't give these people cash when no one else

19 is getting cash.  When everyone is being treated the same and

20 getting stock you can't get any cash.  And in fact the Judge at

21 the time said, "Look, I don't want to hear that because that's

22 not even part of the proposed settlement agreement."  But they

23 said, "We'd be happy to take cash."

24     Now they're here arguing cash isn't good enough.  We

25 really want to be shareholders in NorthWestern.  We want to

33

1   ride the upside of the stock.  Stock that has never traded,

2   even today, with a cash-out merger that's gonna close, isn't

3   even today trading publicly for as high as the merger price of

4   $37.

5       They don't want stock.  And they have no right to stock.

6   They have no right to be shareholders in NorthWestern.  What

7   they have a right to is to be compensated out of the disputed

8   claims reserve.  And they will be compensated out of the

9   disputed claims reserve.  And they haven't shown that there is

10  one wit of injury to them if this cash-out merger goes forward.

11      Let's look at the irreparable injury that would occur to

12  NorthWestern and to its shareholders.  If this merger is

13  enjoined, if it can't go forward, there's a distinct

14  possibility under the merger agreement, as pointed out by

15  Mr. Shiller, Counsel to Magten, when he wrote to the Board of

16  Director's Counsel in July of '06, the original agreement could

17  be terminated.

18      This is a billion dollar merger agreement, $37 a share,

19  95% of the shareholders overwhelmingly voting in favor of it,

20  and even that 5% is not -- even if they were to win, and

21  obviously we have a significant difference of opinion as to

22  whether or not there's any merit in their fraudulent conveyance

23  action, but even if they were to win, there is a significant

24  portion of that stock in the disputed claims reserve that they

25  will never get.  It will be surplus, and that surplus will have

34

1  to be distributed to the constituents of the Plan Committee.

2  And they're not gonna be able to get their $37 a share.

3      So we have the 95% of the shareholders who voted in favor.

4  We have the residual interest in the disputed claims reserve.

5  All of whom are gonna suffer irreparable injury if this is

6  granted.  And we have NorthWestern itself, which will have

7  suffered a termination of a merger agreement.  In fact, we

8  probably will have injury and undoubtedly to the Plaintiffs

9  here.  Because the shares -- it is inconceivable that shares

10  that have never traded even today as high as the cash out-

11  merger value, after this agreement if it were to create -- that

12  somehow it is going to rebound and there's gonna be such an

13  upside that there's gonna be even more of a windfall that they

14  are going to be able to reap if they are successful.

15      Finally, Your Honor, and I'll get to the merits in just

16  one second.  I don't want to really spend a lot of time arguing

17  the underlying merits.  But let me just touch on the public

18  interest here.  The public interest is clearly in seeing that

19  successfully reorganized Debtors are able to conduct their

20  business free and clear of the restraints of the Bankruptcy

21  Court or the Bankruptcy Code.  And NorthWestern, as we pointed

22  out in the papers, is one of the shining examples of a

23  successful reorganization.

24      This is a company which has not only paid off its

25  Creditors, many of those Creditors, including the Creditors

1    represented by these Plaintiffs if they're every successful,

2    have reaped a substantial windfall.  If they win our rough

3    calculation of -- put in the papers, and not to be bound by

4    this, but just to give the Court an idea of a claim which

5    discounted under plan value should have been worth tops $34

6    million.  They could be recovering $66.6 million.  That's my

7    rough math.  Based on 1.8 million shares at $37 a share.  And

8    what that highlights is not only the lack of any injury.  It

9    highlights how successful this reorganization has been.  It

10   highlights the fact that shares that were valued at $20, given

11   the equity value of the company at that time, have now --

12   they're trading around 35.  And the merger price, obviously, is

13   37.  And the public interest isn't to insuring that

14   corporations like NorthWestern are able to take advantage of

15   their status as Reorganized Debtors and be able to conduct

16   their affairs free and clear of any restraints.

17        On the merits, Your Honor, just very briefly.  We do

18   believe that not only are there sufficient provisions in the

19   plan itself which permit this merger, but there's certainly

20   nothing in the plan itself which prevents the merger.  And I

21   know of know case, although I'm quite certain if there was such

22   a case Magten's Counsel would have brought it to our attention,

23   in which a Court has enjoined a merger of a Reorganized Debtor

24   under any circumstances, but certainly not circumstances

25   similar to this one.  Because it somehow violated the terms of

1   the plan.

2       These folks are gonna get everything to which they're

3   entitled if they're successful below.  We don't believe they

4   will be, but that's not an issue for this Court.  And they will

5   suffer no irreparable injury.  There will be substantial injury

6   to NorthWestern and its constituent shareholders.  And by the

7   way, not to leave out of the equation BBI, which will suffer

8   substantially if this deal breaks because of the injunction.

9   Unless the Court has questions.

10          THE COURT:  I do not.

11          MR. PIZZURRO:  Thank you, Your Honor.

12          THE COURT:  Does the Plan Committee wish to be heard?

13          MS. PHILLIPS:  Very briefly, Your Honor.  Margaret

14  Phillips of Paul, Weiss, Wharton & Garrison on behalf of the

15  Plan Committee.  We agree with NorthWestern's position that,

16  you know, first this is not the proper forum to seek an

17  injunction of the merger agreement.  And also that Movants

18  haven't demonstrated any of the four conditions required for a

19  stay pending appeal.

20      In particular we don't believe that they can demonstrate,

21  nor have they demonstrated that they will suffer any harm

22  because they're -- they will receive cash as opposed to stock.

23  And in fact, Mr. Kaplan pointed out today that when the 9019

24  Motion failed at hearing they actually asked for stock.  I mean

25  -- sorry -- they actually asked for cash.

1    If a stay is granted there will be harm to Creditors and

2  other parties-in-interest as Mr. Pizzarroe pointed out.  It

3  puts the merger itself in jeopardy, the shareholders and the

4  constituents of the Plan Committee which are entitled to a

5  surplus distribution if the claim of Magten is ever resolved.

6  So there are in fact constituents out there that will be harmed

7  if the stay of the merger, or of the order that was actually

8  entered by Your Honor gets stayed.

9    And to the extent the Court considers the stay, we believe

10 that there must be a bond.  A bond is the rule not the

11 exception.  Mr. Kaplan pointed out what recently happened in

12 the <u>Adelphia</u> situation.  There was in fact a stay, plus a

13 significant bond.  So it's not as if Court's recognizing the

14 importance of an Appellate's rights don't also recognize the

15 importance of mitigating the harm to other parties that will be

16 impacted by that stay.

17    So in sum we ask that the Emergency Motion for Stay be

18 denied, and to the extent there is any consideration that there

19 will -- that the Court will grant the stay that will be a

20 significant bond posted.  Thank you.

21           THE COURT:  Thank you.

22           MR. KAPLAN:  Your Honor --

23           THE COURT:  I'll have brief rebuttal.

24           MR. KAPLAN:  Thank you, Your Honor.  Just a couple of

25 points.  First, on the estoppel point that Magten argued for

38

1    cash in the 9019 context.  The difference then was we were

2    faced -- we had a settlement that gave us less than the amount

3    of our -- the maximum amount of our allowed claim.  And we came

4    to Court and were told, "Gee, there were calculation errors.

5    We don't have the stock in the reserve."  Even though again,

6    our claim is $50 million, they were supposed to reserve enough

7    to give us, then we found out there's not enough stock.  And we

8    were faced with a settlement that gave us less than the $50

9    million to which we're entitled, and they said there's no --

10   not enough stock to give you.

11        Under those circumstances where there -- where under the

12   plan, and again, we subsequently filed an 1144 Motion to revoke

13   confirmation because there was supposed to be enough stock

14   there.  In that circumstance we said, "Hey, if you can't give

15   us to stock to which we're entitled you got to give us cash,

16   you got to give us something."  And we heard, "No, no, no, no,

17   no.  Stock is stock.  Cash is cash.  Two very different things.

18   You cannot in any way, shape or form talk about getting cash.

19   If there's not enough stock, well, we'll figure that out

20   somehow, and you know, that's your problem.  But no way you can

21   get cash."  So I don't think -- while they tried to turn

22   judicial estoppel on this it frankly doesn't work.

23        In terms of the argument that we've been sitting on our

24   hands.  The Debtors owe fiduciary duties to us.  We put them on

25   notice multiple times.  As Mr. Pizzurro said, they ignored us.

1    If you look at the timing.  They filed the motion at the

2    beginning of December.  They had announced from the beginning

3    they were looking at a closing in the second quarter of this

4    year.  There was still plenty of time for us to take action, be

5    it in seeking an injunction or elsewhere when the motion was

6    filed.  But they brought it before Your Honor instead.  Once

7    they brought it in front of Your Honor and had the exact issue

8    teed up they took away, a) the ability for us to seek an

9    injunction because they would have undoubtedly said, hey that's

10   before -- those issues are before the Bankruptcy Court.  So

11   those issues -- they teed them up in December, months before

12   the issue was ripe.  And months before would have been too late

13   for us to seek relief.  So I don't think they can sit here

14   having come in in December, months before the transaction was

15   supposed to close, say, oh, gee, well where were you?  Well, we

16   were responding to the motion.

17            THE COURT:  Well, when is the transaction due to

18   close?

19            MR. KAPLAN:  I think Mr. Pizzurro can answer that

20   better.  My understanding is that it will probably will -- it

21   won't close in March, probably close in April.  Mr. Pizzurro

22   can tell me if he --

23            THE COURT:  Well, let me ask you this.  Isn't it

24   better then to ask for a stay in March or April?  I mean, isn't

25   it your burden to tell me -- I mean, it's -- if something were

1    to happen tomorrow isn't that different than something that

2    might happen two months from now?

3         MR. KAPLAN:  Well, the issue we have is -- what they

4    have said in all of their papers and their public filings is

5    they're waiting for one regulatory approval.  That's Montana

6    Public Service Commission.  Montana Public Service Commission

7    is beginning its hearings on March 14th.  And we don't know

8    whether that will be a one-day hearing or longer.  NorthWestern

9    has said, "Well, our expectation is it might take them a

10   while."  But we could find ourselves on March 14th with the

11   MPSC signing off on the transaction March 15th with the

12   closing.

13        So we have the burden of -- it's the issue again of things

14   can happen so quick, and it goes back to the 2nd Circuit

15   decision in Gucci with wire transfers that one day may not be

16   enough.  That we could find out on the 14th, read a press

17   release that said the MPSC has authorized it, and on the

18   morning of the 15th have the transaction closed.

19        So all I know is that they have a hearing that starts on

20   the 14th.  It could end.  They could -- I don't know if there

21   are disputes with the MPSC that can be settled.  But we can

22   find ourselves by March 15th with a closed transaction.  And so

23   we can't come any later than today.

24        Other points, and this goes to the point that we're asking

25   for more.  I would strike that language in -- ask -- it's

1    certainly broad.  No harm in asking.  Again, I understand that

2    all we can ask for is a stay of the order.  If they still

3    believe that they can go forward with the merger then that's

4    fine.  That's the risk that they take.  But what I believe is

5    going to happen here is that we're going to find ourselves --

6    were that to happen and let's say we then sought to stop the

7    transaction, I have no doubt -- I think we can say with

8    absolute certainty that they will come in and say, no,

9    collateral estoppel.  That issue's already been litigated about

10   whether it violates the plan.

11       And that's the problem is they're gonna use it both ways.

12   They're gonna say, "Well, no, no, no, no, the Judge already

13   decided that.  That's off the table.  You can't argue whether

14   or not it violates the plan."  And then they say,  "Well, but

15   this order is very limited and it only deals with what is the

16   -- what does LaSalle do with the cash?  They can't have it both

17   ways.  I they are there's no preclusive affect, no binding

18   affect on anything and it was just sort of advisory, you know,

19   ruminations by Your Honor with respect to whether this violates

20   the plan or not.  Or we're going to find ourselves facing a bar

21   to litigating this elsewhere.  And that's a problem that's

22   intolerable for us, and they can't have it both ways.

23              THE COURT:  Thank you.

24              MR. KAPLAN:  Thank you, Your Honor.

25              THE COURT:  All right.  I'm prepared to make my

1   ruling.  In preparation for today's argument I went back to

2   reorganize NorthWestern's motion, which sought the relief as it

3   was styled in aid of execution of its confirmed plan.  And I

4   look at paragraph 2 where it says, Relief Requested.  Part of

5   the paragraph says the following.  "NorthWestern seeks an order

6   from the Court providing direction to the transfer agent

7   holding the new common stock in the disputed claims reserve for

8   investing the funds received which must be tendered for each

9   share of new common stock upon the effectiveness of the merger

10  agreement, plus any dividends paid on such shares, prior to the

11  effective date of the merger agreement between NorthWestern and

12  Babcock & Brown.  Through this motion NorthWestern is not

13  seeking permission to affect the merger with Babcock & Brown.

14  The merger will become effective pursuant to controlling

15  Delaware law following applicable approvals as noted in

16  paragraphs 6 and 7 below."

17      The order that I entered on February 1st says in part that

18  the motion is granted.  And in paragraph 2 the order says,

19  among other things, is that, "The transfer agent shall invest

20  all cash proceeds it receives from Babcock & Brown

21  infrastructure limited in connection with the merger agreement

22  with respect to the new common stock held in the disputed

23  claims reserve plus any dividends paid on such stock prior to

24  the effective date of the merger agreement in one or more

25  interest bearing money market accounts with Federally regulated

43

1   depository institutions in the United States in accordance with
2   11 U.S.C. section 345.  Such proceeds and all interest thereon
3   -- earned thereon after the effective date of the merger
4   agreement shall be distributed in accordance with the plan."
5       The relief that was requested and the relief that was
6   granted was that narrow.  Now, I acknowledge that as part of
7   the analysis that the Court undertook in determining to grant
8   that relief was a determination about whether there was
9   anything in the plan which prohibited the relief that was
10  requested, and or which was inconsistent with the plan.
11      I was not asked to approve the merger.  I suppose it might
12  have been argued that, and was argued really that because the
13  relief that was requested was inconsistent with whether a
14  merger could occur under the plan, the relief shouldn't have
15  been granted.  And I suppose it could be argued that if I had
16  determined that a merger was inappropriate I might not have
17  granted the relief.
18      In any event, the relief that was requested and the relief
19  that was granted was as narrow as I've just read from the
20  motion and the order.  And the fact that the Movants now are
21  asking for in essence a stay of the merger tells me that the
22  Debtors here are right when they argue that what's being
23  requested is something far beyond a stay of the order that I
24  entered.  And which is now subject to an appeal.
25      But even if I were to disagree with that and to look at

1   the substance of the relief requested in light of the standard

2   that has to be imposed, and that is in the 3rd Circuit under

3   the <u>Republic of Philippines v. Westinghouse</u> decision which is

4   reported at 949 Fed 2d. 653.  "The Court must consider the

5   following factors.  Whether the stay applicant has made a

6   strong showing that he is likely to succeed on the merits;

7   whether the applicant will be irreparably injured absent the

8   stay; whether issuance of the stay will substantially injure

9   the other parties interested in the proceeding; and where the

10  public interest lies."  All four factors must be met.

11      And as I look at the factors individually, beyond, beyond

12  the fact that I do think the Debtor's right that the relief

13  that's requested doesn't match the order, which is the subject

14  of the appeal, I look at first likelihood of success.  Now the

15  cases that the Debtor discusses say there's a fairly high

16  threshold in making that determination.  And not unlike Motions

17  for Reconsideration where a Court is being asked to doubt the

18  correctness of a decision, I don't generally impose upon the

19  party seeking that type of relief a very high burden.  That's

20  what the Appellate Court ultimately will decide.

21      But if I turn to the other issues, the other elements of

22  the standard, beginning with irreparable harm, I see no

23  irreparable harm here.  Counsel for the Movants here conceded,

24  as he must, that had stock been issued the Claimants here would

25  be nonetheless required to give it up under the terms of the

45

1    cash-out merger in any event.  I look at the other side, and

2    that is harm to others, and it seems to me that to hold up a

3    merger under these circumstances, even if it were appropriate,

4    would visit undue harm to the shareholders and the Creditors of

5    the Debtor here.  And I think public policy weighs strongly in

6    favor of denying this relief.  Because, as the Debtor I think

7    here has correctly argued supported by the Plan Committee, it

8    fosters the distribution of value to Creditors of this Estate,

9    which ultimately is the overriding goal in Chapter 11

10   reorganization.

11          Is there a Form of Order that the Debtors have for me to

12   sign?

13          MR. PIZZURRO:  No, we'll send one over.

14          THE COURT:  All right.  You'll have another shot at

15   the District Court.  I'll say only this to the Movants here.

16   Both at the hearing where the relief was granted to the Debtors

17   and here -- I mean, you've argued a position which I think is

18   not tenuous, gosh, about as well as it could possibly be

19   argued.  Whether that gives you or your clients any solace I

20   can't say.  Are there any questions?

21          ALL:  (No verbal response).

22          THE COURT:  All right, thank you.  That concludes

23   this hearing.  Court is adjourned.

24          (Court adjourned)

25

46

```
 1              CERTIFICATION
    I certify that the foregoing is a correct transcript from the
 2  electronic sound recording of the proceedings in the above-
    entitled matter.
 3

 4  _____          2-26-07
    Signature of Transcriber           Date
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT M

IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| NORTHWESTERN CORPORATION, | : | Case No. 03-12872 (KJC) |
| | : | |
| Reorganized Debtor. | : | Ref. Docket No. _3600, 3581, 3591_ |
| | : | |

## ORDER DENYING EMERGENCY MOTION OF MAGTEN ASSET MANAGEMENT CORPORATION AND LAW DEBENTURE TRUST COMPANY FOR A STAY PENDING APPEAL OF ORDER IN AID OF EXECUTION OF PLAN OF REORGANIZATION

Upon consideration of the Emergency Motion of Magten Asset Management Corporation and Law Debenture Trust Company for a Stay Pending Appeal of Order in Aid of Execution of Plan of Reorganization (the "Motion"); and a hearing (the "Hearing") having been held with respect to the Motion; and the Court having heard the statements of counsel regarding the relief requested in the Motion at the Hearing; and the Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and due notice of the Motion having been given under the circumstances, it is hereby ORDERED as follows:

1.      The Motion is DENIED for the reasons set forth on the record at the Hearing.

2.      This Court shall retain jurisdiction to hear and determine all matters arising from the interpretation or implementation of this Order.

Dated: February 22, 2007

Honorable Kevin J. Carey
United States Bankruptcy Judge

# EXHIBIT N

Marjorie L. Thomas
Dick and Thomas, P.C.
17 South Main St.
P.O. Box 645
Butte, Montana 59703

Attorneys for Intervenors


DEPARTMENT OF PUBLIC SERVICE REGULATION
BEFORE THE PUBLIC SERVICE COMMISSION
OF THE STATE OF MONTANA

*****

| | | |
|---|---|---|
| IN THE MATTER of the Joint Application | ) | |
| In Compliance with Consent Order and | ) | UTILITY DIVISION |
| Required Notification of Northwestern | ) | |
| Corporation and Babcock & Brown | ) | DOCKET NO. D2006.6.82 |
| Infrastructure Limited, BBI US Holdings | ) | |
| Pty Ltd., BBI Holdings II Corp. and BBI | ) | |
| Glacier Corp. pursuant to Commission | | |

**PETITION FOR INTERVENTION
OF
LAW DEBENTURE TRUST COMPANY OF NEW YORK, AS INDENTURE
TRUSTEE
AND
MAGTEN ASSET MANAGEMENT CORPORATION**


LAW DEBENTURE TRUST COMPANY OF NEW YORK, AS INDENTURE

TRUSTEE (INDENTURE TRUSTEE) and MAGTEN ASSET MANAGEMENT

CORPORATION (MAGTEN) hereby petition the Montana Public Service Commission

(MPSC) for Intervention in the above-entitled Docket, pursuant to Administrative Rules

of Montana (ARM) § 38.2.2403(1) and the Procedural Order, Order No. 6754, issued by

the MPSC on July 20, 2006. Petitioners are interested persons with legally protectable

interests and requests party status with respect to the above-entitled application for

approval of the sale and transfer of NorthWestern Corporation to BBI.

Petitioner makes the following statements in support of its intervention:

1.  Petitioners' names, addresses and telephone numbers:

LAW DEBENTURE TRUST COMPANY OF NEW YORK, INDENTURE TRUSTEE

Phone: 202-750-6474
Patrick J. Healy, Vice President/Trust Officer
400 Madison Avenue
New York, New York, 10017

MAGTEN ASSET MANAGEMENT CORPORATION

Phone: 212. 813.0900
Talton R. Embry, Principal and Managing Director
410 Park Avenue
New York, NY 10010

2.  Petitioner's attorneys' names, addresses, phone numbers and emails addresses are:

COUNSEL FOR PETITIONERS:

Marjorie L. Thomas
Dick and Thomas, P.C.
17 South Main St.
P.O. Box 645
Butte, Montana 59703
Phone: 406-723-2345
Fax No.: 406-723-0118
marjoriethomas36@msn.com

COUNSEL FOR MAGTEN ASSET MANAGEMENT CORPORATION

Bonnie Steingart
Gary Kaplan
Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, New York 10004-1980
Direct Line: 212-859-8004
Fax No.: 212 859-8583
steinbo@ffhsj.com

COUNSEL FOR LAW DEBENTURE TRUST COMPANY, AS INDENTURE TRUSTEE

John V. Snellings
Nixon Peabody LLP
100 Summer Street
Boston, Massachusetts 02110
Direct Line: 617-345-1202
Fax No.: 866-947-1732
jsnellings@nixonpeabody.com

THE GENERAL POSITION OF THE INDENTURE TRUSTEE AND MAGTEN

1.      Petitioners are currently pursuing litigation against NorthWestern Corporation and others in the U.S. District Court for the District of Delaware arising from NorthWestern's acquisition of the Montana utility assets from its wholly-owned subsidiary, Clark Fork and Blackfoot in 2002 (the "Going Flat Transaction"). The Indenture Trustee is the successor trustee to The Bank of New York as trustee under that certain Indenture, dated as of November 1, 1996, as amended from time to time, by and between The Montana Power Company, a Montana corporation (the "Montana Power") and The Bank of New York as trustee, pursuant to which, among other things, Montana Power issued certain 8.45% Junior Subordinated Debentures (the "Debentures") in the original aggregate principal amount of Sixty-Seven Million, Ten Thousand, Three Hundred Twenty-Five and 00/100 Dollars ($67,010,325.00), to Montana Power Capital I which then issued certain 8.45% Cumulative Quarterly Income Preferred Securities, Series A (the "QUIPS"). While Magten is a substantial holder of QUIPS, there remain numerous individual holders of QUIPS many of whom reside in Montana and neighboring states. Magten is a corporation validly organized and doing business under the laws of the State of Delaware. Magten holds in excess of 40% of the QUIPS. Pursuant to NorthWestern's chapter 11 plan of reorganization, holders of the QUIPS will be entitled to receive shares of NorthWestern's common stock once the litigation pending

in the Delaware District Court is resolved in favor of Petitioners (whether through a settlement or a judgment).

Petitioners' position is that NorthWestern Corporation used admittedly false financial statements when it acquired the Montana utility assets from its subsidiary Clark Fork; caused Clark Fork to fraudulently convey the Montana utility assets to NorthWestern Corporation; has failed to resolve its obligations to QUIPS holders; and failed to consummate an agreed to settlement with Magten and the Indenture Trustee that NorthWestern said was in the best interests of the company while Mr. Hanson, CEO of NorthWestern and former CEO of Montana Power, and others responsible for the actions and sales have received and anticipate receiving substantial additional bonuses. Please refer to the letter to the Commission from Magten, dated December 20, 2006, which is attached as Exhibit "A" and is hereby made a part of this Petition. The issues being pursued by Petitioners in the Delaware litigation relate to issues that have previously been before the Commission and that should be addressed at this time. In its Order No. 6474a, dated January 24, 2003, a copy of which is attached as Exhibit "B", the Commission noted concerns with respect to NorthWestern's accounting practices and noted that NorthWestern had adopted a "wholly inappropriate" incentive plan for its senior executives. Thereafter, in April 2003, NorthWestern issued a press release announcing that it was restating its financial statements because it had overstated its assets by approximately $900 million. A copy of the press release is attached hereto as Exhibit "C". On August 13, 2003, the MCC petitioned the MPSC to initiate a financial investigation of Northwestern. That investigation was settled by a Stipulation and Settlement Agreement dated July 8, 2004. Although the July 8, 2004 Stipulation and

Settlement Agreement resolved the outstanding issues between the Commission and NorthWestern, the same underlying issues have not been resolved with the holders of the QUIPS. The Commission should insure that in approving this transaction, NorthWestern rectifies all prior issues.

Therefore, Magten and the Indenture Trustee request that the Commission condition the sale on NorthWestern's satisfaction of outstanding claims of QUIPS holders in a manner consistent with its obligation under its chapter 11 plan of reorganization, which required NorthWestern to set aside shares of NorthWestern's common stock to satisfy such claims.

**PETITIONERS HAVE A LEGALLY PROTECTABLE INTEREST DIRECTLY AFFECTED BY THIS DOCKET.**

4.     Petitioners have a legally protectable interest in this Proceeding as they have claims against NorthWestern and its officers for engaging in wrongdoing in connection with the Going Flat Transaction and will receive shares of NorthWestern common stock once Petitioners' claims are resolved. The holders of the QUIPS provided essential financing to permit NorthWestern Corporation (and its predecessors) to operate its utility business and to ensure quality of service to the consumer. The Commission should not approve further disposition of these assets (and the additional compensation that will be paid to management at the time of the sale) without ensuring that NorthWestern has resolved all outstanding disputes with those parties that provided financing to NorthWestern. No other intervenor in this Docket is concerned for the creditor's interests.

INTERVENTION WILL NOT DELAY OR PREJUDICE THE PROCEEDING.

5.      The Petitioners for Intervention will not delay or prejudice the existing parties to this proceeding.  The Petitioners seek to intervene as the proceeding exists and does not seek to file testimony unless the proceeding is delayed and other parties (KELP and YELP) are allowed to file testimony.  The Petitioners will not seek access to protected information.  The Petitioners seek to cross-examine the NorthWestern witnesses about information that has been provided in the record as it relates to the issues set out above.

THE PETITIONERS HAVE GOOD CAUSE AS TO WHY THE INTERVENTION WAS NOT TIMELY FILED.

6.      Petitioners did not file for intervention earlier as they had held the belief that their issues would be resolved in other forums.  However, because there has been no such resolution and because NorthWestern has urged Petitioners to intervene in these proceedings, the Petitioners to seek to protect their interests before the Commission.  When Petitioners raised its concerns with the transaction before the bankruptcy court, NorthWestern argued that:

> If the [Petitioners] wish to enjoin the merger they should proceed in a forum other than this Court and in another manner other than through the Emergency Stay Motion . . .  The proper procedure would be to seek an injunction under Delaware law in the Delaware Courts as reorganized NorthWestern Corporation is a Delaware Corporation.  *The [Petitioners] could also intervene and appear before any of the regulatory authorities, specifically including the Montana Public Service Commission ("MPSC"), to raise issues and voice their displeasure with the proposed merger.*

As is clear from the revised scheduling order concerning the Merger Agreement before the MPSC and the certificate of service attached thereto, neither Magten nor Law Debenture have chosen to specifically intervene in that proceeding.

See Reorganized Northwestern Corporation's Brief in opposition to the Emergency Motion of Magten Asset Management Corporation and Law Debenture Trust Company for a stay pending appeal of Order in Aid of Execution of Plan of Reorganization [Re: Docket No. 3581] (emphasis added).

Petitioners hoped that the matter can be resolved without having to burden the Commission, but NorthWestern's continued recalcitrance regarding the QUIPS along with its arguments that Petitioners' issues should be addressed before this Commission left Petitioners with no alternative other than to intervene in these proceedings.

Petitioners anticipate that NorthWestern will object to this intervention and requests that they be given the opportunity to reply and that the response and reply times be expedited so that a final order may be issued before the Pre-hearing Memorandums are due on March 8, 2007.

RESPECTFULLY REQUESTED this 23rd day of February, 2007.

DICK AND THOMAS, PC

By: _____
        Marjorie L. Thomas
        Attorney for Petitioner

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on the 23rd day of February, 2007, I hand delivered a true and correct copy of the foregoing Petition for Intervention of LAW DEBENTURE TRUST COMPANY OF NEW YORK, AS INDENTURE TRUSTEE and MAGTEN ASSET MANAGEMENT CORPORATION to the following:

Montana Public Service Commission (Original plus 10 copies)
1701 Prospect Avenue
P.O. Box 202601
Helena, Montana 59620-2601

And mailed this date to the service List in this Docket.

_____
P.O. Box 645
Butte, Montana 59703

# EXHIBIT O



NorthWestern Corporation | NWEC

Portfolio Tracking Ticker Alerts

InfoQuotes

News | Price Charts | Hoovers Profile | Annual Report | Stock Consultant

Stock Report | Company Filings | Holdings/ Insider | Equity Options | Extended Trading | Guru Analysis | Company Financials

**Mar. 2, 2007 Market Closed**
**Common stock**

**Market : NASDAQ-GS**

| | | | |
|---|---|---|---|
| **Last Sale:** | **$ 36.01** | Net Change: | 0.30 ▼ 0.83% |
| Share Volume: | 201,685 | Previous Close: | $ 36.31 |
| Today's High: | $ 36.35 | Today's Low: | $ 35.99 |
| Best Bid: | $ 35.86 | Best Ask: | $ 36.26 |
| 52 Week High: | $ 36.66 | 52 Week Low: | $ 30.07 |
| P/E Ratio: | 36.01 | Shares Outstanding: | 35,622,000 |
| Earnings Per Share (EPS): | $ 1 | Market Value: | $ 1,282,748,220 |
| NASDAQ Official Open Price: | $ 36.06 | Date of Open Price: | Mar. 2, 2007 |
| NASDAQ Official Close Price: | $ 36.01 | Date of Close Price: | Mar. 2, 2007 |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | |
| | : | Chapter 11 |
| NORTHWESTERN CORPORATION, | : | |
| | : | |
| Reorganized Debtor. | : | Case No. 03-12872 (KJC) |
| | : | |
| _____ | : | _____ |
| | : | |
| MAGTEN ASSET MANAGEMENT CORP. | : | |
| and LAW DEBENTURE TRUST | : | |
| COMPANY OF NEW YORK, | : | |
| | : | |
| Appellant, | : | |
| | : | |
| v. | : | Civil Action No. 07-114-JJF |
| | : | |
| NORTHWESTERN CORPORATION, | : | |
| | : | |
| Appellee. | : | |

**MEMORANDUM ORDER**

Pending before the Court is the Emergency Motion Of Magten
Asset Management Corporation And Law Debenture Trust Company Of
New York For (I) A Stay Pending Appeal Of Order In Aid Of
Execution Of Plan Of Reorganization And (II) Expedited Appeal
(D.I. 2). By their Motion, Appellants, Magten Asset Management
Corporation ("Magten") and Law Debenture Trust Company Of New
York ("Law Debenture"), request the Court to issue a stay
delaying NorthWestern Corporation from consummating a Merger
Agreement with Babcock and Brown Infrastructure Limited ("BBI")
pending Appellants' appeal of the February 1, 2007 Order (the
"Order") of the Bankruptcy Court captioned "Order In Aid Of
Execution Of Plan Directing Transfer Agent To Invest Proceeds
Received From Stock Tender Upon Consummation Of Merger In

Accordance With 11 U.S.C. § 345."

The Bankruptcy Court's Order authorizes LaSalle Bank, N.A., the transfer agent holding shares of new common stock in the Disputed Claims Reserve, to invest the cash proceeds it receives from BBI in connection with the merger into interest bearing money market accounts in accordance with 11 U.S.C. § 345. The Order further provides that any proceeds and interest earned from the investment shall be distributed in accordance with the Plan, and the transfer agent is relieved of any requirement that it post bond in conjunction with the investment of the proceeds, as it might otherwise be required to do under Section 345 of the Bankruptcy Code.

Appellants contend that the Bankruptcy Court's Order impermissibly amends NorthWestern's substantially consummated Chapter 11 Plan, because the Plan does not provide or allow for cash to be substituted for shares in the Disputed Claims Reserve. Appellants contend that they will be irreparably harmed if a stay of the merger is not granted pending this appeal, because NorthWestern is actively seeking regulatory approval for the merger which will result in the cash-out of the stock and the mooting of any appeal of the Bankruptcy Court's Order authorizing the cash-out. Appellants also contend that since they are the only parties with disputed claims having an entitlement to the shares in the Disputed Claims Reserve, they will not be treated

2

the same as other creditors who have already received pro rata shares of NorthWestern's new common stock.

NorthWestern opposes a stay and any expedited treatment of this appeal. NorthWestern contends that its Aid of Execution Motion did not request Bankruptcy Court approval for the merger and did not seek approval to tender and convert shares in the Disputed Claims Reserve. Rather, the Aid of Execution Motion was only directed to the transfer agent's authority to invest the cash proceeds of the merger after the conversion of the shares. Thus, NorthWestern contends that the Court lacks jurisdiction to enjoin the merger through this appeal.

NorthWestern also contends that Appellants' application for an emergency stay is barred by laches, because they were aware of the merger ten months ago but took no action, thereby creating the need for "emergency relief." NorthWestern contends that Appellants have not demonstrated a likelihood of success on the merits of the appeal and the balance of harm weighs in favor of NorthWestern because a stay would impair the successful completion of its reorganization through the merger. In this regard, NorthWestern points out that if the merger cannot close by April 26, 2007, the Merger Agreement may become subject to termination. NorthWestern also contends that the shareholders of both NorthWestern and BBI will be harmed because the market price of NorthWestern's stock would likely decline and BBI's investment

3

of time and resources would be jeopardized.  According to NorthWestern, Appellants' true motivation behind this appeal is to threaten high damage to NorthWestern in order to maximize their leverage to facilitate a settlement of their Disputed Claims.

Pursuant to Federal Bankruptcy Rule 8005 and case law interpreting the rule, this Court may stay an order of the Bankruptcy Court if the party moving for the stay demonstrates 1) a strong likelihood of success on the merits of the appeal; 2) that the movant will suffer irreparable harm if the stay is denied; 3) substantial harm will not be suffered to non-moving parties if the stay is granted; and 4) the stay will not harm the public interest.  In re Polaroid Corporation, 2004 WL 253477, *1 (D. Del. Feb. 9, 2004).  No single factor is dispositive, and the Court must balance these factors in light of each particular case.

In the circumstances of this case, the Court concludes that Appellants have not demonstrated that a stay of the merger between NorthWestern and BBI is warranted.  As a threshold matter, this Court's jurisdiction to enjoin the merger through this appeal is questionable because the Order being appealed did not authorize the merger.[1]  However, even if the Court has

---

[1]     In denying the stay motion before it, the Bankruptcy Court acknowledged that Appellants were moving beyond the confines of the Bankruptcy Court's Order stating:

4

jurisdiction to enjoin the merger through a stay of the
Bankruptcy Court's Order pending appeal, the Court concludes that
Appellants have not demonstrated that the relevant factors weigh
in favor of a stay.  Appellants have not demonstrated a strong
likelihood of success on the merits of their appeal, and
Appellants have not demonstrated that they will suffer
irreparable harm if a stay is not granted.  Appellants contend
that they will be harmed, because their appeal of the Bankruptcy
Court's Order may become moot if the merger moves forward.
However, the mootness of Appellants' appeal is not, in and of
itself, sufficient to constitute irreparable harm.  In re Global
Home Prods., LLC, 2006 WL 2381918 (D. Del. Aug. 17, 2006).

     Further, Appellants have not demonstrated that their right
to obtain recovery on their claims will be impaired absent a
stay.  Indeed, Appellants have repeatedly expressed a willingness
to accept cash in lieu of NorthWestern new common stock in
satisfaction of their Disputed Claims and have not demonstrated
that the value they would receive for any Allowed Claims would be
different from the value that similarly situated creditors have

----

          The fact that the Movants now are asking for
          in essence a stay of the merger tells me that
          [NorthWestern] here [is] right when [it]
          argue[s] that what's being requested is
          something far beyond a stay of the order that
          I entered.

(D.I. 9, Pizzurro Aff., Ex. L, Transcript, 2/20/07 at 43).

5

received.  (D.I. 9, Pizzurro Aff., Ex. A at 10; Ex. B at 17; Ex. C at 17; Ex. D at 2.)

Moreover, the Court is persuaded that the harm resulting to NorthWestern, its shareholders and the other Allowed Claim holders outweighs any harm to Appellants.  The Allowed Claim holders are entitled to Surplus Distributions from the Plan and the Bankruptcy Court's decision in connection with the Aid of Execution Motion provides the Allowed Claim holders with the opportunity to earn interest on the Surplus Distributions.  In addition, the shareholders of NorthWestern approved this merger months ago and will likely suffer a devaluation of their stock if the merger is not allowed.

Lastly, the Court concludes that a stay of the merger between BBI and NorthWestern is not in the public interest, because it conflicts with the purposes and goals of reorganization.  A reorganized debtor may engage in business activities without the oversight of the Bankruptcy Court.  See e.g., Pettibone Corp. v. Easely, 935 F.2d 120, 122 (7th Cir. 1991).  NorthWestern is now a Reorganized Debtor trying to complete the reorganization process and finish making distributions to its creditors.  The public interest lies in having NorthWestern emerge from bankruptcy as quickly as possible, and in the Court's view, the merger between NorthWestern and BBI is another step that facilitates that goal.

6

In sum, the Court is persuaded that the balance of the relevant factors weighs against a stay of the merger between NorthWestern and BBI pending resolution of Appellants' appeal of the Bankruptcy Court's Order.  In these circumstances, the Court also concludes that expedited briefing of this appeal is not warranted.

NOW THEREFORE, IT IS HEREBY ORDERED that:

1.   The Emergency Motion Of Magten Asset Management Corporation And Law Debenture Trust Company Of New York For (I) A Stay Pending Appeal Of Order In Aid Of Execution Of Plan Of Reorganization And (II) Expedited Appeal (D.I. 2) is **DENIED**.

2.   The parties shall adhere to the following briefing schedule unless an otherwise agreed upon schedule is filed within **fifteen (15) days** of the date of this Order:

a.   Appellant's Opening Brief on appeal shall be filed within **fifteen (15) days** of the date of this Order.

b.   The Answering Brief on appeal shall be filed within **fifteen (15) days** of receipt of the Opening Brief.

c.   The Reply Brief on appeal shall be filed within **ten (10) days** of receipt of the Answering Brief.

March 9, 2007
DATE

UNITED STATES DISTRICT JUDGE

7