**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| NORTHWESTERN CORPORATION, | C.A. No. 03-12872 (KJC) |
| Reorganized Debtor. | Re: D.I. 3575 |

|  |  |
|---|---|
| MAGTEN ASSET MANAGEMENT CORP. and LAW DEBENTURE TRUST COMPANY OF NEW YORK, | |
| Appellants/Movants, | |
| v. | Appeal No. 07- 114-JJF |
| NORTHWESTERN CORPORATION, | |
| Appellee/Respondent. | |

## REPLY BRIEF OF APPELLANTS

**FRIED, FRANK, HARRIS,
SHRIVER & JACOBSON LLP**
One New York Plaza
New York, NY 10004
Telephone: (212) 859-8000
Facsimile: (212) 859-4000

- **and –**

**BLANK ROME LLP**
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 425-6400
Facsimile: (302) 425-6464

Counsel for Magten Asset
Management Corporation

Dated: April 19, 2007

**NIXON PEABODY LLP**
100 Summer Street
Boston, MA 02110
Telephone: (617) 345-1000
Facsimile: (617) 345-1300

- **and-**

**SMITH, KATZENSTEIN & FURLOW, LLP**
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 652-8400
Facsimile: (302) 652-8405

Counsel for Law Debenture Trust Company of
New York

120087.01600/40168388v.1

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................................................ 1

ARGUMENT ................................................................................................................................... 4

I.       THE BANKRUPTCY COURT ERRED IN GRANTING NORTHWESTERN THE
         AUTHORITY TO CASH OUT SHARES IN THE DISPUTED CLAIMS RESERVE. .... 4

         A.       The Exchange of Shares in the Disputed Claims Reserve for Cash Violates
                  Bankruptcy Code Section 1127(b). ........................................................................ 4

         B.       The Exchange of Shares in the Disputed Claims Reserve for Cash Violates
                  Bankruptcy Code Section 1123(a)(4). .................................................................... 7

         C.       Bankruptcy Code Section 1142(b) Did Not Authorize Entry of the Cash-
                  Out Order. ............................................................................................................. 10

         D.       Bankruptcy Rule 3020(d) Did Not Authorize Entry of the Cash-Out Order ......... 10

II.      THE BANKRUPTCY COURT ERRED IN FAILING TO FIND THAT
         NORTHWESTERN WAS JUDICIALLY ESTOPPED FROM ARGUING THAT IT
         MAY CASH OUT SHARES IN THE DISPUTED CLAIMS RESERVE. ...................... 11

CONCLUSION ............................................................................................................................. 15

120087.01600/40168388v.1

# TABLE OF AUTHORITIES

## FEDERAL CASES

Almeroth v. Innovative Clinical Solutions Ltd. (In re Innovative Clinical Solutions, Ltd.),
    302 B.R. 136 (Bankr. D. Del. 2003)...................................................................................4

Branchburg Plaza Assoc., L.P. v. Fesq (In re Fesq), 153 F.3d 113 (3d Cir. 1998).......................11

Consumers Realty & Dev. Co. v. Goetze (In re Consumers Realty & Dev. Co.), 238 B.R.
    418 (B.A.P. 8th Cir. 1999)................................................................................................9

In re Continental Airlines, Inc., 91 F.3d 553 (3d Cir. 1996)...........................................................4

GECC v. Dial Bus. Forms, Inc. (In re Dial Bus. Forms Inc.), 341 F.3d 738 (8th Cir.
    2003)....................................................................................................................................8

Hillis Motors, Inc. v. Haw. Automobile Dealers' Ass'n, 997 F.2d 581 (9th Cir. 1993)................8

Jones v. Keene Corp., 933 F.2d 209 (3d Cir. 1991).......................................................................9

In re Kmart Corp., 2005 Bankr. LEXIS 3151 (Bankr. N.D. Ill. Feb. 22, 2005).......................10 n.6

Montrose Med. Group Participating Sav. Plan v. Bulger, 243 F.3d 773 (3d Cir. 2001)...............12

New Hampshire v. Maine, 532 U.S. 742 (2001).......................................................................3, 13

Ocasek v. Manville Corp. Asbestos Disease Comp. Fund, 956 F.2d 152 (7th Cir. 1992)..............9

In re Roach, 824 F.2d 1370 (3d Cir. 1987).....................................................................................9

United States v. Lincoln Sav. Bank (In re Commercial Millwright Serv. Corp.), 245 B.R.
    603 (N.D. Iowa 2000).........................................................................................................8

## STATE CASES

The Union Ill. 1995 Investment Ltd. P'ship v. Union Financial Group, Ltd., 847 A.2d
    340 (Del. Ch. 2004).............................................................................................................8

## FEDERAL STATUTES

11 U.S.C. § 1123(a)(4) .........................................................................................................2, 3, 7, 11

11 U.S.C. § 1127(b).........................................................................................................2, 3, 4, 6, 11

11 U.S.C. § 1142(b)..................................................................................................1, 2, 3, 10, 10 n.6

28 U.S.C. § 2075 ...................................................................................................................................11

Fed. R. Bankr. P. 3020(d) ....................................................................................1, 3, 10, 10 n.6, 11

## MISCELLANEOUS

7 Collier on Bankruptcy, P 1142.03[2] (15th Ed. Rev. 2006) ........................................................10

Appellants Magten Asset Management Corporation ("Magten") and Law Debenture

Trust Company ("Law Debenture") respectfully submit this reply brief in further support of their

appeal from the Order In Aid of Execution of Confirmed Plan of Reorganization (the "Cash-Out

Order"), entered by the United States Bankruptcy Court for the District of Delaware (the

"Bankruptcy Court") on February 2, 2007.[1]

## PRELIMINARY STATEMENT

The issue presented by this appeal is straightforward: May NorthWestern be authorized

to amend its substantially consummated plan of reorganization (the "Plan") by substituting cash

for NorthWestern stock in the Disputed Claims Reserve for payment of Appellants' Class 9

claims? The Bankruptcy Court correctly held that such substitution was not permitted by section

1142(b) nor any other provision of the Bankruptcy Code. Once the Bankruptcy Court reached

this conclusion, it was reversible error for the Bankruptcy Court to authorize the Cash-Out Order

pursuant to Bankruptcy Rule 3020(d).

In its answering brief (the "Response"), NorthWestern argues that the relief it sought and

obtained from the Bankruptcy Court was solely limited to the grant of authority to invest cash

proceeds received upon consummation of the merger without posting a bond. NorthWestern,

however, ignores the fact that for the Bankruptcy Court to have entered the Cash-Out Order, it

was required to, and did, consider whether the stock in the Disputed Claims Reserve could be

converted to cash. Although NorthWestern styled the Cash-Out Motion as simply an

administrative request, it filed the motion seeking a determination by the Bankruptcy Court

---

[1] Capitalized defined terms used herein have the same meaning as set forth in Appellants' opening brief on appeal
(the "Opening Brief") unless otherwise specified.

regarding whether the effect of the merger (the substitution of cash for shares) was permissible under the Plan.[2]

Although NorthWestern argues that the Plan permits the merger, the language of the Plan is explicit that the sole currency to be paid to Class 9 claimants from the Disputed Claims Reserve is NorthWestern stock. By entering the Cash-Out Order, the Bankruptcy Court determined that the Plan could be modified to allow for substitution of cash for stock in the Disputed Claims Reserve. The Cash-Out Order thus violates section 1127(b) of the Bankruptcy Code, which prohibits modification of a substantially consummated plan. Further, exchanging the shares in the Disputed Claims Reserve for cash results in disparate treatment of Appellants' claims in violation of Bankruptcy Code section 1123(a)(4). Under the Plan, holders of claims in Class 9 are entitled to receive shares of stock, and those Class 9 claimants whose claims have been allowed have received stock. Because the trial on Appellants' claims is not scheduled to occur until after the merger is supposed to take place, Appellants will be forced to receive cash while all other Class 9 claimants will have received stock.

NorthWestern also fails to offer any applicable authority to justify entry of the Cash-Out Order. First, NorthWestern advances an argument that was flatly rejected by the Bankruptcy Court – namely, that Bankruptcy Code section 1142(b) permits the relief granted in the Cash-Out Order and allows NorthWestern to substitute cash for the shares in the Disputed Claims Reserve. The Bankruptcy Court correctly found that it could not rely on section 1142(b) because the Plan had already been substantially consummated.

---

[2] Notably, NorthWestern's purported purpose in filing the Cash-Out Motion is belied by its process for obtaining regulatory approval of the merger. Final briefing on NorthWestern's request for approval from the MPSE will not occur until May, and it is unlikely that NorthWestern will be granted such approval before June. There is no reason why NorthWestern would have filed the Cash-Out Motion in December of last year, six months before the merger could even happen, if all it was seeking was direction on what it could do with the merger proceeds.

2

Next, NorthWestern claims that the Bankruptcy Court properly entered the Cash-Out

Order pursuant to Bankruptcy Rule 3020(d). However, the Bankruptcy Court's reliance on

Bankruptcy Rule 3020(d) amounts to reversible error in light of its finding that neither section

1142(b) nor any other section of Bankruptcy Code permitted entry of the Cash-Out Order. It is

well-settled law that the Bankruptcy Rules cannot abridge, enlarge or modify the substantive

rights afforded by the Bankruptcy Code. Because the substitution of cash for shares in the

Disputed Claims Reserve contravenes sections 1127(b) and 1123(a)(4) of the Bankruptcy Code,

Bankruptcy Rule 3020(d) did not provide the Bankruptcy Court with the authority to enter the

Cash-Out Order.

The Bankruptcy Court also committed reversible error in failing to apply the doctrine of

judicial estoppel to NorthWestern. The Supreme Court has recognized that estoppel is necessary

to protect the integrity of the judicial process where a prevailing party in one proceeding

advocates a contrary position in a subsequent proceeding. New Hampshire v. Maine, 532 U.S.

742, 750-51 (2001). In connection with the 9019 Motion, NorthWestern successfully argued

before the Bankruptcy Court and this Court that Appellants' claims could only be satisfied with

stock.[3] The Bankruptcy Court then afforded NorthWestern an unfair advantage by allowing it to

turn around and prevail on the exact opposite argument in connection with the Cash-Out Motion.

Accordingly, the Cash-Out Order should be reversed based on the Bankruptcy Court's failure to

find NorthWestern judicially estopped from arguing that Appellants' claims could be satisfied by

any consideration other than stock.

---

[3] As discussed in the Opening Brief, the 9019 Motion was brought by the Appellants to enforce a global settlement agreement among Appellants and NorthWestern. The Bankruptcy Court denied the 9019 Motion and this Court affirmed on appeal. See App. Exhs. 53 and 82.

3

## **ARGUMENT**

## **I. THE BANKRUPTCY COURT ERRED IN GRANTING NORTHWESTERN THE AUTHORITY TO CASH OUT SHARES IN THE DISPUTED CLAIMS RESERVE.**

### A. The Exchange of Shares in the Disputed Claims Reserve for Cash Violates Bankruptcy Code Section 1127(b).

NorthWestern does not dispute, and thus concedes, that its Plan has been substantially

consummated and therefore may not be amended. Section 1127(b) of the Bankruptcy Code

imposes a bar to modification of a chapter 11 plan once substantial consummation has occurred.

See In re Continental Airlines, Inc., 91 F.3d 553, 570 (3d Cir. 1996) (section 1127(b)

"dramatically curtails the power of a bankruptcy court to modify a plan of reorganization after its

confirmation and 'substantial consummation.'"); Almeroth v. Innovative Clinical Solutions Ltd.

(In re Innovative Clinical Solutions, Ltd.), 302 B.R. 136, 144 (Bankr. D. Del. 2003) (finding that

1127(b) is the sole means for modifying a confirmed plan and that the plan could not be

modified because it had been substantially consummated); see also App. Exh. 82, p. 7 (wherein

this Court, affirming the Bankruptcy Court's ruling on the 9019 Motion, held that an amendment

to the Plan would be necessary to implement the settlement but that such an amendment was not

feasible, as the Plan had been substantially consummated.).[4] Here, the Cash-Out Order

impermissibly amends NorthWestern's substantially consummated Plan, which does not provide

or allow for cash to be substituted for shares in the Disputed Claims Reserve.

As set forth in the Opening Brief, the language in the Plan is explicit and unambiguous

that the only currency that can be held in the Disputed Claims Reserve is NorthWestern's

---

[4] References to items identified in Appellants' Designation of Items to be Included in the Record on Appeal and Statement of Issues to be Presented on Appeal of Magten and Law Debenture [Docket No. 11] are referred to as "App. Exh. __."

4

common stock. Section 4.9(c) of the Plan expressly entitles Appellants to receive stock, and

only stock, from the Disputed Claims Reserve:

> On the Effective Date, or as soon thereafter as practicable, each holder of an
> Allowed General Unsecured Claim . . . shall receive in full satisfaction,
> settlement, release, extinguishment and discharge of such Claim its Pro Rata
> Share of: (i) 32,660,000 shares of New Common Stock (such 32,660,000
> shares representing 92% of the New Common Stock issued and outstanding on
> the Effective Date prior to any dilution resulting from shares of New Common
> Stock issued pursuant to the New Incentive Plan and exercise of the Warrants),
> plus (ii) the 505,591 shares of New Common Stock allocated to Class 8(b) if
> Class 8(b) as a class, votes to reject the Plan.

App. Exh. 9, p. 40. Likewise, Section 7.6 of the Plan entitles Appellants to receive stock and any

interests earned from the stock as if their claims became allowed on or before the date

NorthWestern emerged from chapter 11:

> The holder of a Disputed Claim that becomes an Allowed Claim subsequent to
> the Effective Date shall receive Distributions from the Disputed Claims Reserve
> as soon as practical following the date on which such Disputed Claim becomes
> an Allowed Claim pursuant to a Final Order. **Such Distributions shall be**
> **made in accordance with this Plan based upon the Distributions that would**
> **have been made to such holder under this Plan if the Disputed Claim had**
> **been an Allowed Claim on or prior to the Effective Date plus any interest,**
> **dividends or other Distributions earned thereon.**

App. Exh. 9, p. 59 (emphasis added). By permitting the substitution of cash in the Disputed

Claims Reserve for NorthWestern's common stock, the Bankruptcy Court has impermissibly

modified sections 4.9 and 7.6 of the Plan to provide that while all other holders of Class 9 Claims

will have received their pro rata share of stock, Appellants will receive cash.

NorthWestern ignores the relevant Plan provisions and instead directs this Court's

attention to section 7.5 of the Plan, which provides for the maintenance of the Disputed Claims

5

Reserve but does not specify the currency to be held in the reserve.[5] Thus NorthWestern argues that conversion of shares in the Disputed Claims Reserve is not prohibited by the Plan but may be permitted because it deals with a matter on which the Plan is silent. Response at 15. However, NorthWestern's exclusive focus on section 7.5 of the Plan is misleading. Sections 4.9 and 7.6 of the Plan explicitly provide that Appellants are to receive stock upon the allowance of their claims, and the Cash-Out Order modifies these sections in contravention of section 1127(b) of the Bankruptcy Code.

NorthWestern also argues that other sections of the Plan give it the right to enter into the merger by allowing NorthWestern to freely operate its business and acquire and dispose of assets. See Response at 21-22. However, while NorthWestern has the right to carry on its business affairs, it must conduct these affairs in a manner that is consistent with the provisions of the Plan and the Bankruptcy Code. NorthWestern does not dispute, and in fact has already recognized, these limitations on its latitude as a reorganized debtor. When NorthWestern wanted to provide for flexibility in undertaking future transactions, it included appropriate provisions in its Plan documents. For example, the agreement governing the warrants issued under the Plan includes a section providing that upon a merger or sale of the company, NorthWestern may elect to pay each holder of the warrants cash in lieu of the stock to which such holders would be entitled. See App. Exh. 98, Exh. Q, pp. 9-10. NorthWestern chose not to include in the Plan a similar mechanism to address future merger or sale transactions in connection with the Disputed

---

[5] Section 7.5 of the Plan provides that NorthWestern "shall maintain the Disputed Claims Reserve equal to the aggregate of any distributable amounts of Cash and New Common Stock equal to the relevant percentage of the Distributions to which holders of Disputed Claims would be entitled under this Plan if such Disputed Claims were Allowed Claims in the amount of such Disputed Claim or such lesser amount as required by a Final Order." App. Exh. 9, p. 59.

6

Claims Reserve. Further, NorthWestern has admitted that prior to, during, and immediately following confirmation of its Plan, NorthWestern was receiving and actively considering numerous offers to purchase the company and/or its assets. NorthWestern was fully aware of the possibility of a merger, and its intentional omission of a Plan provision that would enable it to cash-out shares in the Disputed Claims Reserve, whether or not the result of poor drafting, leaves NorthWestern with no other choice but to give Appellants stock upon allowance of their claims.

B.    The Exchange of Shares in the Disputed Claims Reserve for Cash Violates Bankruptcy Code Section 1123(a)(4).

Section 1123(a)(4) of the Bankruptcy Code provides that a plan must treat each claim of a particular class equally with other claims of the same class, absent consent to a less favorable treatment. As discussed in the Opening Brief, the tender of shares in the Disputed Claims Reserve in exchange for cash will result in non-consensual disparate treatment of claimants in Class 9. On one hand, there are Class 9 claimants whose claims have been allowed and who have therefore already received stock from the Disputed Claims Reserve. On the other hand, there are Appellants whose claims are not yet allowed but who will be forced to receive cash in lieu of stock upon allowance of their claims. A simple apples-to-apples comparison (stock versus cash) demonstrates the disparate treatment to Appellants.

NorthWestern attempts to confuse the issue and argues that Appellants are not being treated differently under the Cash-Out Order because (i) payment in shares does not offer any enhanced value over payment in cash and (ii) Delaware law requires conversion of the shares to cash in order to effectuate the merger. Both points are irrelevant. First of all, the standard under section 1123(a)(4) is equal treatment, not economically equivalent value. NorthWestern argues in vain that the Appellants are being treated equally because "they will receive a distribution of

7

cash from the Disputed Claims Reserve equal to the value of shares of New Common Stock they would have otherwise received from the Disputed Claims reserve under the terms of the Plan." Response at 2-3. Once again, NorthWestern's argument completely looses sight of the issue, which is limited to what currency Appellants are entitled to receive under the Plan and has nothing to do with what happens to that currency in the event of a merger. There is no question that the Plan could never have been confirmed if Appellants received cash while the remaining Class 9 claimants received stock. Merger or no merger, there is no conceivable basis under the Bankruptcy Code that would allow for a different result now.

Further, the operation of Delaware corporate law and its treatment of mergers have nothing to do with NorthWestern's contractual obligation to provide Appellants (once their claims are allowed) with the stock in the Disputed Claims Reserve as the only permissible form of relief under the Plan. See GECC v. Dial Bus. Forms, Inc. (In re Dial Bus. Forms Inc.), 341 F.3d 738, 743 (8th Cir. 2003) (once the plan is confirmed, it "acts like a contract that binds the parties that participate in the plan") (quoting United States v. Lincoln Sav. Bank (In re Commercial Millwright Serv. Corp.), 245 B.R. 603, 606 (N.D. Iowa 2000)); see also Hillis Motors, Inc. v. Haw. Auto. Dealers' Ass'n, 997 F.2d 581, 588 (9th Cir. 1993) (a reorganization plan should be construed as a contract).

It is true that under Delaware law, shares tendered on the effectiveness of a merger must be cashed out. See The Union Ill. 1995 Investment Ltd. P'ship v. Union Financial Group, Ltd., 847 A.2d 340, 366 (Del. Ch. 2004). The Bankruptcy Court apparently relied on this authority when it found that entry of the Cash-Out Order "grants [Appellants] the same rights they'd have under state law, which wouldn't permit them to hold onto the stock." See App. Exh. 112, p. 43

8

(lines 15-18). However, the operation of Delaware law in connection with the contemplated merger is the exact reason why the merger would result in a brazen violation of the Bankruptcy Code – the conversion of shares in the Disputed Claims Reserve upon the merger, as required by Delaware law, would impermissibly alter the treatment of creditors under NorthWestern's Plan, which has been confirmed by the Bankruptcy Court and substantially consummated.

The Third Circuit has recognized that "any state legislation that frustrates the full effectiveness of federal law is rendered invalid by the Supremacy Clause." In re Roach, 824 F.2d 1370, 1373 (3d Cir. 1987); Jones v. Keene Corp., 933 F.2d 209, 214 (3d Cir. 1991) ("if a provision of the [p]lan, a creature of federal law, conflicts with the law of a state and the state law 'frustrates the full effectiveness of federal law, [the state law] is rendered invalid by the Supremacy Clause.'") (internal quotations omitted); see also Consumers Realty & Dev. Co. v. Goetze (In re Consumers Realty & Dev. Co.), 238 B.R. 418, 426 (B.A.P. 8th Cir. 1999) (finding that the provisions of a confirmed plan will govern if contrary to state law); Ocasek v. Manville Corp. Asbestos Disease Comp. Fund, 956 F.2d 152, 154 (7th Cir. 1992) (holding that because the provisions of a plan bind all parties, the terms of the plan will govern and appellant cannot rest on contradictory Illinois state law for an award of interest). In entering the Cash-Out Order, the Bankruptcy Court improperly allowed Delaware corporate law to override the express terms of the Plan and the provisions of the Bankruptcy Code, obstructing the operation of federal law and undermining Congress' plenary power under the Supremacy Clause. Accordingly, the Bankruptcy Court should be reversed on this basis alone.

9

C.    Bankruptcy Code Section 1142(b) Did Not Authorize Entry of the Cash-Out Order.

NorthWestern brought the Cash-Out Motion under the guise of seeking to execute its

Plan pursuant to section 1142(b) of the Bankruptcy Code. Section 1142(b) provides in pertinent

part:

> The court may direct the debtor and any other necessary party to execute or
> deliver or to join in the execution or delivery of any instrument required to effect
> a transfer of property dealt with by a confirmed plan, and to perform any other
> act, including the satisfaction of any lien, that is necessary for the consummation
> of the plan.

The clear intent of section 1142(b) is to give the bankruptcy court the ability to enforce the

unperformed provisions of a confirmed chapter 11 plan, not alter the terms of the plan. See 7

Collier on Bankruptcy, P 1142.03[2] (15th Ed. Rev. 2006) ("While phrased broadly, section

1142(b) has its limitations and should not offer justification for a plan proponent to seek orders

beyond the scope of what may be accomplished by a chapter 11 plan or what is called for by the

particular chapter 11 plan."). As such, and as the Bankruptcy Court recognized, section 1142(b)

does not provide a basis for entry of any order that materially modifies the Plan. See App. Exh.

112, p. 43, (line 20) (stating that granting the motion under section 1142(b) would impermissibly

result in "too broad of a reading of the statute.").

D.    Bankruptcy Rule 3020(d) Did Not Authorize Entry of the Cash-Out Order.

While the Bankruptcy Court properly concluded that it had no authority to enter the

Cash-Out Order under section 1142(b) or any other section of the Bankruptcy Code, it erred in

finding that it had such authority under Bankruptcy Rule 3020(d).[6] It is black letter law that a

court may not use the Bankruptcy Rules to abridge, enlarge or modify the substantive rights

---

[6] Bankruptcy Rule 3020(d) is similar to Bankruptcy Code section 1142(b) in that both authorize the entry of post-confirmation bankruptcy orders to "ensure that reorganization plans are implemented." In re Kmart Corp., 2005 Bankr. LEXIS 3151, *17 (Bankr. N.D. Ill. Feb. 22, 2005) (quotation marks and citations omitted).

10

afforded by the Bankruptcy Code. See Branchburg Plaza Assocs., L.P. v. Fesq (In re Fesq), 153
F.3d 113, 116 (3d Cir. 1998) (finding that "when Congress accorded the Supreme Court
authority to promulgate the Bankruptcy Rules, it stated 'such rules shall not abridge, enlarge, or
modify any substantive right.'") (quoting 28 U.S.C. § 2075). As discussed above, the Cash-Out
Order violates section 1127(b), which prohibits modification of a plan that has been substantially
consummated, and section 1123(a)(4), which prohibits disparate treatment of similarly situated
claimants. Because the Bankruptcy Rules cannot be used to override sections 1127(b) and
1123(a)(4), the Bankruptcy Court erroneously relied on Bankruptcy Rule 3020(d) as the basis for
entering the Cash-Out Order.

Apparently recognizing that there is no basis to rely solely on Bankruptcy Rule 3020(d),
NorthWestern attempts to sidestep the Bankruptcy Court's error by arguing that the issue is not
properly before this Court. Instead, NorthWestern asserts that this Court need only determine
whether the Bankruptcy Court erred in "permitting the investment of cash proceeds of the shares
in the Disputed Claims Reserve" upon consummation of the contemplated merger. Response at
15. However, as noted above, NorthWestern misses the point. The simple fact is that sections
1127(b) and 1123(a)(4) the Bankruptcy Code prohibit NorthWestern from converting the shares
in the Disputed Claims Reserve into cash. Therefore, there can be no cash proceeds to be
invested.

## II. THE BANKRUPTCY COURT ERRED IN FAILING TO FIND THAT NORTHWESTERN WAS JUDICIALLY ESTOPPED FROM ARGUING THAT IT MAY CASH OUT SHARES IN THE DISPUTED CLAIMS RESERVE.

The Bankruptcy Court erred by not applying the doctrine of judicial estoppel to preclude
NorthWestern from arguing that cash in lieu of stock may be placed in the Disputed Claims

11

120087.01600/40168388v.1

Reserve. As set forth in the Opening Brief, judicial estoppel is appropriate under the following three-part test adopted by the Third Circuit:

> First, the party to be estopped must have taken two positions that are irreconcilably inconsistent. Second, judicial estoppel is unwarranted unless the party changed his or her position in bad faith--i.e., with intent to play fast and loose with the court. Finally, a district court may not employ judicial estoppel unless it is tailored to address the harm identified and no lesser sanction would adequately remedy the damage done by the litigant's misconduct.

Montrose Med. Group Participating Sav. Plan v. Bulger, 243 F.3d 773, 779-80 (3d Cir. 2001)

(quotation marks and citations omitted). Here, judicial estoppel is applicable under all the three prongs of the Third Circuit test. First, in connection with the 9019 Motion and prior failed settlement, NorthWestern took the position before the Bankruptcy Court and this Court that because the Plan was substantially consummated, Appellants could not receive any consideration other than stock in satisfaction of their claims. See App. Exh. 46, ¶ 65. Obviously, that position is irreconcilable from its current position that Appellants can receive cash in lieu of the shares to which they are entitled under the Plan. With respect to the second prong, NorthWestern changed its position in bad faith with the intent to further its own agenda and gain an advantage in the prior litigation, in which it was successful. Third, judicial estoppel would directly address the harm of allowing NorthWestern to substitute the shares in the Disputed Claims Reserve for cash, and there is no lesser sanction available that would adequately remedy the damage done by NorthWestern's conduct. Accordingly, the Bankruptcy Court erred in failing to find NorthWestern judicially estopped.

Rather than defending the Bankruptcy Court's erroneous determination on this point, NorthWestern attempts to turn the tables and argue that Appellants are the ones that should have been judicially estopped. NorthWestern claims that Appellants should not be able to argue that

12

that their claims can only be satisfied by stock because they previously took the position in connection with their opposition to the Plan and the 9019 Motion that their claims could be satisfied by payment in cash. Response at 23-4. However, there was no reason for the Bankruptcy Court to find that Appellants were judicially estopped because Appellants did not succeed on their prior position. The Supreme Court has recognized that judicial estoppel is only called for where a *prevailing party* in one proceeding advocates a contrary position in a subsequent proceeding:

> [C]ourts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled. Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations, and thus poses little threat to judicial integrity.

New Hampshire v. Maine, 532 U.S. at 750-51 (internal quotation marks and citations omitted).

Clearly, Appellants did not prevail in opposing confirmation of the Plan or in seeking to enforce the settlement pursuant to the 9019 Motion. Indeed, the Bankruptcy Court and this Court rejected Appellants' argument that their claims could be satisfied in cash once the Plan had been substantially consummated. The fact that the Bankruptcy Court dismissed this argument when it was advanced by Appellants and then accepted the same argument when it was advanced by NorthWestern is not grounds for judicial estoppel of Appellants. It is, however, grounds for judicial estoppel of NorthWestern.

There is no question that this Court and the Bankruptcy Court accepted and relied upon NorthWestern's prior position in making findings adverse to Appellants at the hearing to consider the 9019 Motion. See App. Exh. 56, p. 41 (lines 12-13) ("[T]here is not going to be any cash paid. That's not even contemplated by the agreement."). NorthWestern then managed to

13

persuade the Bankruptcy Court to adopt a contrary theory in order to facilitate the contemplated merger transaction. The Bankruptcy Court improperly permitted NorthWestern to gain an unfair advantage by asserting and prevailing on one theory in the earlier litigation and then asserting a completely contrary theory to advance its self-serving interests. Such error amounts to abuse of discretion and should be reversed to protect the integrity of the judicial process.

14

## CONCLUSION

For the foregoing reasons as well as those set forth in the Opening Brief, Appellants

respectfully request that this Court vacate the Cash-Out Order and grant such other relief as it

deems appropriate.


Dated:  Wilmington, Delaware
April 19, 2007

**BLANK ROME LLP**                                    **SMITH, KATZENSTEIN & FURLOW, LLP**


 /s/ Dale R. Dubé                                      /s/ Kathleen M. Miller
Dale R. Dubé (DE No. 2863)                  Kathleen M. Miller (DE No. 2898)
Bonnie G. Fatell (DE No. 3809)             800 Delaware Avenue, 7th Floor
David W. Carickhoff (DE No. 3715)       P.O. Box 410
1201 Market Street, Suite 800                 Wilmington, DE  19899
Wilmington, DE 19801                            Telephone:  (302) 652-8400
Telephone:  (302) 425-6400                     Facsimile:  (302) 652-8405
Facsimile:  (302) 425-6464

                                                                       -and-

      - and -
                                                        **NIXON PEABODY LLP**

**FRIED, FRANK, HARRIS, SHRIVER**       John V. Snellings
**& JACOBSON LLP**                             Amanda Darwin
Bonnie Steingart                                   100 Summer Street
Gary L. Kaplan                                    Boston, MA  02110
John W. Brewer                                    Telephone:  (617) 345-1201
One New York Plaza                              Facsimile:  (866) 947-1732
New York, NY 10004
Telephone:  (212) 859-8000                    Counsel for Law Debenture Trust
Facsimile:  (212) 859-4000                     Company of New York

Counsel for Magten Asset Management
Corporation

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of April, 2007, I served by hand delivery and

electronic filing the REPLY BRIEF OF APPELLANTS, using CM/ECF which will send

notification of such filing(s) to the following:

### BY EMAIL AND HAND DELIVERY

Neil B. Glassman, Esquire
Charlene D. Davis, Esquire
Eric M. Sutty, Esquire
The Bayard Firm
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899

Victoria Watson Counihan, Esquire
Dennis A. Meloro, Esquire
Greenberg Traurig LLP
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801

I also certify that, on this 19th day of April, 2007, I served the aforementioned document,

by e-mail and Federal Express, upon the following participants:

### BY EMAIL AND FEDERAL EXPRESS

Alan W. Kornberg, Esquire
Margaret A. Phillips, Esquire
Ephraim I. Diamond, Esquire
Paul Weiss, Rifkind, Wharton & Garrison
1285 Avenue of the Americas
New York, NY 10019

Steven J. Reisman, Esquire
Joseph D. Pizzurro, Esquire
Nancy E. Delaney, Esquire
Miriam K. Harwood, Esquire
Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue
New York, New York 10178-0061

Dale R. Dubé

Dale R. Dubé  (No. 2863)

120087.01600/40168388v.1

# TAB 1

LEXSEE 2005 BANKR. LEXIS 3151

**In re: KMART CORPORATION, et al., Debtors.**

**Chapter 11, Case No. 02 B 2474**

**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2005 Bankr. LEXIS 3151*

**February 22, 2005, Decided**

**COUNSEL:** [*1] For Kmart Corporation, Chicago, IL, Debtor: Andrew Goldman; Andrew N Goldman, Wilmer, Cutler and Pickering, New York, NY; Craig Goldblatt, Wilmer Cutler Pickering Hale & Dorr LLP, Washington, DC; David E Gordon, Barack Ferrazzano, Kirschbaum et al, Chicago, IL; Elisabetta G Gasparini; Eric R Markus, Washington, DC; George R Mesires, Barack Ferrazzano, Chicago, IL; George R Mesires, Gardner Carton & Douglas LLC, Chicago, IL; Gillian E Munitz, Barack Ferrazzano, Chicago, IL; Jon R Steiger, Quinn Emanuel Urquhart Oliver & Hedges, Los Angeles, CA; Joseph M Harrison, IV; Julie E Patterson; Kimberly J Robinson, Barack Ferrazzano, Chicago, IL; Lisa A Lynch; Michael J Canning, New York, NY; Michael Snyder; Michelle Bock; Patrick M McCarthy; Robert O Sands; Synde B Keywell, Keywell & Associates, Chicago, IL; Victoria F Maroulis, Quinn Emanuel Urquhart, Oliver etc, Redwood Shores, CA; William J Barrett, Barack Ferrazzano, Kirschbaum, Chicago, IL; William J. Barrett, Barack Ferrazzano, Chicago, IL.

For The Estate of Tony Roberts, Petitioning Creditor: Jeremy C Kleinman, Frank/Gecker LLP, Chicago, IL.

For Janet S Casciato-Northrup, Trustee: Wayne Kitchens, Houston, TX; William B Finkelstein, [*2] Hughes & Luce LLP, Dallas, TX.

For Zions First National Bank NA, Successor Trustee: Deborah M Gutfeld, DLA Piper US LLP, Chicago, IL; Jeffrey Weston Shields.

For Gannett Retail Advertising Group, Creditor Committee: Freeborn & Peters, Freeborn & Peters, Chicago, IL; Joseph D Frank, Neal Gerber & Eisenberg LLP, Two North LaSalle Street Ste, Chicago, IL.

**JUDGES:** SUSAN PIERSON SONDERBY, UNITED STATES BANKRUPTCY JUDGE.

**OPINION BY:** SUSAN PIERSON SONDERBY

**OPINION:**

### MEMORANDUM OPINION

This matter comes before the court on the Motion of DDR MDT Midway Marketplace LLC ("DDR") to Clarify this Court's April 15, 2003 Order Authorizing Assumption and Assignment of Certain Property to Wal-Mart (the "Motion"). For the reasons set forth herein, the Motion is denied for lack of jurisdiction.

### BACKGROUND

On January 22, 2002 (the "Petition Date"), Kmart Corporation and thirty-seven of its affiliates filed voluntary petitions for reorganization under chapter 11 of title 11 of the United States Code, *11 U.S.C. §§ 101 et seq.* (the "Code"). The court entered an order on the Petition Date providing for the joint administration of the estates pursuant to *Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.* [*3] On April 23, 2003, the court entered an order (the "Confirmation Order"') confirming the First Amended Joint Plan of Reorganization of Kmart Corporation and its Affiliated Debtors and Debtors-in-Possession (the "Plan"). The Plan became effective on May 6, 2003 (the "Effective Date").

In October of 1994, Kmart entered into a lease (the "St. Paul Lease") pursuant to which it leased approximately 114,000 square feet of retail space (the "Former Kmart Store") in the Midway Marketplace Shopping Center in St. Paul, Minnesota (the "Shopping Center") from DDR's predecessor-in-interest. There are a number of other retail stores in the Shopping Center, including one operated by Supervalu, Inc. as a "Cub" supermarket. The St. Paul Lease and all other leases of space in the Shopping Center are subject to a Reciprocal Easement Agreement regulating and restricting each tenant's use of its store ("REA").

The St. Paul Lease provides, in pertinent part,

> so long as the Supervalu Lease is in effect, except for [Supervalu/Cub], no portion of the Shopping Center will be occupied or leased as a supermarket, convenience food market, grocery store or department within a store or other store facility [*4] or department within a store for the retail or wholesale purveyance for off-site consumption of food, fruit, vegetables, dairy produces, cookies, candy, groceries, produce, bakery products, meats, and/or delicatessen products and/or other miscellaneous foods (excluding stores which primarily sell prepared sandwiches for on- or off-site consumption); provided, however that (i) the occupant of [the Former Kmart Store] shall be permitted to sell such items so long as no more than 7,500 square feet of Gross Floor Area, including aisles, nor more than ten percent (10%) of the lineal feet of shelving in such occupant's premises are used for the sale of such products, and so long as such items do not include any fresh baked goods or perishable fresh or frozen meat, fish, poultry, produce or diary products, which such occupant shall not sell. . .

Exhibit F. to St. Paul Lease, P 32.

On April 15, 2003, this court entered an order authorizing Kmart to, *inter alia,* assume, sell and assign the St. Paul Lease to Wal-Mart Stores, Inc. (the "Assignment Order") pursuant to *Section 365* of the Code. n1 The Assignment Order contemplated that Kmart's authorization to assign the St. Paul [*5] Lease would be pursuant to the terms of a proposed form Lease Assignment and Assumption Agreement attached as an exhibit to the Assignment Order. That form Agreement provided, *inter alia,*

> 3. Assumption of Leasehold Obligations, Assignee hereby accepts the foregoing assignment and covenants with Assignor, that from and after the Assignment Date, Assignee and its successors and assigns hereby assume and agree to keep, perform, fulfill or cause to be performed all of the terms, covenants, conditions and obligations contained in the Lease, which,

by the respective terms therein, are imposed upon Assignor.

> 4. Ratification of Lease. Assignor and Assignee hereby ratify, reaffirm and adopt and agree that the Lease shall be in full force and effect as to Assignee.

> n1 *Section 365* of the Code authorizes, *inter alia,* the trustee to assume and assign unexpired real property leases. *11 U.S.C. § 365(a).* The debtor in possession in a chapter 11 case has the rights of a trustee. *11 U.S.C § 1107(a).*

[*6]

On April 22, 2003, Kmart and Wal-Mart executed a Lease Assignment and Assumption Agreement with respect to the St. Paul Lease and a separate REA Assignment Agreement pursuant to which Kmart assigned its rights and obligations under the REA to Wal-Mart.

The Assignment Order also provides in the decretal portion at subparagraph (f),

> While the Court does not expressly decide the issue of whether the [Former Kmart Store] is part of a "shopping center" within the meaning of *Section 365*, all of the so-called "shopping center" provisions of the Bankruptcy Code with respect to the assumption of a shopping center lease have been satisfied in connection with the assumption and assignment of the [St. Paul Lease] and . . . the Purchaser's use of the premises is in a manner consistent with its typical retail operations.

Approximately one month after receiving the assignment of the St. Paul Lease, Wal-Mart commenced retail operations from the Former Kmart Store. DDR contends that Wal-Mart is currently selling grocery items, such as fresh and frozen meat, fish, poultry, produce and dairy products, in contravention of the use restrictions in the REA. Wal-Mart is also purportedly [*7] using more than the square footage allowable under the St. Paul Lease for the sale of non-perishable grocery items.

DDR sent Wal-Mart a letter dated May 28, 2004, with a copy to Supervalu's counsel, notifying Wal-Mart that it was in default under the St. Paul Lease and demanding that Wal-Mart "cease the sale of any and all

Case 1:07-cv-00114-JJF Document 23-2 Filed 04/19/2007 Page 4 of 9

Page 3

2005 Bankr. LEXIS 3151, *

items violating the 'prohibited uses' . . . of the REA." In response, Wal-Mart sent correspondence dated June 8, 2004, to Supervalu's counsel setting out Wal-Mart's position that the terms of the Assignment Order authorized it to operate the Former Kmart Store in a manner consistent with Wal-Mart's "typical retail operations," which include the present grocery sales. A similar letter dated June 9, 2004, was sent by Wal-Mart to DDR's counsel. Another letter dated June 21, 2004, was sent by DDR to Wal-Mart further elaborating DDR's position that Wal-Mart defaulted under the St. Paul Lease and advising that if Wal-Mart did not stop its continuing violation of the St. Paul Lease and REA, "[DDR] shall seek not only injunctive relief to ensure such compliance, but will also seek any damages, including attorneys' fees, arising from Wal-Mart's refusal to comply with the [*8] terms of the [St. Paul Lease] and REA." The last correspondence included in the parties' briefs is dated June 23, 2004 and was sent by Wal-Mart's bankruptcy counsel to DDR's counsel. The June 23 letter reiterated Wal-Mart's previous arguments, including its contention that DDR is precluded from complaining about the grocery sales because although DDR knew that such sales were part of Wal-Mart's "typical retail operations," it failed to object to the entry of the Assignment Order.

To date neither party has commenced a complaint to resolve their dispute. On July 14, 2004, DDR filed this Motion asking the court to clarify that the Assignment Order authorized the assignment *cum onere* and thus did not eliminate the use restrictions in the St. Paul Lease and the REA. Moreover, DDR requests the court to explain that none of the provisions of the Assignment Order, most particularly subparagraph (l) quoted above, should be construed to negate the REA use provisions so as to effectively give Wal-Mart *carte blanche* on what kind of groceries it can sell in the Former Kmart Store and how much of the store space can be devoted to its sale of groceries

In response to the Motion, Wal-Mart [*9] argues that the Assignment Order unambiguously authorized Wal-Marl to use the Former Kmart Store in a manner consistent with its "typical retail operations," which include selling the types of groceries it is currently selling at the store. Wal-Mart further contends that because the Assignment Order is now final and non-appealable, DDR is barred by *res judicata* from revisiting the issues, such as the purported elimination of the use restrictions, that were necessarily decided against DDR with the entry of the Assignment Order.

At the initial oral arguments on this matter, the court *sua sponte* raised the issue of whether it has subject matter jurisdiction over a motion brought more than a year after the entry of the Confirmation Order and the Effective Date of the Plan involving a dispute between a for-

mer Kmart landlord and a third-party assignee of a Former Kmart Store. The court asked the parties to provide supplemental briefs on the jurisdiction issue. The court also requested that the parties address whether the Motion seeks an advisory opinion given that the dispute thus far has been limited to the arena of competing correspondence.

## DISCUSSION

### Bankruptcy [*10] Subject Matter Jurisdiction

A bankruptcy court must determine as a threshold matter whether it has subject matter jurisdiction over a proceeding. *See In re Federated Dept. Stores Inc., 240 B.R. 711, 716 (Bankr. S.D. Ohio 1999).* Subject matter jurisdiction is generally defined as "the court's authority to hear a given type of case." *U.S. v. Morton, 467 U.S. 822, 828, 104 S.Ct. 2769, 2773, 81 L.Ed.2d 680 (1984).* "The jurisdiction of bankruptcy courts, like that of other federal courts, is grounded in, and limited by, statute." *Celotex Corp. v. Edwards, 514 U.S. 300, 307, 115 S.Ct. 1493, 1498, 131 L.Ed.2d 403 (1995). Section 1334(b) of title 28 of the United States Code* is the statutory source of bankruptcy jurisdiction and is thus the starting point for the bankruptcy judge to ascertain whether jurisdiction exists. *In re Cary Metal Products, Inc., 152 B.R. 927, 930 (Bankr. N.D. Ill. 1993), aff'd, Zerand-Bernal Group, Inc. v. Cox, 23 F.3d 159, 161 (7th Cir. 1994)(citing In re Spaulding & Co., 131 B.R. 84 (N.D. Ill. 1990)).*

*Section 1334* gives district [*11] courts original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11. Id.

> Bankruptcy judges "constitute a unit of the district court," *28 U.S.C § 151*, and the district court may refer to them "any or all proceedings arising under title 11 or arising in or related to a case under title 11." *28 U.S.C. § 157(a).* The jurisdiction of the bankruptcy courts is thus "derivative" because it flows from the statutory grant of jurisdiction to the district courts. To summarize, this jurisdiction includes the power to adjudicate proceedings "arising in," "arising under," or "related to" a case under title 11.

*In the Matter of FedPak Systems, Inc., 80 F.3d 207, 213 (7th Cir. 1996)*(citations omitted). The district courts in this district have referred proceedings "arising under," "arising in," or "related to" a case under title 11 to bank-

Case 1:07-cv-00114-JJF    Document 23-2    Filed 04/19/2007    Page 5 of 9

Page 4

2005 Bankr. LEXIS 3151, *

ruptcy judges. *See* Internal Operating Procedures of the Northern District of Illinois 15(a).

"Arising under" jurisdiction encompasses causes or actions "created or determined by a statutory provision of [*12] title 11." *Cary-Metal, 152 B.R. at 931.* "'Arising in' jurisdiction encompasses issues relating to administration of bankruptcy matters that arise only in bankruptcy cases." *In re Schwinn Bicycle Co., 210 B.R. 747, 754* (Bankr. N.D. Ill. 1997), *aff'd 217 B.R. 790 (N.D. Ill. 1997).* So, while a proceeding may not arise under a specific Code section, it may arise in the case if it "would have no practical existence but for the bankruptcy." *In re Conseco, Inc., 305 B.R. 281, 285 (Bankr. N.D. Ill. 2004)(citing A.H. Robins Co., Inc., 182 B.R. 128, 132 (Bankr. E.D. Va. 1995)).*

The Seventh Circuit has held that "[a] case is 'related' to a bankruptcy when the dispute 'affects the amount of property for distribution [i.e., the debtor's estate] or the allocation of property among creditors." *Fed-Pak, 80 F.3d at 213-14.* The Court further noted that,

> [w]e have interpreted 'related to' jurisdiction narrowly "out of respect for Article III . . . as well as to prevent the expansion of federal jurisdiction over disputes that are best resolved by state courts. *Home Ins. Co. v. Cooper & Cooper, Ltd., 889 F.2d 746, 749 (7th Cir. 1989);* [*13] *see also In re Kubly. 818 F.2d 643, 645 (7th Cir. 1987)(the "limited jurisdiction" of the bankruptcy court "may not be enlarged by the judiciary because the judge believes it wise to resolve the dispute."). Additionally, we believe that common sense cautions against an open-ended interpretation of "related to" statutory language "in a universe where everything is related to everything else." Gerald T. Dunne, *The Bottomless Pit of Bankruptcy Jurisdiction,* 112 Banking L.J. 957 (Nov.-Dec 1995).

*Id. 214.*

### Subject Matter Jurisdiction After Plan Confirmation in a Chapter 11 Case

Chapter 11 cases normally involve the restructuring or reorganization of debt through the proposal and confirmation of a plan of reorganization. *See In re Hall, 304 F.3d 743, 747 (7th Cir. 2002).* The chapter 11 case presents a concern regarding the extent of the jurisdiction of the bankruptcy court in the period after confirmation of the plan but prior to closing of the chapter 11 case, which may span months or even years.

There is no express statutory provision providing for a change in the nature of subject matter jurisdiction after [*14] plan confirmation. *Section 1334* of title 28 is still the operative jurisdictional statute after confirmation and its broad language is unchanged. The Seventh Circuit in Zerand-Bernal Group, Inc. v. Cox, observed, however, that while the language of *section 1334(b)* is broad enough to encompass matters such as the post-confirmation injunction sought in that case, the section should not be read so broadly. *23 F.3d 159, 161 (7th Cir. 1994).* Rather, the section should be construed in light of the purposes of its enactment. Id. After confirmation of the plan, the purpose of a bankruptcy case, *i.e.,* dealing efficiently and expeditiously with all matters connected with the bankruptcy estate, is diminished. The diminishment of the purpose effectively contracts the 1334 jurisdiction in the post-confirmation period. Indeed, bankruptcy .subject matter jurisdiction following confirmation of a chapter 11 plan has been described as "sharply reduced," *In re Spiers Graff Spiers, 190 B.R. 1001, 1007 (Bankr. N.D. Ill. 1996)(citing Pettibone Corp. v. Easley, 935 F.2d 120, 122 (7th Cir. 1991)),* and "limited" *Schwinn Bicycle, 210 B.R. at 754-55.* [*15]

This does not mean that there is no post-confirmation bankruptcy jurisdiction and the functions of the bankruptcy court are at an absolute end. Rather, the bankruptcy court retains jurisdiction to protect the confirmation order, prevent interference with the execution of the plan, and otherwise aid in the plan's operation. *Cary Metal, 152 B.R. at 932.* A number of Code provisions and Rules give bankruptcy courts authority to exercise that retained jurisdiction and are also indicative of the narrowed scope of post-confirmation jurisdiction. *See In re Kewanee Boiler Corp., 198 B.R. 519, 525 (Bankr. N.D. Ill. 1996)("[w]hether emanating from the general power of courts to enforce their decrees . . . or from specific bankruptcy code sections . . . there exists a residue, albeit limited, of court authority over a confirmed plan chapter 11 case.")

One such specific Code section is *1142(b),* which empowers a court to direct the debtor and any other necessary party to perform acts "necessary for the consummation of the plan." *11 U.S.C. § 1142(b).* This court observed in Cary Metal that the literal language of *section 1142(b)* [*16] "provides that particular point-in-time when post-confirmation jurisdiction ceases, the point at which a creditor's action will not affect the administration of the plan." *152 B.R. at 931-32.*

Another source of post-confirmation authority is found at *Federal Bankruptcy Rule 3020(d),* which provides: "Notwithstanding the entry of the order of confir-

mation, the court may issue any other order necessary to administer the estate." Finally, *section 105(a)* of the Code empowers bankruptcy judges to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Code and to *sua sponte* take any action or make any determination "necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." *11 U.S.C, § 105(a)*.

Again, however, a bankruptcy court's ability to invoke the powers given to it is limited to take only those actions that aid in its jurisdiction. *See Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 206, 108 S.Ct. 963, 969, 99 L.Ed.2d 169 (1988); In re Sybaris Clubs Intern., Inc., 189 B.R. 152, 156 (Bankr. N.D. Ill. 1995).* [*17] As noted above, jurisdiction is reduced after plan confirmation. Accordingly, the exercise of powers. whether under *sections 105(a)* or *1142(b)* or Bankruptcy *Rule 3020(d)*, should only be undertaken to "ensure that reorganization plans are implemented . . . and to protect estate assets devoted to implement the confirmed Plan." *Schwinn Bicycle, 210 B.R. at 754* (citations omitted).

Summarizing subject matter jurisdiction after plan confirmation, at least one conclusion can be reached. There is no bankruptcy jurisdiction over a postconfirmation dispute between non-debtor parties that concerns assets that are no longer property of the estate, has no effect on the estate and does not implicate the integrity or affect the implementation of the plan.

Both parties argue, however, that the court retains jurisdiction to interpret its orders into the postconfirmation period without qualification. Wal-Mart relies on In *Petrie-Retail, Inc., 304 F.3d 223, 230 (2nd Cir. 2002)* and *In re Cedar Chemical Corp., 294 B.R. 224, 229 (Bankr. S.D.N.Y. 2003)* for its argument that confirmation has no effect on the court's jurisdiction to interpret its own [*18] orders. This court is not entirely convinced that reliance on those cases for that argument is well placed. First, Petrie Retail involved a motion to enforce an injunction contained in a sale order as well as the discharge injunction in the plan of reorganization. Moreover, the dispute impacted consummation of the plan in that case. Indeed. the Second Circuit referred to the motion as the "Plan Consummation Motion." Petrie Retail thus involved more than a post-confirmation request for interpretation of a pre-confirmation order.

Cedar Chemical, which relies on Petrie Retail, makes no mention of whether a plan was confirmed in that case. Moreover, Cedar Chemical held that the court had core jurisdiction over a request to interpret an order even if the dispute is between non-debtors and the outcome had no effect on the estate. The dismissal of the effect on the estate analysis, at least in the postconfirmation period. as irrelevant appears antithetical to the law in this circuit. *See, Conseco, 305 B.R. at 283* (*citing In re FedPak Sys., Inc., 80 F.3d 207, 214 (7th Cir. 1996)*, for the proposition "that the bankruptcy court [*19] did not have jurisdiction to interpret its own order when resolution of the dispute would not affect the amount of assets available for distribution to creditors of the estate.").

## Is DDR's Motion within this Court's post-confirmation subject matter jurisdiction?

In this matter, the court concludes that it docs not have subject matter jurisdiction over this Motion. The post-confirmation dispute between these two non-debtor parties involves the interpretation of a prior order of this court, *i.e,* the Assignment Order and its possible preclusive effect. There is no apparent or urged need to interpret the Assignment Order to protect an estate asset "devoted" to the Plan. The Former Kmart Store is no longer part of the estate and serves no role in the implementation of the Plan. In addition. this court would not invoke the power to declare the preclusive effect of the Assignment Order given that such an analysis hardly appears necessary to ensure the implementation of the Plan. Moreover, as pointed out by the Seventh Circuit in Pettibone, the *res judicata* effect of an order entered in the first case is usually for the judge presiding in the second case to decide. [*20] *935 F.2d at 123*.

Neither party has sufficiently demonstrated that this court's interpretation of the Assignment Order or a determination of its preclusive effect would impact the amount of property available for distribution to or the allocation of property among Kmart's creditors. There is what can only be characterized as speculation offered by Wal-Mart that if the court were to clarify the Assignment Order unfavorably to Wal-Mart's position, it may be forced to file an action to rescind the sale. Wal-Mart acknowledges that such a rescission suit would be brought not against Kmart, but the new firm that exists postconfirmation. which the court will refer to as Reorganized Kmart. Consequently, Wal-Mart recognizes that the potential damages from such an action will not directly impact the creditors of Kmart's estate, many of whom received stock in Reorganized Kmart in exchange for their allowed claims pursuant to the Plan. The action may, however, conceivably impact the value of the stock. Wal-Mart contends that this potential indirect negative impact on the stock value. constitutes a sufficient effect to confer "related to" jurisdiction. Wal-Mart makes no attempt to [*21] estimate the likelihood of success of such an action or quantify the decrease in stock value if Reorganized Kmart were required to rescind the sale. For its part. Kmart states that the "outcome of the DDR v. Wal-Mart dispute will not directly affect the value of Kmart stock distributed to its creditors." Kmart's Sup-

plemental Pleading Addressing this Court's Post-Confirmation Jurisdiction to Adjudicate the Motion of DDR MDT Midway Marketplace LLC to Clarify this Court's April 15. 2003 Order Authorizing Assumption and Assignment of Certain Property to Wal-Mart, p. 5: P 7.

DDR stales that "it is not in a position to determine what Wal-Mart's remedies could be against Kmart and what effect, if any, there would be on the distribution to Kmart's creditors under the Plan." Supplemental Brief of DDR MDT Midway Marketplace LLC in Support of its Motion to Clarify this Court's April 15, 2003 Order Authorizing Assumption and Assignment of Certain Property to Wal-Mart Appellant (*sic*), p. 5. Rather. DDR "is simply asking this Court to clarify what the language in its own Order meant so that it can stop Wal-Mart from misusing this Court's Order." Id. at 4. That request is enough, according [*22] to DDR, to impart jurisdiction, even though it acknowledges that "any affirmative relief it would seek against Wal-Mart would be litigated in the appropriate forum, namely state court." Id.

The mere possibility of a rescission action may be insufficient to establish "relatedness." *See Zerand-Bernal, 23 F.3d at 159.* In Zerand-Bernal, the subject sale was the premise of the plan and the adversary complaint that threatened the rescission of the sale, and thus the undoing of the plan, was filed after the expiration of the 180-day deadline to revoke a plan. To the Court therefore, "the threatened rescission is no threat at all." Id. The Court observed, however, that it was an open question as to whether a threatened suit to rescind a bankruptcy sale that was *not* part of a plan could confer "related" jurisdiction and cited to competing opinions on that point. Id. (*citing Pacor, Inc. v. Higgins. 743 F.2d 984. 994-96* (3rd Cir. 1984: *In re G.S.F, Corp., 938 F.2d at 1474-76. In re Wolverine Radio Co., 930 F.2d at 1142-43*)).

Here, the assignment of the St. Paul Lease was approved before the entry [*23] of the Confirmation Order and was not incorporated into the Plan. The assignment was not by itself Tan integral aspect of the Plan and did not form the cornerstone of the Kmart reorganization efforts. There is no suggestion that the Plan is in jeopardy. Indeed, the only asserted impact on the Kmart creditors is a remote possibility of a decrease in stock value. Moreover, the possible reduced stock value to some extent assumes that Wal-Mart will be successful on the rescission lawsuit. Under all of these circumstances. there is too tenuous a thread of "relatedness" to the estate. *See, Schwinn Bicycle Co. 210 B.R. at 756.* n2

n2 Wal-Mart urges the court to analogize this situation to those cases that hold a potential positive impact on stock value constitutes a benefit for purposes of a trustee's ability to bring an avoidance recovery action brought pursuant to *section 550* of the Code. *See In re P.A. Bergner & Co., 140 F.3d 1111, 1118 (7th Cir. 1998), cert. denied 525 U.S. 964, 119 S. Ct. 409, 142 L. Ed. 2d 332 (1998)* and *In re Kmart Corp., 310 B.R. 107 (Bankr. N.D. Ill. 2004).* Those cases, however, were not decided on the issue of subject matter jurisdiction. Rather, they arose in the context of an affirmative defense brought by preference defendants against a trustee's statutory recovery action. The court considers the analogy not particularly persuasive.

[*24]

### Advisory Opinion

In this matter, the fact that the parties have not filed a formal complaint in this or any other court raises another jurisdictions! concern about the Motion. Specifically, the Motion may not present a real case or controversy ripe for consideration.

In a recent Sixth Circuit Bankruptcy Appellate panel opinion, the purchaser of a chapter 11 debtor's assets filed an adversary complaint with the bankruptcy court asking the court to determine that certain language in a bankruptcy sale order would prevent an account obligor from raising a defense in a future collection action. *In re Buckeye Steel Castings Co. Inc., 306 B.R. 186, 188 (6th Cir. BAP 2004).* In that case, the sale order authorized the debtor to sell accounts receivable and enjoined all persons from taking any action against the purchaser to recover claims they may have had against the debtor. After the sale was closed, the purchaser made a written demand to recover an account receivable. The obligor on the account indicated, presumably in response to the demand letter. that it would seek to sctoff against its liability on the account a claim that the obligor held against the debtor. [*25] Before any lawsuit was filed, however. the purchaser filed the adversary complaint, asking the bankruptcy court to declare up front that the attempted sctoff is barred by the terms of the sale order. The bankruptcy court dismissed the complaint for lack of jurisdiction because the issue was not ripe.

On appeal, the Bankruptcy Appellate Panel affirmed. In reaching its decision, the Panel explained the concept of ripeness:

The power of federal courts extends only to cases and controversies, *U.S. Const. art. III, § 2, cl. 1*, and this has been interpreted to mean that to be cognizable a federal court, a suit 'must be definite and concrete, touching the legal relations of parties having adverse legal interests. * * * It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, *as distinguished from an opinion advising what the law should he upon a hypothetical state of facts*.

*Buckeye Steel, 306 B.R. at 188 (6th Cir. BAP 2004)(quoting Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240-41, 57 S.Ct.461, 464, 81 L.Ed. 617(1937)*(emphasis in original)). The Panel held that, [*26]

> [t]he bankruptcy court's jurisdiction was thus invoked by CSC, a mere buyer of estate assets. in order for the court to give its opinion about whether a not-yet-raised defense to a not-yet-filed collection action in some other court might be something other than a recoupment. That issue is not ripe for adjudication upon hypothetical facts of a hypothetical case.

*Id. at 188-89*. To the Panel, the purchaser was attempting to gain the upper hand over the obligor by in essence preemptively attacking the anticipated defense so the obligor would be prevented or, at least, dissuaded from raising it in a future lawsuit.

A bankruptcy court in this district summarized the circumstances when an opinion is advisory,

> An advisory opinion results if the court resolves a question of law that is not presented by the facts of the case. *In re Chi., Rock Island & Pac. R.R. Co., 772 F.2d 299, 303 (7th Cir. 1985)*(finding that a court can decide "only the case before, it, and can not render advisory opinions disposing of other issues not presented for decision."). Likewise, a court's opinion on hypothetical statutes or "dubious constitutional principles . . [*27] . would be difficult to characterize as anything but advisory." *United States Nat'l Bank of Or.,*

*508 U.S. at 447, 113 S.Ct. 2173, 124 L. Ed. 2d 402*. Further, a decision that cannot affect the legal rights of the parties is an impermissible advisory opinion, as arc opinions on abstract legal questions. *See, e.g., In re Shondel, 950 F.2d 1301, 1309 (7th Cir. 1991); United States v. Peters, 754 F.2d 753, 757 (7th Cir. 1985)*. Finally, *"[a] dispute must have ripened into a legal case before a federal court can act. the case must not lie merely in the future." Jones v. Griffith, 870 F.2d 1363, 1366 (7th Cir. 1989)*.

*In re Outboard Marine Corp., 304 B.R. 844, 859-60 (Bankr. N.D. Ill. 2004)*(emphasis added). In the Outboard Marine case, a bank argued that a manufacturer's summary judgment motion seeking a declaration that it had a valid, first priority lien in certain equipment sought an advisory opinion. The court disagreed, finding that the motion was in the nature of a request for a declaratory judgment. The court noted that "[t]here is little doubt that [the manufacturer's] suit is 'an honest and actual [*28] antagonistic assertion of rights,' that 'valuable legal rights . . . [will] be directly affected to a specific and substantial degree.' and that, accordingly, this Court has before it a real case or controversy." Id. (*citing United States Nat'l Bank of Or., 508 U.S. at 446, 113 S.Ct. 2173*). The Outboard court's conclusion is supported by the fact that the summary judgment motion was brought in response to an adversary complaint pursuant to Bankruptcy *Rule 7001(2)* to determine the relative priority of liens in an estate asset. A ruling on the summary judgment motion could establish the rights of those litigants in estate property and dispose of a pending lawsuit.

Here, there is no complaint for a declaration of competing interests in estate property. As noted earlier, there is no estate property at issue here. DDR admits that it is not seeking affirmative relief from this court but plans on bringing a complaint against Wal-Mart in another court. It is reasonable to surmise that DDR is more likely to bring its future plans to sue Wal-Mart in another court to fruition if this court were to interpret the Assignment Order in DDR's favor. In any event, this [*29] court is concerned it is being put in the position of rendering advice to a future court on how to view the relative strengths of the positions of the parties before that court. This court also notes that if it were to find at Wal-Mart's urging that DDR is barred by *res judicata* from raising certain arguments, this court would be usurping a function usually reserved for the second court in the context of adjudicating an affirmative defense.

## CONCLUSION

For the foregoing reasons, this court concludes that it lacks subject matter jurisdiction over the Motion. The court further concludes that it lacks jurisdiction over the Motion which asks for a ruling on an issue not ripe for adjudication. Accordingly, the Motion is denied.

Date: FEB 22 2005

ENTER:

SUSAN PIERSON SONDERBY

UNITED STATES BANKRUPTCY JUDGE

**ORDER**

For the reasons stated in its Memorandum Opinion entered on this date, the court denies the Motion of DDR MDT Midway Marketplace LLC ("DDR") to Clarify this Court's April 15. 2003 Order Authorizing Assumption and Assignment of Certain Property to Wal-Mart for lack of jurisdiction.

Date: FEB 22 2005

ENTERED:

SUSAN PIERSON SONDHRBY

United States Bankruptcy [*30]  Judge